Andrea K. George
Federal Defenders of Eastern Washington and Idaho
601 West Riverside Ave., Suite 900
Spokane, Washington 99201
(509) 624-7606
Attorneys for Justice Forral

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
The Honorable Rebecca L. Pennell

United States of America,

Plaintiff,

v.

Justice Forral,

Defendant.

No. 2:25-cr-00113-RLP-2

Amended Motion for Judgment of Acquittal under Fed. R. Crim. P. 29 or Motion for New Trial under Fed. R. Crim. P. 33 or Motion to Dismiss under Fed. R. Crim. P. 12

## Table of Contents


INTRODUCTION .......... 4

BACKGROUND .......... 13

- I. The underlying facts .......... 13
- II. Prosecutorial proceedings .......... 20

ARGUMENT .......... 25

- I. The Court should enter a not guilty verdict under Rule 29 .......... 25
  - A. The legal standard in cases that implicate the First Amendment. .......... 25
  - B. The government presented insufficient evidence of a § 372 conspiracy. .......... 27
    - 1. An agreement to impede is not enough to prove a § 372 conspiracy; the government must also prove the agreement was to inflict injury or to use force, threats, or intimidation .......... 29
    - 2. The government presented legally insufficient evidence of an agreement to inflict injury or use force, threats, or intimidation .......... 31
    - 3. To the extent the government believes the tire-deflation episode is sufficient evidence of a § 372 conspiracy, it's not .......... 36
      - i. There was insufficient evidence of an agreement between Lang and Forral to let air out of the GEO Group bus's tire .......... 37
      - ii. An agreement to let air out of the GEO Group bus's tires is not § 372 conspiracy because the bus was not the property of a federal officer .......... 38
      - iii. Letting air out of a tire does not qualify as injuring property for purposes of § 372 .......... 43

4. An independent review of the record shows that the government's case crucially rested on criminalizing constitutionally protected speech and assembly ............ 45

II. The Court should vacate the judgment and grant a new trial under Rule 33 ............ 54

A. The evidence weighs heavily against the verdict. ............ 55

B. There is a grave risk that the verdict rests on constitutionally-impermissible grounds ............ 56

C. The prosecutor's misconduct during closing argument requires a new trial. ............ 59

D. The potential of a non-unanimous jury verdict requires a new trial. ............ 65

III. The Court should dismiss the indictment ............ 67

A. The Constitution prohibits the government from selectively prosecuting a defendant for arbitrary reasons, including for exercising First Amendment rights ............ 71

B. Former U.S. Attorney Barker has admitted that the government prosecuted Forral for an impermissible discriminatory purpose ............ 72

C. The proper remedy is dismissal with prejudice ............ 73

D. At minimum, discovery and an evidentiary hearing are warranted because Forral has shown a realistic likelihood of selectiveness ............ 75

CONCLUSION ............ 76

## Introduction

On June 11, 2025, hundreds of Spokane residents gathered outside the ICE field office on Cataldo Street to protest ICE's illegal[1] arrest and detention of Joswar Rodriguez Torres, a Venezuelan asylum seeker. This protest fell squarely into the long American tradition of civil disobedience. Except for a couple isolated episodes of vandalism and disorder, it overwhelmingly involved individuals engaged in nonviolent acts of civil disobedience (sitting in front of a bus, linking arms, refusing orders to disperse). "Nobody was really hurt. None of the protesters were hurt. Fortunately, none of the law enforcement officers were hurt either."[2]

Nevertheless, the government chose to prosecute multiple participants in this protest, including Forral, under 18 U.S.C. § 372—a law passed to address the existential violence of the Civil War and Reconstruction.

Section 372's predecessor—a proscription against conspiracies to use force, intimidation, or threats to prevent federal officers from discharging

---

[1] *See Torres v. Noem*, 2026 U.S. Dist. LEXIS 17366, at *8–10 (W.D. Wash. Jan. 29, 2026) (holding that Rodriguez Torres's arrest violated his Fifth Amendment rights and the Administrative Procedure Act).

[2] *Army Veteran Faces Conspiracy Charges after Participating in anti-ICE protest*, PBS News, (March 27, 2026) https://www.pbs.org/newshour/show/army-veteran-faces-conspiracy-charges-after-participating-in-anti-ice-protest (Richard Barker interview).

their duties—first appeared in the Conspiracies Act of 1861, which Congress enacted three months after secessionists fired on Fort Sumter. Concerned that conspirators plotting "treason or resistance" could not be arrested until their plot was "consummated by an overt act," Congress passed the Conspiracies Act as "a statute of prevention." *In re Charge to Grand Jury*, C.C. Mass., 30 F. Cas. 1049, 1051 (1861). The Act accordingly criminalized mere agreements to "forcibly . . . resist or . . . delay the execution of any law." *Id*. Violations "implie[d] force against the government as a government," *Baldwin v. Franks*, 120 U.S. 678, 693 (1887), and Congress attached "severe punishment" to these "high crimes," *In re Charge to Grand Jury*, 30 F. Cas. at 1051.

In 1871, Congress expanded § 372's scope. The impetus for amending § 372 was again existential; this time, the aim was to break the Ku Klux Klan's violent resistance to federal authority throughout the South. *See Stern v. United States Gypsum, Inc.*, 547 F.2d 1329, 1334-35 (7th Cir. 1977) (outlining legislative history for Ku Klux Klan Act); *see also* Cong. Globe, 42d Cong. 1st Sess., 116-17, 244. To accomplish this purpose, Congress added clauses criminalizing conspiracies to injure federal officers or their property on account of their performance of official duties—or to impede them in the

performance of those duties. *See* Cong. Globe, 42d Cong., 1st Sess., 477-78 (Congressman Shellabarger introducing the amendment that eventually becomes the Ku Klux Klan act).

In keeping with its origins, § 372 is, in one sense, extraordinarily broad: it criminalizes mere acts of agreement. Unlike the general conspiracy statute, § 372 does not require proof of an overt act. *See Whitfield v. United States*, 543 U.S. 209, 214, 219 (2005) (where text of statute "does not expressly make the commission of an overt act an element of the conspiracy offense, the Government need not prove an overt act to obtain a conviction"); *see also* Dep't of Just., Off. of Legal Counsel, Memorandum 77-68 re Conspiracy to Impede or Injure an Officer of the United States at 276 (Dec. 14, 1977), https://www.justice.gov/file/148151-0/dl. Instead, the agreement itself is the crime. And not just any crime: a federal felony—a "high crime" to which, at the time it was enacted, Congress attached notably "severe punishment." *In re Charge to Grand Jury*, 30 F. Cas. at 1051.

There is another sense, however, in which § 372 is quite carefully circumscribed. As its origins in anti-secessionist and anti-Klan violence reflect, Congress was careful to limit § 372's application to only the most serious anti-government conspiracies. To be guilty of violating § 372, a

defendant must agree not just to prevent or impede a federal officer from discharging their lawful duties—but specifically to do so through force, intimidation, or threat, or by injuring officers or their property. This latter requirement is "the crucial element separating legal innocence from wrongful conduct." *United States v. Ehmer*, 87 F.4th 1073, 1120 (quoting *Elonis v. United States*, 575 U.S. 723, 737 (2015)).

This "crucial element" breaks down into three categories: (1) an agreement to use force, intimidation, or threat; (2) an agreement to injure a federal officer; or (3) an agreement to injure a federal officer's property. Each of these categories has violence at its core. Section 372 thus draws a bright line between nonviolent civil disobedience (which it does not criminalize) and concerted efforts to violently resist federal authority (which it does). Under this distinction, the government may use § 372 to quell treasonous conspiracies before their plotted violence is unleashed. On the other hand, it cannot use § 372 where individuals have merely agreed to engage in the time-honored American tradition of civil disobedience in the face of laws they consider unjust.

But that is precisely what happened here. On June 11, 2025, Forral and other community members responded to ICE's unlawful arrest of Joswar

Rodriguez Torres by showing up at the ICE field office on Cataldo Avenue, where Rodriguez Torres was being held, and "thoughtfully risk[ing] arrest": sitting down in front of a transport bus, by linking arms in front of a parking lot exit, and gathering around a separate transport van. Exhibit 78. This is nonviolent civil disobedience.

Like most protests against government misconduct—and illegally detaining an asylum seeker certainly qualifies—the Cataldo protest involved vituperative but protected political speech: "vehement, caustic, and [even] unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). It also involved—what is, again, common during emotionally charged protests—isolated acts of disorder and vandalism.

Faced with this basic situation—civil disobedience, isolated acts of vandalism, all taking place against the backdrop of an illegal ICE arrest—the government has a couple of permissible options available to it. It may, of course, exercise its declination discretion not to prosecute and resolved to do a better job, going forward, of not illegally arresting people in the United

States.[3] It could have prosecuted individual lawbreakers for applicable federal crimes, such as destruction of federal property or federal assault. Or it could have worked with its partners in Washington State to pursue charges against a broader swathe of the protesters that actually fit their nonviolent acts of civil disobedience: charges like failure to obey a lawful order or obstructing the police.[4]

It didn't do any of this. Instead, the government doubled down on its aggressive illegality. It did so by bringing § 372 charges that branded the entire Cataldo protest as a violent anti-government conspiracy. It seized on the fact of civil disobedience, isolated acts of vandalism, and even clearly protected speech to weave a narrative of generalized, conspiratorial violence and disorder. It repeatedly urged the jury to infer a violent conspiracy against

---

[3] *See* Corey Arwood, *Why a VT's State Attorney isn't Charging Six People in ICE Raid Fallout*, Burlington Free Press (updated April 24, 2026), https://www.burlingtonfreepress.com/story/news/crime/2026/04/24/vermont-prosecutor-sarah-george-no-charges-ice-raid-protest-south-burlington/89763362007/; Nate Raymond, Kristina Cooke, and Brad Heath, *Courts have Ruled 4,400 Times that ICE Jailed People Illegally. It Hasn't Stopped.*, Reuters, (updated Feb. 17, 2026) https://www.reuters.com/legal/government/courts-have-ruled-4400-times-that-ice-jailed-people-illegally-it-hasnt-stopped-2026-02-14/.

[4] *Washington State Laws Most Relevant to Demonstrations & Protests*, Evergreen University https://www.evergreen.edu/sites/default/files/2023-05/Demonstration%20Laws.pdf

federal power from the mere fact that a particularly passionate political protest—against, again, affirmatively unlawful federal action—took place.

