# Exhibit A.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:25-cr-00113-RLP |
| Plaintiff, | ) | May 20, 2026 |
| | ) | Spokane, Washington |
| vs. | ) | |
| | ) | Excerpt of Jury Trial - Day 3 |
| JUSTICE FORRAL (2), BAJUN MAVALWALLA (8), and JAC ARCHER (9), | ) | **Testimony of Jared Tomaso** |
| | ) | Pages 1 - 143 |
| Defendants. | ) | |

BEFORE THE HONORABLE REBECCA PENNELL
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | LISA C. CARTIER-GIROUX<br>REBECCA R. PEREZ<br>U.S. Attorney's Office<br>920 W. Riverside Avenue<br>Suite 340<br>P.O. Box 1494<br>Spokane, WA 99201 |
| For Defendant Forral: | ANDREA K. GEORGE<br>AMY H. RUBIN<br>Federal Defenders of Eastern Washington & Idaho<br>601 W. Riverside Avenue<br>Suite 900<br>Spokane, WA 99201 |
| For Defendant Mavalwalla: | AINUDDIN AHMED<br>Ahmed Law Firm<br>550 Congressional Boulevard<br>Suite 350<br>Carmel, IN 46032 |
| | MATTHEW F. DUGGAN<br>Duggan Law Offices PLLC<br>23505 East Appleway Avenue<br>Suite 200-175<br>Greenacres, WA 99019 |

For Defendant Archer: CARL JOSEPH ORESKOVICH
ANDREW M. WAGLEY
Etter McMahon Lamberson Van Wert & Oreskovich PC
618 West Riverside Avenue
Suite 210
Spokane, WA 99201

Official Court Reporter: Crystal L. Gonzalez, CRR, RPR
United States District Courthouse
P.O. Box 700
Spokane, Washington 99210
(509) 458-3434

Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.

(Whereupon, previous proceedings were held which were not ordered and transcribed.)

(JARED TOMASO, called as a witness by the Plaintiff, having first been duly sworn, testified under oath as follows:)

THE COURT: Please be seated.

DIRECT EXAMINATION

BY MS. CARTIER-GIROUX:
Q. Good morning.
A. Good morning.
Q. Special Agent Tomaso, where are you currently employed?
A. I'm employed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives, also known as ATF.
Q. How long have you worked for ATF?
A. I've been an ATF agent for approximately eight years.
Q. And in what capacity?
A. As a special agent.
Q. Did you have any training to become a special agent?
A. Yes, I did. I went through a basic criminal investigative training program in Georgia for about three months. And then I went to the ATF specific add-on special agent basic training for another three, three and a half months after that.
Q. And are you currently engaged in any kind of training?
A. Yes, I am. I'm currently training out in Virginia to be a K-9 handler, an explosive detection K-9 handler.
Q. Previous to working for ATF, where did you work?

A. I was employed by the Immigration and Customs Enforcement for approximately two years.
Q. What did you do for them?
A. I was a deportation officer for them, and then prior to that, I was a border patrol agent on the southwest border for approximately eight years.
Q. Eight years?
A. Yes, ma'am.
Q. Do you speak any other languages?
A. I do. I speak Spanish.
Q. Do you speak it fluently?
A. Yes.
Q. Can you write it?
A. Yes, I can.
Q. In addition to reading it?
A. Yes.
Q. On June 11, 2025, where were you employed?
A. I was employed by ATF.
Q. Were you positioned in a different office than the ATF office?
A. Yes. We were directed by our headquarters to provide agents to assist Immigration and Customs Enforcement, so I was chosen to assist, to be over there and help them.
Q. Okay. And what was the physical location where you were required to report?

A. It is the ICE office off of Cataldo.
Q. Okay. And on June 11, 2025, what time did you arrive, approximately?
A. Approximately 8:00 or 9:00 in the morning.
Q. And do you recall which door you entered into?
A. The front door. Would have been the north-facing door.
Q. Okay. And when -- you say the north-facing door and the front door. Do you mean the -- which street is that on?
A. I believe that's Cataldo.
Q. Okay. And that street, where does the -- where does the transport bus for that facility usually park?
A. It parks right on that street. So the main pedestrian door where I went in just to the east of that towards Washington Avenue is where there's a big garage-type door where the van parks in front of.
Q. Okay. And did you make any observations upon your arrival at 8:00 or 9:00 a.m.?
A. When I arrived, it was a normal check-in day, I guess. So there's a lot of people that are kind of on -- released on supervision or whatever that come in to check in with the immigration officers. And so this was one of those days that they -- a lot of people had been scheduled to come check in. So there was a line of people out front.
Q. Okay. And can you describe the lobby to that facility? Is it large? Small? Give a little bit of a description of it.

A. It's pretty small, actually. So it's -- I would estimate maybe four feet wide by maybe 15 feet long.
Q. And are people coming in -- who are accompanying people that are checking in allowed to come inside that lobby area?
A. Usually, no. That lobby is reserved for people that are waiting to check in and maybe an attorney if they're present with them or possibly a close family member. But since it's such a small space, they don't want a lot of people gathered in there.
Q. Okay. On that day, were you aware at some point in time that there were detainees that needed to be processed?
A. Yes, I was.
Q. What does that mean, "processed"?
A. So when people are taken into custody, there's paperwork that needs to be completed. There's forms that need to be served to them. They take fingerprints, things of that nature.
Q. Okay. And are people -- are people kept -- is that facility on Cataldo a holding facility?
A. No. It's a temporary holding is all. It's not an overnight or long-term facility.
Q. Are there beds in that facility?
A. No.
Q. Is there a kitchen in that facility?
A. No. There's a break room area where water and things like that are stored, but...

Q. Okay. When -- after they are processed and the paperwork is done and they're served with the paperwork as you testified, what happens after that?

A. So after that, they're prepared for -- they're prepped for transport, meaning per policy, things like that, they have to be placed in cuffs and restraints, and then they're prepared to get put on the bus to transport to court.

Q. Okay. How do they get on the bus?

A. So there's -- the government pays for a contract company that comes and does all the transports, and so the drivers of the bus are contractors. They're not actually government employees. When they show up, then an agent or officer has to escort the detainees and turn them over to a transport company.

Q. Okay. Did there come a point in time when the GEO bus, the transport bus, arrived at Cataldo?

A. Yes.

Q. To your memory, did there come a point in time where an individual named Ben Stuckart arrived with two males who were to be taken into custody?

A. Yes.

Q. Can you tell us about what you observed when that happened?

A. So basically, there was -- as I stated earlier, there was a pretty long line of people. But as the day kind of grew, there was more people than normal. I could tell it wasn't just people that were waiting to be checked in, but it was other people

also. And so I learned that there was two individuals that were, I believe, Venezuelan nationals, and there was -- Ben Stuckart was with them.

Q. Were the individuals with Mr. Stuckart -- actually, I'll ask this question.

Do you all keep juveniles or underage individuals at this facility?

A. Not my knowledge.

Q. Okay. Do you know who the two individuals were who were taken into custody that had been with Mr. Stuckart?

A. Yes.

Q. Were they adult males?

A. Yes, they were.

Q. The purpose of going -- being transported, what happens when they get brought to Tacoma?

A. When they get brought to Tacoma, that's kind of a more long-term facility. Not long term, but more an overnight facility where people are housed before seeing a judge or before the court proceedings.

Q. Okay. Where are the judges located for immigration court?

A. In Seattle-Tacoma area.

Q. So in order for them to go see a judge, where would they have to be transported to?

A. To the west side, to Seattle-Tacoma.

Q. Now, did you speak with those -- the two males that

accompanied Mr. Stuckart?
A. I did. I was asked by the officers to assist with talking to them and taking them into custody.
Q. Did you explain to them the purpose and what would happen?
A. I did.
Q. Okay. Did that information include that they would be go seeing a judge?
A. Yes, it did.
Q. Okay. Who prepared the detainees for transport?
A. I believe I assisted with that. I don't recall exactly who did.
Q. And were the two males the only detainees that were in the facility?
A. No. I believe there was around 12.
Q. So approximately 12 people?
A. Yes. Somewhere around there.
Q. Were they all to be transported to Tacoma?
A. Yes. So this -- this center acts as kind of a hub also. So border patrol usually drops off people because the bus shows up to this location. So border patrol drops off other of their detainees, and then sometimes they continue to be processed at this facility, and then they get loaded on the bus from there.
Q. Okay. But your recollection, there was about 12 people?
A. Correct.
Q. Okay. Did there come a point in time where you looked

outside the windows or -- is there surveillance cameras at that -- the facility?
A. There is.
Q. Did there come a point in time where you looked at surveillance cameras or looked outside the window --
A. Yes.
Q. -- and noticed anything?
A. Yes.
Q. When was that, approximately?
A. That was sometime after the two individuals that we spoke of were taken into custody. I don't recall. Maybe around noon, I believe.
Q. Okay. And what did you observe?
A. I observed that there was a growing number of people. It wasn't just a line outside of it as it had been earlier. There was a lot more people. There was people carrying signs. There was people that were starting to get a little bit loud and agitated. There was people with blow horns or megaphones. And so there was just a growing number of people, I guess, out front.
Q. Did you go outside at any point in time?
A. At one point in time, I did go outside. I was told that there was people sitting in front of the bus, around the bus, kind of blocking it. And so at one point in time, I went out with one of the Homeland Security agents, and I went out just to

assist him in telling people that they were going to need to move as we needed to transport people out of there.
Q. Do you recall which person you went outside with?
A. It would be the Assistant Special Agent in Charge LaForte.
Q. What's his first name?
A. David, I believe. John. John. I'm sorry.
Q. What is it?
A. It's John LaForte, I believe.
Q. But you remember his last name.
A. Yes.
Q. But he doesn't work with your agency?
A. Correct.
Q. Okay. So you went outside. When you went outside with Agent LaForte, what, if anything, did you observe?
A. I observed that there was people sitting blocking the sidewalk in between the garage area of the building and the bus. There was people sitting also in front of the door to the bus. And I believe there was also people sitting in front of the bus itself.
Q. Okay. Based on your training and experience -- first of all -- withdrawn.
How far is the distance between the building where you'd have to bring the detainees out and the door of the bus, approximately?
A. The length of a sidewalk. So I would estimate no more than

10 feet.
Q. Okay. Based on your training and experience in transporting detainees, would -- based on what you had observed when you went outside, would it have been safe to bring out the detainees and place them in the bus?
A. No.
Q. Why not?
A. There was a lot of people out there. We didn't know who all was out there. There was a just a hazard. It's not safe to bring people out. There's tripping hazards. There's -- we don't know who's there. We don't -- we have to make sure nobody runs. A lot of times we're just concerned for their safety, for everybody's safety.
Q. For everyone's safety? Okay.
Were the people blocking the door to the bus asked to move?
A. They were.
Q. Did they comply?
A. No.
Q. At that point in time, when someone -- now, based on your training and experience, when you give -- do you identify yourself as a law enforcement officer?
A. Yes.
Q. When you give a lawful order and you order someone to move and they do not move, is that something that you're allowed to act upon?

A. Yes.
Q. Okay. And what types of things are you able to do if someone disobeys an order that you give?
A. At that time, we can physically move them out of the way.
Q. Okay. While these people were sitting in front of the bus, blocking the bus, did you believe that you and Special Agent LaForte could move those people?
A. No. There was too many people.
Q. Sorry. Why?
A. No. There was too many people at that point.
Q. How many people -- agents, law enforcement officers -- were there in that facility at that time?
A. I believe there was six of us.
Q. Okay. Is it fair to say when you went out the first time that there were different --
MR. ORESKOVICH: Objection to the leading question, your Honor.
MS. CARTIER-GIROUX: I didn't ask it yet.
THE COURT: Go ahead and finish your question.
Q. (BY MS. CARTIER-GIROUX) Is it fair to say that there was a differential between the number of officers and the number of people outside?
A. Yes. There was more people --
THE COURT: Sustained, but it's also not the most critical question. Go ahead.

Q. (BY MS. CARTIER-GIROUX) What was that differential?
A. I estimated at the time there was approximately 20 people to our six people in total but two outside.
Q. Okay. What was the decision made, as far as you knew, to do about the people sitting outside and blocking the bus?
A. At that point, we asked them to leave. And then we wanted to give them an opportunity to comply, which they didn't. But we also would call for the local police to come and intervene.
Q. And did -- were the -- were the locals called to intervene?
A. They were called, yes.
Q. As far as your training and experience, are you aware of whether or not it is lawful to block a sidewalk?
MR. ORESKOVICH: Objection, your Honor.
MS. CARTIER-GIROUX: How else am I going to ask the question?
MR. ORESKOVICH: Either --
MS. CARTIER-GIROUX: Okay. I'll ask it this way. Did you --
THE COURT: Why don't we bring this up later and go ahead and ask your question. Legal issues, of course, are for the Court, not for witnesses.
MS. CARTIER-GIROUX: Understood.
Q. (BY MS. CARTIER-GIROUX) Based on your training and experience, when you are looking at the --
MS. GEORGE: Objection. What is that training and

experience?
MS. CARTIER-GIROUX: Okay.
Q. (BY MS. CARTIER-GIROUX) How long have you been a law enforcement officer?
A. Approximately 18 years.
MR. ORESKOVICH: Judge --
Q. (BY MS. CARTIER-GIROUX) 18 years?
A. Yes.
Q. Prior to being a special agent, what types of training did you have?
A. I've gone through -- well, technically three law enforcement academies, as well as continual training. We do quarterly use-of-force training or firearm qualifications, things of that nature. We're constantly training.
Q. Okay. Are you familiar with Washington State statutes?
A. Familiar, yes.
Q. Okay. When you saw people blocking the sidewalk, did you believe --
MS. GEORGE: Objection. Leading.
THE COURT: Overruled.
Q. (BY MS. CARTIER-GIROUX) Did you believe --
MS. GEORGE: Objection. Leading.
THE COURT: I overruled it.
MS. GEORGE: I'm sorry. I didn't hear you.
Q. (BY MS. CARTIER-GIROUX) Did you believe that they were

committing an arrestable offense?
A. I believe so.
MR. ORESKOVICH: Objection, your Honor.
THE COURT: I'll overrule it. This is just what he believes. It doesn't mean that it's an arrestable offense.
MS. CARTIER-GIROUX: Okay.
THE WITNESS: According --
Q. (BY MS. CARTIER-GIROUX) Go ahead.
A. According to my belief, it wasn't lawful to block a route of travel.
Q. Okay. Based on your beliefs, was it lawful to block the door of a bus that you were using to transport prisoners?
A. I believed that it was not.
Q. Based on your beliefs, did you provide them with lawful orders to move?
A. Yes.
Q. Did they comply with those orders?
A. No, they did not.
Q. You indicated that there came a point in time when 91 -- when locals were called to help?
A. Yes.
Q. At that point in time, what did you believe was going to happen?
A. When we initially called, what we believed or hoped that was going to happen is that they would send a marked law

enforcement officer or a marked police unit there and they would ask them to move and hopefully facilitate that.
Q. Okay. Did there come a point in time after you went outside where you had an opportunity to observe the bus, the white bus again, the transport vehicle?
A. Yes.
Q. What, if anything, did you observe about the bus?
A. We observed people all around it. We observed some individual spray-painted the windshield of the bus. We also observed people under and behind the bus. And it appeared as though one individual was letting air out of the tires or at least one of the tires.
Q. Did you observe the letting the air out of the tires?
A. I did. I observed an individual crouched behind the tire as if that's what they were doing.
Q. So let's be clear. So you saw an individual crouched behind the tire. Is that what your testimony is?
A. Yes.
Q. At that time, were you able to tell exactly what that person was doing?
A. No. I just suspected.
Q. Did you learn thereafter that the tires had been deflated?
A. Yes.
Q. So you see people or somebody near the tires of the white bus. What, if anything, did you believe could be happening at

that time?
A. I believed that they were either letting air out of the tire, slashing the tires, or sabotaging the bus. There was also an individual underneath the bus it appeared. And so I had concerns that they could have been tampering with a brake line or something like that also.
Q. Okay. But you didn't know --
A. I didn't know.
Q. -- for sure.
A. Correct.
Q. Okay. You indicated earlier that you heard people on megaphones; is that correct?
A. Yes.
Q. I want to play you what's been admitted as Exhibit 7.
MR. ORESKOVICH: I'm sorry. I did not hear you.
MS. CARTIER-GIROUX: I'm sorry. I didn't talk into the microphone. I keep forgetting. I apologize.
THE COURT: Exhibit 7.
MR. ORESKOVICH: Thank you.
MS. CARTIER-GIROUX: Exhibit 7.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Do you recognize what I just played?
A. Yes, I do.
Q. Is that consistent with what you were hearing at the time

when the megaphone was being used?
A. Yes.
Q. Was it being used for other things as well?
A. It was.
Q. What other things was it being used for?
A. At some point, there was people chanting in the megaphone. There was vulgarities being chanted at us, things like that.
Q. While you were focused on the white bus, at any point in time, did local police come?
A. No, not to my knowledge.
Q. Okay. Did there come a point in time where you determined that you could -- you were no longer going to use the white bus?
A. Yes.
Q. Did you all come up with a second plan?
A. Yes. There was -- at this time, things were evolving rapidly and there was a lot of talk about what we were going to do as we didn't know if the local police were going to come assist. And so there was a couple of different ideas that were thrown out there of how we were going to be able to get out of there and get the detainees moved.
Q. Did there come a point in time where you made a plan that a van would arrive?
A. Yes.
Q. Okay. Can you tell us a little bit about that?
A. So border patrol was contacted because we knew they had

vans and transport capabilities. So a plan was made that they were going to show up and bring a van and we were going to attempt to go through the back door with the detainees and load them into this border patrol van.

