# Exhibit B.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:25-cr-00113-RLP |
| Plaintiff, | ) | May 20, 2026 |
| | ) | Spokane, Washington |
| vs. | ) | |
| | ) | Excerpt of Jury Trial - Day 3 |
| JUSTICE FORRAL (2), BAJUN MAVALWALLA (8), and JAC ARCHER (9), | ) | **Testimony of Jeremy Burlingame** |
| | ) | Pages 1 - 48 |
| Defendants. | ) | |

BEFORE THE HONORABLE REBECCA PENNELL
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | LISA C. CARTIER-GIROUX<br>REBECCA R. PEREZ<br>U.S. Attorney's Office<br>920 W. Riverside Avenue<br>Suite 340<br>P.O. Box 1494<br>Spokane, WA 99201 |
| For Defendant Forral: | ANDREA K. GEORGE<br>AMY H. RUBIN<br>Federal Defenders of Eastern Washington & Idaho<br>601 W. Riverside Avenue<br>Suite 900<br>Spokane, WA 99201 |
| For Defendant Mavalwalla: | AINUDDIN AHMED<br>Ahmed Law Firm<br>550 Congressional Boulevard<br>Suite 350<br>Carmel, IN 46032 |
| | MATTHEW F. DUGGAN<br>Duggan Law Offices PLLC<br>23505 East Appleway Avenue<br>Suite 200-175<br>Greenacres, WA 99019 |

For Defendant Archer: CARL JOSEPH ORESKOVICH
ANDREW M. WAGLEY
Etter McMahon Lamberson Van Wert & Oreskovich PC
618 West Riverside Avenue
Suite 210
Spokane, WA 99201

Official Court Reporter: Crystal L. Gonzalez, CRR, RPR
United States District Courthouse
P.O. Box 700
Spokane, Washington 99210
(509) 458-3434

Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.

(Whereupon, previous proceedings were held which were not ordered and transcribed.)

(JEREMY BURLINGAME, called as a witness by the Plaintiff, having first been duly sworn, testified under oath as follows:)

THE COURT: Please be seated.

DIRECT EXAMINATION

BY MS. CARTIER-GIROUX:

Q. Good afternoon. Can you please spell your first name and your last name?

A. Yes. Jeremy, J-E-R-E-M-Y. Last name Burlingame, B-U-R-L-I-N-G-A-M-E.

Q. Sir, where are you employed?

A. I work for Department of Homeland Security under ICE, ERO.

Q. In what capacity? What do you do?

A. I'm a supervisory detention and deportation officer for Spokane and sometimes all of Eastern Washington.

Q. How long have you done that?

A. I've been a supervisor for about a year and a half, and I've been with ICE entirely since 2007, so June actually will be 19 years.

Q. Okay. And you've worked primarily in the Eastern District of Washington?

A. That is correct.

Q. And mostly in Spokane?

A. That is correct. And then I was assigned in headquarters in Texas for a little while.
Q. Okay. In order to have your position as a supervisor and also just as a -- as an agent with HSI, did you receive any specialized training?
A. Yes, ma'am.
Q. Give us a little bit about that.
A. So obviously, the basic academy. I've also participated in training for focusing on at-large arrests, locating and apprehending criminals, specialized training for like prosecutions of those similar cases. Firearms instructing, use-of-force, and obviously, some management courses related to administrative duties related to supervising other officers.
Q. Okay. And what office were you located at in June of 2025?
A. In June of 2025, I was supervising both the Richland office and the Spokane office concurrently.
Q. Okay. On June 11, 2025, where were you actually physically?
A. I came up to Spokane for the day.
Q. Okay. And do you know what time you arrived at that office?
A. Not exactly, but approximately at about 8:00 in the morning or so. I would leave Richland around 6:00 a.m.
Q. And just so the record is clear, what's the address of the building that you work at?

A. 411 West Cataldo Avenue, Spokane.
Q. Okay. And you said you arrived around what time?
A. Around 8:00 I would guess.
Q. What entrance do you enter into from the building?
A. I park in the rear secured parking area, and then I enter on that side, so that would be the -- I guess the south side entrance near the stairs that go up.
Q. Okay. So near the -- in the secure parking lot?
A. Correct, yes.
Q. What type of facility is the facility at Cataldo?
A. So our facility is shared with HSI. We co-locate and share some space. We do have detention space, and it is an under-12-hour detention space, so we're not able to keep people any longer than 12 hours. And in reality, we don't like to keep any longer than about six hours because we have logistics to deal with and it becomes problematic.
Q. What would make it problematic for you to keep somebody over six hours detained there?
A. The bathroom facilities are limited in a detention center. They're not like a normal bathroom center. We don't have any showers or, you know, a lot of the hygiene capability that some other facilities do. We don't have medical staff on hand. Our food that we do have on hand is very limited. So it's not ideal for any length of time. The water that we have available, it's plentiful, but it's -- you know, it's not ideal for any

elongated stay.

And the biggest concern for us is the probability of a medical thing that would develop, any sort of a medical issue and having to deal with that. We just don't have medical staff.

Q. Do you have -- there are obviously officers that work in that building. Are there civilian employees?

A. Yes, we do have some, and it varies based on what's going on with the day and different events. So like right now, we have a female that's there pretty much every day, but that's not always the case.

Q. On June 11th of 2025, did you have any civilian employees in the building?

A. Yes, that's correct. We had two that were down working with us in our area.

Q. What were their names?

A. Brad Keemer (phonetic) and Arianna Sanchez.

Q. Okay. Where are the detainees? When you have detainees at your facility, where -- and you said you wanted to do it under six hours, the processing. Where are you trying to send them?

