# Exhibit C.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) Case No. 2:25-cr-00113-RLP |
| vs. | ) May 19, 2026 ) Spokane, Washington |
| JUSTICE FORRAL (2), BAJUN MAVALWALLA (8), and JAC ARCHER (9), Defendants. | ) Excerpt of Jury Trial - Day 2 ) **Testimony of Ethan Hawks** ) Pages 1 - 96 |

BEFORE THE HONORABLE REBECCA PENNELL
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff: LISA C. CARTIER-GIROUX
REBECCA R. PEREZ
U.S. Attorney's Office
920 W. Riverside Avenue
Suite 340
P.O. Box 1494
Spokane, WA 99201

For Defendant Forral: ANDREA K. GEORGE
AMY H. RUBIN
Federal Defenders of Eastern Washington & Idaho
601 W. Riverside Avenue
Suite 900
Spokane, WA 99201

For Defendant Mavalwalla: AINUDDIN AHMED
Ahmed Law Firm
550 Congressional Boulevard
Suite 350
Carmel, IN 46032

MATTHEW F. DUGGAN
Duggan Law Offices PLLC
23505 East Appleway Avenue
Suite 200-175
Greenacres, WA 99019

For Defendant Archer: CARL JOSEPH ORESKOVICH
ANDREW M. WAGLEY
Etter McMahon Lamberson Van Wert & Oreskovich PC
618 West Riverside Avenue
Suite 210
Spokane, WA 99201

Official Court Reporter: Crystal L. Gonzalez, CRR, RPR
United States District Courthouse
P.O. Box 700
Spokane, Washington 99210
(509) 458-3434

Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.

(Whereupon, previous proceedings were held which were not ordered and transcribed.)

(ETHAN HAWKS, called as a witness by the Plaintiff, having first been duly sworn, testified under oath as follows:)

THE COURT: Please be seated.

DIRECT EXAMINATION

BY MS. PEREZ:

Q. Will you please state your full name and spell your last name.

A. Yes. Ethan Hawks. Last name is H-A-W-K-S.

Q. How are you employed?

A. I'm employed by the FBI.

Q. And how long have you been an FBI agent?

A. I've been with the FBI for about three and a half years.

Q. Okay. Did you have any law enforcement experience prior to that?

A. I did. I was with United States Border Patrol in Arizona for about three and a half years.

Q. Okay. Tell me about your training to become an FBI agent.

A. Yes. So FBI training is approximately four months. Basic law enforcement training, investigations, constitutional law, a wide variety of investigative techniques to include, you know, arrest techniques, search and seizure through DOJ policy, use-of-force. Just basic law enforcement training.

Q. Okay. So four months. Did you pass that training?

A. Yes, I did.
Q. Okay. So now as an FBI agent, what are your current responsibilities?
A. So currently right now, I primarily work counterterrorism and national security matters. A lot of that right now, unfortunately, is crimes against children is what I work most of the time, but I also assist with a lot of criminal case matters, whether that's crimes on Indian Country reservation, assaults, a lot of violent crime as well.
Q. Okay. Special Agent Hawks, what was your role in this case pertaining to June 11th, 2025?
A. Yeah. So I was assisting kind of as a co-case on this case. I did a lot of the evidence and video review. There was hours and hours of video review, so we kind of split that up amongst the team.
I also assisted with some of the search warrants, legal process, and going through extractions from cell phones as well.
Q. Okay. So co-case agent, is that what you said? Is that right?
A. Correct. Yeah.
Q. So let's talk through some of the things you did. So specifically, you talked about video review; is that right?
A. That's correct.
Q. So tell me, what type of video existed in this case?
A. So there was a massive amount of video in this

investigation. We had a lot of video from Spokane Police Department. Am I okay to refer to them as SPD? SPD as like a lot of drone footage, or UAS as they would call it, unmanned aerial systems. SPD has a very robust drone team, and that provides a lot of good camera footage. There was also many officers that responded that day, so lots of body cam footage from the officers themselves.

On top of that, lots of news coverage, social media, a lot of stuff that was publicly available on the internet to review.

Q. Okay. So in terms of the volume of video evidence, what are we talking?

A. Hundreds and hundreds of hours. Some of the body cam footage from the SPD officers, there's like upwards of eight, nine hours long, and there was 30, 40 officers that responded, quite a few. The drone footage is upward of hundreds of hours as well.

Q. Okay. So then -- so you're the video review guy. And so as you reviewed this evidence, were you looking for anything in particular?

A. We were. At first it was just to get a good idea of the event itself. I wasn't there that day. We heard about it several days after or the day after. But really, it was just to kind of absorb what happened between -- in that afternoon.

Once we determined kind of the event itself, then we looked at specific criminal behavior that was easily identifiable and

determining was there any assaults, impeding of federal officers. And then it went to, like, identifying who those specific people were that we saw in the video.

Q. Okay. Were you able to identify kind of broad categories of events that occurred that day?

A. Yes. So since this was a long afternoon event, to help organize for us, we broke it into several major events just to kind of keep it all organized in our investigation. Would you like me to go into those right now?

Q. Sure. Yeah. So tell me how you organized them as you sorted through this data.

A. Yeah, so we -- how about we kind of consider the white bus incident. That was the white transport bus that was going to be used to transport the individuals to their immigration hearings.

Later on, we identified an incident which we call the south gate. That was preceding the white bus incident. That south gate incident kind of led into the barricading of several vehicle gates of a secure parking lot that's by the HSI ICE facility.

And then a United States Border Patrol van that we kind of termed red van arrived to assist in that day.

And then we finished up with the response from Spokane Police Department and Spokane County Sheriff's Office as well.

Q. Okay.

A. So those are kind of the five-ish main events that we

organized it to.

Q. Okay. So just to reiterate, is this correct? You had white bus, south gate, barricading, red van, and then local law enforcement response. Is that how you organized --

(Simultaneous speaking.)

A. Yeah, correct.

Q. Okay.

A. The main reason for that organization was really to help identify actors and individuals there throughout the day so we could say, oh, we saw this person at white bus. We also saw them at the red van. And that helped organize because there was hundreds of people there. So that -- without that organization throughout the day, it kind of all bleeds together.

Q. Okay. So let's go through some of the -- well, backing up. Were you able to create, then, some exhibits, some clips of much larger videos and sort them into those categories?

A. Yes. So I organized those into their respective incident. And then since these clips run up towards of 16 to an hour long, I trimmed those down just so it was more absorbable and to kind of get to the specific actions that we identified.

Q. Okay. So let's go through some of those categories. First I'm going to refer to Exhibits 5 through 27. Special Agent Hawks, have you previously reviewed Exhibits 5 through 27?

A. I have.

Q. And do those match what occurred at white bus?

A. Yes, they do.
Q. Okay.
MS. PEREZ: I will now offer to the Court Exhibits 5 through 27. I believe they've already been admitted.
THE COURT: They've been admitted.
MS. PEREZ: Okay. And so now I'm going to go through and publish these with the Court's permission, some of these exhibits.
THE COURT: All admitted exhibits can be published.
Q. (BY MS. PEREZ) We'll start with Exhibit 5. There we go.
Okay. Do you have Exhibit 5 in front of you?
A. Yes, I see it.
Q. And just tell us, what is Exhibit 5?
A. Yes. This is a Google Maps overview of the HSI ICE facility that's on Cataldo Ave. What this picture kind of shows is the location of the white transport bus. That red box symbolizes where the white transport bus was parked on the north end of that facility.
Q. Okay. And so just kind of since this is the first time we're seeing this, so on the north of the facility, what street is that there?
A. That's West Cataldo Ave.
Q. And on the east of the HSI building, what is that?
A. That's North Washington Street.
Q. So now let's go to -- we're not going to -- we're not going

to go through all of these exhibits at this time. But you had talked about drone footage; is that right?

A. Correct.

Q. So tell me, what are drones? What do they do?

A. Drones, a more colloquial term is like an unmanned aerial system, usually represents like a quad-rotor device that can fly several hundred feet in the air. And all of them have -- well, all the ones SPD use have some sort of camera system on them.

Q. Okay.

A. So it's kind of like an aerial to photography unit.

Q. Okay. Aerial photography unit.

So let's go through some of those exhibits that refer to white bus. Let's go to Exhibit 8. Okay. So this is just about a 30-second clip. Just before I hit "play" on that, Special Agent Hawks --

THE LAW CLERK: We have a malfunctioning evidence screen here.

THE COURT: Okay. Let's make sure our video monitor is working. Ms. Hansen, do you want to look into that? We might need to get Mike up here if it's not working.

Do not feel bad. I am glad that you called that to our attention.

The first slide wasn't visible either, so we'll need go back a little bit.

Okay. If you can go back and show the previous exhibit.

Q. (BY MS. PEREZ) Let's go back to Exhibit 5. And, again, Special Agent Hawks, just kind of describe, what's in Exhibit 5?

A. This is a Google Maps overview of the ICE HSI facility with West Cataldo Ave. on the north end of the facility and then North Washington Street on the east side of the facility.

Q. And the red rectangle at the top, what is that?

A. That is where the white bus was parked on June 11th, '25.

Q. Okay. Now go on to exhibit -- sorry. Exhibit 8. So it's about a 30-second clip.

Before I play that, Agent Hawks, please just tell us what we're initially looking at here.

A. Yes. So this perspective is from a drone that is northeast of the facility. We are looking at the north side of the facility there where the white bus is -- was parked. We can also see a lot of the crowd, the people who arrived that day, standing around the bus as well as the red vehicle parked in front and then a silver SUV parked behind the white bus.

Q. And so just to clarify, Special Agent Hawks, were drones recording the second this incident started?

A. No. SPD's aerial unit didn't arrive until several hours after I would say the event started, so it did not capture from the beginning. It was several hours after.

Q. Okay. So this is among the first drone footage; is that right?

A. That's about correct.

Q. So things have already happened.
A. Yes.
Q. Okay. So I'll just hit "play" here. It's about a 30-second clip.
(Playing Exhibit.)
Q. (BY MS. PEREZ) Can you tell me what time of day this was?
A. This is approximately about 4:30 in the afternoon.
Q. Okay. So I'm going to go to Exhibit 9.
This is again drone footage; is that right?
A. Correct.
Q. Okay. So I'll hit "play" here. It's about a 40-second clip.
(Playing Exhibit.)
Q. (BY MS. PEREZ) Actually, I'll stop and ask you a question. The individual we see in that red vehicle in the just middle of the screen, were you able to identify that individual?
A. We were.
Q. Who is it?
A. That's Justice Forral.
Q. Okay. And this clip, around what time of day is this?
A. This is around the same time, about 4:30 in the afternoon.
(Playing Exhibit.)
Q. (BY MS. PEREZ) Special Agent Hawks, and so that video -- that clip has stopped. Can you tell us -- are you familiar with the entrances and exits to the HSI facility?

A. I am.

Q. Can you tell us where the main entrance to this facility is?

A. So the main entrance where people would arrive to visit the facility would actually be to the right of our screen that we're looking at right now. It's not in view. It might be behind some of those trees there. But we can also see kind of that garage door --

THE COURT: Yeah, we all lost the video. Is Mike gone?

THE COURTROOM DEPUTY: Mike is supervising so I can bring him back.

THE COURT: It's back.

Q. (BY MS. PEREZ) Okay. Go ahead. You said the main garage door you can see in the middle?

A. As I was saying, the garage door in the center of the screen just above the white bus is also another entrance point. And then there's going to be a door directly adjacent to the right of that door if we're looking from our perspective.

