# Exhibit D.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:25-cr-00113-RLP |
| Plaintiff, | ) | May 22, 2026 |
| | ) | Spokane, Washington |
| vs. | ) | |
| | ) | Excerpt of Jury Trial - Day 5 |
| JUSTICE FORRAL (2), BAJUN MAVALWALLA (8), and JAC ARCHER (9), | ) | **Testimony of Ian Burns** |
| | ) | Pages 1 - 88 |
| Defendants. | ) | |

BEFORE THE HONORABLE REBECCA PENNELL
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:
LISA C. CARTIER-GIROUX
REBECCA R. PEREZ
U.S. Attorney's Office
920 W. Riverside Avenue
Suite 340
P.O. Box 1494
Spokane, WA 99201

For Defendant Forral:
ANDREA K. GEORGE
AMY H. RUBIN
Federal Defenders of Eastern Washington & Idaho
601 W. Riverside Avenue
Suite 900
Spokane, WA 99201

For Defendant Mavalwalla:
AINUDDIN AHMED
Ahmed Law Firm
550 Congressional Boulevard
Suite 350
Carmel, IN 46032

MATTHEW F. DUGGAN
Duggan Law Offices PLLC
23505 East Appleway Avenue
Suite 200-175
Greenacres, WA 99019

For Defendant Archer: CARL JOSEPH ORESKOVICH
ANDREW M. WAGLEY
Etter McMahon Lamberson Van Wert & Oreskovich PC
618 West Riverside Avenue
Suite 210
Spokane, WA 99201

Official Court Reporter: Crystal L. Gonzalez, CRR, RPR
United States District Courthouse
P.O. Box 700
Spokane, Washington 99210
(509) 458-3434

Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.

(Whereupon, previous proceedings were held which were not ordered and transcribed.)

(IAN BURNS, called as a witness by the Plaintiff, having first been duly sworn, testified under oath as follows:)

THE COURT: Please be seated.

DIRECT EXAMINATION

BY MS. CARTIER-GIROUX:

Q. Special Agent Burns, please state and spell your first and last name.

A. My name is Ian Burns. I-A-N, B-U-R-N-S.

Q. Where are you employed?

A. I'm a special agent with the Federal Bureau of Investigation.

Q. And in what capacity?

A. I currently act as the Spokane Child Exploitation and Human Trafficking Task Force coordinator. It's a partnership between the FBI, Spokane Police Department, and Spokane County Sheriff's Office. And we primarily investigate the sex trafficking of children and adults as well as other matters pertaining to the sexual exploitation of children.

Q. And your title at the agency, are you a special agent?

A. Yes. I'm a special agent.

Q. To become a special agent, what type of training do you have to have?

A. All special agents must undergo the FBI academy in

Quantico, Virginia. During that training, agents receive basic legal training, training regarding the rules of criminal procedure, tactics training, basically training on how to become a law enforcement officer. Also training on firearms, deadly force policy, a variety of topics.

Q. How long have you been a special agent with the FBI?

A. Just under 12 years now.

Q. Do you have other assignments other than with the FBI?

A. Yes, I do.

Q. What do you do?

A. I'm currently a member of the FBI Seattle SWAT team. I was selected for the SWAT team in 2018. And I'm also certified to teach other agents basic tactics as what they call a practical applications instructor.

Q. Prior to the FBI, were you employed elsewhere?

A. Yes.

Q. What did you do?

A. Prior to my time in the FBI, I served in the United States Marine Corps as a military policeman and military working dog handler, primarily working with explosive detection dogs. After I left active duty, I worked as a Department of Defense contractor as an explosive detection dog-handler providing that support to U.S. coalition forces in Afghanistan.

Q. Are you the lead agent in the investigation into the incident at the HSI facility on Cataldo on June 11, 2025?

A. Yes. I investigated this with Special Agent Hawks, and we both served in varying roles throughout the investigation. But yes, I'm a lead investigator.

Q. What was one of the first things that you did in this investigation in terms of -- I mean, I'm sure you did a lot of different things. But what was one of the first things that you pulled from online or through social media accounts?

A. We pulled a tremendous amount of material from a varying amount of sources. One of the first things that we did was we looked at social media as social media kind of initiated this incident. We also sort -- sought materials from social media as far as images and videos that depicted the incident. We obtained surveillance video, drone footage, body-worn camera footage. Basically anything that we could identify and locate to help us further investigate the incident.

Q. In terms of the number of hours of video, could you give us an estimate of how many hours of video there was for you to watch?

A. It's hard to estimate but certainly in the hundreds, I'd imagine.

Q. Okay. I'm going to have -- was one of the social media posts that you were able to obtain was social media posts on June 11, 2025, from a Benjamin Stuckart?

A. Yes.

Q. Why did you believe that that may be relevant to this

investigation?
A. We believed that that social media post was basically the genesis, the beginning of this incident.
Q. I'm going to have you take a look at Government's Exhibit 76.
What do you recognize as page 2 of Exhibit 76?
A. This is the social media post that I referenced posted by Ben Stuckart on June 11, 2025, at 12:52 p.m. This particular capture was taken from Mr. Stuckart's publicly visible Facebook page.
Q. Okay. And when you said that this was kind of -- was the genesis of what occurred, can you indicate what in the Facebook post made you believe that?
A. Mr. Stuckart essentially put out a call to action to his followers. At the time, Mr. Stuckart appeared to have approximately 5,000 followers, which I believe is the maximum number you can have as a Facebook user. And so after Mr. Stuckart was at the Cataldo building with the other two individuals who were taken into custody, Mr. Stuckart became upset and created this post and asked others to join him at that building.
Q. To do what?
A. To basically go with him to sit in front of the bus.
Q. When -- was the time of that important to you?
A. I did take note that this was at 12:52 p.m.

Q. Okay. During the course of this investigation, did you have the opportunity to seize several phones from individuals in this -- in this -- you believed to be involved in this incident?
A. Yes.
Q. Okay. Was one of the phones that you seized from Archer?
A. Yes.
Q. I'm going to -- was that phone seized pursuant to a federal search warrant?
A. Yes.
Q. When was it seized?
A. July 15, 2025.
Q. Okay. And was the phone searched pursuant to that warrant?
A. Yes.
Q. Did you prepare a PowerPoint with exhibits of what you located on the phone during the search that you believed to be relevant to the investigation?
A. Yes.
Q. I'm going to have you take a look at Exhibit 78, which is that PowerPoint.
What do we see on the -- what do we see on the first page of the PowerPoint?
A. This is a picture of Archer's phone.
Q. Okay. And it has the date of seizure on it, correct, that you put in there, July 15, 2025?
A. That's up top. I -- I do see a different date down below.

That was a different -- that's a -- that's a note made by our digital forensic examiner.
Q. Okay. But was, in fact -- based on your understanding of when it was taken into custody, it was taken into custody on July 15, 2025, correct?
A. Yes. That's correct.
Q. What -- now, from whom was the phone taken?
A. Archer.
Q. Okay. And other than taking it from Archer, was there other indicia on the phone itself that indicated that the phone belonged to Archer?
A. Yes.
Q. Does page -- does slide 3 indicate -- actually -- this is slide 3 -- slide 2, actually -- indicate some indicia of ownership?
A. Yes.
Q. What is that?
A. So the device name is Jac's S20 FE, and there's also a phone number associated with this particular device. And during my review of the information on the cell phone, I found that that particular phone number was also associated with a Signal mobile messaging application that shared the same phone number. And it was also shared with a mobile messaging application called WhatsApp.
Q. How did you connect that?

A. I should add that the Signal application, the associated name with that phone number's account was Jac, and for the WhatsApp account, I believe the associated name was Jac Archer.
Q. On the phone, did you locate any voice memos that further confirmed your identification of the phone to belong to Archer?
A. Yes.
Q. We had testimony very early on in this case that you cannot get Signal from Cellebrite. Being a child exploitation investigator, do you do a lot of investigations involving cellular devices and computers?
A. Yes. The reviews of cellphones as evidence is very common in my work.
Q. Based on your experience and obviously your training, is Signal something that you can obtain from Cellebrite?
A. Yes. Signal is something you can obtain through Cellebrite and it's something that we located as part of this investigation on Archer's phone.
Q. Okay. Now is there an error in the date on this slide?
A. Yes, there is.
Q. What is that error?
A. The error is on the year. It should be June 11, 2025.
Q. And is that throughout several of the slides?
A. Yes. That carries through the following five to six slides.
Q. But the actual -- it appears that there are some text

messages that you've grabbed from the phone.
A. Yes. These are captures that I obtained from Archer's cell phone particularly relating to Signal communications.
Q. And are the dates on the captures correct?
A. Yes.
Q. Dates and times; is that right?
A. Yes.
Q. Okay. So the first thing that you believe of relevance that you located was -- is displayed in slide 3. What is that?
A. This slide represents what I believe was the origin of when Archer learned about the incident at the Cataldo building. There was a Signal group that Archer was a part of called The SCAR Staff and Steering Committee. In that particular group, there was a message sent by Scott Mueller on June 11, 2025, at 1:11 p.m. That was a -- what you're seeing there in the small red box is a thumbnail, a smaller version of an image that was sent to the group. I was able to locate the corresponding full-size image of that thumbnail, and that's the image that you see to the right in the large red box. So that's a screen capture of what Mueller sent to that particular group.
Q. Okay. So this Signal group chat, did you recognize any names in the -- that -- of the -- how many recipients were there in this group?
A. There are nine participants in the group.
Q. Okay. And were you able to see who the participants were?

At least the phone numbers.
A. Yes, and those individuals are on the bottom left-hand side of the screen.
Q. Who, in terms of this incident, did you recognize the names of? Obviously, you said Archer.
A. Yes. The top user is Jac. That's the title of the username. And that number corresponds with the previous number I described. And at the bottom there is a username Justice.
Q. Can you circle that?
A. (Witness complies.)
Q. And did you recognize that phone number?
A. I was not previously aware of that phone number.
Q. After the investigation, do you recognize what that -- who that person is?
A. Yes.
Q. Who is that person?
A. Justice Forral.
Q. Okay. Now, in terms of the correct times of receipt and stuff, you just testified that the Scott Mueller individual sent a text that included the Stuckart call to action to these nine participants and you indicated what time that was sent to the Archer phone. Can you show us on the screen where you get that information from?
A. Yes. (Witness complies.)
Q. Okay. Now, knowing that you had just testified that

Stuckart's post was made at 12:52 p.m., was the time 1:11 consistent with that call-out?
A. Yes. Based on my basic math skills, I'd say it's approximately 19 minutes after Stuckart made that post that it was disseminated to the SCAR Staff and Steering Committee group by Scott Mueller.
Q. And you indicated that this larger red-boxed item, that is the same item that is in the smaller box within this dissemination?
A. Yes. It's the full-size version of that particular thumbnail.
Q. And this larger red box on the side, is that call-out consistent with what you found on the Facebook of Ben Stuckart?
A. Yes.
Q. So it is the same message?
A. Yes.
Q. So when the Archer phone received the Ben Stuckart call-out, what does -- what is sent back, if anything, to the Scott Mueller person?
A. So the first response that I observed to this was Jac responding: "I want to repost on our page. Any objections?"
Q. Now, with how Signal works, when there's a group chat, does everyone in the group chat get to see the responses as far as you know?
A. As far as I know, yes.

