# Exhibit E.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:25-cr-00113-RLP |
| | ) | |
| Plaintiff, | ) | May 21, 2026 |
| | ) | Spokane, Washington |
| vs. | ) | |
| | ) | Excerpt of Jury Trial - Day 4 |
| JUSTICE FORRAL (2), | ) | |
| BAJUN MAVALWALLA (8), | ) | **Testimony of John LaForte** |
| and JAC ARCHER (9), | ) | |
| | ) | Pages 1 - 100 |
| Defendants. | ) | |

BEFORE THE HONORABLE REBECCA PENNELL
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | LISA C. CARTIER-GIROUX<br>REBECCA R. PEREZ<br>U.S. Attorney's Office<br>920 W. Riverside Avenue<br>Suite 340<br>P.O. Box 1494<br>Spokane, WA 99201 |
| For Defendant Forral: | ANDREA K. GEORGE<br>AMY H. RUBIN<br>Federal Defenders of Eastern Washington & Idaho<br>601 W. Riverside Avenue<br>Suite 900<br>Spokane, WA 99201 |
| For Defendant Mavalwalla: | AINUDDIN AHMED<br>Ahmed Law Firm<br>550 Congressional Boulevard<br>Suite 350<br>Carmel, IN 46032 |
| | MATTHEW F. DUGGAN<br>Duggan Law Offices PLLC<br>23505 East Appleway Avenue<br>Suite 200-175<br>Greenacres, WA 99019 |

For Defendant Archer: CARL JOSEPH ORESKOVICH
ANDREW M. WAGLEY
Etter McMahon Lamberson Van Wert & Oreskovich PC
618 West Riverside Avenue
Suite 210
Spokane, WA 99201

Official Court Reporter: Crystal L. Gonzalez, CRR, RPR
United States District Courthouse
P.O. Box 700
Spokane, Washington 99210
(509) 458-3434

Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.

(WHEREUPON, previous proceedings were held which were not ordered and transcribed.)

(JOHN LAFORTE, called as a witness by the Plaintiff, having first been duly sworn, testified under oath as follows:)

THE COURT: Please be seated.

DIRECT EXAMINATION

BY MS. PEREZ:

Q. Would you please state your full name, spell your last name?

A. John LaForte, L-A-F-O-R-T-E.

Q. How are you employed?

A. I am employed by HSI.

Q. What do you do with HSI? What's your assignment?

A. I'm the -- currently the attache in Bucharest, Romania.

Q. What does that mean? What do you do as an attache in Romania?

A. So I cover a region in Eastern Europe. And we basically facilitate the domestic cases. So whenever anything touches on one of my countries, we facilitate with the local government those investigations and then vice versa.

Q. Back in June of 2025, early June of 2025, what was your assignment with HSI at that point?

A. I was the Assistant Special Agent in charge of Spokane covering Eastern Washington and Idaho.

Q. Eastern Washington and what?

A. Idaho.
Q. And Idaho. Okay. And what is Assistant Special Agent in charge? What does that mean?
A. So I covered the offices in Eastern Washington and Idaho, six offices, all the agents the admin staff, and oversaw the investigations.
Q. How long have you been an HSI agent?
A. Since 2004, so 22 years.
Q. June 11, 2025, where were you working that day?
A. I was in the Spokane office.
Q. The HSI building on Cataldo; is that right?
A. Yes.
Q. And was that your last day in the office?
A. That was my last day in the office.
Q. What was going to happen next for you?
A. I was flying out and going overseas.
Q. To take this Romania spot; is that right?
A. Yes.
Q. Since it was your last day in the office on June 11, 2025, what did you do that day with respect to kind of responsibilities, equipment, and that sort of thing?
A. So really it was just going to be kind of a last day cleaning things up. I had to turn in my vest. I had to turn in my gun because you're not allowed to carry overseas. And so that was basically the plan for the day.

Q. Turn in the vest? What's a vest? What do you mean?
A. My armor. My body armor, bulletproof vest.
Q. So what -- around what time did you arrive to the building that day?
A. Around 9:30, 10:00.
Q. And so kind of morning -- fast-forward. Morning responsibilities, nothing notable; is that true?
A. No. I basically cleaned everything up, so it was literally just waiting for our firearms agent to come from Yakima to pick everything up for me.
Q. Okay. And so early afternoon or so, did you begin to notice something going on on the north side of this facility?
A. Yes. So our mission support specialist --
Q. So what did you notice?
A. What did I notice?
Q. Yeah.
A. Once I was sort of alerted to that there were people up front, I went to our lunchroom and looked outside, and I noticed that there were some people gathering near the bus.
Q. Around what time was that?
A. I think around noon.
Q. What did you do, if anything, based on that?
A. So monitored the situation. And then after a little bit, I made a call to Eastern District to see --
Q. Okay. So we're just talking about what you were seeing.

A. What I was seeing.
Q. Yes.
A. Yeah. Just people that were up around the bus, and then eventually, some people started sitting in front of the bus.
Q. Okay. And so did that cause you any concern?
A. Yeah, because --
Q. Why?
A. Because they were going to -- it looked like they were starting to block the bus and prevent us from basically doing our job.
Q. And so based on, then, what you were seeing with the bus, did you go outside?
A. I did. Yeah. Me and -- I can't recall who, but another officer or agent went outside to talk to the protesters, and we basically told them, listen, we have a job to do. We need the area cleared from this door to the bus. You're free to protest if you want, you know, away from the bus, but you have to give us space to operate. And most everyone there agreed except that there were two or three people that were sitting in front of the bus. They wouldn't leave.
And I actually started walking back, and then I was, like, you know, I kind of want to make sure audibly they understood what I was saying. So I went back and I said, "Are you guys going to leave?" And they said, "No." And I said, "When will you leave?" And they said, "Oh, well, when you come out, we'll

leave." And I said, "You're not going to leave now, though?" "No, we're not leaving right now." And so then we went inside.
Q. Did they -- so just kind of the collective of people that were out front there that you were seeing and speaking to, did they physically resist you at that point?
A. No.
Q. Okay. Was there any physical contact or anything at that point?
A. No.
Q. Were you yelling at these people?
A. No.
Q. Were they yelling at you?
A. Not at that point, not at the beginning.
Q. Did they indicate any sort of inclination to move out of the way of the bus?
A. No.
MR. ORESKOVICH: Just a moment, your Honor. I object to the hearsay, number one. And it would be helpful if we knew who, if they know who these persons are.
THE COURT: You can clarify if they know. I don't think it's offered for -- I think it's offered for a state of mind, so I'm going to overrule the hearsay objection.
Q. (BY MS. PEREZ) So I --
THE COURT: I think the question was: Do you know who said something?

Q. (BY MS. PEREZ) Okay. Do you know who said something?
A. Do I know who said something?
Q. I think my question was: Did they indicate an inclination to leave?
A. No.
Q. Okay. So based on that, what did you do?
A. We went back inside. I called Eastern District.
Q. Okay. So we're not talking -- let's just talk about kind of the things going on outside. Okay?
A. Yeah.
Q. Well, actually, did you call any law enforcement for assistance?
A. We called Spokane PD.
Q. Okay. And at that time, did Spokane PD respond?
A. They did not send a response. I mean, I got ahold of somebody, but they did not respond at that time.
Q. So --
MS. GEORGE: Could you repeat your answer? I didn't hear it.
THE WITNESS: I called SPD, but they did not respond at that time.
MS. GEORGE: Thank you.
Q. (BY MS. PEREZ) As time went on, as the afternoon progresses, did you see any change in what was going on in front of your building?

A. Yes. So it went from no one sitting in front of the bus. Then it went to a few people sitting in front of the bus. And then we went out there to talk to them. And then more and more people started arriving and protesting sort of in that front area sitting in front of the bus. Fast-forward, eventually, somebody spray-painted the window of the bus. And it just -- the protest and the pushback increased throughout the day.
Q. Okay.
A. Basically taking the bus out of commission.
Q. Okay. So let's talk about that. What were the things that you saw going on that took this bus out of commission?
A. So I didn't witness it, but I was told that somebody --
MS. GEORGE: Objection. Hearsay.
THE COURT: Sustained.
Q. (BY MS. PEREZ) Okay. So why --
A. I saw the aftermath of what happened.
Q. Okay. You saw the aftermath of something?
A. Yes.
Q. What were you -- what did you see that took this bus out of commission?
A. So somebody had ridden by, spray-painted white spray paint across the front of the bus.
Q. Okay. And --
A. And then I physically saw somebody who I didn't know but somebody leaning down by the tires of the bus, seemingly either

slashing them or taking the air out of the tires.

Q. Could you tell exactly what that person was doing by the kind of the lower portion of the bus?

A. I could tell when they were on the backside they were kneeled down. They were, you know, sort of at the wheel base of the -- of where the air would be. And someone was sort of looking down at them. So I assumed that they were probably letting air out. And then later on, we saw that there was air out of the tires so that I put two and two together.

Q. So to clarify, Special Agent LaForte, are you looking outside from the north side of the facility? Is that right?

A. Yes.

Q. So can you see the driver side of the bus?

A. Not the driver side. I can see from up top around, but I couldn't see like -- obviously, I couldn't see the door.

Q. What tire was this person kneeling by?

A. The front driver side tire.

Q. Could you see the front driver side tire?

A. No, I couldn't see the tire.

Q. Okay. So how are you -- I just want to clarify exactly what you kind of -- you're able to see and interpret here.

A. I could see from the vantage point, because we were the second story, so we could see sort of up. So I could see around the front, but I couldn't see the actual tire. But you could see that somebody was kneeling in the front, so then their butt

and back and, you know, their head bobbing up and down. I could see them at the driver side tire.

Q. Did that cause -- like what did that -- how did that affect you going forward?

A. Well, if they had been taking the air out of the tire, then the bus -- I mean, the bus was already pretty much inoperable because the -- because of the spray paint on the windshield. I thought perhaps maybe we could try to scrape that off or something and still be able to do something with the bus, but -- or that GEO could do something with the bus. But then people started crawling underneath it. And at that point, it was -- we don't know what they were doing to the bus so we -- it was inoperable. Plus there were two cars that were pinning it in.

Q. Okay. So the crawling underneath the bus, tell me what you were seeing as far as that.

A. You could see someone was crawling around underneath the bus. I couldn't see exactly what they were doing, but they were under sort of what the cab of the bus would be, and there's brake lines that are under there. There's oil. I mean, who knows what they were doing.

Q. Then you talked about people -- cars parked in relation to the bus. Tell me about that. How did that impact your ability to use this bus?

A. So someone at some point, there was -- I believe it was a red car had pulled up right in front of the front bumper

probably about six to eight inches from the front bumper. And then someone shortly thereafter parked behind the bus about the same distance. So basically the bus couldn't move. It couldn't go forward. It couldn't go backward unless they wanted to plow through a car, which wasn't going to happen.
Q. So that's what -- so talked about the bus. That's what changed with respect to the bus.
Tell me about the people that you were seeing outside. How did that change over time?
A. So it went from, like I said, just a few people gathering, then they started sitting in front of the bus. They were, you know, holding each others' hands, linking arms. And then more and more people started arriving. And that's when sort of the chants and the -- you know, the "F ICE" and all those sorts of things started escalating.
Q. Did that affect your opinion or your decision as to whether or not this -- the north entrance could be used?
A. The north entrance couldn't be used.
Q. How did -- so the people -- how did the people that you were seeing and acting and hearing -- how did that affect your decision?
A. We couldn't put agents, contractors, and detainees out into that crowd when there was no method or means of removal. The bus was inoperable, so the north side was not an option to go out. Plus there was the gathering of all those protesters so,

like, it just was not a safe environment to go out through the front. That was -- that was done.
Q. Based on that, what did you do?
A. So we had multiple conversations with Spokane Police --
Q. I want to stay away from your conversations. Based on that, did you make another plan?
A. Well, the plans were based on a lack of response.
Q. Okay.
A. So we weren't getting a response, so what we were told was do you have another option? Is there another option for you to get out? And you know, eventually, it became, all right, let's use the south entrance. That's the only other sort of viable entrance.

