# Exhibit F.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:25-cr-00113-RLP |
| Plaintiff, | ) | May 21, 2026 |
| | ) | Spokane, Washington |
| vs. | ) | |
| | ) | Excerpt of Jury Trial - Day 4 |
| JUSTICE FORRAL (2), BAJUN MAVALWALLA (8), and JAC ARCHER (9), | ) | **Testimony of Tyler Heiman** |
| | ) | Pages 1 - 30 |
| Defendants. | ) | |

BEFORE THE HONORABLE REBECCA PENNELL
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | LISA C. CARTIER-GIROUX<br>REBECCA R. PEREZ<br>U.S. Attorney's Office<br>920 W. Riverside Avenue<br>Suite 340<br>P.O. Box 1494<br>Spokane, WA 99201 |
| For Defendant Forral: | ANDREA K. GEORGE<br>AMY H. RUBIN<br>Federal Defenders of Eastern Washington & Idaho<br>601 W. Riverside Avenue<br>Suite 900<br>Spokane, WA 99201 |
| For Defendant Mavalwalla: | AINUDDIN AHMED<br>Ahmed Law Firm<br>550 Congressional Boulevard<br>Suite 350<br>Carmel, IN 46032 |
| | MATTHEW F. DUGGAN<br>Duggan Law Offices PLLC<br>23505 East Appleway Avenue<br>Suite 200-175<br>Greenacres, WA 99019 |

For Defendant Archer: CARL JOSEPH ORESKOVICH
ANDREW M. WAGLEY
Etter McMahon Lamberson Van Wert & Oreskovich PC
618 West Riverside Avenue
Suite 210
Spokane, WA 99201

Official Court Reporter: Crystal L. Gonzalez, CRR, RPR
United States District Courthouse
P.O. Box 700
Spokane, Washington 99210
(509) 458-3434

Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.

(WHEREUPON, previous proceedings were held which were not ordered and transcribed.)

(TYLER HEIMAN, called as a witness by the Plaintiff, having first been duly sworn, testified under oath as follows:)

THE COURT: Please be seated.

DIRECT EXAMINATION

BY MS. CARTIER-GIROUX:

Q. Sir, good afternoon.
A. Good afternoon.
Q. Please state and spell your first and last name.
A. Tyler Heiman. T-Y-L-E-R, H-E-I-M-A-N.
Q. Where were you employed on June 11, 2025?
A. Spokane Police Department.
Q. How long had you been employed with SPD?
A. Approximately nine years.
Q. Okay. And before that, where were you employed?
A. Houston Police Department.
Q. And before that?
A. U.S. Army.
Q. All right. Have you had any specialized training as a police officer?
A. Yes.
Q. Briefly, what have you had?
A. Part of the TAC team for the Spokane Police Department.
Q. What is the TAC team?

A. Primarily deal with crowd management, large events, large crowds, crowd control for protests and other demonstrations.

Q. And were you part of the TAC team on June 11th, 2024 [sic]?

A. I was.

Q. Did you have any other specialized assignments?

A. My primary role -- no, I did not, no.

Q. Okay. And -- but was your -- I was just going to ask you this. What was your primary role?

A. Neighborhood resource officer.

Q. And what is a neighborhood resource officer?

A. So we liaison with the community in our specific areas. I was assigned to the northwest area of Spokane. We go to the city council meetings -- or, sorry, neighborhood council meetings and just kind of act as a liaison, kind of a first connect for people in that neighborhood to contact if they have issues pertaining to the police.

Q. Okay. June 11th, 2025, were you working that day or were you called to respond?

A. I was called to respond.

Q. Do you know approximately when you were called to respond?

A. Approximately like 4:00 or 5:00 p.m.

Q. Okay.

A. I believe.

Q. And where did you go to?

A. We went -- initially, we went to -- we staged a couple

places, but the last place we staged was at the high school, North Central High School.
Q. Okay. And what was the purpose of you going to North Central?
A. To stage, to get our resources together.
Q. And what was the plan?
A. Prior to responding to the ICE building on -- off Washington to -- like what we were supposed to do there?
Q. Yes.
A. We got called to assist HSI, ICE -- I'm not sure -- with evacuating the building because it had been surrounded.
Q. And so you met at the high school. What was your role in -- like when you were going there, what were you supposed to do?
A. From the high school, we were --
Q. Yes.
A. We caravanned down to the ICE building with several police vehicles and a red van, like a border patrol. I believe it was driven by border patrol agents. The plan was to go to the building, create basically a safe space for the people in the building to evacuate the detainees to that red van, and then leave.
Q. Okay. And so you were part of the caravan?
A. Yes.
Q. Do you know what in line you were, like where you were in

