# Exhibit G.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. JUSTICE FORRAL (2), BAJUN MAVALWALLA (8), and JAC ARCHER (9), Defendants. | Case No. 2:25-cr-00113-RLP<br>May 21, 2026<br>Spokane, Washington<br>Excerpt of Jury Trial - Day 4<br>**Testimony of Keith Gonsalves**<br>Pages 1 - 63 |

BEFORE THE HONORABLE REBECCA PENNELL
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | LISA C. CARTIER-GIROUX<br>REBECCA R. PEREZ<br>U.S. Attorney's Office<br>920 W. Riverside Avenue<br>Suite 340<br>P.O. Box 1494<br>Spokane, WA 99201 |
| For Defendant Forral: | ANDREA K. GEORGE<br>AMY H. RUBIN<br>Federal Defenders of Eastern Washington & Idaho<br>601 W. Riverside Avenue<br>Suite 900<br>Spokane, WA 99201 |
| For Defendant Mavalwalla: | AINUDDIN AHMED<br>Ahmed Law Firm<br>550 Congressional Boulevard<br>Suite 350<br>Carmel, IN 46032 |
| | MATTHEW F. DUGGAN<br>Duggan Law Offices PLLC<br>23505 East Appleway Avenue<br>Suite 200-175<br>Greenacres, WA 99019 |

For Defendant Archer: CARL JOSEPH ORESKOVICH
ANDREW M. WAGLEY
Etter McMahon Lamberson Van Wert & Oreskovich PC
618 West Riverside Avenue
Suite 210
Spokane, WA 99201

Official Court Reporter: Crystal L. Gonzalez, CRR, RPR
United States District Courthouse
P.O. Box 700
Spokane, Washington 99210
(509) 458-3434

Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.

(WHEREUPON, previous proceedings were held which were not ordered and transcribed.)

(KEITH GONSALVES, called as a witness by the Plaintiff, having first been duly sworn, testified under oath as follows:)

THE COURT: Please be seated.

DIRECT EXAMINATION

BY MS. CARTIER-GIROUX:

Q. Good afternoon.
A. Good afternoon.
Q. Please state and spell your first and last name.
A. My name is Keith Gonsalves. First name is spelled K-E-I-T-H. Last name is spelled G-O-N-S-A-L-V as in victor, E-S in Sam.
Q. And where do you work?
A. I work for the Spokane Police Department.
Q. How long have you worked for the Spokane Police Department?
A. Just under 12 years.
Q. And what is your rank right now?
A. Sergeant.
Q. And how long have you been a sergeant for?
A. Just under three years.
Q. Okay. And before you worked for SPD, where did you work?
A. I worked for the University of Washington Police Department.

Q. Okay. And before that?

A. I was in the United States Navy for approximately five years.

Q. All right. Do you have any specialized training as a police officer?

A. I do. I currently serve as our assistant commander for our tactical team, which is our crowd -- large-crowd response team.

Q. Okay. Can you tell us a little bit about what the TAC team is?

A. Our TAC team is twofold. It's a large-crowd response team and also does training in advanced first -- advanced patrol response.

Q. Okay. And what type -- what do you mean it's specialized in crowd control? What does that mean?

A. We work a number of events, whether it be a demonstration, a protest, a Hoop Fest, bar patrols for big events such as Hoop Fest, St. Patrick's Day, 4th of July events. We used to work Pig Out in the Park. Anytime -- or concerts. Anytime there's a large crowd for any reason, we're typically called upon to work that.

Q. Okay. And are you an assistant commander of that unit?

A. I'm currently the assistant commander.

Q. Okay. Do you also have another assignment?

A. Currently, I am one of two sergeants in our special investigations unit.

Q. Okay. Are you also with the munitions group?
A. I had previously -- before coming -- becoming the assistant team commander, I was the munitions supervisor and one of two field commanders.
Q. Okay. And the job you currently have now that the -- what was it called?
A. Assistant team commander.
Q. Yeah. What's that?
A. So we have three sergeants currently on the team. I'd be what you -- the equivalent to the top-ranking sergeant.
Q. Okay.
A. I'm kind of running the -- a lot of the day-to-day operations, meeting with different administrators, meeting with the lieutenants, making sure that training is organized, making sure that operations plans are done for certain events.
Q. And when you were the munitions supervisor, what was your role?
A. I would coordinate and plan training for our munitions team. I'd order munitions. I'd help also the former assistant commander with developing operation plans.
Q. What are munitions? I should probably ask you that. What are munitions?
A. Our munitions are -- when I refer to that, it's less lethal munitions, so PepperBall, blue nose, chemical agents.
Q. What is blue nose?

A. Blue nose is a sponge round we use for -- as an impact munition. It can be used on patrol purposes or for -- or we use it in -- either SWAT will use it or TAC will use it for crowd demonstrations.

Q. Okay. And what is PepperBall?

A. PepperBall is a launcher. The best way to sum it up is a -- it looks exactly like a paintball gun. It is a compressed-air launching system.

Q. Okay. And what comes out of it?

A. PepperBall is a PAVA, like an OC, yeah, in a powder form.

Q. What is an OC?

A. I always butcher it. It's Ospolot (sic).

Q. What does it do?

A. It basically -- it's what we carry on patrol. It basically affects your eyes and your nose, can make you cry, stuff like that.

Q. Okay. And what is smoke?

A. Smoke is smoke. There's no chemical agent in smoke. We use what's called Saf-Smoke, S-A-F Smoke.

Q. Okay. And do you frequently use smoke in combination with PepperBall?

A. We can.

Q. Okay. Why would you do that?

A. The smoke kind of disperses at a wider range than our PepperBall. It's a much more concentrated range. So mixed in

with the smoke, it can actually help kind of spread the OC around.
Q. Okay. And what were the other less lethals that you were naming that are munitions? You said blue nose.
A. Blue nose. We carry bean bag shotgun rounds.
Q. What's a bean bag shotgun round?
A. Exactly that. It's a shotgun that has a sock filled with just tiny little particles in it. And it's used as a blunt-impact munition.
Q. Okay. And what else do you have?
A. PepperBall, blue nose, bean bag, and then we have handhelds. So we have smoke handhelds, we have OC handhelds, and we have CS handhelds.
Q. What is OC? Is that different than PepperBall?
A. It is very similar to PepperBall.
Q. Okay.
A. Different chemical mix but very similar. One is in a powder form; other comes mixed in with smoke. Disperses the same as smoke.
Q. What is CS?
A. CS is what most people refer to a tear gas.
Q. All right. So you said that the TAC team has specialized training?
A. Yes.
Q. For crowd control?

A. Correct.
Q. Does it also have specialized training for munitions?
A. Yes.
Q. Do they have specialized equipment?
A. Yes.
Q. What type of equipment do they have different than a regular patrol officer?
A. So we have bikes that we'll use in protests. And all of our officers are bike-certified certified through IPMBA. I'm one of our IPMBA instructors. They'll get specialized training on not just how to ride a bike, but also how to use a bike within the crowd management setting.
Q. Could you move your mike closer?
A. I'm sorry.
So we'll use those bikes not only for -- they'll not only learn how to use them for patrol but also how to use them for a protest or demonstration setting. And then most officers are not given the munitions that we have. We don't issue out the hand-held canisters such as smoke, OC, CS. We don't issue that out to patrol. We only -- that is only issued to MRAD, which is our munitions team. It stands for munitions response and deployment. Or they're given to CART, which is chemical agent response team, and that's the SWAT side of the house.
Q. So you're different than SWAT.
A. Correct.

