# Exhibit H.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:25-cr-00113-RLP |
| Plaintiff, | ) | May 21, 2026 |
| | ) | Spokane, Washington |
| vs. | ) | |
| | ) | Excerpt of Jury Trial - Day 4 |
| JUSTICE FORRAL (2), BAJUN MAVALWALLA (8), and JAC ARCHER (9), | ) | **Testimony of Greg McSullivan** |
| | ) | Pages 1 - 68 |
| Defendants. | ) | |

BEFORE THE HONORABLE REBECCA PENNELL
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:
LISA C. CARTIER-GIROUX
REBECCA R. PEREZ
U.S. Attorney's Office
920 W. Riverside Avenue
Suite 340
P.O. Box 1494
Spokane, WA 99201

For Defendant Forral:
ANDREA K. GEORGE
AMY H. RUBIN
Federal Defenders of Eastern Washington & Idaho
601 W. Riverside Avenue
Suite 900
Spokane, WA 99201

For Defendant Mavalwalla:
AINUDDIN AHMED
Ahmed Law Firm
550 Congressional Boulevard
Suite 350
Carmel, IN 46032

MATTHEW F. DUGGAN
Duggan Law Offices PLLC
23505 East Appleway Avenue
Suite 200-175
Greenacres, WA 99019

For Defendant Archer: CARL JOSEPH ORESKOVICH
ANDREW M. WAGLEY
Etter McMahon Lamberson Van Wert & Oreskovich PC
618 West Riverside Avenue
Suite 210
Spokane, WA 99201

Official Court Reporter: Crystal L. Gonzalez, CRR, RPR
United States District Courthouse
P.O. Box 700
Spokane, Washington 99210
(509) 458-3434

Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.

(WHEREUPON, previous proceedings were held which were not ordered and transcribed.)

(GREG MCSULLIVAN, called as a witness by the Plaintiff, having first been duly sworn, testified under oath as follows:)

THE COURT: Please be seated.

DIRECT EXAMINATION

BY MS. CARTIER-GIROUX:

Q. Good morning.

A. Good morning.

Q. Could you please state and spell your first and last name?

A. My name is Greg McSullivan. First name G-R-E-G. Last name McSullivan, M-C capital S-U-L-L-I-V-A-N.

Q. Sir, where are you currently employed?

A. With the Department of Homeland Security, Homeland Security Investigations.

Q. How long have you worked for them?

A. Approximately eight years.

Q. In what capacity?

A. As a special agent and now a national program manager.

Q. And what is your current assignment?

A. I'm a national program manager over in headquarters.

Q. And what --

MS. RUBIN: Can I ask the witness to speak up? I apologize. It's just very hard to hear.

THE COURT: If you could pull the microphone closer or scoot in closer to it.

THE WITNESS: Sorry. Is this a little bit better?

MS. RUBIN: Yeah. That's better. Thank you.

Q. (BY MS. CARTIER-GIROUX) What do you currently do for HSI?

A. I'm a special agent with Homeland Security Investigations and a national program manager at our headquarters.

Q. Okay. Back in 2025, specifically June of 2025, did you work for HSI?

A. Yes.

Q. And what type of cases were you investigating then?

A. Primarily fraud and child pornography, child rape, child sex abuse material, things of that nature.

Q. Okay. And where was your office? Where were you reporting to at that time in June of 2025?

A. The Spokane field office.

Q. And how long had you been at the Spokane field office in June of 2025?

A. Approximately a year and a half.

Q. And prior to your position at the Spokane field office, where did you work?

A. I was still with Homeland Security Investigations, but I started in Los Angeles. Worked for a variety of groups down there, all for HSI.

Q. And how many years were you at the LA field office?

A. Approximately five or so.

Q. Just briefly, what type of training have you undergone to be an agent with HSI?

A. I'll try and spell out all the acronyms. So I worked at FLETC, the Federal Law Enforcement Training Center in Glynco, Georgia. And there I went through CITP and HSISAT. CITP is Criminal Investigator Training Program. It's kind of the academy or basic that pretty much almost all but not every special agent goes through.

And then from there, I went to the specialized training with the Homeland Security Investigations Special Agent Training, HSISAT. And that's where specifically it's the add-on where HSI special agents go to be specifically trained within whatever their agency's jurisdiction and tasking and mission is.

Q. Prior to working for HSI, did you have a previous employment?

A. Yeah. I was a contractor for the military. I taught surveillance, counter-surveillance, surveillance detection routes. Prior to that, I was an EMT.

Q. You said -- repeat your answer.

A. Yeah. I was a contractor for the military, and before that I was an EMT. Before that, I worked in the United States Marine Corps.

Q. How long were you in the Marines?

A. Well, I'm still a Marine, but I was in the Marine Corps for

about six years.
Q. How many?
A. About six years.
Q. Six years. Okay.
June 11, 2025, you indicated that you worked at the Spokane field office with HSI. What was the address of that location?
A. 411 West Cataldo, I believe. Something similar to that.
Q. Did HSI -- was the HSI the only -- was there any other agency working there along with you?
A. So that's an ICE building. So ICE is generally divided into two different subdivisions. You have Homeland Security Investigations, HSI, so we handle -- we have immigration authorities, we have customs authorities, but we're primarily there to investigate criminal activity. Child pornography is one of them, amongst a variety of other criminal activity.
You also have enforcement removal operations, ERO. And they're tasked primarily with administrative immigration enforcement internally throughout the U.S.
During that day specifically, we also had -- ATF was there with us. Those are the agencies that I'm aware of that were there that day.
Q. So at that point in time, you indicated that you were doing child victim investigations; is that correct?
A. Correct.
Q. Okay. So where was your office in relationship to ERO's

office? Is the facility divided? Like what is it?
A. Yeah. So generally speaking, just on the logistics of where our cubicles are, we were -- the HSI offices tend to be on the third floor. It's a cubicle city. It's nothing special. And then the second floor tended to be the ERO offices.
Q. While you were working at that facility, were there times where you were asked to help in facilitating the activities of ERO?
A. Sure.
Q. Okay. On June 11, 2025, did there come a point in time when you were asked to help in facilitating the transport of some detainees?
A. Yes.
Q. Why were you asked to help?
A. There's a couple of reasons, a variety of reasons. But we had approximately 12 detainees in that area, which was fine for a temporary period of time, but problematic for an extended period of time, so they needed to be processed. They needed to be moved. We had a duty to do so.
But also we were starting to see the accumulation of people, especially on the north side of the building. So we were beginning to feel a sense of urgency to, hey, we need to get the show on the road, so to speak.
Q. Were you advised at some point in time that the white bus was no longer an option to transport the detainees?

A. Yes.
Q. Were you asked to participate in another -- another potential -- sorry. Withdrawn.
Were you asked to participate in a plan to go out through the south gate?
A. Yeah. So at a --
Q. Were you personally requested to go out through the south gate or were there other officers that were asked to go out through the south gate?
A. There were other officers, ERO, that were -- the initial plan was for them, after the north side -- it sounds fancy -- exfil was compromised and just deemed to be unsafe, right, there was a new plan drawn up to take people out the south side. And it was ERO that was asked, and it was the primary officers to go down through the south side.
Q. So you were not asked to go out initially?
A. Initially, I was not a part of the first team of people to go out on the south side, no.
Q. Okay. When they went outside -- and who went outside as far as you knew?
A. If I recall correctly, it was deportation officer, DO, Jason McIntosh, Kevin Wilks, and then supervisory detention and deportation officer Jeremy Burlingame, if I recall correctly.
Q. When they went outside, where were you?
A. I believe I was on the south side of the building, I think

on the -- inside the building on the second floor watching them attempt this plan from the second floor windows.
Q. I'm going to show you what's been previously marked as Exhibit 22. I'm not going to play it. Can you -- well, it's not on their screen, so hold up.
Do you recognize 22?
A. Yep. That's our office building.
Q. Can you circle on the screen where you were when the individuals McEntire, Wilks, and Burlingame left the building?
A. I think it was McIntosh, if I recall.
Q. I'm sorry. McIntosh.
A. If I recall correctly.
Q. Yes.
A. And I presume touch screen?
Q. Yes.
A. Okay. I believe I was at the window that I've roughly circled.
Q. Okay. What did you -- what, if anything, did you observe from that window as they left?
A. If I may draw on the picture?
Q. Yes.
A. What I observed is that there was vehicles along this central area pointed -- and there's a rough arrow there. Hopefully you can see it. Pointed to leave the south side vehicle exit. They appeared to be our government vehicles that

had red and blue lights activated and on. And I can see that there was a crowd of individuals that was quickly growing on the outside south side of the gate.

