# Exhibit I.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | Case No. 2:25-cr-00113-RLP |
| vs. | May 27, 2026 Spokane, Washington |
| JUSTICE FORRAL (2), BAJUN MAVALWALLA (8), and JAC ARCHER (9), Defendants. | Excerpt of Jury Trial - Day 7 **Closing Argument by the Plaintiff** Pages 1 - 44 |

BEFORE THE HONORABLE REBECCA PENNELL
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff: LISA C. CARTIER-GIROUX
REBECCA R. PEREZ
U.S. Attorney's Office
920 W. Riverside Avenue
Suite 340
P.O. Box 1494
Spokane, WA 99201

For Defendant Forral: ANDREA K. GEORGE
AMY H. RUBIN
Federal Defenders of Eastern Washington & Idaho
601 W. Riverside Avenue
Suite 900
Spokane, WA 99201

For Defendant Mavalwalla: AINUDDIN AHMED
Ahmed Law Firm
550 Congressional Boulevard
Suite 350
Carmel, IN 46032

MATTHEW F. DUGGAN
Duggan Law Offices PLLC
23505 East Appleway Avenue
Suite 200-175
Greenacres, WA 99019

For Defendant Archer:

CARL JOSEPH ORESKOVICH
ANDREW M. WAGLEY
Etter McMahon Lamberson Van Wert & Oreskovich PC
618 West Riverside Avenue
Suite 210
Spokane, WA 99201

Official Court Reporter:

Crystal L. Gonzalez, CRR, RPR
United States District Courthouse
P.O. Box 700
Spokane, Washington 99210
(509) 458-3434

Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.

(WHEREUPON, previous proceedings were held which were not ordered and transcribed.)

MS. CARTIER-GIROUX: Thank you, your Honor. May I turn this?

THE COURT: Yes.

MS. CARTIER-GIROUX: Oh, it's easy.

Good morning. Thank you for your patience in this case. I know it's been a long week and two days. But I want to -- but I want to start this morning with something that is important. The United States supports people's right to speech. The United States supports the right to be passionate. The United States supports the right to disagree and to do so loudly, to do so fully, but this case is not about that.

It's not about immigration. It's not about protesting. It's not about speaking out. It is about violating the law. And no matter what adjective you use to describe the conduct, no matter what high-minded adjective you can put on the conduct, what you're here to do is look at the conduct and see whether or not the evidence shows that the conduct occurred, if the intent element is present, and that the Defendant is the person that committed the conduct. And if you find that beyond a reasonable doubt, then I have proven my case, and it is your obligation to find a Defendant guilty. You're not here to make other decisions.

We don't get to pick our witnesses, as you could see during

the course of this trial. We don't pick them. It is life. It is reality. It is unfortunate at some times, but that is how it works. This is not television.

But you're not here simply on the testimony of witnesses. You have video. You have multiple videos that captured what occurred on June 11, 2025. And I encourage you to use those videos to corroborate testimony.

You may not like the decisions made by people. You may not like the witnesses. But your job here is not to decide if it could have been done better. You're not here to punish witnesses that you don't like. You are here to decide whether or not I have proven this case beyond a reasonable doubt, deciding each Defendant's case individually.

That is the purpose of the instructions. The purpose of the instructions is to guide you. It is to make sure that your oath can be fulfilled. Because you are to use these instructions and apply the evidence that we've presented to you, all of the evidence that's been presented to you by all of the parties, and make a determination of whether or not we've proven our case beyond a reasonable doubt. And so that's why I start with the instructions.

Now, that being said, I have done several PowerPoints just to guide the conversation that we're going to have this morning, though it's a one-sided conversation, to talk about different areas. But the first thing I'm going to start with are the

instructions. Now, that being said what the -- the instructions that the Court gives you is what matters, not what I have in my PowerPoint. Okay?

Same thing with the evidence. What you recall is what matters, not what I have in my PowerPoint. This is how I believe the evidence has come in. Okay? So let's start with the instructions.

There's one count for you to decide. And we're going to get to the verdict sheet at the end. And that count is conspiracy to impede or injure officers.

And I'm not messing with my phone, other than I have to time myself.

There are four possible ways to violate this, and you saw in the instructions it was listed A through D. Right?

So on June 11, 2025, there was an agreement. An agreement. That is an element of a conspiracy. There was an agreement to prevent by force, intimidation, or threat any officer of the United States from discharging any of their official duties, or -- that's an "or" -- injure the person or property -- as we go on -- of that person, of that officer, that federal officer, while they were on account of the discharge of their official duties or while they were engaged in the -- their official duties, or to injure the property -- that's the same one. B and C are very similar. And then D, to injure the property of any officer of the United States so as to molest, interrupt, hinder,

or impede them in the discharge of their official duties.

So they're all different, like A, B, C, and D. I just combined B and C. But read them. Because what it is, it is to use force. There's an agreement, an agreement to do one of the following: To prevent, by force, intimidation, or threat, the officer from discharging their duty, or to injure the person or the property -- B is person, C is property -- of the officer, the federal officer, on account of the discharge of their duties or while they're engaged in the discharge of their duties, or there's an agreement to injure the property of an officer of the United States so as to molest, interrupt, hinder, or impede them in discharging their duties.

So the elements. First element: There was an agreement. Was there an agreement to do any of the previous acts I just described? Second: The Defendant joined the conspiracy knowing of its purpose and intending to help accomplish that purpose. And then third: One of the members -- it doesn't have to be the Defendant -- performed at least one act in furtherance.

So what a conspiracy does, it's an agreement to do any one or more of the acts for this specific type of conspiracy that they're charged with. It doesn't matter if A through D actually were completed or committed. It is the agreement to do those things.