The government's attempt to weaponize § 372 in this case is dangerous to our free and open society. Before this administration's attempt to weaponize § 372 against nonviolent anti-ICE demonstrations,[5] the government had charged § 372 violations sparingly—generally reserving this charge for cases involving violence in the face of federal authority.[6] And for

[5] Since President Trump returned to office in January 2025, the government has brought § 372 charges against more than three dozen people in at least 10 cases, all of which involved protesting federal immigration enforcement. Meg Anderson, *She protested ICE raids. Then agents showed up at her door.*, NPR (Aug. 3, 2026), https://www.npr.org/2026/08/03/nx-s1-5886263/ice-dhs-immigration-enforcement-conspiracy-arrests. This includes the "Broadview Six" case, where the government moved to dismiss the charges following allegations of prosecutorial misconduct in connection with securing the § 372 indictment. *Id.*

[6] The government charged members of the Proud Boys with violating § 372 after they stormed the Capitol and attempted to prevent the lawful transition of power from President Trump to President Biden. *See United States v. Nordean,* No. 21-175, 2026 U.S. Dist. LEXIS 153404, at *4 (D.D.C. July 10, 2026). Prosecutions prior to the January 6 attack are sparse but include the 1962 prosecution of former Maj. Gen. Edwin A. Walker for leading the violent riots that sought to prevent the desegregation of the University of Mississippi. *3,000 troops put down Mississippi rioting and seize 200 as Negro attends classes; Ex-Gen. Walker is held for insurrection*, New York Times (Oct. 2, 1962), https://www.nytimes.com/1962/10/02/archives/walker-is-facing-4-federal-counts-flown-to-medical-center-in.html.

good reason. Branding nonviolent political demonstrations as violent conspiracies against federal power—and leveraging isolated acts of disorder into evidence that a crowd has agreed to commit acts of violence—poses grave risks of chilling political speech and assembly. If the protest on Cataldo was a § 372 conspiracy, then anyone who participates in or organizes a protest against federal action is exposing themselves to federal felony charges.

And so Forral moves for entry of a judgment of acquittal under Rule 29, for a new trial under Rule 33, or for dismissal of the indictment. As detailed below, the government presented insufficient evidence that Forral and their fellow protesters entered into the sort of violent agreement that § 372 criminalizes. This is true whether the court examines the evidence through the ordinary test for evidence-sufficiency—or, as it should, by "mak[ing] an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *United States v. Hanna*, 293 F.3d 1080, 1088 (9th Cir. 2002).

Even setting the insufficiency of the evidence to one side, Forral's conviction must also be vacated, in the interest of justice, because of the threadbare § 372 evidence the government presented, the prosecutor's constitutionally improper argument seeking to secure Forral's conviction on

the basis of their protected speech, the government's misleading characterizations of § 372's elements, and the significant risk that the jury was not unanimous in convicting them.

Finally, Forral moves for dismissal of the indictment based on new, post-verdict evidence that they were selectively prosecuted for their political viewpoints. This case is a prime example of the current Presidential Administration's weaponization of the federal criminal system to punish its perceived political enemies while sparing its political allies. Forral was prosecuted under § 372 shortly after President Trump pardoned his most loyally violent supporters who had been convicted of that very crime. This asymmetry—the government's twisting of the federal code to punish its opponents for acts of civil disobedience while making a mockery of the pardon power to shield murderous mobs from their just deserts—poses yet another grave risk to the American way of life.

When the government first considered whether to bring charges for the Cataldo protest, Richard Barker was the US Attorney for the Eastern District of Washington. He did not bring charges and instead resigned. The replacement interim US Attorney then filed charges and oversaw this prosecution. Then, shortly after the jury returned a guilty verdict in this case,

Barker unambiguously asserted that Forral had been selectively prosecuted, publicly announcing that Forral's prosecution was a viewpoint-motivated decision "to punish members of the Spokane community who stood up for two young men who were unlawfully detained by ICE."[7] This is yet another reason why the verdict in this case cannot stand. Because the government selected Forral for prosecution based on their political viewpoint, the Court must dismiss the indictment.

## Background

### I. The underlying facts

This prosecution arose from a protest outside ICE's Spokane field office on June 11, 2025. The protest began when ICE unlawfully detained Joswar Rodriguez Torres, a Venezuelan citizen with no criminal history who had entered this country lawfully under a humanitarian parole program and who was seeking asylum. *See Torres*, 2026 U.S. Dist. LEXIS 17366, at *2–3. When Rodriguez Torres showed up for a scheduled check-in at the ICE field office,

[7] Alexandra Duggan, *Former Leader of Federal Prosecutors in Spokane Criticizes Outcome of ICE Protest trial, the First of its Kind Locally*, Spokesman Review (Updated May 29, 2026), https://www.spokesman.com/stories/2026/may/28/former-leader-of-federal-prosecutors-in-spokane-cr/.

ICE arrested him. Its plan was to immediately transport him to the Northwest ICE Processing Center in Tacoma for deportation proceedings.

Rodriguez Torres's arrest was a part of this Administration's politically divisive—and intentionally incendiary—immigration enforcement initiative.[8] And it was clearly unlawful. A federal judge later found ICE had violated both the Fifth Amendment's Due Process Clause and the Administrative Procedures Act—and ordered Rodriguez Torres released. *Id.* at *9–10.

When Rodriguez Torres was arrested, his legal guardian (Ben Stuckart, the former president of the Spokane City Council) immediately connected what was happening to the Trump Administration's anti-immigrant policies. And he decided to launch a protest. So, at 1:11pm, Stuckart posted to Facebook that because "a young man from Venezuela seeking asylum," he was

[8] In 2024, then-candidate Trump campaigned on a platform of mass deportations because "we got a lot of bad genes in our country right now." Emmy Martin, *Trump on immigrants: 'We got a lot of bad genes in our country right now.'*, Politico (October 7, 2024), https://www.politico.com/news/2024/10/07/trump-immigrants-crime-00182702. On his first day back in office, President Trump issued an Executive Order entitled "Protecting the American People Against Invasion," launching an immigration enforcement initiative because "[m]any" undocumented immigrants were "committing vile and heinous acts against innocent Americans." Exec. Order No. 14159, 90 Fed. Reg. 8443–48 (Jan. 20, 2025).

"going to sit in front of the bus" that ICE planned to use to transport Rodriguez Torres to the ICE processing center. Exhibit 76.

Shortly after Stuckart posted this message, other human rights activists amplified his call. At 1:14 p.m., Jac Archer forwarded Stuckart's post to a Signal group along with the message, "Those of us who can, should." Exhibit 78.

Soon, several other protesters joined Stuckart outside the Cataldo building. Like Stuckart, they engaged in acts of civil disobedience. ICE's plan was for a contractor employed by the GEO Group (a for-profit prison operator) to drive a bus owned by the GEO Group to transport Stuckart's client and several other detainees from Spokane to Tacoma. Exhibit A. at 96. Early in the protest, someone sat in front of the GEO Group bus's door, blocking anyone from boarding. An ICE agent ordered him to leave, but he refused—and six other people joined him in blocking the door. Exhibit B. at 11-16.

During trial, both parties presented video evidence of Stuckart, Archer, and Moore's speaking on the bullhorn. Stuckart said "we all need to remain nonviolent." Exhibit 601A. Liz Moore told the crowd, "it's not about being peaceful and calm, it's about being nonviolent." Exhibit 601C. She then asked

the crowd if they could all agree to maintain nonviolence – to which they all agreed. Exhibit 601C.

As the protest took shape, Archer continued to post updates to social media. At 2:14 p.m., they posted to Facebook: “Some contingents are choosing to risk arrest to block the exits to ICE. We're about 100 strong in total. I hope to see you here.” Exhibit C. at 17-18; Exhibit 78. A little under an hour later, they provided a further update via Signal chat: “There are multiple exits that about 90 to 100 people are struggling to cover. Can use more folks willing to thoughtfully risk arrest.” Exhibit D. at 17; Exhibit 78.

The reason Archer’s focus shifted from the bus to “multiple exits” is that, in the interim, ICE agents had abandoned their plan to use the GEO Group bus. This is in part because at approximately 2:30 p.m. someone (the government presented zero evidence as to their identity) spraypainted the bus’s windshield. Exhibit E. at 58; Exhibit 603A. In fact, this person was unknown to Archer and was not one of the protesters. In a voice memo, Archer stated: “Ah, someone came by really, really early on actually and spraypainted the windshield. Um, not one of the protesters, just a rando who came up on a bike and spraypainted it.” Exhibit 78. Additionally, at some point before 2:30 p.m., Forral parked their car in front of the bus. This decision did not block in

or immobilize the bus, and the Government presented no evidence that anyone asked Forral to move their car during the entire protest.

In any event, ICE eventually decided to abandon the plan to use the GEO Group bus. With the GEO Group bus abandoned, ICE needed a new plan. That plan, which they attempted to implement at around 5:20 p.m., was for several officers to use their own vehicles to drive out of the Cataldo building's secured parking lot, rendezvous with a U.S. Border Patrol van, escort that van back to Cataldo, and use it to transport the detainees. Exhibit B. at 21.

At approximately 5:20 p.m., ICE agents—wearing masks and body armor—walked to the secured parking lot (on the west side of the Cataldo building), got into their vehicles, and attempted to leave through the parking lot's south gate. Exhibit 19; Exhibit B. at 21-22.

Some of the protesters saw the agents attempting to leave. They called out to other protesters, several of whom gathered together in front of the south gate and linked arms. Exhibit B. at 22. With their passage out of the lot blocked, three other ICE agents came around from the back and initiated physical contact with the crowd. Exhibit 605C. Though, they did not break through. Exhibit C. at 73. At approximately 5:45 p.m., the agents gave up,

closed the south gate, stood in the lot for some time laughing, and eventually returned to the building. Exhibit C. at 33; Exhibit 605G. At that point, Forral and two other individuals, piled benches and other items in front of the Cataldo building gates. Exhibit C. at 34-35; Exhibit 615F. (Archer and other protesters removed the benches and other items. Exhibit 606B.)

Shortly before 6:00 p.m., Forral returned to the white bus, sat down next to the front driver-side tire, and appeared to attempt to deflate it. Exhibit C. at 40; Exhibit 13. As they did so, another individual at the protest, Erin Lang, parked her bicycle next to Forral and observed Forral for approximately six seconds. Exhibit 13. (An agent described this as "someone sort of looking down at [Forral]." Exhibit E. at 10.) Lang then walked to the rear driver-side tire and began attempting to deflate that tire. Exhibit 13. While they were at the front tire, Forral appeared to interact briefly with three individuals on three separate occasions. Exhibit 13; Exhibit 14. Forral then stood up, walked to the front of the bus, looked at a group of people milling about on the passenger side of the bus, and walked to the back of the bus. Exhibit 14. While walking to the back of the bus, Forral passed Lang, who followed Forral for seven seconds before returning to her bicycle. Exhibit 14. Six other individuals walked some distance behind Forral for approximately 30 seconds but had no

interaction with Forral. Exhibit 14. Forral then turned around and walked back to the front tire. Exhibit 14. The six individuals did not follow Forral. Exhibit 14. Forral and Lang passed one another but did not stop or interact. Exhibit 14.