Q. I'm going to show you now Exhibit 17 that's in evidence. What is Exhibit 17?

A. So that is a map of the location that we're talking about.

Q. Okay. And if you recall -- you can use this map to draw with your fingers.

A. Okay.

Q. Where was the red van supposed to go?

A. The red van was going to go to this parking lot here.

Q. Okay.

A. Somewhere here, I believe.

Q. Can you make an X on the map where the white transport bus was?

A. Yes. That was somewhere right here.

Q. Okay.

A. A little closer to this building.

Q. There's a yellow arrow on this map. What is the yellow arrow pointing to?

A. So that was a door, a man door that we could get through.

Q. Is that the door you were going to utilize?

A. Yes.

Q. So did there come a point in time where the van did arrive?

A. Yes.
Q. Was that plan executed?
A. No, it was not.
Q. Why wasn't it executed?
A. As soon as the van pulled into that lot right there with the blue circle, then they were swarmed by a crowd of individuals.
Q. Okay. Did you believe at that time it would be safe to take out the prisoner -- the detainees?
A. No. And the agents that were driving the van did not want to stick around either because of the amount of people that swarmed them.
Q. Okay. Did you all come up with a third plan?
A. Yes.
Q. And the time that you came up with a third plan, how long had you been waiting for the police to respond by that time?
A. It was hours.
Q. Are we talking -- give me an estimate of how many hours it was.
A. Three or four hours at that time.
Q. Okay. And what was the plan at that point in time?
A. So there was a plan that two or three officers would try to sneak out that same door. And if I -- I'll kind of draw a line here.
Q. Mm-hmm.

A. They would go out like this and follow the sidewalk. And there was another door right here. And they would try to sneak into that. That red box is kind of a secured parking area where their vehicles were located. There was -- the ICE vehicles were located in that parking lot.

So three officers were going to try to sneak through there and get in the vehicles and hopefully get their vehicles out of there and then just get them out of the area so maybe they could circle the block and wait for an opportune time to hopefully load some of the detainees into those vehicles at some point.

Q. At the time when this plan was made, did you believe that the local police department was going to respond?

A. I did not. There was some talk at one point even. I believe it was the chief of police had recommended that we wait until the middle of the night and try to --

MR. ORESKOVICH: Objection, your Honor, as to the hearsay.

Q. (BY MS. CARTIER-GIROUX) Don't say what he said. Was the chief of police contacted?

A. Yes.

Q. Did you believe that they were going to respond?

A. No.

Q. Were you able to sit in that facility with those detainees indefinitely?

A. No.

Q. Did the police -- did you believe that the police gave you a definite answer that they would respond?
A. No.
Q. So what did you believe you guys -- you all needed to do?
A. We had to take action. We had a limited amount of resources in the building. We had a limited amount of water, little or no food. We also -- I didn't know if any detainees took medicine or anything like that. So for everybody's safety, we couldn't stay there.
Q. Did you have people in the building who were employees of your agencies as opposed to actual federal officers?
A. Yes.
Q. So were there civilians in the building?
A. There were civilians.
Q. So this -- who was going to go outside?
A. So I believe it was going to be three of the ICE officers.
Q. Do you know their names?
A. Yes. Jason McIntosh, Kevin Wilks, and then Jeremy Burlingame.
Q. Were you going to go outside?
A. No. I didn't -- I knew we had talked about doing this plan, but I didn't know that was finalized at the time.
Q. Where were you when they -- did they actually exit the building?
A. So I didn't initially know that they had exited the

building until I was -- I'm going to draw on the corner of this building. There's windows along the building.
Q. Uh-huh.
A. Right here.
Q. Mm-hmm. Sorry. I messed up.
A. That's okay. Well, there's actually windows all along the building here.
Q. Okay.
A. So at some point, I heard a commotion, and I heard that they were -- that they had executed the plan and gone outside. I heard a lot of commotion. I heard people yelling outside, something to the effect of "They're trying to leave, get them." And then I just saw a swarm of people kind of running along the sidewalk right here to the south, to the area of the parking -- of the secured parking.
Q. Okay. What, if anything, did you do?
A. So at that point, I was concerned for the officers' safety out there because of the size of the crowd that I saw running towards them. I also at that point thought this may be our only opportunity. Since they had already gone out there, I thought this may be our only opportunity to possibly at least get them out of there with their vehicles, so I ran out the door.
Q. Other than the white transport bus that was -- you believed you couldn't use at that time, were there any other vehicles other than the ones that were in that secure parking lot that

you could utilize?
A. No, not for transport.
Q. Okay. So what happened next?
A. So I ran out -- down the stairs and out the door, and I ran south -- and I'll draw a line where I ran. I -- at first, I ran out because I didn't really know exactly where they were, and then I slowed down and walked because I was trying to figure out what was going on. And then I went -- rounded this corner. And at that point, I saw the crowd blocking this opening right here, and there were some of the ICE vehicles lined up in here trying to exit with their red and blue lights on.
Q. Okay. In addition to the people blocking that area that you have blue -- the horizontal line there --
A. Mm-hmm.
Q. I'm talking about where the red arrow is pointing.
A. Yes.
Q. What is that area?
A. So that is -- that's just an exit point for -- we have -- there's a gate that opens and closes right there that we can drive through.
Q. Okay. And what did you observe, if anything, in the street area in addition to the gate area?
A. So there was just a large amount of people there gathered.
Q. Okay. And were they on the sidewalk? Were they in the street? Where were they?

A. They were both. They were blocking the street. They were in the sidewalk, and they were communicating with each other. There was more people that were flooding the area from where I had described earlier where I -- my route of travel.
Q. When you were over there, did you hear anybody say anything?
A. Yes. There was a lot of talk, like "Don't let them leave."
MR. ORESKOVICH: Objection to the hearsay, your Honor.
MS. CARTIER-GIROUX: It's --
THE COURT: I'm not sure who he's hearing things from. Maybe you can clarify.
MS. CARTIER-GIROUX: Okay.
Q. (BY MS. CARTIER-GIROUX) Was there anything that you heard from the crowd that made -- that informed your beliefs?
A. Yes.
Q. What did you hear?
MR. ORESKOVICH: Objection to the hearsay, your Honor.
THE COURT: Overruled.
THE WITNESS: I heard a lot of people screaming not only vulgarities at us but also "Don't let them leave," things to that effect.
Q. Who was with you?
A. It was Special Agent McSullivan with Homeland Security Investigations.
Q. Was there anyone else with you?

A. Also Officer Jeremy Burlingame.
Q. Well, you had indicated Wilks, Burlingame, and McIntosh had gone out in the garage.
A. Yeah.
Q. I'm sorry, not in the garage. In the parking to move the vehicle.
A. Yes, that's correct.
Q. Who was with you when you came out the building?
A. So I believe it was just me and Special Agent McSullivan at that point.
Q. Okay. Did there come a point in time where you saw another agent?
A. Oh, yes. Special Agent LaForte was also with us.
Q. Okay. What were you wearing?
A. So I was wearing -- I had plain clothes on because we don't have like a uniform, but I had my tactical body armor on with police markings. So I have a badge that says "ATF" and my badge number on it. And then it said "Police ATF" in letters also on the front. And then on my back it said "Police." I can't remember if I had the patch that just said "Police" or if it says "Police ATF." One of those two.
Q. When you came around the corner and you indicated that you didn't know what was going on exactly, what, if anything, did you observe when you came around the corner?
A. So when I came around the corner, there was a large number

of people there just yelling at us, screaming. There was also people trying to block our path as we were walking. At one point, there was a banner, some sort of a cloth banner that was strung kind of across the road area that was blocking our point of egress also.

Q. When you came around the corner and you saw what you just described, did you believe that the individuals that you were observing were committing law violations?

A. Yes.

Q. What law violations did you believe you were observing?

A. At that point, we were engaged in lawful processes and activities and they were trying to stop us from executing those.

Q. The vehicles that you indicated with the vertical lines in Exhibit 17, can you describe to me what they looked like?

A. Yes. They're sport utility vehicles, SUVs. They have dark tinted windows and they had lights, red and blue lights, which were activated.

Q. Okay. So you indicated you were wearing equipment. Was Special Agent LaForte?

A. No, he was not.

Q. Do you know why?

A. I do. It was my understanding that he had recently been transferred out of country and so he had turned in all of his gear either to be transported somewhere else or something to that effect. But he didn't have any of his equipment with him.

Q. Can you tell us what you had on you in terms of equipment?

A. Yes. So I had my duty belt, which consisted of my duty weapon, my firearm, as well as spare magazines for that, as well as a taser that I carry, and then handcuffs. I believe that's all.

Q. Did you have any other kind of nonlethal items such as mace?

A. I didn't personally, but I knew the other officers to carry that.

Q. Okay. When you arrived, based on your -- what you were hearing and seeing, what was your perception of the tone of the crowd?

A. It was very -- it was a -- I don't know how to describe it other than angry.

MR. ORESKOVICH: Objection, your Honor, as to his conclusion as to the tone of the crowd, your Honor.

THE COURT: Overruled to the extent that the witness can testify as to his -- what he perceived and describe his perception.

Q. (BY MS. CARTIER-GIROUX) What formed your opinion that it was angry?

A. They were yelling. There was a lot of yelling, a lot of vulgarity. There was communication, like coordination between people in the crowd to kind of stop our movements.

Q. Okay. When you say that, what do you mean?

A. So they were -- as I stated earlier, they were yelling things to the effect of "Stop them, don't let them leave, they're coming," things like that.
Q. Okay.
A. General heckling also. And, like I said, a lot of vulgarity, a lot of yelling, screaming, things of that nature.
Q. When you first arrived at the gate, what, if anything, did you and the other two officers do?
A. So at that point, I viewed that there was a large crowd there as I had stated, but there was -- the gate was open and the vehicles were lined up waiting to come out. There was people forming kind of a human chain in front of that area to stop them from leaving. But at that point, I thought there may be a small chance that we could move that chain -- human chain out of the way so that the vehicles could get out.
At that point, there was also a sense of urgency because I thought that this may be our small window of opportunity to move some people out of the way, get the vehicles out, and then hopefully we could go from there and at least get some people out of there.
Q. Did you believe, based on your observations, that the crowd was going to get smaller or bigger?
A. I believed it was going to get bigger. I also knew in advance that -- we had information that there was an actual planned protest that was going to take place close to this area

later in the evening. So we -- like I said before, we had a sense of urgency because we had watched the crowd grow larger and larger all day to this point, and then we knew that there was going to be a larger crowd that was going to be forming later that evening. So we had a very big sense of urgency to get out of there, not only the detainees but ourselves out of there and the contractors and the civilians.

Q. I want to talk to you a little bit about ATF's -- you worked for ATF at this time, correct?

A. Correct.

Q. Your use-of-force policy.

A. Okay.

Q. So tell me a little bit. If you give a command to a person based on your policy and that person does not listen to your command, what is the next step you're trained to do?

MR. ORESKOVICH: Your Honor, I'm going to object to this. This witness has not been identified as an expert on the use-of-force.

MS. CARTIER-GIROUX: I can create a foundation.

THE COURT: Okay.

MR. ORESKOVICH: My objection is identification, your Honor, undisclosed.

THE COURT: I understand the objection. As I understand, the proposal is to just discuss ATF's use-of-force policy, which may or may not be something that an expert would

accept. But you can go ahead and ask if this witness is familiar with that policy.
Q. (BY MS. CARTIER-GIROUX) In your training to become an ATF officer, do they train you in what type of force you can use?
A. Yes, they do.
Q. And you've been with ATF for nine years, correct?
A. Eight years.
Q. Eight years?
A. Yes.
Q. Has that use-of-force in a context where someone doesn't listen to a command, has that changed over the eight years?
A. No, not to my knowledge.
Q. Okay. So can you tell me what you -- what your beliefs were, at the time this is going on, when someone doesn't listen to a command that you give them, what is the next step you can utilize in conformance with your training?
A. At that point, we're authorized to use physical force against them to get them to comply.
Q. Okay. What type of physical force?
A. So we have a lot of different options, but we try and are trained to use the least amount of force necessary to accomplish what we're trying to accomplish.
Q. Okay.
A. So that includes being hands-on as far as pushing, shoving, pulling if we need to, things of that nature. And then if it

escalates from there, then we have our intermediate weapons that we can use. We also have strike capabilities, using open-hand strikes, closed-hand strikes, such as punching, kicking, things like that. We have our intermediate weapons such as our taser. And then obviously, if it rose to the -- if we had to use deadly force, that is also on our use-of-force continuum.
Q. Okay. And in this case, did you, McIntosh, and -- did you, McSullivan, and LaForte make a plan as how you were going to move these people out?
A. No. We didn't make a plan because there wasn't enough time.
Q. Okay.
A. We left very hastily once we found out that three of the officers were down below and potentially in harm's way.
Q. Okay. So when you got there and you saw the crowd, did you all work in coordination?
A. We did. So we immediately -- we saw the crowd. We saw a little maybe window of opportunity, and we began to shove people out of the way.
Q. Okay. And so you were pushing people?
A. Yes.
Q. How hard were you pushing them?
A. Hard.
Q. Why?
A. Because we were met with force in return.

Q. When you say that, what do you mean?

A. So when we pushed, we felt pushing back. So it wasn't just -- because normally, if we have to use force on somebody to push or pull them, if they're just being passively resisting, they'll be easy to move out of the way. But once we started pushing, then this crowd was pushing back. They were anchoring to other people. They were linking arms. They were pushing off of each other and pushing back into us.

Q. Do you react different -- can you describe to me how you would react between a person who goes limp and just goes deadweight to a person who uses their body to push back against you?

A. For somebody that's using their body to push back, we're forced to use more force, to push harder so that we can accomplish what we're trying to accomplish.

Q. Okay. And at this location at that time, did you observe people go limp and just deadweight or did you see something different?

A. Something different.

Q. What did you see?

A. We felt the force back and people linked arms and were refusing to be moved. So they were -- not only that, but they were pushing back into us and using force against us.