A. Our logistics is set up to move everybody to Tacoma, Washington, because that's where the better housing, better medical, and they see the immigration judge to be -- basically to initiate or continue their immigration case, depending on what status they're in.

Q. What was your assignment that day like? What were you

doing on June 11, 2025?
A. So that day, I came up actually in a random -- the reason I came up from Richland was just random, just doing my job, just overseeing what was going on and dealing with the daily tasks for the day. So that particular day, we had certain people that were to be taken into custody. And we also are responsible for assisting in the transportation for anybody detained with the border patrol throughout different areas up in Northern Washington, Idaho, even all the way out to Montana. So helping with the logistics and transporting for those people as well.
Q. So you transport border patrol's arrests to immigration court as well, correct?
A. All the time. Yes, that's correct.
Q. Okay. Do you have any children at that facility?
A. No.
Q. Are you permitted to hold children at that facility?
A. No.
Q. In the 19 years that you've worked in the position you've worked, have you held children at that facility?
A. Never.
Q. So all the detainees that day and any other day, how old -- were they, over the age of 21?
A. That is correct.
Q. When you have a detainee, are you able to just release them?

A. No. All releases have to be coordinated and arranged with headquarters.
Q. Or they have to be brought to a judge, correct?
A. Correct.
Q. Okay. And all the people that you had that day were going to be transported to Tacoma?
A. Yes, that's correct.
Q. Okay. Did there come a time when Ben Stuckart brought in two adult males that were taken into custody?
A. Yes, that's correct.
Q. Do you know approximately what time that was?
A. I would have to estimate probably around 10:00 a.m.
Q. Okay. And that facility, the public entranceway --
A. Mm-hmm.
Q. -- is there a lobby in there?
A. It is a lobby. It's maybe two to three people can sit there, and then maybe two of the people can be standing, so it's very, very small, very -- in tight closed space.
Q. Okay. And do you usually let people stay in that area?
A. We will if they're particularly -- like on any given day, we may have anywhere from just a couple to maybe dozens of people reporting on some bit of their case management. So if we are doing some paperwork, sometimes we have to obtain other documents and photos and stuff, so we'll allow them to sit in there while we're particularly working with their particular

case. And then if anybody is waiting, we prefer that they wait outside just because of the space. It gets hot and, you know, stuffy in a small space.

Q. After Mr. Stuckart had brought the two males that were taken into custody -- they were taken into custody, correct?

A. Correct.

Q. And were they -- what were they taken into custody on?

A. We had an administrative warrant to take them into custody.

Q. Okay. At the time you took them into custody, did Mr. Stuckart -- was Mr. Stuckart upset?

A. I honestly didn't deal with him face to face. I learned that from other officers that briefed me of what was going on.

MR. ORESKOVICH: Objection as to hearsay.

THE COURT: Sustained.

MS. CARTIER-GIROUX: Okay.

Q. (BY MS. CARTIER-GIROUX) So did there come a point in time where you saw Mr. Stuckart outside?

A. Yes.

Q. What was he doing?

A. He was kind of discussing with other people. He was on his phone communicating with, again, the people out there. And during that time, like I said, there was other people that were there for their case, and so I wasn't familiar with who was who. It was just different people having a communication together. And then I quickly learned that, you know, people were getting a

little frustrated, which is somewhat normal for our process. People get upset, and there's emotions and so.
Q. Okay. Did there come a point in time where you saw Mr. Stuckart in front of the bus?
A. Yes. That's correct.
Q. So tell us a little bit about this transport bus. Does your agency utilize this transport bus to transport your detainees?
A. Yes. That's correct, for many years.
Q. So in order for you to accomplish your job, meaning to have these detainees transported, do you have to utilize this bus?
A. Yes.
Q. Okay. I'm going to show you what's been entered as Exhibits 408, 409A and 409.
Start with 408. What do we see in 408? First of all, do you recognize 408?
A. Yes.
Q. What do we see here?
A. I see Mr. Stuckart communicating with somebody, looking on a phone, and then I see another five or six people around discussing.
Q. So when you first notice Mr. Stuckart, were there a lot of people outside?
A. Around that time, I recall there was about 15 to 20 people that began to mill in front of the bus and discuss and

communicate.
Q. Okay. And I'm now going to show you 409. Does that look familiar to you?
A. Yes, it does.
Q. Okay. And now I'm going to show you 409A. Do you recall seeing Mr. Stuckart in this position?
A. I do.
Q. Okay. Did there come a point in time where you made a decision to go outside and speak with the people in front of the bus?
A. Yes. Because when the bus arrived, we were beginning to get ready to move the 12 detainees that we had in custody, so we had already had them restrained as our policy, and we had to get them out into the bus. So one of my officers, I believe, told me that they're sitting down and blocking the bus and that we don't know what to do.
So I went out to initiate -- to initially just deconflict with them, talk with them, and basically explain to them that we have to leave, we have these people in custody, we have to get them on the bus, and that they're obstructing our duties.
Q. And is it part of your training to try to de-escalate?
A. Yes.
Q. And was this part of that attempt?
A. Yes. Because, as I said, I've done training with de-escalation. I even went out there without a mask, which I

know has been a concern for some people. I did that so I can just communicate openly and clearly. And again, I didn't know the people individually, so I just went out to have a dialogue with a couple of them.

Q. Okay. I'm going to show you Exhibit 6, which is in evidence. Okay. Do you see the person on the screen?

A. Yes.

Q. Who is that?

A. That would be me.

Q. Okay. And is that -- does this reflect you walking out the building that day?

A. Yes. That is correct.

Q. So I'm going to play Exhibit 6.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) So at this point in time, there's one person sitting in front of the bus, right?