Q. What is that door there, the garage door, kind of the big one, what is that used for?

A. That is usually used to go into the detention area. So anybody who's under detention will be transported through that door to the transport vehicle. So it's kind of the shortest path and it's more safe for the officers and the individuals.

Q. Okay. And so if detainees were walked out of the building, what would their path be?

A. It would be directly to the side of the bus that's directly next to the facility, if that makes sense. So they would come across the sidewalk and enter the bus right there.

Q. Okay. So essentially out the garage door, across that sidewalk to the bus; is that right?

A. Correct.

Q. I'm going to go to Exhibit 10. And we'll play this, and then after this is done playing, Special Agent Hawks, I'm going to ask you why was this particular segment captured. Okay?

(Playing Exhibit.)

Q. (BY MS. PEREZ) Okay. Special Agent Hawks, why did you capture this segment?

A. Yeah. So this video points to several things that I identified through review. First, we still see the red vehicle parked in front of the bus. This also shows -- I don't know if you can tell from the screen, but there's white paint, spray paint, on the windshield of the bus, so somebody did come and spray paint the vehicle at some point during the day.

This also points to an individual walking around with what looks like a clipboard talking to people, organizing people. During the review, we were looking for organizers, people who were kind of leading the main group.

MR. ORESKOVICH: Object to conclusion, Judge.

THE COURT: Sustained as to the characterization.
Why don't you just describe what you saw?
THE WITNESS: So we saw an individual walking around with what appeared to be a clipboard talking to several people.
Q. (BY MS. PEREZ) Were you able to create an enhanced video kind of -- so it's easier to see, basically?
A. Yes, we were.
Q. So Exhibit 10A.
(Playing Exhibit.)
Q. (BY MS. PEREZ) Were you able to identify the individual highlighted in this video?
A. We were.
Q. Who is it?
A. Jac Archer.
Q. I'm going to show you Exhibit 11. It's just about 20 seconds long. And, again, I'll ask you at the end of this why was this a clip that you created.
(Playing Exhibit.)
Q. (BY MS. PEREZ) Go ahead, Special Agent. Why was that a clip that you -- that you pulled out?
A. This clip was a good highlight. So I do want to point out that SPD had multiple drones flying at the same time. So the video that we just watched and this video should be about around the same time. This video shows, A, how close the red vehicle was parked in front of the white bus, but also the drone

operator zooms in and shows another angle of Archer walking around with the clipboard talking to people.

THE COURT: Is it not working again?

THE LAW CLERK: There's a five- to seven-second delay so that might be what's going on.

MS. PEREZ: I didn't change anything.

THE COURT: There it is again.

Q. (BY MS. PEREZ) Okay. So we'll go to -- that was 11. We'll go to 12. And this is just about 20 seconds again.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Were you able to create an enhanced version of this video again to focus on an individual?

A. Yes.

Q. Okay. And so that will be 12A.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Okay. Special Agent Hawks, around what time was this video, this drone footage?

A. This was approximately around 4:30 as well, as we saw in the other videos.

Q. Okay. Mid/late afternoon.

And I should have asked this before. As part of your -- you talk about being co-case agent. Were you able to review some Facebook data associated with an individual named Benjamin Stuckart?

A. Yes, I did.

Q. Okay. And were you able to obtain a Facebook post which corresponded with what was going on that day?
A. We did.
Q. Okay. I'm going to show you that. That is Exhibit 76.
Okay. And is that the Facebook post that you had reviewed and collected?
A. It is.
Q. Would you -- what time was this post made?
THE COURT: I don't know if there's like an input feed. I'm asking our tech person to come up here in case...
Q. (BY MS. PEREZ) Can you see that?
A. I can.
Q. So this is a Facebook post from an individual named Benjamin Stuckart. What time was this posted?
A. 12:52 p.m.
Q. And just to clarify, at the top it says "19:52:55 UTC."
A. Correct.
Q. What does that mean?
A. UTC, universal time code, something like that. That is seven hours ahead of Pacific standard time.
Q. Okay. So just a way to standardize time; is that right?
A. Correct.
Q. When that standardized time is moved into Spokane time, what time is it again?
A. 12:52.

Q. Okay. Can you just read for me the Facebook post that was made?
A. Yes. "Action alert. Three weeks ago, I became the legal guardian to a young man from Venezuela seeking asylum. He has turned in all paperwork and has a future court hearing. I went with him to ICE check-in today. They detained him and are shipping him to Tacoma. I am asking that if you care at all about these illegal detainers, you meet me at 411 West Cataldo by 2 p.m. I am going to sit in front of the bus. Feel free to join me" dot dot dot dot. "The Latino community needs the rest of our community now; not tonight, not Saturday, but right now."
Q. Okay. In addition to this particular Facebook post, were you able to access some Facebook records associated with Jac Archer?
A. Yes.
Q. Okay. And I'm going to show you Exhibit 77.
And so what is this here in 77?
A. This is a post made by Jac Archer on their Facebook that was a response or a share of Benjamin Stuckart's initial post.
Q. When was this post made by Jac Archer?
A. This was 22:14 UTC, which should be about 2:00-ish, 2:14 p.m. Is that correct?
Q. Sorry. Did I interrupt you?
A. No.
Q. Okay. And so read to me what this Facebook post by Jac

Archer says.
A. "Edit: Actually, that was way too soft. Let's try that again. Come down now. We need more bodies. There is a nonzero chance we can wait out ICE and they may be free this man -- they may free this man. Come down now." Multiple Xs. "We are still here. Some contingents are choosing to risk arrest to block the exits to ICE. We're about 100 strong in total. I hope to see you here."
Q. Okay. So now, Special Agent Hawks, when you review Facebook data from Facebook, does it come looking essentially like what we see in our screen?
A. Yes.
Q. Okay. So let's go to the second page of this exhibit. What do we see here in the second page of Exhibit 77?
A. So if you were reviewing the Facebook posts like on a mobile device or a computer, this is how it would look with the post itself and then the post that was shared and adjacent.
Q. Okay. What does it illustrate with respect to Ben Stuckart?
A. This shows Archer reposting Stuckart's post and then adding their own commentary to the post.
Q. Okay. That commentary matching what you just read from Facebook itself; is that right?
A. Yes.
Q. Okay. So now I'll go back to just a few more drone

footage -- pieces of drone footage at white bus. Exhibit 15. Okay. And I'll play this. Just about 20 seconds or so.

(Playing Exhibit.)

Q. (BY MS. PEREZ) And so it stopped here at the end. And can you kind of just orient us -- this zoomed out a little bit. Tell us what we're looking at overall.

A. Yes. This drone footage kind of provided a good overview of the facility from a northern view. So as the video zooms out, we can see the east side of the facility that runs along Washington Street. We can see people wrapped around the building and on the grass along it, alongside of it.

Furthermore, if you look in the top left of the screen, you can see --

THE COURT: Okay. So it has to do with when you pause a video, I guess. It's a Windows issue.

MR. WAY: When you go from a video to -- a video from a still, after 12 to 15 seconds -- and this is new. We discovered this in our last big trial. This causes everything to flicker. We haven't figured it out yet.

THE COURT: Thank you. All right.

Q. (BY MS. PEREZ) I can't remember if I asked you this. In the top left corner you were describing, what's there on the screen?

A. So the top left corner shows the parking area that is used by the employees that work at that facility. You can tell that

that's the secure parking lot because it's surrounded by that fence line as well.

Q. Okay. And around what time is this footage taken?

A. This is also around that 4:30 time.

Q. 4:30. Okay.

A. Approximately.

Q. So between about -- so the time of those original Facebook posts up until about now-ish, 4:30, is this approximately the scene at white bus?

A. Yes.

Q. Okay. So at some point, do -- does the crowd transition to another location?

A. Yes. So this eventually transitions to what we refer to as the south gate. That was kind of the next incident.

Q. Okay. So let's go to Exhibit 16, the last or second to last piece of drone footage at white bus. This is about a minute long.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Special Agent Hawks, I guess to be clear -- and I should have asked this earlier -- is there sound on any of these drone videos?

A. No. There's no sound.

Q. Okay. And then in the middle of this clip, there was a moment where the kind of view changed with these drones. Can you tell me what happened there?

A. Yes. So these drones have pretty good cameras on them that have zoom capabilities. As you can kind of tell by the quality, they're very nice. That's probably the drone operator zooming out so he can orient himself. You can see the drone kind of moving in a lateral way, so he's probably repositioning. So it zooms out. If he stays zoomed in, it's difficult to kind of keep the camera where you're wanting to look. So it's really the operator just making adjustments.

Q. Okay. Now, with respect to Exhibit 16, this footage of the crowd moving, were you able to create an enhanced video of that?

A. Yes.

Q. Why?

A. So this crowd moving to the east side and the south side of the building, there was a lot of people there. We were able to identify Jac Archer in that crowd going with them towards the south end of the facility. So we created an enhanced version to highlight that portion.

Q. Exhibit 16A.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Okay. So now, Special Agent Hawks, we've seen white bus. And let's go -- you said south gate was next; is that right?

A. Correct.

Counsel, if I may also, this is a good view where we can point out the front door of the entrance here.

Q. Sure.
A. On the right side of the screen.
Q. So I previously asked you where the main front door of this facility is. Can you point that out on this exhibit?
A. Yeah, so that's going to be the right side of the screen. It's those two double doors with glass. That's your main entrance into the facility.
Q. Okay. And so -- wait a second. While we're waiting for that -- so south gate exhibits. You were able to also create some clips pertaining to south gate; is that right?
A. Yes.
Q. So Exhibits 17 through 27, are those the exhibits that you created with respect to that?
A. They are.
Q. You reviewed those previously; is that right?
A. Yes.
Q. So let's go through some of those. Exhibit 17. And so, again, just orient us. What is this?
A. So this is another Google Maps image that was created just to orient us to where that parking lot is that I pointed out earlier. You can see the red box is kind of encircling the secure parking lot.
There's also a red arrow that points to the south exit gate. It's the vehicle gate that opens and closes from when people are trying to exit the facility.

There is also a yellow arrow pointing to a door that leads from the south end of the facility to that parking lot. So there is no enclosed way to get to the parking lot from the facility. You have to exit outside and then enter the parking area through a gate.

Q. Okay. Exhibit 18, we'll go through that one. And so Exhibit 18, Special Agent Hawks, is this drone footage?

A. No, it's not. This is going to be security camera footage from the building or the facility. There's security cameras pretty much around the entire facility.

Q. And why was this particular clip captured by you?

A. So this clip will show why we refer to the south gate incident. After the white bus was determined to be inoperable by the agents that were inside, they attempted to leave through -- with their government vehicles out of the secure parking lot. So for them to do that, the only way is they have to exit this door that we'll see at the right side of our screen here.

Q. Okay. So this is about -- it's a little over two minutes. We'll play this Exhibit 18.

(Playing Exhibit.)

Q. (BY MS. PEREZ) It's pretty hard to see with this footage. Is there individuals walking out now?

A. Yes.

Q. Okay.

(Playing Exhibit.)
Q. (BY MS. PEREZ) And then again, are there individuals walking out?
A. Yes.
(Playing Exhibit.)
Q. (BY MS. PEREZ) Special Agent Hawks, time of day-wise, how did this particular exhibit, Exhibit 18, relate to the previous exhibit we just watched, Exhibit 16 at the north bus -- the white bus.
Let me just say that again. How does this Exhibit 18 relate in terms of time of day to the last video we watched at white bus?
A. They are approximately about the same time, just different viewpoints of the same incident. So this is showing -- do you want me to continue?
Q. Yeah. Yeah. Sorry.
A. This is showing the security camera facing south that captures when that crowd runs around the facility, and it captures them going to that south gate area.
Q. Okay.
A. So it's approximately the same time, maybe a couple minutes after, because it takes time for people to come across the -- come around the facility.
Q. Okay. So were you able to capture a couple different viewpoints of essentially this same time?