Q. Okay. And then when the Jac -- when the Jac person, which is from Archer's phone, indicates "I want to repost on our page. Any objections?" what does Scott Mueller respond?

A. None.

Q. What does the Archer phone then respond back?

A. There's two messages from Archer following that. "Doing it now" and then "I'm there now."

Q. Okay. The "doing it now," what did that mean to you?

A. I interpreted that as Archer saying that they reposted this to their page.

Q. Okay.

A. And by "their" -- I did not look personally, but because this is the SCAR Staff and Steering Committee group, I assume that it's to their group.

Q. Okay. What time was the "doing it now" post response made at -- not post -- response made at?

A. That was at 1:33 p.m.

Q. And you said that there was then a secondary response provided by the Archer phone saying "I'm there now"?

A. Yes.

Q. And when -- what time was that one sent out?

A. 2:04 p.m.

Q. And when you read "I'm there now," what did that -- what did -- what did you believe that meant to be?

A. I believe that meant that Archer had arrived at the

location that Stuckart called everybody out to at 411 West Cataldo Avenue.
Q. Okay. And the time was 2:04, correct?
A. Yes.
Q. And in fact, on that -- on this same phone, did you find some location information that would confirm your belief that Archer was at the Cataldo location?
A. Yes.
Q. And I'm going to move this now to slide 8.
Okay. What do we see in slide 8?
A. Slide 8 is a screen capture from Archer's phone on the right-hand side and then some file data that I captured from Cellebrite on the left side.
Q. When was that screen capture made?
A. 2:00 p.m. on June 11, 2025.
Q. Would that be consistent with what the text was sent to Mueller?
A. Yes. I see this as what appears to be a Google Maps directional instruction and a screen capture of that. And based upon the information displayed on the screen capture, adding two minutes of travel time to 2:01 p.m., that would theoretically put that individual at the Cataldo building at approximately 2:03 p.m., which is very consistent with the previous message.
Q. We're going to go back to the slide 2 -- sorry. 3. After this exchange, were other exchanges or disseminations of the

Stuckart post sent from the Archer phone?
A. Yes.
Q. Through Signal?
A. Yes. I located several instances in which Archer further disseminated Stuckart's Facebook post to different groups that Archer was a part of on Signal.
Q. Now, let's go to slide 4 and 5, then.
This is slide 4. What does slide 4 indicate?
A. This was the next subsequent dissemination of this particular post. This group was called The Calm and Rumor Control and it had 38 participants. And here it's shown that Archer simply sent the screen capture to the group. There was no immediate message with the screen capture. It was just the screen capture itself.
Q. And, again, on this one is the date incorrect in this left-hand corner in terms of the year?
A. Yes. Yes. The next four to five slides have that same error.
Q. Now, of the -- how many participants are in this group?
A. 38.
Q. Okay. And based on your investigation, did you recognize some of the people in this group in some of the video that was captured from the incident?
A. Yes.
Q. Can you tell us at least some of the names that you

recognized?
A. Liz Moore, who I knew to be Elizabeth Moore, who was an individual of investigative interest that we observe frequently and noted during our investigation. Going through the contacts, there was also Angel Tomeo Sam, who was another individual of investigative interest who we observed in different key moments throughout the incident on June 11.
Q. Okay. And if you could explain to us what this stuff is. Like what is that?
A. Those are just the members of that particular group.
Q. Does it show -- on this side, what is this column show?
A. That shows dates and times.
Q. Of what?
A. It appears to be when they received the messages but -- yeah.
Q. Okay. And what was this?
A. That was the thumbnail version of the full-size image that's on the -- inside of the large red square on the right-hand side of the screen.
Q. Okay. So that's the Stuckart post that was disseminated?
A. Yes.
Q. To this group?
A. Yes.
Q. All right. And now we're going to go to page 5 of the slide show.

So what is the significance -- this is the same group, right?

A. Yes.

Q. Okay. And so what in this particular Signal chat did you believe was important to your investigation?

A. Yes, so Archer sent a message at 3:09 p.m. on June 11, 2025, and inside of the message is the text, "There are multiple exits that about 90 to 100 people are struggling to cover. Can use more folks willing to thoughtfully risk arrest."

MS. CARTIER-GIROUX: I think somebody was speaking, so can you read that again?

THE COURT: There's something coming over an intercom. Or over the Zoom meeting?

It was from the overflow room. The microphone was on?

Okay. Okay. We're good. It's just court staff. We're good.

MS. CARTIER-GIROUX: I was, like, is the PowerPoint talking?

THE COURT: While we're on a break, can you call this out? Because I don't even think with my readers I can read that. Can you call it out? Is that possible?

MS. CARTIER-GIROUX: Make it larger?

THE COURT: Yes.

MS. CARTIER-GIROUX: I'm sorry. I don't think we can. It's not that great of a PowerPoint, I guess.

Q. (BY MS. CARTIER-GIROUX) Can you show us on the screen what time this was sent out?

A. Would you like me to circle it?

Q. Yes, please.

A. (Witness complies.)

Q. Thank you. Can you read out loud -- well, can you actually circle -- is where I'm pointing with my green arrow where the message is?

A. Yes.

Q. Okay. And read again, please, the message?

A. "There are multiple exits that about 90 to 100 people are struggling to cover. Can use more folks willing to thoughtfully risk arrest."

Q. "There are multiple exits that about 90 to 100 people are struggling to cover." What about that was of significance to you, that statement from Archer?

A. Statement stood out to me because Archer was coordinating the effort to block the exits to the Cataldo building to prevent the 12 detainees from being removed. This was a call for assistance, basically asking for additional people who were willing to, quote, thoughtfully risk arrest to be able to assist in covering additional areas of the building that there must have been gaps in coverage on.

Q. So you're telling -- so you told me that this went out at 3:09 p.m. on June 11th, correct?

A. Yes.

Q. And the text indicates that there are about 90 to 100 people in this effort currently at 3:09 p.m.?

A. Yes.

Q. Okay. And the statement "thoughtfully risk arrest." What of interest did you have to that? What did that indicate to you in your investigation?

A. When I read that there is an assistance request for people to thoughtfully risk arrest, I interpret that as looking for people that are willing to conduct criminal acts to achieve their goal.

Q. Okay. Now I'm going to the next slide, which is slide 7. Again, is this another group that Archer disseminated the Stuckart post to?

A. Yes. This is approximately one minute after our previous slide. And this dissemination was to the Spokane Police Accountability Group, which had 15 participants.

Q. Okay. And -- so this is being -- these groups are being disseminated this information to all around the same time, correct?

A. Yes.

Q. Okay. And so we're talking like right after 1:00, correct?

A. Yes.

Q. So immediately after Archer receives the post, Archer is disseminating this information?

A. Yes, within minutes.

Q. Okay. And the text that we had seen on the previous slide about blocking the exits, that was just a text that was sent later on to this particular group, correct?

A. Yes.

Q. The one with the 38 participants; is that correct?

A. Yes, that's correct.

Q. In this particular group, were there individuals in the participants that you had noted were also at or captured in video of the incident?

A. Yes. This was a continuation from our previous slide, so the same answer is as we just discussed. So Liz Moore and Angel Tomeo Sam.

Q. And anyone else? Is Justice Forral in this group? Do you see anyone --

A. Justice Forral is part of this group. We have a different slide that makes it easier to see this.

Q. This is not easy to see. Okay. Let's go now to slide --

MR. ORESKOVICH: Just a moment. Could you show us where Liz Moore is on this, please?

Q. (BY MS. CARTIER-GIROUX) Can you circle where you see Liz Moore on this group?

A. (Witness complies.)

MR. ORESKOVICH: Thank you.

MS. CARTIER-GIROUX: Okay.

Q. (BY MS. CARTIER-GIROUX) Now, again, is this another -- this is -- which group is this?

A. This is the Spokane Police Accountability Signal Group.

Q. So is this a different group that is being disseminated this message?

A. Yes.

Q. What time is this sent out to this group?

A. Archer sent the Stuckart screenshot at 1:14 p.m. on June 11, 2025.

Q. And how many participants are in this group?

A. This group has 15 participants.

Q. And when Archer sends out the Stuckart call to this group, does Archer provide a message along with it?

A. Yes.

Q. And what does Archer say?

A. They said, "Those of us who can should."

Q. And do you recognize anyone in the 15 participants who you saw captured in video on the date of the incident?

A. Yes.

Q. Who was that?

A. Forral.

Q. Can you circle that?

A. (Witness complies.)

Q. Were there chat or text messages within this group chat that you found of interest?

A. Yes.

Q. And can you tell me what that is?

MS. GEORGE: I missed that question.

Q. (BY MS. CARTIER-GIROUX) Can you tell me what chat was of interest to you?

A. There's a brief exchange here shortly after the message is sent. After Archer sends the message "Those of us who can should," a user with a name Megra -- I'm not sure if I'm pronouncing that correctly, but Megra responds, "Was this over at 2 when the bus left or an ongoing protest we can still join?" And that message was sent at 2:14 p.m. And then Archer responds, "We ate still here," which I believe is a typo for "We are still here." And that message was sent at 2:26 p.m.

Q. And is there a request after that?

A. Yes. There's an additional message that says "Come on down."

Q. So at this point in time, it's -- this message was sent at 2:26. And based on these messages, where do you believe Archer is at this time?

A. Based on the previous information we discussed, I believe that Archer was at the Cataldo building.

Q. At which location?

A. At the white bus at the Cataldo building.

MR. ORESKOVICH: Just a moment, Judge. Based on -- I'm going to object to the conclusion based upon this message.

MS. CARTIER-GIROUX: Okay.

THE COURT: Sustained.

MS. CARTIER-GIROUX: I can fix that.