With the bus out of commission, we wanted to get -- we had to see if there was another means of like a van or a bus that we could get ahold of. Someone had called border patrol. They did have a van, but it could only hold I think like seven people, so we needed more space.

So in discussions with ERO, they had a couple cars. I think they were going to use three of their vehicles plus the van. We were going to go out through the south because people were still gathering just mainly in the front, and they weren't really gathered in the south. So I thought, all right, let's get out through the back, get your cars, go and meet up with the border patrol bus, and we can either stage in the back, which

really wasn't a good idea because it was too long of a distance that we'd be able to protect the detainees to get to the van or to the cars.

So the option was to try to use the east entrance, which is a little lobby off the side of the building. If we had to, we would -- we would link our arms and create like a little safe zone so that the detainees could go straight into the vehicles or the van. And we were going to try that.

Q. Okay. So what steps were taken to implement that plan?

A. So we got the ERO guys together. They decided they had three vehicles. They were going to pick those up at the south lot. They went down. They went out to the south parking lot. They got in their vehicles and then they, you know, began to drive them out.

Q. What did you do?

Let me back up. What were you seeing as that happened?

A. So once they left and they went sort of to the back parking lot, there must have been a spotter. Some -- somebody notified the crowd, and then there was just a wave of people that came from the north, and they ran out to the south parking lot.

Q. Did you see that happening?

A. Yes, from the windows.

Q. Okay.

A. Because we were in the prisoner processing area so you could oversee sort of the east side. And then the elevator

shaft or lobby area, there's windows that are on the corners, so you could see to the south as well.
Q. Based on that, what did you do?
A. We had to -- I wanted to go out there and make sure that they were safe. We got a couple folks together to try to see if we could open up a path so that the cars could get out. If it was not as many people, maybe we could sort of open up a path and get folks out of the way so that the cars could get out.
So we ran out there and, you know, we went to the south gate, and we tried to basically make that hole, but pretty quickly, we got overwhelmed. There was too many people.
Q. Okay. So we'll come back to that.
As you were walking out, Special Agent LaForte -- well -- let me back up.
So you told us at the beginning you did not have any sort of body armor, weapon; is that right?
A. Yeah. Correct.
Q. And so did you decide to go out without any real equipment on you?
A. Yes. Yeah.
Q. Why would you do that?
A. Because I was the -- you know, the supervisory agent of the building, and I wanted to have sort of lead from the front. I wanted to go out and -- go out there myself and make sure that those guys were safe.

Q. Even before you kind of were at the south gate, so as you're seeing what's going on and as you're just barely walking out, did you have concerns for your safety?
A. Yes, but it was in the back of my mind. My primary concern was making sure we could -- that the guys that are inside the parking lot were safe and that we could get the vehicles out.
Q. What made you think that the guys inside that parking lot were not safe?
A. Well, the yelling from the crowd. There was people saying -- again, like I said, the "F ICE" chants. There were people saying, like, "You're baby killers" and "Go kill yourself." So it had become more violent rhetoric. Plus they're trapped in a lot with hundreds of people sort of surrounding. It's a detached lot, so the parking structure is about 20 yards from the back door. So if you get stuck out there, you're pretty stuck.
Q. So, Special Agent LaForte, so ICE is kind of a part of Homeland Security or vice versa? Homeland Security is a part ICE; is that right?
A. ICE is a part of Homeland Security.
Q. What I'm getting at is you guys work together; is that right?
A. We work together, yeah. There's two main components under ICE, and it's ERO and it's HSI. The ICE portion basically exists at headquarters.

Q. Okay. And so working in tandem with ICE, you must have heard "F ICE" before; is that right?
A. Yeah. I mean, we've heard that for -- you know, many times.
Q. Yeah. So you've heard violent rhetoric before.
A. Yes.
Q. What -- in this circumstance as you are getting ready to leave and seeing this kind of thing start at the south gate, so you're not even there yet, what made you think that this was different?
A. The coordination, that obviously somebody must have been in the back to be --
MS. GEORGE: Objection. Speculation.
THE COURT: Just report on what you saw, not maybe based on your thoughts of what other people were doing.
Q. (BY MS. PEREZ) So what did you see that made you think that?
A. I saw that there was no one in the back, and then as soon as the guys went to the parking structure, hundreds of people ran to go to the back.
Q. So was it --
A. So someone had to have been notifying the people up front. They wouldn't have done that organically because they couldn't see the people coming out the back.
Q. So you then walk out. Tell me, as you're walking out --

and I'll just show an exhibit just real quick just to orient us. Exhibit 22.

Tell us the path that you walked, Special Agent LaForte.

A. So under that green banner where it says "Broadview Dairy," there's a door that you can't see that's behind that red wall.

Q. Oh, sorry. Just hang on one second.

Good. Okay.

Special Agent LaForte, with your finger draw the path that you walked as you walked out.

A. (Witness complies.)

Q. Okay. So what are you seeing and hearing as you walk right here?

A. There's a lot of yelling, screaming, and there's a rush of people that are trying to get to that south gate. So we're sort of in with people that are getting to the south gate. Protesters.

Q. So as you were able to see more clearly what's going on at the south gate as you got closer, were your concerns lessened or in -- decreased or increased?

A. I mean, I was -- I would say it stayed about the same, but, you know, now I'm hearing the screaming that I --

MS. GEORGE: Objection. Hearsay. I'm sorry. Were you -- I take it back.

THE WITNESS: I heard it, yes.

THE COURT: Please answer.

THE WITNESS: I was hearing the screaming whereas I couldn't really hear it from the inside because it was muffled. But now you could hear the chants, you could hear the screaming. So, again, my primary concern -- all of that was sort of in the back of my mind and, you know, I was a little bit more fearful and more sort of aware of our security, but my primary concern was getting to that back gate and being able to safely get those guys out of the parking lot to, you know, get to doing our job.

Q. So as you then kind of round the corner to that actual gate, what do you start to see as you round the corner?

A. I see people gathering. Someone raised like a banner or flag or something, looked like bunting.

Q. Like what?

A. Like circus bunting. You know, the sort of half circle bunting.

Q. Okay.

A. And while it's just a flag, but it -- for me it seemed like they were trying to either obstruct the view of what was going on at the gate or they were trying to basically prevent us from, you know, going through. It's just sort of a barrier even though it's, you know, a barrier that you can easily take down, but it's still a barrier of sorts.

Q. What did you do with that bunting?

A. I just ripped it out of whoever's hand it was so we could get to the gate.

Q. Then what did you do?
A. We started pulling people away from the gate, because the gate was open. We started pulling people away and pushing them back. And it looked -- you know, at the initial push, it looked like we were able to get an opening, but then it just quickly collapsed back, and people were linking arms again. And we had to keep trying to remove those people.
Q. Okay.
A. Go ahead.
Q. So we'll go through just some specific things. Exhibit 25. And we've already seen most of this, but I want to -- I'm just going to start this with you, Special Agent LaForte, and talk through some things.
(Playing Exhibit.)
Q. (BY MS. PEREZ) Okay. Do you see yourself in this -- well, backing up a little bit. You had already ripped down that flag or whatever it was; is that right?
A. Yes.
Q. And so after you ripped down that flag kind of -- can you tell me, like, where specifically in the crowd you went? You were -- what were you doing kind of initially?
A. From what I remember, I was sort of in the middle of the sort of the -- it almost looked like a door. We pushed the people out of the way. And then I sort of ended up a little bit further out in the middle of the crowd.

Q. Okay. So you said you ended up a little further out. Do you see yourself in this particular video right here?
A. Yeah.
Q. And why are you positioned -- circle yourself first of all.
A. What did you say?
Q. Please circle yourself in that exhibit.
A. (Witness complies.)
Q. Why are you positioned there? You're kind of -- you're facing in toward the gate; is that right?
A. Yeah. I mean, it wasn't purposeful. It's just where I ended up. And then I was trying to make my way back to the gate to again try to clear people out of the way.
Q. How did you get so far out?
A. When everyone got pushed, I was pushed along with it, and then they sort of pulled away from us and then pushed back toward the gate.
Q. Okay. Now, did you have anything on you that identified you as police?
A. I just had my ID badge for the office.
Q. And what's that ID badge look like? What's it say?
A. It's like a PIV card. It says "ICE" on it with my picture.
Q. Small size of a credit card just hanging around your neck; is that right?
A. Yeah.
Q. Were you saying anything as you walked out, as you got into

the crowd?
A. I wasn't. There were a couple of uniformed officers that were right ahead of me, and I -- I heard them yelling "Police" or "Get out of the way." And because I was with them and we were pushing, I was saying, basically, "Get out of the way, you need to clear this out," but I don't recall if I said "Police."
Q. Okay. So here, as you said you're kind of -- you've been kind of -- momentum is taking you out, and you're coming back into the crowd. Why are you coming back in?
A. Coming back in to, again, make a second attempt at clearing that out.
Q. Okay.
A. And I do remember some of the protesters yelling -- can I say what they said?
Q. Yeah. Tell us what you were hearing.
A. "Who the fuck are you? Who the fuck are you? Who the fuck are you?"
Q. Like to you specifically?
A. Yeah.
Q. Why?
A. Because I was trying to prevent them from doing what they were doing, and maybe they didn't know that I was police, so they were, I guess, like, just wondering what the hell are you doing --
Q. Yeah. Okay.

A. -- kind of a thing.
Q. So let's move forward a little bit in this video. Still Exhibit 25.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Okay. What are you doing there?
A. So they were making an attempt to link arms again. And there was a lady that was sort of the last part of the link. And I grabbed her to pull her out of there because I knew it would be exponentially harder for us to break up when they linked arms. So I started pulling her back and then people were pulling and pushing me. They were pulling her back and pushing me at the same time.
Q. Okay.
A. So obviously, they wouldn't be doing that if they thought I was a protester, so...
Q. Okay. So this woman that you were pulling trying to break the link, how hard was that to pull on that woman?
A. It was pretty difficult because there were multiple other people that were grabbing her, trying to pull her back.
Q. Let's move forward a little bit more.
(Playing Exhibit.)
Q. (BY MS. PEREZ) Okay. And so where are you in this particular scene here?
A. Right over here.
Q. What are you doing?

A. Again trying to pull that person out.
Q. Describe how the crowd is affecting your ability to pull.
A. They're pushing me. They're pushing me. They're pulling on her. There's also -- because so many people are there, I can't see that -- it's kind of a futile effort, that most of my other guys were already up by the front, if not inside. Well, it looks like someone was there, but I couldn't really see whether we were making any progress. I was just trying to, again, open that hole so that the guys could come out.
Q. Did it feel like you were making progress?
A. No.
Q. Why?
A. Because everyone kept coming and they, again, were pulling back, and more and more and more people kept coming. And eventually, it was a futile effort, so I tried to make my way back up to the front to get into the parking lot.
Q. What do you mean by "futile effort"?
A. There was no way that we could open that gate and get those people cleared. They were -- they were intent on obstructing that, and they weren't going to move.
MS. GEORGE: Objection.
THE COURT: Sustained. Just talk about what you saw, not what maybe other people's mental state would be.
THE WITNESS: Okay.
I saw that they weren't moving. And, in my mind, I said

they're not going to get out of the way, so we need to get back into the gate and, like, reassess.
Q. (BY MS. PEREZ) I'm going to keep moving. Exhibit 25.
(Playing Exhibit.)
Q. (BY MS. PEREZ) Where were you here?
A. Right next to this guy with the backpack.
Q. Okay. So --
A. And the glasses.
Q. -- lower left-hand corner of that screen; is that right?
A. Yep.
Q. What are you trying to do there? You're still a little bit further back.
A. I think we're still -- I mean, the whole time, I'm trying to move people out of the way. So I had gotten pushed pretty far back. And I think it was shortly thereafter this, I was, like, this isn't working, so I need to get back up by the rest of the guys.
(Playing Exhibit.)
A. This guy in the back seemed to know --
Q. (BY MS. PEREZ) Don't talk during the video. So go ahead. What were you saying?
A. This guy with the backpack seemed to know what I was doing, and he was like --
MS. GEORGE: Objection.
MR. ORESKOVICH: Objection.