relation to the red van?
A. I was in front of the red van.
Q. Were you the first car in front of the red van?
A. I don't know. I was towards the front of the caravan.
Q. Okay. When you -- how did you get to the building? Like what street did you come down?
A. We came south on Washington.
Q. Okay. When you came south on Washington, did you pass Cataldo?
A. Yes.
Q. Were you able to see the front of the ICE building?
A. Yes.
Q. Okay.
A. They -- the -- I guess what's the front? Is that facing Washington or facing Cataldo?
Q. The one that's on Cataldo.
A. Yes.
Q. Yeah, the building -- the entrance facing Cataldo.
A. Yes.
Q. So when you're driving down Washington, you would pass Cataldo, correct --
A. Yes.
Q. -- when you were driving south?
A. Yes.
Q. What, if anything -- were you able to observe the white bus

parked on Cataldo?
A. I was, yes.
Q. And could you -- could you describe its condition?
A. It looked like there was white spray paint on the windshield covering most of the windshield, and the tires looked like they were deflated.
Q. Did you see any other vehicles blocking it?
A. Yes. I believe there was a small car in front of it.
Q. Okay. What time did you arrive at the federal building?
A. It was around -- a little before 6:30.
Q. Little before 6:30? P.m.?
A. Yes, p.m.
Q. Okay. When you got there, were -- what happened? What did you observe happen?
A. So when we parked -- we were past -- so we were further south, I guess, than the red van. So we parked in front of the red van on Washington and walked towards -- would have been the east side of the building. We had a door identified that the people we were going to -- were supposed to be coming out of, the detainees and the agents or whatever the federal agents or people were. They were supposed to exit out of and we were going to basically set up two skirmish lines on either side to create, like, a safe alley or pathway from that door to the red van that was parked on Washington.
Q. When the red van got there, did you see what happened?

A. Yes.
Q. What happened?
A. So initially, there was a -- like kind of a -- there was kind of like people all over everywhere, and they didn't seem -- so and then after we showed up, we created that line, that skirmish line, the both skirmish lines on either side of that door. The group started kind of closing in on the lines. And then there was some people also kind of hanging out by the red van.
Q. Okay. And what were they doing to the red van, if anything?
A. So -- well, initially, like I said, it didn't -- they were just kind of approaching our lines, like on the skirmish lines. And then a few minutes in, I noticed that they were actually trying to like -- they were circling the van, the red van.
Q. They were surrounding the red van?
A. Yes, they were surrounding the red van.
Q. Okay. Were they on the skirmish lines as well?
A. Yes.
Q. Okay. Were you -- did there come a point in time where SPD officers were given commands to push back those who were on the line?
A. Yes.
Q. Okay. And did that happen?
A. Yes.

Q. Was it effective?
A. No.
Q. Why wasn't it effective?
A. There was numerous warnings given by SPD officers for people to get back and -- so I don't want to say nobody was listening, but the vast majority were not complying to those orders.
Q. What, if anything, did people do in response to being pushed back?
A. Everything from, you know, screaming back at us, saying -- calling us names, then also shoving back against us.
Q. Did you witness that?
A. Yes.
Q. I want to ask you to take a look at exhibit -- hold on one second. 40 -- 41.
Do you recognize Exhibit 41?
A. Yes.
Q. Now, Exhibit 41, what point in time does this appear to be?
A JUROR: Not on our screen.
MS. CARTIER-GIROUX: Oh, I'm sorry. Is it now? Okay. Thank you. Thank you for telling me.
Q. (BY MS. CARTIER-GIROUX) What point in time does this appear to be?
A. Shortly after we arrived.
Q. Okay. So what I want you to watch, if you would, is the

area around the red car. Okay? It's going to move a little bit because it's a drone, but I want you to watch the activity near the red car, and then I want you -- I'm going to stop it, and I want you to tell me what, if anything, you observed. Okay?