Q. So you're crowd. What is SWAT usually called out for?
A. SWAT's usually called out for a barricade.
Q. Okay. June 11, 2025, were you working that day?
A. No.
Q. Did you get called in?
A. I did get called in.
Q. Tell us a little bit about what happened, what time, and what you did?
A. Between about 1:00 and 2:00 p.m., I was called by Lieutenant Yrigollen, who is our -- currently serving as our TAC commander. He had called me and informed me there was a demonstration at 411 West Cataldo, and he asked me to respond and that -- call him back to get more details once I was en route from my house.
Q. Okay. And did you respond?
A. I did respond.
Q. How did you get there?
A. I got there in my -- at the time, my patrol vehicle.
Q. And where did you -- where did you arrive at?
A. I arrived -- I parked just off distance from the building, just to the northeast of 411 West Cataldo.
Q. And were you in sight -- could you see the building?
A. I could see the building.
Q. What time was that, approximately, that you arrived?
A. It was a little after 2:00, right around there.

Q. Okay. And did you -- hold on. I want to show you and maybe you can show me where you were parked if it's on here. I'm going to show you Exhibit 5.

Can you see where you were parked on Exhibit 5 or are you off map?

A. Off map.

Q. You're off map.

Where -- are you further north? Are you further south?

A. Further northeast.

Q. Northeast. So you're further up Washington?

A. Further up Washington on Cataldo to the east.

Q. Okay. And did you use anything to help you see far away?

A. I used -- utilized a set of binoculars.

Q. Okay. So you were looking through binoculars.

Okay. And what were you looking at?

A. When I first arrived, I had seen the north side of the building. There was a large white bus. It had two vehicles, one on each side, pinned to the front and the back.

Q. Okay.

A. And then the front window was smeared white, and there was a large group of protesters on the sidewalk between the north door and the bus.

Q. Okay. Based on your observations, what, if anything, did you conclude?

A. So seeing the bus pinned and seeing the window -- the

windows smeared with white, I assumed it was paint. That tells me that that vehicle is -- whoever did that is making it inoperable and not wanting to move that vehicle. We use vehicle pinning on patrol to prevent cars from leaving, so that's a very similar technique that I saw being utilized. Along with the group standing on the sidewalk in between the door and the bus, to me at least, on that north side made me feel like I would not be able to be free to leave that building if I were in that situation.

Q. Did you report your observations to your command?

A. I did report it to my lieutenant, correct.

Q. To be clear, do you make decisions about deployment of SPD to different locations?

A. No.

Q. Okay. You were there to report what you were observing, correct?

A. I was in an observe and report mode at that point.

Q. Did you continue to monitor from your location?

A. I did.

Q. And, again, what -- you said you were in a patrol vehicle?

A. Correct.

Q. Was it marked or unmarked?

A. It's an unmarked vehicle.

Q. Okay. Were you in uniform?

A. I was in uniform.

Q. Does your uniform indicate that you're a police officer?
A. It does.
Q. What, if anything, happened while you were monitoring the situation at the building?
A. So after starting additional resources -- I started calling in additional resources in just because it takes time for them to come in. At one point, there was a group of about 8 to 10, maybe 12 individuals. They were all dressed in black with black face masks on. They were walking eastbound. They noticed my vehicle. They started filming my vehicle and encircling around my vehicle, preventing me from leaving. Because I'm in an unmarked car, at that point, I felt I didn't want to be there anymore having the crowd kind of encircle around me, so I decided to leave.
The crowd did not -- the group that was there would not let me leave initially when I tried to pull away from the curb. I then activated my lights and sirens. They still would not let me leave. And it was about a minute into that I started using my air horn. And once I used my air horn, they finally created enough space for me to leave.
Q. When you said they weren't going to let you leave, what were they doing?
A. They were blocking the -- they were on the roadway side, impeding my vehicle from leaving.
Q. Okay. Doing what with their bodies?

A. They were just standing there in the roadway.
Q. Okay. Couple questions. You're a police officer.
A. Correct.
Q. You have your lights and sirens on.
A. Correct.
Q. Blocking your vehicle, is that a crime?
A. Blocking any vehicle standing in the roadway is pedestrian interference.
Q. Did you get out of your car and try to arrest them?
A. No. I was -- there was just one of me. Our TAC -- when we do an arrest within our TAC role, we like to do that in a team facility.
Q. Why would you want to do that in a team?
A. It's safer for us, safer for them.
Q. Because you were one person and they were eight?
A. Correct.
Q. Okay. What did you do?
A. I left. I told my lieutenant what had happened, and he told me to report back to our TAC headquarters. Units were starting to arrive, so I was supposed to brief them on kind of what was going on and just kind of get them ready to make sure they had the equipment they needed.
Q. Okay. When you were -- when those eight people were around your vehicle and blocking you in, were you concerned for your safety?

A. Initially, I wasn't concerned for the safety. Just more concerned with them filming my vehicle.
Q. Okay. Why?
A. Because it's an unmarked car, and I wasn't sure if they -- there's no SPD markings on it. It has no exempt plates. I wasn't sure if they thought I was going to be a federal agent, local police. There's no indication on -- with my vehicle what role I'm -- type of law enforcement I am.
Q. Okay. And why would that concern you?
A. Well, from what I understand being there, the initial information I gathered was that they were not in support of the federal officers that were there.
Q. Okay. So you were worried about being identified as a federal officer?
A. Yes.
Q. When you were able to leave, where did you go?
A. I went to our TAC headquarters.
Q. And what happened at your TAC headquarters?
A. Additional TAC officers started arriving, and I was briefing them on kind of what happened. And then I was notified by my lieutenant to meet up with additional resources. And I met up with another lieutenant. And our plan was to -- or we were tasked with planning a rescue of the detainees and agents that were inside the building.
Q. Okay. Why did you believe that the detainees and the

agents needed to be rescued?
A. Based on what I'd seen with the bus being taken out of commission, with doorways being blocked, sideways being blocked, I didn't feel like they were safely able to leave.
Q. Okay. Were any plans made for the rescue as you call it?
A. We did eventually have a plan in place.
Q. Do you know around what time that was?
A. A little after 6:00.
Q. 6:00 p.m.?
A. After 6:00.
Q. Okay. So you had seen this around 2:00, correct? So around 6:00 is when you actually had enough manpower; is that fair to say?
A. Correct.
Q. Okay. What was the plan?
A. So the plan was to escort a red transport bus driven by two agents. We were going to go caravan style, so have several cars in the front, several cars in the back, and we were going to escort them to the east side of the building.
Q. Okay. To be clear, the van that was actually going to transport the detainees, whose van was it?
A. I can't tell you who actually owned the van. I can tell you that it was not being operated or not being used by Spokane police.
Q. It was a federal -- federal -- one of the federal