Q. Did you observe anything going on with regard to the people in the unsecure parking area?

A. Yeah. So they were gathered on the south gate on the unsecured side, and that was quickly becoming a crowd of people who were refusing to move out of the way of vehicles with the red and blue lights.

MR. ORESKOVICH: Objection, your Honor. Just --

THE COURT: Could you repeat your objection?

MR. ORESKOVICH: I'm objecting to his characterization about whether people refused to move. He's watching this from a window.

THE COURT: Okay. Please -- I'll sustain in part. Please try to focus your testimony on what you saw, not your impression of what other people -- the reasons behind what people were doing. Okay?

THE WITNESS: Yes, your Honor. Apologies.

Q. (BY MS. CARTIER-GIROUX) Did you observe anyone running in this direction, meaning running south?

A. Yes. There was a variety of people, not just one.

Q. Okay. And your testimony is that you observed people over here by the gate line?

A. Yes. Below that line that you just drew.

Q. Okay. All right. So what, if anything, did you do when you had observed that happen?

A. At a certain point, I turned to other law enforcement officials that were around me. Most specifically was our ATF Special Agent Jared Tomaso was nearest, and then my -- one of my supervisors was ASAC -- which is Assistant Special Agent in Charge, ASAC -- John LaForte, and basically asked them, like, "Hey, are we going out," or something to that effect of "Hey, are we going to go help them?" And heard a "yes" from Jared, heard a yes or something in a positive affirmative manner from John. And, yeah, so we went out.

Q. Okay. And what was the path you took when you went outside the building and what door did you go out?

A. So there's a stairwell and a pedestrian door. It's not quite viewable from this photo, but I can circle it if that works.

Q. Okay. Yes.

A. So right here, there's a pathway. And I've kind of drawn a line.

Q. Mm-hmm.

A. And I basically took that line of pathway from the door on foot walking toward the south.

Q. Okay. And did you come around the corner around the gate line -- sorry -- around the fence line over here at the bottom of the photo?

A. I did. So I was moving south or down in this photo, and I turned right, which then, I think, takes me toward the west.

Q. And when you turned right, walking towards the gate, the exit gate, what, if anything, did you observe?

A. I mean, on the way there, there was people, you know, yelling, screaming at us, you know, insulting us, saying whatever heinous things of Nazis, you know, saying things about our children, whatever it is. Generally pretty riled up.

And when we started moving toward the gate, it was becoming a little bit more incoherent as there was more people that were there and it was a lot of yelling.

Q. Okay. Could you see, when you turned around the corner, what was occurring at the gate?

A. Yeah. There was a whole slew of people that were there. They were gathered up. They were at the gate, and it was downright impossible to move through that area from the secure parking lot.

Q. Okay. Did you observe what some of them were doing with their bodies? Were they standing alone or were they attached to one another?

A. Yeah. Eventually, as I got there, it seemed as if they were starting to conglomerate or move together. As I got closer, I was seeing people linking arms, starting to almost rugby style move back and start pushing with their legs and almost forming a human wall and not letting us move outside of

this and keeping us inside.

Q. Okay. By linking their arms together, what, if anything, does it do to the body mass of one person?

A. Yeah. It makes it exponentially more difficult to shift somebody when they're in that -- that type of tactic or strategy. It makes it, like I said, exponentially more difficult to shift them or move them, get them out of the way.

Q. And if a person pushes back, if a group pushes back linked together, what does that do to your -- what does that do? What does that feel like towards you?

A. Yeah. I mean, even a weaker person, if they're together and -- strength in numbers. It's quite literally just that, is strength and numbers, so -- and we were very much so at this point outnumbered.

Q. And you described a rugby. Not everybody is familiar with rugby. What do you mean when you say it's like a rugby technique?

A. Yeah. Sorry. I guess the scrum. You know, you see the tush push in football or whatever it is, getting that ball over the one yard line. It's kind of the same tactic of just the force in numbers, and there's a whole bunch of mass. And, you know, I'm not the strongest guy out there, but I don't think I'm the weakest, but I couldn't -- you know, there's just too many people there.

Q. When you got to the gate line, did you believe at that

point in time that you might be able to get those cars an access point to get out initially?

A. Yeah. Yeah. That's part of the reason why we went down there, and it was also to ensure that those other LEOs, those law enforcement officials, were safe. I mean, there was three of them, and we were seeing a crowd of at least dozens and growing at that point. We wanted to make sure that they were safe, they weren't left alone. And so it was to make sure that they were not left alone and also to effect the plan.

Because, again, you have to take this in the context where we've called 911. We've -- you expect when you call 911, somebody to show, you know, and this --

MR. ORESKOVICH: Objection to the responsiveness of the answer, your Honor.

Q. (BY MS. CARTIER-GIROUX) Sir --

THE COURT: Go ahead. You can re-ask.

Q. (BY MS. CARTIER-GIROUX) Did you -- when you went out to the gate at that time and you said that you were -- you believed that you might be able to create a space, did you believe that local law enforcement was going to respond to help you with the protesters?

A. Absolutely not.

Q. Okay. Did that infuse your thinking in terms of what you needed to do?

A. Yeah. It colored the context of the situation where nobody

was coming to help us. We had to figure this out ourselves. And this had been not we called 911 five minutes ago; this had been hours. And I was under the impression, when I made the decision to go down there, that we were basically told to buckle in for the night.

Q. And was that something that was feasible with the number of detainees that you had?

A. No. Not in -- not to maintain my duty to those detainees and their well-being.

Q. And we already had some testimony about it, but would it -- based on your understanding of the facility, would it, in your opinion, have been safe to keep them there overnight?

A. No. It's not equipped to hold people, especially detainees and especially a mixed-gender group of detainees overnight. We did our best to give them food and water and other things. We were doing our best to keep them healthy and whatnot. But it is not equipped for an extended period of time to keep detainees there, no.

Q. When you -- you indicated on your testimony that when you came down to make the right-hand turn to get to the gate area, people were yelling things at you. What was -- when you arrived, what was the -- what were you seeing and hearing from the individuals gathered at the gate in terms of what level of emotion did you hear or see?

A. Yeah. I would say that the level of emotion that I -- that

I heard and that I saw was that people were getting riled up, that they were incensed at that point.

Q. What types of things were you hearing?

A. Things that are not appropriate for the courtroom generally, but expletives, swear words, you know, Nazi, pig, all these other things that were being thrown out. It was chaotic. Like I can't give you the specifics on every single person that was out there, but, I mean, it was a mass. It was a crowd of people who were just yelling out everything and clear -- in my opinion, did not obviously like us at all.

Q. So I know you don't want to say expletives, but I kind of need you to say what you heard.

THE COURT: I also know we've heard it, but -- so you can move on quickly through this.

MS. CARTIER-GIROUX: No. I just want know what he personally heard.

Q. (BY MS. CARTIER-GIROUX) What did you personally hear? And you're allowed to say expletives, knowing that this not coming from you.

A. Yeah. So it's not coming from me, but people were saying, you know, "Fuck you." "Go fuck yourself," things along that line. You know, everything that was not PG-13.