And how you're going to see the agreement to do those things in this particular case is going to be through both words

and actions. Because this is not, ladies and gentlemen -- I'm sure many of you have seen the movie -- *Ocean's Eleven*. *Ocean's Eleven* is a conspiracy, but it's a different kind of conspiracy in that conspiracies can occur differently. And that's why these instructions are so important. *Ocean's Eleven,* you have everybody meeting in advance. They're planning. They pick the people. They pick their conspirators. That's a conspiracy, but that's not the only way a conspiracy can be done.

And the instructions are to guide you. And in this case, it says it is not necessary -- and this is from the instruction -- that the conspirators made a formal agreement or that they agreed on every detail of a conspiracy. The agreement is to do one or more of the acts.

It doesn't matter if the crime, as I just said earlier, is actually committed. It's not necessary -- this is the same one. Sorry. You join by knowing -- knowingly participating in the plan with the intent to advance or further some object or purpose of the conspiracy.

So that's how you join in an agreement. You join by knowing that there is a plan, and you participate in the plan with the intent to advance that object. You join because you want to move forward on the goal. You want to do -- help move forward. You don't have to have full knowledge of all the details of the plan. You don't have to know everybody. You don't have to even meet them. You don't have to know all the

locations where the plan is going down. You just have to knowingly join the agreement to commit A through D.

It doesn't matter if you join later. It doesn't matter if your participation was minor or short. When you join an existing conspiracy, you are just as responsible for it as the originators. That's coconspirator liability. Acts done that are reasonably foreseeable, acts that have been done that are reasonably foreseeable to complete the goal, to do A through D, are attributed to you if you join the conspiracy knowing of its object.

Now we'll talk about knowingly because that's the intent, is knowingly. You're aware of the act. And it does not -- and you're not acting through ignorance, mistake, or accident. So you're aware of what you're doing. You're aware of, in this case, piling stuff up against a gate. You're aware of pushing someone. You're aware of letting the tires out.

Ignorance, mistake, or accident are very, very specific. Ignorance -- I'll give you an example of ignorance. Ignorance is I ask you to borrow my car. You -- I give it to you -- you give it to me. I then use that car to do a robbery. You're ignorant. You don't know I'm -- that that's what's going to happen. That's ignorance.

Mistake. I pick up a coffee at Starbucks for my friend Allie, my friend Allie, and the printed name on the cup is actually Allen. That's my mistake. I mistakenly read what the

cup had written on it.

Accident. A waiter drops a dish when cleaning up a table. There's no intention to destroy the property of the -- of the restaurant.

That's different than knowing your acts or omissions are unlawful. And that's why it says in the instruction that the Defendant does not need to know their acts or omissions were unlawful. They have to knowingly do the act. They have to knowingly commit the action. It doesn't matter what they believe is legal or illegal.

I can say I think theft should be legal. If I go and steal something, it's still a crime, regardless of whether I think it's illegal, believe it shouldn't be illegal. It is illegal. The acts or omissions, it doesn't matter whether the Defendant thinks that they had a legal right to do it. I don't have a legal right to beat my spouse, even though I think they deserve it. Does that make sense? That's why the law is the way it is.

Words -- and this is important. Words, acts, or omissions, along with all the other evidence, is proof. And that's what happens in this case and that's what you're going to see in this case because it's not *Ocean's Eleven*, because we don't have people contacting each other, because this is an event that occurs in a period of one day, you have to look at the words. You have to look at the acts, you have to look at what they didn't do, their omissions, along with all the other evidence

that we've presented to make a determination if there was a conspiracy that they knowingly joined.

Okay. The third element of a conspiracy is that at least one overt act was committed for the purpose of carrying out the conspiracy. The act doesn't have to be unlawful. Makes sense. Me renting a car to do a robbery is still an element. It's still purposeful to commit a crime, but the act itself in renting the car is not unlawful.

A lawful act can be an overt act. A Defendant does not have to commit an overt act. Someone else, another member of the conspiracy, can commit the overt act so long as I have the other two elements: the agreement and the knowingly joining.

Okay. Force, intimidation, or threat. Remember we were talking A through D. A talks about the use of force, intimidation, or threat, and the definition is given in the instructions. Threatens or results in violence or if it threatens or destroying property or harming or killing people. Again, it is the agreement to do this. Merely tensing up or resisting does not by itself constitute a force. And we're going to talk about that. Because we don't have just tensing up here. We don't have just resisting arrest. Moving away from the cuffs. That's not what we have here. And we'll talk about that when we get into the actual facts of this case.

Intimidation or threat. It's words or conduct or the combination of both if the speaker or actor intends their words

or conduct to imitate -- intimidate or be a threat. Again, it's the agreement to do these things. And a reasonable person hearing or observing them would foresee that they would be interpreted as a serious expression of intent to harm or assault. So it's a reasonable person standard.

The person to whom the conduct or words or combination doesn't actually have to be frightened. In this case, the officers did testify that they were afraid, that they were fearful for themselves or for other officers, but it's a reasonable person standard. A person in the place, standing in the shoes of the officer, a reasonable person. Not a reasonable officer standard; a reasonable person standard.

Officer of the United States. And in this case, I think it it's pretty clear everyone that was in that building that testified that was an officer was part of one of these groups. Lawfully engaged in official duties. They're acting in the scope of their employment. Here, you heard testimony that their job, what they had to do, what they were mandated to do was to transport the detainees. And that's what you heard they were trying to prevent, the Defendants were trying to prevent, Defendants and others.

There's also an alternate theory of liability in this case. If you find -- you can find both. But if you find that one or more of the Defendants was not part of the conspiracy, there's something called aiding and abetting liability. If you find

that they intentionally helped members of the conspiracy, they are guilty of the conspiracy.

And this is what you'd have to prove. These are the elements for -- under an aiding and abetting liability. First, someone else committed the conspiracy. Second, the Defendant aided, counsel, commanded, induced, or procured that person, that person that was part of the conspiracy, with respect to at least one element of the conspiracy. Third, the Defendant acted with the intent to facilitate the conspiracy. And fourth, the Defendant acted before the crime was committed -- was completed. Sorry.