At approximately 6:25 p.m., the Spokane Police Department arrived, escorting a red van from U.S. Border Patrol to the east side of the Cataldo building. Exhibit C. at 42. Forral did walk over to the area near the red van carrying what appeared to be a steering-wheel lock. Exhibit C. at 43-44; Exhibit F. at 11. The crowd chanted "Let them go," and at one point, Forral stated (to another protester), "I'll keep it peaceful until it's not." Exhibit F. at 16; Exhibit 48. Shortly after, Forral returned to their car and returned the steering-wheel lock to the car.

Eventually, the crowd moved to the red van and gathered around it, and Thalia Ramirez slashed the van's tires with a boxcutter. ECF No. 231 at 11. Forral was not at the red van when Ramirez slashed the tires, *see* Exhibit 612C, and there is no evidence they knew Ramirez or even knew this had happened.

Forral did not in fact break the peace. Instead, at approximately 7:35 p.m., they were arrested. Exhibit 612A. After Forral's arrest, the protest

continued—and expanded. At approximately 7:45 p.m., a group of protesters walked across the bridge from downtown Spokane and joined the crowd. Exhibit C. at 49–51. Law enforcement then deployed munitions to break up the crowd, and an agent testified that, at 8:10 p.m., a protester threw a canister back at the police and damaged a police vehicle. Exhibit C. at 53–54. At approximately, 9:00 p.m., the Spokane SWAT team arrived and escorted the immigration detainees out of the facility. Exhibit G. at 16-18, 33-34; Exhibit D. at 23; Exhibit C. at 60; Exhibit B. at 37-38.

## II. Prosecutorial proceedings

When it comes to protest prosecutions, federal prosecutors have many possible arrows in their quiver. They can decline prosecution, bring appropriate federal charges, or work with their state law enforcement partners to bring a fitting state prosecution.

Here, the government took none of these measured steps. Instead, to quote the U.S. Attorney Richard Barker, Eastern Washington prosecutors chose to "dust[] off" a "Civil War-era law . . . to punish members of the Spokane community who stood up for two young men who were unlawfully detained by ICE."[9]

---

[9] Duggan, supra fn 7.

As Barker's comments reflect, § 372—which criminalizes violent conspiracies against federal power—simply does not fit the facts of this case. And the prosecutor's evidentiary presentation in this case reflected as much. At trial, the government set out to prove that Forral and others agreed to impede officers from discharging their duties—which is not itself a § 372 violation. And it went about proving up this agreement by a strategy of guilt-by-atmosphere, arguing that the broader atmospherics of the protest—the initial calls to protest, the caustic political speech, the civil disobedience itself, the isolated acts of vandalism—meant that a crime must have been committed.

Thus, the government spent considerable time on evidence that Stuckart and Archer disseminated social media posts encouraging people to join their nonviolent protest at the Cataldo building, although those posts called only for nonviolent action (sitting in front of a bus). *See, e.g.*, Exhibit D. at 6-7; Exhibit C. at 15-17. The government had agent after agent testify they had been called "Nazis" and "mother-fuck[ers]" and other unpleasant, but constitutionally protected, things. *See, e.g.*, *Houston v. Hill,* 482 U.S. 451, 461 (1987); *United States v. Poocha*, 259 F.3d 1077, 1082 (9th Cir. 2001) (holding "the question is not even a close one" that saying "fuck you" to the police does

not constitute an incitement to riot and is constitutionally protected speech). The government called witnesses who described how demonstrators sat in front of the GEO Group bus and how Forral parked their car in front of the GEO Group bus, although there was again no allegation of any violence. The government spent an inordinate amount of time on testimony that protesters linked arms for 25 minutes to prevent ICE from leaving the secured parking lot, although linking arms to impede the police is a time-honored hallmark of nonviolent civil disobedience dating to at least the Civil Rights sit-ins. *See, e.g.*, Exhibit A. at 33-34, 44-49, 130-31; Exhibit H. at 12-13.[10] And the government presented evidence that Forral let air out of one of the GEO

[10] At closing, the prosecutor told the jury that the protestors' linking of arms was evidence of an agreement to use force. The argument here was that linking arms creates "a harder body weight," and "us[ing] your body weight against the officer"—the "multiple officers [who] are pushing at you"—constitutes a use of force. Exhibit I. at 28, 32. But, as the Supreme Court recently noted, a protestor "with her arms interlocked with those of her fellow protestors" is merely "passively resist[ing]." *Zorn v. Linton*, 607 U.S. 568, 570 (2026). So, as the Court instructed the jury, "[m]erely tensing up or merely resisting does not, by itself, constitute 'force.'" ECF 361 at 21. Rather, "[a]n act involves 'force' only if it threatens or results in violence or if it threatens or results in harming or destroying property or harming or killing people." *Id.* The government presented no evidence or argument that protestors' linking of arms threatened or resulted in violence, harming or destroying property, or harming or killing people. In no way was the protestors' linking arms a use of force, or evidence of an agreement to use force.

Group bus's tires (and that Lang did the same on a different tire), long after ICE had abandoned any plan to use that bus and the protest had moved to the south gate on the opposite side of the Cataldo building. Though it presented evidence of the tire-deflation episode, it offered no evidence or argument that there was any agreement to deflate the tires.

Not once, however, did the government articulate any theory of a specific violent conspiracy. At closing, the prosecutor did not explain what, in the government's view, constituted the agreement to use force, threats, or intimidation or to injure property (the "crucial element" of a § 372 prosecution, *Ehmer*, 87 F.4th at 1120). Instead, she roamed across the entirety of the protest, zooming in here and there on bits that particularly upset the government. Here she repeated the mean things protesters said about ICE. *See* Exhibit I. at 33. There she focused on how the protesters linked arms, placed objects in front of the Cataldo building exits, and had the temerity to get back up after being shoved to the ground. *See, e.g.*, Exhibit I. at 20, 32. Then she shifted to Forral letting air out of the GEO bus's tires. Exhibit I. at 24. This focused the jury on the moments the government wished to highlight, but it did not make out an argument that anyone had conspired to use force, threats, or intimidation, or to injure property.

Credit where credit is due, though: the prosecutor's closing fully owned the government's underdeveloped, scattershot theory of this case. What, according to the prosecutor, was the conspiracy in this case? It was the "[l]inking arms, running, sprinting, acting in solidarity . . . The communication, the actions, *every single thing that you see in these videos* show that this is a conspiracy." Exhibit I. at 38 (emphasis added). It was the whole undifferentiated shebang. And what, according to the prosecutor, did it all prove? It proved that "these Defendants worked together with an agreement with each other and others to impede officers." Exhibit I. at 42.

Fair enough, as far as it goes. There's just one problem: "linking arms" and "acting in solidarity" does not a violent § 372 conspiracy make. And merely working together to "impede officers"—without more—is insufficient to sustain the charge.

And so Forral moves for acquittal under Rule 29, a new trial under Rule 33, and—for the reasons described in part III of this motion—dismissal of the indictment for selective prosecution.

## Argument

# I. The Court should enter a not guilty verdict under Rule 29.

## A. The legal standard in cases that implicate the First Amendment.

The Due Process Clause "protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary." *Jackson v. Virginia*, 443 U.S. 307, 315 (1979). The "application of the beyond-a-reasonable-doubt standard . . . is *not* irretrievably committed to the jury," as the law also requires the judge to apply that standard. *Id.* at 317 n.10.

Rule 29 of the Federal Rules of Criminal Procedure is the mechanism for this. Under Rule 29, a court "must enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction"—as it is here. Fed. R. Crim. P. 29(a). If the court "reserves decision" on a Rule 29 motion after the close of the government's evidence, then "it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).

To decide a Rule 29 motion, courts ordinarily employ a two-step inquiry: First, "a reviewing court must consider the evidence presented at trial in the light most favorable to the government." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (citing *Jackson*, 443 U.S. at 319)). Second, "the

reviewing court must determine whether this evidence, so viewed, is adequate to allow *any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *Id.* The second step "protects against rare occasions in which a properly instructed jury may convict" without sufficient evidence. *Id.*

Importantly, the Ninth Circuit requires *sufficient* evidence, not just *any* evidence. "More than a 'mere modicum' of evidence is required to support a verdict." *Id.* (citing *Jackson*, 443 U.S. at 320) (rejecting rule that conviction may be affirmed with only "some evidence"). If a reasonable jury "could not find guilt beyond a reasonable doubt, the court may not enter judgment on a guilty verdict." *United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013).

There is also a special rule for cases—like this one—that implicate core First Amendment rights. "[I]n speech cases," unlike others, a court considering a Rule 29 motion must "make an *independent examination* of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *United States v. Hanna*, 293 F.3d 1080, 1088 (9th Cir. 2002) (emphasis added). "In speech cases," therefore, the court "defers to the [jury's] findings on *all but* the constitutional facts." *United States v. Lincoln*, 403 F.3d 703, 705-06 (9th Cir. 2005)

(emphasis added). "Constitutional facts are facts—such as . . . whether a statement is a true threat—that determine the core issue of whether the challenged speech is protected by the First Amendment." *Id.* (quoting *Hanna*, 293 F.3d at 1088).

This part of Forral's motion explains why the government presented insufficient evidence of a § 372 conspiracy. Even considered under Rule 29's ordinary standard, the government failed to present sufficient evidence of a *violent* conspiracy. Under the independent constitutional review this Court must perform to ensure that this prosecution does not traduce Forral's rights to free speech and assembly, it's not even a close call.

### B. The government presented insufficient evidence of a § 372 conspiracy.

The government charged Forral with conspiracy—and aiding and abetting conspiracy—under 18 U.S.C. § 372. To prove that Forral violated § 372, the government needed to present sufficient evidence that Forral conspired with at least one other individual to accomplish one of three objectives:

1) preventing any officer of the United States from discharging their official duties through force, intimidation, or threat;

2) injuring the property of any officer of the United States on account of the lawful discharge of their official duties or while they were engaged in the lawful discharge of those duties; or

3) injuring the property of any officer of the United States so as to molest, interrupt, hinder, or impede them in the discharge of their official duties.[11]

Under § 372, "the crucial element separating legal innocence from wrongful conduct is that the defendant conspires to prevent an employee from discharging his or her duties 'by force, intimidation, or threat'"—or through injury. *Ehmer*, 87 F.4th at 1120. To prove a § 372 violation, therefore, the government is "required to establish scienter with respect to the use of 'intimidation' or 'threat[s]'" or the other proscribed means of accomplishing § 372's proscribed ends. *Id.*

Additionally, to prove that a defendant aided and abetted a crime the government ordinarily must "prove four elements: (1) that the accused had the specific intent to facilitate the commission of a crime by another; (2) that the accused had the requisite intent of the underlying substantive offense; (3) that the accused assisted or participated in the commission of the underlying offense; and (4) that someone committed the underlying substantive offense."

[11] Section 372 also criminalizes conspiracies to injure the person of an officer of the United States, but Forral was not convicted on this theory so it is not at issue here. *See* ECF No. 365 at 2.