Q. When you came up upon them and started pushing them, what was your intent in terms of the manner in which you did it and

the voice that you used? What informed that? What were you trying to accomplish and what types of voice did you use? What types of mannerism did you use and why?

A. I was very stern and I came out aggressive because from what I had observed all day to this point led me to believe that they weren't listening to us, that they were intending on disrupting what we were trying to do. And we had this sense of urgency. So I came out aggressive, and that goes back to a lot of my training as well and my experience. When I was a border patrol agent down on the southwest border, there was many times where I was -- I would encounter a group of sometimes --

MS. GEORGE: Objection, relevance.

MS. CARTIER-GIROUX: Your Honor, it informs his -- why he did what he did.

THE COURT: Okay. I just --

MS. CARTIER-GIROUX: Okay.

THE COURT: I will observe that if this is relevant, other things may be relevant as well.

Q. (BY MS. CARTIER-GIROUX) So have you encountered -- I'll shorten it. Have you encountered groups before where you were outnumbered?

A. Yes.

Q. What is a normal tactic that you use when there are more people than officers?

A. In my experience, you have to be aggressive because if not,

they will overpower you.

Q. In this situation, based on what you had observed at the white bus and then what you were observing when you arrived, did you believe that the crowd would be compliant?

A. No.

Q. Okay. Did you intend on hurting anyone?

A. No.

Q. Okay. At any point in time, did you use any of the other weapons available to you?

A. I did not.

Q. I'm going to play the video at speed, and then I want to slow it down, and I want to have you describe what your perceptions are and what you're doing. Okay?

A. Okay.

MR. ORESKOVICH: Excuse me.

MS. CARTIER-GIROUX: This is Exhibit 86.

MR. ORESKOVICH: Thank you.

MS. CARTIER-GIROUX: Thank you.

Q. (BY MS. CARTIER-GIROUX) Why did you choose to wear tactical gear?

A. At some point during the day when this was all coming to fruition, we chose to gear up because we could see that the crowd was growing and becoming agitated and angry, and so we wanted to put our gear on so that in case things got escalated, then we'd be prepared for that.

Q. What type of gear is it?
A. So it's tactical. It's a bulletproof vest as well as our tools as I had described earlier.
Q. And were you -- was your face covered or uncovered?
A. At the point that we went out, my face was covered.
Q. Why?
A. Well, for a couple of reasons. One, as an ATF agent, we engage in a lot of covert activities, including undercover activities. So that was one reason. So I don't like to advertise my face if I don't need to. And then also, I knew through what I had seen and through my experience that there was a lot of doxxing being -- taking place, and I was fearful for my family. I have a family and I don't -- didn't want my face out there and people to potentially identify me and dox me.
Q. I'm going have you look at Exhibit 86. We're going to play it at speed first.
THE COURT: You've got some marks on there, Ms. Cartier-Giroux.
MS. CARTIER-GIROUX: Oh. Thank you, your Honor. Sorry.
Q. (BY MS. CARTIER-GIROUX) What is doxxing so that they know? I don't know if people know what that is.
A. It's a tactic used by people that don't agree with what we're doing, and they use it to intimidate. They use it to -- basically, they find out who you are, and they try to do things

to impede or annoy or just to intimidate you into not doing what they don't agree with.
Q. And when you -- during your observations, did you observe people with what appeared to be phones filming you?
A. Yes, a lot of people.
Q. Okay. So let's do 86. And, again, this is at speed. This is Government's 86.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Now I'm going to replay this video, and I'm going to do it as best as I can frame by frame. Okay? Can you see anyone in this video that you recognize?
A. Yes. The individual wearing the black and blue jeans, that's me.
Q. Is that the person closest to us?
A. To the right, yes.
Q. I'm sorry. Facing us with the sunglasses?
A. Correct.
Q. And the individual you can see a little bit to the rear, who is that?
A. That's Special Agent McSullivan.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Okay. Now, are you -- have you come around the corner yet at this point?
A. I don't think so.
(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) So at this point, you have -- what do you have in sight?
A. So at that point, I can see the crowd in front of the exit gate for the secure parking.
(Playing Exhibit.)
Q. Okay. Who just walked by?
A. That's Special Agent LaForte.
Q. And the person behind?
A. Special Agent McSullivan.
Q. Okay.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) All right. Do you recognize that colored thing?
A. Yes. That was the banner that I had referred to earlier that was strung out and kind of blocking us.
Q. Okay. And what do you do?
A. I tried to move it out of the way.
Q. And when you move it out of the way -- and you get around it, correct?
A. Mm-hmm.
Q. What happens next?
A. Then --
Q. Watch the banner. What happens to the banner?
A. So I remember kind of trying to pull it out of the way, and I didn't get it all out of the way, but I was able to get under

it at that point. And then Special Agent LaForte was able to remove it.
Q. Prior to you going through it, based on this video, what do you see the individual who's with the banner do after you pass? What happened? You passed. There you are, right?
A. Yep.
Q. And you pull it, right? What do you do? What do they do next?
A. They strung it back across, blocking it.
Q. Okay. All right. Sorry, it's a little bit difficult.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) And you just saw -- what did Special Agent LaForte just do?
A. So he was able to actually remove it.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Okay. Are you making any orders at this point in time?
A. Yes.
Q. What are you saying?
A. At this point, I was saying, "Move out of the way." I'd notified them, I said, "You are impeding a lawful -- a lawful process. You need to move."
Q. Okay. Are people past the gate line at this point in time?
A. Yes.
Q. Okay. So are they within your gate line?

A. Yes, they are.
Q. Okay. So they're not -- are they any longer on the public area?
A. No.
Q. Okay. We'll do that again.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Okay. So what are you all doing right now?
A. So at that point, we're pushing them out of the way, trying to move them.
Q. Okay. So the three of you you can see, who is this?
A. That's me.
Q. Okay. Who is this?
A. That's LaForte.
Q. And you can't see, but whose elbow is this?
A. Special Agent McSullivan.
Q. So what, if any, type of formation are you doing at this point in time?
A. We kind of formed our own line to counter their line.
Q. Was it effective?
A. It was effective but not all the way effective, if that makes sense.
Q. Okay. While you're pushing, because you clearly are pushing, what are you feeling on your hands?
A. I'm feeling resistance.

Q. What do you mean by that?
A. My force is being met with force, so I could tell that they weren't just being moved. They were pushing back into me.
Q. Did you feel anyone just go limp?
A. No.
Q. Okay. So it wasn't deadweight?
A. Correct.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) All right. So what's happening now?
A. So at that point, we were able to move some people, and we kind of -- our line kind of shifted around. And at this point now, Special Agent LaForte is kind of surrounded by people.
Q. Where is Special Agent LaForte?
A. He's the one in the light-colored shirt to the left.
Q. Can you point him out?
A. I believe this is him.
Q. And did you see him there?
A. Yes.
Q. Did you have any concerns?
A. Yes. He didn't have any of his equipment, as I stated earlier. He wasn't wearing a vest. He did have a lanyard with some identification on him, but he wasn't wearing the bulletproof vest, nor did he have any tools.
Q. Based on your training and experience, is it safe for

officers to enter into a crowd like this?
A. No.
Q. Why?
A. Because we're outnumbered, for one. And also, in my experience, when there's a large group of people gathered like this, there's kind of a mob mentality that takes over, and a lot of times people do things, violent things.
MR. ORESKOVICH: Would you speak into the mike? I could not hear what you last said.
THE WITNESS: My apologies. I said that in large groups like this, a lot of times there's a mob mentality that takes over, and sometimes it turns violent.
Q. (BY MS. CARTIER-GIROUX) Okay. Take a look at the screen right now. Who is this person?
A. That's me.
Q. Okay. Where is your hand at this point in time?
A. It is on the back of an individual.
Q. Do you know who that individual is?
A. Yes.
Q. Who is it?
A. I believe that's Archer.
Q. Okay. And when your hand is on the back of Archer, what is Archer doing?
A. Kind of lowering their center of gravity, making themselves harder to move, and also planting feet and pushing back.

Q. Okay. And what does Archer's arm appear to be doing?
A. Kind of making a sharp elbow, making it harder to move.
Q. This group of people, what were they attempting to do?
A. They were attempting to link arms together also so that they couldn't be moved.
Q. When someone links arms together -- have you seen that technique before?
A. Yes, I have.
Q. What is the purpose of doing that?
A. The purpose is to be stronger. It's easy for one person to be moved, but when they link arms with more people, it's harder to move them.
Q. Okay. Is it fair to say, based on your opinion, based on your physical strength, that Archer alone -- if Archer was alone, that you would be able to move that person?
A. Yes. At one point when their linked arms broke or they hadn't linked all the way yet, at one point, I was able to move Archer.
Q. Okay. But when they link together, how does that change your ability to move people?
A. It changed it so that I couldn't move them anymore. And as we were doing this, more and more people kept coming. And then more and more people would stand in the way. They would link arms. They would push off of each other and push back into us.
Q. Okay.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Okay. This individual here, do you recognize him?

A. Yes, I do.

Q. Why do you recognize him?

A. That was one of the individuals that I identified when I was there in the moment as being very aggressive towards me and hostile.

Q. Okay. What, if anything, did he do that made you feel that way?

A. He was screaming. At one point, he spit. He was not listening to commands. At one point, he got really close to me in my face. He bladed his body. At one point, he kind of balled his hands into a fist. And through our training and experience, we call that pre-assault indicators. So he was displaying these pre-assault indicators. And our use-of-force policy and training allows for us to be able to use an amount of force when we perceive these pre-assault indicators.

Q. What is blading?

A. So it's kind of like putting your -- moving your body to the side, kind of making a smaller target but also kind of putting your body more in an athletic stance as if you're going to fight or something like that.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) So what are we seeing this group

over here doing?
A. So they're -- together it looks like they're -- right now it looks like they're kind of pushing into each other.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) And so what is McSullivan doing?
A. So at that point, the two individuals to the right are kind of holding on to each other, and Special Agent McSullivan is attempting to move one of the individuals. And so he's grabbing him and pulling.
Q. And is the individual allowing him to move him?
A. He's resisting.
Q. What are they doing?
A. So they're linking arms. They're still trying to link arms. And we were doing our best to kind of break their link because we still -- at this point in time, we were still hopeful that we could move them out of the way. And as we tried to break their link, they would link again.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) So what is he doing now?
A. So he appears to be hanging on to that corner pillar so that he -- which is kind of crossing the threshold into the secure parking. And he's hanging on to that so that we couldn't move him.
Q. Okay.
(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) And who is this?
A. I can't tell. Is that --
Q. Well, you have to be able to tell. I can't tell you.
A. Yeah.
Q. Let's move it a little bit and see if you can recognize who that is.
Were you able to see?
A. I believe that's Archer.
Q. Okay. And I'm going to pull it back a little bit. I want you to tell me what you see Archer doing.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What is Archer doing?
A. At that point, they're still linking arms, and they appear to be, as I stated before, lowering their center of gravity and making them harder to move and also kind of pushing back.
Q. Okay. So when you're pulling at them, what motion are they doing with their body?
A. They're kind of like aggressively going back and forth to try to break out of that, I guess. And also, as I stated, lowering the center of gravity is something that -- a tactic that's used to make one harder to be moved.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Are you pushing Archer?
A. Yes.
Q. Why are you pushing Archer?

A. To move them out of the way.
Q. Why do you need to move them out of the way?
A. Because at that point, they're still blocking our exit, our vehicles from exiting.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What are you doing there?
A. Same. I'm pushing and kind of driving.
Q. Can you put an arrow where you are?
A. (Witness complies.)
Q. Are you using -- based on your feeling at that moment, are you using any force more than what was necessary to move these people out of the way?
A. No.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Okay. Archer is not moving, right? Quickly? Is Archer moving quickly away from you?
A. No.
Q. Okay. What is Archer and the others doing in order to prevent the movement?
A. You can see that their feet is planted right here, and they're pushing back into me.
Q. You feel them pushing back into you?
A. Correct.
(Playing Exhibit.)
MS. CARTIER-GIROUX: Oh, there's an arrow on here.

I'm sorry.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) You're holding Archer at this point, correct?

A. Mm-hmm.

Q. What are you feeling while you're holding Archer?

A. Resistance again.

Q. So you're holding, meaning like are you grabbing on to the shirt or are you pushing?

A. At that point, I believe I had pushed out of the way, and I was able to move them a little bit, and so I was attempting to keep that ground that I had -- that I had gained.

Q. What are you still hoping to happen?

A. At this point, it was very -- and this all happened very fast. But at this point, I'm still hoping that we're able to clear enough of a path to get the vehicles out.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) What are they doing?

A. Same thing. They're linking together. They're bracing each other. They're making it so that we couldn't move them.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Okay. Do you recognize this person?

A. I do.

Q. Who do you recognize him to be?

A. That's -- and forgive me if I pronounce it wrong -- Mavalwalla.
Q. Okay. What do we see here?
A. It looks like they're holding a sign up.
Q. Okay. Do you -- all right. In this picture, do you see this hand here?
A. Yes.
Q. Okay. Can you tell me what happens this direction if you can? If you can't, that's fine.
A. Okay.
Q. I'm going to clear this.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Did you see anything happen? If you can't, that's fine.
A. That was pretty difficult to see anything.
Q. That's fine. So at some point in time, what happens with these two?
A. At that point, there's somewhat of a scuffle between those two.
Q. Okay. When you mean a scuffle, what do you mean? What do you see happening?
A. Pushing back and forth.
Q. Okay. Now watch.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Okay. Now watch. What do we see

here?
A. So at that point, it appears that Mavalwalla is pushing into Officer Burlingame.
Q. Okay. What happens there?
A. At that point, that looks like Mavalwalla grabs Officer Burlingame's arm.
Q. What do we see here?
A. And then you can see the elbow go back into Officer Burlingame.
Q. I want to pull it back again. Hold on.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What do we see here?
A. Right there is the elbow going back into Officer Burlingame, so he's elbowing him.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Did people fall when you were pushing them?
A. Yes.
Q. Would you have pushed them if they had complied?
A. No.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What happens after?
A. So right here, as I stated earlier, this individual kind of with the goggles on was being very aggressive towards me. And so you can see me pointing at him, telling him he needs to move

back, "You need to move out of the way." And that's -- right here is where I described earlier those pre-assault indicators that I'm seeing. And so at that point, I'm telling him and he's saying no. He's saying no, you know, expletives and everything else, still being aggressive towards me. Then in a little bit, you'll see me give him a good shove. And at that point --

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) I'm sorry.

A. I'll just let it play out. I can...

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) At this point in time, do you believe you're going to be able to leave?

A. No.

Q. Why?

MS. GEORGE: I'm sorry. I couldn't hear.

Q. (BY MS. CARTIER-GIROUX) At this point in time, do you believe you're going to be able to leave?

A. No. So at that point in time, as we were moving people, the crowd kept growing and growing. So at this point in time, every time we would clear a hole, it would fill in with people. So at this point, it was apparent that we weren't going to be able to move everyone.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Did you all have a plan right now?