A. That's correct.

Q. Is this earlier in the day when you first go out?

A. I think this is probably maybe my second time I went out. I don't recall the order. But he was the one that I -- I spoke to another individual, and again, I don't remember the order, but I went out and spoke with him. And he was obviously blocking the access to the vehicle, and it was loud, and so I tried to communicate with him, again, the same message: We have to do this, you're obstructing our duties, and we have to move

the people out, and he would be arrested if he continued to sit.
Q. And did the markings on your vest, does it indicate you're a law enforcement officer?
A. It does. That's our normal issued vest that has our markings on it.
Q. And who is the person with the vest that's facing us?
A. He's one of our -- he's a civilian contractor for -- a GEO contractor for -- that drives the bus.
Q. Okay.
(Playing Exhibit.)
Q. (MS. CARTIER-GIROUX) At that point in time, did you hear what you just said to that person?
A. Yeah. I said that you're obstructing federal law enforcement activity.
(Playing Exhibit.)
Q. (MS. CARTIER-GIROUX) What's happening now?
A. So every time I tried to communicate, they would elevate their voices, continue to yell in a louder manner so that I couldn't communicate, and then more people began to rush in and create more of an obstruction for me.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Who is this person you're talking to here?
A. I know him now as Mr. Brodbank (phonetic). At the time, I wasn't too sure who he was. It appeared to me like -- honestly,

it appeared to me like he was willing to discuss based on where he was in proximity to the door, and I perceived him as someone that maybe I could just talk to and who was, again, close. And I just reiterated the same thing, that we're trying to move these people out, that they're in custody, we can't maintain them, and that they're obstructing our duties.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Okay. With those people sitting in front of the bus right at this point in time, there's only -- how many of them are sitting there?

A. Looks like seven.

Q. Okay. Could you bring the detainees out?

A. No.

Q. Why not?

A. Because I can't walk over other humans with people that are in custody for their safety, for these individuals' safety. They're handcuffed, and I cannot safely move people out while there's people encroaching with cameras and other activities as such.

Q. Did you have enough -- if you had to remove these people physically, could you remove these people physically if you had to?

A. No. No, I could not. At the time, I only had two other officers that were available to support that, so it would be me and two other officers at this point.

Q. And would that be safe?
A. No, not at all.
Q. Okay. Let me just finish this video.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What did you do?
A. I went back in to discuss with my other officers, and it's at this time I decided to call 911 based on our current procedures that we have in place.
Q. So did you call 911?
A. I did.
Q. And this was approximately what time?
A. Probably about 10 after 2:00, something like that.
Q. Okay. While you were waiting -- did you wait for the police to come?
A. Yes, I did. The initial conversation was that they were going to assess the situation, and so they said they would call me back in a few minutes.
Q. Mm-hmm.
A. Again, this is our normal procedure to call because this area is Spokane Police Department or Spokane public property. And, again, we don't have the manpower to safely -- to manage crowd control in this case, and so that's our normal procedure.
Q. By them sitting in front of the bus, did you believe that you would be able to bring them out at all --
A. No.

Q. -- at any point in time?
A. No, not at all.
Q. Could you bring them out the front door?
A. Well, the front door is only a few feet behind there, and the large grouping of people was -- I saw the group growing, you know, exponentially rather quickly, and so the front door we would have -- was already obstructed. We also had other people doing their case management checking in. This was all concurrent. And with the location of the front door, the size of the mass, their inability to discuss with me, and the location, it was not an option.
Q. And if you even took them out the front door, what bus were you going to put them in?
A. Exactly. I didn't have any option. That was my bus, and it was surrounded by people.
Q. Okay. Now, at some point in time, you said that there were a larger number of people that showed up.
A. That is correct.
Q. About how many could you say showed up?
A. Well, it seemed like it was -- people were just coming in continuously from around that 2:00 hour, and then, you know, reviewing some of the pictures, some -- there was somewhere 30 to 40 people within a matter of a short time. So my estimation -- I've never counted -- would be, you know, in the 50s, I would say, by like 2:40.

Q. Okay. Did you, during this time, make some observations about the bus?

A. Yes. So, again, I've worked with crowds before in law enforcement situations, and I saw that people were coordinating and communicating. I saw that when I would go out and try to communicate, they would push into the proximity of the door or the proximity of the bus. There was a larger mass assembling in front of the bus and along the curb. Some of them were sitting and standing.

Eventually, a vehicle moved in and parked right up close, blocking both the vehicle and then our -- there's a roll-up door right there, so that was blocking both the roll-up door and the bus as well. And then also concurrently to that, people were crawling under the bus and going underneath the tires and stuff like that.

Q. Did you have some concern about seeing people under the bus?

A. I did very much so.

Q. And why?

A. Well, I mean, people under a large vehicle is never good, and so we could not move. And then also I was concerned about them damaging the tires or the brake lines or any other, you know, emergency equipment on a bus.

Q. Did you subsequently have an ability to take a look at the tires on the bus?

A. Yes. Later on that evening and then additionally the following day, I was tasked to go take pictures of the bus. And so I saw the bus prior to being towed later that night around probably midnight, and the tires were deflated.
Q. On which side of the bus were they deflated?
A. The driver side away from the building.
Q. Okay. I'm going to have you take a look at Exhibit 420 in evidence. What do we see in 420?
A. So the building is on the left. We have obviously the bus there being blocked by the red vehicle, and there's a larger assembly on the -- blocking the man door for the bus, and then we have people kind of on the far side either walking past or standing. I can't tell.
Q. Did there come a time wherein you came up with another -- withdrawn.
Did there come a time where it appeared that local police were not going to respond?
A. Yes. Just a few minutes after the initial phone call, I spoke with a captain with the Spokane Police Department. I don't recall the name.
Q. Don't tell me what he said --
A. Okay.
Q. -- but as a result of what he said, did you come to believe that they were not going to respond?
A. Yes, very quickly.