A. Yes. With the security camera footage around the facility, we were able to track the group all the way around the facility. There's almost cameras pointed in every direction of that facility.

Q. All right. So let's go to another one of those, Exhibit 19.

What time of day?

A. So those first three agents that we see exit that door on the south end is approximately about 5:20ish. So really, this incident is about 5:20 in the day.

Q. And so this is another -- what is this I should say?

A. So this is another camera almost next to the last viewpoint that we saw. This captures the man gate that you have to enter in to get to the secure parking area. So when we saw those three agents walking out and then make a right-hand around the corner, we're going to see them coming around the tree on the left side of our screen here.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Special Agent Hawks, were you able to create an enhanced video of this particular exhibit?

A. Yes.

Q. Why?

A. So what this captures is it shows the agents getting into their vehicles, pulling out, attempting to leave that secure parking area just to leave the facility. On the left side of

the screen in that other parking lot that's not surrounded by a fence, there's an individual who sprints around the entire corner of that gated area and then stops directly in front of that south gate where the vehicles are trying to leave from. And --

Q. Okay. Keep going.

A. And then stand in front of the vehicles. So to kind of point that out and make it a little easier to see, there's an enhanced version.

Q. So we'll go to 19A.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Okay. Going on to a few more exhibits. Again, there was a couple of different angles of this crowd running south; is that what you described?

A. Yes.

Q. Okay. So let's go to just some of those.

20. And what perspective are we looking at here?

A. So this is a camera on the east side of the facility looking northeast. We'll see the crowd notice the agents leaving and then pursuing them towards the gated area.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Is there any point in this Exhibit 20 in which Archer is shown?

A. Yes, there is.

Q. When is that -- or let us know when that is.

A. Okay.

(Playing Exhibit.)

A. Right about here we can see Archer on the walkway in like a white blue shirt jogging right there to the bottom right.

(Playing Exhibit.)

Q. (BY MS. PEREZ) And then we'll go to Exhibit 21. And, again, is this surveillance footage?

A. Yes, it is.

Q. Okay. Do we see Archer at some point in this exhibit?

A. We do.

Q. Please point that out when it happens.

A. This camera would be facing southeast.

(Playing Exhibit.)

A. Right here we see Archer running on the grass right by the walkway.

Q. (BY MS. PEREZ) I'll now go to Exhibit 22. Is this drone footage again?

A. This is.

Q. And I don't think we've seen this perspective. Can you just orient us what we're looking at?

A. Yes. So this drone was flying south of the facility, so we're looking at the south end. That's -- provides a good view of the secure parking area and where the agents were trying to pull out of at that south gate.

Q. Okay. This is about three minutes long. I'll play this.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Can we see the three agents walking into the gated area?

A. You can. You'll see them walk to their vehicles and leave as we saw earlier -- attempt to leave.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Is there a point at which the three additional federal agents come down to the area?

A. Right about now, we see them coming out of that south door up by the facility. They're going to walk through this parking lot here to the south gate.

(Playing Exhibit.)

Q. (BY MS. PEREZ) At some point, do you see Justice Forral arrive?

A. Yes.

Q. When is that?

A. Right about now, we see walking from the right side of the screen into the crowd. Like a salmon-colored tank top.

Q. Okay. So, Special Agent Hawks, a lot of things happened there. Were you able to create several different enhanced videos of this drone footage?

A. Yes. So since this footage really captured what we term the south gate, we isolated individuals that were running to that south area to kind of highlight them in the crowd.

Q. Okay. So let's go through those in turn. First 22A.

(Playing Exhibit.)
Q. (BY MS. PEREZ) And who was that individual that was highlighted?
A. That's Bajun Mavalwalla.
Q. Let's go to another enhanced footage, so 22B.
(Playing Exhibit.)
Q. (BY MS. PEREZ) And who is this?
A. This is Bajun Mavalwalla again, just a later part in the clip.
(Playing Exhibit.)
Q. (BY MS. PEREZ) And then finally, let's play 22C. And who is highlighted here in the final exhibit?
A. This is Jac Archer, bottom right, green circle.
(Playing Exhibit.)
Q. (BY MS. PEREZ) Special Agent Hawks, I guess to be clear, is there -- were you able to capture other video clips of this event on the ground?
A. Yes. There was multiple viewpoints of this incident from the ground and also other drone images from the air, as well as one of the agents that was there on the ground had a body cam that was running as well.
Q. Okay. So that's in that group of video footage that you have maintained in the red -- or excuse me -- the south gate category; is that right?
A. Correct.

Q. Okay. So we won't play all of those right now, but they will be later.

THE COURT: Ms. Perez, we're at a time when I would normally take a break. Is this an okay time?

MS. PEREZ: Yes. Thank you.

THE COURT: Ladies and gentlemen, we're going to take our afternoon break. It will be 10 minutes long. You'll retire to the jury room.

My admonishments remain in place. Do not talk about the case or look up anything about the case.

And we will be excused for 10 minutes. All rise.

(Jury exits the courtroom.)

THE COURT: Anything you need to bring up with me, you can. Our tech person is -- he's working on it to see if we can get this to work better.

(Court in recess from 2:37 p.m. to 2:51 p.m..)

THE COURT: Are the parties ready to resume? I got a nod yes from the Government. Ready to resume?

Members of the gallery, we have to get started on time, so if you're still coming in, please come in quietly.

Is there anything the parties need to address with me? We have our tech team working on the video as much as possible. Hopefully, we'll muddle through.

Okay. We will -- I think Mr. Mathis went to go get the jury.

(Jury enters the courtroom.)

THE COURT: Ms. Perez, you may resume your direct examination.

Q. (BY MS. PEREZ) Okay. Special Agent Hawks, so we had talked about there are other videos that were kind of captured from the ground perspective of this south gate incident; is that right?

A. Yes. That's correct.

Q. Okay. We won't play those now. We'll play those later. But let's go to another drone video. This is Exhibit 26.

(Playing Exhibit.)

Q. (BY MS. PEREZ) And tell us, what's the perspective we're looking at with Exhibit 26?

A. So this drone video is north of the facility looking south. The last drone video that we saw was the opposite direction, so this kind of shows the perspective of the agents and officers that were attempting to leave.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Okay. So that was Exhibit 26.

And were you able to again create two different enhanced videos or just highlight various events or various people?

A. Yes. This drone footage kind of has the same issues with others where there's a loud -- large group of people crowded together. So to point one specific person out of the crowd, we created a highlighted video.

Q. Okay. So let's go with Exhibit 26A. And who is highlighted here? Once it happens, you can say.

(Playing Exhibit.)

A. This is Jac Archer.

Q. (BY MS. PEREZ) Okay. Then let's go to 26B.

(Playing Exhibit.)

Q. (BY MS. PEREZ) And who is highlighted here?

A. Bajun Mavalwalla.

(Playing Exhibit.)

Q. (BY MS. PEREZ) And then following this incident, were you able to capture additional building surveillance?

A. Yes.

Q. Okay. So let's go through that, Exhibit 27. And where and what is this capturing?

A. So this is the same viewpoint that we saw earlier. This is going to be the agents returning to the facility after that crowd of individuals kept them from leaving at that south gate.

Q. And I should have asked -- while their screen is blacked out, I'll ask. With respect to the -- what we just saw at the south gate, the crowd, the pushing, what time was that?

A. So the time with where the crowd was pushing, the agents kind of leave around 5:20.

MR. ORESKOVICH: Judge, I'm going to object to the characterization. The video speaks for itself.

THE COURT: Just a second.

MS. PEREZ: I can rephrase, your Honor.
THE COURT: Why don't you rephrase.
Q. (BY MS. PEREZ) What time was the last drone video?
A. The last drone video --
Q. I'll just pull it up again so it's super clear. So, Exhibit 26, can you tell me about what time this drone footage was taken?
A. This is approximately 5:25.
Q. Okay. Now going back to Exhibit 27. What's the viewpoint here?
A. This is a building security footage facing south that we saw earlier.
Q. Okay. I'm going to play this, about 20 seconds.
(Playing Exhibit.)
Q. (BY MS. PEREZ) So now, so was that kind of the -- at least the drone footage portion of the south gate videos that you captured?
A. Yes, it is. And for understanding the time of when they came back was approximately 5:45, 5:44. So they were back there for approximately 20, 25 minutes.
Q. Okay. And so to be clear, I guess, did they remain in this gated area for some time?
A. Yes. There's other video perspectives from on the ground where we see the agents stand back away from that vehicle gate. That vehicle gate closes, and the crowd of people stay there.

The agents eventually park their vehicles and decide to go back into the facility because they were unable to leave.

Q. Okay. So moving forward, then, we talked again about the categories of things you captured, so we've done white van, south gate. What's next?

A. So after the agents -- well, I would say even during and after the agents were in that parking lot, we see multiple individuals start piling various items on that south gate as well as the east vehicle gate that we will point out here in the future. Those -- both of those gates had multiple items piled on them, I would presume to keep them from opening.

Q. Let's go through some video that you've captured of that. First, Exhibit 29. And I'll just say -- so Exhibits 28 through 38, are those the barricading videos that you've kind of categorized in that way?

A. Yes, they are.

Q. Actually, let me start with Exhibit 38 -- excuse me. Sorry. 28. So we've seen a similar map before. Tell us what's being pointed out here?

A. So the only thing that's different from this one that we saw earlier is the yellow arrow is now pointing out the east vehicle gate. So if you were going to enter into that area with a vehicle, you would come in from that yellow area, you know, take a parking spot, and then if you're going to leave, you would leave where the red arrow is pointing.

Q. All right. So let's go to some drone footage. Exhibit 29.

(Playing Exhibit.)

Q. (BY MS. PEREZ) And is this -- start after agents have gone back into the gated area; is that right?

A. Correct. This is while they were still there. We can see the agents' vehicles still parked there and still standing there almost immediately after that south gate closes.

Q. And why did you capture this particular footage?

A. So this footage shows Justice Forral and several other individuals were identified putting various items in front of that south gate.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Going to Exhibit 30. And while that's playing, again, why was this captured?

A. This is later on in that timeframe. We see Justice Forral in the bottom left with a bench walking to that south gate. So additional items being placed in front of that gate, in front and on.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Did you create an enhanced video of this behavior?

A. Yes, we did.

Q. A little out of order, but Exhibit 29A. This is about three minutes.

(Playing Exhibit.)

A. So this is the first instance where there's cones being brought.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Is Archer visible in this video?

A. Yes. We see Archer directly next to that green circle at the moment standing next to Forral.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Is Archer still in this clip?

A. Yes. We can see Archer standing in the center of that gated area facing southbound talking to the group around the south gate. See there Archer looking at the gate.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Okay. I'll now go to Exhibit 31. Does this capture kind of a similar -- what does this capture?

A. I believe this video should be a zoom-in of that south gate kind of showing the amount of items that were placed in front of it and on it.

Q. Okay. It's about 40 seconds.

A. This also shows the officers pulling away from the south gate and parking their vehicles.

Q. Is Archer seen in this clip?

A. Yes. We can see Archer right in front of the guy in the orange shirt talking to a group of individuals. We also see Archer with a megaphone in their left hand.