Q. (BY MS. CARTIER-GIROUX) So the message from Ben Stuckart indicates to come to what location?

A. To go sit in front of the bus.

Q. At what location?

A. 411 West Cataldo.

Q. At 2:00 p.m., was there any other bus at 4:11 West Cataldo Avenue on June 11, 2025?

A. That's the only bus that I'm aware of.

Q. And what color was that bus?

A. White.

Q. Is that the reason why you believe that at 2:26 when the -- when Archer says, "We are still here, come on down," that Archer is still at the bus?

A. Yes.

MR. ORESKOVICH: Object to the speculation, your Honor.

THE COURT: Overruled.

You may answer.

THE WITNESS: Yes.

MS. CARTIER-GIROUX: Okay.

Q. BY MS. CARTIER-GIROUX) So what do we have on this slide?

A. This is an additional dissemination of the Stuckart

Facebook post to the Signal group BIPOC Advocates Support Group, which included 17 participants.

Q. And what did Archer send to the Signal group chat?

A. This was the same message we saw Archer send to the previous group, which was "Those of us who can should."

Q. Okay. And are there participants in this group that you were able to identify in some of the video of the incident?

A. Yes.

Q. And can you circle their names?

A. (Witness complies.)

Q. And what are their names?

A. Forral and Angel Tomeo Sam.

Q. We've already done slide 8. Let's go to slide 9.

What is slide 9 and why is it of significance to you?

A. This was an exchange between Archer and a username Kate Bitz. And this particular exchange discussed obtaining contact information and dates of birth for individuals to obtain bail.

Q. Okay. And can you read that -- can you tell us what time that was sent, who it was from and who it was sent to?

A. Yes. The first message was sent by Kate Bitz, 4:27 p.m. and it says "Everyone's info -- "

Q. Who is it sent to?

A. This is and exchange between Kate Bitz and Archer.

Q. Thank you.

A. This is not part of a group chat.

Q. Okay. And what is sent to Archer?

A. "Everyone's info is shared out, right? Bail needs full government name and birth date."

Q. Okay. And did Archer respond to that?

A. Yes.

Q. What did Archer respond?

A. At 4:27 p.m., Archer responded, "Emergency contacts have been collected by Cam."

Q. Okay.

A. And then shortly after, "Oh, birth dates. Thank you."

Q. Why was this exchange of significance to you?

A. This was evidence that individuals with Archer were intending to commit criminal acts in order to be arrested.

MR. ORESKOVICH: Objection to the speculation, your Honor.

THE COURT: I will sustain that objection. The jury can interpret the evidence.

Q. (BY MS. CARTIER-GIROUX) Did it appear to you that people were preparing to get arrested?

A. Yes.

Q. Okay. Let's go to the next slide. What do we have here on the next slide?

A. A continuation of the same exchange between Kate Bitz and Archer.

Q. Tell me who's sending what and when and to whom first

before you read it.

A. So Kate Bitz at 4:28 p.m. sends a message that says --

Q. Sends a message to who?

A. To Archer.

Q. Okay. That says what?

A. "Also get them all to turn off biometrics on their phones."

Q. What does Archer respond?

A. At 4:37 p.m., Archer responds, "That announcement was made real early LOL."

Q. Based on your training and experience, what is the purpose of advising people to turn off biometrics?

A. Biometrics are a means in which law enforcement might be able to access a phone with lawful authority to do so. And this, to me, indicated that there was an intent to prevent law enforcement officers from potentially accessing data on a phone.

MR. ORESKOVICH: Objection to speculation.

THE COURT: I will sustain. I think that what we could do is just explain what you found, but it is, of course, for the jury to interpret the evidence and decide what anybody's intent was. So that's just my concern.

MS. CARTIER-GIROUX: Your Honor, I'm just asking him why it was of significance to him to capture this. Biometrics is meaningful to an investigator --

MS. GEORGE: Objection.

THE COURT: I understand that. There was -- it went

further to talk about whether or not there was an intent. And so my instruction is the witness should not talk about what other people's intent is. He can certainly talk about what information is from biometrics and what he's found in the past regarding biometrics.

Q. (BY MS. CARTIER-GIROUX) Biometrics. What's the purpose of biometrics on cellular telephones?

A. It's an easier way to access a device.

Q. Is it also a security means?

A. Yes.

Q. When a phone is seized and there are -- and it's required -- biometrics are required to open the phone, does it make it more difficult for investigators to open that phone?

A. It can, yes.

Q. In your experience as an investigator, have you had individuals purposefully turn off biometrics on their phone?

A. I can't recall a specific instance which I could say that.

Q. Okay. But is it something that you know based on your training and experience?

A. Yes.

Q. It might not have been in your investigations of child exploitation, but you have heard of that in your experience as an investigator?

MR. ORESKOVICH: Object to leading question.

MS. CARTIER-GIROUX: I'm trying to --

THE COURT: Overruled.

Q. (BY MS. CARTIER-GIROUX) You've heard of it in your training and experience that that is a technique used?

A. Yes.

Q. Okay. Let's go to slide 11.

Okay. What do we have on slide 11?

A. This is a continuation of the same exchange between Kate Bitz and Jac Archer.

Q. What do we have here?

A. So these are images --

MR. ORESKOVICH: I can't hear you.

MS. CARTIER-GIROUX: Can you not hear him? Oh. Sorry.

Q. (BY MS. CARTIER-GIROUX) Go ahead. Sorry.

A. These are images that were sent by Archer to Kate Bitz.

Q. When?

A. So the top message was sent at 4:40 p.m., and there's a small thumbnail that's included there and then there's also text that says "Here. Safekeeping."

Q. And what do the images appear to be?

A. I was able to obtain the full-size images associated with those thumbnails, and I found that they were two lists on legal pad that included names, emergency contacts, phone numbers. And then there's a message that's below that that also included a thumbnail image. There was no associated text with that

message. And that was sent at 4:40 p.m. Each color of the thumbnail image, the box outlining that particular image is to the right. So red corresponds with the red box on the right and yellow on the bottom. On the bottom the yellow outlined box says "Bail list" and it includes a number of individuals with their full names and dates of birth.

Q. Now, when you saw these images on Archer's phone, was it consistent or inconsistent with video of Archer at the white bus?

A. Yes.

Q. Explain.

A. There is a drone video that depicted Archer with a notepad.

Q. Doing what?

A. Appearing to write.

Q. What was Archer doing?

A. Going around, appearing to be in a leadership role.

MR. ORESKOVICH: Objection, your Honor. The description could --

THE COURT: I understand. Rather than characterize what kind of role, just describe -- like other witnesses, describe what you saw them doing and the jury can conclude anything from that.

MS. CARTIER-GIROUX: Let's hold off. I'll play the video in a little bit. We'll just hold off.

Q. (BY MS. CARTIER-GIROUX) But it's consistent with the video

that you saw?

A. Yes.

Q. Okay. And what does this capture show?

A. These are the full-size images which are just easier to view than the previous slide.

Q. Okay. What do we have in this slide?

A. This is a capture of a WhatsApp communication between Archer -- excuse me -- Austin Archer and Beverly Roper Archer.

Q. Okay. When does this occur?

A. This occurred on June 11, 2025, at approximately 1:51 p.m.

Q. Okay. And what does it indicate and what is it?

A. So the top message -- would you like me to circle it?

Q. Yes.

A. (Witness complies.) Is the first part of this particular group chat.

Q. When was it sent?

A. June 11, 2025, at 1:51 p.m.

Q. Okay. What is it?

A. So it's a thumbnail image and it includes the text "Heads up."

Q. Okay. And what are the responses? What is it giving a heads-up of? What is that link or image?

A. It corresponds with a full-size image that's in the following slide.

Q. Okay. And what is that? Where is that in the phone -- in

the slide?

A. So this is basically the same thing we saw before but with the thumbnail image in a square red box and then the full-size image to the right in the large square box. And so it's a screen capture that appears to be from a Signal group that says "family chat." And there's a number of messages that appear to be from Archer.

Q. And what messages did you believe was -- were part of your -- part of the -- of value to your investigation?

A. So the first part says, "Hey, fam, I want to go." And it includes a Facebook link.

Q. Okay.

A. And then there's another message below that that says, "This carries the risk of arrest so I do not want to go" -- WO -- "without talking to or at least informing you all."

Q. And then what does it say?

A. There's another message that says, "I'm going. I've turned on my Google location. I'll be at the address in the post. 411 West Cataldo. I have my phone and ID on me. My backpack has been emptied of laptops and only contains a couple of books and such for note-taking. Water and a power bank from SCAR for my phone. The rest of my things are at the SCAR office."

Q. Let's go back. And it appears -- so that is what was sent here, correct?

A. Yes.

Q. Okay. So then what follows that? There's responses from family members, but what else of significance is on this slide?

A. The next message from Archer states, "Just letting you know I got home safe without getting arrested." And that message was sent on June 12, 2025, at 2:08 a.m.

Q. Okay. So what does that -- what information does that give you? So you had a time where you believed Archer had made it to the white bus on Cataldo, correct?

A. Yes.

Q. And what does this give you?

A. It gives us an approximate timeline of the amount of time that Archer spent at the Cataldo building.

Q. During the course of your search of the phone, did you find any voice memos by Archer on Archer's phone that you believed were of significance to this investigation?

A. Yes.

Q. Is the first one found here on slide 15?

A. Yes.

Q. When was that voice memo made?

A. I don't know the exact time the voice memo was made. There is data in the file name that appears to show timing, but I -- I did not confirm that particular time. But based upon the file structure, it appears that it would be approximately 1711, or 5:11 p.m.

Q. And what date?

A. June 11.

Q. Okay. We'll listen to that.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) When you located that voice memo, what of significance did you find in that memo?

A. The significant thing that I found in that particular voice memo was Archer's use of the word "we," because to me it indicated that Archer was working with others to essentially try to block parts of the building.

Q. Okay. And at this point in time, does Archer describe what has happened to the bus?

A. Yes.

Q. Okay. And in Archer's voice memo, does Archer -- and if you can explain it -- make a distinction between the "we" that you just referred to and the person that came and spray-painted?

A. Based upon my review of that message, it indicated that Archer did not know that individual who spray-painted the bus.

Q. Okay. Who is -- what is the "we," according to this voice memo, doing?

MR. ORESKOVICH: Judge, objection. The voice memo speaks for itself.

THE COURT: I do agree, Ms. Cartier-Giroux. The voice memo speaks for itself. And you can certainly address this in summation.

Q. (BY MS. CARTIER-GIROUX) Okay. The information that was in

this voice memo about two other exits, is that correct that there were two other possible exits?