THE COURT: Just describe what the guy in the backpack was doing, rather than what you think he might have known.

THE WITNESS: He was yelling at me. He was pushing me. He was trying to prevent me from getting back.

MS. GEORGE: Objection.

THE COURT: I know it's difficult. Just try to -- instead of expressing what you think they were trying to do, just really try to focus on what you saw or felt.

THE WITNESS: He was preventing me from getting back to the gate.

Q. (BY MS. PEREZ) Okay. So I'll have some very direct questions here.

Special Agent LaForte, which direction were you trying to go?

A. I was trying to go back north toward that south gate.

Q. And the man in the backpack, was he in your way or not?

A. He was in my way.

Q. And did he continue to be in your way?

A. He put himself in my way.

Q. Okay. And did he push back in trying to -- or physically -- did you feel that he was -- could you physically feel that he was impeding your way?

A. Yes.

Q. Had that person previously had arms linked also?

A. He was with that group. I can't recall whether he was

linked or not.
Q. We'll move forward in Exhibit 25.
(Playing Exhibit.)
Q. (BY MS. PEREZ) What -- based on what we just saw there, what were you feeling as you continued to engage here?
A. I believe that's when he used his arm to push me back. And then later on, you'll see that he puts like a placard in front of my face.
(Playing Exhibit.)
Q. (BY MS. PEREZ) Was that the placard you just talked about?
A. That was the placard. And then I threw it out of the way.
Q. You did what with it?
A. I grabbed it and threw it.
(Playing Exhibit.)
Q. (BY MS. PEREZ) Okay. So let's go to the end of that segment.
How hard was it, Special Agent LaForte, to get back to kind of just, you know, the gate area there?
A. It was difficult because there were a lot of people, but I was trying to basically wind my way through it. I could see that my fellow officers and agents that were inside were looking for me and trying to find me to get me back in. I couldn't get past the people that were linking their arms because I was trying to -- I was trying to go through them, and obviously they were linked arms, and they weren't allowing me to go past, so I

had to try to find a way in. And then later on, I was able to skirt in from the side.
Q. Did you have concerns for your safety as you're out there in the crowd?
A. I did. Again, it was toward the back of my head. I was concentrating more on the safety of the agents and getting in there to try to get the vehicles out, but it was always in the back of my mind that I don't have a vest, I don't have a gun, I don't have OC. I don't have anything to protect myself. So, you know, anything could happen.
Q. And I want to be clear, Special Agent LaForte. That was your choice to go out there without that stuff.
A. It was my choice.
Q. So why would you do that?
A. Because it had to be done.
THE COURT: Ms. Perez, we are at the time for maybe a morning break. Is this a good place we could stop?
MS. PEREZ: Yes. Thank you.
THE COURT: Ladies and gentlemen, we'll take our morning break. 15 minutes, so be here at a quarter till 11:00.
Don't do any research on the case. Don't discuss the case. But enjoy your break.
All rise for the jury.
(Jury exits the courtroom.)
THE COURT: So we're on break. I want to give the

parties a break unless they have something they absolutely need to address.

MR. AHMED: I do.

THE COURT: Mr. Ahmed?

MS. GEORGE: Justice Forral is not here.

THE COURT: Justice Forral is sitting next to you.

MS. GEORGE: Oh. Never mind.

MR. AHMED: Your Honor, this morning I touched upon a statement allegedly made by my client. And I've been looking at case law while we've been sitting here doing direct examination. And the proper remedy in this case is to suppress that statement.

Now, what we were told was it was disclosed in a video. If you look at the video, your Honor, and I can bring it to the Court's attention, you can't see my client saying that. Okay? And there are -- there's not just one voice. There are many voices when you could hear it, and you can barely hear it. If I was looking at a video, I would hear people screaming in the background, and I would pay no attention to it. Okay?

We were provided about 2,500 pages of discovery, I'm talking just nonvideo discovery, and hours of body cam, and I never heard that statement. And today, the United States said, "Well, it was in the video." And you cannot see my client saying that statement. Okay, Judge.

The proper remedy in this case -- and if the Court wants a

brief, I'd be happy to provide it. I'll give it a phone book because it's all in the Ninth Circuit.

THE COURT: Okay. The concern that I have is it's already out there.

MR. AHMED: I would ask that the Court give the jury an instruction to disregard it.

THE COURT: Let's wait until the evidence is complete. We can brief it. But if your client testifies, I don't know what your client is going to say. So...

MR. AHMED: Judge, if it's suppressed, it's suppressed even on cross-examination.

THE COURT: And that's not always the case.

MS. PEREZ: Can I be heard on this, your Honor?

THE COURT: I don't have briefing on it. Ms. Perez, briefly.

MS. PEREZ: Your Honor, this is the second motion to suppress that we've had in the middle of trial. This is getting ridiculous so --

THE COURT: Okay.

MS. PEREZ: Also -- your Honor, please. It's in the video. And we can argue about what it means and what it doesn't, but your Honor, the evidence is what the evidence is.

THE COURT: Okay.

MS. PEREZ: And so --

THE COURT: I understand.

MS. PEREZ: -- there's no reason to suppress it because Mr. Ahmed disagrees. We disagree. That's fine. We can argue.

THE COURT: Certainly, I can be pointed by the Government to where in the video it might be. It's not a typical motion to suppress. It's a discovery violation. If the Government didn't disclose a statement, then the issue would be what would be the remedy for the nondisclosure of a statement. So my first determination would be was there a nondisclosure of the statement, and I'm not sure that I know what the remedy would be until trial is completed. Because if your client testifies -- it is very rare for a prior statement to be completely suppressed. It would have to be involuntary. And I don't think anyone's saying that if a statement was made, it was coerced. So if your client testifies, I don't know if they're going to say they made the statement, then it's moot. Now, if your client testifies that they didn't make the statement, I'll deal with it. Okay?

All right. We're in recess.

MS. CARTIER-GIROUX: Your Honor, just one other thing. I apologize. Are you going to issue a ruling on the force in writing? I need some --

THE COURT: I'm going to issue jury instructions.

MS. CARTIER-GIROUX: Okay. Perfect. Thank you.

(Court recessed from 10:36 a.m. to 10:45 a.m.)

MS. RUBIN: Let me just see if Forral is out in the hallway.

THE COURT: Okay. Looks like we're all here. Okay.

(Jury enters the courtroom.)

THE COURT: Ms. Perez, you may resume your direct examination.

Q. (BY MS. PEREZ) Okay. Special Agent LaForte, so I think we ended -- so south gate, you kind of were in the back, and then you moved toward the front. Were you able to kind of get inside, inside the gate?

A. Eventually, yes.

Q. Okay. And why did you choose to do that?

A. I couldn't stay out with the protesters. I had to get into the lot so that we could reassess the situation from there.

MS. RUBIN: Agent, would you be able to speak up?

THE WITNESS: Sorry. I'll move closer to the...

MS. RUBIN: Thank you.

THE WITNESS: I wanted to get in so I could reassess the situation from inside.

Q. (BY MS. PEREZ) In this kind of -- this incident, this pushing you've described, everything you've described, did you try to de-escalate the situation?

A. There really wasn't any de-escalation. They were committing a crime. They were blocking us from being able to do our job. They were actively resisting. We were simply trying

to push them out of the way. We didn't use any hard techniques. We didn't use closed fists. We didn't strike anybody. We didn't do any takedowns. We didn't deploy OC. We didn't use anything that was at a higher level. So I would consider that, that that was a de-escalation. I mean, it wasn't escalated.
Q. To be clear, Special Agent LaForte, you were using force. You were pushing --
MS. GEORGE: Objection.
MR. AHMED: Objection.
THE COURT: Why don't you just use "pushing."
Q. (BY MS. PEREZ) Were you pushing?
A. I was pushing.
Q. How was that not an escalation?
A. It was an escalation from doing nothing from inside the building, yes. We went hands-on, and we used an amount of force we needed to get the folks out of the way, but, again, that wasn't fruitful.
Q. How was pushing not an escalation of what was going on in the crowd?
A. From doing nothing, then that was an escalation, yes.
Q. What was the crowd doing that made you need to push?
A. They were pushing back at us, and they were -- I saw people -- I don't remember getting struck, but I saw that the other people we were with were getting, you know, either elbows or getting pushed.

Q. Were you concerned for your safety while in the crowd?
A. Yes.
MS. GEORGE: Asked and answered.
THE COURT: I think we've gone over this before the break.
Q. (BY MS. PEREZ) Did you feel threatened while you were in the crowd?
MS. GEORGE: Asked and answered.
MS. PEREZ: That was not asked.
THE COURT: He can answer that. I think we talked about the crowd, so make sure you move on.
Q. (BY MS. PEREZ) Did you feel threatened while you were in the crowd?
A. I did feel threatened, which is another reason why I wanted to get inside the gate with the rest of my officers.
Q. Okay. So once you get inside the gate, were you able to close the gate?
A. It's open because the cars are on the pressure plate. So we needed to move the cars off the pressure plate. So I discussed with the officers. I said, you know, we need to get these cars off the pressure plate because if we don't move them and that gate stays open, my fear was that they were going to come in and take over. And it could have escalated to something beyond that.
Q. Okay. So you were able to close the gate; is that right?

A. We were, yes.
Q. So what did you do inside the gated area once the gate was closed?
A. First thing I did was call Spokane police to give them an update that we were basically being held hostage inside of --
MS. GEORGE: Objection.
Q. (BY MS. PEREZ) Let's just -- okay. So you called SPD; is that right?
A. We called SPD.
Q. Did anyone respond at that point from SPD?
A. No.
Q. Okay. What else did you do inside that gated area?
A. We had to discuss -- again, from the conversation with SPD, they weren't able to come, so --
Q. So what did you do while inside that gated area?
A. We were making calls, and we had to basically plan to go back into the building.
Q. Okay. So you made a plan to go back in the building. As you were standing there in this gated area --
Well, about how long were you in there?
A. I think just a few minutes. Maybe -- maybe about five minutes or so.
Q. Did you have concerns for your safety in the gated area?
A. Yes, especially from what some of the people in the crowd were yelling.

Q. Why? Weren't you gated in?
A. We were, but we were trapped.
MS. GEORGE: I'm sorry. I missed that.
THE WITNESS: We were, but we were trapped.
Q. (BY MS. PEREZ) Were you able to get out?
A. There was one way out beyond the vehicle gates. There was a man gate at the north end of that, which was the only way out, but my assumption was that because so many people had rushed into the back, that they were -- you can see through the gate. They could see what we were doing. That they would just rush through the back and prevent us from getting back into the building, but we ended up being able to get back to the building.
Q. While there in the gated area, what could you hear from the crowd?
A. We heard people screaming "Go kill yourself." There was some lady that was yelling, "Oh, you're on the phone? Your battery is going to die. The police isn't -- aren't coming. Are you scared?" So there was some violent rhetoric that people were yelling over the wall that would make it seem like they were going to try to keep us in there.
Q. Could you attribute that -- those specific words to any one individual person?
A. No.
Q. Okay. So let's talk about your exit from this gated area.

Exhibit 27.

This is the gate you exit out of; is that right?

THE COURT: We can't see anything, Ms. Perez.

MS. PEREZ: Oh. Sorry.

THE COURT: Can jurors see it? Yes? One can't see it.