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) So what are we seeing happening? You can tell me what's going on right now.

A. There's a group of people -- looks like a group of people walking from the front or, I guess, the north side of the building, the ICE building, around to us on the -- on the east side.

Q. Okay. Now, what I want you to do is watch this red car up in the corner and see if you can see any activity over there.

What do we see?

A. The driver's door is open.

Q. Okay.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) What do we see?

A. Looks like someone getting out of the driver's door and closing the driver's door and now walking towards the crowd.

Q. Okay. Do you recognize the person walking?

A. I do, yes.

Q. Who do you recognize the person to be?

A. Justice Forral.

Q. Do you see anything in Justice Forral's hands?

A. Yeah. Looks like a black -- something black in his right, and then a -- he had a rope or something on his left hand or it was a dog leash. It looked like a dog leash.
Q. Okay. I'm going to bring it back a little bit.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Do you see what's in his right hand right now?
THE COURT: Ms. Cartier-Giroux.
Q. (BY MS. CARTIER-GIROUX) Do you see what's in Forral's right hand right now?
A. Yes. It's -- it looks like a steering wheel lock club.
Q. Okay.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Okay. Now I'm going to have you take a look -- did you see Forral at the -- around the area of the red bus?
A. Sorry?
Q. Did you see Forral around the area of the red bus?
A. Yes.
Q. Okay. And did you see Forral around the area of the red bus around 6:30, little after 6:30 p.m. when you arrived?
A. Yes. Just to verify the red van on Washington, right?
Q. And at that time, did you see anything in their hand?
A. Yes.
Q. I'm going to show you Exhibit 48.

(Playing Exhibit.)
MS. CARTIER-GIROUX: Isn't there sound? Do you know where the sound is?
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) And who do we see in this video that you recognize?
A. Justice Forral.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Okay. What do we see in their hand?
A. That steering wheel lock club.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) And what do we see around their neck?
A. Looks like a rope or like a dog leash of some sort.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) And what are they saying at this point in time?
A. Saying my name.
Q. Okay.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Do you and Forral know each other?
A. No. Outside of work, no.
Q. Okay.
(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) How do they appear to you when you encountered them?

A. They were extremely angry, escalated, just screaming. I was initially trying to just ignore -- ignore them and just not give them -- not give them a response. And it clearly was escalating them, making them upset and just really, really aggressive.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) What are you doing with your hands?

A. So I -- after he started -- after they were screaming for a bit, I was trying to calm them down, saying "Relax" and, you know, "Calm down" in an attempt to deescalate them.

Q. And that was right after you had arrived at the location, correct?

A. Yeah. It was within a few minutes.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Now, when that happened, what, if anything, did you perceive this -- this action to mean?

A. It was extremely concerning. This -- I know this object -- like I said, it's -- I know them. We -- I've handled them. I've interacted with them a lot and --

MS. RUBIN: Objection.

Q. (BY MS. CARTIER-GIROUX) What did you think of the action at that moment? What did -- what did you believe the action to

indicate?
A. That it was escalating. That his -- sorry -- their temperament was escalating.
Q. Okay.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What are they telling you? What did you ask and what did they just tell you? Did you hear?
A. I believe I was saying, "It's just not necessary and not to hit anything with it."
Q. Did they indicate what this was from or for?
A. No. They never said -- I didn't hear anything saying what it was or identifying it at all. I just -- like I said, I knew what it is. And -- and I don't -- I don't know if I questioned them on what it was, but they responded with "It's for my car. It's for my car."
Q. Is that a bicycle lock?
A. No, it is not, no.
Q. Could that be used to lock up a bicycle?
A. I don't -- no. I don't see how it would.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Can that object in their hand be utilized as a weapon?
A. Yes.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Okay. I want you to -- did you