departments, correct?
A. I believe so.
Q. Okay. And your job on scene was to do what?
A. Was to safely escort the detainees and the agents that were inside the building and get them outside and get them to safety.
Q. Okay. So you were not part of any kind of transport of anybody, correct?
A. No.
Q. Okay. So the plan was -- again tell me. You were going to escort a red van in?
A. We were going to escort a red van in.
Q. What else were you going to do at the location to ensure --
A. So once we arrived on scene, we were going to establish what we call skirmish lines, which is exactly like it sounds. It's just a line that we use to create space. So our goal was to have a north and south skirmish line to create a safety corridor that would allow people to exit the building and get them to the red van.
Q. I have a question that I should probably have asked you earlier.
What is a dialogue officer?
A. So a dialogue officer, that is something that we implemented last year. I attended training in Columbus, Ohio, where it kind of originated. But basically what we do is we send out dialogue officers at the beginning of a protest to meet

with organizers and activists and basically kind of help them facilitate their First Amendment right. We -- as part of our team, we want to encourage people's First Amendment activities, but we want them to do it safely, and we don't want them to break the law while doing it.

Q. Was a determination made -- or at least did you make a recommendation of whether or not a dialogue officer should be sent in?

A. I did. We did originally have them on standby. However, we had just started this program about a month or two before June 11th, so it was still kind of in its infancy base phase, getting up to speed. And also, based on what I was seeing from the crowd -- I've worked hundreds of peaceful protests, but seeing this kind of escalation with damage to the vehicle, seeing the crowd was very amped up over what was going on, ultimately, I made the recommendation that they don't go in there. And that's also a decision that goes back with the officers as well because they have to ultimately go into that situation. And if neither of us feel comfortable with them doing it, I will not send anybody in that is uncomfortable with it.

Q. And at that time, was it determined that it wasn't a thing to do?

A. Correct.

Q. Okay. So now you have this plan to execute. What happens?

A. So we arrive on scene. We start to establish skirmish lines on the east side of the building. And I don't think we are prepared to see how fast people kind of reacted to our presence. They started forming up in front of both skirmish lines, and they started to amass around the red transport van.

Q. Okay. I'm going to show you Exhibit 443. Actually, let's do 444.

When you say that they were going around -- did that happen quickly or not so quickly?

A. It happened within minutes of us arriving on scene.

Q. Okay. Where were you in the caravan?

A. So I was in the middle and my -- from this photo, my vehicle is actually parked on the driver side, just kind of in front of it.

Q. Okay. All right. So when you got there, what did you see the protesters do?

A. So in this photo, they amassed around the vehicle. They linked arms. And then there were several that were in the front of the vehicle that were actually sitting down.

Q. Okay. And would that vehicle, that red van, be able to move?

A. Not without injuring somebody there.

Q. Okay. What about on the skirmish lines? What was happening on the skirmish lines?

A. There was people there on both sides just yelling at

officers. Our officers were trying to make some space and just kind of having a back and forth exchange of, hey, you know -- I'd tell them, "Hey, we need to move the crowd back a little bit." The crowd kind of pushed back with just, you know, "Hey, we don't want you to be here."
Q. Okay. I'll have you look at -- is that -- that's 467. Is that what you were referring to, that there were people in the front?
A. Correct.
Q. So the skirmish lines. Was there enough space initially for the people to get out of the building?
A. No. Initially, our skirmish line kind of almost formed into a V shape where the most narrow part was by the red bus. The larger, more broad space was kind of closer to the building.
Q. Okay.
A. So instead of an actual -- you know, two equally separated lines, we were kind of -- kind of almost in a V formation. So as you got closer to the van, you started losing a lot more space.
Q. Did there come a point in time when you realized that you were not coming from -- going towards the right door to the building?
A. Yes.
Q. Okay.
A. There was three doors there, probably 50 feet, maybe a

little bit more, between doors. We had stacked up on the north door, and then eventually realized that that was not the correct door.
Q. Okay. So you needed to go to a different door but on the same side of the building?
A. Correct.
Q. So you needed to correct the skirmish lines?
A. Correct.
Q. Okay. Which would require you to do what if you had to correct the skirmish lines?
A. We would have to start moving the crowd.
Q. Okay. Were warnings given to the people?
A. Multiple warnings.
Q. What type of warnings?
A. Verbal warnings.
Q. Like what were they?
A. They were, you know, from, "Hey, we need you to move back. We need to create some space here." And that's kind of how we initially started with just kind of a -- just very polite, "Hey, we need you guys to move back." Encouraged them. "Hey, we're not here to -- we're not telling you to leave. You can protest, but we need to create some space north to effect what was our mission of getting people out of the building."
Q. And were the protesters listening to the commands that you -- in terms of what you saw?

A. Some were, some weren't. I think the ones closest to the red van were not listening. I think the ones furthest away towards the building were listening because, like, as I said, it started kind of opening up a little bit more space. But still, by the red van, we didn't -- we didn't have any space there.
Q. Okay. What was the -- what did you -- did you hear anything that the crowd was yelling or shouting while you were there?
A. Yes.
Q. What were they yelling?
A. They called us pigs. They called us Nazis and other derogatory words. They said they were -- we were there to help them out.
Q. Did you hear anything -- any chants such as "Let them go"?
A. Yes.
Q. Okay.
A. "Shame." They booed us.
Q. Okay. How did you assess the emotional level of the crowd in such a way that would affect your -- what you were going to do on the ground?
A. I think we were more cautious about what we wanted to do just because we could see that -- the crowd is amped up. And being in a lot of crowds, like I said, they've been typically peaceful from my experience here in Spokane, and what I was seeing that day was not. And we were concerned that if we had

done something that might have been misconstrued that it would -- it could set off the crowd.
Q. Okay. Did you observe any physical objects being used to block in police vehicles or the red van?
A. Yes. Actually, in front of my vehicle there was a bench.
Q. There was a bench?
A. A bench in front of my vehicle.
Q. And when you had pulled up, was that bench there?
A. No.
Q. Okay. What about -- any other items? Were there any other items that you could see?
A. I believe there were some Lime scooters as well and some other benches kind of littered throughout the street.
Q. And what -- based on your training and experience in dealing with crowds, what was the purpose of that?
A. That was to impede our vehicles from leaving or from moving.
Q. Did there come a point in time -- and you indicated that they had to move people back on the skirmish lines, right?
A. Correct.
Q. Did there come a point in time when you had an opportunity to observe officers trying to physically remove people from the van?
A. We tried to push people back. I worked with Sergeant Chris McMurtrey. He was at the time the TAC assistant commander, the

role I have now. And we had told -- we had told people, hey, you can start just pushing people back if they're not moving back if they're not following commands. We'd given a lot of commands to move back. You know, start just kind of using our hands to kind of guide them back to show, hey, we need you to create some space.
Q. What did you observe when that was happening?
A. They were not able to move the crowd.
Q. Why?
A. So some would either turn their back. Others that were behind them would come up and kind of create resistance with that person that was in front of the officer. So as the officer is pushing on that person's back, they almost acted as deadweight because they could not push -- without -- I mean, I can't speak for what the officer would -- wanted -- how much force he was using to push back, but they were just trying to move them back and not actually shove them.
Q. I'm going to show you Exhibit 53.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Do you recognize Exhibit 53?
A. Yes.
Q. What do you recognize it to be?
A. Sorry. What's that?
Q. What do you recognize it to be? Is this something you saw?
A. Yes.