Q. So when you got to the location, it's you, LaForte, correct, and Tomaso?

A. Yes.

Q. What is the first thing you all tried to do in order to create a space?

A. So Special Agent Tomaso and ASAC LaForte are there before I am. And what we had attempted to do was get to the LEOs that were there so at least we could link up with them, which was a challenge in and of itself. And then we formed our own human wall of just the three of us or four of us, however many people could join in against dozen plus, dozens plus of people and push them back.

And we were announcing "Police," who we were, giving commands, lawful commands of "Get out of the way," "Move," "Stop," all of these different things of just get out of the way. And, again, this was in front of vehicles with red and blue lights going and...

Q. At the time, did you think that you could just stand there and ask them to leave?

A. No. That had been done already.

Q. Where had that been done?

A. On the north side of the building.

Q. Okay. I'm going to show you -- and the sound is off -- portions of a video. And I'm not going to show you the whole thing, but I'm going to show you portions of a video, and I want you to explain from your perception what you were doing and what you experienced.

MR. ORESKOVICH: Exhibit number, please.

MS. CARTIER-GIROUX: Oh, I apologize. This is Exhibit 86.

MR. ORESKOVICH: Say again?

MS. CARTIER-GIROUX: 86. I apologize. I'll be more careful with the mike.

86. All right.

Q. (BY MS. CARTIER-GIROUX) Who is this with the lettering on the vest here?

A. Special Agent Jared Tomaso from the ATF.

Q. Okay.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Okay. I'll let this run.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Who is that with the -- no -- nothing on?

A. Well, with the polo on.

Q. Yeah. No equipment. Excuse me. No equipment on.

A. He's a good boss. But that is ASAC LaForte.

Q. LaForte, okay. Who is this gentleman back here?

A. That's me.

Q. Now, you're masked up.

A. Yes.

Q. Why are you masked up?

A. We were and still are worried about doxxing.

Q. Did you do any type of undercover work at that time?

A. No.
Q. Okay. So you, unlike Tomaso, were not working undercover cases.
A. No.
Q. Yet you still felt compelled to wear a mask.
A. Yeah.
Q. Why?
A. We had people outside our buildings. We still do to this day. People photographing. We've had multiple LEOs followed home. We've had people attempting to publish our information online. You know, you name it.
Q. Okay. So -- okay. So where -- I'm going to slow this down.
All right. What do we have here. What is this colorful thing here?
A. I honestly don't know. I thought it was one of those kiddie deals that you, like, throw up in the air and go underneath, the parachute thingies, but I don't know. It could be a banner. I never found out.
Q. Did you see it when you were walking?
A. I believe so.
Q. Okay.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Okay. What are you doing here?
A. Well, just previous to this, we're announcing our presence

as best we can, you know, announcing who we are, trying to give commands of move, get out of the way, stop, whatever it might be. And now I'm trying to push people, shove people, shift them, move them in some way, shape, or form, get them out of the way so emergency vehicles can leave.

Q. And at this time, are the red and blue lights on on the vehicle?

A. I believe so.

Q. Okay. I'm going to do this slowly.

So what do we see here with you all doing?

A. Well, we formed a semi-human wall, if you will, in trying to push people out of the way.

Q. And pushing people, can you describe whether or not that is consistent with your training under these type of circumstances?

MR. AHMED: Objection; cumulative. We've done this, Judge.

THE COURT: Overruled. Go ahead.

THE WITNESS: Could you please repeat the question?

Q. (BY MS. CARTIER-GIROUX) The pushing that you're doing, that you are doing personally, at that time, under these circumstances with that -- was that consistent with your training?

A. Yeah. A hundred percent.

Q. And why was that consistent with your training?

A. Well, these individuals had been given lawful commands.

They're in front of vehicles with red and blue lights that are out there. We're all marked with police markings, almost all of us are marked, but the people who had been out there are marked. It's, to me, very clear that a reasonable person would know that you are not supposed to inhibit the movement of law enforcement.

MR. ORESKOVICH: Objection.

THE COURT: Sustained. I will strike the witness's statement about what a reasonable person would know.

MS. CARTIER-GIROUX: Okay.

Q. (BY MS. CARTIER-GIROUX) So you believe that you had the authority to push them back, right?

A. Yes.

MS. CARTIER-GIROUX: And I'm going to have to lead him a little bit to avoid that.

THE COURT: Okay.

Q. (BY MS. CARTIER-GIROUX) Okay. So was it -- how do I do this so it's not too leading?

So what about what they did made you believe that you had the ability to push them back?

A. They were not obeying our lawfully-given commands. They were grouped together in such a way and turning away from us, using their legs to push against us, forming their own human wall. Some of them were linking arms. All of these things, taken in consideration to prior disobedience to lawfully-given orders, was enough for me to believe that the only way to get

them to move out of the way was to push or shift or move them or grab them or in some way physically move them.
Q. Okay. And, again, the purpose of doing this wall and pushing back is to do what? Like what is your goal? What are you trying to do?
A. It's still the original goal of trying to get these deportation officers out of the secure lot.
Q. So that they can do what?
A. So they could actually link up with help. There's no detainees that are with them. It's just LEOs. We're just trying to leave.
Q. But you're trying to leave to facilitate what?
A. To actually get them outside of this area so they can link up with help, whether that be other federal law enforcement agencies, to help and come in and get the rest of us out and come up with a better game plan.
Q. And to help -- would it be to help to get the detainees out of the building and transport them?
A. Eventually, yes.
Q. Okay. So you needed to get these vehicles out in order to get -- ultimately get the detainees out of that building?
A. Correct.
Q. Okay.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) So what are we seeing here?

A. That looks like the crowd, the backside of Special Agent Tomaso, I believe, and a bunch of people fighting to reposition themselves in front of the gate.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) To be clear, were you arresting anyone here?

A. No.

Q. Okay. So what are we seeing here?

(Playing Exhibit.)

A. That's my left shoulder. And I'm still attempting to shift people, move people, push people, shove people out of the way so we can actually leave.

Q. Did some people fall when you pushed them?

A. I believe so. I don't recall specifically. It was -- it was more of a crowd of people.

Q. Okay. Was the line that you created where we saw that momentary gap, was that able to be maintained?

A. No. You can see it collapsing right now.

Q. Okay. What were people doing?

A. They were trying to put themselves back in the same position that they were in that we just moved them from.

Q. Okay.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) And what do we see in this picture from this group here? What are they doing?

A. Looks like they've repositioned themselves from where we've just pushed them out of the way or shifted them. They're linking arms, and they're bracing for somebody to move them.

MR. ORESKOVICH: Objection to the characterization of what people --

THE COURT: Sustained in part. Just please try to focus on what you saw and don't try to attribute what other people might have been trying to do.

Q. (BY MS. CARTIER-GIROUX) Based on what your observations were of their body positioning, what did you anticipate that they were going to do?

A. Continue to resist lawful orders and me pushing them out of the way.

Q. Okay. Based on their body position, what did you anticipate that they were going to do with their bodies?

A. Resist my efforts to get them out of the way.

Q. But what were they physically going to do with their bodies? Were they going to push? Were they just going to stand there? What did you think was going to happen if you tried to pull them?

MS. RUBIN: Objection. Calls for speculation.

THE COURT: I think she's asking what did he anticipate. He can talk about what he anticipated if he anticipated anything. Could be he didn't. So, if anything.