Now, intent to facilitate the crime. That means by actively participating in the criminal venture with knowledge of the crime and having acquired that knowledge when the Defendant still had an ability or an opportunity to withdraw. I'm not required to prove precisely which Defendant actually committed the crime and which Defendant aided and abetted the crime.

Okay. Now, let's get into the time. Let's get into the timeline of events. I'm going to go through this pretty quickly because you've had days of this, but I just want to put it together for you so that we're all talking about the same thing.

Okay. Timeline of the conspiracy. We're at the white bus beginning around 12:52 p.m. There's a post; there's a call for action to block the bus. You have the post in evidence. It says "Block the bus." Stop the bus, stop the transport of the

detainees by blocking the bus.

Archer and Forral you know received the post by 1:11 p.m. Archer then disseminates the post to multiple Signal groups between 1:11 and 1:14. Archer is at the bus by 2:04 and joins to block the path and door to the bus.

Somebody comes out. Two people come out. They're asked to move. They refuse to move. Somebody drives by, paints the window of the bus. Forral then comes and pins in the bus with their vehicle. People are seen crawling under the bus.

Archer posts on Facebook. And now we have a change because originally we had "block the bus." Now we have a different -- a different goal. We're not just going to block the bus. We have a call for more bodies to block the exits. And that's at 3:14 p.m. Archer posts "We are over 100 strong and is looking" -- and we're going to look at the post when we get to Archer specifically -- "looking for more bodies to force the release." Force the release.

Now we have a different situation. We aren't just protesting. We are trying to keep them in there to give them opposition if they leave because we need more bodies. We're not just standing -- why do we need more than a hundred people if it's just a protest? We want to block them. And we see that at the south gate that that was, in fact, their intent from getting out of there. We're going to turn them back. We're not going to let them out.

And I expect that during -- that there will be argument, well, you know, they could have gone out the front door. Well, yeah, the agents could go out the front door, but that's not what they were trying to prevent. They were trying to prevent the transport. The agent could go outside, at least in the beginning, maybe later on. But it was impossible strategically, and if you look at the photographs, to try to bring those people out right -- and the video of that doorway is very, very misleading because if you look at the photographs and the drone footage, it is very close to the back end of that white bus. So basically, we're talking a couple feet away from where the protesters are actually standing and blocking the bus. You saw what happened at the south gate. What would have happened if they would have brought them out that door? Just put that in your mind.

But we have communication then because this is all changing. Because now we're blocking exits, we're putting people on the exits to keep them in the building with the detainees -- to keep the detainees in the building until they're turned over. We have communication with the mayor and the State AG by Stuckart -- you have his phone records -- between 2:38 and 4:34 p.m. So we're not just blocking the bus.

And it's during those hours that we don't have any response from the locals. They're calling the police. The agents testified we made multiple calls. Nobody is coming. Jared

Tomaso, when they went back in the parking lot after they were turned away trying to exit, was, like, where are the police? Why aren't they responding? Four plus hours, no police.

Comes a point in time when the white bus can't be used to safely transport the detainees. So the plan comes, let's try to sneak out. You hear in the video, "They're trying to sneak out." Shouting "They're trying to sneak out." They're communicating. They're on the exits. How do people all the way on the north side know that people are coming out all the way on the south side? Because they're communicating. Because there's a plan to block the exits, to cover the exits.

And so when they attempt to -- that's why they pick the furthest point away that they can get out where there's cars. So they attempt to bring the red van to the east parking lot first. That's the first time they do it. Remember Caleb Sullivan? He says, "I drove by with the red van. I went in the parking lot, not the secured lot, and as soon as I got there, they came at me. They tried to block in my car, so I took off." The crowd is yelling.

Then they planned to use the south gate. That's when they're going to go meet up with the red van somewhere else and then come back, kind of like -- just like how the -- how the locals eventually help them. They come back in a caravan with some -- with some cars. Because the officers think nobody is coming to help us. We've got to do something.

So the plan becomes let's get these vehicles out here so that we can do the transport. We'll go meet the red van, we'll come back and do the convoy, just like what happened later on.

But when they planned to use the south gate, as soon as they exit that building, again, "Get them, they're trying to leave." And the crowd comes to the south gate.

They attempt to exit. Now, it is clear that the red and blue lights are on. And let's be very, very clear. Like, there was some hedging about, well, did I know they were officers? Well, why are you running to the south gate if you don't think that they are officers? Why are you blocking them if you don't think they are officers attempting to transport detainees?

The acts speak for whatever the words want to say. They sound louder and they're more meaningful than the words in that scenario. So they go there because they want to block them because that has been the plan since about 3:00.

Mavalwalla leads the crowd to block the gate. And there was some -- there was some -- watch the video yourself, and I'm not going to replay it. Mavalwalla runs and he turns around and looks where they are in the lot, and then he turns to his left shoulder for no other reason but to make sure that his people are behind him, that there are people behind him. He needs the people because one person cannot block that entranceway. There needs to be more people. And so they need to act together. They need to act together to perform the goal, which is to block

them and to keep them in and to prevent them from transporting.

And what we hear Mavalwalla yell in the video -- and there's two different videos of it, and you can hear it in both. And I'm going to tell you the exhibit numbers when I go through each defendant. It's against state law. No one is coming to help you. Block every exit. Keep the bus blocked. What is the intent to do? It is to stop the transport. It is to block them. It is to keep them in.

Officers are concerned for their safety. They leave the building. They -- sorry. Other officers are concerned for the safety from what they see out the window, the third floor windows they were talking about. And they -- this is Tomaso. This is McSullivan. This is LaForte. And they leave the building. LaForte doesn't even have any equipment on. They leave the building to go get -- go to the gate to help and maybe try to push people out of the way so that maybe this is the chance they can get out because they know there's no other way after this.