*United States v. Garcia*, 400 F.3d 816, 818 n.2 (9th Cir. 2005) (quoting *United States v. Delgado*, 357 F.3d 1061, 1065-66 (9th Cir. 2004).[12]

Regardless, to prove Forral's guilt, the government needed to prove the existence of underlying § 372 conspiracy. Because the government failed to prove any such conspiracy, Forral's Rule 29 motion must be granted.

**1. An agreement to impede is not enough to prove a § 372 conspiracy; the government must also prove the agreement was to inflict injury or to use force, threats, or intimidation.**

A criminal conspiracy is "an agreement to commit a crime." *United States v. Loveland*, 825 F.3d 555, 557 (9th Cir. 2016). To prove a conspiracy, the government must present sufficient evidence of "[1] an agreement [2] to engage in the specific criminal activity charged in the indictment." *United States v. Garcia*, 151 F.3d 1243, 1245 (9th Cir. 1998). And to prove a § 372

[12] Because § 372 does not require proof of an overt act this Court should hold that "aiding and abetting a [§ 372] conspiracy is not a valid theory of liability." *United States v. Ulbricht*, 2015 WL 413426, at *5-6 (S.D.N.Y. Feb. 2, 2015); *see also Whitfield*, 543 U.S. at 214, 219 (where text of statute "does not expressly make the commission of an overt act an element of the conspiracy offense, the Government need not prove an overt act to obtain a conviction"). Because § 372 criminalizes the bare act of agreeing to take certain specific violent steps against federal power—and does not require proof of any overt acts—there is simply nothing for anyone to aid and abet.

conspiracy, that specific criminal activity must be to impede officers either through force, threats, or intimidation, or by injuring their property.

This agreement—the agreement to engage in that specific criminal activity—is the essence of a conspiracy. *See Loveland*, 825 F.3d at 557 ("Conspiracy means an agreement to commit a crime, *not commission of the crime*" (emphasis added)). For this reason, mere "proof that an individual engaged in illegal acts with others is not sufficient to demonstrate the existence of a conspiracy," *Garcia*, 151 F.3d at 1245, and "there can be no conviction for guilt by association[.]" *United States v. Melchor-Lopez*, 627 F.2d 886, 891 (9th Cir. 1980). What's more, "[w]hile an implicit agreement may be inferred from circumstantial evidence . . . . [a]n inference of agreement is permissible *only when* the nature of the [criminal] acts would *logically require* coordination and planning," *Garcia*, 151 F.3d at 1245 (emphases added).

So, to prove a § 372 conspiracy, the government must establish an agreement on a very specific subset of criminal objectives. Section 372 criminalizes conspiracies 1) to impede federal officers in the discharge of their official duties 2) by using force, threats, or intimidation. 18 U.S.C. § 372. And it criminalizes conspiracies 1) to injure federal officers or their property on account of their official duties or 2) to injure their property "so as to molest,

interrupt, hinder, or impede [them] in the discharge of [their] official duties." *Id.* § 372.

To convict a defendant of any one of these conspiracies, the government must specifically prove an agreement to use force, threats or intimidation—or to inflict injury. Mere proof of an agreement to impede or resist law enforcement is insufficient to establish a § 372 violation. *See Ehmer*, 87 F.4th at 1120. So too is proof of substantive acts involving injury or the use of force absent evidence of an agreement to commit those acts. *Id.* For a § 372 violation, what matters—and what is essential—is the existence of an agreement to injure or use force against federal officers or federal property, either to impede them or on account of their official duties.

**2. The government presented legally insufficient evidence of an agreement to inflict injury or use force, threats, or intimidation.**

The government's case has a fatal evidentiary gap: it contains no evidence whatsoever of any agreement to use force, intimidation, or threats—or to injure federal property. That's because there was no such evidence. The government didn't like that citizens stood up to its illegal actions, so it charged those citizens that made the most noise with § 372 violations. Lacking evidence of a violent agreement, it pointed to a handful of isolated, unplanned acts of vandalism. But that's not evidence of a violent agreement.

From its inception, the protest at the Cataldo building bore every hallmark of nonviolent civil disobedience. It began when Stuckart resolved to sit in front of a private-prison-contractor bus to prevent Rodriguez Torres from being transported to the ICE detention facility in Tacoma. He posted to Facebook that he was "going to sit in front of the bus. Feel free to join me." Exhibit 76. Stuckart's call was then amplified by Archer, who sent a Signal message to fellow political activists encouraging them to join Stuckart in his sit-in, and, later, sent out a call for people to "thoughtfully risk arrest" by standing in front of the Cataldo building exits and blocking the bus. Exhibit 78.

Every time the Cataldo protesters moved to block the transport of Rodriguez Torres, they did so nonviolently. Sitting in front of the bus—and blocking the bus in with other vehicles—was nonviolent. *See* Exhibit 11. Linking arms to prevent ICE agents from leaving the south gate was nonviolent. Exhibit 26. Piling objects in front of the exits to prevent ICE from leaving was nonviolent. *See* Exhibit 30. Chanting anti-ICE slogans, yelling "shame" at the police, even calling them "terrorists" was nonviolent. Exhibit 605E. The coordinated activity at the Cataldo building was nonviolent—and, because the demonstrators refrained from violence even when ICE agents

initiated physical contact by shoving the demonstrators who had linked arms, no one on either side of this highly charged standoff was injured.

Tellingly, the government—in its closing argument to the jury—did not meaningfully contest the nonviolent nature of the protest. Instead, the prosecutor argued it could prove a § 372 agreement with evidence of any coordinated activity meant to obstruct federal officers in the discharge of their duty, even evidence of nonviolent civil disobedience. In this vein, the government referenced Exhibit 24—which depicted a line of protesters linking arms and playing a melodica—




—and argued:

> So what do we have? We have immediately the blocking -- these are photographs. This is Exhibit 24. We have at the south gate. This -- ladies and gentlemen, this is an agreement. This is conspiracy. You lock arms together for a purpose.

Exhibit I. at 23.

Or referencing Exhibit 30, which depicted protesters placing benches in front of the south gate:

> We have the barricading. And this is Exhibit 30. And this is actually a video, and I don't have time to show you all this stuff. If you watch this video, Defendant Archer is standing right there while they're bringing all the benches from the park. They're carrying them. Somebody will come and bring a bench, and then the two of them will pick up the bench. This is an agreement. This is conspiracy. We have the -- again, they're all working together to block.

Exhibit I. at 24.

Again and again in her effort to prove a § 372 conspiracy, the prosecutor emphasized the protesters' linking of arms, blocking the exits with their bodies, and performing other time-honored hallmarks of civil disobedience: chanting, condemning the police, and sharing information about law enforcement's whereabouts. *See, e.g.*, Exhibit I. at 14, 19, 27. What, according to the prosecutor, was evidence of a § 372 conspiracy? "Linking arms, running, sprinting, acting in solidarity." Exhibit I. at 37. "The communication, the actions, *every single thing that you see in these videos* show that this is a conspiracy." Exhibit I. at 38 (emphasis added).

And then, at the very end of rebuttal closing, the government made the point explicit. Why convict? Because "these Defendants worked together with an agreement with each other and others to impede officers." Exhibit I. at 42.

Here's the problem: *that's not a § 372 conspiracy*. To establish a § 372 conspiracy, it's not enough to prove an agreement to impede officers. The government must, instead, prove an agreement to impede officers *specifically through use of force, threats, or intimidation, or by injuring property*. *See* 18 U.S.C. § 372; *see also Ehmer*, 87 F.4th at 1120 (scienter element extends to violence). The prosecutor didn't appreciate this distinction. "And you can call it civil disobedience," she argued. Exhibit I. at 42. "You can call it whatever you want. Giving it a different name doesn't make it not meet the elements that have been read to you." Exhibit I. at 42-43.

That's just not true. There is an ocean's difference between civil disobedience and a violent conspiracy against federal power. What happened at Cataldo is a paradigmatic example of the former. And the government presented no evidence of the latter. It presented no evidence whatsoever to establish the "crucial element separating legal innocence from wrongful conduct." *Ehmer*, 87 F.4th at 1120.

**3. To the extent the government believes the tire-deflation episode is sufficient evidence of a § 372 conspiracy, it's not.**

In the absence of any evidence of agreement, the government also repeatedly emphasized isolated acts of vandalism. In effect, the government sought to prosecute those acts of vandalism as § 372 conspiracy violations. *Cf. Loveland*, 825 F.3d at 557 ("Conspiracy means agreement to commit a crime, not commission of the crime."). In particular, the government focused on Forral's deflation of the GEO Group bus's tire.

As noted above, a few minutes before 6:00 p.m.—well after ICE had abandoned any plan to use the already "inoperable" GEO Group bus as a transport vehicle and well after the crowd had shifted to the south gate—Forral sat down next to the bus and appeared to be letting air out of the front, driver-side tire. Another person, Erica Lang, observed Forral and then walked to the rear of the bus and let air out of a separate tire.

From the prosecutor's scattershot closing argument, it's unclear whether the government thinks this episode constitutes a freestanding § 372 conspiracy. The prosecutor mentioned the tire deflation in her closing argument, but she did not argue there was an agreement to deflate the tire that would constitute a § 372 violation. *See* Exhibit I. at 24. Notably, the government's description of this episode as detailed in Lang's plea agreement

(Lang pled guilty) likewise does not suggest that she and Forral were in any way working in concert to render the GEO Group bus inoperable. *See* Erica Lang's Plea Agreement, ECF No. 211 at 7; *see also Garcia*, 151 F.3d at 1245 ("proof that an individual engaged in illegal acts with others is not sufficient to demonstrate the existence of a conspiracy").

Regardless, the tire-deflation episode is legally insufficient evidence at least three times over.

#### i. There was insufficient evidence of an agreement between Lang and Forral to let air out of the GEO Group bus's tire.

***First***, even assuming an agreement to let air out of the GEO Group bus's tires could constitute an agreement to "injure" a federal officer's property, the tire-deflation evidence is legally insufficient to sustain a § 372 conviction because all it shows is that (1) Forral let air out of one tire and then (2) Lang separately let the air out of a different tire. At best, that's "proof that an individual engaged in illegal acts with others," which is insufficient to prove a conspiracy. *Garcia*, 151 F.3d at 1245. Coordinated conduct authorizes an inference of conspiracy "only when the *nature* of the [coordinated] acts would *logically require* coordination and planning." *Id.* (emphases added). Two people deflating two separate tires does not logically require coordination or

planning. So, even if the tire-deflation evidence established injury to property, it in no way established a criminal § 372 conspiracy.

**ii. An agreement to let air out of the GEO Group bus's tires is not § 372 conspiracy because the bus was not the property of a federal officer.**

***Second***, the tire-deflation episode is legally insufficient because, even if there was an agreement to let air out of the GEO Group bus's tires (and even if letting air out of tires constitutes injuring property), that agreement did not have, as its object, injuring a *federal officer's* property.