A. No.

Q. What happened just now?
A. So at this point, I pushed this individual very aggressively because of those pre-assault indicators that I was witnessing. He had his hands in a fist, and he was displaying those indicators. And so our use-of-force accounts for that. We don't have to wait to be punched in the face before we are allowed to use force. We meet force with greater force is how we train.
Q. What were you feeling?
A. At that point, I was concerned. I was concerned for our safety. I was concerned that we weren't going to be able to leave. I was concerned that nobody else was coming to help us. I was concerned that they were going to -- and at this point, too, it was apparent that we weren't going to move them out of the way.
And so we had -- at least in my mind, I had kind of shifted to, okay, now we have to kind of retreat back a little bit and prevent them from getting into our space even further.
Q. Okay. And can you tell me a little bit about how that gate operates?
A. So it's motion-activated. You have to -- I can't remember. I think you have to push a button to get out. But then once -- after a certain amount of time, if there's nothing in the way, it will close.
(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) What are you doing?
A. At that point, I'm still engaging, telling people to move. At one point, I was telling them "This isn't the way to do this. You guys are going about this the wrong way." And I was trying to talk to them.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) I'm not going to go through the whole thing.
Did you engage with the crowd again at this point in time?
A. Verbally.
Q. Just verbally?
A. Just verbally, yep.
Q. Did you have any physical engagement with them any further?
A. No, not after this time.
Q. Why not?
A. Because it was apparent that the -- we didn't have the capabilities of accomplishing what we wanted to accomplish. We tried to accomplish moving them out of the way using the force that we felt we needed to. But once that didn't work, we didn't really have any other options because it wouldn't have done any good to use any of our intermediate weapons or anything like that. So at that point, our only option was to kind of retreat back into this secured parking area.
Q. I am -- they already saw the end of that, so I'm not going to replay that.

So now I'm going to have you -- again, we're going to watch exhibit -- we're going to do Exhibit 87.

MR. ORESKOVICH: 80 what, please?

MS. CARTIER-GIROUX: I'm sorry. 87.

Q. (BY MS. CARTIER-GIROUX) Like before, we're going to play the whole thing, and then I'm going to go through the parts where you're interacting with the crowd, okay, physically interacting with the crowd.

Do you recognize yourself in this, 87?

A. Yes. I'm the one in the front, the left.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) So this video -- unlike the other one, does this show what the beginning of what your interaction was with them?

A. No.

Q. So in this video, do we see that line you all formed?

A. No.

Q. So when does this video -- you've seen this video before, right?

A. Mm-hmm.

Q. When does this video actually start?

A. Before -- I don't understand.

Q. Okay. I'll play it and then you tell me when it -- when do you start -- I'll ask you. Withdrawn.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Okay. All right. Does this video begin right when you first got there, meaning this part here?
A. No.
Q. Does this capture when you first got there and started interacting with the crowd?
A. No. This is capturing a little bit into it after we interacted with them physically.
Q. Okay. Is it after that line we just saw pushing back had occurred?
A. I believe so.
Q. All right. We'll watch it and you tell me?
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Based on what we see here, is this after or before what we just saw, the video before? Remember the video we just played where it showed where you all were in a line and you pushed back. Does this capture those events that happened in that other video --
A. No, I don't believe so.
Q. -- when you were pushing on the line?
A. I don't believe it does.
Q. What's occurring right at this point in time?
A. It's kind of chaos, honestly. There's just -- for lack of better terms, it's just a melee of people pushing back and forth.
Q. Has the line failed at this point in time?

A. Yes.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) All right. So what is -- who is this?
A. Special Agent McSullivan.
Q. Okay. What is he doing?
A. He's kind of caught in the middle. He's pushing. He's pulling. Still trying to move people.
Q. Again, what are these people doing?
A. They're linked arms. They're making themselves hard to move, and they're using force to push back into us.
Q. What are you still trying to do at this point in time?
A. At that point, it was -- we were still trying to move them.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Did anyone pull -- in this crowd, do you -- well, did LaForte have a weapon?
A. No.
Q. Did you -- did Special Agent McGregor have a weapon?
A. Yes.
Q. Okay. Did you -- sorry. Not McGregor. McSullivan have a weapon?
A. Yes, we both had weapons.
Q. This guy here.
A. Yes.
Q. He had a weapon?

A. Yes.
Q. Did he have a taser?
A. I don't believe he had a taser, but I believe he had mace.
Q. Okay. Did either of you or any of you pull any kind of weapon during this time?
A. No. We did not.
Q. Okay.
A. None of us -- later on, Officer -- Jeremy, he pulled out a taser, but he didn't use it.
Q. Burlingame?
A. Burlingame, yes.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) So is it fair to say that there are people inside your gate area?
A. Yes.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Who is this?
A. That appears to be Archer.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What are you doing?
A. At that point, I'm still trying to move them.
Q. Okay. What are they doing?
A. Lowering center of gravity, link -- trying to link arms with other individuals and pushing back into me.
(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) At that point in time, were you able to push Archer away?
A. Yes.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What is this person doing, McSullivan?
A. At that point, he's pulling this individual in front of him, pulling him out of the way.
Q. What was he doing prior to him pulling him out of the way?
A. It looks like he's pushing and pulling back.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Did there come a point in time where people fell to the ground?
A. Yes.
Q. What are you doing here?
A. Still pushing. I believe at that point as I'm pushing, attempting to move Archer and the rest of the individuals, then Archer at one point falls to the ground.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What do we see here? What is this person doing?
A. Picked up the sign again. And at this point, it looks like the individual turns around to interact with Officer Burlingame.
Q. Who is this?
A. That's Officer Burlingame.

Q. Okay. Who is this person?
A. That's -- I apologize. I'm bad with the name. Mavalwalla.
Q. That's all right. You're saying it correctly.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What do we see happening?
A. So they pick up the sign again, and there's a verbal interaction.
Q. What is Officer Burlingame doing with his left hand?
A. He's kind of putting his hand up, like just to basically create space and say get back.
Q. Why -- do you see -- what is Burlingame doing?
A. At that point, it looks like he's trying to touch his arm to kind of push him back.
Q. Why would he be doing that?
A. It appears that Mavalwalla is putting the sign up kind of in his face and almost -- not quite, but almost striking him with the sign. And then that's when he's pushing him back. Officer Burlingame is trying to push the sign down so that he can see and also push him back.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Okay. So there comes a point in time where there appears to be some kind of contact here?
A. Correct.
Q. Okay. But I want you to watch after the contact.
(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) What do we see?
A. At that point, he's -- Mavalwalla is going -- kind of aggressing into Officer Burlingame.
Q. Now, McSullivan, who we saw here, is now past Mavalwalla, correct?
A. Correct.
Q. Okay. Let's keep watching.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What do we see happening?
A. So at that point, he's kind of advancing back towards Officer Burlingame, and Officer Burlingame is putting his hands out.
Q. What type of stance -- who is this?
A. Officer Burlingame.
Q. What type of stance is Officer Burlingame in?
A. It's an aggressive, kind of an athletic stance.
Q. How would you describe that?
A. It's kind of a fighting stance.
Q. Does it -- it appears as if he's anticipating something?
A. Yes.
Q. So what is he doing?
A. So at that point, he's pushing again.
Q. And here's the -- what is here? What is this thing here?
A. That's the pillar of the gate.
Q. So right now, where is Mavalwalla?

A. It appears that he's crossed the threshold, that he's inside the gate.
Q. So what is Burlingame trying to do?
A. So he's trying to push him. And as he's pushing him, you can see Mavalwalla is leaning back into Officer Burlingame.
Q. What do we see here?
A. And that looks like he's kind of preloading his left elbow.
Q. What do we see?
A. And then he brings it back, kind of elbows Officer Burlingame.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) And there again we see this person?
A. Correct.
Q. Who was that?
A. That's the individual with the goggles that I aggressively pushed.
Q. Okay. Okay. Were you wearing a body camera?
A. I was.
Q. Was -- did you activate it right away?
A. Not right away.
Q. Why not?
A. There was a couple of reasons for that. One -- well, the biggest reason is I left very hastily, so I wasn't -- at that point in time when I left the building, I didn't think I was

going to be leaving the building. And so I left very hastily. When I heard the commotion, I saw the crowd, I found out that three officers had gone down there. So I left and I didn't think at that moment in time to activate the body cam. My focus was on getting down to the officers to help them because I thought they were in harm's way.

Q. But the videos that we just played, do they capture basically your interaction?

A. Yes.

Q. But at some point in time, does your body cam -- did you realize that you had to activate it?

A. Yes.

Q. And I'm going to play you Exhibit 24.

MR. ORESKOVICH: 20 what, please?

MS. CARTIER-GIROUX: 24.

MR. ORESKOVICH: Thank you.

Q. (BY MS. CARTIER-GIROUX) All right. Do you see on the upper hand corner? What does that mean, those numbers?

A. So this appears to be Archer right here.

Q. No, I'm talking about this.

A. Oh, I'm sorry.

Q. I'm talking about this because -- what is that?

A. So that's the date and the time of the recording.

Q. Well it says 6/12. Why does it say 6/12?

A. So our body cams are in a different time zone.

Q. Okay.
A. And so it's UTC, so you have to subtract -- I forget how many, but you have to subtract I believe it's four hours from the time that you see there, which is our actual local time.
Q. Is it 7 or 4 for UTC? Because this says it's midnight, it's a little bit after midnight, correct?
A. Correct. So, yeah, seven hours, I believe. Sorry.
Q. So in UTC time this is what time?
A. 12:25 the following day.
Q. Okay. So what would it be in Spokane time?
A. So it would be, at that point, 6:25 on the 11th.
Q. 6:25?
A. 5:25. Sorry. I'm bad at math.
Q. Okay. All right. So let's watch this.
So at the time you turned on your body camera, at what point in time was it?
A. So it was -- the way our body cameras work, it was on in standby mode, which basically means it's passively recording, but it's not -- there's no sound recording, and it's not really saving it. And then when we push it on from that mode, then it activates the sound, and then it also saves the recording that was passively recording. I think it's 30 seconds before the time you activate it.
Q. So when you first -- when we first play it, do we hear any sound?

A. No.
Q. Okay. And the time that this starts at, what has happened before you activated it?
A. So at that point, we had already attempted to push the crowd back and to push their line back. And you can see some people on the ground right here. Some people had fallen when we had attempted to push them back. And it was just a chaotic situation. It was chaotic. It was a pushing match.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Is it fair to say that this is towards the end of the interaction?
A. Yes.
Q. Okay.
(Playing Exhibit.)
A. It wasn't until I -- we kind of retreated back, and I had a moment to kind of think a little bit. And then I decided to activate my body camera at that point because I wanted to document what was taking place. I knew that it had been passively recording so --
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Sorry. You said you knew that it had been what?
A. I knew it had -- it had been passively recording, so I wanted to capture the interaction as much as I could from before that, and then I wanted to capture any further interaction that

we had.
Q. At the beginning of the video, the person that fell, that you pushed and fell, who was that?
A. I believe Archer was one that had fallen.
Q. Okay.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) The body camera, where is it on your body?
A. So it's on my chest. On my chest.
Q. Okay. How -- I mean, it's a camera angle. So how close are these people to you?
A. Very close. I would say two feet maybe, maybe three.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Do you recognize that person here?
A. In the tank top?
Q. Mm-hmm.
A. Yes. That's Forral.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) So hold on. Now, at this point in time, are they behind the entrance?
A. Yes.
Q. Okay. Are -- being still behind the entrance, but are they still blocking you?
A. Yes.
Q. Are you able to drive the vehicles out with this --

A. No. At that point, I don't even think we could have walked out.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Okay. You're hearing chanting. What are you hearing?

A. "Let them go."

Q. What do you believe that to mean?

A. I believe they were essentially demanding that we release the detainees and that the only way we were going to get out of this was if we release them. And that was their demands.

Q. Can you release the detainees?

A. Absolutely not.

Q. Where did you have to bring them?

A. We had to bring them to court.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) What are you saying?

A. At that point, I was just saying, "This isn't the way to do this." And I was -- at that point, I said something to the effect of "This is how people get hurt. This isn't the way to do this. People are going to get hurt, and it's your fault because this isn't the way to do this."

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) What did we just see?

A. At that point, we backed up a little further so that the gate could close.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) What are we hearing?

A. So they're cheering. They're happy.

Q. What are you feeling?

A. Frustrated.

Q. Why are you frustrated?

A. For a few reasons. One, there was a large group of people that weren't obeying our commands. We were trying to perform our lawful functions, and we were unable to do that. It was a dangerous situation. And at that point, it appeared that no backup was coming for us. So we were forced to retreat back into that secured parking, and it's a very tactically poor location, and it was -- I was concerned for our safety still. I was concerned that -- at that point, I was concerned we weren't even going to be able to get back into the main building.

Q. When you were out in the crowd trying to push them back, did you feel anything to your body?

A. Did I feel anything what? I'm sorry.

Q. Towards your body.

A. Like pushing?

Q. Whatever. Anything.

A. I felt resistance and people pushing into me from all angles is what I felt.

Q. Okay. When you closed the gate, did you hear anything from the individuals outside that affected your thoughts?

A. Yes.

Q. What did you hear?

A. There was a lot of heckling going on still. We were being called Nazis, things like that. At one point, somebody said, "I hope your children hate you" or something to that effect. And then at one point, one of the individuals was saying, "You can't leave, can you? Are you scared?" Just kind of berating us and just heckling.

At one point, I looked at my phone, and one of the individuals outside said, "You're scared? Are you looking at your phone? How much battery do you have?" Kind of telling me like you're going to be here for a while, like, I hope you have enough battery for your phone, things like that.

Q. How were you feeling when you heard that?

A. At that point, I was very frustrated and concerned that we were going to be there for a long time. I was concerned for everyone's safety. I was concerned that it was going to escalate further, and I was concerned that with all that escalation, no help was coming.

Q. Why were you concerned for your safety? What had you observed and what had you experienced that made you feel concern for your safety?

A. The anger, the energy and the crowd. I've witnessed other protests in the past, and this was -- it had a different energy to it. It was an angry energy. It was very -- there was a lot

of yelling. There was a lot of -- in our short interaction, there was violence.
Q. Well, you say there was violence. You didn't get punched, right?
A. Correct. But there was just --
Q. When you say there was violence, what do you mean by that?
A. There was just a physical pushing back and forth. There was people just trying to, in my opinion, agitate. They were -- it was like people were feeding off of each other, and there was individuals in the crowd trying to agitate each other and trying to further -- like to stir it up.
Q. Do you feel -- did you feel at that point in time that you could, you know, just walk the detainees out the door?
A. No.
Q. The south door?
A. No.
Q. Where you guys came out of?
A. No, not at all.
Q. Why did you feel like you couldn't do that?
A. It wouldn't have been safe for anybody, and that's if we could even make it because there were so many people at that point that I didn't even think they would be able to walk through.
Q. And what did you think that the crowd wanted?
A. They wanted us to be trapped in there --

MS. GEORGE: Objection.

THE COURT: Sustained.

Q. (BY MS. CARTIER-GIROUX) Okay. When you -- when you were in that gated area, the parked area and the gate had been closed, what did you guys do next? What did you all do next?

A. At that point, we kind of just didn't really know what to do. We talked about what to do. I called my supervisor just to kind of advise him of the situation and kind of just tell him what was going on and really trying to figure out a solution. So at that point, we talked amongst the people in there, amongst us, and kind of decided what we were going to do.

Q. And what did you decide to do?

A. We decided to try to get back into the main building because we figured that would be our best bet. If we could get back in there, then that would be the safest place for us, and then we could also be there with the rest of the group, as well as the detainees that were in there.

Q. And did there come a point in time where you tried to re-enter the building?

A. We did.

Q. And were you able to re-enter the building?

A. We were.

THE COURT: Ms. Cartier-Giroux, we're getting close to when I would want to take a morning break, so you let me know when you think would be a good time.

MS. CARTIER-GIROUX: We can do that right now.

THE COURT: Okay. Members of the jury, we're going to take our morning break. It should be about 15 minutes. Please don't discuss the case or do any research on the case. All my admonitions remain in place. And so we will take a 15-minute recess.

All rise for the jury.

(Jury exits the courtroom.)

THE COURT: So I'll hear from the Government regarding if there's a juror we need to follow up with. As I was speaking, I forgot to do my morning admonition, so I'm going to do it when we come back in to ask if any of them were exposed to information. So I'll do that before we resume the testimony after our break.

Do you want to address this after the break?

MS. CARTIER-GIROUX: I think Ms. Perez is going to do that.