Q. Because they were not going to respond, and you had to transport these detainees, what -- did you come up with a plan to try to get them out of there?

A. Yes. So after we observed people in and around the bus, we observed that someone got up on the hood and spray-painted the windshield. We rendered the bus unsafe to drive, and so we began to develop another plan at that point.

Q. Was there a plan originally with the red border patrol van to come and park near the south gate parking lot?

A. Yes.

Q. Can you tell us a little bit about that?

A. That's correct. So we don't have the vehicle space to haul 12 people, and so we reached out to border patrol, who does have vehicles that could support us. We contacted them, requesting to see what they had available. And I think in the initial conversations they had one available, but later we had two potentially available. So we started to develop a plan at that point.

Q. Okay. Did the red border van show up in the parking lot at the south gate -- the parking lot next to the south gate?

A. Yes. That's correct.

Q. Okay. Were you able to get the detainees out?

A. No.

Q. Okay. Did you witness why you couldn't get them out?

A. Well, again, there was a lot of people blocking different

exits. So that was just part -- again, it was just not a fruitful decision to take them out exposed with the large number of people.
Q. Do you know what happened at the -- my question is: Did you witness what happened when that person pulled up in the red van?
A. In the parking area?
Q. Yes.
A. I didn't actually witness that.
Q. Okay. That's fine.
Did you then come up -- but you do know that that was not a viable plan --
A. Correct.
Q. -- at some point?
Okay. So did you then come up with a third plan to utilize the cars in the south gate secure parking lot?
A. Yes.
Q. Do you know around what time that was?
A. My guess would be around 2:45.
Q. For the south gate? If you don't know, it's okay.
A. No, that -- yeah, because those pictures I took were like at 2:40, so it was probably later, probably in the 3:00 hour, so I can't report the exact time.
Q. So you began discussing a plan about leaving at the south gate.

A. Yes.
Q. What was your understanding of the plan?
A. So the plan 2 and plan 3 kind of evolved. The initial plan was for the vehicle to come into that back area, that back parking area. And at some point, because I was not the only decision-maker in that -- at some point, we realized that was probably not going to be safe or effective. And so it kind of evolved into plan 2 and a half or 3, or whatever we're calling it, where they would meet us a few blocks away at an undisclosed location, and we were going to meet up with our vehicles to provide -- because we only had the one van -- to provide more vehicle space and then also have law enforcement vehicles in a convoy kind of setting.
Q. Okay. Was there a decision to send some officers out to move out the vehicles?
A. Yes. I made that decision, and it was -- we had three vehicles available to us, law enforcement equipped vehicles with a cage and lights. So I made the decision we were going to take those vehicles out of the parking area and rendezvous with border patrol at a different location.
Q. Okay. Which individuals were designated to go out? You and who else?
A. Officer McIntosh and Officer Wilks.
Q. Tell me what you did.
A. At the time we decided to go out, we could see from the

upper windows that the back was more clear than the front as far as personnel or as far as people being there. So we went out the back exit down the stairway down to the floor level and just walked our way out to the secured parking gated area.

Q. Do you have to go outside --

A. Yes.

Q. -- to get to the --

A. Yeah. There's like an L -- there's probably, you know, maybe 40 feet in distance to the right we have to go out.

Q. Okay. When -- I'm going to show you -- actually, I won't. I'm not going to show you the exhibit.

What happened when you went outside?

A. So immediately upon exiting, we made sure the -- we could see out the glass doors, and there was nobody right there in front. Immediately upon exiting, there was nobody right there, but we saw people right to our left on the curb and near the edge of the parking area and then also straight ahead at some distance. And they immediately began to yell and scream and communicate to other people around the corner that "They're over here, they're trying to leave, they're trying to exit." And then they -- just a lot of people started running.

Q. I'm going to show you Exhibit 19. What is in Exhibit 19?

A. So that's the secured parking lot, and then the nearest door with the red signage is like the man door that's key card accessible for us.

(Playing Exhibit No. 19.)
Q. (MS. CARTIER-GIROUX) So who do we see here? Who's this?
A. Officer Wilks.
Q. Who's second?
A. Officer McIntosh and myself and then -- yep.
Q. On the left, do you see anyone with a megaphone?
A. Yes, I do.
Q. Okay. I'm not going to play this whole thing.
What happened as you got -- sorry.
Were you wearing clothing that identified you as law enforcement?
A. Yes. We intentionally got all of our equipment on that identifies us as law enforcement.
Q. What type of equipment did you have with you?
A. So we all carry a firearm, obviously the body armor, handcuffs, magazines for a firearm.
Q. Do you have any nonlethal weapons with you?
A. I had pepper spray and a Taser, and I believe the other two officers had pepper spray and then also batons.
Q. Okay. When you were walking to your vehicles, which we saw in the video briefly, what, if anything, did you hear?
A. We heard people running, coming around. We could see through the -- there's like metal mesh. We could see them beginning to rush pretty quick. We heard running. We heard "Stop, stop them, block the exits, we're going to fuck you up,

get those Nazis," and then the "Shame, shame, shame" over and over and over again.
Q. Were you able to get in your vehicle?
A. We were able to get in the vehicle.
Q. What was the order of the vehicles? Like who was --
A. I don't recall specifically. I know I was not the first, but I believe I was the third vehicle in order. We just kind of pulled out in no particular order, just where our vehicles were positioned.
Q. Did -- were the vehicles marked as police vehicles?
A. They are unmarked.
Q. Is there anything on them that would indicate that they were police vehicles?
A. We have the full set of lights and sirens and in their plain -- if the lights are not on, they're somewhat visible that we have lights, but they are unmarked vehicles.
Q. Did you turn the lights on the vehicles?
A. Yes. That's correct.
Q. Why did you turn the lights on the vehicles?
A. As part of our normal use of force as law enforcement, and the whole purpose was to indicate that we are law enforcement doing our job. We turn them on to show that's what we're doing. That's what we do as our job, and that's part of our normal training.
Q. What happened -- did you pull up to the gate?