Q. Next go to Exhibit 32. Okay. So this particular clip is

about five minutes long.

Special Agent Hawks, tell me why you created this particular clip.

A. So I believe this clip is the clip entirety from SPD, but this clip follows Justice Forral from the nearby park that is directly adjacent to that secure parking area. The drone will follow Forral all the way to where they place one of the benches on the east vehicle gate. So, one, it shows Forral placing one of the benches from kind of start to finish but also provides an overview of that whole south area.

Q. We'll just wait a second.

Okay. Exhibit 32. We'll play that.

(Playing Exhibit.)

Q. (BY MS. PEREZ) This main street we're seeing on the right-hand side of the screen, what street is that?

A. That's Washington Street.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Can Archer be seen in this clip?

A. Yes. Right side of the screen kind of in a group of people talking to kind of the lady in the orange dress directly next to her.

(Playing Exhibit.)

Q. (BY MS. PEREZ) What was it that just occurred in this video?

A. We can see at the top of the screen there was something

that was thrown into the parking area. It's not visible at the moment, but approximately 10 seconds ago we could see it. And that provides another look at that south gate and all the items in front of it.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Okay. We'll go next to Exhibit 34. Okay. So this is just a few seconds. Why did you clip this, Special Agent Hawks?

A. Another angle of that east vehicle gate, having items placed upon it.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Exhibit 35. And, again, is this a perspective we've seen before?

A. Yes. This is that south-facing building security camera.

(Playing Exhibit.)

A. It appears to be sandbags that were nearby that multiple individuals are placing in front of that gate.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Okay. And then Exhibit 36. And this is just about 30 seconds. Why clip this, Special Agent Hawks?

A. So kind of as I said -- stated earlier, we were looking for people that may have been coordinating. This video shows Jac Archer speaking with another individual that we identified as Collin Muncey.

Q. Okay. You identified that orange shirt individual?

A. Yes. As we saw clips earlier, Collin Muncey in the orange shirt was also one of the individuals placing items on the vehicle gates.

MS. GEORGE: What exhibit is this?

MS. PEREZ: 36.

MS. GEORGE: Thank you.

Q. (BY MS. PEREZ) 37. This is just about 15 seconds. Special Agent Hawks, I'll pause it for a second.

Why capture this?

A. So this drone footage circles around the entire facility. The drone operator zooms in to the vehicle gates several times. This shows another perspective of that east vehicle gate. It also gives us another look at that item that was thrown into the parking lot that we discussed earlier.

Q. By who?

A. Forral.

(Playing Exhibit.)

A. So there's two items there that are thrown. Appear to be water bottles.

(Playing Exhibit.)

A. So and that right there, we see Forral on the bottom right in the salmon tank top on the sidewalk. Jac Archer is also in that group of people next to the woman in the orange dress.

Q. (BY MS. PEREZ) Okay. So, Special Agent Hawks, what's the -- we've watched a series of drone footage videos. What's

the timeframe? What time of day is this?

A. So this is approximately from 5:30 to about 6:00. This was maybe 30ish minutes where items were being placed on the vehicle gates.

Q. Were you able to -- I guess was there any video captured of this timeframe of white bus, back at the white bus?

A. Yes, there was. Well, slightly after, I would say.

Q. Okay.

A. Around 5:55 to 6:00, a little later.

Q. Okay. So let's go back to those exhibits taken at the white bus area. So this is Exhibit 13. Now, this is about two minutes long.

Before I play it, why was this particular footage captured by you, Special Agent Hawks?

A. Yes. So the drone that was on the north side of the facility captures Forral leaning down by the front wheels -- wheel of the white bus that we saw earlier. We also identified the individual just left of them in the blue top and bike helmet as Erin Lang. This video captures the two of them leaning down and what appears to be deflating the tires on that bus.

Q. All right. So we'll go through and we'll play that.

(Playing Exhibit.)

Q. (BY MS. PEREZ) As it's going, what time of day was this?

A. This is approximately 5:55, 6:00 p.m., almost immediately after the items were placed on those vehicle gates.

(Playing Exhibit.)
Q. (BY MS. PEREZ) Okay. And then similarly, Exhibit 14, about three minutes long here. Is this the same -- same timeframe?
A. About.
(Playing Exhibit.)
A. That image also provides a good look at the spray paint that was on the front windshield.
Q. (BY MS. PEREZ) Is Mavalwalla captured in this footage?
A. Later in the clip.
Q. Please let us know when that happens.
A. Okay.
(Playing Exhibit.)
A. So if you could pause there, I can point out. Mavalwalla is seen sitting against one of the -- I guess a pylon you would call it that's on the sidewalk right next to that grassy area. So if we are looking at the front of the red car and going towards the facility, it's that blue jeans, dark-colored shirt leaning up against that pylon.
Q. (BY MS. PEREZ) Sitting or standing?
A. Sitting at the moment.
(Playing Exhibit.)
Q. (BY MS. PEREZ) Does he stand now?
A. Yes. You can see him standing up.
(Playing Exhibit.)

Q. (BY MS. PEREZ) Okay. That's the end of Exhibit 14.

Special Agent Hawks, then you've talked about moving into the red van; is that right?

A. Yes, that's correct.

Q. Okay. So let's -- that's Exhibits 39 through 59; is that right?

A. Yes.

Q. So let's go through those. Exhibit 39.

Again, just to orient ourselves what do we see here?

A. Yes. So what this Google Maps image includes -- so now our red box is going to be --

Q. Just hang on just one second.

Let me try another exhibit. I'll try Exhibit 40. Okay. Here we go.

MS. GEORGE: Is this 40?

MS. PEREZ: Sorry. Going back to 39.

Q. (BY MS. PEREZ) 39. What are we seeing here?

A. Like I was saying, the red box is going to be where the red van pulls up on the east side of the facility on Washington Street. This is approximately at 6:25 when that red van appears with a Spokane Police Department escort. The yellow box now shows the white bus that we saw in the last videos.

Q. Now I'll go to Exhibit 40. That's about 30 seconds here.

And so before I start that, that main street that we see, what street is that?

A. That's Washington Street. Spokane Police Department will escort that U.S. Border Patrol van to the east side of that building.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Now we'll go to 41. About a minute-and-a-half clip.

And so what's the perspective here?

A. So this drone is kind of looking at the northeast corner of the facility. We can see the red vehicle on the right side of the screen that was parked in front of the white bus and then the red U.S. Border Patrol van on the left side.

Q. Okay. About a minute and a half here. Do we see Justice Forral in this clip?

A. Yes. We should at some point later in the clip.

Q. Okay. Point that out when that happens, please.

(Playing Exhibit.)

A. This is approximately 6:25, like I stated earlier.

(Playing Exhibit.)

A. Right there on the top right of the screen, we can see Forral walking towards the red van.

Q. (BY MS. PEREZ) Were you able to determine -- does it show in this clip where he came -- where they came from?

A. It appears, if you go back maybe 10 seconds or so, that the car door opens up. It's kind of difficult to see. It's in the top corner of the video. But it appears that they come from

where the red vehicle and the white bus are parked.

Q. Okay. I'll move it back to --

A. Right there, yeah. You can kind of see the car doors open if you look at the top right.

Q. Okay. I'll move it back to a minute 30 of this exhibit. We'll just wait a second.

(Playing Exhibit.)

A. Yeah. You can see --

Q. (BY MS. PEREZ) Hang on. Okay.

THE COURT: Are the jurors unable to see their screens? Is there anyone that can't see their screen?

JUROR NO. 7: Each screen comes up one by one, so sometimes you're pushing "play" before they all come up.

THE COURT: I noticed that, too. So just wait a little bit before you start. And then it's gone again.

Q. (BY MS. PEREZ) Tell us what you're seeing at the top right corner.

A. We can see the vehicle door was opened, and we see Forral coming from where that vehicle door was just opened.

Q. Are you able to -- are they carrying anything?

A. Yeah. Right there we see Justice carrying a stick of some kind. Difficult to tell from this elevation but some kind of stick in his right -- in their right hand at the moment.

Q. I'll go next to Exhibit 42. It's just about a minute.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Is Justice Forral seen in this clip?
A. Yes. Not at the moment, but this is -- footage should zoom out again, and I can point that out.
(Playing Exhibit.)
A. So right there.
Q. (BY MS. PEREZ) Center of screen; is that right?
A. Yeah. Center of screen. We were looking at that salmon-colored tank top next to a -- someone wearing like a gray shirt holding a sign.
Q. Going to Exhibit 43. And before I hit "play" on that, did -- those kind of series of drone videos right around that red van, what's the timeframe on all that?
A. That was approximately like 6:25 to 6:30.
Q. Okay.
A. I'm sorry. Go ahead.
Q. So within just a couple of minutes; is that right?
A. About 10 minutes or so. As the crowd from the white bus sees the red van there, then they flood in and surround that vehicle.
Q. So Exhibit 43. This is about three minutes.
(Playing Exhibit.)
A. So here we see Mavalwalla looking at Archer as they walk past each other. And then it will zoom out and see the red van up on Washington Street.
Q. And I don't want to pause it, but Archer walked which

direction?
A. That would be westbound.
Q. Toward what?
A. Toward the south gate.
Q. And Mavalwalla is walking what direction?
A. That would be northbound towards the red van. We see Mavalwalla with the green backpack at this point.
(Playing Exhibit.)
Q. (BY MS. PEREZ) So by this time, what law enforcement agencies are on the ground?
A. So at this point, we've got Spokane Police Department and then we also have Spokane County Sheriff's Office. You can tell them apart. SPD is in black uniforms and the county sheriff's office is in the green.
(Playing Exhibit.)
Q. (BY MS. PEREZ) Is Justice Forral seen here?
A. Yes. Right behind the white T-shirt.
(Playing Exhibit.)
Q. (BY MS. PEREZ) So, Special Agent Hawks, in this clip, Exhibit 43, we obviously saw some movement going on next to the red van; is that right?
A. Correct.
Q. And so were you able to gather body camera clips of this footage as well?
A. Yes. Pretty much all of the officers there on that line

had body cameras on, so there's multiple perspectives of that from the ground.

Q. Okay. So we'll play that at a different point in trial, but you were able to kind of capture those, and those are contained within the exhibits that we have; is that right?

A. Yes.

Q. Within this particular exhibit, was Mavalwalla seen at various points?

A. Yes. We see Mavalwalla at several points in this video. Obviously, at the front where we first saw him walking by Archer up to the red van. There's also other points in the video where we see Mavalwalla talking to the group that was sitting in front of the red van. And then later on, we see Mavalwalla walking around the red van handing some items to the people that were leaned up against the red van.

Q. And so were you able to create various enhanced clips of those things you described?

A. Yes.

Q. So we'll go to 43A. This is just about 20 seconds.

(Playing Exhibit.)

Q. (BY MS. PEREZ) And then 43B.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Did Mavalwalla come on the screen?

A. Yep. And you see him walking right there. It will come back down here in a second. Right there with that arrow.

Handing some items to those individuals.

Q. Next go to Exhibit 45.

MS. GEORGE: I'm sorry. Which exhibit is this?

MS. PEREZ: 45. This is just a few seconds here.

THE WITNESS: Again, we see Mavalwalla walking around the Spokane police cruiser right there, and we also see Forral leaning over by the front of that red van.

MS. RUBIN: Can you just speak up a little bit? Kind of went down.