A. Yes. There were two other possible exits.

Q. And based on video that you reviewed, did it appear that there were eyes on exits, meaning people at those exits?

A. Yes. So it varied throughout the day depending on the time, but if this is around that same time, 5:11 p.m., then yes, there would have been individuals on presumably every -- or at least around in the vicinity of the exits of the building.

Q. And based on this memo, is it clear what the objective is?

MR. ORESKOVICH: Objection again, your Honor. The memo --

THE COURT: I think this gets into argument.

MS. CARTIER-GIROUX: That's fine. Okay.

Q. (BY MS. CARTIER-GIROUX) Without saying what it was, did this memo appear to reveal a plan?

MS. GEORGE: Objection.

MS. RUBIN: Objection.

MR. ORESKOVICH: Objection, your Honor.

THE COURT: I think it's the same issue.

MS. CARTIER-GIROUX: That's fine.

Q. (MS. CARTIER-GIROUX.) Let's do the next memo, then.

Was there a second memo on the phone that was of interest? Was there a second memo on the phone that was of interest?

A. Yes.

(Playing Exhibit.)

THE WITNESS: This is not the right one that we're looking for.

MS. CARTIER-GIROUX: This is not the right one? Is it this one?

THE WITNESS: Yes.

MS. CARTIER-GIROUX: Okay.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Wait, is this a continued memo from the last one?

A. Yes. Based upon the file structure, this appears to be sent shortly after the first message and is also consistent with the sounds and noises of the first and second.

(Playing Exhibit.)

MS. CARTIER-GIROUX: So, your Honor, I need -- because of some of the Court's rulings, I need to take a break because I'm concerned about something.

THE COURT: Okay. All right. Let's take an afternoon break. About 10 minutes, is that sufficient, Ms. Cartier-Giroux?

MS. CARTIER-GIROUX: Yes. Thank you.

THE COURT: Ten-minute break. All rise for the jury.

(Jury exits the courtroom.)

MS. CARTIER-GIROUX: Thank you, your Honor. I didn't want to play something that I wasn't 100 percent sure --

THE COURT: I appreciate that.

MR. CARTIER-GIROUX: -- that it was the right number.

THE COURT: I appreciate that very much.

Okay. Is there anything you need to address with me, Ms. Cartier-Giroux?

MS. CARTIER-GIROUX: No, your Honor.

THE COURT: All right. Then we are in recess.

(Court recessed from 3:24 p.m. to 3:34 p.m.)

THE COURT: I want to -- is everyone that needs to be here here? I know people are still filing in.

THE COURTROOM DEPUTY: Yes.

THE COURT: People that are in the gallery, please be seated. I also want to make sure -- this is a very full gallery. There's a lot of evidence that is difficult to hear. Please do not talk during the presentation of evidence. If you are writing things down, do not be disruptive with the way that you're writing things down, particularly if you're seated near the jury. So please be cautious if you are making sounds. You might be asked to leave. We do have an overflow room, so if folks want to watch the proceedings in a way that is -- I'm not -- where there aren't as many concerns about being disruptive, you can certainly go to the overflow room. But there is to be no talking amongst yourselves while you're in the courtroom and any writing needs to be extremely quiet.

All right. We can continue with the direct examination.

Before the parties get in here -- I don't know what the cross-examination will look like. I think we still have a lot of direct examination to go, but as I said before in this case, I'll say again, what's good for the goose is good for the gander, so that means that the defense also should not be asking questions on cross that are interpretive as opposed to just what's there that the jury can listen to themselves.

Okay. Are we ready for the jury?

MS. CARTIER-GIROUX: Yes.

(Jury enters the courtroom.)

THE COURT: You may continue, Ms. Cartier-Giroux.

MS. CARTIER-GIROUX: Thank you, your Honor.

Q. (BY MS. CARTIER-GIROUX) Special Agent Burns, we were listening to some voice memos from Archer's phone. We were speaking about some voice memos from Archer's phone.

Was there a third voice memo that you located on the phone that was of value to your investigation?

A. Yes.

Q. And when was that voice memo recorded?

A. That was from June 12, 2025.

Q. So that would be the day after the incident?

A. Yes.

Q. Okay. I'm going to play that now.

(Playing Exhibit.)

THE COURT: Can we stop it and replay because one of

the jurors -- can we stop it until she gets -- sorry.

MS. CARTIER-GIROUX: Yes. I'm going to replay it.

THE COURT: Could you hear it?

JUROR NO. 6: I could hear a little.

THE COURT: I want you to hear the whole thing, so let's get your battery in.

MS. CARTIER-GIROUX: We good?

JUROR NO. 6: I'm good.

MS. CARTIER-GIROUX: I'm going to restart it, then. I'm sorry.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Special Agent Burns, did you also have an opportunity to examine Forral's phone?

A. Yes.

Q. And when was Forral's phone seized?

A. Forral's phone was seized on June 11, 2025, by the Spokane Police Department.

Q. Okay. And did you subsequently search his phone pursuant to a federal search warrant?

A. A federal search warrant was obtained, and Forral's phone was searched.

Q. What, if anything, was there in terms of data that you could access?

A. Practically nothing.

Q. Do you know why the -- anything about the state of the

phone that made it difficult for you to be able to get any readable data?

MS. GEORGE: Objection.

Q. (BY MS. CARTIER-GIROUX) If you know.

MS. GEORGE: Objection. He hasn't been qualified as an expert. 703.

THE COURT: Okay.

MS. GEORGE: 702.

MS. CARTIER-GIROUX: Your Honor, Cellebrite doesn't require expert notice. I can go through it.

THE COURT: Go ahead. If you know, you may answer the question.

Q. (BY MS. CARTIER-GIROUX) Are you familiar with Cellebrite?

A. Yes.

Q. Are you familiar with what Cellebrite can pull off phones?

A. I'm aware from my training and experience working with Cellebrite that phones can be unpredictable, and the amount of data that law enforcement can obtain from those phones is dependent on the state of that particular phone. There's other factors that go into what kind of data can be received based upon that phone's model, the software that the phone is operating on. And in this instance, I do not know why there was no data that was able to be obtained. I just know that there was no data.

Q. Okay. Did you have an opportunity to review Mavalwalla's

phone?

A. Yes. There was a federal search warrant obtained for Mavalwalla's phone, and there was an examination of the data from that phone.

Q. When was Mavalwalla's phone seized?

A. July 15, 2025.

Q. And when it was searched, was there any information found on it?

A. Yes.

Q. What were you able to read?

A. The most noteworthy information that I observed from Mavalwalla's phone was information from the application Reddit, or it's also a website. There was data on the phone that associated Mavalwalla with a Reddit account, username Itinerant Monkey, and there was exchanges of messages that were captured from Reddit on the device.

Q. Now, in the video that you observed from the incident, did it appear that Mavalwalla was using a cellular device to film?

A. Yes. In various forms of video depicting Mavalwalla that I reviewed, Mavalwalla was depicted holding a cell phone in a manner that was consistent with recording. And during a review of that device, those recordings were not located.

Q. Did you have an opportunity to examine Mr. Stuckart's phone?

A. Mr. Stuckart's phone also was searched via search warrant.

And similar to Forral's phone, there was almost no data that was able to be extracted from that device.

Q. Okay. You indicated earlier in your testimony that you and your co-lead had gathered together and reviewed an enormous amount of information in this case, right? Video reports, body camera, drone footage. Is that right?

A. Yes.

Q. Social media posts?

A. Yes.

Q. How did you break down the incident? Did you -- what methodology did you use in your investigation to make -- try to make sense of what had occurred on June 11, 2025?

A. During our review of evidence, we found that there were a certain number of critical incidents that occurred on June 11 by location, and so we found it easiest to categorize the conduct from that day based upon those particular locations from the incident.

Q. And did you put together a PowerPoint with the various locations or actions that occurred on that day?

A. Yes.

Q. Okay. What were the locations and actions that you divided the incident into?

A. So for this particular PowerPoint, we divided the incidents up chronologically. So the first is -- we call it white bus or the incident surrounding the white GEO Transport bus. The

second was the incident at the south gate. The third was the barricading of that -- well, the secured parking lot that was to the south of the Cataldo building. The next was the incident at the red van and the events kind of surrounding what happened at the red van. And then the last component was -- essentially we call it the south skirmish line, or the incident that happened towards the end of the evening.

Q. Okay. Did you put together a PowerPoint from each of these areas?

A. Yes.

Q. And when you did that, what were you trying to gather in terms of information from each of these designated areas, white bus, south gate, barricading, red van, et cetera?

A. What we wanted to do is we wanted to identify which individuals of interest were at which particular location and what their roles were there and if there was any evidence that they worked together in collaboration, essentially, to facilitate the blockage of the Cataldo building and the parking garage to prevent the 12 detainees from being removed from that site.

Q. And the PowerPoint that you have in front of you, which is Government's -- I think it's exhibit -- I think it's Government's 89.

THE COURT: Do you want it shown to the jury?

MS. CARTIER-GIROUX: Unfortunate that I cannot make it

larger.

THE COURT: Do you want it shown to the jury?

MS. CARTIER-GIROUX: Yes, please. And this is just demonstrative, your Honor.

THE COURT: Okay.

THE WITNESS: And this --

Q. (BY MS. CARTIER-GIROUX) This is very tiny so you're going to have to explain what's on here.

A. Yes. So this is broken out into individual components and following slides. So this is -- this is obviously very hard to look at with our small screens that we have to view these on, so bear with us as we move through the PowerPoint.

But essentially, this is a -- this is a graphic to help better understand the events that day. There's a lot of stuff that happened with a lot of different people at different locations. So for me to organize my thoughts, this was a way to basically depict the critical incidents, approximate location, and who the individuals are that we observed at those particular locations.

Q. Okay. So let's first go to the first slide. Here we go.

Okay. What do we have here on the first slide?

A. So the first component of this is essentially breaking out the dissemination of information regarding Stuckart's Facebook posts to Forral and Archer.

Q. Okay. And this information you derived from what? Where

did this come from?

A. This is from Facebook, from our search warrants of Facebook, as well as from Archer's phone. Just to note as well that next to the Facebook logo, the plus 5K represents that Stuckart had approximately 5,000 followers at that time. And then to the right it goes to the SCAR Staff and Steering Committee Signal group, and the Signal logo to the right with the plus 9 is indicative that that group contained nine recipients.

Q. And the participants that you have here on the lower, those were individuals that received that post?

A. Yes.

Q. Sent to that group? And we already discussed this so we'll move on.

Okay. And what do we have in this slide?