A JUROR: It's yellow. Okay.

THE COURT: Can you look at that, Ms. Hansen?

Is there another line of questioning? We will get tech up here.

MS. PEREZ: Yes. We'll come back.

Q. (BY MS. PEREZ) So once you were back in the building, what happened?

A. We made some more calls. And we had to come up with another plan or, you know, try to figure out what the next plan would be to get everybody out. It was basically futile. There wasn't. So we just had to sit tight and wait for Spokane PD and SWAT to come rescue us, basically.

Q. At some point -- well, were you able to see what was going on outside?

A. We could see through the windows. We could see more and more and more people. We knew that there was a No Kings protest at the red wagon that was starting, I think, around 6:00 or so. And we had heard that they were going to come. And then we did see them flooding through the park and joining the protest.

THE COURT: I'm going to stop for just a moment. Our tech is here to help with the screen.

(Pause in proceedings.)

THE COURT: Okay. Mr. Way, can you stay just in case? Can you stay for a minute just in case?

MR. WAY: Yeah.

THE COURT: Do you want to try putting it up again?

MS. PEREZ: Yes. Exhibit 27.

THE COURT: Everyone see Exhibit 27?

Great. Thank you.

Q. (BY MS. PEREZ) Special Agent LaForte, so you're walking out of this gate; is that right?

A. Yes.

Q. Okay. And are you first at this point?

A. Yes.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Okay. Where are you? Circle yourself.

A. (Witness complies.)

Q. Okay. And at some point, do you come into contact with any of the individuals -- other individuals we see on this screen?

A. Yeah. That person to the left of me. I flipped their hat off their head.

Q. Okay. I'm going to move forward. Tell me when that happened. Just say "stop" when that happens. Okay?

(Playing Exhibit.)

A. Stop.
Q. Was that it?
A. Yep.
Q. Describe to me how you did that.
A. Just used my finger and flipped it off their head.
Q. Why did you do that?
A. I was pretty frustrated at that point. Our building was under siege. We weren't getting any sort of Spokane police response. This was the third option that we tried to get out and get the detainees and officers to safety, and this failed. And then we were told we had to go back through the protesters to go into the building. And so I was pretty frustrated at that point. And plus there was a part of me that thought maybe that would distract them, because I didn't know what these people were going to do and if more people would come.
Q. That particular individual whose hat you flipped off, was he doing anything to you? Saying anything to you?
A. They were yelling at us "Fuck ICE" or something. I can't recall exactly, but I think it was "Fuck ICE."
Q. Did you have any other contact -- physical contact with that --
A. No.
Q. Did you actually have any physical contact with that person's body or was it --
A. No.

Q. -- just the hat?
A. Just the hat.
Q. Now, I'm going to back this up just a few seconds and play it again. And I want to, as we watch this here, focus on what's going on behind you in this video. I'm going to ask you if -- when this actually happened if you knew that that was going on.
(Playing Exhibit.)
A. No.
Q. (BY MS. PEREZ) Okay. So what we saw there was that Agent Wilks -- or rather Officer Wilks and Agent McSullivan behind you; is that right?
A. Yeah.
Q. Were you aware of what was going on with them as you were walking out?
A. No.
Q. Okay. So we talked about you were back in the building, you were able to look through the windows. At any point, did you go on the roof of the building?
A. Yeah. So at one point, I was getting kind of frustrated. We couldn't see. We had to keep going from one window to another and going to different areas. So I knew that I could access the roof. So I went and got a key and went up to the roof so that I could see real time and from an elevated -- elevation the vantage point of the protests from north, east, and south.

Q. As you were on the roof and kind of going to these different vantage points, did the crowd react to you being up there?

A. Surprisingly, yeah. Somebody looked up and saw us, and they were yelling, "Fuck you. Go kill yourself." Those sorts of things.

Q. So how did you know they saw you?

A. Because they were looking up at me and yelling at me. They made -- we made eye contact.

THE COURT: There's an individual in the audience who's wearing a headset, and he says he can't hear. Can you speak closer to the microphone?

MS. PEREZ: I don't know if I can.

THE WITNESS: I've never been accused of not speaking up.

THE COURT: I was talking to the witness.

MS. PEREZ: Oh, sorry.

Q. (BY MS. PEREZ) Okay. So while you were in the building that evening as -- how long were you in there until you were eventually able to get out?

A. I mean, from start to finish, I think it was like six to eight hours or so, because I know I didn't get home until about midnight.

Q. While you were in the building after the south gate thing happened, after you're back in, did you have concerns for your

safety then?
A. I did because there were more and more people coming. While I couldn't hear exactly what people were screaming, there was increased velocity of screams, more people were screaming. I saw what I recognized as people in black bloc, like antifa types with goggles, backpacks, that looked like they were ready for riots and for, you know, sort of fighting the police. So I thought at any moment someone could try to break in. We have glass doors. The lobby with the elevator is glass, so that someone could try to break in and get into the building. So I was fearful that they would take it into the building, and then I didn't know where we would go from there.
Q. To be clear, did anyone break into the building?
A. Nobody broke into the building.
Q. As you were in the building watching this evolve around you, did you feel threatened?
A. Yes.
Q. Why?
A. Because we were completely surrounded. We had nowhere to go. We couldn't get out. We had detainees that were there in our care. I had officers and agents that were there. We had contractors. We had civilians inside the building. So I was -- I was fearful for all their safety, and I knew that help wasn't coming, and we were stuck in there. I didn't know where we would go after that.

MS. PEREZ: No further questions. Thank you.
THE COURT: Okay. Cross-examination?
MS. GEORGE: All these exhibits are in evidence, but would you turn it off while I set up? Thank you. Our system changed.

CROSS-EXAMINATION

BY MS. GEORGE:
Q. We're going to start with something easy. All right. I'm going to show you what's been admitted as Defense Exhibit 616B. Let's start with kind of an overview of HSI ICE building. Okay?
MS. PEREZ: Objection, cumulative.
MS. GEORGE: I'm going to do something with it.
THE COURT: Okay. I've allowed the Government to ask about the layout. I'll allow Ms. George.
Q. (BY MS. GEORGE) Okay. First of all, right here where I circled in red is the main entrance?
A. Correct.
Q. And that's on Cataldo?
A. Yes.
Q. And if you see Cataldo, if you go all the way to the left of Cataldo, and you take a right, you can go down that road, right?
A. Yes. I think it goes to like the soccer stadium.
Q. It goes to the soccer stadium. And there's a road that takes you out?

A. I believe so.
Q. Yeah. Okay. And this is what the front door looks like?
A. Yes.
Q. Fair enough. That's Exhibit 604A.
All right. Now, there are two doors that are on the other end on the east side but facing north, fair?
A. Yes.
Q. And that's where the white bus was parked?
A. Yeah. Sort of in front of the fire room door as it's laid out here.
Q. So we have -- here's 604B, which is an image of the sally port and the fire room door?
A. Yes.
Q. And agents can go in and out of the fire room door?
A. You can go in and out, yeah. There's a PIV card that you need to get back in, yes.
Q. Yeah. I believe we saw Agent Burlingame go out that door. Would that be right?
A. I'm not aware of that.
Q. Okay. And the sally port is close to where the detainees are held?
A. Yes. They would be sort of straight back and to the left is where the processing area was.
Q. Okay. Then we have the blue door, and I'll show you what that looks like. 604C. That is the blue door. It doesn't

appear as though -- oh, maybe it's used. Have you ever used the blue door?
A. No. I believe that door belongs to Bark.
Q. To park and rec?
A. Bark, the restaurant downstairs.
Q. Okay. Thank you. We'll get to Bark.
So that is a door that goes in and out of the building?
A. I wouldn't know. I've never used it, and honestly, until right now, I've never actually seen that door.
Q. All right. Now, you talked about Bark. It's Bark Rescue Pub. I have "cafe" on here which is wrong, but it's Bark Rescue Pub, right?
A. Yeah. It's defunct now, but yes.
Q. It's closed now, right?
A. Yes.
Q. Okay. But that is 804D [sic]. Now we are on the east side of the building.
A. Correct.
Q. And that was where the red van was eventually parked?
A. In the vicinity, yeah.
Q. Well, actually they parked it so that -- they kind of parked it in the wrong spot, right? Because they parked it in front of Bark Rescue Pub, which is not where the -- right?
A. The --
Q. I put it in the wrong spot.

A. I wouldn't know if they were in the right spot or not. I don't -- they drove in and parked it.
Q. You saw where the red van was parked.
A. Yeah. I thought it was a little bit further down closer to our door, but...
Q. Well, okay. But it's -- I put it in the wrong spot there, right?
A. I think it was a little bit closer to our door, but, yeah, they were in the vicinity of that front entrance. They're right next to each other.
Q. Okay. And there is the actual door, 604D.
A. Yes.
Q. And then the next door is HSI ICE man door or door?
A. Yeah. It's a little bit closer to where the Bark Rescue.
Q. Okay.
A. If you show that picture again, there's like a tree that cuts off that picture, and our door is -- yeah. See the tree and that lamp post?
Q. Right.
A. Our door is just to the left of that.
Q. All right. Well, it says -- this says at the bottom right it's not to scale. I did my best, but...
A. Oh, good. Yeah.
Q. All right. It's just for so we get an idea.
A. Yes. Yeah.

Q. Okay. And that door looks like this, 604E, right?
A. Correct.
Q. And that's accessible to HSI and ICE?
A. Yes.
Q. And then Bark Rescue has another door, right?
A. That's a door inside, yes.
Q. Well, it's the door that faces south.
A. South.
Q. Right?
A. Correct.
Q. And that's accessible to -- if you walked out that door, you would be right in a public parking spot, parking area?
A. If you were a Bark employee and exited, you would be, yes, at that parking lot. We don't have access to that.
Q. And here is right where I circled, which is the south HSI ICE door, right?
A. Correct.
Q. And that's the door that you used when you came out?
A. Exited, yes.
Q. And went back in?
A. Correct.
Q. And that's what that door looks like, 604G.
A. Yes.
Q. And then we have the side door that faces east. 604H, right?

A. It's a door. It -- I believe it's a mechanical space behind there.
Q. But it is a door?
A. It's a door by definition, yes.
Q. All right. And then facing southwest is a double door, 604I, right?
A. A double door, right, that goes into the Bark, like their -- that -- what used to be the pet area.
Q. Okay. Accessible from the inside of the building?
A. To Bark, not to us.
Q. And then there is what has been referred to as the man gate, right?
A. Mm-hmm.
Q. And that faces north?
A. Correct.
Q. And you -- that's the gate you all went in and out?
A. In and out of, yes.
Q. All right. That looks like this. 604J?
A. Correct.
Q. And then there is the east gate, yes?
A. Yes. That's a vehicle gate.
Q. And that faces east?
A. Faces east.
Q. And you can't get into that unless you have a key card or punch code or something, right?

A. Correct. A card.
Q. Right. And then there is the infamous south gate. Oh, wait. This is what the --
A. No, that's the east gate.
Q. Right. Sorry. I jumped ahead. 604K.
And then there is the infamous south gate.
A. Correct.
Q. And that looks like -- oops, what am I doing here? Jumped ahead.
That's the route -- where the red lines went down is the route you took to go to the south gate.
MS. PEREZ: Objection. Cumulative.
THE COURT: We have gone over this several times, so please move on, Ms. George. He can answer yes if it is yes.
THE WITNESS: That was the direct -- that was the route I took, correct.
Q. (BY MS. GEORGE) And this is the route you took back.
A. Yes.
Q. And this is south gate, 604L?
A. South gate.
Q. Yes. Okay.
Now, there is a video of the front door of HSI. Or there is a camera --
A. That's the front area of -- yeah.
Q. And there's a camera.

MS. PEREZ: Objection. Cumulative.