observe the interaction between Forral and this person?
A. Yes.
Q. Okay. I'm going to play it back.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Okay. What does it appear that these two are talking about, the ones in the left corner?
A. Something about Forral.
Q. Something about Forral?
A. Yeah. It appears there -- I think the -- the lady in the black --
MS. RUBIN: Objection. Hearsay.
MS. CARTIER-GIROUX: It's a present-sense impression and it -- he's going to respond.
THE COURT: I don't know what the statement is.
MS. CARTIER-GIROUX: I can -- we can -- I can tell you what it is in a sidebar if you want me to.
THE COURT: Okay. Why don't we do that. Just a moment.
(THE FOLLOWING proceedings were had at the bench by Court and counsel, out of the hearing of the jury:)
MS. CARTIER-GIROUX: The woman says, "This is supposed to be peaceful," and Forral says twice, "It's peaceful until it's not peaceful."
THE COURT: Okay. That comes in.
(The following proceeded back in front of the jury:)

Q. (BY MS. CARTIER-GIROUX) Okay. So back to -- what, if anything, did you hear this individual talking about?
A. Trying to -- it appeared they were trying to calm them down, both the lady holding the sign and then -- and then also Forral.
Q. Okay. And what, if anything, did you hear her say?
A. "Keep it peaceful."
Q. Okay.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What, if anything, does Forral respond?
A. I believe he -- I believe they said, "I'll keep it peaceful until it's not."
Q. And then it was repeated?
A. Yes.
Q. And you believe that Forral said what?
A. "I'll keep it peaceful until it's not."
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Okay. And again, this is right after you first got to the red van, the red van arrives?
A. A few minutes into it, yes.
Q. Okay. In addition to your testimony that you saw people surrounding the red van and the issues at the skirmish lines, did you see any other actions done to police cars or the red van that would prevent the movement of the van or police cars?

A. Yes.
Q. What did you observe?
A. Several people -- people wedging items underneath or in front of the police cars.
Q. Okay. I'm going to show you Exhibit 445. And what do we see in 445?
A. Two park benches in front of the police car.
Q. Okay. Did you, at any point in time, attempt to remove objects?
A. Yes.
Q. And what, if anything, did you remove?
A. I believe I removed a few park benches and then also a Lime bike.
Q. Go ahead.
A. And it was tied up. The Lime bike was tied up with a pink leash.
Q. And was that later on?
A. Yes.
Q. And the pink leash, was that consistent with the leash that you saw around Forral?
A. Yes.
Q. Did you see Forral interacting with others near the red van?
A. Yes.
Q. I'm going to show you Exhibit 49.

(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What is Forral calling out for?
A. "Block the doors."
Q. And block what doors?
A. I'm assuming that the doors --
MS. RUBIN: Objection, your Honor. I think it's speculation.
THE COURT: Sustained in part. Just testify as to what you heard, but don't testify as to any assumptions. Okay.
Q. (BY MS. CARTIER-GIROUX) While you were there, did it appear Forral was directing others?
A. Yes.
Q. And is this an example of that?
A. Yes.
Q. I'm going to show you 49A.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Now we'll do 49A.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Okay. What is Forral doing in this video?
A. Directing the crowd to block the doors that we're supposed to be evacuating the people out of.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) All right. And now I'm going to have you watch Exhibit 46.

(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What do we see in Exhibit 46?
A. Forral talking to people at the van, that are surrounding the red van.
Q. And can you describe an article of clothing that they're wearing?
A. That Forral is wearing?
Q. Yes.
A. The pink tank top with some, like, flowered or something -- swim shorts with black shoes.
Q. Okay.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What does it appear Forral is doing?
A. Directing people.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) At the skirmish lines, were you seeing any pushback from the crowd?
A. Yes.
Q. Were all orders being given by officers?
A. Were all orders?
Q. Were orders being given by officers?
A. Yes, orders were given, yes.
Q. To move back?
A. Orders -- numerous orders were being given by officers to

get back.
Q. And I want to show you one of -- one interaction where I believe you were present. Okay?
A. (Moves head up and down.)
Q. I'm going to show you Exhibit 429. Now, you weren't at this location, but I want you to see if you recognize the individual in this photograph that's in evidence. Do you recognize this person?
A. Yes.
Q. Okay. That was 429.
I'm going to show you 430. Is this the same person?
A. Yes.
Q. Did you see that person on one of the skirmish lines?
A. Yes.
Q. Okay. I'm going to play Exhibit 47, which is in evidence.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) So what's going on here?
A. I'm directing these officers just to slowly move forward and try to -- just hopefully our presence would push the crowd back and give us some more room.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) And this woman, do you recognize this person?
A. Yes.
Q. Is that the same individual that I just showed you in