Q. Okay.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) So what are we seeing here?

A. So these officers are trying to move. This is the area closest to the red van. They are trying to move these people back. The gentleman in the red shirt here, you can see he has his back turned towards the officers. So rather than comply and move back, these officers are trying to move him back, he turns his back towards them. And then there are people on the other side creating some pressure against the gentleman in the red shirt here, and that would be to keep us from moving them.

Q. So the people behind would push forward?

A. Correct.

Q. And use the person whose back is towards you basically almost like a barrier?

A. Yes.

Q. Let's watch this.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Is that what's happening in this video?

A. Yes.

Q. I'm going to play it full -- let me pull it back. Let me play it full first and then I'll slow it down and you can tell me what's going on.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Let me go back. I'll go slower because we kind of missed it. I'm going to slow it down.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Why did you come over here?

A. So I was working in coordination with Sergeant McMurtrey. We were the two sergeants. Field command is what we refer to it as in this -- in -- at this time. It's a very loud environment, so in order for us to kind of communicate, we kind of stayed hip to hip either looking at different directions. However, when I saw this push going on, it caught my attention.

Q. Okay.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) In the van -- sorry. In the video, do we see the person from behind pushing the guy with the red shirt forward?

A. At one point, yes.

Q. Okay. Is that consistent with what you had just testified to about a tactic?

A. Yes.

Q. I'm going to have you take a look at -- do you remember the individual with the red shirt from the scene?

A. Yes.

Q. You do? Do you remember the individual that was behind him?

A. Not clearly.

Q. Okay. I won't show you that, then, right now.
I'm going to have you take a look at Exhibit 453.
THE COURT: 453?
MS. CARTIER-GIROUX: Yes. 453.
Q. (BY MS. CARTIER-GIROUX) Do you recognize this -- this -- the person in this picture?
A. Yes.
Q. Do you recall seeing this person on June 11, 2025?
A. Yes.
Q. Where did you see them?
A. To the north side of our skirmish line.
Q. Okay. And do you recall the object that this person has in their hand?
A. I couldn't clearly see what was in his hand. I could only see that there was something, some type of stick or pole in his hand.
Q. Okay. Do you know who this person is?
A. That is Forral.
Q. Okay. What was the -- what were the proportions between the number of officers versus the number of people in the crowd?
A. Well, initially, there was -- my best estimate, there was 50 to 60, 70 people there. We probably had 20 to 30 officers. However, the crowd size started growing quite a bit.
Q. Okay. And when you're saying it was growing, how quickly was it growing?

A. Growing from 50 to within a few hundred.
Q. Okay. And during the time that you were there, did you observe arrestable offenses?
A. Yes.
Q. Did you have the ability to make arrests?
A. Not safely.
Q. Why not?
A. We still needed more resources. We needed to have -- our skirmish lines needed more resources. So we were calling in additional resources from SPD SWAT, county TAC, patrol officers were being called in. So we just -- before we do anything, we wanted to make sure that we had enough bodies to actually effect what we were going to do.
Q. Okay. Was the roadway of North Washington available to uninvolved citizens?
A. No.
Q. Was it being blocked?
A. It was.
Q. Who was it being blocked by?
A. Both demonstrators and our vehicles.
Q. Okay. So were there other events going on that night that affected some of the decisions you were making?
A. Yes. There was another planned protest later in the evening. I believe it started between 6:00 and 7:00. And there was also a soccer game going on just to the west of us.

Q. Okay. And what stadium is that at?
A. I believe that is the One.
Q. Okay. And is that very close to that -- to the building on Cataldo?
A. Yes.
Q. Okay. And what were you concerned about with regard to the protest, first of all, the other protest?
A. As far as?
Q. What did you think could potentially -- what are you worried about? Why are you concerned that there's another protest?
A. Because that's going to increase the numbers.
Q. And, in fact, did it?
A. It did.
Q. What about the soccer event? What were you concerned about the soccer event at the One?
A. I was concerned with people exiting there and somehow potentially getting mixed up into this protest.
Q. Okay. Did there come a point in time when you observed anything about the tires of the red van?
A. I had -- I was to the -- on the passenger side. We -- and I say we, the -- Sergeant McMurtrey and I were communicating. We had been informed that the vehicle tires had been slashed. We went over to the driver's side, where that individual was quickly detained. During that detainment, several people that

were near the bus started jumping forward and towards us. So me and a few other officers were just holding them back so those guys could safely make that arrest.

Q. When you say the bus, do you mean the van or the --

A. The van. Sorry. The van.

Q. All right. So when you went to take the person into custody who had slashed the tires, there were people that came off the van that came at you?

A. Yes. They were very upset about what was going on. And we tried to explain to them this person has slashed the tires, committed a crime, so.

Q. They didn't want you to arrest the person?

A. A few of them did not want us to arrest them. Others appreciated what we had told them, and they went back to standing in front of the van.

Q. Okay. June 11th, 2025, what season was it?

A. Summer.

Q. Okay. Was it hot?

A. Yes.

Q. Okay. Did there come a point in time where you saw people gearing up?

A. Yes.

Q. Okay. When I say "gearing up," what do you think I mean?

A. So we see this -- I have seen this at several protests where people will bring in welding gloves, which are used

because our canisters that we deploy with smoke, OC, those type of chemical agents, those cans are extremely hot. They will burn your skin, if you touch them, on contact. So they'll put on welding gloves. They'll wear gas masks. They'll bring safety cones. Safety cones will be put over those canisters to -- instead of the smoke being dispersed in a wide area, it'll funnel it just straight up. They had sticks in their backpacks. So those are type of the -- some of the equipment that we'd seen them gearing up with.

Q. Was it raining that day?

A. No.

Q. Have you ever seen the use of an umbrella?

A. Yes.

Q. What does an umbrella do?

A. So an umbrella will mitigate any type of PepperBall or any type of blunt impact being used in their direction.

Q. And why would you want to wear the welder's gloves?

A. So you can pick up those canisters and throw them back.

Q. Okay. I'm going to have you take a look at Exhibit 57.

But before I do that, did you see people gearing up?

A. Yes.

Q. And when did that occur?

A. That occurred later in the evening when we were starting to come up with a plan for removing people from the red van.

Q. Okay. I'm going to show you Exhibit 57. And I want you to

watch what this person is doing here on the right, okay, with the black shirt.

THE COURT: 57.

MS. CARTIER-GIROUX: 57. I'm sorry if I'm not saying it loud enough.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) What does it appear that this person has in there?
A. A bottle.
Q. Can you see any color of the liquid?
A. No.
Q. Okay.

(Playing Exhibit.)

Q. (MS. CARTIER-GIROUX) What is milk -- do people bring milk sometimes to protests when munitions are being used?
A. Yes.
Q. What does milk do?
A. Milk just lessens the irritant that is caused by OC.
Q. And what do they do with the milk?
A. They'll pour it in their face and their eyes.
Q. Okay.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) So what does it appear that that person has put on?
A. A respirator.