Q. (BY MS. CARTIER-GIROUX) Did you anticipate, if you made

contact with them, what they were going to do?
A. Yeah. I anticipated more of the same that this video has shown where that they were pushing against us, trying to get back in the same position that they were at, that they were going to resist my efforts to move them.
Q. Okay.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What are you doing here?
A. I believe I'm reaching out to grab one of the individuals that's linked arms there.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) And why are you grabbing him the way you're grabbing him?
A. Because it's the first or only available appendage that I can grab onto.
Q. Is he wearing a backpack?
A. I think so.
Q. Where are his arms?
A. I think one of them on the right side is linked up with another person.
Q. What are you doing here?
A. Grabbing him to try and move him out of the way.
Q. Now, you're grabbing at his head area. Why are you doing that?
A. Well, for one reason, it was what was available to grab in

a very chaotic dynamic situation. But also there is a saying where the head goes, the body goes kind of deal. So that if I can redirect them or redirect somebody with their head, then the rest of them tends to follow.
Q. And, in fact, did that happen?
A. For a short period of time, yeah.
Q. And -- but did that person actually go in the direction you were trying to push them initially?
A. No.
Q. What did that person do?
A. Repositioned themselves right where I pushed them away from.
Q. So then what do you do next?
A. I'm trying to again, still as they're linked arms, move them away from that area and break up their own human wall that they made.
Q. So what are we seeing here?
A. Looks like linked arms to me.
Q. What are we seeing here with the legs?
A. It appears that they're braced against my efforts and others' efforts to move them out of the way.
Q. Are they using -- are they using any force against you to remain in their positions?
A. Yeah. Absolutely.
Q. Are they pushing against you?

A. They're pushing. They're trying to shift. They're shoving themselves as well.

Q. So what did you do that -- just there? I'll pull back a little bit so you can see it again.

All right. That's when you're grabbing him initially. Okay.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) So what are you trying to do here?

A. I'm trying to get him out of the way.

Q. Is it working?

A. For a moment.

Q. Okay. And then finally, are you able to get him out of the way?

A. Again, for a short period of time.

Q. So are you striking anyone? Are you punching anyone?

A. No. No closed fists or strikes were used.

Q. Did you have a Taser on you or any other nonlethal?

A. I had a short baton that was on me that was not deployed at all.

Q. Did you have any spray?

A. I had no pepper spray. I had no Taser.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) What are we seeing here now?

A. Appears like there's still people within the way of the south gate, and it looks like one of them is gripping on to the

brick wall or post that's there.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Okay. Now, what are you trying to do with the person who's gripping the post?

A. Trying to get them out of the way.

Q. While this was happening, did you feel any contact with your body that wasn't created by your motion?

A. I believe so throughout the entire time there. I was jostled or pushed or hit. It -- can't attribute to one single person when I was in the middle of it.

Q. Okay. I'm going to speed up to a part. Hold on.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Okay. You're walking back over here, correct, walking back to the gate line? Did you just see that? What just happened?

A. It appears as if somebody shoved me in the back.

Q. I'm going to play that again.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) All right. Can you see the arm of that person?

A. I believe so, yeah.

Q. Can you point it out, like draw on there?

A. I believe that's -- yep.

Q. Okay. I'm going to show you now Exhibit 435.

MR. ORESKOVICH: 435?

MS. CARTIER-GIROUX: Yes.
MR. ORESKOVICH: Thank you.
THE COURT: Can you clear your screen?
MS. CARTIER-GIROUX: Yes. Yes, ma'am.
Q. (BY MS. CARTIER-GIROUX) What do we see in Government's 435?
A. Looks like somebody's either in the process of or right about close to shoving me in the back.
Q. Okay. Now I'm going to play Government's 88. I'm not going to play the whole thing. And I'm going to start about a minute in. 88. Not sure exactly where it is, but hold up. Okay. There we go. That's my fault. Okay. Okay. Let's go here.
(Playing Exhibit.)
MS. CARTIER-GIROUX: Did I mess it up by turning the sound on?
Q. (BY MS. CARTIER-GIROUX) All right. This is Government's 88. Okay. Let's play now.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) Okay. I want to first direct your attention, sir, to this area, the area behind you. What, if anything, did -- did you notice people behind you?
A. Eventually, I did notice that there were people up there, yeah.
Q. Did they present any concern for you?

A. Yeah. Absolutely. They had what I would call the high ground.

Q. And why did it present concern for you?

A. The situation had become more dynamic. We -- I was under the impression that there was nobody else that was coming for us, and there was a bunch of unknowns that were in that area that were seeing us as we were down below in the quote/unquote secure lot. And I didn't know what those people would do. But either way, because they were an unknown and this was a dynamic situation, it was something that just needed to be continuously considered, in my opinion.

Q. Okay.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Do you see yourself arriving?

A. I do now.

MS. RUBIN: Can we have the question again.

Q. (BY MS. CARTIER-GIROUX) Do you see yourself arriving?

A. I do now.

Q. Can you point yourself out?

A. Sure.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Okay. Now I'm going to slow it down a little bit.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Do we see the person that we saw

in the photograph here that was -- that appeared to be pushing you in the last photograph I showed you? Do you see that?
A. The person who is shoving me in the back?
Q. Yes.
A. I believe so, yes.
Q. Can you circle that person?
A. I believe it was this person here.
Q. Okay. You don't know who that is, correct?
A. At the time, I did not know who it was.
Q. Okay.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What are we seeing?
A. See the person who I just circled pushing or shoving me right where it says "Police" on the back of my vest.
Q. Were you able -- did you feel the shove?
A. I recall feeling a shove at the time. Just I don't recall specifically who it was from.
Q. Did you feel other pushes or blows to your body?
A. During the time, yeah.
Q. I'm going to pull up Exhibit 432.
After you failed to clear an area that could remain open in order for the vehicles to exit, what, if anything, did the individuals do? Did they leave? Did they stay? What did they do?
A. So they stayed. They formed what appeared to be a human

wall linking arms. They spit in our direction. They were yelling at us. They were coordinating. They seemed to be yelling out responses when -- you know, we were attempting to come up with a game plan at one point, and that seemed to be what they were doing.

Q. Okay. Do you recognize this person here?

A. I do.

Q. And what do you recognize him --

MR. ORESKOVICH: Excuse me. Number, please.

MS. CARTIER-GIROUX: Oh, I'm sorry. It's 435.

THE COURT: 432.

Q. (BY MS. CARTIER-GIROUX) 432. Do you recognize this person here with the goggles on?

A. I don't know his name, but I recognize him.

Q. Why do you remember him?

A. Because he was one of the individuals that spit.

Q. That was spitting?

A. Yep.

Q. When people were spitting, or at least this person was spitting, what, if anything, did you think?

A. Well, then it became a concern of I don't know what biological nonsense I would have to deal with. That's how, you know, Hep C or other issues are spread. I didn't want to have to deal with that.

Q. Okay. At the time when you were interacting with the

crowd, when you were inside the crowd and trying to push the line, how were you feeling? What, if anything, were you feeling?

A. Chaotic. I was feeling that it was completely -- complete chaos as far as trying to bring some type of order to what was going on. It was loud. You know, very much dealing with a crowd of people who do not like you at a minimum.

Q. And did you have any concerns for your safety having just the three of you out in the crowd?

A. Yes. A hundred percent. That's part of the reason why we went down to the law enforcement officials that were there. I didn't want to leave them alone. And I had continual --

MR. ORESKOVICH: Objection, your Honor, to the responsiveness of the answer.

THE COURT: I'll let him answer. He's talking about his -- what concerns he had for his safety.

Q. (BY MS. CARTIER-GIROUX) Re-answer the question.

A. Yeah. I was concerned about my safety and the safety of others that were there.

Q. Did there come a point in time where the gate was closed?

A. Eventually, the gate did close as we kind of tried to rethink through a game plan and how to deal with this situation.

Q. When the gate closed, what, if anything, did you hear?

A. From the crowd, they were jubilant. I mean, they were yelling, screaming, but in a different manner. It seemed more

like cheering in that point.

Q. What, if anything, did that make you feel?

A. I mean, just made me feel that -- like okay, this is the depths of their resolve in not allowing any of us to leave that day.

Q. Okay. After the gate closes, what happens? What do you all do in the secure lot?

A. So when we're in the secure lot, we made the decision not to continue with the plan. We decided not to escalate with any of the tools that we had available to us, like a baton, like mace, Tasers, anything else. And we made the decision to, okay, we're going to go back inside. How are we going to do that?

John LaForte was the ranking individual there. He's a lead-from-the-front kind of guy, and so he said he'd take the front. I was very concerned about his safety at the time. So I asked Special Agent Jared Tomaso from ATF to stay with him.