Archer, Mavalwalla. Archer arrives. They all line up. Before, they're milling. Looks -- I think it was Wilks who told you they were just milling around until Archer gets there, and then they all line up and they lock arms. And a line of humans is created to push -- to keep -- to block them, to block that entrance.

And then the officers, because they need to move them and

the crowds -- the people are coming, and they have a very short window. And you can hear in the video, "Get out of the way. Get out of the way." And again, these people know that they are officers because why else are you blocking? Are getting pushed and nobody is listening. And they're not throwing them on to the ground, not initially. They are pushing them. And when they keep going back and they keep pulling away and they keep linking arms, whether that be symbolic or because they don't want to use their fists, we heard different reasonings behind it, but what you can see in the video is that they're using it, and somebody explained it like a rugby scrum. They're using the body mass. And how you know that is because when they do get separated, when they do fall down, what do they do? They get up, relink arms, and go right back to the gate.

And so what we see at the gate is that pushing back, that melee. That relocking arms. That reaffirming you're not leaving, not on my watch. Silva pushes the officer from behind. And we see Silva in a lot of different places. That's the lady with the neck tattoo in that picture, and we're going to see more pictures of her. None of that -- she's in the line. None of that is not reasonably foreseeable. If you're going to physically block officers, the fact that people are becoming physical with the officers is not not reasonably foreseeable. It's not unreasonable.

Hatfield spits in the direction of the officers. This is

all on video. Forral and Muncey join in the line, screaming and yelling profanity at the officers. The officers make a decision that this is too threatening. We cannot retry this because there's too many people and these people are very angry and very agitated and very willing to become physical with us.

The gate closes. The crowd cheers. You hear "No one is coming for you. How much battery do you have left in your phone?" What would that purpose be? How much battery you have left in your phone? You're going to be in there a really long time. "Are you scared now? Are you afraid that no one is coming to get you?" And I submit to you, ladies and gentlemen, and I will argue later, those are words to intimidate, combined with actions that, if you try to come out here, we're going to get physical. We might not punch you, but we're going to make sure you can't do what you have to do, and that in order for you to get us out of here, you are -- and you're going to hear this from more than one person -- have to use violence against us." Do you want to do that? And in this case, the officer said, "No, I don't want to. I'm going to go back inside, and I'm going to hope that somebody comes and helps us." And that's exactly what happened.

And they testified that when they were in that gated -- secured gated area, they were actually worried about going outside back to the building. They were concerned about it. Nothing happened, but that's what they felt based on what they

had experienced and having been in this building for four-plus hours with nobody coming, and a crowd angrier and angrier coming and growing.

And there's no safe way out for them because -- and what's -- if you watch the videos, you're going to see what happens next, which is the barricading. The barricading begins even while they're standing in the gated area waiting for the gates to close. They're starting to bring things over. They're standing there for a little while. Remember, they're talking about what they were going to do, their plans. They're barricading them in right in front of them. Right in front of them. You're not coming out.

And they barricade the south gate, they barricade the east gate with benches, Lime bikes -- Lime scooters, trash cans, et cetera. Do you remember Sesame Street? Cooperation? These videos could be used. They are carrying things together. They are working together for a common goal, knowingly participating, purposefully acting.

Archer and the others take the south gate. That's their job. It's in their statements. That was our job. We held our gate.

Then what happens? Finally, finally, the locals respond, 6:30 p.m. It starts. TAC does what those cars in the south gate that were denied exit did. They escorted the red van to the location.

But what happens? As soon as they arrive, the van is swarmed. The van is swarmed. Why is the van swarmed? Because, again, we're doing the plan to not allow for the transport. And during that, what we're going to hear and what you'll see and you saw in evidence, is Forral running around saying -- when Forral believes that one of the doors is going to be the door that they come out from, "Block the door. This is the door. Over here. Block the door." When they think that they're giving up at the van, Forral is over there saying, "Block the exit, block the exit."

Why? Because the plan is to block the exit. The plan is to keep the detainees inside and the plan is to work together to do this.

And also what we see is that -- and we heard in the testimony that the items that were initially placed to block the south gate were taken down because they were afraid that they could get hurt by them. Not concerned that it could damage the vehicles or break the gate or that it wasn't serving the purpose of blocking, but because they could potentially get hurt by them. So they took them down.

And instead what happens is they take them and Forral and others repurpose the benches and bring them over. And we saw several of them in front of the police car in some photos and we heard testimony that there were Lime scooters shoved underneath the red van.

So the next thing. Commands are given. It is -- watch the video. It goes on and on and on. "Please disperse. Please disperse. You're going to be arrested. Please disperse." Nobody is listening.

The crowd, they need to make a safe passageway. Now, the purpose of pushing back of the officers is because that safe passageway will allow for the transport. So no, the local police are not federal officers, but the intent is to use force, intimidation, or threat to prevent the Officers from doing their duties, their lawful duties. So by pushing against the local police, they are preventing the safe passageway so that they cannot be brought outside.

That's why that is highly relevant because -- and you hear it. That's why the crowd is yelling at them, "Why are you helping them? Why are you helping them?" They're not there for any other reason but to create that safe passageway.

The crowd is highly emotional and angry. There's a lot of concern you heard from the officers that it is just waiting for a spark. It's just waiting for a spark to turn violent.

The officers are outnumbered. We had a lot of talk about can't arrest, all violating -- you know, can't arrest -- that people weren't arrested, this person was arrested. They can't arrest anyone. And you saw in the video of Ramirez the reaction when they arrested somebody who slashed tires right in front of them. It was anger. It was -- it was outrage. And the officer

had to run over and show the knife because they were worried. They were worried that people were going to become violent.

There's an unlawful assembly order at 7:00 p.m. The crowd still doesn't disperse. Still doesn't disperse. There's repeated orders to disperse.