Section 372 sets out different types of prohibited conspiracies, and those that criminalize an agreement to injure property require that it be property of an "officer of the United States." In *United States v. Ehmer*, the Ninth Circuit developed a useful taxonomy of § 372. It subdivided § 372 into four "clauses," each of which—the Court recognized—proscribes a different type of criminal conspiracy. *See* 87 F.4th 1073, 1117 (9th Cir. 2023). Only clauses (3) and (4) are even conceivably at issue in connection with the tire-deflation episode.

- Clause (3) proscribes conspiracies to "injure . . . any officer of the United States['s] property . . . i. on account of his lawful discharge of the duties of his office, or ii. while engaged in the lawful discharge thereof[.]" *Ehmer*, 87 F.4th at 1117.
- Clause (4) proscribes conspiracies "to injure . . . any officer of the United State['s] property . . . so as to molest, interrupt, hinder, or impede him in the discharge of his official duties." *Id.*

In *Ehmer*, the Ninth Circuit observed a "notabl[e]" difference between clauses (3) and (4) of § 372, on the one hand, and what the Court designated "clause (1)," on the other. *Id.* at 1118. Specifically, unlike clauses (2) through (4)—which prohibit conspiracies targeting the person or property of "officers of the United States"—clause (1) conspiracies must be aimed at a person "holding any office, trust, or place of confidence under the United States." *Id.* "Congress's conspicuous choice *not* to use the simple phrase 'officer of the United States' (or a substantially equivalent phrase) in all four clauses of § 372," *Ehmer* noted, "presumptively signifies an intention to give the first clause a different"—and broader—"scope." *Id.* At the very least, *Ehmer* stands for the proposition that the phrase "officer of the United States" in clauses (3) and (4) cannot sweep any more broadly than the phrase "[person] holding any office, trust, or place of confidence under the United States" in clause (1). *Id.*; *see also United States v. Forral*, 2026 U.S. Dist. LEXIS 123127, at *12 (E.D. Wash Apr. 20, 2026) ("Despite their slightly different wording, each of [§ 372's] clauses protect the same class of federal officers.").

Forral respectfully urges the Court to reconsider its earlier decision that the phrase "officer of the United States" refers to the same class of people as "[person] holding any office, trust, or place of confidence under the United

States." *Cf. Forral*, 2026 U.S. Dist. LEXIS 123127, at *10-14. In *Ehmer*, the Ninth Circuit recognized that clause (1) "differs notably from the other three clauses of § 372" and further observed that "Congress's conspicuous choice *not* to use the simple phrase "officer of the United States" (or a substantially equivalent phrase) in all four clauses of § 372 presumptively signifies an intention to give the first clause a different scope." 87 F.4th at 1118. Nothing in the text or context of § 372 rebuts this presumption, so the Court should construe clauses (3) and (4) more narrowly than clause (1), and it should conclude, on this basis, that those clauses do not extend to injuring nonfederal property like the GEO Group bus.

But even if the Court adheres to its earlier view, it remains the case that any agreement to injure the GEO Group bus is not a conspiracy to injure property of an officer of the United States. That's because, as the Ninth Circuit held in *Ehmer*, a person holds an "office, trust, or place of confidence under the United States" only if they are *employed* by the United States. *See Ehmer*, 87 F.4th at 1119 (clause (1) of § 372 "refer[s] . . . to public *employment*" (emphasis added)). This is black-letter law in this Circuit. As the Court has held in interpreting § 372's equivalently worded civil cognate statute, 42 U.S.C. § 1985(1), "[t]he clear import of this language is that the statute's

protections extend exclusively to the benefit of federal officers." *Canlis v. San Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711, 717 (9th Cir. 1981).

This requirement of federal employment flows from clause (1)'s plain text. As the *Ehmer* Court recognized, when § 372 was drafted the word "place" referred to "publick . . . employment," *id.* (quoting Samuel Johnson, Dictionary of the English Language (1843 ed.)), or "an office or employment specif. in public service," *id.* (quoting Webster's Second New International Dictionary (1939)). Likewise, the word "trust" referred to a "responsible charge or office." *Id.* (quoting Webster's Second).

The upshot is that these words, along with the phrase "officer of the United States," collectively refer to *federal employees*. Even if the meaning of "officer of the United States," in clauses (3) and (4), is coextensive with the meaning of clause (1)'s cognate phrase, "office, trust, or place of confidence under the United States," it only extends as far as federal employees. *See Ehmer*, 87 F.4th at 1119; *see also Gallegos v. Jicarilla Apache Nation*, 2003 U.S. App. LEXIS 24235, at *11-12 (10th Cir. 2003) (holding that "clear language" of § 372's companion civil statute—42 U.S.C. § 1985(1)—"only applies when *federal* officers are prevented from discharging their duty" and holding this doesn't extend to tribal officers even when they are enforcing

federal law); *Forral*, 2026 U.S. Dist. LEXIS 123127, at *13 (§ 372 encompasses conspiracies against "*federal personnel* performing official duties" (emphasis added)) . It doesn't extend further to private, nongovernmental contractor's and their property, such as the GEO Group bus.

This result makes sense. Even in the law enforcement context, the law treats private contractors differently from federal personnel across a range of issues. *See, e.g.*, *Geo Grp., Inc. v. Menocal*, 607 U.S. 438, 441 (2026) (noting federal government has limited liability for work performed by federal contractors); *Minneci v. Pollard*, 565 U.S. 118, 131 (2012) (no *Bivens* cause of action "where . . . a federal prisoner seeks damages from privately employed personnel working at a privately operated federal prison"); *Geo Grp., Inc. v. Inslee*, 151 F.4th 1107, 1116 (9th Cir. 2025) ("Because federal contractors are not the federal government, states may impose some regulations on federal contractors that they would not be able to impose on the federal government itself" (internal quotation marks omitted)). What's more, when it wants to, Congress knows how to criminalize conduct directed at federal contractors. 18 U.S.C. section 111(a), for example, makes it a crime to assault "any officer or employee of the United States . . . *or any person assisting such an officer or*

*employee*." 18 U.S.C. §§ 111(a), 1114 (emphasis added); *see also United States v. Holder*, 256 F.3d 959, 963-67 (10th Cir. 2001).

In sum, § 372 proscribes (at most) conspiracies targeted at federal and their property and does not extend to private contractors and their property. Even if clauses (3) and (4) sweep as broadly as clause (1), they do not encompass conspiracies to injure nonfederal property. They therefore do not encompass the tire-deflation episode in this case.

**iii. Letting air out of a tire does not qualify as injuring property for purposes of § 372.**

***Finally***, the tire-deflation episode is legally insufficient because it didn't involve injuring property. All it involved was letting air out of—without inflicting damage upon—the GEO Group bus's tire.

The Supreme Court's recent decision in *Medical Marijuana Inc. v. Horn*, 604 U.S. 593 (2025) charts the path this Court should follow in interpreting § 372's use of the world "injure." In *Medical Marijuana*, the Supreme Court held that "[t]he ordinary meaning of 'injure' is to 'cause harm or damage to' or to 'hurt'." *Id.* at 601 (collecting dictionary definitions). At question there was the civil RICO statute (18 U.S.C. § 1964(c))'s use of the phrase "injured in his . . . property"—a phrase materially identical to § 372's "injure his property." In reaching that result, it rejected an alternative—more capacious—definition of

that phrase, according to which it refers to the "invasion of a legal right." *Id.* at 602 (quoting Ballentine's Law Dictionary). While the Supreme Court noted that the "specialized meaning" of the legal term "injury" can refer to "[a]ny wrong or damage," it found Congress's use of "injured" rather than "injury" to be "notable." *Id.* at 603 (citing Black's Law Dictionary at 924 (rev. 4th ed. 1968) (alteration in original. Because Congress used the term "injured," the Supreme Court found that "context cuts decisively in favor of the ordinary meaning of that word, which is '"[h]urt, damaged, [or] wounded."' *Id.* at 603 (quoting Ballentine's Law Dictionary at 627 (3d ed. 1989)). Thus, where Congress uses the verb "injure" rather than the noun "injury," courts are to give that word its ordinary meaning—which is to hurt, to damage, or to wound.

Because Congress used the verb "injure" in § 372, any agreement to let air out of the GEO Group bus's tire cannot qualify as a conspiracy to injure the GEO Group bus. Letting air out of a tire does not hurt, damage, or wound the tire or the bus. It may render the bus temporarily inoperable (although, here, numerous officers testified the bus was inoperable *before* any air was let out of its tires) but that is not the same.

It follows that any agreement to let air out of a tire cannot legally sustain a § 372 conspiracy in this case. That is the third reason why the tire-deflation episode does not constitute legally sufficient evidence of a § 372 conspiracy in this case.

**4. An independent review of the record shows that the government's case crucially rested on criminalizing constitutionally protected speech and assembly.**

So far this motion has illustrated how, even under the ordinary sufficiency-of-evidence test, the government presented legally insufficient evidence that Forral violated 18 U.S.C. § 372. But this is not an ordinary sufficiency case. Instead, Forral's § 372 prosecution implicates the First Amendment. In keeping with this Circuit's precedent, the Court should accordingly conduct an independent review of the record to evaluate whether Forral's prosecution "intru[ded]" on First Amendment rights. *Hanna*, 293 F.3d at 1088. Because this prosecution did so intrude on the First Amendment, the Court must enter a judgment of acquittal for this reason as well.

Nothing is more constitutionally sacred than our First Amendment freedoms of political speech and assembly. "Expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'" *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (quoting

*Carey v. Brown*, 447 U.S. 455, 467 (1980)). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964). The First Amendment accordingly embodies our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Such speech may "well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* "Strong and effective extemporaneous rhetoric cannot be nicely channeled into purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause." *Claiborn Hardware*, 458 U.S. at 928. Thus, "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Houston v. Hill,* 482 U.S. 451, 461 (1987). And challenges to law enforcement do not lose First Amendment protection when they are "provocative and challenging"—or even when they give rise to "public inconvenience, annoyance, or unrest." *Id.* (quoting *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949)).

An independent review of the record shows that the § 372 conviction in this case rested on constitutionally protected speech and assembly. Time and again, the government urged the jury to convict Forral and their codefendants based on their legitimate exercise of their political First Amendment rights. At closing, the prosecutor told the jury "[e]ven if you ignore the force aspect," conviction was required because the protesters' words—and specifically Forral's words—constituted intimidation. Exhibit I. at 43. As the prosecutor put it, "what do you think it means when they are shouting as loud as they can, linking arms, 'Fuck you, you mother-fucking criminals.' Forral saying, 'Are you going to cry? Are you going to cry?' . . . That's intimidation." Exhibit I. at 43.[13]

The prosecutor is wrong. As "vehement, caustic, [or] . . . unpleasantly sharp" as these "attacks on government and public officials" might appear, they are the essence of protected political speech. *Sullivan*, 376 U.S. at 270. The prosecutor may have found it distasteful, and jurors may have agreed, but free citizens are allowed to call ICE agents "mother-fucking criminals." Such speech loses its First Amendment protection only if it is a "true threat," which

[13] "Are you going to cry?" is an apparent reference to Exhibit 51, a video that begins with an officer shoving Forral.

requires a showing that (1) the speaker intended their words "to intimidate or to be a threat" and (2) "a reasonable person hearing or observing them would foresee that they would be interpreted as a serious expression of intent to harm or assault." ECF 361 at 21; *see also Ehmer*, 87 F.4th at 1121. So, the Court's role at this Rule 29 stage is to make its own independent assessment of whether the government proved the challenged speech in this case was (1) subjectively intended to intimidate or threaten and (2) objectively intimidating or threatening.