THE COURT: Ms. Perez, do you want to come forward now or do you want to do it after the break?

MS. PEREZ: I'll just tell the Court who it is. We have confirmed currently in seat 2, so I believe the original number was 15. Female, ponytail, white shirt. So back row, second one from the right.

THE COURT: Okay.

MS. PEREZ: And then I -- I can -- I'll have some

briefing ready and very quickly get it to the Court. And so whenever the Court wants to deal with it.

THE COURT: Maybe we'll deal with it during the noon hour. Given the circumstances, I think it should be a sealed proceeding when we deal with this juror, unless I have any objections.

So let's take our 15-minute break. Okay.

MS. PEREZ: Thank you.

(Court recessed from 10:33 a.m. to 10:45 a.m.)

THE COURT: So when we bring the jury in, I will just do my admonition. I just want to observe. I do think the door has been opened to witnesses talking about their beliefs as to what's lawful and not lawful. Just letting the Government know.

MS. CARTIER-GIROUX: In terms of like what -- what's a -- what's a violation?

THE COURT: What's lawful, not lawful. There's been testimony as to that, so I just think the door has been opened as to that. I'm just letting the Government know. The door's already been opened.

MS. CARTIER-GIROUX: Okay.

THE COURT: I know there were concerns about that earlier.

MS. CARTIER-GIROUX: Okay.

THE COURT: Okay. So, I think we're ready for the jury.

I should say beliefs, not what is or is not, but a person's beliefs.

(Jury enters the courtroom.)

THE COURT: Members of the jury, before we get -- resume with testimony, sometimes administering a trial is like juggling a bunch of plates in the air. When we began this morning, I should have asked you whether or not any of you think you have learned or shared any information about this case outside this courtroom, even if accidental. So if any of that -- if that has happened, could you let me know by raising your hand?

Has anyone been exposed to any news reports, anybody saying anything to them, or have you said anything to anyone that could possibly be inconsistent with my admonition yesterday?

Wonderful. I see no hands raised.

Okay. You may resume your examination, Ms. Cartier-Giroux.

Q. (BY MS. CARTIER-GIROUX) Special Agent Tomaso, I think when -- where we left was you were in the secured parking lot and headed back to the building.

A. Correct.

Q. Did you have any concerns on how you were going to get back in the building and what were they?

A. Yes. At that moment, from my view, the whole front of the gate was blocked with people. And, in my estimation, there was a lot of people out there. So I was concerned that we would be

met with a crowd of people trying to get back into the building as well.

Q. And were you?

A. There was people there, but there was not resistance. We were able to get back into the building okay.

Q. Okay. And once back inside the building, where did you go?

A. We went back upstairs to where the detainees were. And from that vantage point, there's a lot of windows along the building so we could see. So we went to a point where we could see well.

Q. Which side of the building were you looking at?

A. We kind of shifted from -- mostly the east side of the building, but we could see a little bit to the south and to the north also.

Q. I'm going to show you Exhibit 22. It's a video, but I'm not going to play it. I just want you to be able to show me where you were looking.

A. Okay.

Q. Are you able -- were you -- does this give a good idea of the windows and where you were looking from?

A. Yes, some of them. I'll draw right here. So these windows right along here, we could see out that. And then also the ones on this side we could see.

Q. Okay. And what windows -- you referred to earlier in your testimony when you saw on the crowd running towards the gate

before you departed with the other two officers. Where were you when you observed that?
A. On this corner of the building right there.
Q. Okay. All right. What, if anything, did you observe from the windows after you returned to the building?
A. Just that the crowd continued to grow at that point. There was more and more people arriving. They were still using the megaphone, and they were still chanting and yelling, and there was a bunch of people. I also viewed individuals carrying objects such as park benches, and they were stacking them in front of the doors.
Q. I'm going to show you what has been marked and admitted as 440. Do you recognize 440?
A. Yes, I do.
Q. What do you recognize 440 to be?
A. That is the area just outside of the secure parking to the east. That's that other parking lot down there. And there's individuals kind of right here that are stacking objects in front of the gate.
Q. Okay.
A. There's a different gate. So this gate is kind of our entrance to the secured parking, which is different than the gate that we saw earlier.
Q. Can you explain that a little further? How many gates are there to enter the secure parking lot?

A. So there's one gate to enter and one gate to exit. The one that we were watching earlier where the shoving occurred was the exit gate. This one that I circled is near the entrance gate.
Q. Can you show us on here?
THE COURT: Can you clear your screen?
MS. CARTIER-GIROUX: Yeah. Sorry.
Q. (BY MS. CARTIER-GIROUX) Exhibit 17. Can you mark on Exhibit 17 gated areas where a car can exit from?
A. Yes. So this is the entrance.
Q. Okay.
A. There's a little touch pad there where you can get in, and then this is the exit gate that we saw earlier.
Q. Okay. Is there a gate where you -- like a man gate I guess you'd call it?
A. Yes. And that's right here. And that's the one that we exited out of as I described earlier.
Q. Okay. Once inside the building, what were you feeling?
A. We -- I was feeling very frustrated still. I was -- I was still concerned. Sometime after this point, my family started to call even and say, "Hey, where are you?"
Q. Don't testify about what they were saying.
A. Okay.
Q. So you spoke with your family.
A. I spoke with my family.
Q. How long were you sitting inside the building before you

saw any other activity occurring? Like meaning, like, effort to help you?
A. It was a few hours.
Q. Okay. So you were feeling frustrated?
A. Correct.
Q. Okay. Did there come a point in time where a second -- actually now it would be the fourth plan was created to bring a red van to the location?
A. Yes. Eventually, it was my understanding that the police department agreed to send a couple of marked police cars to escort that same border patrol van from earlier, and they were going to escort it to the side of the building, and hopefully we would be able to then take the detainees out the east doors and put them into the -- into the van.
Q. Do you recall -- did you see that red van arrive?
A. I did.
Q. Do you recall approximately at what time it arrived? If you don't, that's fine.
A. I don't.
Q. Were you observing anything -- can you show on this map if there's any sort of vantage point from which you could observe the red van and where the red van was?
A. So I pointed out these windows earlier.
Q. Mm-hmm.
A. There's windows there that you could see. But this whole

area over here as well is open with windows so I could see. I could kind of move freely back and forth a little bit through there, and I could see out to the east, and then I could also see to the south.

Q. Approximately where was the red van parked?

A. So the red van -- I believe it was somewhere around here.

Q. Okay. All right. Were you looking at the red van periodically?

A. Yes.

Q. What, if anything, did you observe with regard to activity around the red van?

A. So as soon as it pulled in, kind of the same thing from before had happened. The crowd gathered around the van. And this time even there was -- I believe there was a marked Spokane police car in front of it and behind it. And at that point, the crowd did the same thing from earlier. They surrounded all of the vehicles and wouldn't let them move.

Q. Were you able to see anything stacked in front of the cars?

A. Yes.

Q. What did you observe?

A. I observed -- I believe they were park benches and maybe bicycles stacked in front of the lead police car as well as the same types of items being stacked in front of that entrance that I spoke of earlier.

Q. Based on your observations, did you believe that you would

be able to -- that you would be able to transport the detainees in the red van?
A. No.
Q. How did you feel?
A. Again, frustrated. I felt, frankly, that it was a little too little late. And so we, at that point, didn't know how we were going to get out of there. I began to make phone calls trying to get additional assets to us. I began to call other federal partners that I could think of to try to get them to come help us as well.
Q. Did there come a point in time where you observed munitions being deployed?
A. Yes, much later. Much later, there were some sort of -- I believe they were PepperBalls that were deployed.
Q. Okay. And did there come a point in time where you were able to exit the building with the detainees?
A. Yes.
Q. Do you know approximately when that was?
A. Approximately 9:00 p.m.
Q. So in total, approximately how many hours were you inside that building?
A. It was eight or nine hours.
Q. And how did you get out of the building?
A. So eventually what happened was the Spokane police tactical teams came as well as Spokane County sheriff's tactical teams

also came, and we could hear over the police radio that what they were going to do is they were going to put up a smoke screen. They were going to attempt to clear an area on the side of the building where the red -- where I marked that the red van had been. They were going to attempt to clear a spot there so that we could come out the east doors. Once it was cleared, they were going to put up smoke to kind of conceal us so that we could get out without them seeing. And so once the smoke came, that was our cue to exit.

Q. Were you able to exit?

A. Eventually, yes. So once the smoke came up, then they had their tactical armored vehicles in place outside. And we ended up putting the detainees in the back of a BearCat, which is a police tactical vehicle for their SWAT team.

MS. CARTIER-GIROUX: Court's indulgence.

THE COURT: Okay.

MS. CARTIER-GIROUX: Special Agent Tomaso, thank you. I don't have any other questions for you, sir.

THE COURT: Cross-examination?

MS. GEORGE: Yes, please. I will need a second to set up. Can you turn it so it's not on for the jury right now just while I set up?

All the exhibits that I'm going to use have already been entered, so if you can put this on.

THE COURT: So you want to show the jury now,

Ms. George?

MS. GEORGE: Yes.

THE COURT: Okay.

MS. GEORGE: Just so it's ready and good to go. Is it on?

THE COURT: We have a blue dot. Is that your intent?

MS. GEORGE: I have a blue dot. Oh, yes. Good. I was looking at the Government's. All right.

CROSS-EXAMINATION

BY MS. GEORGE:

Q. One of the most frustrating things about this whole day is that the Spokane Police Department did not respond. Fair?

A. That was a frustrating part of the day, yes.

Q. That was a frustrating part of the day, right?

A. Yes.

Q. Because you guys started calling the Spokane Police Department right when you saw, what, 20, 30 people out front?

A. Yes.

Q. And you wanted them to come there to show an appearance so that -- I mean, there were 20, maybe a couple more, there. You wanted them to show an appearance so that, yeah, you get these people out, they're gone, all is good.

A. Yes. In a sense, we wanted to just get out and -- yes.

Q. But SP -- SPD said no, right?

A. Yes. That was my understanding.

Q. I'm sorry?
A. Yes. That was my understanding.
Q. And that was a very frustrating thing.
A. Yes.
Q. In fact, you were thinking this wouldn't have happened if you just had some uniform presence there at the onset.
A. Is that a question?
Q. Right?
A. If we would have had additional resources at the beginning, then I think a lot of this could have been prevented.
Q. I mean, you called 911. Not you but --
A. Correct.
Q. -- the royal "you." Law enforcement called 911. You called the sheriffs, meaning --
A. Mm-hmm, yes.
Q. Someone in that building was calling the sheriff.
A. Yes. They were called.
Q. All right. So I'm going to start with the south gate.
A. Okay.
Q. You testified that you came out aggressive.
A. Yes.
Q. Stern.
A. Yes.
Q. And that was purposeful?
A. Correct.

Q. And that was because you were concerned about what you had seen these people do, fair?
A. Yes.
Q. You had seen people deflating the tires of the white bus?
A. Yes.
Q. And you had seen people under the bus?
A. Yes.
Q. And that was a huge concern for you as to why you came out aggressive.
A. They had also done acts of vandalism to the bus.
Q. But the real thing was the people deflating the tires.
A. I don't know if I would categorize that as the most concerning.
Q. Okay. But let's be fair. It was one of the things that gave you concern?
A. Yes, because that is not a normal behavior.
Q. And you didn't know what these people were going to do.
A. That's fair, yes.
Q. So that's why you came out aggressive.
A. Correct.
Q. Fair? Okay.
And you told us that you had seen a change in groups. I mean, you've been doing border patrol and immigration for a long time?
A. Mm-hmm.

Q. Yes?
A. Yes.
Q. Okay. And you had seen a change in a -- this was different, right?
A. This particular instance had a different feel than other protests that I had witnessed, yes.
Q. Like protests you had seen maybe six months before this or eight months before this?
A. Even sooner than that, because it was somewhat normal for there to be people protesting outside of the ICE office.
Q. Yeah. Right.
There was also a difference in immigration policies, a change in immigration policies?
A. I don't know that I can speak to that.
Q. Well, you were an immigration officer for years.
A. I haven't been an immigration officer --
MS. CARTIER-GIROUX: I'm going to object to this line of questioning.
THE COURT: Sustained.
Q. (BY MS. GEORGE) All right. Well, you talked about -- you talked about that you had seen protests at HSI, oh, before this event.
A. Correct.
Q. Right? And one of those things that you saw was -- like two days before, or the day before that, you saw an individual

outside the ICE building where the white van was just the day prior.
A. Yes. I wouldn't call that a protest, but there was an individual out there, yes.
Q. And that was an individual, David Brookbank?
A. Yes. I recall that.
Q. And he was filming -- oh, there they are. Sorry. He was filming and heckling?
A. Yes.
Q. And you were able to get a video of him?
A. Yes. I filmed him back, yes.
Q. And the vehicle he was in?
A. Yes.
Q. But you went out there and talked with Mr. Brookbank?
A. I did.
Q. And he expressed hostility towards you?
A. Initially, yes.
Q. And towards ICE?
A. Yes.
Q. And government officials?
A. Yes.
Q. And he was recording this conversation on his cell phone?
A. I didn't know for sure, but I had suspicion that he was, yes.
Q. But what you did was you employed de-escalation tactics,

right?
A. I attempted to speak with him. My intent was to kind of find common ground with him.
Q. Yeah, right. And you did, right?
A. Sort of, I guess.
Q. The interaction was de-escalated and ended on a positive note?
A. It ended on a positive note. I wouldn't say it was de-escalated because it wasn't ever escalated, if that makes sense. It was just a conversation.
Q. You wrote a report about this?
A. Correct.
Q. And in that report, you wrote the interaction with David Brookbank -- quote, "The interaction was de-escalated and ended on a positive note."
A. Okay. Yes.
Q. Okay. So you know how to de-escalate a situation.
A. Every situation is different, but yes, we try the best we can to de-escalate when possible.
Q. Yes. And you learned de-escalation tactics when you went to FLETC in Glynco, Georgia?
A. Yes. That's fair.
Q. That's part of your training there?
A. Yes.
Q. And not only did you go to a three-month Glynco -- sort of

federal agent training, but then you went to an add-on for ATF agents?
A. (Moves head up and down.)
Q. And a strong component of your training is de-escalation?
A. A component, yes.
Q. Well, de-escalation is important because it can save human being lives, yours and the individual you're dealing with, right?
A. So I wouldn't call it formal de-escalation training. We train in use-of-force and we train in tactics, and we always train with the mindset of using the least amount of force necessary.
Q. So if ATF were to write that they integrate de-escalation and communication strategies throughout its special agent training, you would agree with that?
A. Yeah. I would agree with that.
Q. Okay. Now, de-escalation training is verbal. You can have verbal conversation with someone?
A. Correct.
Q. Nonverbal, just like maybe going like this. Calm down, right, calm down?
A. Right.
Q. And tactical strategies.
A. Yes.
Q. And the purpose of de-escalation is to reduce the intensity

of the situation.
A. Yes.
Q. To bring the emotions down, to prevent a volatile situation.
A. Yes.
Q. Fair?
A. Yeah.
Q. Okay. And the purpose is to increase the likelihood of voluntary compliance.
A. Yeah. That makes sense.
Q. And doing that without resorting to physical force.
A. De-escalation can also involve using physical force. It's just a matter of how much of force is applied and when.
Q. Right. But as you said to us -- what was the term you used? You want to take steps in increasing force?
A. I'm sorry. I don't understand.
Q. Let me see if I can find your words.
Sort of taking steps, like maybe at first you try and talk; second, you may raise your voice; third, you may engage in tactical strategies such as using your body; fourth, you may do a little pushing; fifth, you may use a taser; sixth, you may shoot someone. Fair?
A. I don't recall making that statement. We have different options available to us, and certain situations warrant different responses and different tools that we have in our tool

belt.
Q. Absolutely. And you don't always want to come out using a gun.
A. Correct.
Q. Right. If the situation calls for it, yes.
A. Correct.
Q. But you don't always want to do that. You start -- you start as least force possible?
A. Correct, but that doesn't mean that you start with no force.
Q. Right.
A. Sometimes you have to --
Q. Least force possible, right? Fair?
A. Correct.
Q. So some key principles of de-escalation are you maintain a calm body, right?
A. Yes. That's fair to say.
Q. Your language and your tone. You try to be calm. Right?
A. Correct.
Q. Because speaking with someone who's hyped up in a calm, measured voice can bring the amp down. Fair?
A. In certain circumstances, yes.
Q. Yes.
Another is to issue clear warning or advisement.
A. Correct. In certain circumstances, yes.