A. Yes. That's correct.
Q. Describe what happens.
A. When we pull up to the gate, there's a pressure pad that's activated by the tires, and we saw a handful of people. I can't remember the numbers of people. They were already assembling in front of that gate as well as -- we would call that the exit, and then the entrance gate had also some people standing about. And then as soon as the gate opened, they were just creating a kind of a phalanx line of people standing there. Some of them were arm in arm. Some of them were just standing there and yelling and screaming.
Q. Were you able to exit?
A. No.
Q. Did you get out of your vehicles?
A. Yes.
Q. Did you say anything to command them to leave?
A. We -- I kind of came up after the other officers were there, and they were already asking them to push back and leave -- and step back and let us exit. I don't recall if I specifically said anything. I was more, as a supervisor, standing back observing the entire situation. I had concerns with people coming over the wall from both behind me as well as to the side because it's easy to get over that wall. So I was observing, watching my other guys and just hearing lots of yelling.

Q. Okay. And did there come a point in time where you -- withdrawn.

Were Special Agent Tomaso, Special Agent LaForte, and Special Agent McSullivan, were they supposed to come out with you all?

A. No. The initial plan was just for us to come out and get in our vehicles and leave to rendezvous with the border patrol.

Q. Did there come a point in time where you saw those other three officers?

A. Yes.

Q. And Special Agent LaForte, did you notice anything about him particularly?

A. Special Agent LaForte was the only one not in uniform.

Q. Do you know why he wasn't in uniform?

A. As I recall, he was -- he had been in the office, and he was about to leave on some other business and so --

MS. GEORGE: Objection, cumulative.

THE COURT: Sustained. We went over this already.

Q. (BY MS. CARTIER-GIROUX) Okay. Well, he wasn't wearing any uniform. Did he have any arms on him -- any armor on him?

A. He did not have armor, and if he was armed, I don't know.

Q. Okay. Did you have any concerns about him being in the crowd?

A. Yes, I did.

Q. Why?

A. So as the initial -- as we approached that line of people, it was growing, they were linking arms. And then I just remember looking up, and he's kind of come around the front or the side, and he's amongst the crowd like in the -- kind of a mosh pit is the term I would use. And so all of a sudden, I look up and I see him within the mass of the people.

Q. Okay. Did there come a point in time where you pulled your Taser?

A. Yes.

Q. Why?

A. It was related to that same event, and then there was a -- there -- at another point, it appeared that one of the officers was being pulled into the crowd, and so I drew my Taser to utilize force if necessary to help my other officer.

Q. Okay. And -- but did you use your Taser?

A. I did not.

Q. Would it have been effective?

A. No.

Q. Did there come a point in time -- actually, I'm going to show you Exhibit 87. I'm not going to play the whole thing. I'm just going to...

Did you ever go out into the crowd?

A. No.

Q. Okay. Okay. I'm going to do this slowly, so there's going -- it's going to go slow. All right?

(Playing Exhibit No. 87.)

Q. (BY MS. CARTIER-GIROUX) All right. So this is Exhibit 87 beginning around second -- I want to take the sound off so it doesn't make so much noise when I do it.

THE COURT: Is it possible to take the sound off?

MS. CARTIER-GIROUX: Can you just mute it so that it's not so loud?

THE COURTROOM DEPUTY: I can't mute that.

THE COURT: If sound is not necessary, then let's just mute them. That will make things easier.

MS. CARTIER-GIROUX: I'm not going to show the whole thing. They've already seen it.

THE COURT: Okay.

MS. CARTIER-GIROUX: All right. Do I have to pull the exhibit up again?

So I'm starting -- for the attorneys, I'm starting at 50.

MS. GEORGE: Objection. This is cumulative.

MS. CARTIER-GIROUX: He's the victim in this.

MS. GEORGE: Objection to the terminology.

THE COURT: Okay.

MS. CARTIER-GIROUX: Okay. Okay. Understood.

MS. GEORGE: That is for the jury to determine.

THE COURT: Okay. Okay. If there is something new that this witness needs to identify in the video, the witness can so do so.

MS. CARTIER-GIROUX: I'm only going to play a short portion of it.

THE COURT: Okay. Thank you.

Q. (BY MS. CARTIER-GIROUX) So it's starting actually at 47. Okay. Are you ready? Are you watching the screen, sir?

A. Yes.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Where are you standing? And you can mark the screen by the way if you touch it. It's a touchscreen.

Where are you?

A. (Witness indicates.)

Q. Do you remember the individual that's standing in front of you?

A. Yes, I do.

(Playing Exhibit No. 87.)

Q. (BY MS. CARTIER-GIROUX) What's happening here?

A. So he comes back with his arm and some sort of a sign. And so I was just trying to block that from hitting me, and at the time, I'm trying to observe everything that's going on.

Q. What are you doing here?

A. I'm just pushing him back out of my body space, and then the whole effort right now is to get them to push back out of the parking space or the parking area.

(Playing Exhibit No. 87.)