THE WITNESS: My apologies.

We see Mavalwalla at the front of that Spokane police vehicle in front of the red van. And then if you would back up maybe a few seconds.

Q. (BY MS. PEREZ) Let me just play Exhibit 45 again. It's just about 10 seconds.

A. And then we see Forral at the bottom right of the corner at the moment leaning over talking to the people in front of the red van.

Q. Okay. Wait a second here.

THE WITNESS: Can you hear me better?

MS. RUBIN: Yes. Thank you.

Q. (BY MS. PEREZ) Okay. Where did you say Forral was in that clip?

A. At the front of the red van leaning over, talking to the people that were seated directly in front of it.

Q. I'm going to now go to exhibit -- wait. Before I do that.

The timeline on the series of drone videos we've just watched, where are we at now?

A. So the red van initially appears around 6:20, 6:25. This is going to be another 20 to 30 minutes, almost getting to about 7:00, maybe a little bit after 7:00.

Q. Okay. Now, at some point -- well, let me -- sorry.

Let's go to Exhibit 58. And what -- why did you capture Exhibit 58, Special Agent Hawks?

A. Yes. So there was another event occurring at the red wagon that is across the river in downtown Spokane. That group walked across the river bridge and met up with the individuals who were at the ICE HSI facility. This drone footage captures that group arriving. It also captures Archer still at that south gate with a group of other individuals seated in front of it as we can see now. It will clear up once it plays.

Q. What time is this?

A. This is going to be approximately 7:00 p.m.

Q. And when you say "red wagon," if someone's not from Spokane, what's the red wagon?

A. Yeah. So there's literally a giant red wagon kind of like what children have that is also a slide, I believe. And it is on the -- right along the river in downtown Spokane. It's a five-, ten-minute walk from where the ICE HSI facility is. There's several bridges that would link up to where that is.

Q. So a little bit of a tourist landmark; is that right?
A. Yes.
Q. So this is about 35 seconds here.
MS. GEORGE: What exhibit is this?
MS. PEREZ: 58.
Q. (BY MS. PEREZ) Again, is Archer visible here?
A. Yes. We see Archer sitting down right behind the -- Collin Muncey in the orange top.
Q. At the south gate; is that correct?
A. Correct.
(Playing Exhibit.)
A. That also provides kind of an overview how there's still individuals by the red van up in the top right.
Q. Okay. And so we'll move forward a few minutes here. Exhibit 59. This is just about 30 seconds.
So that kind of crowd we saw eventually come closer?
A. Yeah. So if you continued with that footage, this crowd joins up and is the crowd that you now are seeing that's surrounding the police vehicles.
THE COURT: And, Counsel, I know you've asked a few times if you can see the exhibit. At least on mine, if you look at the bottom right-hand corner, it will tell you. Of the screen. Once you see something.
MS. GEORGE: Oh, thank you.
THE COURT: You're welcome.

MS. GEORGE: It's so small.

THE COURT: Put on the readers.

MS. GEORGE: There it is. Nice.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Okay. That was Exhibit 69 -- 59. Sorry.

A. I -- I would say this is actually more closer to 8:00 p.m. than it is 7:00 p.m., so maybe like 7:45. I stated that group arrived around 7:00. I'd say that's closer to around 7:45.

Q. All right. Thank you.

A. Yeah.

Q. So what's the next category of exhibits you created?

A. So when the screen returns, Spokane Police Department began removing people from around that red van. They provided multiple orders to those individuals and began removing them to get access to that red van. So here we can see that there is no one sitting around the red van at this moment, so Spokane Police Department and the county sheriff's office kind of managed to clear that area out. And then they also formed kind of like a police line to kind of handle the large crowd that's coming closer to that red van.

I will point out, too, that on the street we see kind of an armored vehicle. That's going to be Spokane Police's SWAT team, special weapons and tactics team, that responded to this incident. So this is kind of that SPD/SCSO response that goes later into the night.

Q. Okay. And is that Exhibit 60 through 74?
A. Yes.
Q. All right. So we'll go to Exhibit 60. And we'll play that. It's about 30 seconds.
(Playing Exhibit.)
Q. (BY MS. PEREZ) Going on to exhibit -- well, before I do that, Special Agent Hawks, you had mentioned kind of some sort of line or space that law enforcement was able to form; is that right?
A. Correct.
Q. Where do you see that on this exhibit?
A. So at the moment, the officers are kind of standing in between the police vehicles that are adjacent to the red van. We'll see the law enforcement officers start to push what would be southbound down Washington Street trying to move the crowd away from the facility.
Q. Okay. So in this next exhibit, which I know no one can see, is that line more visible?
A. It is.
Q. Additionally, this next exhibit, 61, which I'll play, what event goes on in 61?
A. So SPD --
MR. ORESKOVICH: We don't have anything on the screen.
MS. PEREZ: I know. Thanks.
THE WITNESS: There was, at this point, multiple

orders to disperse provided by SPD and the county. Eventually, Spokane Police Department and Spokane Sheriff's Office ended up using some crowd dispersal methods, like smoke canisters, to remove people away from that facility. And that's what these next few clips will show.

Q. (BY MS. PEREZ) All right. So this is Exhibit 61. This is about 40 seconds here. And what time of day is this?

A. This is going to be approximately 8:10.

Q. P.m.?

A. P.m.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Okay. So, Special Agent Hawks, you talk about this being a smoke deployment; is that right?

A. Correct.

Q. Okay. And as you were reviewing this drone footage, what occurred as the smoke was being deployed by officers?

A. So what we can see from this perspective, which is also captured quite well on body camera footage from the officers on the ground, officers deploy the smoke canisters. We see multiple people in the crowd actually pick those up and throw them back at the officers. So I don't know if in the video you saw two more canisters come back north. Those are people picking them up and throwing them back.

We also see a smoke canister get picked up and thrown. One almost hits an officer, and another one actually ends up hitting

one of the police cruisers that's parked up there.

Q. Okay. I'm going to play Exhibit 61 again just to be able to observe some of the things you just talked about.

(Playing Exhibit.)

A. Right there, we see the two canisters, and then we'll see another canister kind of in the middle of Washington Street right there.

(Playing Exhibit.)

Q. (BY MS. PEREZ) 8:10 p.m.; is that correct?

A. Correct.

Q. Were you able to create an enhanced exhibit?

A. Yes. I wanted to better capture that canister that's picked up and thrown that hits the police vehicle.

Q. That's Exhibit 61A.

(Playing Exhibit.)

A. Right here, we see it get picked up, thrown, and then hits the windshield of that vehicle.

Q. (BY MS. PEREZ) In the middle of the screen; is that right?

A. Yes. That's correct.

Q. And then were you able to find an image of that patrol car that was damaged?

A. Yes. There was an image of a patrol car later in the evening with damage similar to what we saw in that video.

Q. Okay. So that was 8:10 p.m. approximately?

A. Correct.

Q. So was smoke deployed again at a later point that evening?
A. Yes. So law enforcement ended up pushing that crowd further south until they were able to -- if you noticed in the videos prior, that crowd was completely surrounding multiple police vehicles, which I'm sure was a security concern for those officers. But they managed to push further south until they were able to get those vehicles out from the crowd, back them up. And then they formed another line on the corner of Washington and -- I'm not familiar with the street that is -- that connects there, but that's kind of the second police line that we see that's made.
Q. Okay. Thank you.
And I jumped ahead a little bit too much. I want to go back. So I missed an exhibit here. Exhibit 63. At the time of the first smoke deployment, were you able to capture what was going on at the south gate?
A. Yeah. So this drone footage captures the south gate right at the moment of the first smoke deployment. We see Jac Archer with the megaphone standing there in front of this group talking. We'll see them sit down, and the drone will pan out to show that smoke being used on Washington.
(Playing Exhibit.)
Q. (BY MS. PEREZ) 8:10 p.m., correct?
A. Correct. This is the same time as the first smoke deployment.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Is Archer still in this footage?

A. Yes. Still seated at that south gate.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Now, I'm going to go back just to the beginning. This is Exhibit 63. Not play it again. But so previously, there had been drone footage of items being placed against that gate; is that right?

A. That's correct.

Q. And they're not here now; is that right?

A. That's correct.

Q. Okay. Are you aware or able to capture where those items went?

A. I don't know for sure, because the drones were probably focused on the red van, if those items were moved away. There was no indication as to who moved those items, but I -- from this footage that I reviewed, I did notice that those items were removed at some point, probably when the red van was occurring.

Q. So then I'm going to go to Exhibit 67.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Now, is this after the first smoke deployment?

A. This is. So here I'll point out that the police cruisers that were further down on Washington Street have now been removed and backed up up toward the other police cruisers. So

this is that second police line that law enforcement made.
Q. Okay. And is this -- so after the first smoke deployment and prior to the second; is that right?
A. Correct.
Q. Okay. It's about 30 seconds. Is Archer present?
A. Yes. Sitting right behind Collin Muncey in that orange top.
(Playing Exhibit.)
Q. (BY MS. PEREZ) Is Mavalwalla in this clip?
A. Yes. We can see Mavalwalla with a black umbrella. So if you look just in front of the police line in the top left, there's an individual with a black umbrella, blue jeans, and a black top.
Q. Special Agent Hawks, I forgot this until now. You can circle things on your screen.
A. Are you sure the screen is not going to black out?
Q. Circle where he is.
That's the individual -- that's Mr. Mavalwalla; is that right?
A. Correct.
Q. Okay. And so I'll now go to Exhibit 72. And I won't play it until our screen is up.
Okay. So smoke deployed again; is that right?
A. Correct.
Q. What time?

A. Approximately 8:43, 8:45.

MS. GEORGE: Could you repeat that?

THE WITNESS: Approximately like 8:43, 8:40 to 8:45.

MS. GEORGE: Thank you.

Q. (BY MS. PEREZ) This is about a minute.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Is Mavalwalla in this?

A. Yes. We can see Mavalwalla right in the smoke at the moment with that black umbrella.

Q. In the middle of the screen?

A. Yep. Right in the middle of the screen walking away from the police line right now.

Q. Picking something up?

A. Yes.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Does Mavalwalla stay on screen until the end of this video?

A. I believe so. It's difficult to tell from this perspective. I believe right about here should still be, but the smoke is difficult from this angle.

Q. Okay. Thank you.

Now we'll go to Exhibit 73. What's the perspective here?

A. This is the same timeframe, approximately that 8:40 to 8:45 timeframe, but this is another drone that's looking north on Washington Street, whereas the last video was looking south.

Same incident, different perspective.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Is Mavalwalla in the middle of the screen?

A. Yes.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Did you create an enhanced video of Exhibit 73?

A. Yes.

Q. Why?

A. Same issues as before. You know, pointing somebody out in a crowd that large can be difficult. Also at that instance, we see Mavalwalla kick a smoke canister back towards the police line, so that was part of the highlight.

Q. So 73A.

(Playing Exhibit.)

A. Green arrow right there. And that's the moment that it's kicked.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Special Agent Hawks, was there further smoke deployed after this?

A. No, not to my knowledge.

Q. And did law enforcement remain on scene after this?

A. Yes. SPD was on scene pretty much overnight into the morning.

Q. Okay. And what happened after this?

A. So after the second smoke deployment, they are able to push the crowd pretty much away from that facility completely. Most of the crowd leaves at that point. The Spokane SWAT team and other officers then eventually assist the individuals that were inside the facility out of the facility and escorted them into their armored vehicles and other vehicles and were able to transport them away from the facility. That was approximately like 8:40 to 9:00 p.m. later in the evening.