A. Our previous slides were kind of more raw data from Cellebrite. That's a little harder to digest. This is more of a simplified way to relay the same information as was relayed in our previous slides.

Q. Okay. So this is what we just discussed from Archer's phone, which is the dissemination by Archer of the communication that was originally sent to Archer of Stuckart's Facebook posts; is that correct?

A. Yes. And we've included Washington driver's license photos to help visually depict the individuals we were referring to.

Q. And these plus 7s and stuff like that, is that because of -- the plus 9, is that indicating that there's more people in the group?

A. That's correct.

Q. So why are we including these pictures? Where do they come from?

A. The pictures of the individuals in this particular slide come from the Washington Department of Licensing.

Q. That's not my question. My question is: Why did you put their images on this slide?

A. These images were included on this slide because these were all individuals of investigative interest to us that we identified in varying roles and capacities at the five major incidents that we're referring to.

Q. So is it fair to say you pull them out -- you saw them in video at the locations?

A. Yes.

Q. Okay. All right. What do we have here?

A. So this was our slide depicting the first major incident of June 11, which was the white bus.

Q. And when did that begin, approximately?

A. Probably earlier in that day. We're using 2:00 p.m. as a reference because that's when more things started to happen.

Q. Okay.

A. But certainly, you know, we know that the bus arrived

earlier that day. Stuckart's post was approximately 12:52 p.m. asking individuals to join him at the bus. And so the below individuals are individuals of interest to us that we observed in varying roles and capacity at the white bus.

And it is important to note that there were varying times, so not everybody arrived at the same time. For example, we know that Archer and Forral arrived earlier in the day and Mavalwalla arrived later in the day.

Q. Okay. But the pictures here, are these indicate -- pictures of individuals who we know were at the white bus at different times that day?

A. Yes.

Q. Okay. So let's talk about some of these people in this picture. Who is the first picture of?

A. Mavalwalla.

Q. And the second?

A. Archer.

Q. The next?

A. Forral.

Q. And the one after?

A. Stuckart.

Q. And then this person here?

A. That person is Mikki Hatfield.

Q. Okay. And what -- just because this person in the video is wearing something to cover their eyes predominantly, what is

this person wearing in a lot of the video?

A. Hatfield throughout the day is generally depicted wearing large black goggles.

Q. We'll get to that after. And the person after Hatfield?

A. Aaron Lang.

Q. And the person after Lang?

A. Angel Tomeo Sam.

Q. And the last person on this?

A. Liz Archer -- excuse me. Liz Moore.

Q. Okay. All right. So let's talk about the next location. What do we have here?

A. This depicts the incident at the south gate.

Q. Okay. And that begins around what time?

A. Well, the planning phases for this incident occurred a little after 5:00 p.m. The main incident of which we reviewed a significant amount of video was probably closer to about 5:20 p.m. and continued a little bit beyond that.

Q. And who were the individuals that we located being present at the south gate?

A. Mavalwalla, Archer, Forral, Mikki Hatfield. Going down to the bottom row left, Bobbi Lee Silva, Collin Muncey, Angel Tomeo Sam, and Liz Moore.

Q. So between white bus and south gate, what are the differences between the individuals?

So white bus. Who is here that isn't at south gate?

A. Stuckart.

Q. Anyone else?

A. Stuckart, Lang.

Q. Is that it?

A. I believe that's it.

Q. Okay. Who is at south gate that wasn't at white bus?

A. Collin Muncey. And I don't recall if Bobbi Silva was at the bus.

Q. Okay. But you don't have her in the first slide as being there?

A. Correct.

Q. So it's Bobbi Lee Silva and Muncey, correct?

A. Yes.

Q. The rest of the individuals were at some point in time, which we're going to discuss, at white bus; is that right?

A. Yes.

Q. Let's go to the next slide.

5:30 p.m. What does this slide indicate?

A. So shortly after the incident at the south gate, there was a coordinated effort to essentially block the egress or the exit points of that lot. In this case, this is the main vehicle entrance to that particular parking lot.

Q. So we have the south gate and we have the east gate and then we have the man gate, correct?

A. Yes.

Q. And so the barricading, the parking lot block, the barricading occurs at around 5:30, correct?

A. Yes. It begins at approximately 5:30.

MS. GEORGE: Objection. Leading.

THE COURT: Overruled.

Q. (BY MS. CARTIER-GIROUX) Who, based on the video, were you seeing -- I mean, there's others obviously because you have the plus -- but of interest to you in this PowerPoint?

A. Forral, Hatfield, Muncey.

Q. Okay. Red van, what time does that begin, approximately?

A. Approximately 6:30.

Q. Okay. Who do we have at the red van?

A. Forral, Mavalwalla, Stuckart, Hatfield, Talia Ramirez, Angel Tomeo Sam, and Bobbi Silva.

Q. Is Aaron Lang also at the red van?

A. Yes. Aaron Lang is also at the red van.

Q. Okay. And now what do we have in this as your -- as the last location?

A. This was the final significant incident of the night, which was the south skirmish line.

Q. Who do we have there?

A. Mavalwalla and Hatfield.

Q. Okay. So now let's talk specifically about what happened at each location during the relevant timeframe, okay?

So white bus. You already indicated that most of the

beginning of the -- of the activities began around 2:00 p.m. The phone that we just discussed, Archer's phone, establishes that Archer is there a little bit after 2:00; is that correct?

A. Yes.

Q. Okay. So talk to me a little bit about what you see -- and I'm going to first show you Exhibit 77.

And actually, let's do something else first.

What do we see -- you said -- you indicated that Archer was at the white bus around 2:00. What do we see in the video of Archer's activities? And I'm going to have you take a look first at Exhibit 413.

MR. ORESKOVICH: Exhibit what, please?

MS. CARTIER-GIROUX: I'm sorry. 413.

MR. ORESKOVICH: Thank you.

Q. (BY MS. CARTIER-GIROUX) Can you tell me what activities you observed of significance to you in the videos that you captured of the event at the white bus?

A. I see a number of individuals that are blocking the white bus.

Q. Okay.

A. The two -- the individuals that of -- were of interest to me standing up near the bus.

Q. Can you circle them?

A. Yes. Certainly. Standing up near the bus, which I'm circling, Ben Stuckart. Below and to the right is Archer. And

then to Archer's left is Liz Moore.

Q. Okay.

A. And in this particular image, Archer is depicted with a bullhorn.

Q. And did you capture video where Archer was utilizing the bullhorn?

A. The video was captured that depicted a video of this surrounding incident.

Q. Okay. All right. This is 414. What do we see in 414?

A. It's a similar scene where a number of individuals are surrounding the bus. Some are sitting. Some are standing. Individuals that I recognize: Stuckart, Archer, and Hatfield.

Q. Okay. And Hatfield was the one that you were talking about that had what?

A. Hatfield had a pair of large black goggles.

Q. Okay. And based on your observations of the video, did you find other individuals that you described in your PowerPoint? Specifically referring to Exhibit 422. Who do we see now in Exhibit 422?

A. I see Forral outside of their vehicle. I'll circle that.

Q. And was that -- what was that vehicle utilized for?

A. That vehicle blocked the white bus from the front.

Q. And I'm going to have you now take a look at Exhibit 416. What do we have in Exhibit 416?

A. This is Archer with what appears to be a clipboard.

Q. Okay. And I'm going to play for you 10A. Let's just do 10.

MS. CARTIER-GIROUX: I'm going to do 10A. It's just easier.

THE COURT: 10A.

MS. CARTIER-GIROUX: Sorry.

Q. (BY MS. CARTIER-GIROUX) What do we have here?

A. That's Archer holding what appears to be a clipboard or notepad or something like that. Something that one would write on.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) And based on what you found in Archer's phone, did you find this video of significance?

A. Yes. I do recall that there were images from the Signal group that were sent which depicted a notepad which had an emergency contact list from one image and another that included full names and dates of birth on another.

Q. Okay. So at this juncture, the people that we've seen at white bus were whom?

A. At this point, we had Stuckart, Archer, Forral, and Liz Moore.

Q. And what about Hatfield?

A. Hatfield as well.

Q. Okay. Now, did there come a point in time where you -- where you took a look at the south gate?

A. Yes.

Q. Okay. So now let's talk about the south gate. You had indicated that there were individuals that you had recognized at the south gate. I'm going to have you take a look at -- first we're going to take a look at 431. Who do we see at the south gate in 431?

A. Would you like me to circle them as I...

Q. Yes, please.

A. I'll start from left to right and circle them as I speak about them.

Liz Moore, Forral, Hatfield, Mavalwalla, and Silva.

Q. Okay. And now let's take a look at 432.

A. Oh.

Q. Sorry.

A. We can't see the face so I won't say it. Never mind.

Q. I think I know -- okay. Let's look at 432. It's the image further down. Okay.

Now we can see a little bit further to the right. Who else is in this picture?

A. In this picture in which I observed the shirt but didn't want to go too fast here. Collin Muncey, Liz Moore, Forral, Hatfield, Mavalwalla.

Q. And do you see Archer in this picture?

A. It's hard to see, but based on my review of other video, that day, Archer was wearing what I believe was a floral print

shirt. And I see a shirt that appears to be that right there.

Q. Okay. And I'm going to have you now take a look at Exhibit 88. I'm not going to play the whole thing and I'm going to get rid of these circles.

Do you recognize Exhibit 88?

A. Yes.

Q. And why is exhibit -- if it is -- of any relevance to your investigation?

A. This particular video depicts the incident at south gate from a view slightly to the south. And in my review of this video, I was able to hear statements by Mavalwalla that were relevant to the blocking of different points of this facility.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) So can you just circle where you see Mavalwalla in this video?

A. (Witness complies.)

Q. Now, up to this juncture, had you been able to locate Mavalwalla at the white bus in video?

A. Yes. The first observation of Mavalwalla at the white bus was approximately 4:30 p.m.

Q. 4:30 p.m.? And what was happening at that time?

A. At that time, individuals were still up there. The windshield of the bus had been spray-painted and the vehicle had been blocked in by -- or, excuse me, the bus had been blocked in by vehicles to the front and rear, which included Forral's car.

Q. And where is -- are you certain about the time, 4:30? When were the tires deflated?

A. The tires were deflated at approximately 5:45 p.m.

Q. All right. So what time is the first time you see Mavalwalla at the white bus?

MR. AHMED: Asked and answered.

Q. (BY MS. CARTIER-GIROUX) At 4:30? Is that when you see him?

MR. AHMED: Asked and answered.