THE COURT: I don't want this to be cumulative. We've gone over this video twice, but if you have something new to present, you may.

MS. GEORGE: I do.

THE COURT: Okay.

Q. (BY MS. GEORGE) All right. Now, this is from video 617, which is the main entrance camera.

A. Mm-hmm.

Q. Correct?

A. It appears so, yes.

Q. All right. And this is Ben Stuckart and a woman who he's standing close to, Joswar, Cesar, and another woman.

MS. PEREZ: Objection. Cumulative. And Ms. George is testifying.

MS. GEORGE: I am leading.

THE COURT: You can lead. We have gone over who's here, so please get to the part --

MS. GEORGE: I'm just orientating him so that the next one he will understand where we are going.

THE COURT: Okay.

Q. (BY MS. GEORGE) Fair enough? Okay. That's right?

A. I don't know who those people are.

Q. You don't have any idea who those people are?

A. No.

Q. You've never seen Ben Stuckart?
A. I don't recall seeing Ben Stuckart.
Q. Ever?
A. No.
Q. In all the videos you watched, you never saw Ben Stuckart?
A. I don't recall what -- which one he is.
Q. And you were watching this scene for seven hours?
A. From a window with grating, yes.
Q. And you took photographs from the second floor of HSI?
A. A couple.
Q. And the photographs you took were of a man sitting in front of a bus?
A. I believe so. Well, I remember a woman sitting in front of the bus.
Q. And you even walked down to the bus and talked to the people.
A. Correct.
Q. And you saw people in front of the bus. And at that time, there weren't that many people there.
A. Not too many.
Q. All right. Well, let's just watch the next video. And this is from 617, 48:31:27 into the start of the video.
(Playing Exhibit.)
Q. (BY MS. GEORGE) A man in a pinkish shirt, gray shorts comes out. And let's just go back so that you can see.

It's fair to say he looks upset?

MS. PEREZ: Objection. Cumulative. And also, Special Agent LaForte already testified he didn't see this.

MS. GEORGE: I have never showed this.

THE COURT: Let me --

MS. GEORGE: I have never showed this video --

THE COURT: Let me rule. We've not seen this portion of it. Please do not be cumulative, and the witness is not to pass judgment on whether or not -- the emotional state of another person.

Q. (BY MS. GEORGE) Now, a woman on a phone and another woman who is wiping her eyes comes out?

MS. PEREZ: Your Honor, the exhibit speaks for itself. Special Agent LaForte has said he did not see this.

THE COURT: She can ask questions if he sees what's in the video.

THE WITNESS: I see four people standing in front of a door.

Q. (BY MS. GEORGE) Okay.

A. I don't know who any of those people are.

Q. Okay. There is a moment that is coming up that's important.

(Playing Exhibit.)

Q. (BY MS. GEORGE) It's almost there.

So we can see on this woman's phone it's 12:13 p.m.

MS. PEREZ: I'm sorry. Can you say that again?
Q. (BY MS. GEORGE) We can see on the woman's phone it's 12:13 p.m.
A. It appears that way, yeah.
Q. Okay. So we know that the man in the pinkish-lavender-ishy shirt and shorts came out at 12:13.
MS. PEREZ: Your Honor, I'm objecting to a video that Special Agent LaForte has not seen, doesn't know anything about, as he's testified to, just being narrated by Ms. George.
MS. GEORGE: It's in evidence.
THE COURT: The video is in evidence. I don't know that this witness is the correct witness to go over the video with if he's not seen it before, Ms. George.
MS. GEORGE: All right.
Q. (BY MS. GEORGE) We'll get to you, then.
There's -- you can see a couple of people down there?
A. Yes.
Q. And that's consistent with what you saw from the window?
A. No. I -- what I saw from the window was later when there were people in front of the bus.
Q. All right. You saw this gentleman sitting in front of the bus?
A. Yeah.
Q. All right. And that's 600B. And you saw this view of this gentleman sitting in front of the bus?

A. That's -- yeah. That's about where the window was where we were looking out.
Q. Okay. 600G. And this is when -- this is a photograph of when people were arriving and sitting by the bus door?
A. Yeah. This is closer to the time when I went outside.
Q. All right. 600D.
And, again, 600E, you see the same man talking to people, the man that was sitting in front of the bus?
A. He appears to be talking to people.
Q. And these are photographs that either you or someone else in the building is taking. This is from HSI's perspective.
A. This appears to be from our break room window, correct.
Q. Thank you. And another shot a little further distance, 600F. Yes?
A. Correct.
Q. Okay. And one more. More people are coming. 600C, right?
A. What are you asking?
Q. I'm sorry. More people came? You can see that in 600C?
A. There's more people, yeah. There's more people.
Q. Now, I believe this is a video of where you come out. No. Sorry. This one is. I'm going through these. Oops. Let's go back.
(Playing Exhibit.)
Q. (BY MS. GEORGE) Now, that's you?
A. There's that handsome fellow, yeah.

Q. And that's Agent Tomaso, right?
A. Yes.
Q. All right. Now, you're going down to the crowd. This is the first time you go out --
A. Correct.
Q. -- to sort of tell them, hey, you know, go protest somewhere else, leave some space?
A. What I asked them to do was to clear a path from the door that you showed previously that was to the right of the sally port door --
Q. Mm-hmm. Yes?
A. -- to the bus, which was directly adjacent to that door.
Q. All right.
A. So it was a straight shot. I asked them to stay clear of that area and to -- they were free to protest down on the corner, in front of the bus, on the other side across the street, wherever else they wanted to, but not in front of that bus because we had a job to do.
Q. All right. And this is one hour and 37 minutes and 53 seconds into when the video started.
A. Is there a time stamp on that?
Q. Yes, but -- there is.
A. Okay. What time was that at?
(Playing Exhibit.)
Q. (BY MS. GEORGE) The time started --

MS. PEREZ: Well, Ms. George is testifying, so I object to that.

MS. GEORGE: All right. That's fine. I won't --

THE COURT: I don't think there's a particular time stamp on this video. There's a time from when the video started. Ms. George, just ask him the questions about what he sees.

Q. (BY MS. GEORGE) All right. Let's start that again.
That's you again, right?

A. Correct.

(Playing Exhibit.)

Q. (BY MS. GEORGE) This is the second time you're going out to talk to the crowd.

A. Is that -- that's the second time? I don't recall. Maybe that was the second time I went back out. Oh, yeah, because I think I was talking to the lady in front of the bus. Yep.

Q. And you went back out so that you could sort of capture that you gave them a warning?

A. So that I can get an audible answer from --

Q. Yes.

A. -- the person in front of the bus.

Q. Yes.

A. And to make sure that she understood that we were asking her to get away from the door of the bus and to clear that path.

Q. All right. And you go back in. And I see your lanyard

right there. Is that right?
A. Yes.
Q. So it's more than a credit card. It's a little bit bigger than that.
A. Yeah. It's like a double-sided lanyard. It's an RFID protector.
(Playing Exhibit.)
Q. (BY MS. GEORGE) Oops.
So when you went out and -- you saw people on a bullhorn, fair?
A. Correct.
Q. All right. I'm going to show you 601A?
(Playing Exhibit.)
Q. (BY MS. GEORGE) 601B.
(Playing Exhibit.)
Q. (BY MS. GEORGE) Then it appears as though the man that was sitting in front of the bus passes the bullhorn to someone else?
A. Mm-hmm.
Q. All right. So 601C.
(Playing Exhibit.)
Q. (BY MS. GEORGE) One more. 601D.
(Playing Exhibit.)
Q. (BY MS. GEORGE) One more, sorry. 601E.
(Playing Exhibit.)
Q. (BY MS. GEORGE) All right. Now, at some point -- and oh,

let me step back a minute.

The white bus, we saw in the bullhorn videos, is parked kind of directly across from the fire door/sally port door?

A. From that fire door where that guy is leaning, correct.

Q. Okay. And at some point, a red car parked in front of that bus.

A. In front of the bus, correct.

Q. Right. And that was what? Around 2:15?

A. I don't recall the time.

Q. Okay. But after the red car parked in front of the white bus, a guy on a bicycle rode by and spray-painted the vehicle?

A. That was my understanding of the events.

Q. So I show you 603A. That is an image of a guy spray-painting the white bus windshield?

A. It appears so, yes.

Q. And that guy has a black bandana on, right?

A. Mm-hmm.

Q. A black shirt, right?

A. Black shirt, yep.

Q. All right. And you can see a little more. A backpack, right?

A. Yes.

Q. Kind of how you described the black bloc?

A. Correct.

Q. And when you were talking about black bloc, this is what

you were talking about?
A. Not necessarily him because I didn't witness him do that.
Q. But this type of --
A. That type of --
Q. -- appearance.
A. -- appearance, correct.
Q. And this is 603B.
A. Although there were -- the ones that I was referring to had goggles and backpacks, and they looked a little bit more like they were ready for...
Q. And you talked about how they were -- came with the group that you were concerned about coming.
A. I think some of them were there before the group from the red wagon came.
Q. But when the group from the red wagon came, that is when it became more prevalent?
A. There were more people.
Q. Yes. Tons more people, right?
A. Hundreds more, yeah.
Q. Yeah. All right.
All right. So I'm now going to skip to 61 -- sorry.
(Playing Exhibit.)
Q. (BY MS. GEORGE) I'll stop this for a minute because -- this is relevant because it shows you walking from the door, the back door of HSI?

A. Correct.
Q. All right. And it's Agent Tomaso, Agent McSullivan, and then you?
A. Correct.
Q. All right. And I -- it's relevant to play it again.
(Playing Exhibit.)
Q. (BY MS. GEORGE) There's Tomaso?
THE COURT: Don't speak during the video, please.
MS. GEORGE: Oh, sorry.
(Playing Exhibit.)
Q. (BY MS. GEORGE) Okay. This is you, 605Q, walking to the south gate?
A. It appears so, yeah.
Q. This is you without tactical gear?
A. Correct.
Q. This is you without a Taser or any sort of spray or weapon?
A. Correct. I had to turn all that in.
Q. Right. Right. Exactly. This is you without your lanyard hanging on your chest?
A. Where did my -- I don't know where my lanyard went. I thought I had it on around that time. I may have put it into my shirt so it didn't get pulled. But I don't remember not having it.
Q. It's not on your chest as you walk to the south gate.
A. That picture, it doesn't appear so.

Q. Okay. Now, you were calling -- well, let me step back and get the sequence of events.
You had a meeting at noon where you turned in your gear?
A. Around 11:00.
Q. Right. And then we saw that the individual at the door where we got the time was 2:13, right?
A. I think it was 12:13.
Q. Oh, I'm sorry. 12:13, right?
A. That was on her phone.
Q. Right.
A. But I don't have a time stamp, so I can't confirm that.
Q. And then there was a Facebook post at 12:52?
A. I don't know.
Q. Based on how you prepared things that day, you had to -- someone alerted you that there was a Facebook post?
A. Someone alerted us that there was a post that was calling for a protest.
Q. And that came in at 12:52?
A. I don't know.
Q. At 2:12, you took the pictures from up on HSI?
A. What time?
Q. 2:12?
A. I don't know if I took that picture. Was that one that I took?
Q. Yes.

A. Okay.
Q. All right. You then spoke with protesters, right?
A. Went outside, spoke to protesters, yes.
Q. And at 2:37, you called the criminal chief of the U.S. Attorney's Office?
MS. PEREZ: Objection. Your Honor, that is not appropriate, and it's also going to call for hearsay.
THE COURT: Move on, Ms. George. We can address it at some other point if you have a theory.
Q. (BY MS. GEORGE) At 2:37, you made a call reaching out for assistance?
A. I probably made a call? To who?
Q. Well, I'm not allowed to say.
MS. PEREZ: Well, your Honor --
THE COURT: Okay. We will address this at a recess.
MS. PEREZ: -- Ms. George is consistently again asking the same question that we have -- you have sustained an objection to. This is ridiculous.
THE COURT: Okay. We will address this at a break.
Ms. George, move on.
Q. (BY MS. GEORGE) You called the Spokane Police Department?
A. At some point, yes.
Q. You called the Spokane sheriff department?
A. Correct.
Q. You eventually were able to connect with Chief Hall?