Exhibits 429 and 430?

A. Yes.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) What is going on here?

A. Just a group of people ignoring our orders to move them -- to move back.

Q. And what does this individual tell you when you asked her to move back?

A. She's saying, "I don't understand. I don't know. I can't do it. I don't" -- and then she says, "You're going to have to physically assault me to move me."

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Did you -- what did you just ask of the guy with the red shirt?

A. To move back so she -- because she's saying she can't move back because she's blocked or stuck or whatever, so I asked him to move back to give her some room to move back.

Q. But is she really blocked? Can she leave to the -- to the side?

A. Yes.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) What is she yelling at you?

A. "Don't assault me."

Q. Are you assaulting her?

A. No.

Q. What are you doing?
A. I gave her -- I tried to ask her -- I pled with her to move back, and now I have to forcefully move her back to accomplish our goal of making that safe path.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What is the person in the red shirt doing?
A. They're shoving back at me, and they're, like, widening their stance and just generally making it tough to move them by forcing back at me.
Q. Okay. Nobody is hitting you, right?
A. No.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Now, what are you doing?
A. Just pushing them forward, like forward.
Q. And what are they -- what is the person in the red shirt doing?
A. He -- like I said, he's widened his stance, and he's also like lowered his shoulder and is shoving back at me.
(Playing Exhibit.)
A. And I asked him why is he shoving me.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Are you assaulting them?
A. No.
(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) So what did he just try to do, the person in the red shirt?
A. I was trying to, like -- I didn't want to continue to push them. I just -- I let go of them, but every time I would let go, they would move back to where I was -- where they were before.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) And this type of pushing back, did you observe this along the skirmish lines?
A. Yes.
Q. Did you observe it along the red van?
A. Yes.
Q. What did you hear people chanting?
A. "Let them go."
Q. While you were there, did there come any point in time before the area was cleared that you believed that the people inside the building -- the officers, the employees, the detainees -- could be brought out safely?
A. No.
Q. Why not?
A. From the moment we showed up, it was -- it was just too chaotic. There was too many people. Like I said, the behavior of certain -- you know, a few -- the behavior of the people that were there, some of the people that were there, it just didn't seem safe to try to bring anybody out.

Q. Were you involved in the deployment of munitions?
A. No.
MS. CARTIER-GIROUX: Okay. I don't have any other questions for you. Thank you.
THE COURT: Okay. Cross-examination?
MR. DUGGAN: No, your Honor.
THE COURT: Mr. Wagley?
MR. WAGLEY: No, your Honor.
MS. RUBIN: Just one moment, your Honor.

CROSS-EXAMINATION

BY MS. RUBIN:
Q. Officer Heiman, I think you indicated that you were involved around 4:00 or 5:00, but did not actually get to the HSI building until 6:30 or right before. Is that fair?
A. Fair.
Q. Okay. And so there is video footage that you have of a body cam that probably starts at the HSI building around 6:30 and lasts a number of hours, fair?
A. Correct, yeah.
Q. Okay. And as you indicated, when you arrived, people were pretty amped up, emotional?
A. Yes.
Q. And certainly there were a lot of people that were yelling at officers when you arrived.
A. Yes.