Q. No, I'm talking about this person.
THE COURT: Could you just maybe -- okay.
THE WITNESS: Sorry, which person?
Q. (BY MS. CARTIER-GIROUX) The person with the black T-shirt on. What did they put on?
A. Oh. They put on a sweatshirt.
Q. Do they have anything on their hands now?
A. I can't tell from...
Q. I will get it. Do you see anything on his hands?
A. They put on a glove.
Q. Okay. All right. And is that consistent with gearing up?
A. Yes.
Q. Okay.
MR. ORESKOVICH: Excuse me, your Honor. If I might interrupt this for a moment.
THE COURT: We need to get a new battery here. Can you clear your screen too, Ms. Cartier-Giroux?
MS. CARTIER-GIROUX: Sorry.
THE COURT: We're good.
MS. CARTIER-GIROUX: Okay.
Q. (BY MS. CARTIER-GIROUX) I do want to go back because I did forget to ask you something.
Very briefly, do you remember when we talked about -- I'm going to pull back up -- I'm not going to replay it -- Exhibit 53. I'll just pull it over to where we were.

Okay. The person with the red shirt on and the person behind them, do you remember those two we just talked about?

A. Yeah. Very briefly.

Q. But you remember this video?

A. Yes.

Q. I'm going to show you Exhibit 56.

That's not the right one. Hold up. Is that 56? Oh yeah. That's 56.

I'm not going to play this whole thing. I'm just going to give you a little bit.

Does it appear to be in this body cam video -- I'll play a little bit of it.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Does this appear to be the same two people?

A. Yes.

Q. Okay.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) All right. Did there come a point in time when an unlawful assembly order was given around 7:00, 7:13?

A. Yes.

Q. And what is a dispersal -- unlawful assembly order?

A. That is an order that we would give to a crowd to disperse.

Q. Okay.

A. We give them a direction and we are compelling them, commanding them to leave the area.
Q. So everybody has to leave.
A. Everybody.
Q. Okay. Before the police officers were given commands -- giving commands to the protesters and before there was this dispersal order, the unlawful assembly order, when an officer would give a command and a person did not comply with the command, was there -- like were they just allowed to do that? Is that, like, lawful or when an officer gives you a command, you have to obey the command?
A. In this case, yes, because it would have been obstructing. We were trying to create space to effect our mission. And when we would order them to move back to create said space, they were not -- the ones that were not -- there were some that were not listening and, like I said, mostly by the red van.
Q. Okay. So you didn't need a dispersal order in order to command people to move back?
A. Correct.
Q. All right. So once the dispersal order or the unlawful assembly order is given, what happened next?
A. So shortly after the dispersal order first commenced was when we had found out the tires had been slashed on the red van. And once we had gotten that person taken into custody, from that point, it was removing the people that were by the van. So we

come up with an arrest plan. We had talked to them multiple times, given them every reasonable chance to leave the area, and we told them if they were just to get up and leave, they would not be arrested.

We also -- I also informed them that if they continued to stay there, they would be subject to arrest and that if they were to resist arrest, then there could be additional charges.

Q. Okay. From the point of time you arrived till this point in time when the tires are slashed and you're starting to pull people off the van, did you believe it would be safe to bring the detainees out at any point in time?

A. At this point?

Q. Any point in time from the time you arrived to this particular period of time?

A. No.

Q. So there was no window of opportunity?

A. No.

Q. Okay. Why were you worried to bring them out?

A. I think when we had initially seen how the crowd reacted to our presence, my thoughts are how is the crowd going to react to when they see the detainees, and that's the reason why they're there.

Q. Did there come a point in time when you were given permission to use munitions to move the crowd back?

A. Eventually.

Q. Okay. When you say "eventually," around what time did that happen?
A. About an hour after our dispersal order started.
Q. So I think you testified -- did you testify what time the -- wasn't it like 7:00, 7:15?
A. We started dispersal orders around that time, and we didn't deploy munitions until a little after 8:00.
Q. Okay.
A. And that was partly because it took longer than I think we anticipated to arrest each individual person by the bus. We had come up with, you know, multiple people facilitating that arrest, and it was removing them one by one. So that's just -- I think that took longer than -- and, again, we had tried talking with them before arrests had even occurred.
Q. Okay.
MS. CARTIER-GIROUX: Court's indulgence.
THE COURT: Okay.
Q. (BY MS. CARTIER-GIROUX) Did there come a point in time when you were ultimately able to safely get the building -- the people out of the building?
A. Yes.
Q. Do you know around what time that was?
A. Not the exact time, but I know it was after 8:00.
Q. It was after 8:00. So it was after the munitions?
A. Correct.

Q. And how was SPD able to do that?

A. So we were using the munitions to push the crowd back. So our first set of munitions that we used is smoke and PepperBall. That's what I was approved by our command post to use. And the plan was, as we deploy these munitions, we're going to move forward. So as the crowd moves back, we move forward. And our hope was to gain more space to move the crowd back.

Q. Okay. And were you able to ultimately move the crowd back somewhat?

A. Eventually.

Q. Okay. And were you able to get the individuals out of the building?

A. Yes.

MS. CARTIER-GIROUX: I don't have any other questions. Thank you.

THE COURT: Cross-examination?

MR. AHMED: Yes, your Honor.

MS. CARTIER-GIROUX: I just want to get them the number of the exhibit I used.

THE COURT: While we're on a little break, just so we're clear, if you're referring to defendants, Defendant Forral, they use they/them pronouns, so please be accurate.

THE WITNESS: Yes, your Honor.

THE COURT: Okay. Thank you.

CROSS-EXAMINATION

BY MR. AHMED:

Q. Good afternoon, Officer. Is it Goncalves?

A. Gonsalves.

Q. I'm going to show you those exhibits again that the prosecutor just showed you, 53 and 56.

MR. AHMED: Can we have 53 first?

Q. (BY MR. AHMED) And, Officer, if you don't mind, my client is sitting right here in the middle, and he's on the video that was depicted in 53 and 56, and that's who I'm going to be asking you about. Okay?

A. Oh, okay.

Q. All right. 53 and -- I'm going to start with 53.

THE COURT: Okay. Can everyone see it? Good.

MR. AHMED: And I'm going to tell you to stop when my client comes up.

(Playing Exhibit.)

Q. (BY MR. AHMED) Sir, in that video right there, you see a guy with a red shirt on and my client on the other side of them, correct?

A. Correct.

Q. Do you see the gentleman --

MR. AHMED: If we could go back just about five seconds on that.

Q. (BY MR. AHMED) Do you see that man's arm around my client?

A. I can see an arm. I can't tell you whose it is.

MR. AHMED: Okay. If we could play that.

(Playing Exhibit.)

Q. (BY MR. AHMED) Does it appear to you that my client is being pulled forward by that gentleman with his arm around him?

A. It's kind of hard to tell in that video.

Q. I understand. Okay.

You testified that my client was pushing, but based on what you just saw, does it appear to you that he's actually being pulled?

A. Initially when I saw the client, he was standing back and then coming forward, so that's why I thought my -- what I'm seeing is pushing.