And then I was also concerned about the security of the quote/unquote secure lot, so I made the decision that I would take up the rear and ensure that the pedestrian door on the north side of the secure lot, which is south of the office building, would stay shut. The reason being is it's a magnetic lock, and if you bang it or close it too short -- or too hard, excuse me, it will just bounce. And I didn't really want unauthorized personnel, especially the ones that were around and a little bit riled up, in our -- in that area dealing with our

vehicles.

Q. Now, you indicated that you had Tasers. Did some people have mace?

A. Mace or pepper spray, yep.

Q. Why did you decide not to escalate?

A. It was tactically unsound to do. We were doing everything we could to de-escalate, to keep the situation as calm as we could over a period of hours.

Q. Did you think it would be safe if you went out there and started using Tasers and mace and batons?

A. I think that would have been a bad idea, which is part of the reason why we didn't do it.

Q. So what did you all do then?

A. Well, we let the door close, the vehicle gate close, and then came together with a plan. And then at that point, John and -- I forget who else was with him in the front, but I believe Jared was, walked from the -- the north end of the motor pool secure lot, parking lot, back to the south side of the office. And I took the rear of that string of people and ensured that the gate fully closed and stayed secured to the best I could.

Q. I'm going to show you Exhibit 27.

THE COURT: 27.

MS. CARTIER-GIROUX: Yes.

Q. (BY MS. CARTIER-GIROUX) Do you recognize Exhibit 27?

A. I do.
Q. What is that?
A. It appears to be the security cam footage of the north end of the parking lot, the secure lot.
Q. Okay.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What's happening here?
A. Looks like the ASAC LaForte has just opened the pedestrian gate on the north end of the parking lot.
Q. Okay. Who is this person, the one that's right next to LaForte to his left?
A. I believe that's SDDO Burlingame.
Q. And who is this person with the black shirt?
A. That, I believe, is Special Agent Tomaso.
Q. Okay. And who is this?
A. I believe that's me.
Q. Okay. And who is there behind you?
A. I believe that's DO McIntosh.
Q. Okay.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) So what are you doing?
A. So I'm positioning myself at the door to ensure that everyone gets out and then the door remains secure.
Q. Who is this person?
A. I believe that's DO Wilks.

Q. Kevin Wilks?
A. I believe so, yes.
Q. Okay.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) So what are you doing?
A. Trying to make sure that the door stays shut, doesn't bounce open.
Q. What do we see happening in this video?
A. I see an individual reaching out toward DO Wilks' face, hat, eyes area.
Q. Okay. Did you see that happen?
A. I did.
Q. And what was your reaction, if any?
A. It was to intercede and protect another individual from whatever that was, whether it was just a swipe or an assault or a hit. I wasn't quite certain. But to ensure that that did not continue.
Q. Okay.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) What are you doing here?
A. I pushed them out of the way and created space and told them you -- again, if I can quote myself that day, your Honor, with...
THE COURT: Sure. Go ahead.
THE WITNESS: I said, "You don't fucking touch us" or

something to that effect.
Q. (BY MS. CARTIER-GIROUX) Did you believe it was just a touch on his hat or did you believe he had touched his face?
A. I wasn't certain at the time.
Q. Okay. So I want to show you. Do you see LaForte?
A. I do.
Q. Which one is that? Is that this guy?
A. Yes, with the polo and the sunglasses.
Q. Did you see what LaForte did?
A. I didn't, honestly, at the time.
Q. Okay. What did he do?
A. It looks like he flipped off somebody's hat.
Q. Okay. Did you get safely back in the building despite the interactions that you all had?
A. Yeah. After all of that, we did all safely make it back into the building, fortunately.
Q. Okay. What did you do next?
A. Well, we made sure that the doors were secure on the pedestrian side. The individuals -- so when we were in the secure lot, one of the things that I'd done is called some of the individuals that were inside the building to, like, "Hey, can you meet us at the gate, meet us there, because we're going to walk that way." Letting them know what our plans were, our intent was. We didn't have radio comms with them, but we had cell phones.

So we met up with them, kind of very quickly debriefed, like holy smokes, what the heck is going on kind of deal, and then just basically tried to come up with another plan about what we were going to do as they were on continuous cell phone calls with 911.

Q. Did you believe that you were going to be able to leave at this point on your own?

A. No, not -- absolutely not, and most especially with the duty to care that I had for other employees that were there and the detainees.

Q. When you were -- did you go back inside the building?

A. We were back inside the building at that point, yeah.

Q. Did there come a point in time where you were finally able to get out of the building with the detainees?

A. Yeah. I don't know how many hours after that point that occurred, but it was not very quickly.

Q. Okay. And when you left, how did you get out?

A. So, again, we -- in a very dynamic, chaotic environment, we were able to get out with the assistance of county and city municipal police SWAT teams, BearCats that showed up. They had assembled on the incorrect door on the east side at first, and so that had to be repositioned to the correct door that we could actually leave from.

And at that point, we formulated a similar game plan where I was one of the last people out with ASAC LaForte to ensure

that the doors were shut. He wanted to make sure that the alarm system was on because we were very worried about people breaking in and taking stuff. I had packed up a lot of my sensitive case information because I was worried about it being -- you know, I had active cases to protect, child victims to protect. And we were able to extract from the one of the pedestrian doors.

MS. CARTIER-GIROUX: Okay. I don't have any other questions. Thank you.

THE COURT: Thank you.

Cross-examination? Mr. Ahmed?

MR. AHMED: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. AHMED:

Q. Good morning, Agent McSullivan.

A. Good morning.

Q. Agent McSullivan, I want to get some of the chronological order right here. So were you in one of the vehicles that was attempting to leave from the south gate when it was blocked? Were you in one of those vehicles?

A. Was I in one of them?

Q. Yes.

A. No.

Q. Okay. And from my -- what is your understanding as to where those vehicles were going?

A. My understanding that the plan -- my understanding at the

time of the plan, without having been on comms with those people, was they were going to leave for a secondary site and meet up with other federal agencies to attempt to come back.
Q. Okay. Chronologically, by this time, you know, as they're trying to exit the south gate, there was a white bus on the other side of the building which had been spray-painted. Do you recall that? The windshield had been spray-painted?
A. Yeah. That was the bus that was going to be the first or primary means to get detainees out of there.
Q. As the vehicles are trying to exit the south gate, if you know, had that truck already been spray-painted?
A. I believe so, yeah.
Q. Okay. And then a secondary vehicle was requested, correct, to move the detainees?
A. Yeah.
Q. And that was a -- I believe there were supposed to be two vans, but only one van showed up; is that correct?
A. I'm not sure what was supposed to have occurred, but I believe at some point, a red van showed up.
Q. And it's your belief that the agents were trying to exit the south gate to meet with some other agents, correct?
A. It was my understanding at the time that they were going to meet with another government agency. Whether they were agents or not, I don't know.
Q. Okay. That agency -- was that the agency providing the red

van the U.S. Marshals, if you know?
A. I don't think it was U.S. Marshals. I thought it was border patrol, but I don't know what the --
Q. Could have been border patrol?
A. I don't know what agency.
Q. But the purpose was to meet up with the people who were providing the red van, correct?
A. That was my understanding.
Q. Okay. But there were no detainees -- in that convoy of SUVs, there were no detainees in those vehicles, correct?
A. Correct, as far as I know.
Q. So the agents were trying to link up with some other agents. I'm just trying to clarify that.
A. Correct.
Q. Okay. And we saw Exhibit 27, and I'm not going to play it again at this point, but it's you and other agents exiting the north gate where the guy is tipping the hat. I think LaForte tips somebody's hat, and a young man tips one of the agents' hat, correct? Do you remember seeing that?
A. Yeah, the north end of the secure parking lot.
Q. Correct.
A. Yes.
Q. And before y'all exited that gate, LaForte and other agents were in the parking area, which is gated, correct?
A. Correct.

Q. Okay. And you're aware LaForte had already shipped his equipment or whatever to wherever he -- his next duty station was, and so he didn't have his vest and his firearm, correct? If you know. If you don't know, just say "I don't know."