Forral is arrested at 7:30. The crowd on the north side gets a little quieter. We have Mavalwalla gearing up in preparation, giving out masks, umbrellas, Mavalwalla and the others. And you're going to see if you take a look at one of the videos, and I'll tell you the name of the video. You can see -- remember the goggles? He's in that video with Mavalwalla. He's on a bicycle but they're both at the front line. The police vehicles are damaged. And that's ultimately, after two deployments of munitions, how this ends.

So I'm going to go very quickly through some of this stuff. And my point with this is to give you exhibit numbers because I'm not sure how many of you wrote stuff down, but if there's an exhibit that you want to look at, a video that you want to look at, that's my purpose in a lot of this. So I'm going to do this pretty quickly and then I'm going to move into some more argument.

So what do we have? We have immediately the blocking -- these are photographs. This is Exhibit 24. We have at the south gate. This -- ladies and gentlemen, this is an agreement. This is conspiracy. You lock arms together for a purpose.

You're joined together for a united purpose.

We have the barricading. And this is Exhibit 30. And this is actually a video, and I don't have time to show you all this stuff. If you watch this video, Defendant Archer is standing right there while they're bringing all the benches from the park. They're carrying them. Somebody will come and bring a bench, and then the two of them will pick up the bench. This is an agreement. This is conspiracy. We have the -- again, they're all working together to block.

Then we have this video, Exhibit 13. We have Forral and the lady with the red helmet. That's Ms. Lang. And then if you watch this video, they're doing it at the same time. Over here he's emptying the air. He shows her how to do it. She then goes to the other tire and does it.

This is Exhibit 14. If you watch this video -- and I'm not going to play the whole thing. I'm going to play one video for sure, though, of this. After this happens, they're all -- there's a whole group of people following Forral after he's deflated the tires. This is not someone acting alone. This is someone acting with others.

Important. And I'm not going to show it because you watched it. This is immediately after the red van appears. Immediately. What does Forral do? He goes to his car. And you can see it in the video where the car -- where the red van arrives, in the right-hand corner you see the car door opening

to his car. It's very hard, but you can look at it. He comes out -- they come out and they have the club. Immediately brings a weapon, what can be used as a weapon, to the red van area. What's the purpose of it? Well, Forral tells you it's peaceful until it's not. Those are their words. And that's in Exhibit 48.

(Playing Exhibit No. 48.)

MS. CARTIER-GIROUX: This is one of the videos where Forral is yelling, "Keep the bus -- keep the doors blocked." And that's Exhibit 49. And this is when they're going to come out the doors.

(Playing Exhibit No. 49)

MS. CARTIER-GIROUX: Why are we doing that? We're doing that because we need to block the doors. This is as far as the red van. The plan is still going on.

And this is the repurposing, what you can see. They're moving everything out. They're moving it. And you're going to see if you watch the video they bring it all the way around the corner to go put underneath the cars, the police cars and the red van so that it can't move. And this one I'm actually going to play. I don't have a lot of time. Watch Forral.

(Playing Exhibit.)

MS. CARTIER-GIROUX: Directing.

(Playing Exhibit.)

MS. CARTIER-GIROUX: And they listen.

(Playing Exhibit.)

MS. CARTIER-GIROUX: Forral is going to come around the other side where we have Stuckart. We have goggles.

Sorry, it's a little slow here. Here we go. And we're going to tell them what they need to do next. "Go over there."

(Playing Exhibit.)

MS. CARTIER-GIROUX: There's the exit.

And what do people do? They follow. I'm not going to play the whole thing. You have the number.

Same thing with Exhibit 46. We have a lot more directing. There's the coordination at the red van, linking arms, blocking. And I'm going to go very quickly. And I apologize. I have only a limited amount of time to talk to you so I just want to go -- just touch on certain things.

Now we're going to do Defendant Mavalwalla. This is again that video where we see the running, we turn around, we make sure that the crowd is behind us because we need others to do this. This is the video. 23. "Cops won't help you. It's against state law." We hear that right from the beginning.

(Playing Exhibit.)

MS. CARTIER-GIROUX: 88. That's the other video where you can hear it. This video you also hear block the -- "Block all the exits, keep the white bus blocked." Why is that important? Because it shows the knowing participation. It shows the shared objective, the shared purpose.

Now, I can't play this right now, but I went through it with Jared Tomaso. Exhibit 87. Short. Do that on a very short video. Like watch what happens. Do it very shortly. Like let a couple seconds go. And what you're going to see is the line. They're trying to create a line and then the line breaks and it's just chaos.

And you see the locking. It is not simply tensing up. It is not simply resisting. It is an objective plan to get themselves back to the front of that line. That is the intent of that action.

(Playing Exhibit.)

MS. CARTIER-GIROUX: There's a video. And Defendant Mavalwalla acknowledged that they recognized Archer at the location. But in this video, Exhibit 43, there's actually like an acknowledgment that's captured on the drone between the two of them. I don't have time to play it. I apologize.

Back at the white bus what happens? That's when Mavalwalla goes back there. Right after the south gate. Not ever abandoning the plan, never leaving, maybe going back to the car to grab a bag. Before the munitions were called, by the way.

And then we have this. We have this red-shirt person. This is Exhibit 56. The linking of arms. The linking of arms here typifies the reason why arms are being linked. And if you watch Exhibit 53, you can see exactly why. They're linked. There's somebody behind that's used as a pusher. And that

person pushes so that when the officers try to push a person with linked arms back, there's a shield behind. There's a push behind. It's a harder body weight and it's harder to move. And it allows for pushing back when multiple officers are pushing at you.

(Playing Exhibit.)

MS. CARTIER-GIROUX: And then here. If you watch this video, we have Mavalwalla right before the munitions go off by handing out -- it's evidence of shared intent. And again, this is gearing up. I'm not going to play the video. Why bring gloves? Why bring an umbrella? Why bring a long-sleeved jacket to an 80-plus degree protest? Unless you are going there with the intent to engage. There's no other reason. And to say that you're wearing the gloves to protect your hand but not put the hood up to protect your head? That's for you to decide.