It's not a close call. Even in the prosecutor's own telling, the evidence simply amounted to individuals in a "super angry" crowd saying things like, "Nazi. Go fuck yourself. Die. You can't leave. No one is going to help you." Exhibit I. at 33. And Mavalwalla saying, "No one is coming to move us." Exhibit J. at 39. These are expressions of defiance and disgust. They are, at most, taunts lobbed by unarmed civilians at heavily armed officers in body armor. They are objectively not threats or intimidations. And the Court heard testimony from both Archer and Mavalwalla that they had no subjective intent to intimidate or threaten anyone. Exhibit K. at 18; Exhibit J. at 39, 45. Simply put, "[t]he freedom of individuals to oppose or challenge police action verbally without thereby risking arrest is one important characteristic by

which we distinguish ourselves from a police state. Thus, while police, no less than anyone else, may resent having obscene words and gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment." *Duran v. Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990) (internal citation omitted). Yet that is exactly what the government has attempted to do here.

In addition to resting its prosecution on protected political speech, the government also sought to prosecute Forral and their codefendants for conduct that is at the heart of freedom of assembly. Again and again, the prosecutor emphasized the codefendants' Signal communications and social media posts as evidence that they were all involved in a § 372 conspiracy. But those posts and texts all involved standard-issue, nonviolent calls to protest and organize against (what the protesters perceived to be) unjust law enforcement activity. Exercising its independent review of the record, this Court should find that the core of the government's case in support of a § 372 conspiracy—the only direct evidence it drew on to support the existence of

such a conspiracy—rested on constitutionally protected, assembly-facilitating speech.[14]

Finally, the government infringed Forral's First Amendment rights by seeking to impute onto Forral other individuals' intent to commit disorderly or potentially forceful acts. In closing argument, the government urged the jury to convict Forral and Forral's codefendants of a § 372 conspiracy based on its view that *other individuals* at the protest used force in a way that was "reasonably foreseeable" to Forral and Forral's codefendants. Exhibit I. at 18. This argument impermissibly intruded on Forral's right of political association. In the context of political action, "[t]o impose liability without a finding that [an individual] *authorized*—either actually or apparently—or ratified unlawful conduct would impermissibly burden the right of political

[14] Ordinarily, the government is not prohibited from relying on otherwise protected speech to prove the existence of a conspiracy. *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("The First Amendment does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."). But this is not an ordinary case. Here, the government's theory was that certain commonplace political rhetoric—both speech directed at law enforcement and exhortations to assemble directed at fellow protesters—*constituted* the § 372 agreement. *See generally* Exhibit I. This Court must accordingly conduct an independent evaluation to "determine the core issue of whether [this] speech," which the government contended formed the basis for Forral's and Foral's codefendants' liability, "is protected by the First Amendment." *Hanna*, 293 F.3d at 1088.

association that are protected by the First Amendment." *Claiborne*, 458 U.S. at 931. The government's argument that Forral and Forral's codefendants were guilty of violating § 372 because other individuals' acts at the protest were reasonably foreseeable—the central pillar of its argument that Forral and others agreed to use force against federal power—cannot withstand First Amendment scrutiny.

Because the government's prosecution of Forral rested on protected speech—vitriolic but protected speech aimed at law enforcement, as well as calls from community organizers to peaceably assemble—it intruded on the First Amendment. This "forbidden intrusion on the field of free expression" requires reversal. *Hanna*, 293 F.3d at 1088 (quoting *Bose Corp. v. Consumers Union of United States*, 466 U.S. 485, 499 (1984)).

~ ~ ~

The merit of a criminal charge is known by the arguments in support of it. Here, the government's arguments belie confidence in the merits of its § 372 case. Nowhere in closing argument did the prosecutor succinctly state a theory of when Forral (or any defendant) agreed with anybody else to either 1) impede federal officers *through force, threats, or intimidation* or 2) injure federal property. Instead, the prosecutor ranged over the events of June 11, 2025. Here she is highlighting protest speech ("Nazi," "race traitor," *See e.g.*

Exhibit L. at 19) as though it lacked constitutional protection. There she is casting the linking of arms into a violent mob action. *See* Exhibit I. at 22, 27-28. Yet elsewhere she's conflating the most basic act of outreach—spreading information about a protest on social media—with a violent agreement. *See* Exhibit I. at 12-13, 33. Back over here, she's stressing that protesters stacked benches, i.e., that they "worked together with an agreement with each other and others to impede officers," which is not a § 372 violation. And interspersed within this unfocused anti-protester gestalt were isolated individual acts of vandalism—someone throwing paint on the window of the GEO bus, Forral and Lang letting air out of its tires—that did not involve agreements at all.

There's a reason for the government's muddled presentation in this case. "When you don't have the facts, bang the law. When you don't have the law, bang the table." This Administration does not like when its citizens protest its unlawful actions, so it twists civil disobedience cases into § 372 conspiracies. Here, the government had evidence of civil disobedience—and vandalism—which is perhaps chargeable in various ways primarily in state court (and Forral has state charges pending). Yet it chose to shoehorn those facts into a violent § 372 conspiracy against federal authority. How is an able advocate to bridge that gap twixt fact and law? By banging the table—spinning a story of

generalized disorder and unsavoriness, mischaracterizing the elements of § 372 (“worked together with an agreement with each other and others to impede officers”), and hoping for the best.

And it is, unfortunately, not unreasonable for the government to hope for victory in a defective § 372 case. There’s an inherent risk of false positives in § 372 because it’s a purely mental crime. It doesn’t require proof of any substantive conduct. And, in the context of political protests, the government’s attempts to prove an agreement to use force, intimidation, threat, or injurious act will often overlap with protected speech and assembly. In such cases, it would be all too easy for a jury—especially one that has been told an agreement to impede is sufficient—to convict defendants for nonviolent acts of civil disobedience.

Rule 29 exists to ensure the district court confirms the legal sufficiency of every challenged conviction—and this is particularly important in cases with substantial First Amendment concerns. Should citizens see their neighbors convicted of violent federal felonies for participating in nonviolent acts of civil disobedience, mightn’t they think twice before speaking out themselves? Because the government presented insufficient evidence to

sustain a § 372 conviction, Forral respectfully asks the Court to enter a judgment of acquittal.

## II. The Court should vacate the judgment and grant a new trial under Rule 33.

Should the Court decline to enter a judgment of acquittal under Rule 29, Forral asks this Court to vacate their judgment and to grant a new trial because "the interest of justice so require." Fed. R. Crim. P. 33(a).

Rule 33 is an entirely different animal from Rule 29—the court's "power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal." *United States v. Alston*, 974 F.2d 1206, 1211–1212 (9th Cir. 1992) (citing 3 Charles Wright, Fed. Practice & Procedure § 553 (1982)). In considering a new trial, the court "need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *Id.* (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). Where the court finds that the "evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict" and grant a new trial. *Id.* (quoting *Lincoln*, 630 F.2d at 1319).

Additionally, a defendant is entitled to a new trial if prosecutorial misconduct rendered their trial unfair under the Fifth Amendment. *Darden v.*

*Wainwright*, 477 U.S. 168, 181 (1986). Whether or not committed in bad faith, a prosecutor's misconduct that taints the fairness of the proceeding necessitates a retrial. *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").

The Court should grant a new trial here because (1) the evidence weighs heavily against the verdict, (2) there is a grave risk that the jury's verdict rests on constitutionally impermissible grounds; (3) prosecutorial error during closing argument deprived Forral of their right to a fair trial; and (4) there is a constitutionally impermissible risk the jury was not unanimous in reaching its verdict.[15]

**A. The evidence weighs heavily against the verdict.**

Even if the Court disagrees with Forral that the government's evidence was legally insufficient, it should still grant Forral a new trial under its discretionary Rule 33 authority because the weight of the evidence weighs heavily against the verdict for all the reasons Forral argued, in their Rule 29 motion, that the evidence is insufficient.

---

[15] In a separate filing after Forral's codefendants' motions are filed, Forral anticipates joining Forral's codefendants' distinct Rule 33 arguments. Forral focuses on the four bases articulated here in order to avoid needless duplication of argument across defendants.

At most, the government presented evidence of an agreement to nonviolently impede federal officers from transporting immigration detainees. It did not prove there was an agreement to use force, intimidation, or threats, or to injure federal property. Instead, the government's constitutionally permissible evidence showed that protesters showed up at the Cataldo building to engage in time-honored practices of civil disobedience, such as linking arms, chanting at law enforcement, and passively or nonviolently obstructing the police. *See* Exhibits 33, 34, 605B. As Forral has acknowledged, some of this conduct may have been illegal (*see supra* fn. 4). But none of it constituted a violent conspiracy against federal power.

**B. There is a grave risk that the verdict rests on constitutionally-impermissible grounds.**

Even worse than the weakness of the government's evidence is the fact that the government's case depended, in large part, on painting Forral's constitutionally-protected activity as criminal. In closing, the government squarely argued that the words Forral (and their codefendants) chanted or even yelled at the police constituted agreed-upon threats and intimidation, in violation of § 372. *See* Exhibit I. at 31, 36-38. It did the same with the internally-directed speech at issue in this case—speech aimed at facilitating

and encouraging protected political assembly—arguing that that speech constituted a § 372 conspiracy. Exhibit I. at 13, 29.

Above, Forral has urged this Court to exercise its independent review of the record, under Rule 29, and hold that the jury's verdict necessarily (and, therefore, insufficiently) rested on these constitutionally protected facts (*see supra* Argument Section I(B)(4)). Even if the Court disagrees—even if it believes that, stripping the prosecutor's constitutionally improper argumentation out of this case, the government presented sufficient evidence to convict—the Court must still grant a new trial under Rule 33 because an attempt to criminalize constitutionally-protected speech lay at the heart of the government's case. The government urged the jury to convict Forral because they yelled vitriolic words at the police (thereby, according to the government, conspiring to intimidate and threaten them). Exhibit I. at 32-33; 40, 43. It urged the jury to convict Forral based on Signal and social media communications (sent by others, not Forral) that constituted commonplace rhetoric encouraging political assembly and protest. Exhibit I. at 12-13. And it argued that Forral was guilty of § 372 conspiracy because of the "reasonably foreseeability" of other individuals' violence—a form of argument the Supreme Court has expressly repudiated as "impermissibly burden[ing] the rights of

political association that are protected by the First Amendment." *Claiborne Hardware Co.*, 458 U.S. at 931.