Q. Yes. Such as "You need to move, please move."
A. Yes.
Q. You can create physical distance or cover?
A. In certain circumstances, yes.
Q. You can actively listen to the individual?
A. Yes, as I did with Mr. Brookbank.
Q. Yeah. Like you did with Mr. Brookbank.
A. Right.
Q. Yes. You actively listened to his concerns, and he felt you heard him or at least it appeared to you that he felt like you heard him. Right?
A. Right.
Q. And it brought it down.
A. Mm-hmm.
Q. You can call for additional resources.
A. Correct.
Q. And you can do a threat assessment, right?
A. Yes.
Q. And part of your training through Glynco or continued training as an ATF agent, you know DOJ policy of use-of-force?
A. Yes.
Q. That policy is officers may use force only when no reasonable effective, safe, and feasible alternative exists, yes?
A. Yes.

Q. This means de-escalation is a prerequisite to force unless there is threat of immediate -- unless there is a threat that is immediate and deadly?
A. Okay. Well, I don't know what you're citing.
MS. CARTIER-GIROUX: Can I see what you're reading from? Because --
MS. GEORGE: Sure.
MS. CARTIER-GIROUX: -- force can be used without deadly force against you.
MS. GEORGE: Yeah.
MS. CARTIER-GIROUX: No, no. The policy.
MS. GEORGE: Right there.
THE WITNESS: Our deadly --
MS. CARTIER-GIROUX: This is your notes.
THE COURT: Why don't we -- there's not an objection standing, so --
MS. CARTIER-GIROUX: Objection. I don't know what she's reading from.
THE COURT: I understand that. It's the witness, though, that needs to respond. If the witness doesn't know what she's referring to, then the witness can so state. And if Ms. George has a document to provide, she can provide it in proper order.
THE WITNESS: There's a difference between our general use-of-force and our use of deadly force policy.

Q. (BY MS. GEORGE) Right.
A. And I don't know what you're referring to.
Q. Okay. De-escalation can reduce the need for force.
A. In some certain circumstances.
Q. Yes, of course. It can.
A. It can, yes.
Q. And it can reduce the risk of injury to officers?
A. Anything is possible at some times, yes.
Q. And civilians?
A. It can in certain circumstances.
Q. And it can improve officer safety?
A. It can, yes.
Q. And community trust?
A. At times, yes.
Q. Community trust in officers' behavior, true?
A. At times, yes.
Q. And it supports more humane and effective resolution of conflicts, fair?
A. You could say that, I guess.
Q. What?
A. I guess you could say that.
Q. Okay. Thank you.
All right. Now, you had been at -- working out of the HSI building for how long?
A. I had been there for maybe a couple of months, but I wasn't

there every day. Most days I was there, but it wasn't -- it wasn't all the time.

Q. And that's because there was a change in policy, and more law enforcement were being put on immigration issues.

A. So as a government employee, sometimes we're tasked to do different things. And so at this time, we were tasked to provide somebody to help with Homeland Security.

Q. And that's because the policy changed?

A. It's because we were directed to do so.

Q. Right. And you were directed to because the policy changed?

MS. CARTIER-GIROUX: Objection, asked and answered.

THE COURT: Sustained.

Q. (BY MS. GEORGE) All right. But you have been -- you have been to HSI enough that you know that this is the main entrance of HSI.

A. Yes.

THE COURT: Can you refer to the exhibit number for the record.

MS. GEORGE: Oh. Sure. 604A.

Q. (BY MS. GEORGE) Yes?

A. Yes.

Q. This is the area where you were talking about that the big line formed the morning of June 11th?

A. Yes.

Q. And it would have been right outside of these doors?
A. Yes.
Q. Now, you are aware that there is a camera on the front door that captures, at least from the angle, everything that's going on?
A. Yes. There's cameras.
Q. Okay. This is Government Exhibit 208. It is a video, but this is a clip from the video -- or a screen grab.
Now, this -- what it shows is it shows that this is the camera from the front entrance, okay? You see the little red line that I put down at the bottom?
A. Yes.
Q. Okay. And it shows that the date is June 11th, 2025?
A. Yes.
Q. It shows the time of 10:00 a.m., 59:19?
A. Yes.
Q. 10:59:19. So almost 11:00.
A. Yes.
Q. I think that timing is off. But what we're concerned about is the 000. See where I circled it?
A. Where?
Q. At the bottom left.
A. Okay.
Q. So we're going to look at just -- it's about 11:00, maybe it's off a half an hour, but we're going to look at the time

that elapses from the little timer on the video, okay?
A. Okay.
Q. Okay. Now, this is when the transport bus arrives, about 14 minutes 39 seconds from when the video starts; fair?
A. Okay. Yes.
Q. Fair?
A. Yes.
Q. Now, this transport bus -- and you may not know the answer to this, but this transport bus is owned by GEO Group?
A. I believe so, yes.
Q. And that's a private corporation?
A. As far as I understand, yes.
Q. All right. Now, this is at -- there. 38 minutes 19 seconds after the timer starts, right?
A. Yes.
Q. And you recognize Ben Stuckart?
A. Yes.
Q. And he's with a woman who we could presume is his wife in a black shirt and flowered skirt, right?
A. Yes. I see.
MS. CARTIER-GIROUX: Object to "presume." Unless he knows.
THE COURT: You can ask if he knows.
Q. (BY MS. GEORGE) There's a woman there standing next to Ben --

A. I see a woman, yes.
Q. Yes. And then there's a woman who is pushing the -- sort of the call button, and then there's two individuals.
A. Yes.
Q. And that -- that is Joswar and Cesar?
A. I'm not familiar with their name, but --
Q. Well --
A. -- I recognize them as individuals that were later taken into custody.
Q. Okay. The individuals that were with Ben Stuckart?
A. Yes.
Q. So if I told you their names were Cesar Alvarez Perez and Joswar Rodriguez Torres, you wouldn't have any reason to doubt that?
A. No.
Q. Okay. So they are there 38 minutes and 19 seconds from the start of the video, which is 11:00, 11:30, right?
A. Yes.
MS. CARTIER-GIROUX: Objection. I believe the video starts at 10:00 a.m.
MS. GEORGE: 10:59:19.
MS. CARTIER-GIROUX: Is that bottom of it? Okay. 11 a.m. Withdrawn.
Q. (BY MS. GEORGE) Now, at one hour, 25 minutes and 56 seconds into the video, Agent LaForte comes out the front door.

A. It appears that way, yes.
Q. You recognize Agent LaForte?
A. Yes, I do.
Q. And you see the timer at 1:25:56?
A. Yes.
Q. And Agent LaForte is looking down where the people are?
A. Yes.
Q. And let's see. One, two, three, four, five, six, seven, eight, nine, ten, eleven, twelvish, give or take?
A. It's hard to tell. There's a group there.
Q. Okay. And then one hour, 29 minutes, 28 seconds into the video, it appears a family arrives and there's some people there?
A. Yes.
Q. And that's you at the front door?
A. Yes, it is.
Q. You're letting them in?
A. I don't recall what I was doing.
Q. You're the guy that opened the door?
A. Yes. It looks like I'm talking to them.
Q. Right. Okay. And then one hour, 34 minutes, 58 seconds, there's -- Agent LaForte comes out the door?
A. Yes.
Q. And you follow him?
A. Yes.

Q. And you guys walk down to the group of people?
A. Yes.
Q. And you're not in tactical gear?
A. Not at this time.
Q. And Agent LaForte is not in tactical gear?
A. Correct.
Q. And no one is sort of surrounding you?
A. Correct.
Q. And then you come back?
A. Yes.
Q. At one hour, 35:36.
A. Yes.
Q. And you have a smile on your face.
A. It appears that I do, yes.
Q. Let's look closer. There you are. See?
A. I smile a lot.
Q. Yeah. Yeah. Yeah. I mean, because the scene was people peacefully protesting; is that fair?
A. At that point, the reason we went out there was to kindly ask them to move away from the bus because at that point they had already sat in front of the bus and were blocking the doors also. And so we went out there to ask them and tell them that if they didn't move, they could be subject to arrest because they would be violating a federal or impeding a federal process.
Q. And you went out there like you did with Mr. Brookbank.

A. At this point -- well, there was two of us and there was -- at this point, they hadn't gotten violent or anything like that. So we went out to talk to them to tell them they needed to move. And we hoped that they would comply and do it.
Q. Yeah. But there were only two of you so you didn't feel it was the best time to push people out of the way.
A. We didn't need to at this time.
Q. And then at 1:46:36 in this, you just see people down there sort of standing around, right? So we're one hour, 46 minutes and 36 since the video started, right?
A. Yes.
Q. No one is blocking the front door?
A. They're not blocking the front door, no.
Q. And then that's you?
A. Yes.
Q. And you come out. And look, you've got another smile on your face.
A. Yep.
Q. So this -- at this point, it's not frustrating. It's not -- there's no tempers flared. You're not concerned at this point.
A. At this point, it appears that I'm not concerned for my safety.
Q. It would have been nice if Spokane police showed up with uniformed presence, but you were not concerned.

A. At this point, I don't know if we had asked for them to come. I don't know at what point this was in our interactions for the day.
Q. Well, if it started at 11:00 -- okay. Well, this timing I think we'll find out is off. But all right.
And you go out. You walk out freely.
A. Yes.
Q. No tactical gear, anything like that.
A. That's correct.
Q. And then there's a guy sitting there at 2 hours and 31 seconds after the video starts. There's a guy sitting there?
A. Yes.
Q. And the crowd is bigger?
A. Yes.
Q. But no one is bothering this gentleman?
A. It appears that nobody is bothering him.
Q. No one is blocking the front door, right?
A. Correct.
Q. And then the gentleman goes in, two people come out.
A. It appears that way, yes.
Q. And no one is bothering these people. Fair?
A. It appears that way.
Q. And the crowd has their backs turned to the front door?
A. Yes. Some of them, yes.
Q. And anyone who was in there, say a civilian employee, could

have walked out just like these people?
A. At this point in time, it appears that way, yes.
Q. Yes. And the gentleman we saw go in leaves?
A. Yes.
Q. And that's at -- oh, there's no time on that one. And then at 2 hours, 23 minutes, 31 seconds, we see a guy at the front door?
A. Yes.
Q. That guy happens to be a lawyer in --
MS. CARTIER-GIROUX: Objection.
Q. (BY MS. GEORGE) Do you know this individual that's at the front door?
A. I can't tell. I can't see a face.
Q. Do you know Justin Lonergan?
A. No, I don't.
Q. Okay. So he's standing there at 2 hours, 23 minutes, and 31 seconds into this video, right?
A. It appears that way, yes.
Q. No one is even looking at Justin -- the individual?
A. It appears that he's not being bothered, yes.
Q. Okay. And then at 2 hours, 36 minutes, 29 seconds, a woman comes out?
A. Yes.
Q. And no one, it appears, is trying to stop her?
A. It appears that way, yes.

Q. No one is even really looking at her?
A. Yes. It appears that way.
Q. So then at 2:48:19, front doors aren't blocked?
A. That's correct.
Q. No one is even near the front doors?
A. That's correct. The front doors are primarily used for the public to come and check in. Those doors aren't doors that we take detainees out.
Q. Right. But you could, if you needed to, take the detainees out this door.
A. It would be not a great place to do that.
Q. You could, if you needed to, take the detainees out this door.
A. We could, but it's kind of a tactically poor location, and that's a dead-end road, and it would be difficult.
Q. Well, actually, you know, Cataldo runs the way, right?
A. I think you get out to the --
Q. You can get out.
A. You can get out, yes.
Q. There's the parking lot.
A. The parking lot.
Q. You can see the parking lot in the upper left-hand corner, right? Yes?
A. Yes.
Q. And that's a public parking lot?

A. Yes, I believe so.

Q. And to the left of that parking lot, you can drive out the road, right?

A. I'm not sure if it's a road or part of the parking lot, but, yes, there's -- you can get through there, yes.

Q. There's an open area for -- even a big bus would fit in that area.

A. Potentially. I'm not sure. I don't know. I can't testify to that.

Q. And then it goes and you can drive. You see a fence, but you could turn right, you could turn left when you get up there.

A. I believe so, yes.

Q. So there's easy exit. If you had something at the front door, you have an easy route out to the left.

A. Potentially.

Q. And the thing about this front door is the detainees, the ones that are going to be detained, they come in the front door, right? Yes?

A. Yes.

Q. This is the door they come in?

A. To check in?

Q. Yes.

A. You're referring to that?

Q. Yes.

A. Yes.

Q. And then if you grab them, say on a warrant, it is in the lobby where you escort them to the detention area?
A. Sometimes. It's different.
Q. But you don't -- you may leave them in the lobby for a bit, but you move them to another part of the HSI building.
A. For detention or -- and to get ready to process and transport?
Q. Yes.
A. Yes.
Q. Right. So that means you can take them from the detention area out to the lobby and out the front door.
A. Potentially we could, yes. It's possible.
Q. And any civilian or agent who is in that building could come out the front door?
A. Potentially, yes.
Q. I mean, right here, right now, no one is even looking at the front door. And this is 2 hours, 48 minutes, and 19 seconds into this day.
A. It appears that way, yes.
Q. And here we have the individual that went in earlier and two other individuals at 2 hours, 56 minutes, and 39 seconds, right?
A. It appears that way.
Q. And no one is impeding their movement, it appears.
A. It appears that way, yes.

Q. And then the individual is leaving. And these two individuals, the one in the blue shirt and the white shirt, are talking to someone inside.
A. Yes.
Q. And they're not impeding the individual inside's movement, it doesn't appear.
A. It doesn't appear.
Q. And the individual could walk out of there.
A. Yes. It appears that way.
Q. And that was 2 hours, 56:40, so three hours into this. Fair?
A. Yes.
Q. At 3:39:51, you still see a crowd, but no one is looking at that front door.
A. It appears that way, yes.
Q. No one is around that front door.
A. If my memory serves correctly, there was people kind of to the left of the screen out of the view. There was people over there and vehicles over there as well. So if I recall correctly, it wouldn't have been tactically advantageous for us to go out those doors.
Q. Okay. Well, you have seen the drone videos in this case?
A. Somewhat, yes.
Q. Yeah. And you have seen the drone videos that look at the front door?

A. I don't recall.
Q. You can see the white bus or -- yeah, the white bus with the red car in front?
A. I'd have to look at it to speak on that.
Q. Now, let's see. 19:40, no one's blocking that front door, fair?
A. Yes.
Q. And that guy comes up at 3:51:28?
A. Yes. It appears that way.
Q. He's not impeded.
A. Yes.
Q. He kind of looks agently like, right?
A. I don't know. I can't speak to that.
Q. Short hair, tie, shirt.
A. It appears to be an individual with -- dressed nice.
Q. And paperwork, right?
A. Yes.
Q. And no one is impeding him. Certainly doesn't appear so from the --
A. It does not appear so, yes.
Q. And now we're at 4:45:02, so almost five hours from the start of the video, right?
A. Yes.
Q. And no one is blocking the front door?
A. No. Not at this moment. However, you can see that there's

a vehicle blocking the bus, and I believe at this point, there was also one in front of the bus.