Q. (BY MS. CARTIER-GIROUX) Okay. And so what happened just there?
A. And so he kind of bladed his body, moved his body to be more in like an athletic stance and is resisting and continued to push into us.
(Playing Exhibit No. 87.)
Q. (BY MS. CARTIER-GIROUX) Okay. What's happening here?
A. I'm pushing back to -- again, all of us are just pushing people back out of the parking area.
(Playing Exhibit No. 87.)
Q. (BY MS. CARTIER-GIROUX) What happens here?
A. He thrusts back in order to hit me.
Q. What do you do?
A. I back up and just create some space and distance.
Q. Okay. All right. Did there come a point in time where you all decided to close the gate?
A. Yes. We realized that we didn't have any path to exit. The crowd was becoming more agitated. They were locking arms. The volume was increasing, and they weren't showing any willingness to cooperate or comply with any lawful orders.
Q. Did you have any concerns for your safety or the safety of the people inside?
A. Yes.
Q. Why?
A. As stated earlier, they showed no sign of willing to

discuss and follow any orders that we gave. They were locking arms. Their numbers increased. Their numbers outweighed us by, you know, multiple folds. The mass of them both working together as a team, locking arms, and then just the verbal threats, "We're going to fuck you up," close -- or "we're going to block the exits, stop them."

And then as I stated before, the wall -- I was concerned that people were going to come over maybe from behind, and I didn't want anybody getting into the secure parking lot from the other side or just pushing in and pushing us past.

Q. Okay. Did there come a point in time where a third plan -- did you go back in the building?

A. Yes. We were able to close the gate and go back in the building.

Q. Did there come a point in time when a third plan was concocted where you were going to bring the red van directly by the building?

A. Yes. That's correct.

Q. Did -- at any point in time -- did you see what happened when the van pulled up?

A. When the van first arrived, I did not see it arrive, but like literally a few seconds later, I went to the -- at this point, I'm back in the building. I went to the building window, and I could see down, just a large mob of people immediately surrounded it.

Q. Would you have been able to bring the detainees out to that van?

A. No.

Q. Did there come a point in time when you were able to get out of the building?

A. Not until many, many hours later.

MS. CARTIER-GIROUX: I don't have any other questions. Pass the witness.

THE COURT: Cross-examination?

MR. AHMED: Thank you.

CROSS-EXAMINATION

BY MR. AHMED:

Q. Good afternoon, Officer Burlingame.

A. Good day, sir.

Q. Officer Burlingame, you gave an interview to the FBI, I believe, about a week after this event on June 11th, correct?

A. That is correct.

Q. It was around June -- I think you were interviewed around June 17th, or I may be wrong, but it was within a few -- within a week of the event that you were interviewed by the FBI, correct?

A. Yes, sir.

Q. Was that in person or was that over the telephone?

A. It was in person.

Q. Okay. And during that interview, and as well as today's

testimony, you indicated that you took out your Taser because you witnessed one of your partners being grabbed by the tactical vest; is that right?
A. Yes. That's correct.
Q. Were you wearing a body cam that day?
A. I do not wear a body cam.
Q. Okay. Do you know if that event was recorded? You indicated you reviewed some videos. Was that event recorded on any of the videos?
A. Yes. That's correct.
Q. You see that happening, somebody grabbing a tactical vest?
A. I haven't seen that video. I don't -- I actually don't know who or where the source of the body cam came from because we don't wear body cams in our agency, so I don't know the source of that.
Q. Okay. And you also said on direct testimony that members of the crowd, quote -- excuse my French -- were going to fuck you up.
A. Mm-hmm.
Q. That was what you said.
A. Mm-hmm.
Q. Is that recorded anywhere in any of the videos that you saw?
A. I don't know. I would have to review them all.
Q. Okay.

A. And some of those videos don't capture, you know, everything that was going on.

Q. When you heard that remark, where were you? I mean in terms of were you on the south gate? Were you on the north side of the building?

A. You know, many of -- many of the comments and the -- and the screaming and stuff were at different points, from the front, as we came around to the side, and then, of course, in that area. And so it was hard to hear at times, and then other times, you know, there's like a lull. And so yes, we did hear it that time.

Q. Okay. But you don't -- do you proceed outside the door, the man gate, as you described, and go around to the south side with McSullivan and the other agents to the south door? Do you do that or do you remain in the parking lot?

A. So we went out and came back in the building. So I don't know a Sullivan.

MS. CARTIER-GIROUX: McSullivan.

Q. (BY MR. AHMED) Okay. McSullivan.

A. Okay. So the three that went out was myself, Mr. McIntosh, and Mr. Wilks.

Q. Okay. And you proceed to the south?

A. To the south secured parking, correct.

Q. Okay. All right. And the video that was shown -- I mean, you're there, correct?

A. Yes. That's correct.
Q. Okay. And in terms of the Taser, I mean, did you intend on using it at that point?
A. I drew the Taser. If the engagement with that particular situation got worse, and as I said before, Mr. LaForte was also in the crowd, but I real quickly determined it was not effective and put it back.
Q. Wouldn't you agree it was the agents that initiated contact with the civilians standing outside that gate?
A. I would not agree. I believe that they were -- we were trying to push back.
Q. But the initial contact was by the agents, correct?
A. I don't know that that was true.
Q. Okay. So as you're trying to exit the gate in your vehicles, I believe Wilks is in the front vehicle, correct?
A. I believe that's correct, yes.
Q. And you're in the second vehicle, correct?
A. I believe so, yes.
Q. Okay. And then the gate is blocked by civilians standing outside, correct?
A. Mm-hmm.
Q. And the gate is open, correct?
A. Correct.
Q. And then you get out of your vehicles, correct?
A. Correct.