And then Spokane Police Department eventually stayed on the facility. There was still a small group of people who hung around, but most of the crowd had dispersed at that point.

MS. PEREZ: No further questions. Thank you.

THE COURT: Okay. Cross-examination.

MR. AHMED: Thank you, Judge.

CROSS-EXAMINATION

BY MR. AHMED:

Q. Good afternoon, Agent Hawks.

A. Good afternoon.

Q. During your direct testimony, you indicated that you were the co-agent on this case?

A. That's correct.

Q. All right. And so you've done a lot of video review; you've reviewed all the evidence in this case, correct?

A. Most of the evidence, yes.

Q. Okay. And you also were involved in the extraction of cell

phones?
A. Yes. I didn't extract the cell phones myself. I don't have that capability or expertise, but I reviewed what is extracted in a readable format.
Q. Did that include the extraction of Mr. Mavalwalla's phone?
A. Yes. That's correct.
Q. All right. And were you involved in executing the search warrants in this case?
A. Yes, I was. It was a multilocation search warrant on the same day, but as in terms of Mavalwalla's specific device, I was not present for that.
Q. You weren't?
A. No.
Q. Okay. But the search warrants were executed about a month after the event, correct, sometime in July?
A. Yes.
Q. Okay. And this event happened on June 11th, 2025.
A. Yes.
Q. Okay. In terms of the investigation, as far as the phones were concerned, did any of the phones get transferred from SPD, Spokane Police Department, to your agency?
A. Many did, yes.
Q. Okay. And when were they transferred to your agency?
A. I believe -- so Spokane Police Department arrested approximately 30 people that night for various charges. When it

was determined that we were going to investigate, I believe those phones were transferred maybe several days after June 11th. Maybe a week after, approximately.

Q. Okay. And do you know how SPD seized those phones?

A. Not every single one. Most of them were probably seized from the person. The phone was on their person during time of arrest.

Q. Okay. So --

A. That's my assumption on most of the phones.

Q. I don't want you to assume. If you don't know, just say "I don't know."

A. Okay.

Q. And you said various charges. Did those various charges include like failure to disperse?

A. From my understanding.

Q. Okay. And you said approximately 30?

A. Yeah. Approximately 30.

Q. Do you know if Mr. Mavalwalla was arrested amongst those 30?

A. He wasn't arrested by SPD that night.

Q. Okay. And we watched various videos -- let me go back.

In terms of your investigation, did you do any background on Mr. Mavalwalla?

A. Yeah. We do backgrounds on investigative subjects.

Q. Did you confirm he had never had any arrests prior to this

occasion?

MS. PEREZ: Objection, your Honor. That's improper character evidence and relevance.

MR. AHMED: He said he did background on him.

THE COURT: Sustained. You can go to what's relevant to this investigation.

Q. (BY MR. AHMED) Let me ask you this. Did you look at his criminal background to see if he had any criminal convictions?

MS. PEREZ: Same objection, your Honor.

THE COURT: Sustained.

Q. (BY MR. AHMED) When you looked at his phone, did you look at his social media sites as well?

A. So during the phone extraction, every phone extraction is different. I'm not an expert on that, but the amount of data that comes off the phone can be different from one phone to the next. In the case of Mavalwalla's phone, I believe information from Reddit was captured. So some of that I was able to review.

Q. Okay. And did you review any text messages and so on?

A. I believe there was some messaging, but some of that might have also been through Reddit.

Q. Okay. Did you find any messages, whether on Reddit or social media or text, that would indicate to you any sort of communications with other parties where crimes were discussed or agreeing to commit a crime?

A. I located multiple messages where Mavalwalla was talking

with -- I don't know who the individual was -- individuals on Reddit discussing the event. There was multiple people that reached out to Mavalwalla. What I -- what looks like they were talking about, the event itself and how they saw him on news coverage and videos and whatnot.

Q. Okay. But my question is, during any of that review, did you see any evidence of him agreeing with somebody to commit a crime? I'm not talking about any messages with, for example, Caleb Hutchins of "We went to the protest the other day." I'm talking about did he have any indication to you where he agreed to commit a crime? Let's go blow up a car, let's go crack a windshield, let's go hurt a police officer, anything like that?

A. There was -- I don't think there was anything explicit like that where "I'm going to go commit a crime," no.

Q. Okay.

A. I don't know how many people actually go onto their phone and say, "I'm going to go commit this crime." That's not something I normally see in investigations. It's usually --

Q. Okay.

A. It's usually messages and discussions that indicate that they were present, actions had occurred, but very rarely do I see people just say, "Hey, are we going to go commit this crime?" "Yeah, buddy, sure." That would make our jobs a lot easier if that was the case.

Q. You said explicit. Were there any implicit messages

where --

A. I located multiple messages indicating that he was present and he was in the smoke. And one of the messages that pops up specifically is an individual discussing how they saw Mavalwalla in the smoke cloud, and that's kind of the one that pops to mind.

Q. There's no dispute about that. We watched the video, correct?

A. Right.

Q. All right. You saw some videos of like a cracked windshield. We saw that a second ago. And do you have any evidence that Mr. Mavalwalla was involved in damaging any government property or any property?

A. In that specific instance where the smoke canister is picked up, that does not appear that Mavalwalla is the one that picked that up. It's another individual in the crowd.

Q. I was going to ask you about that because counsel asked you, on Exhibit 72, did you see him pick something up, and you said yes. Did you ever in these videos see Mr. Mavalwalla pick something up like a canister?

A. In the videos I reviewed, there was the only video of him kicking it towards the officers. But, again, I was only reviewing what was captured by SPD. There might have been instances that weren't captured.

Q. Agent Hawks, you just said that he was kicking it towards

the officers. Based on your review of the video, how far away were the officers? Were they more than a hundred feet from him at that point?
A. That's difficult to tell from that drone angle.
Q. Okay. Were they more than 50 feet?
A. They were close enough to be able to throw something towards the officers. I don't know if I could make a determination just because of the angle of that footage, but you could say approximately 50 to a hundred feet.
Q. Okay. Well, then why would you make the assumption that he's kicking it towards the officers? He may have been kicking it 10 feet down the road.
A. Okay. Well, in the video that I -- that we witnessed, it was kicked in the direction of officers.
Q. Okay.
A. If that's more --
Q. The officers are on the north side of the street, and he's on the south side, and he kicks it towards the north side. Is that what you're saying? Okay.
A. If you want me to be more clear, he kicks the canister north where the officers are also north.
Q. And they're 50 to a hundred feet away from him.
A. Like I say, I can't make a -- a really good determination on that because of the angle of the footage.
Q. I understand.

Let's talk about the south gate. I'm going to show you some videos here in a second, too. When you see -- we saw Mr. Mavalwalla going from the north side to the south side. And you see him running, correct?
A. Correct.
Q. Okay. And you see other people running, but he just appears to be a lot faster than them, correct? I mean, the whole crowd is running from the north to the south, correct?
A. In the video, it appears that he sees the vehicle pull out and sprints down to that south gate.
Q. Correct. And there are other people running with him, correct?
A. Yeah. There's an instance in the video, too, where it appears that he looks back to the crowd.
Q. Okay. And he gets to the south gate, and there are multiple people at the south gate where the vehicle is trying to exit, correct?
A. Correct.
Q. All right. Who makes initial contact? I'm talking about physical contact. Is it the agents that actually contact the civilians that are standing out there?
A. From the videos that I -- that I reviewed, it appears that the crowd makes like a human line, and then the officer -- the agents come in and try to remove those individuals.
Q. Right. And they throw some individuals to the ground,

correct?
A. I think in the shoving, people fall to the ground. I don't know if they were thrown to the ground.
Q. Did you see an agent put one person in a head lock?
A. I did not see that.
Q. And you're saying that just based on happenstance, somebody just fell to the ground? Is that your testimony here?
A. I would say that during the shoving and pushing, people were resisting against the officers and people were falling to the ground, people were pushing against. Officers were trying to remove those people.
Q. Okay. That's a public road, correct? Right in front of that south gate?
A. Yes. I believe so.
Q. That's not federal property, correct?
A. I can't make a determination, but that road has access to that nearby park, so I would assume that it's a public road.
Q. Okay. And you never saw Mr. Mavalwalla enter the gate at any point, correct?
A. From the drone footage that I was looking at, it's difficult to see from that angle just because we're, you know, at a high angle. So if we were maybe directly parallel or perpendicular to that gate, I'd be able to make a better determination of that. But from that angle, I can't.
Q. But you certainly saw a video, and I know it's not been

presented yet maybe, but that gate eventually closes, correct?
A. It does.
Q. And you couldn't close that gate if someone is standing -- it's like a garage door, correct?
A. Mm-hmm.
Q. You couldn't close it if someone's standing there within the boundary of the gate, correct?
A. Correct.
Q. Okay. So they were certainly on the other side of it joined up, correct, arm in arm?
A. When the gate closes, yeah.
Q. All right. I'm going to show you a couple videos.
MR. AHMED: Can I disengage your computer for just a second?
MS. PEREZ: Yeah.
MR. AHMED: Thank you.
And, your Honor, all of these exhibits have been admitted.
THE COURT: Correct.
Q. (BY MR. AHMED) I'm going to play for you Exhibit --
THE COURT: Can you pause it? It's not on all of our screens yet.
MR. AHMED: Okay. I'll wait. I'll play it again.
Q. (BY MR. AHMED) Now, we saw a video earlier where the agents come out of the gate, and they go from the north side to the south side to remove those people, correct?

A. The second three agents?
Q. Yes.
A. Yes. They come from that south door and then go to the south gate.
Q. No, they go from the north door, correct, to the south door?
A. Are you referring to the agents?
Q. Yes.
A. They exit a door that's -- it's north of the south gate if that's what you're referring to, yeah.
Q. Yes.
A. Okay.
Q. It was that video where a guy tipped the hat. Do you remember that? He tipped the agent's hat?
A. It's nearby where that security camera is.
Q. Okay. And I just want to clarify. The guy that tipped the hat of the agent, that's not my client, correct? That guy was wearing shorts.
A. It doesn't appear so.
Q. Okay. Because they both have ponytails. I just want to clarify that's not my client.
A. I don't believe I made an indication it was.
Q. You didn't. I'm just trying to clarify.
Everybody have that now?
(Playing Exhibit.)

Q. (BY MR. AHMED) I'm going to stop it there for just a second.

Now, Agent Hawks, you know, we saw Exhibit 22B where my client's highlighted in front of the gate. Do you -- when you reviewed Exhibit 22B, does it appear to you that my client -- and I'll play it again for you if you need me to -- gets shoved in the back at that point in 22B? Do you see him in 22B jettison forward?

A. I believe there's several instances in those videos where it does appear Mavalwalla is getting pushed around by the crowd.

Q. Okay. By the crowd or by the agents?

A. If you'd like to play the video, I could look at it.

Q. I'll play it again for you. Let's start again.

(Playing Exhibit.)

Q. (BY MR. AHMED) Did you see that?

A. Yeah. I saw that agent trying to move Mavalwalla from the gate.

Q. He gets shoved in the back, correct, Agent, by an ICE agent, correct?

A. Yeah. He was trying to remove Mavalwalla from the gate is what it appears to, yeah.

Q. I understand. Okay. All right.

Let me ask you this: As an FBI agent, you're empowered by statute, correct?