THE COURT: Overruled.

Are you sure that it's 4:30?

THE WITNESS: I was mistaken in my recollection of that, yes.

Q. (BY MS. CARTIER-GIROUX) So why is this video at Exhibit 88 significant to you? You haven't seen him yet at the white bus in your video. Is there any indication in what he says that indicates that he is aware of what is happening at the white bus?

A. Yes.

Q. Okay. Let's listen to it.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Okay. What did we just hear?

A. I heard Mavalwalla say something to the effect of "Block every exit and keep the white bus" -- or not the white bus, but "keep the bus blocked."

Q. When you heard this video -- and this video was occurring at approximately what time?

A. This is approximately 5:20 to 5:25.

Q. What information did that give you with respect to Mavalwalla's knowledge?

A. Mavalwalla was aware of the white bus.

Q. Being what?

A. Being blocked.

Q. Okay. I want you to take -- I'm not going to play the whole thing, but I want you to take a look. Moving the video to approximately -- so Archer -- does Archer arrive immediately?

A. Archer arrives shortly after.

Q. Okay. And when Archer arrives, what does Archer do?

A. Archer makes a statement about -- and this is not the video that depicts that well.

MR. ORESKOVICH: Objection, your Honor, if we're commenting on a different video other than what we've seen.

THE COURT: Is it a video that's in evidence?

MS. CARTIER-GIROUX: Yes.

THE COURT: Just reference what evidence number it is, and then you can say what the video says.

MS. CARTIER-GIROUX: Exhibit 22.

THE COURT: Okay. What is that video? And you can ask him what that video is.

Q. (BY MS. CARTIER-GIROUX) Okay. Do you know what -- hold

on. It's actually Exhibit 23 at 48 seconds.

Why don't I just play it. It will just be easier.

THE COURT: Okay.

MS. CARTIER-GIROUX: I can do that.

Q. (BY MS. CARTIER-GIROUX) So we're going to go to Exhibit 23. Let's go to -- I don't want to belabor playing videos over and over again, so I'll just start at the 48 second mark. Here we go.

Do you recognize this video?

A. Yes.

Q. Okay.

(Playing Exhibit No. 23.)

Q. (BY MS. CARTIER-GIROUX) Did you see Archer in this video?

A. Yes.

Q. Okay. So based on this video, when Archer arrived, what occurs?

A. Archer comes and makes a statement, something to the effect of "This is what we talked about. If you're willing to risk arrest, link arms."

Q. Now, I want to pull this back a little bit because I want to show you something and see if -- just so you recall this a little later. All right. Who is --

(Playing Exhibit No. 23.)

Q. (BY MS. CARTIER-GIROUX) Does Hatfield have anything in his hand?

A. Yes.

Q. What does Hatfield have in his hand?

A. Hatfield has a musical device inside of a case in his -- or, excuse me, in their hand.

Q. And what kind of case is it? What color is that case?

A. That case is green.

Q. Okay. Let's go back to 88 that we were talking about. So we'll start playing it here.

(Playing Exhibit No. 88.)

Q. (BY MS. CARTIER-GIROUX) So do we hear Archer at this point?

A. Yes. This video is essentially an overlap of the other video but from a different angle.

(Playing Exhibit No. 88.)

Q. (BY MS. CARTIER-GIROUX) What do we see happen?

All right. So who do we have lined up?

A. Lined up closest to the entrance of the southern gate of the secured lot we have Mavalwalla, Archer, and Hatfield.

Q. At this point in time?

A. Yes.

Q. Okay. So I'm going to now have you play -- I'm going to now play for you -- well, actually I'm going to show you a picture, Exhibit 427, also at the south gate. What do we see in 427?

A. This is a capture and an enhanced video darkened and

lightened on this particular part for emphasis that depicts Archer appearing to hand off an item to another individual.

Q. Okay. And so it appears that Archer is aware of other people in the crowd at the back; is that right?

A. Yes.

Q. And can you -- in the video can you see items being handed over?

A. Yes.

Q. Okay. And at this point in time, did you go back and look at what -- what time is this at, approximately? When does the -- when does the south gate end?

A. Between 5:25 and 5:30.

Q. Okay. And at 5:30, what begins to happen?

A. After the agents and officers who were attempting to create an exit for the vehicles to eventually facilitate the extraction of the 12 detained individuals inside of that building failed, they retreated back inside of that secure parking lot and then the gate closed.

Q. After that gate closed, what types of activities do we see occurring?

MS. RUBIN: Your Honor, I'm going to object to cumulative.

THE COURT: I am a little worried that we're almost at 4:30. I want to make sure this witness is done today, including cross-examination. We have seen these --

MS. CARTIER-GIROUX: I don't have a lot left.

THE COURT: Okay. But we've seen a lot of these already, so.

MS. CARTIER-GIROUX: Okay.

Q. (BY MS. CARTIER-GIROUX) What do we see occurring?

A. In this particular still, we see individuals that are carrying items that are eventually placed as barriers and as blocking items to various points around the southern secure vehicle parking lot.

Q. Who do we see? Can you circle people that you recognize?

A. Hatfield, Forral, Muncey.

Q. Okay. Let's go to 430 -- sorry, 438. What do we see?

A. This is Forral carrying either a small table or a bench.

Q. What do we see in 439?

A. There's a few things going on in this particular --

Q. I'm asking at the barricading. Just specifically barricading. Who do you see barricading?

A. Yes. So at two different places here -- I'll start with the bottom right. This is Hatfield placing items along that main door entrance on the north side of the lot and then to the left --

Q. I'm going to pull a picture of the stuff to the left, so hold on.

A. Okay.

Q. What do we see in Government's 440?

MS. RUBIN: Objection, your Honor, cumulative.

MS. CARTIER-GIROUX: We're identifying people that haven't been identified.

THE COURT: We can go through and identify.

Q. (BY MS. CARTIER-GIROUX) Okay. Who is here?

A. Muncey, Forral, and Hatfield.

Q. Okay. Do you see Archer in this picture?

A. Archer is gathered -- or there's a number of people gathered around Archer to the right side there.

Q. So to the left we see the barricading. We see to the right Archer with the people; is that correct?

A. Yes.

Q. Let's go to 442. What do we see in 442?

A. This is an image that depicts items that were barricaded and placed in front of the south gate to prevent vehicles from leaving.

Q. Who do we see in this picture?

A. Muncey, Archer, Silva. This is Liz Moore.

Q. Okay. Now, does there come a point in time where Forral returns back to the white bus?

A. Yes.

Q. Okay. What time is that, approximately?

A. Approximately 6:45 -- excuse me. 5:45.

Q. I'm going to have you look at Exhibit 417. And what's happening in 417 and who do you see?

A. We see Aaron Lang, Forral, and an unidentified individual.

Q. Okay. Now we're going to look at 419. What do we see in 419?

A. This is shortly after that. This is Forral, and this is Aaron Lang.

Q. Okay. Now we are going to look at 421. Do you see someone in 421 that you recognize?

A. Mavalwalla.

Q. Do you see anyone else?

A. Forral.

Q. So did there come a point in time when you saw individuals that we've been discussing at the red van?

A. Yes.

Q. Okay. So let's take a look at Exhibit 458. Who do we see at 458? Do you recognize people?

A. Stuckart, Hatfield, Forral, Lang, which is hard to see because their bicycle helmet is a similar color to the van.

Q. Okay. And let's look at 444. Who do we see in 444?

A. Angel Tomeo Sam, Hatfield, Stuckart, Bobbi Silva.

Q. Okay. And who do we see in Exhibit 470? Sorry. Wrong one. That's the wrong one.

Yes. 470?

THE COURT: Can you clear the screen?

MS. CARTIER-GIROUX: Oh. Excuse me.

Q. (BY MS. CARTIER-GIROUX) Who do we see in 470?

A. Mavalwalla, Bobbi Silva.

Q. And -- okay. Did there come a point in time where you saw, by viewing the video, that objects were taken from the gates, the south gates, the barricaded gates in the south and moved elsewhere?

A. Yes.

Q. What did you observe in the video?

A. In the video I observed individuals removing items that had been used to barricade the south gate and essentially repurposing them by bringing them up towards the red van.

Q. Who did you observe doing that?

A. Forral, Hatfield.

Q. Forral and Hatfield?

A. Yes.

Q. Okay. I also want to show you Exhibit 460. This is again at the red van?

MR. ORESKOVICH: Just a moment. Sorry to interrupt. You referred to a video without an exhibit number. Did I miss something?

MS. CARTIER-GIROUX: It's video that's in evidence, one of the larger videos.

MR. ORESKOVICH: I understand, but what exhibit number is it?

MS. CARTIER-GIROUX: I can get that for you before you cross if you want to.

THE COURT: We're just trying to get through the day. We have to get through this witness today.

Q. (BY MS. CARTIER-GIROUX) And approximately what time was that at?

A. I believe it was approximately 6:45 p.m. or maybe between 6:45 and 6:50 p.m.

Q. All right. South skirmish line. Who did you see at the south skirmish line in the video?

A. Hatfield, Mavalwalla.

Q. Okay. And I'm going to show you Exhibit 66.1. And I'll move this all the way to the end. And who do we see in this video?

A. Hatfield on a bicycle. Mavalwalla.

Q. I'm going to show you Exhibit 471. What do we see in Exhibit 471?

A. This depicts a number of individuals at the south gate later in the evening, kind of closer to the time of the south skirmish line incident.

Q. And was that -- that was later in the day?

A. Yes.

Q. Okay. And I'm going to play you Exhibit 63 -- sorry.

Who is in this picture? Who is in 471?

A. Archer, Muncey.

Q. Do you see anyone else?

A. Liz Moore.

Q. Now I'm going to play you Exhibit 63 very quickly.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) What are we seeing in Exhibit 63?

A. Archer speaking, holding the megaphone.

Q. What is occurring now?

A. This is the time when Spokane Police Department began to deploy munitions.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) And what do we see when that happens in the video?

MR. AHMED: Object, Judge. Cumulative. The video speaks for himself. My client doesn't dispute that he was there.

MS. CARTIER-GIROUX: Objection to the speaking objection.

THE COURT: Okay. No speaking objections. I am just concerned about us getting through this.

MS. CARTIER-GIROUX: That's fine.

THE COURT: Are you going to be done in the next five minutes?

MS. CARTIER-GIROUX: I should be, yes.

THE COURT: Okay.

Q. (BY MS. CARTIER-GIROUX) Did you have an opportunity to look at the -- since we're not going to play video -- the drone video of the items -- the canisters being thrown back at police?