A. Correct.
Q. And Chief Hall referred you to -- is it Captain Kendall?
A. Kendall, yeah.
MS. PEREZ: Objection, hearsay. This was objected to hearsay on direct, and it's not coming in.
THE COURT: You talked -- he can answer whether or not he talked to someone. I don't think that's hearsay.
MS. GEORGE: All right.
Q. (BY MS. GEORGE) You first talked with Chief Hall?
A. Correct.
Q. You then called Captain Kendall?
A. I then spoke at some point to Captain Kendall. I don't know whether that was an incoming or outgoing call.
Q. You were -- now, I just want your words, not whoever you were -- Captain Kendall's words. You were seeking help?
A. Yes.
Q. You were telling them all you needed was some uniformed officers to give you a clear path.
MS. PEREZ: Objection, hearsay.
Q. (BY MS. GEORGE) You -- that's what you said.
MS. PEREZ: That doesn't make it not hearsay.
THE COURT: Is -- both -- the Government has introduced them needing help. I think that this is not necessarily offered for the truth, other than guessing, but please just be brief and move on, Ms. George.

Q. (BY MS. GEORGE) You wanted a clear path.
A. We needed a clear path to the bus.
Q. And you wanted at least one vehicle towed.
A. There were two vehicles pretty quickly after the first one arrived. They parked behind the bus. So those would have to be towed if we were going to use the bus.
Q. Well, I do not want to go through an hour of video, but would you agree with me that the second car pulled up around 3:00?
A. I don't recall the time.
Q. Did you see the first -- you didn't see the first red car park?
A. I don't think I saw it pull up. I saw it there immediately after.
Q. Right. So you don't know what time the red car got there?
A. I don't recall the time.
Q. And you don't know what time the car that got behind the bus got there?
A. I'd say probably within 15, 20 minutes of the first one.
Q. Well, now I --
THE COURT: Do you want to turn off the jurors' screens, Ms. George?
MS. GEORGE: Yes. You can do that. I'll see if I can find it quickly. Otherwise, I'll move on.
Okay. Can you turn it back on? Is it on?

It is. Thank you.
Q. (BY MS. GEORGE) Okay. So this clip we're going to watch is two hours and 22 minutes and 41 seconds into the video. All right?
THE COURT: Can you identify the exhibit number?
MS. GEORGE: It's 617. And you see --
THE COURT: We don't see anything, Ms. George.
MS. GEORGE: Oh, sorry. Sorry. Is it --
THE COURT: You can see on the bigger screen what the jury sees.
MS. GEORGE: Let me fix that. There. Is that better?
Q. (BY MS. GEORGE) And we see a man walking up?
(Playing Exhibit.)
Q. (BY MS. GEORGE) Agent, do you see a man walking up?
A. Yes. There was a man that walked up to the door.
Q. All right. And the crowd is significantly bigger now?
A. Yes.
Q. Significantly bigger than when the red car was there when you initially saw it there?
A. Yeah. I mean, it was growing constantly, so.
Q. And you can see if you look right -- well, you can see the red car in front of the bus?
A. I believe -- yeah. It looks like that's the red car.
Q. Now there is --
A. There's the second car.

Q. There is the second car, right?
A. Correct.
Q. Okay. All right. Now, did you ever watch the front video, the front entrance video?
A. I have not seen this front entrance video, no.
Q. All right. So the whole situation was very frustrating; is that fair to say?
A. Correct.
Q. You wanted Spokane Police Department to respond when there were only, say, 20 protesters there?
A. 20, 30. I don't remember a precise number. Yes.
Q. And that was way back in the beginning?
A. That was at the beginning.
Q. Yes. And that's when the red car was in front of the bus with 20 to 30?
A. I think we made the initial call before the red car was in front of the bus.
Q. And did you make the initial call before or after the windshield was spray-painted?
A. Before.
Q. Okay. And then the windshield was spray-painted -- or the red car parked, right?
A. Correct.
Q. Then the windshield was spray-painted?
A. Correct.

Q. And that's when it came to your mind that you needed to either scrape the window or find another plan?

A. At the point when they spray-painted and the -- both cars -- you skipped the part where there was a second car that went on the back. Then that bus was basically inoperable.

Q. Okay.

A. And then also the person doing whatever it was by the tires and crawling around underneath. There was -- it was not safe to use that bus. Plus, it couldn't be used.

Q. Right. And so you believe that this would not have happened if Spokane Police Department would have responded?

MS. PEREZ: Objection. Speculation.

THE COURT: Sustained.

Q. (BY MS. GEORGE) In your mind, you were thinking that this would not have happened had Spokane Police Department responded?

MS. PEREZ: Objection. That is the same question.

THE COURT: Sustained.

Q. (BY MS. GEORGE) You gave an interview to -- I believe it's Detective Oliphant?

MS. PEREZ: Objection, your Honor.

THE COURT: Ms. George, are you going to ask something different? It calls for speculation.

MS. GEORGE: I'm asking his state of mind, and his state of mind is relevant.

THE COURT: Only to a limited extent, Ms. George.

MS. PEREZ: Your Honor, but the question is the same. She is asking him. Yes, he has some thoughts. Everyone has thoughts about what's going on, and those have been objected to on direct --

THE COURT: Okay. Here's the deal. Just as I sustained objections to what individuals that were protesting might have been intending to do or not, I'm going to sustain the objection regarding what the results of Spokane Police Department would have done. I think you've asked this question that they wanted to call Spokane Police Department. You can move on.

Q. (BY MS. GEORGE) And you were frustrated that they would not respond?

A. I was frustrated that there wasn't a response and that also that our building was under siege.

Q. And --

MS. GEORGE: I guess I won't ask anything else.

THE COURT: Okay. Mr. Ahmed.

MR. AHMED: Thank you.

CROSS-EXAMINATION

BY MR. AHMED:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Is it afternoon? Good morning. It's been a long day.

A. This is the awkward time where you can't say good morning,

and you can't say good afternoon.
Q. Special Agent LaForte, what does the word "siege" mean to you?
A. Siege is when you surround a place and prevent people from either coming in or out.
Q. Okay.
A. And keeping them into a place.
Q. All right. Agent LaForte, I mean, certainly you could walk outside, correct?
A. I could walk outside --
Q. Okay.
A. -- with potential issues.
Q. Nobody -- sorry. I'm sorry. I interrupted you.
A. I could walk outside, but there's a threat outside.
Q. Okay. But nobody -- you testified nobody damaged the building; nobody tried to enter the secure parking lot.
A. I did not testify to that.
Q. You didn't testify that nobody damaged the building?
A. That no one damaged the building? There was damage to the building.
Q. Oh. You indicated that there was a -- somebody had spray-painted "Fuck ICE" on the gate?
A. I haven't --
Q. Do you recall being interviewed by --
A. Are you talking about today? Or are you talking about --

Q. No. I'm talking about -- what's the damage to the building?

A. The damage to the building was people had spray-painted "Fuck ICE." They put pig stuff on the gates on the building. They deflated the tires of the bus. They spray-painted the bus. They slashed the tires on the border patrol van.

Q. I'm talking about the building itself. Okay? So you said you were under siege. So I assume we're going to see a photograph of "Fuck ICE" on the gate?

A. I don't present pictures.

Q. Okay. But do you recall seeing that on the gate?

A. Yes.

Q. Okay. And --

A. The pig -- and actually, I walked by yesterday, and you can actually still see the pig, even though it's cleaned.

Q. And somebody had blocked the gate with furniture or something. I don't know what it was, but they had blocked the gate with furniture, right?

A. With patio tables and other stuff.

Q. Okay. But did anybody try to enter the building, break any windows or anything like that?

A. So I'm not certain, but I thought that there was -- someone threw something up at like where the elevator lobby is, that the window may have been cracked. I don't know if that was from that protest or not, but I don't recall it being there before.

Q. Okay. You certainly went outside. We saw the video. We've seen it many times where you approach individuals at the south gate, correct?

A. Correct.

Q. And you weren't afraid at that point, correct?

A. I mean, there was a fear in the back of my mind, but the job and making sure that the security of those folks overrode that.

Q. You certainly weren't afraid to go by and flip somebody's hat off, right? I mean, you certainly didn't appear to be afraid at that point, correct?

A. I don't think that has anything to do with fear.

Q. Oh. So you wouldn't say that's escalation at that point?

A. No. That was frustration.

Q. You might meet the wrong person at some point, wouldn't you, Agent LaForte?

A. Perhaps.

Q. You might flip the wrong person's hat off, and it could be escalation, right?

A. It could.

Q. Right? I mean, you know better than that, correct?

A. It could.

Q. Right. I imagine you've gone to some sort of schooling and training about escalation and flipping -- or touching people, correct?

A. We don't have training on flipping hats.
Q. Okay. Then you just did it out of frustration?
A. Correct.
Q. Okay.
A. And there was also a part of me that thought maybe that would distract them a little bit so we could get into the building.
Q. You were looking for a fight, right?
MS. PEREZ: I would ask the witness be able to answer his question.
THE WITNESS: No, I was not looking for a fight.
Q. (BY MR. AHMED) In fact, some of the agents, before you left that door, had tried to convince you not to lead the way, right?
A. I don't recall that.
Q. Any agents concerned about you not wearing body armor?
A. I think some were, but I don't remember anyone saying that.
Q. And didn't you argue with agents that "I'm going to lead the way"? Didn't you argue?
A. No. I don't recall that.
Q. Okay. Do you recall tearing up a banner? You could have gone around that banner. It was about eight feet long.
A. That was the most direct route and taking that banner down prevented them from blocking that exit.
Q. Don't you think tearing up that banner could have been a

form of escalation?
A. No.
Q. And then you and your troops decided to go ahead and start pushing people at the front, at the south gate, correct?
A. Me and my officers and agents went up to clear that path from people that were obstructing and committing a criminal act.
Q. Let me ask you this, though: Are your powers designated under 8 USC 1325? Is that what your powers are?
A. Title 8?
Q. Yes.
A. For immigration enforcement, correct.
Q. So when you --
A. That's a specific statute that I don't believe had anything to do with the detainees that were in custody.
Q. You didn't have any detainees in those vehicles, those SUVs, at that point, correct?
A. Not at that point. We didn't have a chance to. We were trying to stage them, but we were prevented to doing so.
Q. The truck had been disabled -- I mean the white truck had been -- bus had been disabled at that the point. There was already graffiti on the windshield, correct?
A. Correct.
Q. Okay. And the red van that y'all called in as a substitute -- you were supposed to have two vans, but only one showed up, correct?