Q. And they were certainly not saying nice things most of the time.
A. Sometime, yes.
Q. Well, a lot of the time, fair?
A. I don't know.
Q. Well, you were at the skirmish line.
A. There was a lot of not nice things being said, yes.
Q. Okay. Fair enough. And when you were at the skirmish line, essentially, Spokane Police Department arrives first.
A. Yes.
Q. And you all -- you ultimately end up in a V, but you start probably more parallel with each other; is that fair?
A. Yes.
Q. And then the two lines, once Spokane County sheriffs arrive, ends up more in a V.
A. Okay.
Q. And you shift your lines to be able to be in front of the doors that are on the building.
A. Yes, yes.
Q. And eventually, you and other officers get to a point where the lines are pretty deep in numbers when it comes to officers, and you've got the crowd pretty well divided from a north side to a south side.
A. I'd say the lines were pretty solid, yes, before we started addressing the van, correct.

Q. Sure. And the bottom line is you all did a good job that night, right?
A. I believe we did, yes.
Q. Okay. And you were able to -- as time went by that evening, to slowly move lines back. Or the crowd back, I'm sorry.
A. Can you repeat that, please?
Q. Sure. I mean, the idea behind a skirmish line is you and other officers, when you get an opportunity, you slowly push people back, creating a distance.
A. Correct.
Q. Fair enough?
Okay. And at some point -- obviously, we've seen the video, you -- Forral is in front of you on your line.
A. Correct.
Q. Right?
And you see Forral with -- I called it a bike lock. I think I mistakenly -- is it a steering wheel lock? Is that fair?
A. Yes, it is.
Q. And a steering wheel lock. I mean, it essentially looks like a bigger bike lock; is that fair?
A. No.
Q. Okay. No. Okay. But it was black, and we see Forral with it.

A. Yes.
Q. Right?
And we see Forral hit -- I'm going to call it a pylon.
A. (Moves head up and down.)
Q. And Forral is upset, right?
A. Yes.
Q. Okay. That lasts, at least from what we can see on your video, maybe a minute or a minute and a half, fair?
A. Okay. Yes.
Q. Okay. And we actually see, and I think the Government talked about, we see your hands kind of doing this movement, and I'm moving my hands up and down for the record. Right?
A. Yes.
Q. Because we see your hands in the -- in -- from your camera.
A. Yes.
Q. And that's a move of deescalation, fair?
A. Yes.
Q. You're trying to tell someone calm down.
A. Yes.
Q. Right?
We don't need to get upset, just let's calm down?
A. Yes.
Q. Right?
Okay. And I think you do that a couple of times, fair?
A. Yes.

Q. Okay. And after about a minute, minute and a half, Forral, at that point in this part of the video, walks away.
A. Yes.
Q. And I think that there's still a woman in a gray shirt. She's in your face screaming at you.
A. Yes.
Q. And she's screaming at you for a while.
A. Yes.
Q. Yeah. At no point in time during the sequence of events, there was no officer that was injured.
A. Over the span of the night, I don't believe so, no.
Q. Okay. No officer needed medical attention?
A. I don't believe so.
MS. RUBIN: Your Honor, I think that's all I have.
THE COURT: Okay. Any redirect?
MS. CARTIER-GIROUX: I don't have anything.
THE COURT: Okay. May this witness be excused?
MS. CARTIER-GIROUX: Yes. Yes, your Honor.
THE COURT: Okay. You're excused from further testimony.
The Government may call its next witness.
(WHEREUPON, further proceedings were held which were not ordered and transcribed.)

* * * * *

WITNESS INDEX


| For the Plaintiff | Page |
|---|---|
| **TYLER HEIMAN** | |
| DIRECT EXAMINATION BY MS. CARTIER-GIROUX | 3 |
| CROSS-EXAMINATION BY MS. RUBIN | 24 |


* * * * *

EXHIBIT INDEX


| No. | Description | Page |
|---|---|---|
| None | | |

C E R T I F I C A T E

I, CRYSTAL L. GONZALEZ, do hereby certify:

That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Spokane, Washington;

That the foregoing proceedings were taken on the date and place as shown on the first page hereto; and

That the foregoing proceedings are a full, true, and accurate transcription of the requested proceedings, duly transcribed by me or under my direction.

I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings;

DATED this 30th day of June, 2026.

CRYSTAL L. GONZALEZ, CRR, RPR
Washington CCR No. 2955
Official Court Reporter
Spokane, Washington