Q. Right. And it's an understandable mistake. But now we're viewing the video, would you agree that he's being pulled?

A. I can't say if he's being pulled.

Q. Okay. I won't ask again.

MR. AHMED: If we could...

Q. (BY MR. AHMED) You were asked about a green bottle that he took out. Could you tell whether it was a drink or anything else?

A. No, I can't tell what's in it.

Q. Okay. Were any police officers hurt in the sense of did anybody have to see a medic or anything that night?

A. Not that I recall.

Q. Did any police officer get hit with a canister?
A. Not that I can recall.
Q. Okay. Did you see my client throw a canister?
A. No.

MR. AHMED: All right. Thank you.

THE COURT: Okay. Any further cross-examination?

CROSS-EXAMINATION

BY MS. GEORGE:

Q. You have a lot of training and experience in protests, fair?
A. Correct.
Q. And you told us that you want to encourage the First Amendment?
A. Correct.
Q. And that's speech and assembly?
A. Correct.
Q. And when we're talking speech, it's not always nice speech, fair?
A. Fair.
Q. And as a police officer, you've attended several protests, right?
A. I have.
Q. And as a police officer, you've heard a lot of things.
A. I have.
Q. And you have to have thick skin.

A. I'd like to think I do.

Q. Yeah. And you train your police officers, you're going to hear some stuff.

A. Yeah.

Q. And you've got to have thick skin.

A. Correct.

Q. And that's because you don't want your police officers to respond to escalate things.

A. Correct.

Q. You know, in watching -- and tell me if I'm wrong, but in watching the Spokane police officers, it appeared they spent a lot of time de-escalating.

A. Yes.

Q. In fact, Spokane Police Department takes de-escalation quite -- it's quite important to them.

A. It is. It's within our policy.

Q. You get a lot of training on de-escalation.

A. Yes.

Q. And you even have a dialogue officer that you recently brought on.

A. We have nine now.

Q. Nine? Oh. That's excellent.

MS. CARTIER-GIROUX: Objection for the comments.

THE COURT: Okay. All right. Just ask questions, Ms. George. Go ahead.

Q. (BY MS. GEORGE) And the dialogue officers have been successful?
A. They have been.
Q. Yeah. And that night, you thought about using a dialoguer to -- a dialoguer or two officers to see if you could bring the level down.
A. Correct.
Q. But then you made a determination not to do that.
A. Not just me. That was a decision that was made by everybody that was involved, from me to my lieutenant above me to the officers that are part of the dialogue team.
Q. Although you decided not to use a dialogue officer, one was requested. Do you know that?
A. I do not know that.
Q. Okay. And, you know, it's up to the dialogue officer whether he or she or they feel safe, right?
A. Correct.
Q. So even if one is requested, that doesn't mean there's going to be one, right?
A. Correct.
Q. Okay.

MS. GEORGE: Now, that video that we just saw -- what was the exhibit number? 57?

MR. AHMED: 53.

MS. GEORGE: 53? Well, there was a video at 57 and

that was -- can we see 57?
(Playing Exhibit.)
Q. (BY MS. GEORGE) You know that Justice Forral was arrested about 7:00, 7:15. Are you aware of that?
A. I was aware that he was arrested. I can't tell you the time he was -- sorry -- they/them was arrested. I can't tell you the exact time. I know they --
Q. I'll save this part of the cross. I won't ask you questions that they were not here at this.
MS. GEORGE: Okay. You can take that off. Thank you.
Q. (BY MS. GEORGE) Part of de-escalation is you assess a scene to determine how you should come in, fair?
A. Fair.
Q. And your officers actually came in calm and steady, fair?
A. Yes.
Q. They didn't come in hot. Do you know what I mean by "hot"?
A. I do.
Q. They didn't come in hot, right?
A. No.
Q. They didn't rush in and go right into pushing people, fair?
A. Fair.
Q. Okay. In fact, what your officers did was come in and create a skirmish line.
A. Correct.
Q. And in creating a skirmish line, you pushed people kind of

out of the way by having a line and stepping forward.
A. Correct.
Q. And it's not an initial shove.
A. In this case it wasn't.
Q. Right. And, in fact, your officers did a very good job of creating that skirmish line.
A. Yes.
Q. Okay. All right. You are also a munitions supervisor.
A. Correct.
Q. And you've spent a lot of time doing that, fair?
A. Yes.
Q. Okay. You have trained in less-lethal rifles, the use of them?
A. Less -- we don't have less-lethal rifles. Are you referring to less-lethal shotgun?
Q. Yes.
A. Yes.
Q. Thank you. And you need to go through training before you are allowed to be an officer that carries a less-lethal shotgun, fair?
A. Yes, there is training.
Q. All right. And even though it's called a less-lethal shotgun, it still can cause serious harm or death.
A. Yes.
Q. And that's if you're not following the recommended

distance, fair?
A. Correct.
Q. So, for instance, when you're using -- is it called ammo? Like blue nose, would you call that ammo or shot or whatever?
A. Blue nose we refer to as "blue nose."
Q. If you're using blue nose in a less-lethal shotgun, you would want a -- and the particular kind, you would want to read the manufacturer specifications to know the guidelines.
A. Yes.
Q. And you know that because you've done training in that.
A. Correct.
Q. Okay. And you know that with a blue nose, you want to be about five feet away. That's the shortest distance away.
A. Yes.
Q. And you don't want to shoot someone in the head, fair?
A. Not unless you have a justified reason to use deadly force.
Q. Okay. And a justified reason to use deadly force is when the officer feels his, her, their life is in danger?
A. Correct.
Q. Or another person's life is in danger?
A. Correct.
Q. So -- so with the blue nose, the specifications are no -- no closer than five feet?
A. Yes.
Q. And so you certainly don't want to shoot in the head unless

you can use deadly force, fair?
A. Fair.
Q. And you don't want to shoot in the chest area or gut.
A. Those are secondary target locations.
Q. And not the groin.
A. Correct.
Q. What your aim is -- you're just really trying to stop someone, right?
A. Correct.
Q. So you would want to shoot in the butt or the thigh.
A. Correct.
Q. Now, when you are using a shotgun like this, less lethal, even though it's less lethal, you don't want to walk around a protest at the ready.
A. At the low ready?
Q. No. I'm talking ready or whatever this position is called.
A. We do not carry typically at that position during a protest.
Q. What would you call this position?
A. Well, that is in a position of you're ready to fire.
Q. So ready, right? And you would only come at this position when you can use deadly force, right?
A. Correct.
Q. Or --
A. Or --

Q. Or you're far enough away you're with -- outside the --
A. Yes.
Q. -- danger zone, right?
And in a protest, you're not going to be walking around at ready.
A. Typically not.
Q. Okay. What you are going to do is -- with a shotgun is you're going to hold it down, fair?
A. Yes. And just so you're aware, we don't fire blue nose out of a shotgun. That is out of a 40-millimeter launcher.
Q. Thank you. Okay. But the same is -- everything we've talked about --
A. Correct.
Q. -- is the same with the 40-millimeter launcher.
A. Correct.
Q. Okay. So when you're at a protest, you would want to carry the 40-millimeter launcher at the low ready.
A. Correct.
Q. And when you're at low ready, it's a two-handed hold, fair?
A. Typically.
Q. And you would keep one arm extended and hold kind of the tip of the launcher, right?
A. About that, yeah.
Q. And you would have the other hand with the trigger finger -- you would have your trigger finger straight along the

frame or slide.
A. Correct.
Q. All right. Let me see here. Kind of like this?
A. Correct.
Q. Now also, the angle is important.
A. For low ready, yes.
Q. Yes. 45-degree angle?
A. About that.
Q. But if you're closer to someone, the angle has to be less, fair?
A. Yes.
Q. Because you don't want to have the tip of the launcher, say, at someone's groin.
A. Depending on the person's height, their distance to target, low ready is going to be different for everybody.
Q. Exactly. So the point is to be ready to shoot if necessary, but not harm someone by accident.
A. Correct.
Q. But always at low ready, the finger is off the trigger.
A. Yes.
MS. GEORGE: Thank you. I have no further questions.
THE COURT: Okay. Anything further? Mr. Oreskovich?