A. I -- I knew at the time that he did not have his equipment. I don't know if he shipped it or turned it in or how the logistics of that worked.

Q. But you were concerned about his safety, correct?

A. Yeah.

Q. Okay. And you --

A. I was concerned about everyone's safety there.

Q. I get it. But you particularly were concerned by the fact that he didn't have a vest, right? Do you remember voicing that concern?

A. I was concerned about what about the crowd might do to him, yeah.

Q. Okay. And you actually talked to LaForte about that, did you?

A. Yeah. When we were in the secure lot forming a plan to leave, I was asking to -- like "Hey, I want to make sure you're okay," especially with what we just went through.

Q. And LaForte said, "I'm leading the way out." Do you remember that?

A. He said something to the effect of -- of that.

Q. Not to the effect of that, but he said, "I'm going to lead

the way out." He didn't care about not having a vest, correct?

A. I don't know what he cared or didn't care about, and I don't recall exactly what he said but something to that effect.

Q. Okay. So he wasn't really afraid or anything, correct?

A. You would have to ask him.

Q. All right. But he voiced that to you, too, right?

A. He voiced what?

Q. Based on his mannerisms in the parking lot, based on the fact that he says, "I'm going to lead the way out," based on --

MS. CARTIER-GIROUX: Objection.

THE COURT: Sustained.

MS. CARTIER-GIROUX: I allowed the hearsay to come in, but to then interpret the hearsay is --

THE COURT: Sustained.

Q. (BY MR. AHMED) Okay. Well, let me ask clearly. Did he indicate to you that he was going to lead the way out?

A. Yes, he did.

Q. Okay. All right. And you had a firearm on you?

A. I did.

Q. Okay. And you had a Taser on you?

A. No.

Q. You didn't have a Taser?

A. No.

Q. Okay. Did you have OC spray on you?

A. I did not.

Q. Okay. Did you ever tell anybody that you thought about deploying OC spray?
A. Not that I thought about deploying OC spray. It was one of the tools that I asked is, like, "Hey, are we using this? Are we escalating this? What's the plan here?" Because pushing was not working.
Q. Okay. So besides from a firearm, you didn't have any other weapons on you?
A. No. I testified earlier, and it was the case that I did have a very short baton on me.
Q. Okay. Did you have a camera on you?
A. I did not, no.
Q. Okay. Besides from Tomaso, were there any other ICE officials that had cameras on?
A. Not that I know of. I did not have an issued one, unfortunately.
Q. Okay. And you were interviewed by the FBI back in, I think, July of last year, correct?
A. I was interviewed by them. I don't recall the date.
Q. All right. And do you recall telling the FBI that you heard -- your quote -- jubilant yelling?
A. I don't recall the exact quote, but if that's in the report, then I believe it to be accurate.

MR. AHMED: Can I approach the witness?

THE COURT: You can. I don't know that the witness

disagrees with you.

Do you agree that you said "jubilant"?

MS. CARTIER-GIROUX: Your Honor, I'm not sure that that's an inconsistent statement from what he testified to. I'm not sure how we're doing -- how a prior out-of-court statement made to an investigator is admissible when he said that they were cheering.

MR. AHMED: It's impeachment, Judge. And if he said "jubilant," it is --

THE COURT: Okay. My only hope is to get through this quickly.

Do you remember saying "jubilant"?

THE WITNESS: I don't --

MS. CARTIER-GIROUX: It's my recollection that he used that word, but...

MR. AHMED: Okay. Thank you. Can I ask the witness, please?

THE COURT: Okay. Please. Just...

Q. (BY MR. AHMED) Do you remember using that expression, "jubilant yelling"?

A. I don't recall the exact phrase, but that sounds accurate to me.

Q. Okay. Thank you.

You talked about the gentleman spitting, the guy with the goggles on, correct?

A. Yes.
Q. Okay. Do you recall him spitting at his own feet?
A. I don't recall if it was at his own feet or near my feet or in the space between us but somewhere around there, yeah.
Q. How far were you from him when he spit down on the ground?
A. I think it was a matter of feet. I'm not certain the exact distance.
Q. Okay. Did anybody punch you in the face or anything like that?
A. I don't recall exactly.
Q. Did you seek any medical treatment that day?
A. No.
Q. Now, you said the police had -- at least your belief was that the police were not going to respond; is that right?
A. That was my belief at the time.
Q. And that belief is based on what LaForte told you?
A. I don't recall if it was LaForte's or the other supervisors who may have been in the area or other individuals.
Q. Okay. To your knowledge, was LaForte the one having communication with the police?
A. I believe he was one of them.
Q. Okay. And you -- your belief is, hey, the police aren't coming at all. That was your belief.
A. Not at all, but not in any time period that was useful.
Q. Was it ever explained to you as to why the police would not

be coming?
A. No. That wasn't the time that we were trying to figure that out.
Q. You never asked why? Why aren't the cops showing up?
A. We did, but I didn't -- I don't recall --
Q. So to your personal knowledge, as it was explained to you, not somebody else, as it was explained to you, did you know why the police were not coming?
A. I don't recall, no.
Q. Okay. And you never asked?
A. I believe I asked, but I don't recall.
Q. Okay. Got it.
That's a street outside the south gate, correct? That's a public street?
A. I don't know who owns it, but I believe it's definitely publicly accessible.
Q. Okay. And people had linked up outside the south gate on that public street, right?
A. What do you mean by "linked up"?
Q. Well, I mean, it's a public road, correct, right outside the south gate, correct?
A. As far as I know.
Q. Okay. And you and other agents went out there, LaForte leading the way, to push those individuals out of the way so you could -- so the vehicles could link up with another agency,

correct?
A. Could you repeat that question, please?
Q. Yeah, I'll say it slower. You and other agents went out the north gate, traveled all around the parking lot to the south gate to push those individuals out of the way so the vehicles could exit the south gate, correct?
A. We didn't exit out the north gate. We exited out the south pedestrian door of the office building and then went to the south gate. But otherwise, that question was correct.
Q. Okay. And that's when the shoving started, correct?
A. Uh...
Q. Agent McSullivan, do you remember shoving anybody that day?
A. Oh, yeah. I do.
Q. Okay. And that was initiated by you and the other ICE agents, correct?
A. I don't know who initiated it. I know when I came across that I began to shove and push people when I started there. I don't know what happened before I got there after I left the window.
Q. So you don't know if LaForte got shoved or any other co-agents got shoved first? You don't know that? You haven't reviewed video on this case?
A. I've looked at some video. When I came upon that area, I started to shift, push, shove, grab, move people out of the way in whatever way I could without using hard techniques.

Q. Was it your belief at that time that the civilians outside that gate had started the shoving?

MS. CARTIER-GIROUX: Objection. Asked and answered. How many times are we going to ask this?

MR. AHMED: I don't think he's been clear.

MS. CARTIER-GIROUX: He said he didn't know who was shoving before he got there, if anyone.

THE COURT: Just ask if he knows, get the answer, and then move on.

Q. (BY MR. AHMED) Do you know?

A. Sorry. Could you please repeat your question?

Q. Yes. Do you know who started the shoving outside the gate?

A. No.

THE COURT: Okay. Move on, Mr. Ahmed.

Q. (BY MR. AHMED) In that interview with the FBI, do you recall ever telling him that you did not believe that individual was spitting directly at you? Do you recall ever saying that?

A. I believe I told the Bureau of -- Special Agent that it wasn't directly at me.

MR. AHMED: All right. That's all I have. Thank you.

THE COURT: Thank you, Mr. Ahmed.

Is there further cross-examination?

MS. RUBIN: I just have a couple questions, your Honor. Thank you.

THE COURT: Okay. Ms. Rubin.