And body camera. 65. Very good video -- I suggest you look at it -- showing exactly the level of provocation, the intimidation. Remember, it is the agreement to intimidate. It is the agreement to intimidate, to cause them not to be able to create the safe space.

66. That's the accompanying one. So what 65 does is it brings it out, and then 66 continues the conduct.

73A, that's the video where we have the kicking of the munitions back. And it's over here you'll see somebody. I'm going circle over here in a second. Here. Over here, that's

our friend goggles who just picked up -- and he's going to pick something up, if you watch the video. He picks it up and throws it at the officers in tandem.

Okay. Last one, very briefly. Archer. Again, this is just to point out to you things to look at. There are multiple exits, about 90 to a hundred people. We need more. Why do we need more? We need more because they may free this man if we put enough pressure on them. If we keep them in that building, they may free them. Archer testified we've seen that happen before. We were going to try to do that here.

And there was a lot of preparation in these items. This is all intent to commit crime. All intent to commit crime. First going was to block a bus. Once there was to hold people hostage inside a building.

And this is Archer going around, collecting names. There is the -- we're going to work together, those prepared to get arrested. You know, there's a lot of -- there's a lot of aspirational stuff going on. But aspiration is one thing. What happened is what matters. The acts are what matters, not the aspirations.

Coordinating, that's the eyes on. Archer sees the red car. It's their employee. They see it blocked in. They mentioned it in the 5:00 p.m. voice memo. And these are from the voice memos. This is Exhibit 78. I suggest you listen to them. "We collectively made it so that they had to essentially deploy

violence in order to kidnap these boys. Our job was to link arms and man that gate and keep anything from going in or out. We held the gate and we held it from 4:00 p.m. to 12:00. We did our jobs."

The memo before is actually on scene. I think it's slide 15 from Exhibit 78, slide 15, where they're talking about the exits. "We need more people here, what we know."

(Playing Exhibit.)

This is the organizing. These are the two videos we talked about earlier. I won't play them because they take too long to play right now. And really, when you see this video, think about the words that are reflected on later on June 12th. "We collectively made so they had to essentially deploy violence in order to kidnap these boys."

And you remember -- remember there was a video that was played, and it was a woman who had a black shirt on, and it's in evidence. It's at -- I can tell you where it's at. It's Exhibit 47. And that person is at the gate with the rest of these individuals. And you can see that at Exhibit 429 and 430. And that person in 47 says something eerily similar to this. That person tells Gonsalves, "I have no option but for you to physically assault me, sir." That's a plan. How does that completely mirror what we hear here? "We collectively made it so that they had to essentially deploy violence."

There's the barricading. Archer is there. Archer is here.

To say that we don't know that that's going on? Omissions. Not saying, "Take that down."

Okay. Staying at the gate from 4:00 until midnight. Manning that gate. That's the position. That's the job of Archer. When the munitions go off, and this is -- there's a video for it. I think it's at 90. Immediately get up. Link arms. Block the gate. Because that's the job.

So now I'm just going to run through very quickly. I have a few minutes. Five.

Statements show the agreement. Multiple exits. 90 to a hundred people are struggling to cover. Can use more folks willing to thoughtfully risk arrest. We collectively made it. That they had to deploy violence. Our job was to link arms, man that gate, keep anything from going in or out. We held the gate. We held it from 4:00 to 12:00. We did our jobs. Block every exit. The cops won't help you. Against state law. Block the exits. Come here, come here. This is the door. It's peaceful until it's not.

Conspiracy, knowing of its purpose intending to help accomplish it. All of those acts, all of those acts show that the purpose -- and those statements show what the purpose was. It was to commit A, B, C, or D or the combination of them in order to prevent the detainees from being transported. That's the purpose.

One member performed an act in furtherance. Almost all of

them did. Almost all the coconspirators did. The three Defendants here did. That's for sure.

Force, intimidation, or threat or injure the property. So let's talk very briefly about that, but it's important. Did they use force? Yes, they used force. And the fact that the officers pushed them, that's not a defense to what you see happening in the video. It's not a defense because otherwise you would have a self-defense instruction. There is no self-defense instruction in these instructions. Why? Because it is not a defense. It is not a defense. You cannot push back. You cannot use your body weight against the officers.

Linking arms. Is it symbolic? Is it to prevent punching? I think the videos speak for themselves. It's to use body mass. It's to get back into the spots. It's to maintain the human wall.

We see force at the south gate. We see force around the vans for the safe space. We see intimidation or threat. And, again, it's the agreement to do these things, and the agreement is played out through the actions here. Nobody was writing anything down other than creating a bail fund list. Nobody is writing anything down. This was a rapid response, to use Archer's words. So you have to look at the actions.

And what we see is every officer coming in here. Those federal officers all testified, "I was afraid. I was afraid for myself or I was afraid for others." And why were they afraid?

By words, combined with actions. Nazi. Go fuck yourself. Die. You can't leave. Do you have enough battery? No one is going to help you. Right up up against them. That is a very short distance. A large crowd right in front of you super angry that you just had to engage physically with. And it's showing a willingness to use force against you if you don't do what they want to do. And they're doing that because they want to intimidate you. Because as Archer's post to Facebook indicates, "We can get them to release them if we just have enough people."

The plan was to trap them inside. The plan was not to trap the individuals inside. It was to trap the officers so they couldn't do their duty, which was to transport, to bring them to court in Tacoma. They didn't want them transported. They wanted them released to them. Not necessarily to their homes but to them.

That's not the way things work in this country. That's not how it works. Mobs can't demand police to turn over people. There is a process. And for all the clamoring on about due process, that's exactly what they were going to get. They only delayed it.