If Forral's conviction is allowed to stand in the face of these prosecutorial tactics, it will represent dangerous precedent with chilling consequences for political speech, protest, and assembly in this country. Anytime someone breaks the law at a protest, skillful prosecutors will be able to comb through the events of the day looking for what they will invariably find: vitriolic rhetoric, offensive speech, political activists seeking to coordinate protest activity. Then—weaving a narrative connecting discrete illegal acts with the broader rhetoric and atmosphere of the protest—they will be able to advance a broad theory of § 372 conspiracy, urging the jury to convict any political activist the government decides to target based on (1) their constitutionally protected rhetoric and (2) the separate fact that something illegal happened at some point during the protest.

The interests of justice do not support permitting such a precedent to stand. The government is free to present relevant evidence and argument that defendants enter into agreements that constitute § 372 violations. But its actions in this case cannot be countenanced. Protesters cannot be subjected to felony conviction where the prosecutor urges the jury to convict because they

cursed, called ICE agents bad names, and communicated protests details over social media. Prosecutors cannot be permitted to leverage citizens' decision to "thoughtfully"—and nonviolently—"risk arrest" in the face of illegal government action into evidence of a violent conspiracy. Section 372 was meant to protect against treason and Klan terrorism—and the Court should not permit the government to use this law to punish protesters and to cow like-minded citizens into submission.

To guard against a constitutionally impermissible verdict—one with potentially devastating consequences to our constitutional freedoms—the Court should set aside this verdict under Rule 33.

### C. The prosecutor's misconduct during closing argument requires a new trial.

The Court should also order a new trial based on the prosecutor's misconduct during closing argument. *See United States v. Weatherspoon*, 410 F.3d 1142, 1151 (9th Cir. 2005) (court may order new trial under Rule 33 to protect "the defendant's broad right to a fair trial" (Trott, J., concurring)). "A prosecutor should not misstate the law in closing argument." *United States v. Flores*, 802 F.3d 1028, 1035 (9th Cir. 2015) (citing *United States v. Berry*, 627 F.2d 193, 200 (9th Cir. 1980)). And a prosecutor errs by "improperly inviting the jury to convict" on false grounds at closing. *See id.* at 1036 (finding error

where prosecutor invited jury to convict "based on exportation rather than importation" of drugs).

In closing and rebuttal, the prosecutor in this case repeatedly misled the jury about the law and the facts. ***First***, she expressly told the jury that it should convict Forral and their codefendants so long as it found that they "worked together with an agreement with each other and others to impede"—not *violently* impede, but simply impede—"officers." This is an express misstatement of § 372's law. Nor was it a mere slip of the tongue. Throughout the case, the prosecutor sounded this same theme—essentially seeking to write violence out of § 372. When cross-examining Archer, the prosecutor made clear that she "want[ed] to talk specifically about what you were agreeing to do"—and then had Archer confirm that they "were agreeing to block the bus," "were agreeing to block exits," and "had collectively made a plan . . . so that the federal officers had to essentially deploy violence in order to leave . . . with the detainees." Exhibit K at 62-64. And in her final series of questions (or remarks) to Archer, the prosecutor made clear the nonviolent nature of the agreement: "You didn't need to throw any punches to put the pressure you needed to get [the ICE agents] to release [the immigration

detainees]. . . . It was your numbers. It was your tactics. It was your blocking. Didn't need to punch anybody." Exhibit K. at 88.

The prosecutor took the same tack in her closing arguments. First, she focused the jury on the alleged criminal agreement: "There is much talk about agreement, whether or not there was an agreement here. Luckily, the evidence also shows this as well." Exhibit I. at 36. Then, she turned to that purported evidence of agreement. She told the jury that, "to determine what someone is thinking," it should "look at what they're doing." Exhibit I. at 36-37. Then she told the jury that Forral saying "Block the gate" "indicates the agreement." Exhibit I. at 37. And that "[l]inking arms, running, sprinting, acting in solidarity . . . every single thing that you see in these videos shows that this is a conspiracy." Exhibit I. at 37-38. That is, the prosecutor told the jury that evidence of "acting in solidarity" to "block the gates" establishes a § 372 violation.

Even worse, when the prosecutor did passingly mention acts of violence at the Cataldo protest, she did so in a way that was calculated to mislead the jury into thinking that it could convict Forral and their co-defendants of a § 372 conspiracy so long as it was reasonably foreseeable to them that violence

might have taken place at the Cataldo protest. Hence—focusing on events at the south gate—the prosecutor argued:

> And so what we see at the gate is that pushing back, that melee. That relocking arms. That reaffirming you're not leaving, not on my watch. Silva pushes the officer from behind. And we see Silva in a lot of different places. That's the lady with the neck tattoo in that picture, and we're going to see more pictures of her. None of that -- she's in the line. None of that is not reasonably foreseeable. If you're going to physically block officers, the fact that people are becoming physical with the officers is not not reasonably foreseeable. It's not unreasonable.

(Exhibit I. at 18). But this is a misstatement of the law. The Ninth Circuit has unambiguously held that—to prove a § 372 conspiracy—the government must present evidence that at least two people *consciously* agreed *to use* force, threats or intimidation or to inflict injury. *Ehmer*, 87 F.4th at 1120. The prosecutor, by contrast, encouraged the jury to convict Forral of § 372 conspiracy so long as it found that protesters' "becoming physical with [law enforcement] officers" was a "reasonably foreseeable" consequence of the civil disobedience at Cataldo.

Finally, at rebuttal—after Forral could no longer respond—the prosecutor told the jury that the defendants' "agreement with each other and

others to impede officers" was sufficient for conviction. Exhibit I. at 42. This was one of the very last things the jury heard. The prosecutor ended the trial by misstating the law and telling the jury that, if Forral agreed with others to impede officers, then they were guilty of violating § 372. This invited the jury to convict without finding any agreement to use force, intimidation, or threats, or to injure federal property.

"Evidence matters; closing argument matters; statements from the prosecutor matter a great deal." *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993). These arguments mattered—particularly in a case where the jury may have strongly disapproved of Forral's political views, their gender identity, their incendiary language, or their deflation of the GEO Group bus's tire. In such a case, the prosecutor's decision to press false grounds for conviction may have been tempting.

And it does not matter if the prosecutor erred in good faith. "Prosecutorial misstatements can constitute error even where they were apparently made in good faith." *United States v. Mageno*, 762 F.3d 933, 948 (9th Cir. 2014), vacated on other grounds, 786 F.3d 768 (9th Cir. 2015). Regardless of whether the prosecutor intentionally misled the jury or simply misunderstood the law, one of the last things the jury heard before

deliberations was the government's representative telling them to convict if they found Forral had agreed to impede federal officers. That is prosecutorial error meriting a new trial.

***Second***, the prosecutor also committed other acts of misconduct during closing that call for a new trial. She repeatedly made statements that could serve no other purpose than to inflame the jury's passions against Forral and their codefendants, accusing them of holding ICE agents "hostage" and "delay[ing]" due process for the immigrants ICE illegally detained. Exhibit I. at 29, 33. To shoehorn the tire-deflation episode into § 372, she also mischaracterized the meaning of "property of [an] officer"—saying that this phrase encompasses any "property being used by officers to do their job," including property controlled by private individuals (Exhibit I. at 34)—even though this Court has already held that, in § 372, this phrase only "encompasses property in the officer's possession or under *his* control." *Forral*, 2026 U.S. Dist. LEXIS 123127, at *15 (emphasis added). Considered both singularly and in totality, the prosecutor's improper arguments during closing call for a new trial.

### D. The potential of a non-unanimous jury verdict requires a new trial.

Finally, this verdict cannot stand because of the serious risk that the jury's verdict was not unanimous. Where the government presents two or more theories to the jury and at least one theory was "*legally* erroneous," then the conviction "must be overturned"—because "'jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law.'" *Keating v. Hood*, 191 F.3d 1053, 1062 (9th Cir. 1999) (quoting *Griffin v. United States*, 502 U.S. 46, 59 (1991)) (emphasis in original); *see also United States v. Yates*, 16 F.4th 256, 269, ("'constitutional error occurs' when a jury 'returns a general verdict that may rest on a legally invalid theory'") (quoting *Skilling v. United States*, 561 U.S. 358, 414 (2010)).

Here, the jury was instructed that it could convict Forral if it found they conspired "to prevent *by force, intimidation, or threat*, any officer of the United States from discharging any of their official duties[.]" ECF No. 361 at 19 (emphasis added). This means the jury was instructed that it could convict Forral even if some jurors found the evidence established only an agreement to prevent by force, others an agreement to prevent by intimidation, and others an agreement to prevent by threat.

And we know that the jury did vote to convict on this ground—along with two other substantive § 372 grounds. ECF No. 365 at 2. But Forral has argued those other substantive § 372 grounds—which all require proof of a conspiracy to injure federal officers' property—cannot support conviction. If the Court agrees, then the only remaining potentially valid basis for Forral's conviction would be the "force, intimidation, or threat" prong of § 372. Forral has argued this prong is also legally and factually insufficient to sustain their conviction. The point of Forral's juror non-unanimity argument is that—even if the Court agrees with Forral on only *one* of their arguments against this prong (e.g., if it agrees with Forral that the alleged threats and/or intimidation are protected speech while disagreeing with their argument that linking arms is not a use of force or vice versa)—it must still reverse their conviction because of the risk that some jurors voted to convict on a legally erroneous theory.

This possibility would require reversal unless the Court was "'able to declare a belief that [the error] was harmless beyond a reasonable doubt,' in that 'it did not contribute to the verdict obtained.'" *United States v. Milheiser*, 98 F.4th 935, 946 (9th Cir. 2024) (quoting *Yates*, 16 F.4th at 269) (alteration in original). Here, however, the government pressed argument on all three

theories: that there was an agreement to prevent by force, by intimidation, and by threat. There would therefore be reason to doubt the jury relied on only a legally permissible theory, meaning a new trial is necessary.

## III. The court should dismiss the indictment.

There is a final reason that Forral's § 372 conviction cannot stand: because the government selectively chose to prosecute Forral based on their protected political expression.[16] In that way, this case is the latest in a string of cases in which the government has sought to use the courts to punish its nonviolent enemies—while using the executive pardon power sparing its most violent allies.

In January 2025, on his first day back in office, President Trump pardoned approximately 1,500 people convicted for offenses stemming from the deadly insurrection at our Capitol. Proclamation 10887, Granting Pardons and Commutation of Sentences for Certain Offenses Relating to the Events at or Near the United States Capitol on January 6, 2021, 90 Fed. Reg. 8331 (Jan. 20, 2025). Five months later, Forral and hundreds of others protested ICE's unlawful detention of an asylum-seeker. The very next day, President

[16] The Court previously denied a selective-prosecution motion filed by Forral as untimely. ECF No. 280 (text order). As discussed herein, this new Rule 12 motion is supported by new evidence previously unavailable to Forral.