Q. Absolutely. But what we also know is that bus was -- the windshield was painted at 2:30, right?

A. At some point. I don't recall the exact time. Yes.

Q. And the bus could not be used after the windshield was painted.

A. Yes. We -- at the time the windshield was painted, we had talked about some options of maybe going out there and trying to get to the bus and using a tool to scrape off the windshield so we could get it out. Ultimately, the decision was made that it wasn't safe because we didn't know what had been done to the bus fully, and so we made the decision not to use the bus at some point.

Q. And you made that decision not to use the bus --

A. The collective us.

Q. Yes, the collective you.

A. Yes.

Q. Around 2:30, 3:00?

A. I don't recall what time it was.

Q. It was before the south gate event.

A. Yes.

Q. So y'all decided that that bus -- before the south gate event, y'all decided that you weren't going to be able to use the bus. At that point, you decided it was inoperable.

A. At some point, we decided it probably wasn't be safe because we didn't know what had been done besides the windshield. We saw people crawling under the bus and crouching down by the tires, and so we suspected that they had vandalized the bus further.
Q. And that was before south gate?
A. Yes.
Q. All right. Now let's go to five hours, 8 minutes, 32 seconds into this. And no one's by the front door. Oh, yeah there is. There's a woman with a little dog.
A. Yes.
Q. Like a Yorkshire or a Scottie?
A. I don't know.
Q. No one is going to be intimidated by that little dog, right?
A. I don't know.
Q. Or the woman in the striped skirt and flip-flops, right?
A. I can't speak to that. I don't know the full context.
Q. Now, to be fair, at 5:44:22, some people sat in front of that door with signs.
A. Yes. It appears that way.
Q. But they're not even looking at the front door.
A. I can't tell where they're looking.
Q. Well, they're not looking at the front door, right? Look closely.

A. Some of them appear not to be, yes.
Q. Is there anyone you see looking at that front door?
A. It's hard to tell.
Q. Well, the jury can see as well. They can make a decision.
MS. CARTIER-GIROUX: Objection. Objection. That's not a question.
Q. (BY MS. GEORGE) Right?
MS. CARTIER-GIROUX: That doesn't make it a question.
THE COURT: Move on. We'll strike that. Move on, Ms. George.
Q. (BY MS. GEORGE) At 5:46:32, now we're nearly six hours into this event. There's like very few people that are by that bus down there, right?
A. It appears that way, yes. It -- yes.
Q. And the front door, no blocking of the front door?
A. In this view, yes.
Q. But what is interesting is all the people are gone. And we know a bunch of people ran to the south gate, right?
A. Yes.
Q. And that's when you and -- well, collectively, y'all decided that three would go out and get in the cars?
A. I don't know who decided that, but somewhere along the lines, those three decided to do that.
Q. And you, Sullivan, and LaForte said, "We gotta get out there"?

A. Yes. McSullivan, LaForte, and I.

Q. Oh, did I say Sullivan? Sorry. McSullivan, you, and LaForte said, "We gotta get out there."

A. I don't know that that was verbalized. I believe we just heard the commotion, and we saw them out there, and we just thought we needed to get to them.

Q. And that's because you had no plan. You --

A. I don't --

Q. You testified --

MS. CARTIER-GIROUX: Objection.

Q. (BY MS. GEORGE) -- on direct examination --

MS. CARTIER-GIROUX: That they had no plan?

THE COURT: Please. There's an objection pending. Ms. Cartier-Giroux.

MS. CARTIER-GIROUX: I don't think that the witness testified that they had no plan at this point.

THE COURT: She can pose the question and the witness can answer.

Ms. George.

Q. (BY MS. GEORGE) You testified on direct examination that you had no plan when the three of you went out there?

A. That's fair to say. We responded to a rapidly-evolving situation, and we ran out because we perceived that those officers were in danger.

Q. Exactly. It was a rapidly-evolving situation.

A. Correct.
Q. And you responded.
A. Yes.
Q. You had no plan, right?
A. Yes.
Q. You had no agreement as to what you were going to do?
A. Right.
Q. Right. And just because you acted the same, it doesn't mean that you had an agreement to act the same; it just happened?
A. We didn't verbalize before we went out.
Q. It just happened, right?
A. Yes, what happened happened.
Q. Okay. And so you went out there without a plan, without an agreement. And this is you in front?
A. Yes.
Q. Now, you're walking rapidly, but you're not running.
A. At one point, I was running, but then I was --
Q. A little trot.
A. -- trying to get a feel for what was happening.
Q. Right. Okay. And you can kind of see through the fence?
A. You could -- sort of. You can see through into the secure parking a little bit, but you can't see all the way through to the south gate, if that makes sense.
Q. Fair. Fair. This is when you came out aggressive.

A. Yes.
Q. And McSullivan came out aggressive.
A. Yes.
Q. And you and McSullivan have tactical gear on?
A. Yes.
Q. Because that was what policy requires?
A. It's not a matter of policy. There was -- we just felt that we should put it on for safety.
Q. For safety, common sense, to prevent injury to you.
A. Yes. And to also make sure that we're marked as law enforcement.
Q. That's the other thing. Yes. So everyone knows that you are -- you were marked with ATF law enforcement, right?
A. Correct.
Q. And McSullivan was marked with something that identified him as a police officer?
A. Yes. There's kind of a universal marking for police. It doesn't specify who you work for necessarily.
Q. But that's important, too, so that people see that authority figures are coming?
A. Yes.
Q. And so people know who are the law enforcement and who are not?
A. Yes.
Q. Okay. So this is you guys coming out without a --

(Playing Exhibit.)
Q. (BY MS. GEORGE) And you're hearing people yelling right --
(Interruption by the Court Reporter.)
THE COURT: Ms. George, for the record, it's Defense 605E.
MS. GEORGE: Thank you.
Q. (BY MS. GEORGE) You heard people yelling at you.
A. Yes.
Q. Some really vile things.
A. Yeah.
Q. Right?
A. Yes.
Q. But you're an agent. You're thick-skinned, fair?
A. Yes.
Q. Okay. That's something you've got to learn, but, you know. De-escalation also teaches you to stay calm.
A. We attempt to, yes. We attempt to stay calm.
Q. But as you were walking out, not one individual impeded your way.
A. I wouldn't -- I wouldn't say that.
Q. Let's watch it again.
A. As in the clip that you just showed, that's correct.
Q. Yeah. That's what I'm talking about.
(Playing Exhibit.)
Q. (BY MS. GEORGE) There's your little trot.

(Playing Exhibit.)
Q. (BY MS. GEORGE) Okay. So -- and no one touched you?
A. Up to this point.
Q. No, right?
A. Correct.
Q. And that banner was already stretched out when you turned the corner?
A. I don't recall.
Q. It's not like these people knew you were coming out there, right?
A. I don't know.
Q. Well, let's go back and see if that...
(Playing Exhibit.)
Q. (BY MS. GEORGE) Right? The banner was already stretched out.
A. At this point, yes, it was stretched out.
Q. Okay. It wasn't that it was stretched out because they saw you coming; it was stretched out when you turned the corner?
A. I don't know.
Q. And then there's Exhibit 605C. This is when you're coming around the corner.
(Playing Exhibit.)
Q. (BY MS. GEORGE) And that's...
(Playing Exhibit.)
Q. (BY MS. GEORGE) So at the time that y'all went in there,

there was no de-escalation.
A. There was -- there wasn't an opportunity for de-escalation. We gave verbal commands, and they didn't obey them.
Q. We didn't hear any verbal commands in this audio. Perhaps you did. But this was loud, fair?
A. It was loud, yes.
MS. CARTIER-GIROUX: Objection.
MS. GEORGE: He answered yes.
MS. CARTIER-GIROUX: But the first question was we didn't hear any verbal commands. Can he answer that question? Because it was a combined question. She didn't ask him did we hear verbal commands in that video.
THE COURT: Okay. Why don't you break your question into parts, Ms. George.
Q. (BY MS. GEORGE) We didn't hear any verbal commands.
A. In this video? Is that what you're referring?
Q. Correct.
A. Yeah, I didn't hear any verbal commands.
Q. It was loud.
A. It was loud, yes.
Q. It was very loud.
A. It was loud.
Q. Now, this is McSullivan right here, right?
A. Yes.
Q. And we've seen this video.

(Playing Exhibit.)
Q. (BY MS. GEORGE) And we couldn't hear any verbal commands, fair?
A. I heard a verbal command.
Q. Did you? Okay.
It was loud, right?
A. It was loud, yes.
Q. And you were -- now, this is McSullivan? 605H?
A. Yes.
Q. He has a police badge?
A. Yes.
Q. Identifying himself as a police officer?
A. As a law enforcement officer, yes.
Q. Law enforcement. Sorry.
And this is you?
A. Yes.
Q. 605L?
A. Yes. That is me.
Q. And you have something on your chest here that identifies you as law enforcement?
A. Yes.
Q. This is LaForte?
A. Yes.
Q. He came out of that building without any tactical gear?
A. Correct.

Q. Without any badge?
A. Correct.
Q. Not identifiable necessarily as a law enforcement officer?
A. At some point, he had a lanyard with an identification on it. I don't recall when or I don't see it right at this moment, but I remember -- recall him having some sort of ID.
THE COURT: And we're looking at 605K.
Q. (BY MS. GEORGE) It's fair to say that many of us wear lanyards, right?
A. Yes.
Q. For identification, right?
A. Yes.
Q. So there was nothing on Agent LaForte when he was coming out of the building that would identify him as a law enforcement officer.
A. No, there wasn't.
Q. There was nothing on Agent LaForte when he was pushing the crowd that identified him as a law enforcement officer.
A. No.
Q. It was Agent LaForte's decision to come out without tactical gear.
A. Yes. I can't speak to his decisions, but yes.
Q. Now, this is Agent Burlingame at 605F?
A. Yes. That's Officer Burlingame.
Q. This is -- at 605I, this is you pushing?

A. Yes, it is.
Q. And at 605J, this is you, McIntosh. Who is the third guy? Wilks?
A. I'm not sure. I believe so.
Q. And then Burlingame?
A. I'm not -- it's hard to tell.
Q. Yeah. But you recognize you?
A. I believe so, yes.
Q. Of course. And McIntosh?
A. Yes.
Q. And McIntosh was the driver of the second car?
A. I don't recall which car, but he was --
Q. One of the cars?
A. Yes.
Q. He wasn't one of the guys that came out with you?
A. No. Not from the building, no.
MS. GEORGE: Did I say 605J?
THE COURT: You did now.
MS. GEORGE: Okay.
Q. (BY MS. GEORGE) And you had a body camera?
A. I did.
MS. GEORGE: And it is right here. This is not marked. I will provide the Court with an -- add it to this -- the exhibit sticker.
THE COURT: Is it identified as an exhibit, you just

don't have a sticker on it?

MS. GEORGE: Yes.

THE COURT: Which exhibit is this?

MS. GEORGE: It is the body cam of Agent Tomaso.

THE COURT: What exhibit number is that? Does the Government know?

MS. PEREZ: It's Government Exhibit 24.

MS. GEORGE: Government Exhibit 24.

THE COURT: Thank you.

MS. GEORGE: Thank you.

MR. ORESKOVICH: Say again, please?

(Playing Exhibit.)

MS. CARTIER-GIROUX: That's not 24.

Q. (BY MS. GEORGE) Okay. Well, this is your body camera?

A. It appears it is.

Q. You've watched your body camera before?

A. Yes.

MS. PEREZ: This is not 24.

MS. GEORGE: Okay. That's fine.

THE COURT: If we can identify it soon, what number it is, so we can have it for the record.

MS. GEORGE: I will. We will mark this as 616. And -- well, let me see my exhibit list. Oh, it's 605G.

THE COURT: Okay. 605G.

MS. GEORGE: Thank you, Amy.

MS. RUBIN: Yep.
Q. (BY MS. GEORGE) So this is your body camera once the gate shuts?
A. It appears so.
Q. And I will mark this on the exhibit, too.
Yes?
A. Yes, it appears so.
Q. Oops.
(Playing Exhibit.)
Q. (BY MS. GEORGE) That was you that sort of giggled?
A. Yes.
Q. Said "These guys"?
A. Yes.
Q. All right. All right. And then you guys go back into the building?
A. Yes.
Q. And you can kind of see through the fence because there's holes in the fence, right? It's not solid material?
A. Correct.
(Playing Exhibit.)
Q. (BY MS. GEORGE) And you go through the man gate, the gate?
A. Yes.
Q. And you come out. And it doesn't appear as though anyone impedes your way.
A. At this point, you're correct.

Q. And you're able to walk -- and that's the back door of HSI, right?
A. Yes.
Q. Okay. And you're able to walk right up there?
A. Yes.
Q. And this is another view of that. This is 605N. This is another view of that. And this is 605O.
(Playing Exhibit.)
Q. (BY MS. GEORGE) Now we're going to do that again, and I want you to pay special attention to the guy in kind of the tan wear with the baseball cap.
A. Okay.
Q. And let's watch and see what Agent LaForte does.
(Playing Exhibit.)
Q. (BY MS. GEORGE) You saw what Agent LaForte did?
A. Yes, I did.
Q. He flipped the guy's hat off?
A. It appeared that way.
Q. It didn't appear as though the guy did anything to Agent LaForte?
A. It appeared not, yes.
Q. Let's watch it again.
All right. So the guy -- I'll stop it when the hat comes off. Oops. Sorry.
(Playing Exhibit.)

Q. (BY MS. GEORGE) There's our guy. He's in kind of grayish pants, tan shirt, and a baseball cap on?
A. Okay.
Q. Just to the right of the pillar?
A. Yep.
Q. All right. And then there's a woman with black pants and a whitish blouse, short-sleeved blouse to the right of him?
A. Yes.
Q. Do you see them?
A. Yes.
Q. Okay. Here we go. And Agent LaForte again is not in tactical gear. He's got sunglasses on and a gray shirt?
A. Yes.
Q. Okay. Here we go. Walking in.
(Playing Exhibit.)
Q. (BY MS. GEORGE) There. Did you see it there?
A. I did see it, yes.
Q. And did you see that the guy didn't do anything to Agent LaForte?
A. I can't speak to why he did that or what he saw or heard or perceived. I can't testify to that.
Q. Right. Fair. But you didn't see --
A. I didn't see any of this at the time.
Q. Now, let's go back to the front gate. We see a small child, two teenager type -- this is Government Exhibit 208. Two

teenager-type people, right, at six hours, 35 minutes, and 52 seconds into this day, right?
A. Yes.
Q. And the woman that appears to have the banner that was stretched out on her back?
A. I don't know what that is. Yes. Maybe. I don't know what that is.
Q. All right. And the front door isn't blocked.
A. Correct.
Q. And the people aren't hovering around.
A. Correct. Their focus was not on that door.
Q. And then at six hours, 54 minutes, and 52 seconds into this, nearly seven hours, the front door is not blocked in any way.
A. It appears that way, yes.
Q. In fact, there aren't even any people around.
A. Yes.
MS. GEORGE: Thank you very much.
THE COURT: Okay. We are almost at the noon hour, so I guess this would be a good time to take a break. Members of the jury --
Ms. George, were you trying to signal me something?
MS. GEORGE: No. I was asking Linda something -- Ms. Hansen.
THE COURT: So, members of the jury, we will be on a

recess until 1:00 p.m. Please don't discuss this matter amongst yourselves. Don't do any research. Be careful if you're in the hallways.

Members of the gallery, be careful as well. Jurors are instructed not to talk to anyone, so please respect that. All rise for the jury.

(Jury exits the courtroom.)

THE COURT: So I note that I have received a brief from the Government, and I have not had the ability to read that yet. I will do that over the noon hour. When would the parties expect you would like a hearing on the juror issue?

MS. PEREZ: We'll be prepared at 1:00 or whenever the Court would like.