Q. And then you go in the parking lot and then come outside the man gate and proceed that way, correct, on foot?
A. No. We basically -- the vehicles were stopped at the exit, and we got out and came straight up forward.
Q. Got it. Okay. And you weren't remove -- moving detainees, as you call them, at that point, correct?
A. That is correct.
Q. You were actually going to go meet the red van that was parked down the street?
A. Yes.
Q. What was the purpose of that?
A. So that we could rendezvous with the van and escort it in eventually to potentially remove the detainees.
Q. Had you learned by that time that that van was blocked by other individuals --
A. No.
Q. -- like some people were sitting in there?
A. No.
Q. So why were you trying to escort the van in? Couldn't the van just, to your knowledge, just come into the parking lot?
A. We weren't necessarily trying to escort the van into the parking area. Our initial plan was to bring the border patrol van with us in a convoy of sorts to come along the front, I guess that would be on Washington Street, because that -- there's an entrance there that's probably the closest in

distance for exiting, so by minimizing the exposure and the safety for ourselves and the detainees.
Q. Okay. But the purpose was to get the van closer?
A. That is correct.
Q. Do you recall telling the FBI agent when you were interviewed that members of the crowd began pushing and shoving agents and officers?
A. Yes.
Q. Was that at the south gate?
A. Yes.
Q. And you don't recall whether the agents initiated the contact?
A. I don't -- I don't. Because as I got out the vehicle, as I stated earlier, that I was kind of in a little bit more of a rear position, kind of observing my officers and observing the crowd and trying to ascertain the situation as it was developing rather quickly. And then as it began a shoving match, if you will, or whatever you want to term it as, I'm not sure how that initiated.
Q. Okay. And you also told them that you believed one of your partners was being pulled into the crowd. Is that how you saw it?
A. That's how I perceived it at the time, yes.
Q. Okay. The detainees were eventually moved to a staging area at the high school, I think, around 9:00 p.m., maybe a

little bit after 9:00 p.m., correct?
A. That is correct.
Q. And then they were transported to Tacoma that night, correct?
A. Correct.
Q. So there was a delay of about what, four, four and a half hours?
A. Well, so the GEO bus arrived at approximately we'll say 2:00. I don't know the exact time that they arrived. And I met the other bus in Ritzville at almost 11:00 at night. So that's more than just a few hours. And by the time they got to Tacoma, it was probably 3:00 in the morning.
Q. Okay. But how much was the delay? Four or five hours, correct?
A. Probably closer to 10.
Q. You say the bus got there at 2:00.
A. Mm-hmm.
Q. Did you plan on immediately leaving?
A. Yes. Our general procedures -- sometimes there's a delay because we're trying to finalize some processing or -- but because of the circumstances, we were trying to have them secured and on the bus as soon as we can to move them out as soon as we can.
Q. So the bus gets there at 2:00 p.m., and you're gone by 9:00 or so, correct?

A. Correct.
Q. So that's a delay of about seven hours?
A. Correct.
Q. Okay. Not ten hours, but seven hours.
A. No, because we had to facilitate more transport because that bus was damaged. So we had to get another bus all the way from Tacoma, which takes time and manpower. So during that process, I remember it was like 10:30 at night in Ritzville that I was still transferring from our final transport plan into the bus in Ritzville.
Q. Okay. But the police -- you said on direct that the police didn't respond. But they eventually responded, correct?
A. No -- well, they responded maybe 5:00 or 6:00 in the evening after it was in the hundreds of -- and I know now that they knew it was going on right away based on footage from drones. So we quickly learned that Spokane failed to support us and were not going to help us.
Q. Well, let me ask you this: Is it because they advised you to let the crowd dissipate, they'll go away in a couple, two, three hours? Is that the advice you were being given at that time?
A. I was never given advice. I was told, "Can't you guys spend the night there?" But I was never given advice. We told them we did not have the ability to spend the night and that was not a plan, and they said that they were not going to support

us.
Q. Did that include the sheriff's office, too?
A. I never spoke to the sheriff. There was some other communication with the sheriff that was outside of me.
Q. All right.

MR. AHMED: I've got nothing further. Thank you.

THE COURT: Okay. Any further cross-examination? Ms. Rubin?

CROSS-EXAMINATION

BY MS. RUBIN:
Q. Agent Burlingame, just a couple questions for you.
A. Yes, ma'am.
Q. You indicated that, once the gate closed, you and the other officers -- you and the other agents remained behind the gate for probably, what, 10 to 15 minutes?
A. Maybe a little bit less. We were trying to determine how a plan was going to evolve now and what our options were. And then I had concern about leaving the secured area.
Q. And you indicated you had some concerns, that you were worried that people might try to climb over the gate.
A. Yes.
Q. At this point in time, the gate is closed. The individuals on the other side of the gate have remained on the other side of the gate.
A. (Moves head up and down.)

Q. I just have to get a "yes" from you.
A. Yes.
Q. Okay. And at no point in time does anyone try to climb the walls and get over the gate.
A. That is correct.
Q. Okay. Then you went back into the building.
A. Yes.
Q. And you had a vantage point it sounds like from a lot of different angles once you're in the HSI building.
A. That's correct. There's multiple windows.
Q. Because your office faces a number of different streets.
A. That is correct.
Q. And at no point in time from when you got back into the HSI building did anyone ever try to climb over the walls and get into your secured parking lot.
A. Not that I observed.
MS. RUBIN: Okay. Thank you.
THE COURT: Okay. Any further cross-examination?

CROSS-EXAMINATION

BY MR. ORESKOVICH:
Q. I'm going to show you Exhibit 6. Let's start -- make sure it's on everybody's screen.
(Playing Exhibit.)
MR. ORESKOVICH: Stop it there. Just back it up a hair. Too far. Perfect.

Q. (BY MR. ORESKOVICH) I just have a few questions. All right. I want to talk to you about Government Exhibit 6. All right?