A. Correct.

Q. Are you aware if ICE is allowed to come out there and push people in a public street?

A. They're able to use force according to their own use-of-force policy, just as the FBI is. If their use-of-force policy -- if they are able to make the determination that that's an acceptable use-of-force in that situation, then that's on the agents. I see agents trying to remove people from a gate where they were trying to exit from. So moving people out of the way like that.

Q. Even though they're in a public street?

A. But they're still blocking agents from exiting the secure lot.

Q. Okay.

(Playing Exhibit.)

Q. (BY MR. AHMED) So after this event, did any of the ICE agents have to seek medical treatment?

A. I'm not -- you would have to ask them specifically. I'm not privy to their medical records.

Q. Let me ask you this: Are you aware of any paramedics that day treating any ICE agents?

A. From the videos I've reviewed, I did not see paramedics respond.

Q. Okay.

A. But it was -- it might be an instance, too, where paramedics might have been off scene, but they don't respond

until law enforcement clears the scene.
Q. During your review of this case and as a co-agent, were you ever made aware that an ICE agent suffered any injury?
A. Again, I don't know of any specific injury, but their medical records wasn't something that I personally looked at.
Q. Now after having reviewed Exhibit 703, would you agree that it was actually the ICE agents that initiated physical contact with members of the crowd?
A. They are the ones that initiated physical contact because there was a crowd in front of them that wasn't moving. If the crowd moved out of the way, then there would have been no reason to use --
Q. So your answer is yes, it was the ICE agents that initiated?
A. Well, officers of the law and law enforcement officers are able to use force to -- in their case of their duties, official duties. So I don't see this as an instance that's abnormal for law enforcement.
Q. Okay. Now I'm going to play 702.
(Playing Exhibit.)
Q. (BY MR. AHMED) Just so you know, it's the same event.
(Playing Exhibit.)
Q. (BY MR. AHMED) And now I'm going to play 704.
(Playing Exhibit.)
Q. (BY MR. AHMED) Right there, Agent, did you see an ICE

agent throw somebody to the ground or push somebody to the ground?
A. There's multiple pushing and shoving going on.
Q. I'll point it out for you here.
(Playing Exhibit.)
Q. (BY MR. AHMED) Did you see this person fall to the ground?
A. Yeah. Several people fell to the ground.
(Playing Exhibit.)
Q. (BY MR. AHMED) All right. Agent, when you were talking about the police were using smoke, in fact, they were using incendiary tear gas, were they not?
A. I don't know if it was tear gas.
Q. You don't know whether the police used tear gas then?
A. Tear gas is a very specific chemical agent, and I can't confirm if that was actually tear gas.
Q. Okay. So when we saw the canisters go down the road and you saw fire come out and smoke come out, was that smoke to you or was that tear gas?
A. I don't believe Spokane PD had authorization to use tear gas. You'd have to look at specific Spokane police reports and their executive management made that determination, but I believe it was just smoke. Tear gas is a very specific chemical agent that has a different effect than smoke would.
Q. So you don't know if tear gas was employed that evening or that day?

A. I don't believe it was.

MR. AHMED: Okay. Can I have just a moment, your Honor?

THE COURT: Yes.

MR. AHMED: I've got nothing further, Judge.

THE COURT: Okay. Any further defense cross-examination? Mr. Wagley or Ms. Rubin?

MS. RUBIN: I'm going to be very quick. Your Honor, I know that exhibits have been admitted. We've spent a lot of time with this agent going through the drone videos. I would ask that Defense Exhibit 615, A through V -- I think they've been admitted, but I want to make sure that they are included. I'm not going to play them. They are the entire drone videos. And just in trying to be efficient with the Court's time and the jury's time, I want to make sure they are available in their entirety for the jury. So we would just simply ask that those be included.

THE COURT: Thanks for pointing that out. All exhibits are admitted, unless there is an opt out.

MS. RUBIN: Perfect.

THE COURT: But I think it does make sense to just alert the jury. Okay?

MS. RUBIN: Yes. And so I did want to just let you know that 615, A through V, which are the drone videos in their entirety.

CROSS-EXAMINATION

BY MS. RUBIN:

Q. Because, Agent, you just talked about kind of some snippets and snapshots from the drone videos.

A. Like you said, for the court's time, we tried to keep that succinct for the specific behavior and actions that we were pointing out.

Q. Sure. And there was about, I'm going to say, 22, 23 drone videos in totality?

A. Yeah. There was a lot.

Q. And some of them were two minutes, and some of them were probably 30 to 40 minutes each?

A. Yeah. There was a lot.

Q. So it would take probably --

A. A fair amount of time.

Q. -- a few hours to get through those. Sorry. It would take a few hours to get through those. Fair?

A. It would.

Q. Fair enough. Okay. Thank you.

Agent, I want to ask you -- it appears that, at some point, you may have reviewed a phone that belonged to Ben Stuckart?

A. Yes.

Q. Okay. And you indicated in a report, I believe, that there were about 40 calls made by Ben Stuckart prior to 12:00 p.m. or right around the time the Facebook posts went out?

A. I'm not familiar with 40 calls. I am aware that we did do a search warrant to Verizon Wireless for Ben Stuckart's call detail records.
Q. Okay. And if I told you there were approximately 40 calls on the log and that was in your report, you would have no reason to disagree with me?
A. If that's in my report.
Q. Okay.
A. Was it before 12 or on June 11th?
Q. It was the July -- looks like maybe a July report.
A. Okay. I would have to look at that report specifically.
Q. I'm happy to hand it up. My question is pretty simple.
A. Yeah.
Q. There are no calls on this log of 40 calls from Ben Stuckart's phone that day that were to Justice Forral?
A. I didn't locate any calls that indicated Ben Stuckart called a phone number that was associated with Justice Forral. There were calls to phone numbers that they weren't able to identify who those people were or identify maybe this is who it is.
MS. RUBIN: If I may, may I hand the agent his report just to have him review this?
THE COURT: Would looking at your report refresh your recollection as to some of these details?
THE WITNESS: I believe so.

THE COURT: Okay. Go ahead.

MS. RUBIN: May I approach, your Honor?

Q. (BY MS. RUBIN) Just let me know, Agent, when you've had a chance to review everything.

A. Yes. So during this review of these phone records, a lot of the names that we see here -- I don't know if this is going to be provided to the jury or not to review --

Q. Agent, let me stop you. Have you had a chance to review your report?

A. Yeah. This is fine.

Q. And on that list, you have about 40 calls listed. Yes?

A. Correct.

Q. Okay. And there's no phone calls that identify Justice Forral -- as having a call been made to Justice Forral from Ben Stuckart?

A. I don't have any names on this list that say Justice Forral. There's two that say unknown that I'm not sure of who they were.

Q. Okay. But there's nothing that lists Justice Forral on that list?

A. I did not identify any phone numbers that were directly tied to Justice on this list.

Q. All right. Thank you.

MS. RUBIN: May I approach and just grab the report, your Honor?

THE COURT: You may.

MS. RUBIN: Thank you. I have no other questions.

THE COURT: Any questions on behalf of Defendant Archer?

CROSS-EXAMINATION

BY MR. WAGLEY:

Q. Good afternoon, Special Agent.

A. Good afternoon, sir.

Q. My name is Andy Wagley. I'm one of the defendants for -- or I'm one of the attorneys for Defendant Jac Archer.

I want to start off -- you were asked questions by counsel for Mr. Mavalwalla about if the SPD deployed tear gas. Do you remember that?

A. Yes.

Q. Do you know if the Spokane County Sheriff's Office did?

A. I don't know.

Q. Okay.

A. Specifically.

Q. You testified earlier that regarding a Facebook post from Ben Stuckart that called people to this event. Do you recall that?

A. Yes.

Q. And did you observe footage of Mr. Stuckart at the protest?

A. Yes.

MR. WAGLEY: Okay. Could you please pull up Exhibit

600G?
MS. GEORGE: Will you switch it over to me?
Q. (BY MR. WAGLEY) Special Agent, have you observed Mr. Stuckart in this position at the start of the protest?
A. Yes. We identified this as Ben Stuckart.
Q. Say that again. I didn't hear the last portion.
A. We identified this as Ben Stuckart that day.
Q. And this is how the protest started, is it not?
A. Yes. This is earlier in the afternoon.
Q. Okay. So we talked about Exhibit 12A earlier, which was an enhanced video of Defendant Archer by the white bus on the north end of the video -- of the facility. Do you recall that?
A. Yes.
Q. And you testified regarding Defendant Archer walking around with a clipboard. Do you recall that?
A. Mm-hmm.
Q. But you can't hear what Defendant Archer is saying in the video, correct?
A. Not from that drone video.
Q. Okay. There's no audio of that; is that right?
A. Correct, from that video.
Q. Okay. So counsel for Defendant Forral asked you about the skirmish at the south gate and individuals being shoved down. Do you recall that?
A. Yes.

Q. One of the individuals that was shoved down was Defendant Archer, was it not?
A. Through review of the video, it does appear that Archer fell to the ground during that incident.
Q. Okay.
MR. WAGLEY: So if we could go to --
THE COURT: Do you want to help? It's not connected. I think it's connected to Ms. George's computer.
MR. WAGLEY: So does everyone see it?
Q. (BY MR. WAGLEY) Agent, I think you testified earlier that this is a video regarding the south gate enhanced towards Defendant Archer. Do you recall that?
A. I do.
Q. And that's Defendant Archer with a circle?
A. It is.
(Playing Exhibit.)
Q. (BY MR. WAGLEY) That's Defendant Archer again zoomed in?
A. It is.
(Playing Exhibit.)
Q. (BY MR. WAGLEY) Is that Defendant Archer locking arms?
A. It is.
(Playing Exhibit.)
Q. (BY MR. WAGLEY) Special Agent, right there, when I can go back, do you see that footage of Defendant Archer in the circle right there?

A. I do.
Q. Okay. And is that not Defendant Archer being pushed down by an ICE agent?
A. Yes, it is. Counsel, respectfully, if Archer walked away from that --
Q. Hold on. My question was: Is that Defendant Archer being pushed down by an ICE agent?
MS. PEREZ: I would ask for Special Agent Hawks to be able to finish his answer.
THE COURT: He just needs to answer the question asked, and you can follow up on redirect.
Q. (BY MR. WAGLEY) That is Defendant Archer being pushed down by an ICE agent; isn't that correct?
A. Can you back up, please?
Q. Are you ready?
A. Go ahead, sir.
(Playing Exhibit.)
Q. (BY MR. WAGLEY) That's Defendant --
MS. PEREZ: Ask for Ms. George to not be commenting on the video that's going on right now.
THE COURT: Okay. Ms. George.
MS. GEORGE: Sorry.
Q. (BY MR. WAGLEY) That is Defendant Archer being pushed down by an ICE agent, correct?
A. It appears that Archer falls down after an ICE agent is

standing there, yes.
Q. My question was: Was Defendant Archer pushed down?
A. It appears so.
Q. Thank you.
We focused on footage earlier regarding the red van. Do you recall that?
A. Yes, sir.
Q. And did you observe Defendant Archer in any of that footage surrounding the red van?
A. No. From my understanding, Archer stayed at the south gate after the south gate incident.
Q. Okay. If Defendant Archer is at the south gate, Defendant Archer isn't by the white bus when the air is deflated from the tire; isn't that correct?
A. There's no footage that shows Archer by the white bus when the tires are deflating, so I would have to go off the assumption that they are still at the south gate. But there's no footage to confirm or deny that.
Q. Okay. Thank you.
A. There is footage that shows Archer at the south gate later around that similar timeframe when the red van is occurring, so approximately around the same time as the tires are being deflated.
Q. Defendant Archer is at the south gate, correct?
A. There's videos that would show that would be around the

same time. I don't know if it's exactly the same time, but it would be appropriate.
Q. Okay. Will you look at -- are you done with your answer?
A. Go ahead, sir. I'm sorry.
Q. Thank you for your answer, sir.
We looked at Exhibit 63 earlier, which was about 8:10 p.m. according to your testimony, and it was people appearing from the red wagon to the red van. Do you recall that?
A. Yes.
Q. And at -- in that video, Defendant Archer is at the south gate, correct?
A. That's correct.
Q. And in that video, there's no items barricading the south gate; isn't that correct?
A. At that time, there wasn't any.
Q. Okay. And you testified earlier that you did not -- you testified earlier that you reviewed all the drone footage, correct?
A. Yes.
Q. Did you see any drone footage of items being removed from the south gate, the barricade?
A. There is one drone video that comes to mind where we see an individual that we identified as Liz Moore had an item in her hand nearby the gate, but I don't believe there was drone footage that directly captured those items being moved away.