A. Yes.

Q. In Exhibit 61, do you see a canister being thrown back at a police vehicle towards police vehicles?

A. You're not going to show the exhibit?

Q. Apparently I can't right at this second. But did you watch Exhibit 61?

A. I don't know the exhibits by number particularly.

Q. I'm trying to rush. I'm sorry. Exhibit 61.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Do you see during this video -- do you recognize the video?

A. Yes.

Q. During this video, is there canisters thrown back at police vehicles?

A. Yes.

Q. Several of them correct?

A. Yes.

Q. Does one of them strike a police vehicle?

A. I did not see that strike yet in this video, but there is video that depicts a canister striking a --

Q. Is this the video that depicts the canister striking the car?

A. I believe so, yes.

Q. Okay. Let's watch. There we go.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Do you see it hit the car?
A. Yes.
Q. Okay. Were you able to obtain a photograph of the police vehicle that was struck?
A. Yes.
Q. I'll have you take a look at Exhibit 62. Does that fairly and accurately represent the strike to the car?
A. Yes.
Q. Okay. Were you able to view the video of -- actually, 73A. Who is being pointed out in 73A?
(Playing Exhibit.)
A. This video was edited to emphasize Mavalwalla.
Q. (BY MS. CARTIER-GIROUX) What did we see just happen? Did you see what just happened?
A. Would you replay the video, please?
Q. Sure. And I apologize. I'm trying to go quick.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What do we see happening?
A. So right there, it appeared that Mavalwalla kicked one of the smoke canisters.
Q. In what direction?
A. It looked like it was generally towards I believe the -- forward and to the left, which was in the direction of officers.
Q. Okay. Did you have an opportunity during the course of your investigation to obtain Verizon records from Mr. Stuckart?

A. Yes. Verizon records were obtained for Stuckart's cell phone number.

Q. Okay. Can you see -- were there items of interest in the returns from his Verizon phone number?

A. Yes.

MS. RUBIN: Lisa, will you repeat that question? I just couldn't hear.

Q. (BY MS. CARTIER-GIROUX) Were there items of interest in the return to the investigation?

A. The items of interest from this particular return are who Stuckart was speaking to, the times that Stuckart was speaking to those individuals, and then the duration of those calls.

Q. Okay. And why -- what about did you learn during the investigation that made these relevant to your investigation? What information did the officers advise you that they had heard the protesters say during -- during their interactions with them?

A. There was a statement made that "This is Washington, the police aren't coming to help you."

Q. Okay. And was there also information from the officers that there was a significant delay in the arrival of local law enforcement?

A. Yes.

Q. And what do we see during the timeframe, the relevant timeframe, according to this exhibit, Government 75?

A. So the initiation of this particular record is approximately 1448, or 2:48 p.m. That occurs basically after 2:30, which is the approximate time that the windshield of the white bus was spray-painted and that the bus was eventually blocked by Forral's vehicle at approximately 2:31 p.m.

Q. Can you circle that?

A. (Witness complies.)

Q. Okay. So that is a -- first, is it an outgoing or ingoing?

A. It's a message it appears.

Q. From whom to whom? From Stuckart? Or it's a message between Stuckart and Brown, correct?

MS. RUBIN: Objection. Leading.

THE COURT: Overruled. Go ahead. We have seen this already, so just go ahead with what you need to get from this witness.

THE WITNESS: I don't have Stuckart's phone number memorized, so.

Q. (BY MS. CARTIER-GIROUX) This is Stuckart's phone records, correct? Verizon phone records?

A. Yes.

Q. Okay. So it appears that there's communication between Stuckart and Lisa Brown. Who is Lisa Brown?

A. Lisa Brown is the mayor of Spokane.

Q. So does this Government 75 show interactions between Stuckart on June 11th between 2:48 p.m. to approximately, what,

4:30 p.m.?

A. Yes.

Q. Okay. Did local law enforcement respond before 4:30 p.m.?

A. No.

Q. Okay. Subsequent to that, is there interaction between Ben Stuckart and another individual at approximately 4:34 p.m.?

A. Yes.

Q. And who is that person?

A. That interaction is between Stuckart and Nick Brown.

Q. Why would interaction between Stuckart and Lisa Brown be relevant to your -- to your investigation with regard to the arrival of local law enforcement, specifically SPD?

A. My understanding of the structure of Spokane City's leadership is that the Spokane Police Department's chief, Kevin Hall, reports to the mayor, Lisa Brown.

Q. You identified a variety of individuals in the stills that we have of the videos. You identified that people that you -- the three individuals who you saw in those videos was Mavalwalla, Forral, and Archer. Do you see Mavalwalla in the courtroom this afternoon?

A. Yes.

Q. Can you identify an article of their clothing?

MS. RUBIN: Objection, your Honor.

THE WITNESS: I need to move around because this is not a...

MS. CARTIER-GIROUX: They can stipulate that the people he's referring to are them, but I have to prove identity.

THE COURT: Okay. Do the defendants? No?

Okay. Point them out.

Q. (BY MS. CARTIER-GIROUX) Okay. Can you point out the individual who you are identifying as Mavalwalla in the videos and stills?

A. Yes.

Q. Can you identify --

MR. AHMED: We stipulate.

MS. CARTIER-GIROUX: Okay.

Q. (BY MS. CARTIER-GIROUX) What about Forral?

A. Yes.

Q. Okay. What -- can you identify an article of clothing that they are wearing?

MS. GEORGE: Justice Forral is sitting between his two attorneys.

MS. CARTIER-GIROUX: Okay. I guess it's kind of a stipulation. I'd ask that the record reflect.

THE COURT: Okay. The record reflects that Justice Forral has been identified.

Q. (BY MS. CARTIER-GIROUX) What about Archer? Can you --

A. Yes.

Q. Can you identify an article of clothing they are wearing?

A. Yes. Archer is wearing a checkered shirt.

MS. CARTIER-GIROUX: Ask that the record reflect that that is Archer.

THE COURT: The record reflects Archer has been identified.

MS. CARTIER-GIROUX: I have no other questions. Thank you. I appreciate your patience.

THE COURT: I appreciate you trying to go fast, Ms. Cartier-Giroux.

MR. AHMED: Your Honor, can we get two minutes?

THE COURT: Two minutes. You're done at 5:30.

MR. ORESKOVICH: Say again.

THE COURT: Cross-examination lasts -- well, we're done at 5:30, I should say. There might be redirect.

MR. ORESKOVICH: One moment, your Honor.

This witness -- sorry. This witness testified to a video that shows the repositioning of items.

THE COURT: I can't -- can you come forward?

MR. ORESKOVICH: Okay.

THE COURT: Are you wanting to make an argument?

MR. ORESKOVICH: No. I'm trying to find out --

THE COURT: Oh, the identification of that video. You need to get that from counsel.

Can you get Mr. Oreskovich the exhibit number of that video?

MS. CARTIER-GIROUX: Yes.

MS. PEREZ: I have to get it.

THE COURT: Meanwhile --

MS. CARTIER-GIROUX: I have to get the number. I apologize.

THE COURT: Okay. Are you ready?

MR. AHMED: I'm ready.

THE COURT: All right. Mr. Ahmed.

CROSS-EXAMINATION

BY MR. AHMED:

Q. Good afternoon, Agent Burns.

A. Good afternoon.

Q. Agent Burns, I'm going to kind of work backwards based on the direct examination.

A. Understood.

Q. Just give me a second to get there.

Agent Burns, let me ask you: In terms of the post by Mr. Stuckart, was that ever on Reddit, to your knowledge?

A. I'm not aware.

Q. Do you know if individuals -- well, where was it posted directly?

A. Facebook.

Q. Facebook. Okay. To your knowledge, was that post ever forwarded to other people?

A. Yes.

MR. AHMED: Okay. And if we could go to Exhibit 389,

please. If we could go to the 2:00 p.m. slide. I'll tell you when to stop. Keep going. Keep going. Oh, go back. I'm sorry. There was a -- there. That's it. Okay.

Q. (BY MR. AHMED) Now, you have a -- it's a notation there, "2:00 p.m. white bus," and Mr. Mavalwalla's photograph is there. Correct?

A. Yes.

Q. So I think on direct examination you indicated that does not mean he was at the white bus at 2:00 p.m.

A. That's correct. He was not there at 2:00 p.m.

Q. So Mr. Mavalwalla at some time during the day was at the -- near the white bus, correct?

A. Yes.

Q. And he was not identified as the person flattening the tire at the white bus, correct?

A. That's correct. He was not.

Q. From my understanding, and we saw a photograph of it, he was standing next to a tree to the left of that red car depicted, correct?

A. Yes.

Q. Okay. And that was sometime after 4:30? I think you said 5:30.

A. Yes. Closer to approximately 5:45.

Q. So the significance of this slide is -- I mean, you've got him kind of in a -- you know, in a group shot there kind of, but

the significance of the slide is that at some point in time, Mr. Mavalwalla was near the white bus, correct?

A. Yes.

MR. AHMED: Can we see the next slide?

Q. (BY MR. AHMED) And significance of the time, 5:00 p.m. at the south gate, okay, was -- are you saying that he was at the south gate at 5:00 p.m.?

A. No.

Q. Okay. So you're just saying at some point in time -- and I don't think there's any dispute -- he's at the south gate, correct?

A. Yes. The purpose of these slides was to give a general timeframe of the conduct that occurred at the respective locations.

Q. Okay. Agent Burns, you've examined his phone, correct?

A. Yes.

Q. Okay. Did you find any evidence in his phone that he knew anybody at the protest prior to coming to the protest?

A. No.

Q. Okay. That's a "no," correct?

A. Correct.

Q. Okay. And at the beginning of your testimony, you talked about, "Well, I downloaded some texts," but you didn't go into those texts.

Let me ask you: Was that text -- were those texts

concerning the protest?

A. Are you referring to my previous testimony about Reddit messages from username Itinerant Monkey?

Q. Exactly.

A. Yes.

Q. And that was post protest, right, with a Mr. Hutchins, correct?

A. Yes.

Q. And without going into the contents of -- and you actually downloaded those texts, correct? As part of the Cellebrite report, those texts were downloaded?

A. I wouldn't use that terminology, but yes, those messages were reviewed as part of the search of that phone, yes.

Q. And it certainly didn't involve -- and I don't want to get into legal terms here, but you certainly have used the term "conspiracy" and "warrant" and so on like that, and I imagine you've had some training, but it certainly didn't involve some sort of plan to go to this protest and commit violence or anything like that, correct?