A. No. There was only one van that was available, to my knowledge.
Q. And you certainly couldn't have fit all the detainees in that van, correct?
A. Correct. That's why we needed the cars.
Q. So you don't have a van. You have no way of moving the detainees at this point when you're exiting the south gate. By this point, you have no way of moving those detainees, correct?
A. We weren't trying to move the detainees.
Q. Understood. But you had no way of moving the detainees when those SUVs were leaving the south gate, correct?
A. Yes, we did.
Q. What was that?
A. The border patrol van and those three vehicles were the means.
Q. And they had not got there yet, correct?
A. They hadn't had the opportunity because they were blocked.
Q. Okay. So but they weren't usable at that point. Did you know that when you were exiting the south gate, that they'd already been blocked?
A. That people were beginning to block it. That's why we went outside to try to prevent that.
Q. What were you going to do outside?
A. We were going to try to push everyone out to create a gap and hopefully be able to hold that gap, but quickly that

disintegrated.
Q. And SPD showed up about that time, too, correct?
A. No.
Q. What time did SPD show up?
A. When the SWAT team showed up, like 8:00 or 9:00 at night.
Q. There were more than 20 police officers out there, correct?
A. At 9:00 at night?
Q. Earlier than 9:00 at night.
A. There was no one there at that time.
Q. Agent LaForte, do you remember what time or, if you know, the smoke was shot out?
A. I don't recall the exact time, but it was evening, so it was probably 9:00 something, 9 or 10.
Q. Could it have been as early as 8:00, 8:15?
A. I don't remember the exact time.
Q. You don't know? Okay.
You certainly initiated the contact with those protesters, correct?
A. We did.
Q. Okay. And that would be a form of escalation, too, correct?
A. It is a form -- it is not escalating. It is doing our duty to prevent criminal acts. There was a criminal act that was occurring. They were obstructing our means of fulfilling our duty and trying to get those vehicles out, and they were

surrounding a parking lot. So you can't just sit there. And the verbal -- you know, in terms of the continuum, verbal was not working. At some point, you have to physically try to move people.

Q. I don't know if you've seen the video, but did you try to verbalize with the people when you went out to the front gate?

A. We told them to get out of the way.

Q. And you immediately began assaulting them, correct?

A. No, we weren't assaulting.

MS. PEREZ: Object to the characterization.

THE WITNESS: We weren't assaulting them.

THE COURT: That's a legal term. Please just ask for facts.

Q. (BY MR. AHMED) You immediately began pushing them, correct, and throwing them to the ground?

A. We were moving them out of the way and pushing them, correct. Not throwing them on the ground. We were pushing them out of the way.

Q. You were certainly being aggressive.

A. We were pushing them out of the way.

Q. You had an alternate way of moving the detainees, too. You had a back door, correct?

A. A back door where?

Q. Do you recall telling an investigator when you were interviewed that you had a back door that you could have used,

but you didn't want to?
A. The back door was the door that we went out.
Q. Yeah.
A. The south door. That was where we tried to --
Q. You referred to it as a back door back when you were interviewed.
A. The back door would be that south door.
Q. Okay. And you were asked about that --
A. That's what we were trying to start was that.
Q. Okay.
A. See, the issue is there was probably five or six different plans that we had throughout the time. Getting people out the back door, through that south door, was at one point an option. But once the protesters, you know, went out there and -- that quickly became not really feasible because you're trapped in a parking lot. So then we tried to go -- at that point, the plan was to try to go on the east side, out the east with the border patrol van and those other vehicles.
Q. Okay. At about sometime around 2:00 you started making phone calls to people, correct?
A. Correct.
Q. You called Alison Gregoire, who is --
MS. PEREZ: Objection, your Honor. This is -- this is shocking what defense counsel is doing, trying to improperly impede the jury --

THE COURT: I already sustained that, Mr. Ahmed, for now. If you want to address something at a break, you can address it at a break.

MR. AHMED: Okay. Well, no, I'm not going to elicit any hearsay here, Judge.

THE COURT: No. That conversation I've sustained for now.

MR. AHMED: Okay.

Q. (BY MR. AHMED) Was it your understanding that the police weren't responding -- did that have anything to do with the Keep Washington Working Act? I mean, was that your understanding?

MS. PEREZ: Objection. Also that's a legal conclusion.

MR. AHMED: If he knows.

THE COURT: I'll let him ask if he knows.

THE WITNESS: I don't know. You'd have to ask Chief Hall.

Q. (BY MR. AHMED) You indicated that the crowd was yelling. I mean, we heard "chickenshit," "Nazi," "shame on you." And you said "Kill yourself," too?

A. Somebody at some point said "You should just kill yourself" or something along those lines.

Q. Did you feel threatened by that?

A. Of course.

Q. Why?

A. Because we were surrounded, and we couldn't go anywhere, and if people are wanting death or harm on us, then --
Q. But not --
A. -- that sort of leads to the mindset of the protesters that are out there.
Q. But not one time during that whole protest did any of the crowd initiate contact with you. It was always the other way around. Correct?
A. There was one time that we went out to initiate contact, was to clear the gate from a criminal act.
Q. And there were 20, 25 people out at that front gate, correct?
A. The back gate?
Q. The south gate.
A. The south gate.
Q. Yes.
A. I think there were more than that at one point.
Q. They could have certainly overran you if they wanted?
A. They could have.
Q. Didn't happen.
A. Well, it did happen. It did happen. We couldn't get out.
Q. Did you see the video? Did you see the video?
A. I have seen the video.
Q. Okay.
A. Did you see the video?

Q. I saw it.

THE COURT: This is getting argumentative. Ask some questions.

THE WITNESS: It's pretty apparent they --

Q. (BY MR. AHMED) It's apparent that you're the aggressor, right?

A. -- swarmed in and --

Q. It's apparent --

A. I'm not aggressive.

Q. It's apparent that you're the aggressor, right?

A. We are not the aggressor.

MS. PEREZ: Objection, your Honor. That is inappropriate.

MR. AHMED: It's not inappropriate. It's proper impeachment.

I have nothing else.

MS. PEREZ: I would move to strike that, your Honor.

THE COURT: Okay.

MR. AHMED: I would oppose the motion to strike.

THE COURT: We will address this at a break.

We've got five minutes, Mr. Oreskovich. You want to start?

MR. ORESKOVICH: Sure.

CROSS-EXAMINATION

BY MR. ORESKOVICH:

Q. Good morning, Agent.

A. Good morning, sir.
Q. What led you and the other two officers -- I think it was you and Officer Tomaso --
A. Can you repeat that question? I'm sorry.
Q. Can you not hear me?
A. I had a hard time hearing you.
Q. Is that better?
A. Yeah.
Q. Usually people hear me real well, but...
What brought your attention to the south gate and what caused you and Officer Tomaso and Officer McSullivan -- and if I'm using the wrong term, I apologize. But what led you to go out there is that you saw a group of protesters standing at the front gate blocking the three vehicles coming out, correct, sir?
A. When we saw the rush of people to go out and block our officers.
Q. They were blocking your officers from leaving, correct?
A. Correct.
Q. And you went out there then to clear the crowd, correct?
A. We attempted to clear the crowd away from that gate, correct.
Q. Clear the crowd away from the gate so the vehicles could leave, right?
A. Correct.
Q. None of those protesters, while you were waiting, while you

were attempting to get out there, did any damage to your vehicles, correct?
A. To the vehicles inside --
Q. Yes.
A. -- the gate?
Q. Yes.
A. I don't believe they -- no.
Q. Oh. They didn't do any damage to the vehicles, they didn't slash any tires.
A. They didn't have the means to do so, though.
Q. Sir, I want you to answer my question. All right?
My question is whether or not they slashed any tires. Did they or did they not slash tires before you arrived?
A. Of the vehicles inside that lot?
Q. Of the vehicles inside the south gate.
A. They didn't have the means. They weren't inside there to be able to slash those tires.
Q. The gate was open, was it not?
A. Yes.
Q. All right. So if the hundred people or so that were there, if they wanted to, could have advanced through the gate, could they not?
A. They could have.
Q. And you were concerned about that at least at one point, correct, sir?

A. Correct.
Q. All right. But they didn't do that, did they?
A. No, but they had slashed other tires.
Q. Can you answer my question, sir?
A. Yes, sir.
Q. My question dealt specifically with the south gate. All right? So let's just frame our line of questioning and your answers to the south gate.
No one from the protest crowd, prior to the time you people arrived, the three officers arrived, went inside that gate and did any damage to the vehicles, correct, sir?
A. Not those vehicles, no.
Q. Correct. And then, sir, the only physical contact that occurred between the ICE officers and the protesters occurred at the south gate when you folks were attempting to clear the way, move the crowd, whatever language you want to use. The only contact that occurred was in a roughly 30-second period at that time, correct, sir?
A. Correct.
Q. All right. And after that happened, it became apparent to you that you were not going to be successful in terms of moving the folks out of the way, right?
A. Correct.
Q. And your team of officers went back inside the gate, correct, sir?

A. Yes.
Q. You didn't close the gate immediately.
A. We couldn't. We had to move the vehicles off the pressure plate in order to close it. We don't just close it.
Q. I get that. The point about all this is the gate was open for how long?
A. Oh, 15, 20 seconds or so until we were able to move the cars back.
Q. Well, it was open a little longer than that, sir. Let's look at 605D if we can, please.
(Playing Exhibit.)
Q. (BY MR. ORESKOVICH) Now, your officers are inside the gate at that point, are you not?
A. The officers are inside the gate, yeah.
Q. All right. Let's watch it from this point until the gate closes.
(Playing Exhibit.)
MR. ORESKOVICH: You can stop it, please.
Q. (BY MR. ORESKOVICH) Would you agree with me that that was slightly less than three minutes?
A. Yeah. I thought you were talking about from the time that I went into the gated. So, yeah, it was open for minutes in total, yes.
Q. And the hundred or so protesters -- let me rephrase the question here for a moment. Let me rephrase the question here

for a moment.

In that two- or three-minute period while the gate was open, you folks were standing within feet of the protesters, correct, sir?

A. Correct.

Q. How many feet would you estimate between where your folks were and the protesters were?

A. Five, six feet.

Q. Say again?

A. Five or six feet.

Q. All right. Thank you. I can't hear well, so...

A. Neither can I.

Q. And in that time period, those couple or three minutes, none of those protesters advanced on you, did they? They didn't come across that line? They didn't come through the gate, right?

A. They didn't come through the gate.

Q. They didn't engage in any type of physical contact with you or your group, correct?

A. Not afterward.

Q. They didn't engage in any destruction or damage or vandalism to your vehicles, did they?

A. Not inside that gate, no.

Q. Correct. And then after the gate closed, you folks continued to stay there for a period of time, didn't you?

A. Yes. A few minutes.
Q. Say again?
A. For a few minutes.
Q. Isn't it fair to say that you were roughly inside that gate for about 15 minutes?
A. About that probably, yeah.
Q. All right. So it's not a few minutes. Fifteen minutes; isn't that more accurate?
A. Well, a few. More than three, yeah.
Q. Well, do you recall ever being interviewed by Detective Oliphant for the Spokane Police Department?
A. Yes.
Q. Three different occasions you were interviewed by the detective, were you not?
A. I don't recall three times, but...
Q. You first had an interview in person, correct, sir?
A. Correct.
Q. And then after that interview, you wanted to provide some more information to the detective. You called him --
A. Telephonic.
Q. -- correct?
A. Correct.
Q. And then even after that phone call, you wanted to provide more information, and you called yet a second time?
A. A second time.

Q. Three interviews, correct?
A. Yeah. One main one and then two subsequent follow-ups.
Q. Doesn't matter, sir.
You recognize it's important, as a law enforcement officer, to write accurate reports. You write reports all the time, right?
A. Not as many as I used to.
Q. But you write reports. Correct, sir?
A. Yes.
Q. You know it's important to get good information, and you know that officers try to be accurate in their report-writing, correct?
A. Correct.
Q. And more importantly, you know that when you're trying to interview a witness, what you want to do is get the witness to provide accurate information to the officer, right?
A. Correct.
Q. In this circumstance, you were not the officer who was doing the interview; you were the witness who was providing the information, correct?
A. Correct.
Q. And it would have been important at that time, and you understood at that time, to provide accurate information, correct?
A. Correct.