CROSS-EXAMINATION

BY MR. ORESKOVICH:
Q. Sir, can you hear me?

A. Yes.
Q. Okay. Good.
I missed your rank. Could you tell me what it is, please?
A. Sorry, what's that?
Q. Your rank.
A. My rank, I'm currently a sergeant.
Q. Sergeant. Can I address you as sergeant, then? Would that be appropriate?
A. If you'd like, yes.
Q. Good. I don't have a lot of questions, but I want to cover some of the areas that you talked about in your direct examination. All right?
A. Okay.
Q. As I understand it, sir, you were not on duty that day, but you got called in. And when you got called in, at some point at least, you went to the -- near the site and observed it from the northeast of the Cataldo building. Would that be correct?
A. Correct.
Q. All right. You were in an unmarked vehicle, an F150 Ford pickup?
A. Correct.
Q. All right. And in that time period, you were observing through binoculars?
A. Yes.
Q. And you observed from that location roughly -- just tell me

how -- over what period of time. How long were you there do you think?
A. Maybe about two hours.
Q. Say again?
A. About two hours.
Q. All right. Thank you.
And in that time period, you observed some people on the north side of the building blocking the access to the white van?
A. Correct. They were standing on the sidewalk between the door and the van -- sorry, the bus.
Q. Sure. And was it a roughly 20 to 30 people or were there more or do you know?
A. Roughly about that.
Q. All right. And at some point in time while you were there, as you were getting ready to leave, is that when this 8 or 10 or 12 individuals dressed in black came to your vehicle?
A. They were walking eastbound on Cataldo. I kind of watched them for a sec because they were, like I said, dressed in all black, had black face masks on. As they started walking past my vehicle, I don't know what alarmed them to my vehicle. Again, it's unmarked. It has no police markings, no exempt plates, nothing overt to tell you that is a police car, and that's how it was issued to me. But once they started filming my vehicle, that's when I thought it was best to leave.
Q. And that's when they surrounded your car or stood in front

of your pickup and would not let you leave; is that correct?
A. Yes. I was parked on the north curb line facing west.
Q. All right. And it took roughly about a minute of you doing various things including, I think, at the end blowing your -- did you say your air horn --
A. Air horn.
Q. -- before they ultimately would move out of the way so that you could exit?
A. Yes.
Q. All right. What was the significance, if anything, in terms of the way they were dressed?
A. So they were dressed in all black. From my training and experience, people dress -- we refer to them as black bloc. It's just how they're dressed. They're dressed to conceal their identity. They're dressed all the same. So that way, we cannot identify who they are.
Q. All right. And over the course of the period of time as you had contact with your office and the people that you were working with, did you return back to that location where you had been observing it?
A. Not the location where I had been observing. I returned to the actual building.
Q. You returned to the actual building. Okay.
And what I'm interested in trying to find out is -- you had mentioned about this crowd growing, and what I'm trying to

understand, if we can, at some point in time, is there roughly somewhere between 3- and 400 protesters in that Washington Street area when you were observing this?
A. Initially from --
Q. Not initially. But at some point in time, the crowd amassed?
A. At some point, the crowd -- the crowd grew to several hundred people. And then there was another protest later in the evening, and that protest marched and then mixed in with this crowd to ultimately I'd say there was roughly 1,000 people by the time we deployed munitions.
Q. Okay. So in other words, this started out pretty small, at least from what you observed, and then, over the course of the day into the evening, grew as large as potentially 1,000 people?
A. Correct.
Q. When that happens, when you start out with a smaller crowd and it grows and grows and grows, there's the opportunity or the danger, I suppose, of having kind of a crowd mentality. Is that fair to say?
A. The more people, yes.
Q. All right. Now, what I'm interested in finding out is you had mentioned this new program that you have with the SPD of --
A. Dialogue.
Q. -- dialogue officers, right?
A. Yes.

Q. And dialogue officers, as I understand it, is kind of a collaborative effort, is it not, between SPD and organizers or people that are putting together protests to try to help those people protest and exercise their First Amendment right?

A. Correct.

Q. In a nonviolent manner so we don't end up with 1,000 people in the street that you have to shoot?

A. Yes.

Q. All right. And in the course of doing that, it's helpful, is it not, to meet with the people that may be organizing the protest? You've been to hundreds of them, I think, if I heard you right and I wrote it down correctly. Am I correct in that regard?

A. As far as?

Q. Protests?

A. Yes. I've been on the team for about 11 years, and I've worked protests starting from 2020 all the way until now.

Q. All right. And you've seen a lot. I don't know how many, but you've been through a lot of them, correct?

A. Yes.

Q. And in terms of trying to have a protest that is nonviolent, it helps to be organized, doesn't it?

A. As far as SPD?

Q. No, no. The organization that is conducting the protest for them to organize their protesters in terms of understanding

what the purpose is.
A. Yes.
Q. Understanding that -- what the rules are. I'm going to call them the rules. Maybe that's not the correct term. But for people to have an understanding that the protest is going to be conducted in a nonviolent manner, right?
A. Yes.
Q. And typically, good responsible organizers, community organizers, at nonviolent protests do exactly that. Wouldn't that be fair to say?
A. Yes.
MS. CARTIER-GIROUX: Objection. Okay. Kind of leading to speculation of --
THE COURT: He's testified to his training on protests, so I will allow it.
Q. (BY MR. ORESKOVICH) All right. And that's what community -- good responsible community organizers try to do is organize protests so that the goals are understood by the participants and that the rules, so to speak, that this is nonviolent also is understood by the participants, correct?
A. Correct, but I'm usually not part of those meetings.
Q. No, no, no. I get all that. All I'm trying -- really trying to do is -- your agency is kind of innovative, in my mind at least, that what you try to do is collaborate with a protest. You have these dialogue officers to kind of get everybody

working in the right direction instead of having a --

A. That's where we're at now, but it did take some time to get there. These relationships don't happen overnight. Like I said, this program had only been in its infancy about a month or two in development. So this is something -- Columbus is a large department, so we have to take what a large department does and figure out what's our best practice here in Spokane. So something that just takes time to build. It's like everything else we do, training and experience. These dialogue officers have been spending, you know, weeks, months developing these relationships with these organizers. It didn't happen overnight. There was not a lot of trust in the beginning. But these guys have -- you know, they've persevered pretty hard to develop these relationships, which is why I think we've been successful now to where we're at.