CROSS-EXAMINATION

BY MS. RUBIN:
Q. Agent McSullivan, you indicated on direct that you had concerns when you were leaving -- I'm going to call it the man gate. Is that fair? Do you know what I'm talking about?
A. The --
Q. After the gate had closed, you were in the secured parking area.
A. The -- after the vehicle gate had closed --
Q. Yes.
A. -- and we had finished contact with anybody who was outside of that, then yes, we were in the secure parking lot.
Q. And you were with the other agents?
A. Yes.
Q. Right. And you were with the agents that were in the vehicles? There were three?
A. There were three officers, yes.
Q. And there were three officers/agents that you had come out of the building with, so six total.
A. If I recall correctly, yes.
Q. Then you left what I'm going to call the man gate, which was out the back of the secured parking area basically to the north of the south gate, the parking gate?
A. Yes.
Q. You walked out of the gate?

A. Yeah.
Q. And you were concerned about making sure it was secure?
A. Yes.
Q. Okay. At no point in time later that day did anyone come back through that secured parking gate.
A. I -- are you asking --
Q. I am asking you.
A. I don't know if anybody did or not.
Q. Okay. No one climbed over any walls that you're aware of.
A. Not that I'm aware of.
Q. No one came back through that secured man gate that you left.
A. Not that I'm aware of.
Q. That gate remained secured the rest of the day.
A. That I'm aware of.
Q. Okay. And you had indicated that there were people I'm going to say on top of the hill that would have been closer to the front entrance of the HSI building?
A. Between the podium and the office building?
Q. Exactly.
A. Yes.
Q. Okay. And no one came running down that hill while you were out there.
A. Not that I'm aware of.
Q. No one threw any rocks or anything at you all.

A. Not that I'm aware of that day.
Q. That area, after the gate closed, remained secure.
A. That I'm --
Q. That you're aware of.
A. That I'm aware of, yeah.
Q. And you were there the entire day?
A. No. We left. I mean, at a certain --
Q. You went back into the building?
A. Yes.

MS. RUBIN: Okay. Thank you. No further questions.

THE COURT: Okay. Anything, Mr. Oreskovich?

CROSS-EXAMINATION

BY MR. ORESKOVICH:

Q. Can you hear me?
A. Yes, sir.
Q. Sir, I don't have a lot of questions for you, but I have one subject matter I want to talk about.

You had mentioned in your cross-examination that you had reviewed some videos of these incidents, correct, sir?
A. I've seen some videos of the day in question, yeah.
Q. And how many times have you reviewed videos?
A. I'm not certain.
Q. Well, is it more than one?
A. Yeah. Absolutely. It was -- I mean, the subsequent day of, this was obviously one of the larger --

Q. My question to you is how many times have you reviewed the video? Can you answer the question?
A. Not accurately. I don't know.
Q. Is it less than 10?
A. I don't know. It could -- I think it would be more than that.
Q. Okay.
A. Which videos, I'm not certain.
Q. Videos in total, that would be fine with me. That's what I'm interested in knowing. How many times have you reviewed any video of this incident?
A. I would say more than 10.
Q. All right. And you had mentioned -- you had testified in your direct examination that there -- a woman had pushed you?
A. It appeared that a woman pushed me, yeah.
Q. It appeared that a woman had pushed you? You don't know for sure whether she pushed you?
A. From what I saw on the video and from what I felt that day, it looked like a woman pushed me, yeah.
Q. In reviewing the videos, did you look for any other time that someone had had contact with you? In the 10 times that you reviewed these videos, is it fair to say that the only video that you were capable of finding or someone was capable of finding that demonstrated that you were pushed is this Exhibit 88? Is that fair to say?

A. I'd have to see Exhibit 88.
Q. Okay. Let's look at Exhibit 88.
(Playing Exhibit.)
MR. ORESKOVICH: Can we stop for one moment? Thank you.
Q. (BY MR. ORESKOVICH) I want to move to a different question just because we're stuck in that area.
You had testified earlier in your direct examination that when you got out there, you had some difficulty getting through the crowd before you formed your line to push. Do you remember that?
A. Yeah. We -- in order to link up with the DOs that were there, yes.
Q. Yeah. You said you had some difficulty?
A. To fully make it to them, yes.
MR. ORESKOVICH: Can we back up a couple of seconds, please?
(Playing Exhibit.)
MR. ORESKOVICH: Could we go -- for the next few seconds just play until I ask you to stop.
(Playing Exhibit.)
MR. ORESKOVICH: Stop.
Q. (BY MR. ORESKOVICH) Have you formed your line at this point in time in Exhibit 88?
A. It looks like we did, yeah.

Q. Sure. So the difficulty that you're referring to that you had going through the line or getting through the crowd is demonstrated in those first few seconds when the three of you arrive on scene and are capable of forming a line, correct, sir?

A. The difficulty I was referring to --

Q. I want you to answer my question. Is that correct or not?

MS. CARTIER-GIROUX: Objection. He's trying to answer the question.

THE COURT: He needs to answer the question. So please ask your question again. And when you're asked a question, just answer the question. You don't need to explain. Okay?

Q. (BY MR. ORESKOVICH) Let me see if I can rephrase it. Is the difficulty that you had in getting through the crowd accurately depicted in Exhibit 88?

A. I think the difficulty that I had getting --

Q. My question to you is the difficulty that you refer to, sir, getting through the crowd accurately depicted on Exhibit 88?

A. Not yet, no. I don't believe yet.

MR. ORESKOVICH: Now, if we can go further, please. Can we go to the push? And when we get to the push, stop.

(Playing Exhibit.)

MR. ORESKOVICH: Stop again, please.

Q. (BY MR. ORESKOVICH) You testified earlier in your direct

examination that you weren't sure whether someone had gotten thrown to the ground. Is that correct or did I get that wrong?
A. If I recall correctly, I believe that I said that -- or I believe that people had been shoved to the ground.
Q. And you had thrown someone on the ground; isn't that fair to say?
A. Thrown or shoved or pushed, yes.
Q. All right.
MR. ORESKOVICH: And if we can continue, please.
(Playing Exhibit.)
MR. ORESKOVICH: Please stop. Can we back up a few frames?
Q. (BY MR. ORESKOVICH) Now, sir, I want to, if we can, focus on this woman in the frame that I've circled in blue. Can you see that?
A. Are you referring to the individual with what appears to be a butterfly tattoo on the left arm?
Q. I am.
A. Yeah, I see that person.
Q. Is this you, right to that person's back or right shoulder?
A. Yes.
Q. All right.
MR. ORESKOVICH: Now, if we can continue, please.
(Playing Exhibit.)
Q. (BY MR. ORESKOVICH) Now, you believe that that woman

pushed you at that point in time?
A. Pushed or shoved, yes.
Q. Yeah. And did you see in any way that that caused you to lose your balance or increase your speed or in any fashion that it interfered with your ability to proceed through there?
A. Yeah. It pushed me into one of the defendants.
Q. Okay.
A. It shifted my motion as...
MR. ORESKOVICH: Can we back up, please, and show this again?
Q. (BY MR. ORESKOVICH) I want you to point out when we get through and through here which defendant you got pushed into.
(Playing Exhibit.)
Q. (BY MR. ORESKOVICH) Did you see yourself getting pushed into one of the defendants?
A. Yes, I believe so.
Q. Okay. Let's back up, and you show it to us. You tell us.
MR. ORESKOVICH: If you can back up if we can, please.
THE COURT: Do you want to clear your screen, too, Mr. Oreskovich? Do you know how to do that so we don't have the marks on there? Do you know how to clear the screen so you don't have the marks on there since the circling is over the --
MR. ORESKOVICH: I think so.
THE COURT: Ms. Perez can help you.
Okay. Thank you.