The intimidation was actions. It's words. It's psychological by barricading them. It's a combination of factors. It placed them in fear of harm or physical assault.

Did the coconspirators intend for their words or conduct to intimidate or be a threat? What other purpose did they have?

What other purpose? Would a reasonable person hearing and observing interpret them as a serious expression of intent to harm or assault? Ask Ariana Sanchez. She's a reasonable person. She was afraid. And she didn't even go outside. She didn't even see the south gate.

Injure person or property. And then I'm going to stop here. Now, it says "property of officer." Okay. What that means -- doesn't say property belonging to the United States. When it says "property of officer," it doesn't mean the personal property of the officer because that would make no sense, especially in the performance of their duties. What it means is property being used by officers to do their jobs. Otherwise, if I -- if someone would take their duty weapon, that doesn't belong to them. That's not their personal property. It's an item given them to do their job.

So the red van is a border patrol van. The white bus is a contracted bus from GEO. Those items are the property of the officer to do their job. It is a rented property of the officer, but it is nonetheless their property.

I ask you to review the evidence, to look at it carefully, to hold me to my burden. But if you do so, we submit that we have proven this case as to each defendant beyond a reasonable doubt.

And very quickly -- I'm so sorry -- verdict sheets. You make a determination of whether or not -- you go through A

through D. If you find one or two or more, that they've committed A through D, meeting the elements, they're guilty of conspiracy. And then you check off guilty of conspiracy at the top box. I don't have time to show it to you right now. Maybe Ms. Perez will after.

There's an aiding and abetting. You can find them guilty through the aiding and abetting theory. It's your purview.

Thank you for listening.

(WHEREUPON, proceedings were held which were not ordered and transcribed.)

MS. PEREZ: Members of the jury, I just have a few minutes to talk about what you've heard about for the last hour and a half. I'll be brief.

One thing that all parties agree on in this case is the importance of the actual evidence, the importance of the recordings, the importance of the videos, the importance of the actual testimony. And so you have heard things during these arguments that aren't in the actual evidence. Mr. Ahmed referred to the United States is engaging in bush league tactics. Ladies and gentlemen, the evidence will show what happened. The evidence will show what occurred that day.

Now, you may not like Officer Burlingame. His posts were offensive and vile. The United States condemns those posts. You are free to disregard his testimony. Look at the video. Look at the evidence. That's where the facts come from.

And as Mr. Oreskovich indicated, you are the deciders of the facts. That responsibility, ladies and gentlemen, is critical, absolutely critical. You may have concerns about other things, peripheral matters in this case. Those peripheral things, and anything else that may be in your mind, that is the purview of Judge Pennell. Trust her to engage in whatever else it is. You are the deciders of the facts. That is your responsibility, and that is based on the evidence.

Regarding that evidence, there have been discussion about Officer Burlingame, discussion about ICE generally. You may dislike ICE strongly. You may like ICE strongly. You may have a neutral view. But that is not what this case is about. This case is about what occurred that's crossed a line what Defendants and the others working with them did.

There have been attempts to villainize Deputy Morgan. Deputy Morgan uses horrible language, no doubt about it. But luckily, his entire conduct for that day was on body camera. You can see the way that weapon was used. You can see what happened with it. You can see how it was pointed. It is there for you to decide, ladies and gentlemen.

There Is much talk about agreements, whether or not there was an agreement here. Luckily, the evidence also shows this as well. Now, an agreement is often something that's kind of a mental thing, a thought maybe, and so it's hard to tell what someone is thinking, obviously. And so what can you do to

determine what someone is thinking, what they're agreeing to? You look at what they're doing, right? You look at what's going on, what they're saying.

Mr. Ahmed said something to the effect there's got to be some sort of communication. That's not actually in the jury instructions, but let's talk about what communication there was. Mr. Mavalwalla. Mavalwalla on the stand indicated -- I said, "Why are you yelling like this? Why are you putting your hand up? Why are you punctuating the air with what you're saying?" "To communicate effectively." That was his response.

Archer: "This is what we talked about." Forral: "Block the gate. Block the gate."

The communication that does exist that is captured on this evidence, in this -- in this video indicates the agreement. But not only communication, ladies and gentlemen, it's also the actions. What actions indicate the agreement?

Now, mere presence is not enough. But certainly, the fact that this was a nine-hour, seven-hour thing shows some agreement. Certainly the fact that all Defendants chose to be there is at least a foundation. And not only to be there, but what did they do? Linking arms, running, sprinting, acting in solidarity. All of those things, ladies and gentlemen. I cannot go through all the actions. There's communication. There's actions. And that's been what was conveyed in the hours and hours of video.

Not everyone did every thing. Right? Archer, no doubt about it, was not at the red van. And why weren't they at the red van? They didn't need to be because Forral was there, because others were there, because the red van was covered. The fact that Archer wasn't at the red van is evidence of the conspiracy. This is not a one-person thing. This is not a two-person thing. This isn't even a hundred-person thing. In Archer's own words, Archer didn't need to be there.

Forral did not need to be at the beginning of the south gate. Why? Because the crowd behind them had ran down there. The south gate was being taken care of, at least initially. Again, that's evidence of the agreement.

Mavalwalla was not at the white van at the beginning. He didn't show up then. That's fine. He was at the other locations. This is something that cannot be done. If there had been a random couple people just like, "Hey, I don't know what you're doing, I don't know what you're doing." That's not what this is, ladies and gentlemen.

The communication, the actions, every single thing that you see in these videos shows that this is a conspiracy. This is people showing up. And again, not *Ocean's Eleven.* They didn't sit in a basement and shake hands and say, "Okay, we've got our plan." But that's not what is required. That is not the law.

And importantly, these Defendants did not necessarily need to conspire with each other. They conspired with others.

Mavalwalla linking arms with red-shirt guy, Caleb Hutchins. He's conspiring with him. It's others as well.