Trump's Justice Department ordered all U.S. Attorneys to prioritize criminal prosecutions of protesters.[17] Barker dutifully undertook a prosecutorial review of the protest at the Cataldo building, determined no charges were warranted—and then resigned, saying he was grateful he "never had to sign an indictment [he] didn't believe in."[18] Just two days later, his acting replacement signed the indictment in this case. *See* ECF No. 1. And that indictment constituted an unconstitutionally selective prosecution.

"The prosecutor has more control over life, liberty, and reputation than any other person in America." Robert H. Jackson, *The Federal Prosecutor*, 31 J. Crim. L. & Criminology 3 (1940). While prosecutors enjoy "broad discretion to enforce the Nation's criminal laws," *United States v. Armstrong*, 517 U.S. 456, 464 (1996), that discretion is not unfettered. "Selectivity in the

---

[17] Sarah N. Lynch, *Prosecutors told to prioritize, publicize cases tied to Trump immigration policies*, Reuters (June 12, 2025), https://www.reuters.com/world/us/prosecutors-told-prioritize-publicize-cases-tied-trump-immigration-protests-2025-06-12/. This came two days after President Trump called anti-ICE protesters in Los Angeles "animals" and "a foreign enemy." *Trump calls Los Angeles protesters 'animals' and 'a foreign enemy' in speech meant to mark Army's 250th anniversary*, Associated Press (June 10, 2025), https://news.wttw.com/2025/06/10/trump-calls-los-angeles-protesters-animals-and-foreign-enemy-speech-meant-mark-army-s

[18] Richard Barker, Linkedin, https://www.linkedin.com/feed/update/urn:li:activity:7350949196650213377/

enforcement of criminal laws is . . . subject to constitutional constraints," including that the decision to prosecute cannot be based on "the exercise of protected statutory and constitutional rights." *Wayte v. United States*, 470 U.S. 598, 608 (1985). That is, the Constitution not only protects individuals' right to speak out against their government—it also forbids prosecutors from retaliating against individuals for exercising that constitutional right. The prohibition on selective prosecutions guards against prosecutors using our criminal justice system to punish and imprison their perceived political enemies. But that is exactly what happened here.

The government sought to prosecute Forral and their co-defendants because they took a stand against the Trump administration's immigration policy. The U.S. Attorney at the time (Richard Barker) resigned in lieu of bringing charges against the protesters at the Cataldo building. (The indictment charging Forral was filed by the Acting U.S. Attorney two days later. ECF No. 1.) When Forral was convicted, Barker stated the charges were filed "to punish members of the Spokane community who stood up for two young men who were unlawfully detained by ICE."[19] .

[19] Duggan, supra fn. 7.

Forral moves for dismissal Rule 12(b)(3)(A)(iv) because Barker's statement establishes that the government engaged in selective prosecution, in violation of equal protection principles. And Forral has good cause for seeking relief at this stage because Barker did not make this statement until after the jury had returned its verdict. *See* Fed. R. Crim. P. 12(c)(3). (Barker had made other statements suggesting disagreement with the charging decision but had not stated that the government brought charges "to punish" its political opposition.)

Dismissal of federal criminal charges under the selective prosecution doctrine has been rare. That is because the Department of Justice had—until very recently—a reputation for following the facts and the law to determine whether to bring criminal charges. But this case illustrates the extent of the Department's departure from that tradition. It's clear the Trump administration's animus towards its political opponents led directly to this selective prosecution—as evidenced by the statements of the U.S. Attorney asked to file charges against Forral and their codefendants.

The government is attempting to use this case—and this Court—to punish Forral because they opposed the Trump administration. That is a

constitutional violation of the most basic sort, and the indictment must be dismissed.

At a minimum, if the Court does not dismiss the indictment outright, Barker's statement justifies thorough discovery into the suspect prosecutorial decision-making process that led to this indictment and a hearing at which the government must justify its decision to bring these charges.

### A. The Constitution prohibits the government from selectively prosecuting a defendant for arbitrary reasons, including for exercising First Amendment rights.

The "equal protection component of the Due Process Clause" prohibits the government from selectively deciding "whether to prosecute . . . based on an unjustifiable standard such as race, religion, or other arbitrary classification." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (cleaned up). "To establish a claim of selective prosecution, a defendant must show both discriminatory effect and discriminatory purpose." *United States v. Sellers*, 906 F.3d 848, 852 (9th Cir. 2018) (citing *Armstrong*, 517 U.S. at 465). The government has recognized that a defendant may be able to satisfy both selective-prosecution prongs by identifying "direct admissions by [prosecutors] of discriminatory purpose." *Armstrong*, 517 U.S. at 469 n.3 (citing Brief for United States).

### B. Former U.S. Attorney Barker has admitted that the government prosecuted Forral for an impermissible discriminatory purpose.

The Supreme Court has previously held that, in "the ordinary case," "the presumption of regularity supports [U.S. Attorneys'] prosecutorial decisions." *Id.* at 464.[20] But not where there is "clear evidence to the contrary[.]" *Id.* Where there is evidence that the government's actions are infected with "bad faith or improper behavior," the presumption of regularity falls away. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). That is the case here.

The government's decision to prosecute an individual has an impermissible "discriminatory purpose" if it is based on the individual's exercise of constitutional rights or other "arbitrary" factors. *Wayte v. United States*, 470 U.S. 598, 608 (1985). Most relevant here, the government cannot

[20] While Forral argues the presumption of regularity should not apply based on the specific facts of this case, the egregious actions of this administration have led several courts to find that the Trump administration "may have forfeited the right to such a presumption of regularity" in any case. *Fed. Educ. Ass'n v. Trump*, 795 F.Supp.3d 74, 89–92 (D.D.C. Aug. 14, 2025) (collecting cases finding the Trump administration's conduct justified withdrawing the presumption of regularity).

selectively prosecute an individual "because of his exercise of First Amendment rights." *Id.* at 606–07.

Barker's statement that charges were brought against Forral "to punish members of the Spokane community who stood up for two young men who were unlawfully detained by ICE" is a direct acknowledgment that the decision to prosecute was based on impermissible factors. Since returning to office in January 2025, President Trump's Justice Department has sought to prosecute and punish those who dare stand up to the administration. Barker's statement establishes that the decision to prosecute Forral was not based on a good-faith application of law to facts. Rather, it was based on the Department's hostility to protected oppositional speech and assembly.

The evidence here shows that, but for the content of the Cataldo building protest (community members standing up for neighbors unlawfully detained by ICE) the government would not have brought this prosecution. This Court should therefore conclude that the government selectively prosecuted Forral in violation of their right to equal protection of the law.

**C. The proper remedy is dismissal with prejudice.**

Dismissal with prejudice is the only remedy that will vindicate the fundamental constitutional values at issue in this case and deter the

government from continuing to selectively prosecuting perceived political opponents.

In criminal cases, federal courts use their "supervisory power" to "implement a remedy" aimed at vindicating "recognized rights" and "deter[ring] illegal conduct." *United States v. Hasting*, 461 U.S. 499, 505 (1983). Such a dismissal may be with prejudice. *See United States v. Bundy*, 968 F.3d 1019, 1031 (9th Cir. 2020).

To determine whether government conduct merits dismissal with prejudice, courts consider whether "there is (1) flagrant misbehavior and (2) substantial prejudice." *Id.* If the answer to both is yes, courts next assess whether (3) "any lesser sanction will put the defense at a greater disadvantage than it would have faced had the government not violated a constitutional right. *Id.* at 1043.

Here, the factors compel dismissal with prejudice. The government has flagrantly violated equal protection by prosecuting Forral based on their protest, and the government's misconduct caused Forral substantial prejudice in the form of a felony prosecution they would not otherwise have faced. And any other sanction would put Forral at a greater disadvantage than if they had never been charged because it would leave the government—with the

same President in office—free to continue abusing the criminal justice system by re-filing the same charge in the face of a finding of selective prosecution (and to force out any U.S. Attorney unwilling to re-file the charge), thereby keeping Forral under indictment in perpetuity. To prevent that affront to the integrity of our criminal justice system, dismissal must be with prejudice.

### D. At minimum, discovery and an evidentiary hearing are warranted because Forral has shown a realistic likelihood of selectiveness.

At the very least, if the Court concludes that Barker's statement is not sufficient to establish that Forral was selectively prosecuted, then the Court should order discovery into the government's motives and hold a hearing. (This would provide the government an opportunity to provide record support for its assertion that Barker—the U.S. Attorney who directed the initial prosecutorial review to determine whether federal crimes were committed at the Cataldo building protest—was "ill-informed." ECF 247 at 3.) For a selective-prosecution motion, the defendant is entitled to discovery if there is "some evidence tending to show the existence of the essential elements" of the claim. *Armstrong*, 517 U.S. at 468. Barker's statement readily meets that standard.

## Conclusion

For the reasons stated above, the Court should grant Forral's Rule 29 motion on the basis of insufficient evidence or, at minimum, grant their Rule 33 motion on the basis that the weight of the constitutionally-permissible evidence weighs heavily against the verdict, there is too grave a risk the verdict infringes Forral's First Amendment rights, the prosecutor's misconduct during closing militates strongly in favor of a new trial, and there is a high potential risk of prejudicial juror nonunanimity. And it should dismiss the indictment as a product of selective prosecution.

Dated: August 26, 2026

Federal Defenders of Eastern Washington & Idaho

*s/Andrea K. George*
Andrea K. George, MN 202125
601 West Riverside Ave., Suite 900
Spokane, Washington 99201
t:(509) 624-7606
Andrea_George@fd.org

*s/ Amy H. Rubin*
Amy H. Rubin, WA45874
601 W. Riverside Ave., Suite 900
Spokane, Washington 99201
t: (509) 624-7606
Email: Amy_Rubin@fd.org

*s/ Katie E. Kitchen*
Katie E. Kitchen, DC90030420
601 W. Riverside Ave., Suite 900
Spokane, Washington 99201
t: (509) 624-7606
Email: katie_kitchen@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following: Lisa Cristine Cartier-Giroux and Rebecca R. Perez, Assistant United States Attorneys.

*s/Andrea K. George*
Andrea K. George, MN 202125
601 West Riverside Ave., Suite 900
Spokane, Washington 99201
t:(509) 624-7606
Andrea_George@fd.org

*s/ Amy H. Rubin*
Amy H. Rubin, WA45874
601 W. Riverside Ave., Suite 900
Spokane, Washington 99201
t: (509) 624-7606
Email: Amy_Rubin@fd.org

*s/ Katie E. Kitchen*
Katie E. Kitchen, DC90030420
601 W. Riverside Ave., Suite 900
Spokane, Washington 99201
t: (509) 624-7606
Email: katie_kitchen@fd.org