THE COURT: How about 12:45 so that we impinge on the jury as little as possible. I hope people brought their lunch.

How are we doing in terms of timing? We're on day three. We're not done with the second witness yet. One of our jurors did inform me that, like me, they cannot be here after the end of next week. Are we on track?

MS. PEREZ: Your Honor, this is taking longer, a lot longer than anticipated, and the United States intended on kind of focussing on specific moments with each individual witness. I don't know if that's defense tactic, and that's fine. This is taking longer than we anticipated. Hopefully, we can speed up, but I don't know that -- again, three defense attorneys and two

more crosses this afternoon. I don't know where this is going, so this is slower than anticipated.

THE COURT: Okay. That's helpful. I'm being sarcastic. I don't know if we should try and go until 6:00 p.m. in the evening to try to get through this. I guess I'll have -- and I would need to discuss that with the jury. That's not something I've asked of them. But we're going to be in a bad spot if we're not really with the evidence by the end of the day next Thursday.

MS. PEREZ: Your Honor, I can tell the Court, with each witness, we are trying to focus on the things that they did. So, for example, we did not play the portion of LaForte -- Agent LaForte flipping the hat because that is not what Special Agent Tomaso did. It will be played with Agent LaForte. So we're trying to focus each individual questioning on the agent's actions. That is the best the United States can do, your Honor. And, again, defendants of course have free rein to cross-examine, but we truly are trying to very much focus. This was the first witness -- well, second really, but did give an overview. We do intend on speeding up and focusing on what each individual agent did. Each person that was on the ground that day, the three ICE agents who walked out, as well as the other federal agents who walked out, they will be testifying. We will be asking them what they did, not what others did.

THE COURT: I'm not going to formally limit

cross-examination, but if you cross-examine on one thing and it's cumulative, I will sustain an objection to being cumulative, so please choose which witness you want to cross-examine on things. I haven't heard cumulative objections yet, but I will sustain them because that's the only way we can get through them.

In addition, if we can avoid playing the same video multiple times. I realize why it's done, but we need to be judicious with that. So if it's possible for someone to give an overview when they play the video instead of playing a video and then playing it again. Hopefully, that doesn't happen too much. In my experience, that can really slow things down. The jury will have the videos also back in the jury room with them. So I guess that's the best we can do.

Let's be back here at 12:45. If we bring the juror in, it will be a closed proceeding. Thank you.

(Court recessed from 12:01 p.m. to 12:49 p.m.)

(Whereupon, proceedings were held which were not ordered and transcribed.)

(Jury enters the courtroom.)

THE COURT: A couple of things. Counsel, I do have a request from the jury, a written request to please, when a witness comes in, have them say their name clearly and spell it so that the jury can be very clear on that, and please do not talk while the video is playing. And I will try to help remind

people as well.

Okay. So, Ms. George, you wanted to do one final thing before passing on cross.

MS. GEORGE: Yes. We renumbered what I referenced in that cross-examination from Government Exhibit 208, which was referenced as video front entrance, to Defense Exhibit 617. And it was contained in a PowerPoint, which I move to admit as 616A. It is the PowerPoint of Tomaso's cross-examination.

THE COURT: Is that already on the list?

MS. GEORGE: It is a new one.

THE COURT: Okay. Any objection?

MS. CARTIER-GIROUX: No, your Honor.

THE COURT: Okay. That's admitted.

(Exhibit No. 616A admitted into evidence.)

THE COURT: Okay. Is there further cross-examination from the other defendants?

MR. DUGGAN: No, your Honor.

MR. ORESKOVICH: Yes, your Honor.

CROSS-EXAMINATION

BY MR. ORESKOVICH:

Q. Good afternoon, sir.
A. Good afternoon.
Q. I only have a few areas of inquiry. All right?
A. Yes, sir.
Q. As I understand your testimony, although there had been a

plan discussed for the other three agents to leave the south gate, you weren't aware that the plan actually got executed until you looked out and saw the vehicles at the gate. Is that correct to say?
A. Yes, that' correct.
Q. And what you did is you saw that the vehicles were stopped there, and there were people crowding around the entrance to the gate, correct?
A. Are you -- are you referring to when I was still in the building or by the time I got out there?
Q. When you were still in the building.
A. I can't recall what I saw that led me to go out exactly from the building, but I, at that point, was aware that they had gone down there. I don't remember if I saw the vehicles or just them or the crowd or what, but...
Q. And I accept that. That's not the important part of my question. What I'm really interested in finding out is that, at some point, you saw that there was a crowd forming at the entrance of the gate or at the gate exit, right?
A. Yes.
Q. And you went out and the other agents went out for the purpose of trying to clear them out of the way, the crowd out of the way, so that the three ICE vehicles could depart the facility, right?
A. Yes. Initially, I just went out there because I'd learned

that three officers were out there, and I believed that they could be in danger, so I went out there to assess. And once out there, then we saw kind of a window where we thought we could move people out of the way and get them out of the -- out of the gate.
Q. Is the answer to my question "yes," sir?
A. I guess I'm not understanding fully.
Q. At some point in time, you realized that a crowd was out there, after whatever you did, you assessed, and you made a decision that you were going to attempt to clear the crowd out of the way, correct?
A. Correct.
Q. All right, sir. And at that point in time, you recognized that maybe with -- to clear the crowd out of the way, you might, as you did, have to use some force to push them, correct?
A. Yes.
Q. All right. Now, you had mentioned in the course of your direct examination that when you got out there, the three of you, that the protesters had formed a line with their arms linked?
A. Yes. At some point, they did.
Q. And then at some point, you folks had gotten in and formed your own line, correct?
A. To a degree, yes.
Q. To a degree, sure.

MR. ORESKOVICH: Could we look at Defendant's Exhibit 605C, please?

(Playing Exhibit.)

Q. (BY MR. ORESKOVICH) And what I'm going to do, if it's okay with everyone -- are we up on everyone's screen? I'm going to just play it to the point where I think we see your line, okay, and then I'm going to stop so we can discuss that. Okay?

A. All right.

MR. ORESKOVICH: Please play.

(Playing Exhibit.)

Q. (BY MR. ORESKOVICH) All right. Now, the line you formed was a little different than the line that the protesters had, correct, sir?

A. Correct.

Q. The protesters had a line where their arms were linked together?

A. Yes.

Q. And when you went out there and the three of you formed your line, you didn't link your arms together, correct?

A. That's correct.

Q. Because it wouldn't have made sense to link your arms together at that point because you knew you were going to have to use some force to push them out of the way, right?

A. Correct.

Q. And if you intended to use the force, linking your arms

would not be effective, would it?
A. No, it wouldn't be.
Q. All right. And the other aspect of this is you were also concerned about officer safety, were you not?
A. Yes.
Q. Anytime that you would be out in a crowd like that and have some type of interaction with protesters or other persons, you have to have the ability to defend yourself, right?
A. That's correct.
Q. You testified for us in direct examination as to your training on reading these physical cues. I forgot what you called it, but one of the things you do is look at a person in front of you and make a decision as to whether or not you have to react in some defensive manner, correct?
A. Correct.
Q. And, in fact, you told us about one individual who was standing aggressively and you gave him, quote, a good push, right?
A. Yes.
Q. And what would happen if you were out there with your arms linked together? You wouldn't be able to do that, would you?
A. That's correct.
Q. In fact, in essence, you would be defenseless, at least during the time period that your arms are linked together, to be able to defend yourself like the person that was potentially

confronting you, correct?
A. Correct.
Q. I want to move to one other subject matter, and I'll be finished. All right?
A. Yes, sir.
Q. One of the things you told us is after this incident occurred -- and so we're clear about this, the only physical interaction that occurred that day involving you was this incident that we saw at the south gate, right?
A. Yes.
Q. And that incident we've seen from this video, zillions of views of videos at this point -- maybe not quite zillions -- lasted about 30 seconds, correct, sir?
A. Somewhere around there.
Q. It was short?
A. Somewhere, yes.
Q. Right?
A. Fairly short. I don't know how long it was.
Q. All right. Fair enough. And one of the things after that occurred and you folks went back inside -- and when I say "back inside," I mean back inside the gate, the gate is open, you folks are standing there, protesters are on the other side, right?
A. Mm-hmm.
Q. One of the things you were concerned about was what I think

you referred to as a mob mentality, right?
A. Yes.
Q. What had been happening is over the course of the day, it started out as kind of a smaller protest, and then individuals kept coming, correct?
A. Correct.
Q. And I think you testified, with this interaction that occurred at the south gate, that as you were pushing or moving people that other people were coming and filling in, correct?
A. Yes.
Q. All right. And what you were worried about is that as that happens, as more people come, correct, that this situation becomes more unmanageable and more disorganized?
A. More unmanageable is a good way to put it.
Q. Sure. Because more people can come that have different purposes, and it can become a situation where people would do things that are difficult and not manageable, correct?
A. Yes. That's a concern.
Q. So it would make good sense, wouldn't it, to the extent that we could all get on the same page, to try to manage this in some fashion so that didn't occur?
A. I guess I don't understand the question.
Q. Sure. The protesters -- in essence, if we didn't want to have a situation where there was some type of a mob mentality or some melee, it would be a good purpose wouldn't it, to try to

organize it so that people were on the same page to act nonviolently? You'd agree with that, wouldn't you?
A. Sure.
Q. And that would protect protesters if that worked, wouldn't it?
A. If it worked. That would take resources.
Q. Protect people like yourself, wouldn't it?
A. Yeah.
Q. Thank you. That's all I have.
THE COURT: Any further cross-examination? No? Any redirect?
MS. CARTIER-GIROUX: Briefly.

REDIRECT EXAMINATION

BY MS. CARTIER-GIROUX:
Q. Ms. George had asked you about an encounter that you had with someone named Brookbank. When did that occur?
A. June 10th, the day prior to this incident.
Q. Okay. And, in fact, can you tell us a little bit -- how many people were involved with your interaction with Mr. Brookbank?
A. Just him and I.
Q. Okay. And was he cursing you out?
A. Yes.
Q. He was?
A. He was filming me and kind of getting in my face and not --

I guess I wouldn't call it cursing out.
Q. Okay. And you said earlier in your testimony that you had filmed him back?
A. Yes.
Q. And you did engage in a conversation with him?
A. I did.
Q. Can you tell us what was different between your interaction with Mr. Brookbank on June 10th of 2025 and your experience at the south gate?
A. For starters, it was one person, so it was me and one person. So it's a circumstance where it's manageable to talk, and I'm able to de-escalate because it's one on one. It was a lot different from the next day when we were outnumbered vastly.
Q. Okay. And had any de-escalation been attempted earlier at the white bus?
A. Yes. In one of the videos that defense showed, when myself and Special Agent LaForte left the building, we went out there for that purpose, to talk to the individuals and asked them to leave so that we could get the detainees out onto the bus.
Q. And did you use those hand expressions that Ms. George demonstrated when you spoke to them?
A. Which ones?
Q. The -- you know, open hand, open palm? Do you remember if you did that?
A. I don't recall. I recall that we spoke kindly. We used

our words. We didn't use any force. We asked them and we told them that they were impeding a federal process and that they needed to move.

Q. Besides you and Special Agent LaForte, did someone else also from the facility attempt to go out and de-escalate?

A. Yes. Officer Jeremy Burlingame did also.

Q. Did he go out before you or after you?

A. I believe before.

Q. So after the two attempts to de-escalate, was the -- were the individuals blocking the bus willing to leave?

A. No, they were not.

Q. Is it at that point that you called the police?

A. Yes.

Q. Now, Ms. George also showed you a bunch of video for hours at the front door. Where was the crowd?

A. The crowd was around the bus at that point.

Q. What was the bus's purpose?

A. To transport the detainees.

Q. So to be clear, what were the people in front of the bus preventing you from doing?

A. Putting detainees on the bus and then transporting them.

Q. How many detainees did you have?

A. I believe 12.

Q. How many were male and how many were female?

A. There was one female, to my recollection.

Q. Okay. So you had 11 males and one female?
A. Yes.
Q. Can you explain to the members of the jury how you would move out from the facility 12 people?
A. It would -- we would have to -- usually when we do that, we have people standing on either side of their path to the bus, and then we walk them out to the bus and -- but we have to keep the males and females separate.
Q. Are they -- do they have any kind of shackles or any kind of inhibitors for them to be able to run?
A. Yes. Per policy and procedure, they wear shackles on their ankles as well as belly chains and cuffs.
Q. Is that because there's only a couple of you?
A. Correct.
Q. Would you have been able to walk the detainees from the front door all the way to the bus?
A. It would have been very difficult.
Q. Okay. And then once you got to the bus, was there -- they had the same problem there?
A. Yes.
Q. As walking them out the sally port?
A. Yes.
Q. Okay. So later on, when you made the plan to the south gate, why did you pick the south gate?
A. We thought that -- we didn't know that they associated that

to our building, so we thought maybe there was a chance that we could go out unnoticed.

Q. Okay. Is that why you want -- why did you want to go out unnoticed?

A. So that we could circle the block or something and find an opportune time where we could get a little gap or something and get the detainees out somewhere.

Q. So what did you believe would happen if you took them out that front door right up the block from where the people were blocking the bus?

A. It would have been -- it would have been a terrible tactical nightmare. It would have been --

Q. What do you think -- what did you believe the people in front of the bus would do?

A. So I don't believe they would have moved out of the way because we had already asked them to at least twice. So I don't believe they would have moved out of the way, and it would have posed a risk for us loading the detainees for the detainees, for us, and for the protesters.

Q. If you would have pulled the red van up to the side, what did you -- what did you believe would have happened?

A. The same thing that happened when we pulled it down below.

Q. Now, Ms. George also asked you about when you returned after your -- an inability to leave at the south gate, and you were able to walk freely into the building. Did you believe --

you were able to walk into the building, right?
A. Yes.
Q. Did you believe you'd be able to take the detainees out?
A. No.
Q. And is it fair to say -- up until the point of time when you went out to the south gate, what were you waiting to happen? Who were you waiting for?
A. We were waiting -- we were hoping that the Spokane Police Department would come.
Q. Why did you need them to come?
A. Because there was too many protesters and not enough of us. We were -- we were very much outnumbered.
Q. When you were at the south gate, what, if anything, did you hear between people standing by the gate that would indicate to you that there may possibly be a level of coordination?
A. At one point, it's clear in one of the videos that they were organizing. They were saying "Block all the gates, make sure somebody stays in front." And they were coordinating to block the gates.
MS. CARTIER-GIROUX: I have no further questions. Thank you.
THE COURT: Okay. Any recross? Any recross?
MS. GEORGE: No.
THE COURT: May this witness be excused?
MS. CARTIER-GIROUX: Yes, your Honor.

(WHEREUPON, further proceedings were held which were not ordered and transcribed.)

* * * * *

WITNESS INDEX



| For the Plaintiff | Page |
|---|---|
| **JARED TOMASO** | |
| DIRECT EXAMINATION BY MS. CARTIER-GIROUX | 3 |
| CROSS-EXAMINATION BY MS. GEORGE | 82 |
| CROSS-EXAMINATION BY MR. ORESKOVICH | 128 |
| REDIRECT EXAMINATION BY MS. CARTIER-GIROUX | 135 |



* * * * *

EXHIBIT INDEX



| No. | Description | Page |
|---|---|---|
| 616A | PowerPoint of Agent Tomaso's Testimony | 128 |

C E R T I F I C A T E

I, CRYSTAL L. GONZALEZ, do hereby certify:

That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Spokane, Washington;

That the foregoing proceedings were taken on the date and place as shown on the first page hereto; and

That the foregoing proceedings are a full, true, and accurate transcription of the requested proceedings, duly transcribed by me or under my direction.

I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings;

DATED this 1st day of July, 2026.

CRYSTAL L. GONZALEZ, CRR, RPR
Washington CCR No. 2955
Official Court Reporter
Spokane, Washington