As I understand your testimony, sir, this is at -- in the afternoon when you were out to visit persons at the red bus on one or two occasions, isn't that correct, sir? You went out there twice?

A. I believe so, yes.

Q. And is this the second time you went out? Do I understand that was your testimony?

A. I think I said earlier I'm not sure if this was the first or the second, but I believe it was my second.

Q. Sure. And the people that were there were seated at the doorway of the bus, correct?

A. Correct.

Q. And at that point in time, they were passively resisting you, weren't they?

A. Yes.

Q. In fact, Exhibit 6, we actually see someone playing guitar at the bus, correct, sir?

A. Correct.

Q. You had mentioned that, at some point in time, you had taken some pictures?

A. That is correct.

Q. And at some point in time, did you or someone else take a

picture of the windshield of the van being spray-painted?
A. In the act of being spray-painted?
Q. Yeah.
A. I don't -- I did not take a picture of that, no.
Q. You're aware of the fact that someone had driven up on a bicycle, spray-painted the bike -- I'm sorry -- the windshield of the bus, and then drove away on a bicycle, correct?
A. I don't know the driving away portion. I know that the windshield was damaged, and I saw that.
Q. And someone had come up on a bicycle and done that; do you know that or not?
A. I don't know the bicycle component.
MR. ORESKOVICH: That's all the questions I have. Thank you.
THE WITNESS: Thank you, sir.
THE COURT: Any redirect?
MS. CARTIER-GIROUX: Briefly. Could I just ask briefly?
THE COURT: Yeah.
MS. CARTIER-GIROUX: Okay. Thank you.

REDIRECT EXAMINATION

BY MS. CARTIER-GIROUX:
Q. Sir, did you -- at the white bus, you were asked about they're, like, sitting in front of the bus. Did you make any effort at that time to physically remove them?

A. No.
Q. Do you know what they would have done if you had tried to physically remove them?
MS. GEORGE: Objection.
MR. DUGGAN: Objection.
MS. RUBIN: Objection.
THE COURT: Sustained.
Q. (BY MS. CARTIER-GIROUX) Do you -- did you recognize some of the people at the white bus that were at the south gate?
A. The white bus took place before the south gate.
Q. Understood. But did you recognize some of the people at the white bus at the south gate?
A. Yes.
Q. Okay. The people at the south gate, when they were being pushed back by the officers, were they not just passively resisting?
A. Correct. They were using preindicate -- pre-assault indicators. They were using, as I stated before, an athletic body stance, the balling of fists, and then some of them within the crowd had, you know, goggles on and things like this that indicated they were not willing to comply.
Q. Did you see them linking arms?
A. Yes, multiple times.
Q. Did you see them pushing back at officers trying to move them?

A. Yes, multiple times.

MS. GEORGE: Objection, cumulative.

THE COURT: I'll overrule that objection.

Q. (BY MS. CARTIER-GIROUX) Why didn't you try to physically remove the people at the white bus? What did you think was going to happen? Who did you think was going to come help you?

A. We didn't have any idea that anybody would help us, so I knew it was myself and two others. And in my initial efforts to again, de-escalate, my goal was just to communicate and ask them to depart. And then I, you know, elevated my rhetoric by saying you're going to get arrested if you don't comply or depart by obstructing, you know, our lawful duties. And so --

Q. Was that effective?

A. No, it wasn't.

MS. CARTIER-GIROUX: I have no further questions. Thank you.

MR. AHMED: Judge.

THE COURT: Any recross briefly?

MR. AHMED: Just based on what she asked.

THE COURT: Of course. That's what it is.

RECROSS-EXAMINATION

BY MR. AHMED:

Q. Agent, let me ask you this: Counsel asked you about pre-assault indicators. Balling of the fists you mentioned. Were any agents hurt that night where you had to go seek

paramedic help or go to the hospital or anything like that?
A. No.
Q. We've seen some videos. I know you didn't have a body cam video on, but in that video, were any of the officers punched in the face or anything like that that you observed?
A. No.
Q. All right.
MR. AHMED: All right. That's all I have. Thank you.
THE COURT: Anything further?
MS. RUBIN: Not on behalf of Justice Forral.
MR. ORESKOVICH: No, your Honor.
THE COURT: Okay. You may be -- may this witness be excused?
MS. CARTIER-GIROUX: Yes, your Honor.
THE COURT: You are excused from further testimony. Thank you.
The Government may call their next witness.
(Whereupon, further proceedings were held which were not ordered and transcribed.)

* * * * *

## WITNESS INDEX


| For the Plaintiff | Page |
|---|---|
| JEREMY BURLINGAME | |
| DIRECT EXAMINATION BY MS. CARTIER-GIROUX | 3 |
| CROSS-EXAMINATION BY MR. AHMED | 32 |
| CROSS-EXAMINATION BY MS. RUBIN | 40 |
| CROSS-EXAMINATION BY MR. ORESKOVICH | 41 |
| REDIRECT EXAMINATION BY MS. CARTIER-GIROUX | 43 |
| RECROSS-EXAMINATION BY MR. AHMED | 45 |


* * * * *

## EXHIBIT INDEX


| No. | Description | Page |
|---|---|---|
| None | | |

C E R T I F I C A T E

I, CRYSTAL L. GONZALEZ, do hereby certify:

That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Spokane, Washington;

That the foregoing proceedings were taken on the date and place as shown on the first page hereto; and

That the foregoing proceedings are a full, true, and accurate transcription of the requested proceedings, duly transcribed by me or under my direction.

I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings;

DATED this 29th day of June, 2026.

CRYSTAL L. GONZALEZ, CRR, RPR
Washington CCR No. 2955
Official Court Reporter
Spokane, Washington