And like I stated earlier, I think that's because SPD was focused on the red van at the time.

Q. Okay. So you don't -- you don't know when those items were moved away from the south gate; is that right?

A. I can't say for certain who did it or when they occurred.

Q. So we also looked at Exhibit 67, which was also at the south gate. And it was after the first smoke deployment, from my recollection. And that shows Defendant Archer sitting in front of the south gate; isn't that correct?

A. That's correct.

Q. Sitting with perhaps 15 people around them?

A. Approximately.

Q. Okay.

MR. WAGLEY: If I could have one second, your Honor?

THE COURT: Yes.

Q. (BY MR. WAGLEY) We're going to have you look at Exhibit 606B. If we can switch back over to Ms. George's computer.

Do you recognize this footage?

A. That's the video that I referred to earlier where it appears that she had her hand on that pole over there, but there's -- I didn't ever see a footage of stuff being moved away from that gate. So you would have to assume that that was getting moved, but I can't say for certain. So there, that's a good stopping point where we do see she's holding that sign or pole or whatever it is.

Q. And there's no items in front of the south gate at this point in time?
A. That's correct.
Q. Special Agent, do you identify -- so you identified Liz Moore in this video and Jac Archer. Do you identify any other individuals that you recognize in this footage?
A. At the moment, I don't know the names of the other individuals in this scene that we're looking at.
Q. Okay.
MR. WAGLEY: Nothing further, your Honor.
THE COURT: Okay. We've got -- almost at the end of the day, but can we get into redirect?

REDIRECT EXAMINATION

BY MS. PEREZ:
Q. Special Agent Hawks, just really quickly, a few things with Mr. Ahmed, Mavalwalla's counsel.
So to be clear, you were the after-the-fact video review guy; is that right?
A. That's correct.
Q. Okay. Were you on the ground at the south gate?
A. No, I was not.
Q. Okay. And so did you have the perspective that the officers on the ground had?
A. I don't.
Q. Okay. With respect to Mavalwalla's phone. So Mr. Ahmed

talked to you a little about that. You reviewed data from the phone; is that right?
A. That's correct.
Q. Okay. So was there anything that -- from that phone that had been deleted?
A. When an extraction occurs like that, it's difficult to say if stuff has been deleted. I did notice that, in reviewing body cam and drone footage, there was multiple instances where I saw Mavalwalla holding up a cellular device and in what manner that you would be making a video. When I went and reviewed the data that was extracted from his phone, I noted that I did not find any photos, videos of that event on his phone. I cannot say for certain if those videos were deleted or if they were live-streamed to a social media account, and I just couldn't see it or they were on the phone and just didn't get extracted. Extractions are different with each device. But I did note that as odd.
Q. Odd why?
A. Well, that I -- there was so many instances when I saw what I believe is him taking footage, recording, but then when I reviewed the phone, there was no record of that occurring.
Q. I'm going to show you briefly Exhibit 85.
Now, before we do that, Mr. Ahmed had talked about that particular road by the south gate being a public road; is that right?

A. That's correct.
Q. So cars -- anyone can drive on it, right?
A. Yeah.
Q. All right. So Exhibit 85. What's that?
THE COURT: We can't see anything yet.
MS. PEREZ: Oh, sorry.
THE WITNESS: That is the south gate.
THE COURT: We still can't see anything.
MS. PEREZ: Sorry. One second.
THE WITNESS: Sorry.
Q. (BY MS. PEREZ) What is Exhibit 85?
A. That is an image of the south gate.
Q. What's it say?
A. There is multiple signs saying "Authorized Parking Only," "Do Not Block Gate," and then some smaller lettering I can't make out. But then "Warning: Moving Gate Can Cause Serious Injury Or Death." So there is identification to not block that gate.
Q. Okay. Ms. Rubin, counsel for Forral, talked about Stuckart's phone review, Mr. Stuckart's phone review; is that right?
A. Yes.
Q. So I'm going to show you Exhibit 75. So a little small, I guess. Do you recognize Exhibit 75?
A. Yes. These are call detail records from Stuckart's Verizon

account.
Q. And to be clear, is this the entirety of every call Mr. Stuckart made?
A. No. Not at all.
Q. Okay. But what does it capture here?
A. So this captures the 11th of June, approximately 2:48 p.m., on the top row and then ends at 4:34 p.m. as the last call on this list.
THE COURT: I think you can all expand it if you know how.
THE WITNESS: There is a zoom -- looks like a zoom icon down here.
Q. (BY MS. PEREZ) Thank you. Yeah. So let me -- I'll kind of expand this. There we go. That's the right side of the screen.
Who was Mr. Stuckart communicating with, according to these records?
A. So these records indicate that Stuckart was calling current mayor of Spokane Lisa Brown between 2:00 p.m. and 4:00 p.m.
Q. And "SOU" on the right side of the screen, what's that?
A. I believe it stands for seconds of -- you'd have to -- I would have to look up what the U is. But what that means in the data is how long was the call, so that's going to be in seconds.
Q. Okay. So a call that was 28 seconds and then a couple that were four seconds?

A. Yeah. So the calls that are 4 seconds are likely it rang and it wasn't picked up. There is another spot on this table that will document whether that was a received call, whether that was an outgoing call or incoming call.

Q. So then a couple calls that were 380 seconds, two 78 seconds, 78 seconds; is that right?

A. Yes.

Q. The bottom person, what is that?

A. So I identified this phone number to be associated with Washington State Attorney General Nick Brown.

Q. What was the call length of that call from Mr. Stuckart?

A. 422 seconds. What? Seven, eight minutes or more.

Q. And then in addition to that, you -- as you indicated with Ms. Rubin, there was some unknown calls that you just simply don't know; is that right?

A. Yes. So when I do a review of phone numbers, I'm checking open source data. I can't -- I would have to serve legal process to every phone provider to determine who actually owns that phone number. So when I see a phone number, I go into an open source database, and it says this phone number is likely associated with this individual. It's not for sure. It can be wrong because phone numbers change from person to person. The only way for me to know for certain who owns a phone number at that specific time is I have to send legal process to that phone provider.

Q. Last question, Special Agent Hawks. With Mr. Wagley, counsel for Archer, you began to say "respectfully, Counsel, if Archer had" -- what next?
A. I'm sorry. Say that again.
Q. When Mr. Wagley was showing you video of the south gate -- sorry, just reorienting -- south gate discussing Archer's being pushed to the ground, fall to the ground, however that was framed, you had started the answer to a question --
A. I see.
Q. -- "Respectfully, Counsel, if Archer had..."
A. Had moved.
MR. WAGLEY: Objection to speculation.
THE COURT: It does sound like it calls for speculation. If you can do a foundation. And what I'll explain is you can't testify to what you think might have happened.
THE WITNESS: Yes, your Honor.
THE COURT: You can only testify to what you saw.
THE WITNESS: What I saw.
THE COURT: Or what happened.
THE WITNESS: Yes, your Honor.
THE COURT: Okay. So with that in mind.
THE WITNESS: Yes, your Honor.
So what I saw in the video is after agents trying to push them away from the gate, they get back up and/or resist against the agents and move immediately back to where that gate is.

Also in one of the videos that was played where you could actually hear the audio, you do hear agents saying, "You're impeding us." They were giving orders to these individuals to move from a law enforcement officer, which would be considered a lawful order.

MS. PEREZ: No further questions.

THE COURT: Okay. Any very brief redirect -- or recross? Excuse me. And we're talking very brief or we'll recess.

MR. AHMED: Just on the issue she just raised, your Honor.

THE COURT: Okay.

RECROSS-EXAMINATION

BY MR. AHMED:

Q. Agent, you were asked about whether you thought there were some missing items on Mr. Mavalwalla's phone. Did you see any evidence -- let me ask you this: You downloaded the phones using Cellebrite, correct?

A. Correct.

Q. All right. And explain very briefly to the jury what Cellebrite is.

A. Cellebrite is really a way for we -- to review the data on the phone in a readable format. So when we extract the data -- I'm also not an expert in cell phone data. This is my basic, basic understanding. It really just puts everything in a

readable format, similar to how you would see it on a device. But it's designed to extract data from it. Like I said earlier, it can get some, it can get most, it can get none.

Q. Cellebrite would show you if there was a mass dump from the phone, right, if there was a mass deletion?

A. I can't testify to that, sir. I'm not an expert in it.

Q. Have you ever heard of the messaging app Signal?

A. Yes.

Q. Do you know if Cellebrite picks up Signal?

A. It's unlikely. Signal is an encrypted chat. Encrypted chats are difficult to be extracted from a device. So that is a -- if we extract a device that's using Signal, it's unlikely that we might get something from it.

Q. So if Mr. Mavalwalla was taking video or photographs using Signal, that wouldn't be picked up by Cellebrite, correct?

A. It would be unlikely because it's encrypted. But it's -- the Cellebrite application is constantly being updated. You would have to talk to somebody who's a technical expert to really be able to understand how that works.

MR. AHMED: That's all I had, Judge.

THE COURT: Any very brief recross? We've only got a couple of minutes. Mr. Wagley is standing up.

MR. WAGLEY: No, your Honor.

THE COURT: Ms. Rubin?

MS. RUBIN: No, your Honor.

THE COURT: Okay. May this witness be excused?

MS. PEREZ: Yes.

(WHEREUPON, further proceedings were held which were not ordered and transcribed.)

* * * * *

WITNESS INDEX


For the Plaintiff — Page

**ETHAN HAWKS**

DIRECT EXAMINATION BY MS. PEREZ 3
CROSS-EXAMINATION BY MR. AHMED 60
CROSS-EXAMINATION BY MS. RUBIN 76
CROSS-EXAMINATION BY MR. WAGLEY 79
REDIRECT EXAMINATION BY MS. PEREZ 86
RECROSS-EXAMINATION BY MR. AHMED 92


* * * * *

EXHIBIT INDEX


No. Description — Page

None

C E R T I F I C A T E

I, CRYSTAL L. GONZALEZ, do hereby certify:

That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Spokane, Washington;

That the foregoing proceedings were taken on the date and place as shown on the first page hereto; and

That the foregoing proceedings are a full, true, and accurate transcription of the requested proceedings, duly transcribed by me or under my direction.

I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings;

DATED this 18th day of June, 2026.

CRYSTAL L. GONZALEZ, CRR, RPR
Washington CCR No. 2955
Official Court Reporter
Spokane, Washington