A. In the messages, Mavalwalla discussed wounds from being shot by PepperBall, some type of other projectile, and being sprayed with OC spray.

Q. Okay. But getting back to my question -- that's not in dispute. But getting back to my question, did any of the texts involve any sort of conspiracy to commit like an act of

vandalism or --

MS. CARTIER-GIROUX: Objection to the use of "conspiracy."

THE COURT: Use a nonlegal term. Use a nonlegal term.

Q. (BY MR. AHMED) Well, let me ask you this Agent Burns: Did you use the term "conspiracy" in affidavits before?

MS. CARTIER-GIROUX: Objection.

THE COURT: Sustained. Do not open the door to this, Mr. Ahmed.

Q. (BY MR. AHMED) But this was all post-protest, correct?

A. Yes.

Q. Okay.

A. You're asking a nuanced question.

Q. Let me ask you this: Are you going to present those texts, do you know, as part of the evidence? Do you know? If you know.

THE COURT: Mr. Ahmed, this witness does not present evidence so.

MR. AHMED: Okay.

Q. (BY MR. AHMED) All right. He had a Samsung Galaxy, correct --

A. Yes.

Q. -- Mr. Mavalwalla? Okay.

And you indicated that he used Signal and that Cellebrite cannot get into Signal. Is that your testimony or can it get

into Signal?

A. That is not at all my testimony.

Q. Tell me. It can get into Signal, correct?

A. What can get into Signal?

Q. Okay. But that's only if it's open, correct? Well, like if you have, like, biometrics for the phone, correct?

A. Mr. Ahmed, I'm not sure what you're asking me.

Q. Okay. Are there times that Cellebrite cannot get into Signal, if you know?

A. I can't speak to Signal specifically. What I can say is that based on my training and experience, each phone is unique, and every time somebody goes to get a digital forensic extraction of that phone, it is unique to that particular phone. It's unique to the software that's on that phone, and it's unique to the state of, essentially, unlock for that particular phone. So there's a variety of reasons why data may or may not be present. And I cannot speak to why there is or is not data present on Mavalwalla's phone.

Q. Okay. So you don't know.

A. I do not know.

MR. AHMED: If we can go to Exhibit 417.

Q. (BY MR. AHMED) Let me ask you this: In terms of Mavalwalla's phone, you seized it during the search warrant, correct?

A. Yes. I believe that Mavalwalla's phone was seized from his

person.

Q. On July 15th, correct?

A. Yes.

Q. And those warrants were sealed, correct?

A. Yes.

Q. Meaning he wouldn't have had access to those warrants before you executed them?

A. I don't know that for certain.

MR. AHMED: Okay. All right. If we could go to 417, please.

Q. (BY MR. AHMED) Now, this is a video, correct?

A. This is a still.

Q. Still shot, I'm sorry. And Mavalwalla is over on the other side of the red vehicle by the trees, correct?

A. Yes.

MR. AHMED: Okay. And if we could go to 421.

Q. (BY MR. AHMED) And you see Mavalwalla over there on the other side of the tree, correct?

A. Yes.

MR. AHMED: All right. And if we could go to 76, please. Oh, excuse me. That's the wrong exhibit. Apologize. Can we go to 88?

Q. (BY MR. AHMED) Now, this is the video -- before we start it, Agent Burns, you said that you heard Mr. Mavalwalla say "block" -- and I may not be verbatim -- but "block every exit"

and something about the bus. You tell me?

A. Yes.

Q. Correct?

A. Yes.

Q. Okay. I'm going to play the video, but I'm going to ask you afterwards if you hear two distinct voices, one saying "Block every exit" and another voice saying something about the bus. Let's play it.

(Playing Exhibit.)

MR. AHMED: Stop it.

Q. (BY MR. AHMED) Did you hear -- is it that that you heard?

A. Yes.

Q. Okay. Can we go back about 10 seconds? So you're saying Mr. Mavalwalla said both statements, correct?

A. Yes.

Q. Okay.

(Playing Exhibit.)

Q. (BY MR. AHMED) Okay. You hear Mr. Mavalwalla say "Block the bus"? You say you heard Mr. Mavalwalla say that.

A. So you're kind of clipping the video from the full -- the full thing, which is important to view. So in some parts in the early part of the video, you can watch Mavalwalla's mouth move in sync with the speech. And then in this particular part and when he -- when Mavalwalla goes into speaking about the white bus, I have to demonstrate using my arm, so I'm going to do the

best that I can to articulate the movements of my arm.

As Mavalwalla is speaking, if you watch Mavalwalla's arm, Mavalwalla's arm moves in sync with the speech, kind of like a fist kind of moving the arm back and forth. So if you play that same video from beginning to end, that same clip, you will see that Mavalwalla is consistently moving in sync with his speech with his hand gestures.

Q. And your understanding is -- when you say he knew what was happening at the bus, are you talking about flattening the tire or what are you talking about? Or it's blocked?

A. The general effort to block the white bus.

MR. AHMED: Okay. Can we play 23.1, please?

Q. (BY MR. AHMED) Let me ask you. Do you hear it again on 23.1? Let's listen.

MS. CARTIER-GIROUX: 23.

MR. AHMED: 23. Sorry.

(Playing Exhibit.)

Q. (BY MR. AHMED) Okay. Stop right there.

So do you hear the two expressions we talked about, "Block the exit" and "Block the bus"? And you're saying both of those expressions, based on arm movements, came from Mr. Mavalwalla?

A. Yes. So based on the previous video, yes. I share that belief. And in watching this video, I do agree that there's a slight shift, but it's likely that there's a movement somehow. This is a cell phone recording so it's not a high quality or

audio capture like a professional device. So it's very possible that if Mavalwalla just moved his head slightly, it might sound slightly different. But to me, I hear the same voice.

Q. Okay. And I'm going to ask you a follow-up question. If we could just go back eight seconds. I'm going ask you one more follow-up after we hear it one more time.

(Playing Exhibit.)

Q. (BY MR. AHMED) Okay. So you're saying it was a voice inflection? That's your opinion, that the pitch changed? Is that your opinion?

A. No, that's not what I said.

Q. Okay. What did you say?

A. I said that it was likely having to do with the recording because this is coming from a cell phone video that's to the far right. Mavalwalla turned his head, and perhaps it might sound slightly different. But to me, I hear the same voice. That's my opinion.

Q. Okay. Understand. But you're not a voice expert, correct?

A. I am not a voice expert.

MR. AHMED: Can we go to 89 again? I'm almost done, Judge. I'm trying to be as quick as I can.

THE COURT: I know. I appreciate it.

MR. AHMED: But he said a lot about my client, so I want to get to it.

And if you could keep going. Keep going, please. Keep

going until the phone tree we see. You had a phone tree in here. I'm just going to get to that. Keep -- is that it right there? Oh, okay. All right.

Q. (BY MR. AHMED) In terms of Justice Forral, did you see any phone contacts between Justice Forral and my client prior to the protest or even afterwards?

A. No. As I previously testified, we were not able to obtain any useful data from Forral's phone.

Q. Okay. And what about Jac Archer? I mean, did you see any contacts prior to the protest between Jac Archer and my client? Did you see any contacts?

A. No.

Q. And, in fact, did you see any contact -- were you able to access his contact list on his phone?

A. I don't recall that being accessed.

Q. Okay. Did you see any evidence of anybody that you saw at the protest that you've identified in these photographs, any contacts with those people -- and I know there was a Liz Moore and there was many other people -- with my client prior to the protest?

A. No.

Q. How about after the protest?

A. No, not that I'm aware of.

Q. In fact, other than that one contact with somebody at the protest that he met, were there any other contacts with people

at the protest?

A. No.

Q. To your knowledge, was he arrested at the protest?

A. Mavalwalla was not arrested at the protest.

Q. In fact, I mean, you were able to find him based on some face technology, correct?

A. Yes.

Q. Okay. And the first time you had contact with him was when he was arrested during the search warrant, correct?

A. Yes.

Q. And he was completely cooperative during the search warrant?

A. Yes.

Q. Okay. In fact, you didn't even have to search the house. You said, "This is what we're looking for. Turn it over." And him and his girlfriend turned it over, correct, including his phone?

A. I was not present but that's my understanding.

MR. AHMED: Judge, I think I'm almost done. Let me just double-check with my cocounsel.

THE COURT: Okay.

Q. (BY MR. AHMED) Just one more question, sir. Was there any evidence that he talked to anybody during the protest that you found on his phone during the protest?

A. Not that I'm aware of.

MR. AHMED: All right. Nothing else. Thank you, Judge.

THE COURT: Okay. Further cross-examination.

MR. ORESKOVICH: Your Honor, Government counsel and I have agreed to a stipulation that the video that the agent was referring to, that identified video is...

MS. PEREZ: Your Honor, there's a long name to it. It will be submitted as Exhibit 90. And Mr. Oreskovich and I have stipulated to everything for it.

THE COURT: Okay. Do you want to play 90?

MR. ORESKOVICH: What's that, your Honor?

THE COURT: Do you want to play 90? No. Okay.

MR. ORESKOVICH: I don't want to question, Judge. I just want that record.

THE COURT: Okay. Great. Exhibit 90 is the exhibit.

MS. RUBIN: We have no questions.

THE COURT: No questions. Any redirect?

MS. CARTIER-GIROUX: No, your Honor. Thank you.

THE COURT: I realize I've rushed people. I just want to make absolutely sure that we're done with this witness?

MS. CARTIER-GIROUX: Yes. Yes.

THE COURT: Okay. You are excused.

Does the Government have any further evidence it wishes to produce or present?

MS. PEREZ: The United States rests.

(WHEREUPON, further proceedings were held which were not ordered and transcribed.)

* * * * *

WITNESS INDEX


| For the Plaintiff | Page |
|---|---|
| **IAN BURNS** | |
| DIRECT EXAMINATION BY MS. CARTIER-GIROUX | 3 |
| CROSS-EXAMINATION BY MR. AHMED | 73 |


* * * * *

EXHIBIT INDEX


| No. | Description | Page |
|---|---|---|
| None | | |

C E R T I F I C A T E

I, CRYSTAL L. GONZALEZ, do hereby certify:

That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Spokane, Washington;

That the foregoing proceedings were taken on the date and place as shown on the first page hereto; and

That the foregoing proceedings are a full, true, and accurate transcription of the requested proceedings, duly transcribed by me or under my direction.

I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings;

DATED this 18th day of June, 2026.

CRYSTAL L. GONZALEZ, CRR, RPR
Washington CCR No. 2955
Official Court Reporter
Spokane, Washington