Q. And that interview took place on a June 18th of 2025, right?
A. June 18th?
Q. Yes.
A. I don't recall the date.
Q. Within a week or so of the incident occurring, correct?
A. Yeah.
Q. Your memory was fresher at that time, was it not?
A. It was -- it was what?
Q. Memory was fresher.
A. Fresher, correct. Yes.
Q. All right. And didn't -- at some point in time, did you not tell Officer Oliphant that you and the other agents were in the secured lot for about 15 minutes? Do you remember saying that?
A. If that's what my statement was, yes.
Q. Would you like me to show it to you?
A. I trust you.
Q. All right. And during that 15-minute time period that you were within the secure lot, no one attempted to have physical contact with you. None of the protesters tried to climb over the fence and have contact with you folks, correct?
A. Correct.
Q. And then you were able to leave. And we've seen the video, Exhibit 27, as you walking out the man gate, you and the other

officers, where you flipped the person's hat, correct?
A. Then we went -- yeah, when we left.
Q. Yeah. You were able to walk out to that man gate. You and the other officers walk out through the parking lot area and back into the ICE building, correct?
A. Back into the building, correct.
Q. No one interfered with you at that point?
A. I mean, they were yelling --
Q. Did the protesters --
A. -- and screaming and in the way.
Q. I'm sorry. I didn't mean to cut you off. Go ahead and answer.
A. They were yelling and screaming. They were in the way, but they didn't initiate contact or, you know, fight with us or anything.
Q. Fair enough, sir. Thank you.

THE COURT: Okay. I want to take our lunch break. I realize there may be redirect examination, but let's go ahead and take our lunch break until a little after 1:00.

So members of the jury, be back here at about five after 1:00, no later than that, for us to resume testimony.

Again, my admonitions remain the same. Don't do any research. Don't talk to anyone, even each other, about this case. And enjoy your lunch hour. Please rise.

(Jury exits the courtroom.)

THE COURT: Officer, you're excused. There may be some things the parties might want to be brought up, so it might be best for you to be excused for right now, but you can come back -- please come back close to 1:00. Okay?

THE WITNESS: Okay. Thank you.

THE COURT: Okay. There's an issue with respect to phone calls to the U.S. Attorney's Office. I'm not sure why it's relevant. It could go into work product issues. I will say, as just an observer, and this information is new to me. It's getting a bit repetitive in terms of the information. There's some new information coming forth, but I'm hoping we can move on.

It is well established that police officers were calling for help. That has been said many times, not contested, so I'm not sure what new information is sought and what legal basis there is, if the parties want to address it, or we can drop it.

The other issue would just be to not be argumentative with the witnesses. I realize that this is an upsetting case in many regards, but we just need to ask questions, factual questions, not what other people were thinking, not what other entities were planning on doing, but what this person saw or perceived, and accept the witness at their answer. And if they don't give it to you, they don't give it to you.

Okay. Ms. Perez.

MS. PEREZ: Your Honor, first of all, with calls to

the U.S. Attorney's Office, that's not appropriate. That is not appropriate evidence. I would move to exclude that. There --

THE COURT: I don't think it's come in.

MS. PEREZ: Right, right. I guess that brings me to the second point. There was multiple questions where they attempted to bring it in. So what I would ask is that, when your Honor sustains an objection, that either counsel does not then immediately ask the same question and then try to say it again and again and again. If the United States were to do such a thing, your Honor, if we were to just sua sponte bring forth, say, Jac Archer's phone information that your Honor has excluded, this would be a mistrial. So there's really a double standard here as to what behavior is tolerated by the parties. I would ask that, if an objection is sustained, that the other counsel has to move on and not say this legally-inappropriate thing in front of the jury.

THE COURT: Okay.

MR. AHMED: Your Honor?

THE COURT: I'll hear from you. I have seen it happen a couple of times. I realize sometimes an objection is to speculation, and you can ask it in a different way. But if the topic is inappropriate -- and, please, you all have been attorneys for a long time. You should know the difference between a topic being inappropriate versus the form of the question. But if you don't know, then you need to just not ask

the question, and we'll bring it up at break. And if I say we bring it up at break, that means we bring it up at break, and that does not mean that you try in a different way, at all, full stop. So we're bringing it up at a break.

Mr. Ahmed.

MR. AHMED: Judge, I consider the matter dropped, but I want to explain to the Court why it's important.

THE COURT: Okay.

MR. AHMED: Because Alison Gregoire tells them -- and I wasn't going to get her hearsay in. Okay? But I wanted to know where he was at because Alison Gregoire tells him, "Can you wait it out," basically, "Can you let it de-escalate?" That's the same thing the police department tells him at that point. "Can you wait it out? Can you let it de-escalate? They'll go away in a couple hours." Okay?

And this guy goes in there and initiates contact with them when he's told over and over and over again, "Let it de-escalate." That was what I was trying to get at was -- what I was going to elicit from him was, "Were you told at any point" -- the effect on the listener -- "that to de-escalate this situation?" I would submit to the Court it is a relevant question. I wasn't going to get into "What did Alison Gregoire tell you," or "What did the police chief tell you?" But, "In terms of the effect on you, were you told to de-escalate in this situation?" And he did exactly the opposite, and I do think

it's relevant, but I won't bring it up again.

MS. GEORGE: I -- it was in the point of my cross when I was trying to establish a timeline, and I was only asking that you -- because it's documented in his report, so I was trying to establish a timeline that that is one of the calls he made at this particular time. I was not going any further.

THE COURT: Okay. Okay. There has been evidence introduced about making phone calls, and help was not arriving. I'm trying to think in my head of what -- you know, their state of mind is of minimal relevance. This is about defendants' state of mind. Now, their state of mind, with respect to whether or not they felt threatened, is relevant to whether or not a reasonable person would be threatened under the circumstances, which is an element, and so that's why I've allowed them to testify as to that.

Whether or not people were telling them that they should de-escalate and they did not, I'm just trying to think in my mind about what that is relevant to.

MS. PEREZ: Your Honor, to be clear --

THE COURT: So help me with that.

MS. PEREZ: If there's some question about what Alison Gregoire, the criminal chief, thinks about this case, we can call her in here and get that.

THE COURT: We're not doing that. We're not doing that.

MS. PEREZ: Well, I guess that's my point. And so if -- so -- oh, and I just overheard that we can call Rich Barker. I would love to cross Mr. Richard Barker, your Honor.

THE COURT: No. We're not calling Rich Barker. We're not calling --

MS. PEREZ: Okay.

THE COURT: -- and I really want to move on beyond this. It seems to me that the probative value is low. I'm not understanding it, and people can explain to me why I'm wrong. It seems to me that the evidence is pretty clear that they were calling for help, that help was not coming, and it could be that we have law enforcement officers who will come and explain why they didn't come, and that may well be sufficient.

The thing is that I think we're going to get into a timeline issue. It's not clear to me that phone calls were made before they went out and did the pushing thing.

MS. PEREZ: Your Honor, to --

THE COURT: It seems like it would get very complex.

MS. PEREZ: I think the ultimate crux of this issue is calls to the U.S. Attorney's Office, legal advice, that is not appropriate to bring in.

THE COURT: Okay. I think that I heard Mr. Ahmed say it was calls to other people, too, to the SPD, who told them to wait it out. I think we've already heard that.

MS. PEREZ: We've got that in so much, your Honor,

throughout the afternoon, and the timeline is fuzzy. No officer was exactly looking at their watch this whole time. Throughout the afternoon, there were multiple calls to SPD. That is in evidence in so many ways. We don't need to go any further, and I would ask that it not go further.

THE COURT: I think it doesn't need to go further. Clearly, they were frustrated. They've admitted that they were frustrated that help wasn't coming. They wanted help to come. Help knew what was going on, and help did not come. I don't think that we need to go further. It's just going to be some wrangling about a bunch of stuff that's really getting off point.

We have a day and a half left of this week, and we need to get through it. Like I said, this has been -- I understand that each witness that experienced things is entitled to explain their experiences, but it is getting pretty cumulative. So where are we at in terms of witnesses?

MS. PEREZ: Your Honor, I have -- it will be brief redirect, and then this afternoon, we have kind of moved on from this -- the south gate incident. We will have a few local law enforcement officers. Defense has the list of what that's going to be. I am hopeful we can move quickly. Although, that is a little bit outside of my control.

THE COURT: I understand that. I'm just hoping that -- and I just don't know this case the way you know it. I'm

just hoping that we don't have to go through the same videos over and over again.

MS. PEREZ: No, no, no. Really, we're done essentially playing video of the south gate. We've kind of moved on to different -- this is the red van kind of start of videos. There really -- I mean --

THE COURT: Were the defendants at the red van?

MS. PEREZ: Yes.

THE COURT: Okay. I mean, we need to focus on where the defendants were.

MS. PEREZ: Yes. The defendants were at the red van, and then they were at the smoke -- Mr. Mavalwalla was at the smoke deployment. So, yes, they were there throughout the whole thing.

THE COURT: I think it needs to focus on where the defendants were during these incidents.

MS. CARTIER-GIROUX: There are coconspirators as well. This is a conspiracy, so it's not just the three defendants.

THE COURT: I understand that.

MS. CARTIER-GIROUX: So we need to place people who we're going to talk about in closing who are part of this conspiracy.

THE COURT: Okay. I understand that, so I'm just trying to make sure it's focused so that we get to closing arguments.

MS. PEREZ: I agree, your Honor.

THE COURT: That's my goal. That's my goal. Okay. All right. Well, enjoy your brief lunch. I'm going to be back on the bench about five after, just in case there's anything to talk about.

(Court recessed from 12:17 p.m. to 1:11 p.m.)

THE COURT: Okay. Are we ready to bring the jury in? We are. Okay. Great.

THE LAW CLERK: Ready for you now.

(Jury enters the courtroom.)

THE COURT: Okay. Officer LaForte, please retake the stand and we'll continue with redirect examination.

REDIRECT EXAMINATION

BY MS. PEREZ:

Q. Okay. Special Agent LaForte, I just have kind of one thing I want to clarify with you.

So Ms. George went through with you the various doors on the HSI facility; is that right?

A. Correct.

Q. Okay. And I want to clarify. How many doors are accessible to you or to HSI?

A. There's those three doors, north, east, and south.

Q. Okay. So this is Exhibit 11.

A. I'll clarify that, too. There's two doors on the north.

THE COURT: Can everyone see the exhibit? Okay.

Good.

Q. (BY MS. PEREZ) Okay. Exhibit 11, still here. There's one door here; is that right?

A. The main door, yep, and then there's the sally port door. I mean, the garage itself, but that's not -- I wouldn't consider that a door.

Q. So that's what you referred to as the north; is that right?

A. North.

Q. And that's the -- and then on the south, there's a door you walked out of; is that right?

A. Correct. Just one.

Q. And then on the east, is there one door you walked out of at the end of the night?

A. One door.

Q. The other doors that Ms. George showed you, are you able to access those?

A. No.

MS. PEREZ: No further questions.

THE COURT: Okay. Any recross based on that very limited redirect?

MR. ORESKOVICH: No, your Honor.

MS. GEORGE: No.

MR. AHMED: No, your Honor.

(WHEREUPON, further proceedings were held which were not ordered and transcribed.)

* * * * *

## WITNESS INDEX


| For the Plaintiff | Page |
|---|---|
| **JOHN LAFORTE** | |
| DIRECT EXAMINATION BY MS. PEREZ | 3 |
| CROSS-EXAMINATION BY MS. GEORGE | 43 |
| CROSS-EXAMINATION BY MR. AHMED | 68 |
| CROSS-EXAMINATION BY MR. ORESKOVICH | 80 |
| REDIRECT EXAMINATION BY MS. PEREZ | 97 |


* * * * *

## EXHIBIT INDEX


| No. | Description | Page |
|---|---|---|
| None | | |

C E R T I F I C A T E

I, CRYSTAL L. GONZALEZ, do hereby certify:

That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Spokane, Washington;

That the foregoing proceedings were taken on the date and place as shown on the first page hereto; and

That the foregoing proceedings are a full, true, and accurate transcription of the requested proceedings, duly transcribed by me or under my direction.

I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings;

DATED this 29th day of June, 2026.

CRYSTAL L. GONZALEZ, CRR, RPR
Washington CCR No. 2955
Official Court Reporter
Spokane, Washington