Q. Sure. And the skirmish line that we referred to -- or you referred to, sir, in the course of your direct testimony or even in your cross-examination, that was on Washington Avenue -- Washington Street; is that fair to say?

A. Yes.

Q. All right.

MR. ORESKOVICH: Thank you.

THE COURT: Okay. Redirect?

REDIRECT EXAMINATION

BY MS. CARTIER-GIROUX:

Q. You were discussing with defense counsel some of these meetings between SPD and some of the community leaders and some of these --

MS. GEORGE: Could you pull the microphone?

MS. CARTIER-GIROUX: Oh, I'm so sorry. I'll say it over again.

Q. (BY MS. CARTIER-GIROUX) You were discussing with defense counsel some of these meetings between your organization, SPD, and some of the community protest leaders or such if you want to call them, whatever you want to call them. There's a discussion of aspirational rules of engagement at these kind of protests, correct?

A. Correct.

Q. Is it fair to say that aspirational rules are not always followed at the actual protest based on your experience?

A. Yes.

Q. I want to talk about low ready. So low ready, deciding to move a gun -- well, first of all, do you know what other agencies' rules are in terms of when you can use the low ready versus the ready? It's low ready, ready, fire, correct?

A. Correct.

Q. Okay. So when you go from a gun that is not in low ready, what would you call a gun not in low ready be? What do you guys

call it when a gun is not in low ready?
A. If we're moving it up to the ready?
Q. Yes.
A. We're moving it up to the ready position.
Q. Okay. But when you're from a stand position to a low ready position.
A. What do we call that?
Q. Yes.
A. Not -- to my knowledge, I don't know what we call that. I know we're at the low ready, and then if we're going to address a threat, we bring it up to the ready position.
Q. Okay. So when you bring something up -- when you're going from low ready to ready, are there some times -- would it determine -- would it be based on the circumstances as the officer perceives the threat?
A. Yes.
Q. Okay. So if an officer perceives a -- what would -- what that officer would perceive as even a low-threat encounter, can the officer take the firearm -- could you see that the officer could possibly take the firearm from a low ready to a ready?
A. Yes. Each officer is given discretion. So there's training that is involved, but they're also given to discretion because I'm not seeing what they're seeing.
Q. And is it fair to say also that it depends -- you can -- can you always say that when there's a certain number of people

around you can't do certain things?
A. Potentially.
Q. Right. Because it depends on the circumstances, right?
A. Yes.
Q. And it depends what -- how -- what the variables the officer is reacting to.
A. Yes.
Q. Is it fair to say in a very crowded situation when there's a lot of people around that it requires the officer to make judgment --
MS. GEORGE: Objection. Leading.
THE COURT: Can you ask it in a nonleading way.
Q. (BY MS. CARTIER-GIROUX) What types of factors could affect an officer's decision-making when they're in a crowded location and they see a possible, even a low-threat encounter?
A. I'm sorry. Ask that again.
Q. What are kind of variables or factors would an officer consider when they're in a crowded situation, a very close encounter, and they believe that there is a low-threat element present?
A. So it could be the person's body language. It could be distance between the two. It could be potentially objects in their hands. Any other kind of perceived threat.
Q. So lunging at someone or coming very directly at them, would that enhance an officer's --

MS. GEORGE: Objection, leading.
MS. CARTIER-GIROUX: I haven't finished the question.
THE COURT: Overruled. Ask the question.
Q. (BY MS. CARTIER-GIROUX) Would that potentially enhance the officer's belief that that person is at least a low threat?
A. Yes.
Q. And can that affect how they may engage with that person with their less lethal?
A. Yes.
Q. Why -- was Spokane County police called in?
A. Yes.
Q. Why were they called in?
A. We needed more officers.
Q. You didn't have enough officers for the skirmish lines?
A. No.
Q. And when you were observing -- did you observe some of the county officers?
A. I mean, briefly. There was just kind of a lot going on that I was paying attention to.
Q. Okay.
A. And they have their own supervisors. So eventually once they came, we kind of positioned them to the north and a majority of our officers were to the south. We felt like more the -- we needed more of our officers to the south because there was just more people there.

Q. Okay. So it was mostly because you didn't have the manpower?

A. Correct.

MS. CARTIER-GIROUX: I don't have any other questions. Thank you.

THE COURT: Recross.

MS. GEORGE: Thank you.

RECROSS-EXAMINATION

BY MS. GEORGE:

Q. Once the finger is on the trigger, that's use-of-force, fair?

A. Depends on what their intent is.

Q. Interesting. Okay. So --

A. I can't speak to what the person's intent or why they're doing it. They may perceive a threat. That threat may go away and they may bring it down to the low ready. So as to why they do it, there may be a perceived threat, but I'm not seeing what they're seeing, so I can't say why or why they didn't do it.

Q. Fair enough. But once the firearm comes up and the finger is on the trigger, that's use-of-force?

A. Intentional pointing of a firearm is a use-of-force.

MS. GEORGE: Thank you.

THE COURT: Okay. May this witness be excused?

MS. CARTIER-GIROUX: Hold on. I have to follow up. We're talking about firearms, not less lethals. So, like,

there's a difference.

THE COURT: Okay. Can you clarify?

Q. (BY MS. GEORGE) The same is true with less -- excuse me. The same is true with less lethal if within that five-feet range?

A. Not within the five -- it's -- what matters is the intent. If they're actually using that said object to affect what they're intending to do. If it's a quick scan, they bring it down really quick, then no, that is not a use-of-force.

Q. Okay. Thank you.

THE COURT: Okay. May this witness be excused?

MS. CARTIER-GIROUX: Yes, your Honor. Thank you.

(WHEREUPON, further proceedings were held which were not ordered and transcribed.)

* * * * *

WITNESS INDEX


| For the Plaintiff | Page |
|---|---|
| **KEITH GONSALVES** | |
| DIRECT EXAMINATION BY MS. CARTIER-GIROUX | 3 |
| CROSS-EXAMINATION BY MR. AHMED | 38 |
| CROSS-EXAMINATION BY MS. GEORGE | 40 |
| CROSS-EXAMINATION BY MR. ORESKOVICH | 48 |
| REDIRECT EXAMINATION BY MS. CARTIER-GIROUX | 56 |
| RECROSS-EXAMINATION BY MS. GEORGE | 60 |


* * * * *

EXHIBIT INDEX


| No. | Description | Page |
|---|---|---|
| None | | |

C E R T I F I C A T E

I, CRYSTAL L. GONZALEZ, do hereby certify:

That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Spokane, Washington;

That the foregoing proceedings were taken on the date and place as shown on the first page hereto; and

That the foregoing proceedings are a full, true, and accurate transcription of the requested proceedings, duly transcribed by me or under my direction.

I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings;

DATED this 1st day of July, 2026.

CRYSTAL L. GONZALEZ, CRR, RPR
Washington CCR No. 2955
Official Court Reporter
Spokane, Washington