Q. (BY MR. ORESKOVICH) What I'm going to ask if we can, please, sir, we're going to play it, and you tell us when to stop the video when you think it shows that you've been pushed into somebody. Okay? Is that fair?
A. From this perspective, I'll try and see that specific push into the defendant, yeah.
MR. ORESKOVICH: Sure. Can we start, please?
(Playing Exhibit.)
THE WITNESS: Right there.
Q. (BY MR. ORESKOVICH) This person here? Let's back up a little bit.
Are you referring to this woman in the bandana, the multicolored bandana?
A. No, I don't believe so.
Q. All right. My mistake.
In any case, you believe you got pushed into a defendant. Did you see anybody get knocked down when you contacted that person after the push?
A. Sorry. Could you ask that again?
Q. Sure. As I understand your testimony, you have testified that you got pushed, and it affected you enough that you got bumped into one of the persons who was protesting at the scene. Is that fair to say?
A. I got pushed into one of the defendants.
Q. Yeah. Well, which defendant did you get pushed into? Was

it the -- any of the three persons that are seated here in the courtroom?

A. I believe so, yes.

Q. Okay. Which one did you get pushed into, please? If you can tell us.

A. I believe it was the defendant on the left, if...

Q. Mr. Mavalwalla; is that right?

A. I believe so.

Q. All right.

MS. CARTIER-GIROUX: Your Honor, I'd ask that the record reflect that the witness pointed out Mr. Mavalwalla.

THE COURT: The record so reflects.

MR. ORESKOVICH: Very good. That's all the questions I have. Thank you.

THE COURT: Okay. Any redirect examination?

MS. CARTIER-GIROUX: Yes, please.

THE COURT: And we can clear the screen when appropriate.

REDIRECT EXAMINATION

BY MS. CARTIER-GIROUX:

Q. And just a couple of things. I want to first start back with what you were just testifying about, about when you got pushed, that you believe that you bumped into Mr. Mavalwalla, correct? Is that --

A. I believe so, yes.

Q. Okay. I'm going to show you exhibit -- let's start with 86. It's this one or another one. Okay.

Actually, why don't we start here.

So you testified -- withdrawn on the other question.

You testified that when you first -- the angle of the other video, what angle was that from?

A. The camera was south pointing north I believe.

Q. And was it across the street, actually, across the roadway on the sidewalk?

A. I believe so.

Q. Okay. Now, I'm going to have you take a look at Government's 86.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Is this you?

A. Yes.

Q. Okay.

A. I believe.

Q. So your back is to us right now.

A. I believe so, yes.

Q. Okay. So what's happening here?

A. Coming across the initial -- I'm making initial contact with the group of people there.

Q. Okay. Are they blocking your path to get inside the gated area?

A. Yes.

Q. I'm going to bring you up to the portion now from this perspective. And let me know if you can see in this video. Okay. Here we go. Hold on. All right. I'm going to go slow.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Do you see yourself?

A. I believe so, yeah.

Q. Can you circle your head?

A. (Witness complies.)

Q. Okay.

A. I believe I circled my head.

Q. Okay.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) All right. Do you see yourself getting pushed in this video?

A. I believe so, yeah.

Q. Okay. Can you show me the arms? Can you draw an arrow to the arms that are making contact?

A. I'll try with the touch screen. I believe that's about as accurate as I can get with it.

Q. That's okay. Okay. And describe your motion -- what just happened there?

A. I believe I made contact with the defendant that I previously indicated.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) Okay. All right. Is that the

contact that you believe happened?
A. From earlier?
Q. With Mr. Mavalwalla. Is it captured in this video?
A. I believe so, yeah.
Q. Okay. Now, were you slammed into him or did you get bumped into him?
A. I believe somebody pushed me in, and I subsequently bumped into him.
Q. And changed -- did your bumping into him, based on this video, change his motion somewhat?
A. Somewhat, I believe, yeah.
Q. Okay. Okay. You indicated on your cross-examination that someone had called 911. At least you hadn't called 911, correct?
A. Not that I recall.
Q. Someone had called 911 at least one time?
A. At least one time.
Q. Between the time that you are aware that 911 had been called and the time that you were out at the south gate, approximately how many hours had passed?
A. I'm not certain, but I believe several if I recall correctly. More than one.
Q. Did the passage of time impact your belief that the police were not coming?
A. Yes.

Q. When you made the right turn and came down what we just -- came down the path towards where you could see the gated area, did you observe individuals in the street?
A. Yes.
Q. Okay. What were they doing?
A. There's a bunch of different individuals who were just standing around either across the street or on the street filming, videotaping, yelling, whatever, making rude hand gestures, whatever it is. And then a bunch of people specifically assembled right in front of the south vehicle exit of the secure lot.
Q. So what areas were they blocking?
A. Primarily the vehicle gate. And the street, but the vehicle gate was the primary area.
Q. And were -- just to confirm, were the red and blue lights on on your vehicles?
A. I believe the red and blue lights were on on those vehicles.
Q. Did you believe that -- sorry. Withdrawn.
Were your actions predicated on your belief that these individuals were not obeying the red and blue -- withdrawn.
When someone is in -- when red and blue lights are on, what is your understanding, based on your training and experience, of what citizens are supposed to do?
MR. ORESKOVICH: Objection --

MR. AHMED: Objection.

MR. ORESKOVICH: -- to the cumulative nature, and it's outside the scope, your Honor.

MS. CARTIER-GIROUX: It informs why he pushed them.

THE COURT: He can very briefly answer the question. I'm not sure how clear the question is.

MS. CARTIER-GIROUX: I can rephrase. Do you want me to rephrase?

THE COURT: Rephrase.

Q. (BY MS. CARTIER-GIROUX) When you saw that the red and blue lights were on the vehicles, and you saw individuals standing in the path of those vehicles, what, if anything, did you believe you were able to do?

A. I was able to use force.

Q. And did you do that?

A. Yes.

Q. Why were you able to use force?

A. Because they were disobeying the indicators of red and blue lights. They were disobeying lawfully-given orders, and they had been given, from my understanding, previous warnings.

MS. CARTIER-GIROUX: I don't have any other questions. Thank you.

THE COURT: Okay. Any recross?

MR. ORESKOVICH: No, your Honor.

MR. AHMED: I've got something, Judge. Just one

question.

THE COURT: Good. Okay. I'm going to count it.

MR. AHMED: I don't want to belabor.

RECROSS-EXAMINATION

BY MR. AHMED:

Q. During your interview with the FBI, do you recall telling the FBI agent during your interview that you had given orders, "Police, move. Police, move," yelling that out loud?

A. Yes.

Q. Do you hear that on the video at any time? You've said you've watched it many times. Do you hear that on the video that we just watched, 88?

A. I don't believe I hear that, no.

Q. Okay. Thank you.

THE COURT: Thank you.

Anything further?

MS. RUBIN: No, your Honor.

MR. ORESKOVICH: No, your Honor.

THE COURT: May this witness be excused?

MS. CARTIER-GIROUX: Yes, your Honor.

THE COURT: You are excused from further testimony. Thank you.

THE WITNESS: Thank you.

(WHEREUPON, further proceedings were held which were not ordered and transcribed.)

* * * * *

## WITNESS INDEX


| For the Plaintiff | Page |
|---|---|
| **GREG MCSULLIVAN** | |
| DIRECT EXAMINATION BY MS. CARTIER-GIROUX | 3 |
| CROSS-EXAMINATION BY MR. AHMED | 40 |
| CROSS-EXAMINATION BY MS. RUBIN | 51 |
| CROSS-EXAMINATION BY MR. ORESKOVICH | 53 |
| REDIRECT EXAMINATION BY MS. CARTIER-GIROUX | 60 |
| RECROSS-EXAMINATION BY MR. AHMED | 66 |


* * * * *

## EXHIBIT INDEX


| No. | Description | Page |
|---|---|---|
| None | | |

C E R T I F I C A T E

I, CRYSTAL L. GONZALEZ, do hereby certify:

That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Spokane, Washington;

That the foregoing proceedings were taken on the date and place as shown on the first page hereto; and

That the foregoing proceedings are a full, true, and accurate transcription of the requested proceedings, duly transcribed by me or under my direction.

I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings;

DATED this 29th day of June, 2026.

CRYSTAL L. GONZALEZ, CRR, RPR
Washington CCR No. 2955
Official Court Reporter
Spokane, Washington