The conduct of officers, there's significant discussion on that. De-escalation. Ms. George has talked very, very calmly. De-escalate. De-escalate. That's -- that's not the circumstance here. De-escalation was the first couple hours at the white bus when multiple officers went out and said, "Hey, can you leave? Can you leave? Can you please leave?" Right? That's -- that's the talking that's going on.

And so when they got to the south gate, it was three hours in. They knew talking wouldn't work. And how did they know? Because they tried it. Federal officers don't have to sit on their hands and do nothing until -- just until it's the next day. They were doing what they had to do.

There's multiple -- multiple witnesses testified de-escalation includes sometimes using a little bit of force. Not everything. De-escalation includes the circumstances -- or the conduct needed to address the circumstances. And what were the circumstances here? You saw it over and over and over again. These people were not going to move. Because they hadn't moved. They proved it.

These other doors. We had lots of testimony and lots of argument about the other door, the front door. Ladies and gentlemen, how long did it take this crowd to run to the south gate? Like seconds. That south gate was surrounded in seconds.

You saw it. How long did it take to get to the red van? Like a minute. So the front door, which is 20 feet away -- you can look at the photos -- that's going to be surrounded. The front door is not an option to take the 12 detainees out.

Force, threats, or intimidation. Again, ladies and gentlemen, the evidence shows -- and saying "Fuck you" is mean. But that's not only why we're here. Right? That word was repeated over and over and over again. And people are allowed to say that. People are allowed to be mean. That's the reality. You're allowed to protest, you're allowed to be mean, you're allowed to assemble, but, again, when it rises up to where we got in these videos, that's crossing the line. This is not a quiet "it's peaceful until it's not." This is not Justice Forral walking around that van saying, "Would you please go home? Would you please go home?" as Ms. George suggested. "Hey, move over here."

No, ladies and gentlemen. What do you think they're doing based on the entire context of this five hours in? We are -- look at the circumstances. Look at the way the arms are linked. Look at how their bodies are positioned. Yes, Tomaso does a nervous laugh after he gets inside of that south gate. It happened, ladies and gentlemen. But based on the circumstances, it is reasonable that they were threatened. Not only did officers say they were threatened, say they were intimidated, say force was used against them, these videos show it. It is

reasonable to believe that.

Mr. Oreskovich talked about these -- the people at the south gate, the crowd at the south gate. Ordinary citizens. He referred to them as ordinary citizens. Yeah. Mr. Oreskovich emphasizes these are women. Yes. And yet, these federal officers couldn't move them. They were -- the federal officers had to retreat. These big guys were defeated at the south gate. And why were they defeated? Because force was being used against them. If there hadn't been force, if there hadn't been threats, if there hadn't been intimidation, they would have been successful at the south gate.

Property, ladies and gentlemen, is the stuff used by federal officers to do their job. That's what we're talking about here. So property arguments, all red herrings. The federal property we're talking about, stuff used by the federal agents to do their job. Red van, for this context federal property. White van -- white bus, federal property. All the stuff that was surrounding the federal building that the federal agents are using, federal property.

Mr. Ahmed said, speaking in another context, but said if you're going to act according to your political beliefs, you might as well call it a day. Very true.

Ladies and gentlemen, there are peripheral political aspects of this case. No doubt. Again, you may really hate ICE. You may really hate or like any number of political issues

on the right or the left or in between. This protest could have been about anything. Any right issue -- right-wing issue, any left-wing issue. That -- that's just not what this case really is focused on. This case is focused on the conduct of these defendants who crossed the line.

Protesting is important. Assembling is important. Expressing your views is important. But not when this happens. But not when there is the working together in such a way that federal officers, trained federal officers, have to retreat inside a building for hours.

Yes, this could have been worse. There was talk of that. No cars overturned. All these things. But just because something isn't really, really, really bad doesn't mean it's not a crime.

Ladies and gentlemen, as you -- a week and a half ago now, voir dire, jury selection, you were told multiple times avoid bias and set aside kind of any other kind of ideas you might have which is going to impede your decision-making. That is so true. You must do that. But that admonition did not mean to abandon all your reason, abandon common sense when you took a seat here in the jury box.

This event happened. And it was only possible because these Defendants worked together with an agreement with each other and others to impede officers. And you can call it civil disobedience. You can call it whatever you want. Giving it a

different name doesn't make it not meet the elements that have been read to you.

Ladies and gentlemen, an important -- let me be clear. Just impeding -- this wasn't just impeding. This wasn't just laying down in front of someone. This was pushing back. It was fighting. You heard in one of those exhibits someone yelling at Jac, "Fight, Jac, fight." And that's exactly what happened.

And not just pushing. Even if you ignore the force aspect, what do you think it means when they are shouting as loud as they can, linking arms, "Fuck you, you mother-fucking criminals." Forral saying, "Are you going to cry? Are you going to cry?" That's in an exhibit. Standing behind the line, poking his head in, "You gonna cry? You gonna cry?" That's intimidation. And so these officers because -- now, they weren't crying, but they retreated because they had to. They had no other choice.

Ladies and gentlemen, look at the evidence. Again, we all agree on that. But common sense and a careful application of these facts to the law will show that each defendant individually did exactly what is laid out in the elements. We'll ask you to find them guilty.

Thank you.

(WHEREUPON, further proceedings were held which were not ordered and transcribed.)

C E R T I F I C A T E

I, CRYSTAL L. GONZALEZ, do hereby certify:

That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Spokane, Washington;

That the foregoing proceedings were taken on the date and place as shown on the first page hereto; and

That the foregoing proceedings are a full, true, and accurate transcription of the requested proceedings, duly transcribed by me or under my direction.

I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings;

DATED this 28th day of June, 2026.

CRYSTAL L. GONZALEZ, CRR, RPR
Washington CCR No. 2955
Official Court Reporter
Spokane, Washington