# Exhibit J.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:25-cr-00113-RLP |
| Plaintiff, | ) | May 26, 2026 |
| | ) | Spokane, Washington |
| vs. | ) | |
| | ) | Excerpt of Jury Trial - Day 6 |
| JUSTICE FORRAL (2), BAJUN MAVALWALLA (8), and JAC ARCHER (9), | ) | Testimony of **Bajun Mavalwalla II** |
| Defendants. | ) | Pages 1 - 106 |

BEFORE THE HONORABLE REBECCA PENNELL
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | LISA C. CARTIER-GIROUX<br>REBECCA R. PEREZ<br>U.S. Attorney's Office<br>920 W. Riverside Avenue<br>Suite 340<br>P.O. Box 1494<br>Spokane, WA 99201 |
| For Defendant Forral: | ANDREA K. GEORGE<br>AMY H. RUBIN<br>Federal Defenders of Eastern Washington & Idaho<br>601 W. Riverside Avenue<br>Suite 900<br>Spokane, WA 99201 |
| For Defendant Mavalwalla: | AINUDDIN AHMED<br>Ahmed Law Firm<br>550 Congressional Boulevard<br>Suite 350<br>Carmel, IN 46032 |
| | MATTHEW F. DUGGAN<br>Duggan Law Offices PLLC<br>23505 East Appleway Avenue<br>Suite 200-175<br>Greenacres, WA 99019 |

For Defendant Archer: CARL JOSEPH ORESKOVICH
ANDREW M. WAGLEY
Etter McMahon Lamberson Van Wert & Oreskovich PC
618 West Riverside Avenue
Suite 210
Spokane, WA 99201

Official Court Reporter: Crystal L. Gonzalez, CRR, RPR
United States District Courthouse
P.O. Box 700
Spokane, Washington 99210
(509) 458-3434

Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.

(WHEREUPON, previous proceedings were held which were not ordered and transcribed.)

(BAJUN MAVALWALLA II, called as a witness by the Defendant, having first been duly sworn, testified under oath as follows:)

MR. AHMED: May I begin, your Honor?

THE COURT: Yes.

DIRECT EXAMINATION

BY MR. AHMED:

Q. Good morning, Mr. Mavalwalla.

A. Good morning.

Q. Mr. Mavalwalla, can you tell us how old you are?

A. I'm 36.

Q. Where were you born?

A. Fort Polk, Louisiana.

Q. And why at Fort Polk?

A. My parents were stationed there.

Q. And where did you go to high school?

A. San Francisco.

Q. And after high school, what did you do?

A. I joined the military.

Q. And what was your MOS or what did you do in the military?

A. I was a 35 Papa. It's a cryptologic linguist, signals intercept.

Q. Do you have to do any sort of training before you become a linguist in the military?
A. I do.
Q. What sort of training did you receive?
A. I had a year and a half of language school at the Defense Language Institute in Monterey, California.
Q. Which language did you learn?
A. Japanese.
Q. After you were completed with training -- let me go back.
Did you do basic as well?
A. I did.
Q. Okay. Did you ever go to advanced individual training as well?
A. I did, at Goodfellow Air Force Base in Texas.
Q. And after you completed your training, were you -- where were you stationed?
A. I was on active duty orders working for the Joint Forces Component Plan for Network Warfare, which was eventually folded into Cyber Command.
Q. Were you ever deployed?
A. Yes.
Q. What year?
A. 2012.
Q. Where?
A. Afghanistan.

Q. What did you do?
A. I was team leader running signals intercept for ground patrol vehicle and static operations.
Q. So you were outside the wire?
A. Constantly.
Q. You're familiar with the terms, and I'm going to come back to them, but based on your military training and your background, have you become familiar with the terms that we've heard in this trial like "siege"?
A. Yes.
Q. And "bladed position"?
A. Yes.
Q. And "fighting position"?
A. Yes.
Q. I'm going to come back to those terms in a minute, but I want to ask you about -- what year did you leave the military?
A. 2013.
Q. What did you do then?
A. I went back to college.
Q. Okay. And where did you go to college?
A. I went to Santa Rosa Junior College and then Sonoma State University.
Q. Was that on the GI Bill?
A. Yes.
Q. Did you finish your degree?

A. I did.
Q. And what did you to after that?
A. I spent some time working in California, and then I bought property up in Washington.
Q. When did you move to Washington?
A. 2020.
Q. And I want to take your attention now -- and I'm kind of moving forward -- to June 11, 2025.
Okay. What were you doing that day?
A. I was at home with my kids.
Q. And at any point in time, did you receive or did you see a post concerning a potential protest that day?
A. I saw a Reddit post, yes.
Q. You saw it on Reddit?
A. Yes.
Q. Can you tell the jury specifically, was this a -- and I'm not familiar with Reddit, so some other people may not be either. What is Reddit and how do you use it?
A. Reddit is an online forum. It has specific pages for certain categories, and there's all kind of categories. The Spokane specifics of Reddit is for things that take place in Spokane. It's art. It's festivals. It's people talking about restaurants. It's some political stuff. It's a very wide variety of things.
Q. Approximately how many users, if you know, were on that sub

folder of Reddit where you read this post?
A. I believe about 60,000.
Q. I'm going to take you to Exhibit 76, page 2. And let me ask you, Mr. Mavalwalla, when you read the post -- have you ever worked with refugees?
A. I have, yes.
Q. Specifically tell the jury what work you've done with refugees.
A. In 2021 and 2022, I worked with Afghan refugees after the fall of Afghanistan to the Taliban, helping them secure housing, medicine, food, and escaping the country.
Q. Okay. I'm looking at page 2 of Government's Exhibit 76, which was admitted. Is this the post that you read?
A. I believe so, yes.
Q. Did it -- when you read the post, did it have Ben Stuckart's name on it?
A. I don't specifically recall, but it would seem likely.
Q. Okay. Have you ever met Mr. Stuckart?
A. No, I have not.
Q. Did you know him in any way when you read the post?
A. No.
Q. Have you ever communicated with him using your phone or any other device?
A. No.
Q. When you read the post, what sort of refugees or people did

you think you were dealing with here?
A. Based on the post, I believed that we were dealing with a minor from Venezuela.
Q. That was your belief, correct?
A. Correct.
Q. And did that eventually change after you went to the protest and spent some hours there and learned what we were dealing with?
A. Yes.
Q. Okay. And learned that they weren't juveniles, correct?
A. Yes, eventually.
Q. That's actually on one of the body cams that we saw, correct?
A. I believe so.
Q. Okay. All right. What time did you leave for the protest?
A. I don't remember specifically what time I left, but I got there just before 5:00 p.m.
Q. And just to make sure, I mean, was someone taking care of your kids when you left for the protest?
A. Yes.
Q. Okay. Did you know anybody at the protest?
A. No.
MR. AHMED: Can we please look at Exhibit 89, please? Can you please go to the next page, and the next page please, and the next page. This one right here. If you could stay

there.
Q. (BY MR. AHMED) Do you see this page before you on Exhibit 89?
A. I do.
Q. Were you anywhere near the white bus at around 2:00 p.m.?
A. No.
Q. These individuals that we see, you know, in photographs next to you, Jac Archer, Justice Forral, Ben Stuckart, and then you've got Hatfield, Lang, Tomeo, Sam, Moore, and others, did you know any of these people?
A. No.
Q. Did you, in any form or fashion, agree with them to -- to commit a crime that day?
A. No.
Q. In terms of knowing them even a little bit, you'd never met them before the protest?
A. Never.
MR. AHMED: Okay. If we can go to the next page.
Q. (BY MR. AHMED) And we see some -- same group of people. We've got Mr. Muncey down on the bottom row and appears to be Ms. Silva, Ms. Moore, and others. Ever met them before the protest?
A. No.
Q. Ever communicated with them before the protest?
A. No.

Q. I want to ask you some very specific questions regarding the protest, and then I'll -- let me ask you this. Why did you go to the protest?
A. I believe very strongly in people's right to immigrate to the United States and seek asylum, and I believe that the people have a duty to speak up when they see something that they believe is wrong.
Q. Okay. I want to ask you some specific questions during the protest. Did you ever put any objects in the gate?
A. No.
Q. Did you ever deflate any tires?
A. No.
Q. Did you spray-paint the windshield of the bus?
A. No.
Q. Did you break the windshield of the police car?
A. No.
Q. Did you ever throw a canister?
A. No.
Q. Counsel asked, during the video on direct examination during the Government's case, you handing something to somebody. What were you handing to somebody? Something to somebody.
A. Are you referencing the red van?
Q. Yes. You're seen -- I'm not going to play the video again and again, but you're seen handing something to somebody near the red van.

A. Water bottles.
Q. And you actually see you -- you're handing water bottles out?
A. Correct.
Q. So it's not like communist manifestos or something like that?
A. No.
Q. Okay. All right. And you're seen taking something from somebody. What were you taking from them?
A. Garbage.
Q. Garbage. Okay. Not drugs?
A. No.
Q. Not fentanyl?
A. No. The water bottles.
Q. Okay.
A. The empty water bottles.
Q. Okay. We heard testimony from -- I think it was from Agent Wilks that said while you were at the south gate, you made the comment, something to the effect of "This is Washington. The police aren't coming." When we sat here during opening statement and Counsel said that, did you even remember saying something like that?
A. I did not.
Q. And then when you heard the recording, did you recall saying something like that?

A. It does sound like my voice, yes.
Q. Okay. Why would you have said something like that?
A. My understanding is Washington State has something called the Keep Washington Working Act, which prohibits local law enforcement from assisting ICE and border patrol with deportations.
Q. And did you mean it as some sort of threat when you said it?
A. No.
Q. It was a point of fact for you, correct?
A. Correct.
Q. All right. I want to go back. I didn't ask you this question. When you left the military, did you receive an honorable discharge?
A. I did.
Q. All right. Talk to me about when you were arrested. Do you remember approximately when you were arrested?
A. It was 6:00 a.m. on July 15th.
Q. Okay. And did you cooperate with law enforcement?
A. Yes.
Q. Did they ask for specific articles from you?
A. They did.
Q. What did you give them, if you recall?
A. They asked for my work boots, my necklace, the shirt that I was wearing, a backpack, and my cell phone.

Q. Okay. And did you know that the police were coming?
A. No.
Q. Did you ever delete anything off your phone?
A. No.
Q. Okay. And I don't want to get into the contents, but we heard something on direct -- don't tell me what somebody said, but did you have communication after the protest with somebody you met during the protest?
A. I communicated with a couple of people via Reddit, yes.
Q. Did that include a Caleb Hutchins that you met at the protest?
A. Yes.
Q. Did you even know what Mr. Hutchins' name was?
A. No.
Q. And during the -- your conversation, did you ever discuss, you know, let's plan to commit some crimes or --
A. No.
MS. PEREZ: Objection. Leading, your Honor. This has gone on for a little while.
THE COURT: Try not to lead, Mr. Ahmed.
MR. AHMED: I'll try, Judge. I'll do my best.
Q. (BY MR. AHMED) While you were at the protest, did you damage any property?
A. No.
Q. Let's talk about what happened at the south gate, okay?

Did you use any force against anybody?
A. No.
MS. PEREZ: Again leading, your Honor. This is the same thing.
MR. AHMED: Well, I'm going to follow up. Can you please --
THE COURT: I'll let you follow up. Just try to point your questions towards what happened.
Q. (BY MR. AHMED) Tell us -- describe for the jury exactly what happened at the south gate.
A. When I got there, there were three vehicles lined up trying to leave the gate, and a large number of protesters stood in front of the gate. Some linked arms. And then very quickly, there was a lot of shoving and people being thrown to the ground. And then pretty quickly after that, it died down and the protesters stood there and the agents stood there. And then eventually the gate closed, and they went back inside the building.
Q. Okay. We saw video that the Government played where your -- I think it's your left arm is back. Can you describe for the jury what -- I mean, are you taking a -- let me ask you this: What are you doing right there?
A. So at that point in time, I had bent over to pick up a sign, and when I stood up, somebody bumped into me from behind, and I was pushed forward, and there was an agent that grabbed my

elbow, and I thought that they were trying to pull me inside the compound, so I pulled my elbow free.
Q. Okay. Did you ever punch an officer?
A. No.
Q. Did you see anybody damage any building -- damage the building?
A. The ICE building? No.
Q. Can you tell us what it means to take a bladed position?
A. Yes. Bladed position is a fighting stance where your body and your feet and your shoulders are not necessarily directly facing but towards the person that you're intending to attack.
Q. Did you ever take a bladed position?
A. No.
Q. Is that similar to a fighting position?
A. Yes.
Q. Did you ever take a fighting position?
A. No.
Q. In terms of your military background, have you had hand-to-hand combat training?
A. We've had some combatives training before deployment, yes.
Q. Okay. And so you -- what was your -- was it your intent to fight at any point?
A. No.
Q. We see in the video that you kicked a canister. What was your intent there?

A. I was moving what I believed to be a dangerous object away from myself and the other protesters.
Q. Where did you kick the canister to?
A. Off to the side of the road.
Q. We saw that you put on some -- let's go back. What was -- was it your intent to kick it towards officers?
A. No.
Q. How far were the officers from you when you kicked that can?
A. I don't specifically remember, but it had to have been at least 50 feet.
Q. Were you arrested that night?
A. No.
Q. We see you put on some gloves during the video. What's the intent of the gloves?
A. I work with my hands, and I believed that there were going to be munitions deployed, and so I was taking steps to protect myself.
Q. And I want to ask you again: Did you ever throw any canisters?
A. No.
Q. At some point in time, your girlfriend joined you?
A. Yes.
Q. What time did -- what's your girlfriend's name?
A. Caitlin.

Q. What time did she join you?
A. I believe around 7:00 or 7:30.
Q. Okay. And is that the individual we see putting on a gas mask next to you?
A. Yeah. I gave her the respirator.
Q. Have you been to other protests?
A. Many.
Q. And is that why you know something about a gas --
MS. PEREZ: Objection. Leading, your Honor.
MR. AHMED: I'll rephrase, Judge.
Q. (BY MR. AHMED) Why did you have certain items with you?
A. After the incident at the south gate, I believed that there would be munitions deployed, so I went back to my truck and got some of the protective gear that I have for work, and I brought that with me.
Q. Did you ever take any offensive conduct towards law enforcement?
MS. PEREZ: Objection, your Honor. That's an improper conclusion.
MR. AHMED: I don't think so.
THE COURT: It's leading, if anything else. So just ask what happened.
MR. AHMED: Okay.
Q. (BY MR. AHMED) In terms of your codefendants, Jac Archer, ever met him or her -- them? Excuse me.

A. No.
Q. Justice Forral?
A. After I was arrested.
Q. What time did you go home that night?
A. From the protest?
Q. Yes.
A. 9:30.
MR. AHMED: Can I have just a moment, your Honor?
THE COURT: Yes.
Q. (BY MR. AHMED) During the Government's case, there was a video of you getting angry at a police officer. Do you recall that?
A. Not specifically.
Q. Okay. Do you recall whether there was a flat -- a tire getting flattened?
A. Yes.
Q. Okay. Did you know that the tire had been flattened?
A. No.
Q. Why did you get angry at the police officer?
A. I heard people yelling "They're a kid. They're a kid."
Q. Did you think it was a kid?
A. I did, yes.
Q. Did you know that that kid -- or now we know it's an adult --
MS. PEREZ: Objection, leading.

MR. AHMED: It's been in evidence, your Honor.

THE COURT: Finish your question.

MR. AHMED: Okay.

Q. (BY MR. AHMED) Later known to be an adult, did you know that person -- whether that person had flattened a tire at that point?

A. I did not.

Q. We can go through Exhibit 89 again, but did you know any of those people?

A. No.

MR. AHMED: Okay. That's all I have, Judge. Thank you.

THE COURT: Okay. Cross-examination.

CROSS-EXAMINATION

BY MS. PEREZ:

Q. Mavalwalla, you -- okay. So you testified you arrived to the HSI facility around 5:00 p.m.; is that right?

A. Yes, ma'am.

Q. And when you arrived, where did you go to?

A. So I had parked on Cataldo, so I crossed Washington, and there was a woman that had a sign, and I talked to her for a second just to see what was going on. And she told me to go meet up with Ben, and I had no idea who that was. So I just went and stood next to the building for a little bit just to see what was happening.

Q. Okay. And so you saw -- so Cataldo is on the north side of the building, right? By that white bus, right?
A. Correct.
Q. And so you saw the white bus, right?
A. Yes.
Q. You saw the spray paint, right?
A. I did.
Q. You saw the red car right in front of that white bus?
A. I don't specifically recall if I saw vehicles in front of it or not.
Q. Okay. You saw a bunch of people there in front, right?
A. Yes.
Q. And so you were aware of what the purpose was, right?
A. The purpose of what?
Q. Of this protest.
A. Yes.
Q. You were aware why the people who were gathered in front of the white bus were there, right?
A. I was aware that people were protesting the detention of an asylum seeker, yes.
Q. But it wasn't just a protest, was it, Mavalwalla? It was to block the bus, right?
A. Some people expressed that intent.
Q. But that was your intent as well, right?
A. No.

Q. Okay. So you saw that the bus was in at least some way blocked. You didn't remember the red vehicle, but you knew that bus's windshield had been painted, at least, at the very minimum, as far as what you saw, right?
A. That's what I saw, yes.
Q. And the people that were there in front of that white bus, you knew what they were there to do, right?
A. I didn't know anybody there.
MS. GEORGE: Objection. Calls for speculation.
THE COURT: It does call for speculation, Ms. Perez.
Q. (BY MS. PEREZ) So you talked -- you talked to someone, right?
A. I briefly interacted with a couple of people, yes.
Q. And that interaction, combined with what you were observing, showed you what was going on that day around 5:00, right?
MS. GEORGE: Objection to the broad nature of the question.
THE COURT: Overruled.
Q. (BY MS. PEREZ) Right, Mr. -- right, Mavalwalla?
A. I'm not sure what you're asking me.
Q. You knew that that crowd wanted to block the white bus, right?
A. I knew that some people in the crowd intended to block the bus, yes.

Q. And you knew that there were enough people there at the front of the building, on the north side of the building, they had that part handled, right?
A. I'm not sure.
Q. You knew that there was no more people needed at the north side because that bus was already blocked, right?
A. I'm not sure what you're asking me.
Q. You just stated you knew the intention of the people there.
MS. GEORGE: Objection to --
THE COURT: I think he said some people, so.
Q. (BY MS. PEREZ) You knew the intention of some people there, right, Mavalwalla?
A. I -- based on what I had seen online, yes.
Q. Sure. Yeah, yeah. Based on everything that you knew, right, you showed up there for a purpose, right?
A. Yes.
Q. And it was as stated in the post, as stated in what you're -- or as indicated in what you're seeing, as indicated in what you're hearing, it's to block the bus, right?
A. No, ma'am. That was not my intent.
Q. Okay. So let's keep going then. So this is 5:00ish, approximately. You show up and -- but you don't stay on the north side, right? You go around to kind of the south or more east, kind of the side of the building-ish; is that right?
A. That sounds right, yes.

Q. Okay. So you were on the side of the building, so the east section kind of by the public parking lot; is that right?
A. At some points, yes.
Q. At some points. And you were down there to kind of make sure all the exits were -- at least had an eye on them, right?
A. At that point, I had just gotten there. I am not familiar with the building. I wasn't familiar with any of that area specifically, so I was just sort of seeing what I saw.
Q. Okay. Yeah. So you were orienting yourself. And so as you walked around the building, you could see that most of the people at that time were on the north, right?
A. Yes.
Q. With just a few kind of scattered along the east and south area, right?
A. Yes.
Q. And pretty soon after you got there, you saw three officers, three people, federal agents, walking out of that building, right?
A. I saw three people leave the building.
Q. Okay. And you knew they were agents, right?
A. I didn't know who they were. They were wearing masks.
Q. Okay. They had some kind of body armor-type vests on, right?
A. Yes.
Q. They were walking out of the building that you were there

to block, right?
A. I didn't know where that door led.
Q. And -- okay. So at least for a second, you weren't quite sure what's going on, right?
A. Yes.
Q. And so you watched for a few seconds, right?
A. Yes.
Q. Watched them walk into that south gated area, right?
A. Into the parking lot you mean?
Q. Yeah, yeah. Into the parking lot?
A. Yes.
Q. And then you saw those officers get into vehicles, right?
A. Yes.
Q. You saw them start to back up, right?
A. Yes.
Q. You saw the police lights turn on, the blue and red overhead, right?
A. I don't recall if I saw any lights or not.
Q. Okay. So at that point, you had to know these are officers, right? This is law enforcement.
A. Yes.
Q. Yeah. Absolutely. That -- that's absolutely what happened right, Mavalwalla? You knew these were federal agents coming from the federal building, right?
A. Yes.

Q. Okay. So they walked out. And to be clear, you just saw the three of them, right?
A. That's who I saw leave the building, yes.
Q. Right, right. So since they weren't -- they didn't have detainees with them, right?
A. No.
Q. Okay. So you see this start to happen. You see them back up. You see them go toward that gate and you sprint, right?
A. Yes.
Q. And you're sprinting because you had to block them, right?
A. There were a lot of people running.
Q. You were the very first, right?
A. I was the fastest.
Q. Yeah. Oh, absolutely. You were the very fastest, and you were also the very first, right?
A. I believe so, yes.
Q. Yeah. Okay. So -- and as you're running, as you are sprinting toward that gate to block federal agents, you look over your shoulder and make sure people are coming, right, following you?
A. I don't specifically recall.
Q. You yelled back at people to make sure that they knew what was going on.
A. There were a lot of people yelling.
Q. Okay. But you yelled at people to make sure, hey, this is

it, you're kind of showing people this is -- come follow, right?
A. I also repeated some things that I had heard, but I was not the only person saying anything.
Q. But you -- as you were sprinting towards that exit to block the gates, you were making sure people were following you, right?
A. I wasn't making sure people were following me. I was just running.
Q. Just running. Let's look at Exhibit 19A.
This -- you've seen it before Mavalwalla, right? This is you sprinting. I don't see any other people running. Do you?
A. Not in this video, no.
Q. Not in this video. Okay. So at least here, you're the only one running, and you're for sure the fastest, right? You're for sure first, right?
A. Yes.
Q. Okay. And you look back over your right shoulder. That will come up here in a second. Do you see yourself do that, Mavalwalla?
A. I do.
Q. Okay. And you were looking back to make sure that others are following you, right?
A. No. I believe I was looking where the vehicles were.
Q. You're tracking to make sure that these vehicles are not -- that you're pacing the vehicles, that they're not going to beat

you, is that what you're saying?
A. I was just checking where they were.
Q. Just checking? Well, you weren't just kind of casually checking, you were sprinting as fast as you could to make sure that you could catch them, right?
A. Yes.
Q. Okay. So let's go to the next video. Exhibit 22. And you've seen this, right, Mavalwalla? This is the south gate. You're there. I'm going to go to 30 seconds into this video.
(Playing Exhibit 22.)
Q. (BY MS. PEREZ) Okay. And you're recognizing that the cars are backing out, right?
A. Yes.
Q. Okay. And you see now -- okay. So you turned to run at that point, right?
A. Yes.
Q. No one else is running?
A. I see one other person running.
Q. Where is that person that's running? You've seen it. Circle.
A. (Witness complies.)
Q. Okay. So there's one other person running, and they are behind you; is that right?
A. Yes.
Q. Was that a news reporter that you circled there?

A. I have no idea who that was.
Q. Is that Erin Sellers from Range Media that you circled there?
A. I have no idea who that was.
Q. All right. Okay. So -- but you are first. So you started to run and you're -- there's no one ahead of you, right?
A. Correct.
Q. Here, as we get to here at this point in the video, you look over your other shoulder, right, to make sure people are coming?
A. I...
Q. Okay. Let's zoom in a little bit. Let's zoom in on that area.
You looked over your left shoulder, right?
A. I did.
Q. And to make sure people are following, right?
A. To keep situational awareness.
Q. Situational awareness. What is that?
A. That means being aware of your surroundings.
Q. Okay. Being aware of surroundings, making sure there's no threats coming, making sure -- kind of knowing what's going on, right?
A. Correct.
Q. So you look over your left shoulder so you could be aware of whether or not the crowd was following you, right?

A. That would have had some of it, yes, but I was also checking for traffic and that sort of thing.
Q. Okay. Checking for traffic. Okay. What happens next here, Mavalwalla? You ran into traffic, right?
A. I ran into the street.
Q. There's a car right there, right?
A. Yes.
Q. This is a public roadway, right?
A. Yes.
Q. So there's cars going back and forth. There's a stoplight right there. You can see it, right?
A. Yes.
Q. So you -- behind you is a parking lot, right, before you ran into that street?
A. Yes.
Q. So you weren't looking behind you for traffic. Traffic is ahead of you, right?
A. I was checking my surroundings, including looking for traffic.
Q. Okay. So no traffic behind you because it's a parking lot, but there's traffic ahead of you, and you're going to run into that.
A. I ran into the street, yes.
Q. Okay. Well, let's be clear. That -- that's a car right there, right?

A. Yes.
Q. That's -- I don't know -- one second behind you.
A. I don't know specifically how...
Q. Okay. We'll back up just a second.
(Playing Exhibit.)
Q. (BY MS. PEREZ) You didn't even slow down, did you?
A. No.
Q. Okay. Because you had to get to that gate, right?
A. I didn't have to get there.
Q. But you really, really, really wanted to get there first, right?
A. I wanted to get to the gate, yes.
Q. You really wanted to get to the gate, right?
A. I wanted to get to the gate.
Q. And you were aware, because you were checking your surroundings, that the crowd was following you, right?
A. I -- they were not following me. There were lots of people running.
Q. They weren't following you?
A. They were not following me.
MR. AHMED: Objection, your Honor. Asked and answered.
THE COURT: He's answered the question. Go ahead.
Q. (BY MS. PEREZ) Were they going in the same direction as you with you going first?

A. There were lots of people running in the same direction.
Q. With you going first, right?
A. I was fastest.
MR. AHMED: Asked and answered, Judge.
MS. PEREZ: Your Honor, he's not answering.
THE COURT: He can answer the question. Go ahead.
THE WITNESS: I was fastest. That means that I was in front.
Q. (BY MS. PEREZ) Okay. So you all are sprinting. You were sprinting, others are jogging, some walking to the south gate. And you get there first, and you yell something, right?
A. Yes.
Q. You're yelling at others to come, right?
A. I don't specifically recall what I was saying.
Q. Okay. You were yelling, as loud as you can, something, right?
A. I can be loud, yes.
Q. Sure. You can be loud. But you were yelling as loud as you could, right?
A. I don't specifically remember.
Q. Okay. Let's look for a second. Exhibit -- we'll go to Exhibit 22A?
MR. ORESKOVICH: Say again, please.
MS. PEREZ: 22A.
MR. ORESKOVICH: Thank you.

Q. (BY MS. PEREZ) This just enhanced what we just watched. And I'm going to zoom in on this area that you come into.
Do you see yourself put up your left hand to your mouth?
A. Yes.
Q. Lean back?
A. Yes.
Q. It looks like you are yelling as loud as you can, right, Mavalwalla?
A. Yes.
Q. Okay. And you were yelling to make sure people were coming behind you, right?
A. I don't specifically remember what I said, but --
Q. Why did you yell?
A. To make sure that other people knew what was going on.
Q. Okay. Exactly. You yelled as loud as you could to make sure other people knew what was going on, right?
A. Yes.
Q. Because, Mavalwalla, you couldn't block that gate entirely by yourself, right?
A. You're asking if one person could block that gate?
Q. You needed others to come join you, right?
A. I didn't need other people to come join me to stand there, no.
Q. But you yelled as loud as you could to invite them to come.
A. I was letting people know what was happening, yes.

Q. This wasn't a merely informative yell, right, Mavalwalla?
A. I don't understand.
Q. You weren't just saying, "Hey, guys, I'm going to stand here for a little while," right? This was "Come help, they're getting out this way, come here, block this gate," right?
A. Sure.
Q. Yeah. Sure. Okay. So something to that effect. And so as that is happening -- because you know that this is where the action is, right?
A. I knew that there were vehicles trying to leave.
Q. And you needed the crowd to come block that gate with you, right, Mavalwalla?
A. There is strength in numbers.
Q. Yes. There is. You just told me you walked around that building. There's many doors, right?
A. Yes. I observed many entrances and exits to the building.
Q. Yes. And so to have that strength in numbers, you needed these people to follow you to that south gate, right?
A. I didn't need them to follow me.
Q. You just -- you just sprinted to the gate, yelled as loud as you could, and invited them to follow you, right?
A. I let people know what was happening at the gate, yes.
Q. Okay. Okay. So then -- so you're there, and pursuant to your yelling and pursuant to your leading the sprinting, the crowd comes, right?

A. There were lots of people there very quickly, yes.
Q. Yes. Just within a few seconds they're there, though, right?
A. Yes.
Q. And you -- and you saw that officer, that first officer in that police car, that federal agent, get out of his car, right?
A. Yes.
Q. And you're just a couple feet from him, right? Like closer than me and you right now, right?
A. I believe it was about the same distance.
Q. Okay. Well, it's a little closer than that, right? Let's go back to that exhibit we were just looking at. I'll just go to the end, just take us to right where we were.
You are -- I don't know -- a foot from that car, something like that. Very, very close, right?
A. I'm pretty close to it, yes.
Q. Like maybe a foot, right?
A. It's hard to tell, but potentially.
Q. Okay. And then the officers -- I mean driver's seat. And so very close, right?
A. Yes.
Q. Okay. And so then you say to the officer, "The cops won't help you. It's against state law. Nobody is going to move us." Right?
A. Something to that effect.

Q. Something to that effect. "No one is going to move us." You didn't say "me"; you said "us."
A. Yes.
Q. Us because this is a crowd of people, Mavalwalla, right?
A. Yes.
Q. A crowd of people who are all doing the same thing, right?
A. Yes.
Q. A crowd of people who are all doing the same thing because you have led them there, right?
A. No.
Q. No? That's not true?
A. There were lots of people that were running, and had I not been the fastest, somebody else would have been there first.
Q. And those cars would have left?
A. I don't know. I can't speculate.
Q. Those cars would have been able to get out if you hadn't stepped in there right at the exact second, right, Mavalwalla?
A. I cannot speculate to that.
Q. Let's just back up and look at how close they are to getting out.

That gate is opening, it's opening, it's opening. And almost at the second that there's enough space for them to get out, you're there, right?
A. I also see a vehicle behind me that would have stopped the SUV from getting out of the compound.

Q. Well, maybe the SUV would have sped out in front of the vehicle like you did when you ran out.

MS. GEORGE: Objection.

THE WITNESS: I believe that's speculation.

THE COURT: I can't hear. Please don't ask any questions that call for speculation. Some of this is speculative.

Q. (BY MS. PEREZ) So it's a couple seconds before someone else gets there, right, Mavalwalla?

A. It appears so, yes.

Q. Okay. So "No one is going move us." No one is going to move this crowd that is following me, right?

A. No one is going to move the protesters?

Q. Yeah. So not just you. You're not alone in this, right?

A. No. There were lots of protesters there that day.

Q. Right. Lots of people working with you, right?

A. Not with me specifically.

MR. AHMED: Objection.

THE COURT: Is there a basis for your objection?

MR. AHMED: Yes. It's -- assumes evidence that's not in evidence.

THE COURT: Overruled. Go ahead.

Q. (BY MS. PEREZ) There were lots of people working with you, right?

A. There were lots of people that were at the protest, yes.

Q. But that's not the question, right? There were lots of people working with you to block the south gate, right?
A. There were lots of people working together to block the south gate.
Q. Sure. Working together to do the thing that you're also doing, right?
A. I happened to be one of them, yes.
Q. So -- and then this statement, "The cops won't help you. It's against state law."
A. Yes.
Q. Okay. Now, you -- so Officer Wilks, this federal agent, is just a few feet from you. He's already blocked. They've got their lights on. They're in a secure gated area with pretty much one exit. And you tell that officer, you shout at him "No one's coming to help you." Right? Something to that effect?
A. Something to that effect.
Q. And, Mavalwalla, that wasn't just -- you weren't just informing him. This wasn't casual conversation. You were saying that so this officer knew he was alone, right?
A. No. I was saying that so the officer knew that the protesters have a right to be there.
Q. No, no, no, that's not what you said, though. You didn't say protesters have the right to be there. You said "The cops won't help you. No one is -- it's against state law. No one is coming." Right?

A. My understanding is that it's against state law for the police to assist in deportations.

Q. There's no deportation going on right here, right? This is officers trying to drive away, officers with no -- alone, right? There's no detainees in these cars. You saw it.

A. I actually had just gotten there, so I had no idea what had happened beforehand.

Q. You saw them, the three officers -- you just said you saw the three officers walk out of the building, walk into this parking lot, and individually get in their cars and try to drive out, right?

A. I did see three officers leave the building and enter that compound. I did not see what happened before that. So I had no idea if there were other people in the vehicles.

Q. Okay. "The cops won't help you. It's against state law. No one is going to move us."

So you talked about -- you talked about your military experience. Absolutely. You're very highly trained. And you have some significant experiences. And you talked about situational awareness.

MS. GEORGE: Objection. Is there a question there?

MS. PEREZ: There is a question.

THE COURT: Overruled. Go ahead and ask your question.

Q. (BY MS. PEREZ) And you talked about situational awareness.

So you have some specialized knowledge as far -- you have specialized knowledge, right?

A. Yes.

Q. And so in your training and experience, then, if you have a job to do and someone has blocked you into a parking lot, a gated parking lot, they have sprinted to block you in, they are calling for reinforcements, and you've already been told no one is going to help you, that's a threat, isn't it, Mavalwalla?

A. I did not intend it as a threat.

Q. Mavalwalla, that is absolutely -- you are trying to intimidate those officers so they'll back off, right?

A. No.

Q. Why else would you say that? "The cops won't help you, it's against state law, no one is coming for you"?

A. I didn't say no one was coming for them.

Q. "No one is coming to move us."

A. Okay.

Q. That's intimidation.

MS. GEORGE: Objection. Calls for -- invading the province of the jury.

THE COURT: Well, you've already asked that question, Ms. Perez, and he's answered it.

Q. (BY MS. PEREZ) All right. Let's go to Exhibit 23.

Okay. And I'm going to move to -- to second 45. So you heard your voice at the beginning. I'll just play that real

quick.

(Playing Exhibit 23.)

Q. (BY MS. PEREZ) Okay. So you heard your voice there, right?

A. Yes.

Q. And I'm going to fast-forward to second 45 here and...

(Playing Exhibit 23.)

Q. (BY MS. PEREZ) Okay. What did you say there?

A. I made sure that people were staying in the front as well.

Q. Mm-hmm. That's not all you said, right? What else did you say?

A. I said make sure people stay in the front and to block every exit.

Q. And block every exit and keep the bus blocked, right?

A. I did not say anything about the bus.

Q. You didn't say that?

A. No.

Q. Let's go to Exhibit 88 and watch it from a different angle. I'm going to fast-forward to second 26 here.

Okay. You see yourself, right?

A. Yes.

Q. So let's listen for what you are saying and we'll -- we'll deal with that.

(Playing Exhibit 88.)

Q. (BY MS. PEREZ) Did you say "Keep the bus blocked" at the

end?
A. I'm not sure what I said. It's hard to tell.
Q. It is hard to tell. Do you see your hand going up like this, keep the bus blocked?
A. I saw my hand shaking, but, like I said, it's hard to tell what I'm hearing, and I don't specifically remember what I said.
Q. Let's go through it again.
Now, to be clear, your hand is raised, and you're kind of punctuating the syllables as you point, right?
A. Yes, to ensure effective communication.
Q. To ensure -- okay. Perfect. To ensure effective communication. So let's go back to second 26 and watch that again.
(Playing Exhibit 88.)
Q. (BY MS. PEREZ) You didn't hear you say, "Keep the bus blocked" with that same pointing?
A. It's possible that's what I said, but I heard somebody else say, "Block the bus."
Q. Okay. Someone else said it, too.
A. Okay.
Q. But you, you said it, right?
A. Maybe. I don't specifically remember, and it's very hard to tell from the audio. It -- I could have said that.
Q. Okay. Well -- okay. So effective communication. You're communicating to all the people around, right?

A. In general, yes.

Q. Yeah. Just all of these crowd of people who have followed you to this area, you're yelling at them, punctuating the syllables to ensure effective communication.

MR. AHMED: Objection, your Honor. "Following to this area," that mischaracterizes his testimony.

MS. PEREZ: That is exactly what he said.

MR. AHMED: No, that's not what he said.

THE COURT: Overruled, in that the witness can answer a question as to what their recollection is, and you can also follow up with redirect.

You can ask your question, Ms. Perez.

Q. (BY MS. PEREZ) So you are yelling, punctuating the words in the air with your finger and fist, telling people to block every exit, keep the bus blocked, right?

A. I specifically recall saying "block every exit." I don't specifically recall if I mentioned the bus.

Q. And you're saying that and you're yelling that, as you said, to ensure effective communication, right?

A. Yes.

Q. And you are communicating that to the people who have followed you there, right?

A. There were lots of people that moved independently to that gate. They didn't follow me there. But yes, I communicated that people should stay in the front as well.

Q. Okay. And why did you say that?

A. Because at that point, I had just seen the -- what I believed they were trying to sneak out, and I wanted to make sure that they didn't try to go out another direction as well.

Q. Okay. So this was a -- this was not a one-person project here that you're involved in, right?

A. Are you referring to the fact that there's other people at the protest?

Q. I'm referring to the fact that keeping the exits blocked that you just yelled, that could not be done with one person, right?

A. No. It could not.

Q. It had to have people who were working together, right?

A. Yes.

Q. Okay. Now, at this point, Mavalwalla, so just as far as we've seen here in this video -- we're still on Exhibit 88. At this point, there are officers, federal officers, who have attempted to leave a building, right?

A. In vehicles, yes.

Q. Yes. And you were also aware that there was a bus spray-painted on the north side, right?

A. Yes.

Q. So you knew that they had -- there was one vehicle at least incapacitated, right?

A. Yes.

Q. And you knew this had been going on for a couple of hours at least, right?
A. Yes.
Q. And you knew that now federal agents were trying a different exit in the opposite side of the building, right?
A. In vehicles, yes.
Q. Yes. And you knew that these were indeed federal agents, right?
A. I had no way of knowing exactly who they were.
Q. Okay. These were people leaving the federal building in police uniforms, driving police vehicles with red and blue lights, right?
A. They were not in uniforms. They were wearing body armor.
Q. Body armor that said "Police" on it, right?
A. Yes.
Q. Okay. So they had the name tag "Police" on them.
And they're trying to leave, right?
A. In vehicles, yes.
Q. In vehicles, yep. Yep. And you have sprinted in front of them, right?
A. In front of the vehicles, yes.
Q. Yes. You have blocked them in, right?
A. The vehicles, yes.
Q. And the crowd has come after you, right?
A. Other people arrived, yes.

Q. Yes. Other people arrived right after you, right?
A. Yes.
Q. And they've been told the cops won't help them, right?
A. The protesters or --
Q. No. You have told these cops -- these federal agents "The cops won't help you," right?
A. Yes.
Q. And you have encouraged others to keep blocking all the other exits, right?
A. Yes.
Q. Mavalwalla, that is absolutely intimidation, right?
MS. GEORGE: Objection.
MR. AHMED: Objection, your Honor.
THE COURT: Sustained. Sustained. Don't ask --
MS. GEORGE: I'd ask --
THE COURT: -- the witness for legal conclusions.
Q. (BY MS. PEREZ) When you did that, Mavalwalla, that was intended to be intimidating, right?
MS. GEORGE: Objection.
THE COURT: Overruled. He can testify as to his intent.
THE WITNESS: No, I did not intend to intimidate anybody.
Q. (BY MS. PEREZ) To be clear, Mavalwalla, again, you were highly trained. You have been in circumstances where people

have been trying to oppose what you're doing, right?
A. Yes.
Q. And if in that circumstance, a crowd of people had come up to you, outnumbered you 20 to 1, and were yelling at you, telling you no one is going to come and help --
MR. AHMED: Calls for speculation. Your Honor, this calls for speculation. This is a hypothetical question.
THE COURT: I think it's a hypothetical and somewhat argumentative, Ms. Perez. You can ask about his intent, but hypotheticals, I think, are too complicated.
Q. (BY MS. PEREZ) Mavalwalla, you have training and experience dealing with difficult circumstances, right?
A. Yes.
Q. This is the type of circumstance that shows your intent of intimidation, right?
MS. GEORGE: Objection.
THE COURT: Overruled.
THE WITNESS: No, I did not intend to be intimidating.
Q. (BY MS. PEREZ) Okay. So you're just saying no one is going to come help you, we're not leaving, all the exits are blocked, just because?
MS. GEORGE: Objection, asked and answered and argumentative.
THE COURT: This has been asked and answered, Ms. Perez.

MS. PEREZ: Your Honor, he's really not answering.

THE COURT: Well, I think he's answered. I think it's getting somewhat argumentative, Ms. Perez.

Q. (BY MS. PEREZ) Okay. So here we are at this point -- and I'll play just a few --

(Playing Exhibit 88.)

Q. (BY MS. PEREZ) And so at some point, Archer arrives, right?

A. I didn't know who it was.

Q. Okay. Fair enough. You did not know Archer had not ever met them, right?

A. Correct.

Q. You do know who it is now, though, right?

A. I do now, yes.

Q. At some point very quickly after this, Archer arrives. And what did they say?

A. Something to the effect of, if you're risking arrest, this is what we talked about.

Q. Okay. And then immediately after that, you link arms, right?

A. Yes.

Q. Okay.

(Playing Exhibit 88.)

Q. (BY MS. PEREZ) So it's Archer that coordinates the arm-linking, right?

MR. ORESKOVICH: Objection to the conclusion, your Honor.

THE COURT: Overruled.

THE WITNESS: I wouldn't call it coordinating.

Q. (BY MS. PEREZ) Okay. It's Archer that starts the arm-linking?

A. Initiating, yes.

Q. Okay. Archer initiates the arm-linking and -- because before they arrived, there was no arm-linking, right?

A. I'm not aware.

Q. Well, there wasn't, right?

A. From the video, I can't tell, but I -- like I said, I'm not aware if there was or not.

Q. You were right there on the ground. There was no arm-linking prior to Archer, right?

MR. ORESKOVICH: Objection, your Honor. Asked and answered three times.

THE COURT: I think you can ask whether or not he knows.

Q. (BY MS. PEREZ) Based on you being there, did you link arms prior to Archer arriving?

A. I did not.

Q. Okay. And based on this video, did anyone link arms prior to Archer arriving?

A. Not that I could tell.

Q. Okay. So Archer is standing about two people away from you. There's a woman in between you, right?
A. Yes.
Q. And you didn't know that person; is that right?
A. No.
Q. Okay. And you're standing with your backs to officers, right?
A. Yes.
Q. And you do that because that's kind of a stronger position to be in, right?
A. No.
Q. That -- why would you stand with your backs to officers?
A. To indicate that we're not a threat.
Q. You stand there with your backs to officers to indicate you're not moving, right?
A. That too.
Q. Okay. And you stand with your backs to officers because that just kind of physiologically is a stronger way. You can kind of use your legs to push against them, right?
A. I disagree.
Q. Okay. You stand with your backs to officers because if it does get physical, your faces -- your back is more protected, right?
A. More protected as in -- it's easier to defend yourself if you're facing the person attacking you.

Q. This -- and you link arms with the purpose of combining strength, right?
A. Yes.
Q. Okay. So any one person can be pushed down, right?
A. Most people, yes.
Q. Sure. Most people pretty easily, right?
A. Yes.
Q. Linked arms, you are way stronger, right?
A. Correct.
Q. And so now, again, all these things have happened, and now you're putting yourself in a -- physically the strongest position you can be in, right, right in front of these officers?
A. I disagree that your backs to the officers is the strongest position you can be in.
Q. Okay. So facing -- you would have preferred to face the other way?
A. No. I'm saying that the strongest position is not with your back to the person that you are -- that is attacking you.
Q. Right. So -- okay. So you would have preferred kind of -- that's better to face the other way, right?
A. I would not have preferred to face the other way.
Q. Okay. So this is going on, you're linking arms, strengthening yourselves, and then -- we've watched a ton of videos -- officers come in, right?
A. Yes.

Q. And to be very clear, you used force against a federal agent, right?
A. No.
Q. No. So you don't feel like you were -- you didn't elbow a federal agent?
A. I did not.
Q. Let's go through Exhibit 87. I'm going to turn the sound off. We won't need it for this. I'm going to fast-forward to second 45, and we'll just go through real slowly.
(Playing Exhibit 87.)
Q. (BY MS. PEREZ) So you kind of see where you are in there, right?
A. Yes.
Q. Okay. So here, you're standing. Your back is still toward the officer, right?
A. Yes.
Q. And you see behind you one of the federal agents, right?
A. Yes.
Q. Okay. You've got a sign there, and you've dropped it, and you're going to pick it up, right?
A. I did not drop the sign.
Q. Okay. Someone dropped the sign.
A. Yes.
Q. And you're going to pick it up, right?
A. Yes.

Q. And with that sign, you put it right in the officer's face, right?
A. No.
Q. No? Okay.
(Playing Exhibit 87.)
Q. (BY MS. PEREZ) Did you put it in the officer's face?
A. I was turning around with it.
Q. Well, Mavalwalla, you didn't just turn around with it. You kind of put it in his face, right?
A. Not intentionally.
Q. You just pushed your arm out unintentionally?
A. It was a very chaotic situation with a lot of people moving around, a lot of people bumping into each other. It can be very difficult to keep your own body under control in a situation like that.
Q. No one bumped your left arm that caused you to push that sign out, right?
A. Not my arm, no.
Q. Okay. Picked up the sign. And you feel like you didn't put that in the officer's face?
A. I didn't intend to put it in his face, no.
Q. Okay. And so then he pushes that sign out of the way, right?
A. Yes.
Q. And then you kind of lean in toward that officer, right?

A. I got bumped from behind.
Q. Okay. So Agent McSullivan. And you heard that he was pushed, and then he got pushed into you, right?
A. That's what I heard, yes.
Q. Okay. And so now you're leaning in with your back against these officers, right?
A. No. He grabbed my arm and pulled me.
Q. Okay. Let's watch that again.
(Playing Exhibit 87.)
Q. (BY MS. PEREZ) I backed up just a few seconds. We'll get forward to that point.
(Playing Exhibit 87.)
Q. (BY MS. PEREZ) You are leaning in with your back toward the officer, right?
A. I was turning around, and he grabbed my elbow and pulled me.
Q. And then you elbowed him, right?
A. I pulled my elbow free.
Q. You used that left arm, you kind of geared it up, and you elbowed him, right?
A. No, ma'am.
Q. Isn't that what the video shows?
A. I do not believe that's what the video shows.
Q. We'll watch it just one more time.
(Playing Exhibit 87.)

Q. (BY MS. PEREZ) You don't feel like you elbowed the officer?
A. I did not elbow the officer, no.
Q. You didn't feel like you were pushing against him with your back?
A. No.
Q. So these federal officers are trying to leave with their vehicles, and you won't let them, right?
A. I was not letting the vehicles leave, no.
Q. And when they try to leave individually and push you out of the way, you use force back --
MS. GEORGE: Objection.
Q. (BY MS. PEREZ) -- right?
THE COURT: It calls -- well, it's asking for a legal conclusion. I think he's testified as to what he did. Just focus on what he did and whether or not it's already been answered. Otherwise it's argumentative.
Q. (BY MS. PEREZ) Okay. So after this happens -- so other people have been pushed out of the way as well, right?
A. Lots of people were shoved, yes.
Q. Lots of people. But they come right back, right?
A. Yes.
Q. Okay. They come right back and, again, using that stronger position, they link up again, right?
A. Yes.

Q. So that the force that they're able to use is much greater, right?
A. That's not using force. That's a defensive move.
Q. A defensive move can be used in an offensive way, right?
A. In very specific circumstances, yes.
Q. Sure. So if someone is linked, and then you, with the combined force of your body push against someone, that's using it in an offensive way, right?
A. Linking arms is designed to give people more strength together so that they can't be moved as easily.
Q. Exactly. But it also gives people strength together so they can move elsewhere more easily, right? So they can push back?
A. It could be used that way, but I do not believe that was the intent here.
Q. Mavalwalla, that had to be the intent here, right?
MS. GEORGE: Objection.
MR. AHMED: Objection.
THE COURT: Sustained. Ms. Perez, I don't know when we're going have a good stopping point for a morning break.
MS. PEREZ: Sure.
THE COURT: Is this a good point?
MS. PEREZ: Yes. Thank you.
THE COURT: We're going to take our morning break, which will be 15 minutes.

To the jury, don't discuss this case, don't do any research during your break.

Mr. Mavalwalla, because you're in the middle of examination, don't talk to your attorney about anything about your testimony. That's the same with all witnesses during our break. Okay.

All right. All rise for the jury.

(Jury exits the courtroom.)

THE COURT: Mr. Mavalwalla, you can go ahead and step down. Just like I said, don't be discussing anything that has to do with this case with your attorney during your break.

Anything the parties want to bring to my attention?

MS. PEREZ: No.

MS. GEORGE: No.

MR. AHMED: No, your Honor.

THE COURT: Okay. We're on break.

(Court recessed from 9:06 a.m. to 9:19 a.m.)

MS. CARTIER-GIROUX: Has the case been called? Are we on the record?

THE COURT: Are we on the record?

THE COURT REPORTER: Yes.

MS. CARTIER-GIROUX: The Government would just request -- we can hear the audience, the viewers, making comments and reacting. And we just ask that the Court enforce norms of federal court where the gallery is silent during

testimony.

THE COURT: Thank you. So please do not talk in the courtroom. We do have an overflow room if you feel that you can't abide by that expectation. So you can go to the overflow room. It's really important that the jury be able to hear the evidence. It's also important that the jury not be influenced by spectators. So we do have court security here that will remove people if they're making comments, so please abide by that instruction.

Anything else?

MS. CARTIER-GIROUX: Not from the Government. Thank you.

THE COURT: Anything from the defense?

MR. AHMED: No, your Honor.

THE COURT: Okay. Let's get the jury.

(Jury enters the courtroom.)

THE COURT: Ms. Perez, you may continue with cross-examination.

Q. (BY MS. PEREZ) So, Mavalwalla, we talked about what happened at the south gate. And then, as you indicated, very quickly kind of ends, gate closes, right?

A. Yes.

Q. Okay. And so then you stayed there for at least a few minutes, right?

A. In the vicinity, yes.

Q. Okay. You were there when the crowd cheered when the gate closed, correct?
A. Yes.
Q. And you cheered, right?
A. Yes.
Q. Because that gate closing was consistent with the goal, right?
A. Of keeping vehicles from leaving, yes.
Q. So then after the gate closed, there was -- there were six officers there within that enclosed area, right?
A. I didn't know how many at the time, but I now know six, yes.
Q. Okay. Some small number of officers, right?
A. Yes.
Q. And so there's the crowd still at the gated area which is closed. And you could hear the crowd shouting at these officers, right?
A. There were lots of people shouting, yes.
Q. Yes. You could hear them shouting things, kind of insulting things, right?
A. Yes.
Q. You could hear them shouting things such as "Hope your phone is charged," those sorts of things, right?
A. I didn't specifically recall what people said exactly.
Q. Okay. Things such as "Fuck you, you should kill yourself"?

A. Again, I didn't specifically recall.
Q. Okay. What did you specifically recall?
A. I don't specifically recall. It was almost a year ago.
Q. Okay.
A. Watching the videos, we've heard things to that effect, yes.
Q. And you could tell that kind of behind this gated area there was some high ground up there too, right?
A. Yes.
Q. And you could see that there was at least a few people on that high ground area, right?
A. Yes.
Q. Okay. And you also knew that there were some individuals that were in that more public parking lot area, right?
A. I didn't know specifically because I couldn't see them.
Q. Okay. So a small number of federal agents in this area being screamed at, with high ground -- they're the low ground, there are people in the high ground, and the gate is blocked, right?
A. Yes.
Q. So you talked about situational awareness. This is a really concerning situation, right?
A. If I were in combat, yes.
Q. Yeah. If you, based on your training and experience, were in this type of situation, that would be intimidating, right?

A. In a combat situation, yes.
Q. In any situation, Mavalwalla, this would be intimidating, right?
MS. GEORGE: Objection.
MR. AHMED: Objection.
THE COURT: That is overbroad, Ms. Perez. He did answer with what his experience was in combat.
MS. PEREZ: I'm sorry?
THE COURT: It's either overbroad, "any situation," or it is speculative.
Q. (BY MS. PEREZ) Okay. This situation. This situation is intimidating, right?
MS. GEORGE: Objection.
MR. AHMED: Objection, Judge.
THE COURT: And I should have also clarified he can testify as to his intent. As to the legal characterization of it, though, that is argumentative.
Q. (BY MS. PEREZ) So your intent, based on what was going on, based on what was said, based on the positioning, was to intimidate, right?
A. My intent was to prevent the vehicles from leaving.
Q. And that was done through intimidating them, right?
A. I did not intend to act intimidating towards anybody.
Q. But you were being intimidating.
MR. AHMED: Objection, your Honor. Asked and

answered, argumentative.

THE COURT: My answer is the same. You can move on, Ms. Perez.

Q. (BY MS. PEREZ) So that south gate was 5:30ish, give or take a few minutes, right?

A. Yes.

Q. Okay. So -- and then over the next little while, what were you doing?

A. Wandering around.

Q. Okay. Wandering around doing what?

A. Wandering around.

Q. Okay. You at one point walked up by the white bus area, right?

A. I got a popsicle from somebody near there, yes.

Q. Okay. So you were by the white bus area, right?

A. Briefly, yes.

Q. Okay. You kind of sat down by that front entrance, right?

A. Yes.

Q. Okay. And did you see Justice Forral letting the air out of the tires then?

A. I didn't see anybody letting air out of tires.

Q. Okay. You saw the red car there in front of the white bus, right?

A. I guess, but I don't specifically recall.

Q. Okay. So you were at the white bus area. And then you

were also -- you know, in your wandering around, you saw the gates being barricaded, right?
A. Yes.
Q. Okay. You saw Justice Forral doing some of that, right?
A. I didn't know who was blocking the gate.
Q. Okay. You saw the person that you now know to be Justice Forral doing some of that, right?
A. I did see that, yes.
Q. You saw that happening from -- you saw multiple people doing that, right?
A. Yes, I saw several people doing that.
Q. Yeah. Working together, right?
MS. GEORGE: Objection.
THE COURT: Overruled.
MS. GEORGE: Calls for speculation.
THE COURT: He can testify as to what he saw.
THE WITNESS: I saw multiple people doing similar things.
Q. (BY MS. PEREZ) Okay. So multiple people working together, right? That was the question.
MS. GEORGE: Objection.
THE COURT: We're just -- we're getting stuck on terminology. You can answer the -- go ahead and answer the question. Did you see multiple people working together I believe was the question.

THE WITNESS: I saw multiple people doing similar things, yes.

Q. (BY MS. PEREZ) Okay. And that included carrying benches together, right?

A. I don't specifically recall, but I think we saw that in the video.

Q. Okay. You crossed paths with Archer, too, right?

A. Yes. I crossed paths with many people throughout the evening.

Q. And by this point, you kind of recognized Archer, right?

A. As somebody that I had seen in the crowd.

Q. Yeah. As someone that had told you to link arms, right?

A. I didn't know who said that.

Q. At some point, then, in this kind of 5:30 to 6:30 approximate time, you had a backpack. You got a backpack, right?

A. Yes. I went back to my truck.

Q. And do you keep that backpack in your truck?

A. It happened to have been in there from an event that I took my son to.

Q. Okay. And that backpack had big thick like welding-type gloves, right?

A. I grabbed some gloves that I use for work, yes.

Q. And a gas mask?

A. Not a gas mask. It's a respirator, and we use it in

construction regularly.
Q. Okay. Jacket, right, also in the backpack?
A. It was a sweater, yes, a zipping sweater.
Q. And a bunch of COVID masks, right? Like kind of blue paper masks, right?
A. I don't recall that, no.
Q. Okay. You were passing those masks out to people at the red van, right?
A. I don't recall that. I gave water to people at the van, and I gave my partner the respirator.
Q. Okay. You don't remember pass -- like handing blue kind of COVID-type masks to people?
A. No. I remember handing water to people.
Q. Okay. You went back to your truck to get that backpack, why?
A. Because I suspected that we were going to be shot at.
Q. Why?
A. Why did I suspect that we were going to be shot at?
Q. Mm-hmm. Yeah.
A. Because of the response from law enforcement.
Q. So you're just -- so in that 5:30 to 6:30, you're just wandering around, and you feel like some shooting is coming; is that what you're saying?
A. I'm saying that based on the reaction from the agents and from the police arrival that I suspected the crowd was not going

to move and that there would be munitions deployed.
Q. Hang on. So you brought this backpack before local law enforcement arrived?
A. I don't recall when I got the backpack.
Q. Okay. Well, you had it at the point at which you're eating a popsicle and sitting on the ground at the white van -- or white bus, right?
A. I don't specifically recall.
Q. So again --
A. If -- the video shows that, but I don't specifically recall.
Q. Okay. So you -- let's be clear, Mavalwalla, you walked -- after the south gate, you wandered around, walked back to your truck, got the backpack, and then just kind of were milling around; is that right?
A. More or less, yes.
Q. Okay. And that was before local law enforcement arrived?
A. Again, I don't specifically recall what time I got the backpack and whether or not law enforcement was there at the time.
Q. It was well before any deployment of munitions, right?
A. Yes.
Q. Well, before any, like, formal dispersal orders, right?
A. I don't remember exactly what time.
Q. Okay. So you're just milling around thinking you're going

to be shot at?
A. Yes but no. In the sense that I suspected, based on the response from the agents and the arrival of law enforcement, that there would be chemical munitions that would be deployed, and I wanted to ensure that I was -- I was going to be there, and I wanted to make sure that I was protected.
Q. So when you say the response of law enforcement, you mean the response at the red van area; is that right?
A. That's when law enforcement arrived, yes.
Q. Okay. So you weren't talking about the south gate law enforcement, right?
A. Well, the agents were very assaultive.
Q. Okay. So you think since because they pushed you, because there was some pushing, that an hour or so later, they're going to shoot you?
A. I knew that the crowd was likely to not disperse.
Q. Right. You saw this crowd, right? You were in it, right?
A. Yes.
Q. This was not the type of crowd to back down, right?
A. I mean, that is the point of a protest, yes.
Q. Well, let's be clear, Mavalwalla. The point of a protest is to convey an idea, right?
A. Yes.
Q. The point of a protest is to express either pleasure or displeasure with something, right?

A. Generally displeasure, yes.
Q. Yeah, sure. Generally displeasure. It's to express something. The point of this protest on June 11th was to block the gates, right?
A. The point of this protest was to protest the detention of asylum seekers.
Q. The point of this protest, as stated by you, as stated by the Facebook posts, as stated by your conduct, as indicated by your conduct, was to block the exits, right?
A. It was to prevent the transfer of the detainees.
Q. Sure. Through blocking the exits, right?
A. Through blocking vehicles.
Q. Well, but also exits, right?
A. There were exits that were not blocked.
Q. So -- but when some -- when some action was seen, when there was some movement, there were people stationed such that the crowd could respond within seconds, right?
A. The crowd was able to respond to an evolving situation, yes.
Q. This crowd was so coordinated you didn't need an individual person at each door, right?
A. I would not say that we were coordinated.
Q. This crowd was so united in purpose that you didn't need an individual at each door, right?
A. I believe that we were all there for roughly the same

purpose, yes.
Q. Okay. Red van area. You had been milling around, but then you saw, hey, this is where the action is, right? This is where stuff is happening, right?
A. Yes.
Q. So that's where you went, right?
A. That's where I ended up.
Q. It's where you went, right?
A. I was part of the crowd, yes.
Q. That wasn't meant to be a difficult question. It's just if -- you went to that south area by the red van, right?
A. That's where I ended up, yes.
Q. Okay. And, again, you linked arms, right?
A. Occasionally, yes.
Q. Let's look at just one of those. Exhibit 56.
Red shirt guy. Do you see him?
A. I do.
Q. Okay. And you now know that person's name is Caleb Hutchins, right?
A. I do.
Q. And you said you met him here at this protest?
A. He happened to be standing next to me in the crowd.
Q. Okay. Did you know him before?
A. No.
Q. Okay. So you met him at the protest?

A. Yes.
Q. Okay. So -- and then this person next to you, you said that was your --
A. That's my partner.
Q. It's your partner.
A. Caitlin, yes.
Q. Okay. So you, partner, and Caleb Hutchins. And then you link arms, right, with Caleb Hutchins?
A. Yes.
Q. Okay. And you kind of held that position for a little bit, right?
A. Yes.
Q. And you could see that there was law enforcement, I mean, really just a few feet in front of you, right?
A. Yes.
Q. So the purpose of linking arms was, again, to be stronger together, right?
A. Yes.
Q. Okay. Make it so that they wouldn't be able to move you, right?
A. To make it more difficult to move, yes.
Q. Sure. To make it more difficult to move you.
So -- and you can see kind of -- so this is the south skirmish line. We've talked about that in trial. This is the south line at least at this point, right?

A. Yes.
Q. And then you can see that up further north, a little closer to the red van, there's another line, right?
A. Yes.
Q. And you can see -- can you see Justice Forral there?
A. I saw many people.
Q. Did you see Justice Forral there?
A. I don't specifically recall.
Q. At the north skirmish line.
MS. GEORGE: So not Exhibit 56?
MS. PEREZ: No.
THE COURT: I think that there's confusion on you can see -- you can see in the video versus you could see.
Q. (BY MS. PEREZ) Could you see Justice Forral on the north skirmish line next to the red van?
A. At times, I saw the person that I now know to be Justice Forral.
Q. Okay. And you could see that Justice Forral was amping the crowd up, right?
MS. GEORGE: Objection.
THE COURT: Overruled.
THE WITNESS: I wouldn't characterize it that way.
Q. (BY MS. PEREZ) Okay. You could see that Justice Forral was yelling, right?
A. There were lots of people yelling, yes.

Q. Okay. Justice Forral was encouraging, right?

MS. GEORGE: Objection, speculation.

THE COURT: It's an unclear question. Could you be more precise with your question, Ms. Perez?

Q. (BY MS. PEREZ) You could see that Justice Forral was walking around, going from person to person, pointing, directing, encouraging, right?

A. I didn't specifically watch any one person.

Q. Justice Forral. You said you recognized Justice Forral on that north skirmish line.

A. At times, yes.

Q. At times. Okay. Tell me about one of those times.

A. I don't specifically recall.

Q. So Justice Forral was such a person that stood out to you in the midst of an already chaotic scene, but you don't remember what happened.

A. There were lots of people and I try to be observant. So yes, many times I saw people that I recognized. Justice Forral happened to be one of them.

Q. What did you recognize him doing -- them doing?

A. Nothing specifically.

Q. He -- they were right up front next to officers, right?

A. Yes. There were a lot of people that were right in front of officers.

Q. You saw Justice Forral directing the people around the red

van, right?

MS. GEORGE: Objection, asked and answered.

THE COURT: Overruled. You can answer the question if you saw something.

THE WITNESS: Again, I didn't see anything specific.

Q. (BY MS. PEREZ) Okay. So going back to Caleb Hutchins with the red shirt, Exhibit 53. Again, I've muted the sound. We don't need that for this.

So after your arms were linked with Caleb Hutchins, red shirt guy, you used that combined force, like you said, and were pushing back on officers, right?

A. I did not use --

MR. AHMED: Objection, your Honor, irrelevant. These are local SPD officers.

THE COURT: Overruled. You can answer the question.

THE WITNESS: I did not use the word "force."

Q. (BY MS. PEREZ) Did you use force?

A. No.

Q. Did you push?

A. I resisted.

Q. Did you push?

MS. GEORGE: Asked and answered.

THE COURT: He's not answered. It's a yes-or-no question.

THE WITNESS: I pushed against the person in front of

me, yes.
Q. (BY MS. PEREZ) Okay. So you pushed, right?
A. Yes.
Q. Okay. So you pushed officers, and you were doing so with the help of Caleb Hutchins, right?
A. There were lots of people.
Q. But with -- it was at least Caleb Hutchins, right?
A. Okay.
Q. Well, okay? Is that a "yes"?
A. Yes.
Q. Okay. So you do this with the help of Caleb Hutchins and as well as your partner, right?
A. It appears that way, yes.
Q. Well, not just appears that way. That's what happened. Right, Mavalwalla?
A. From what I see in the video, yes.
Q. But from what happened in the ground when you were there doing it, right?
A. There were lots of people that were doing lots of things.
Q. Mavalwalla, you pushed with the help of Caleb Hutchins as well as your partner, right?
MS. GEORGE: Asked and answered.
THE COURT: Overruled. You can answer the question, and then we can move on. Answer the question.
THE WITNESS: I helped stand my ground with other

people, yes.

Q. (BY MS. PEREZ) Yes. Okay.

MS. PEREZ: Do we need to pause for a second?

Q. (BY MS. PEREZ) And so then after this -- after this --

MS. PEREZ: I'm just going to pause if that's okay.

THE COURT: Okay. All right. We're trying to get the -- it doesn't interfere with the proceedings, but I understand it's distracting.

Q. (BY MS. PEREZ) I'm going to go to Exhibit 57.

So at this point, Mavalwalla, now is when -- and again muted, so I'm just going to play it here. Now is when you've decided to take the stuff out of the backpack and gear up, right?

A. Yes, based on what I saw law enforcement doing.

Q. What was that you saw them doing?

A. Putting on gas masks.

Q. Okay.

A. Taking smoke canisters.

Q. You saw them getting smoke canisters at this point?

A. Handing out pepper spray and canisters. They were distributing gear.

Q. Okay. Well, they had the gear on them. They weren't distributing anything.

MS. GEORGE: Objection. Counsel is testifying.

MS. PEREZ: I'm asking the question.

THE COURT: Why don't you rephrase it so that it's a question.
Q. (BY MS. PEREZ) Isn't it true that these officers came equipped with their own stuff? They weren't just like handing out smoke canisters, right?
A. Some officers came with their own gear, yes.
Q. Okay. But you didn't see anyone handing out smoke canisters to each other?
A. I did see officers transferring items between each other, yes.
Q. Okay. What you saw was them putting gas masks on, like you said, right?
A. Yes.
Q. And that allowed -- and that kind of informed you, hey, you needed to gear up now, too, right?
A. Yes, to protect myself.
Q. Okay. And so you give your partner the gas mask you had, right?
A. Yes.
Q. And then put on --
A. It's a respirator.
Q. Say that again?
A. It's a respirator. It's not a gas mask.
Q. Okay. A respirator that allows you to breathe clean air, despite whatever is outside, right?

A. Yes.
Q. Okay. And you put on the jacket, right? Sweatshirt?
A. Yes.
Q. And the big, thick gloves, right?
A. Yes.
Q. And you got an umbrella as well?
A. Yes.
Q. Now, the umbrella, why did you get that out?
A. Because it can be used as a shield.
Q. Okay. A shield. The jacket, why did you put that on?
A. To help protect against being hit by munitions.
Q. So also something that you feel like was going to protect you. The gloves. Gloves aren't just protection, right? They're so you can pick something up, right?
A. No.
Q. How is it anything else?
A. Because if you get hit in the hand with a less lethal round, it can break your hand.
Q. Well, a glove isn't going to -- like that's not like armor. That's not going to prevent something from hitting you, right?
A. I believe you used the term "welding gloves." Those are heavy duty.
Q. Well, you -- what type of gloves are these?
A. They're heavy-duty construction gloves --
Q. Yeah.

A. -- usually used for doing demolition.
Q. Okay. So you were afraid that a smoke canister was going to hit your hand; is that what you said?
A. Not necessarily a smoke canister.
Q. Something.
A. Yes.
Q. Those gloves, though, what they can do for you, they protect you if you want to pick something up, right?
A. They could, but I never picked anything up.
Q. But you wanted to, right?
A. No, I did not.
Q. So at some point -- this is kind of the south line, but at some point, this backs up further and moves across the entirety of Washington Street, right?
A. Yes.
Q. Okay. And this has been going on for hours at this point, right?
A. Yes.
Q. So let's -- Exhibit 64.
Okay. And you recognize this, right? You're there, you are taking pictures or video or something, right?
A. Yes.
Q. And we've seen this exhibit before, so smoke is going to come a few seconds into this, right?
A. Yes.

Q. Okay. Let's -- I'm going to put the sound back on and just play a few seconds of this.
(Playing Exhibit 64.)
Q. (BY MS. PEREZ) Mavalwalla, you are right at the front of the line, right?
A. I'm not in the very front of the line.
Q. You're just feet from officers, right?
A. You can't really tell from this video.
Q. This is a body cam of an officer, as has been testified, right? You've seen that.
A. Yes.
Q. And there's a whole line of officers going across the street, right?
A. From what I recall, yes.
Q. And you're standing just feet from them, right?
A. Yes.
Q. Most of the crowd is behind you, right?
A. Yes.
Q. Almost all of it.
A. Most of the crowd is behind me, yes.
(Playing Exhibit 64.)
Q. (BY MS. PEREZ) At this point, you're putting the gloves back on, right?
A. I took the glove off so that I could take pictures, and then I put it back on, yes.

Q. Put the gloves on. And did you have head covering that day?
A. No.
Q. Okay. So you felt like your hands were the thing that needed protection, but you didn't bring a helmet, hood, anything like that; is that right?
A. The sweater has a hood.
Q. You didn't put it up, though, right?
A. No.
Q. Okay. Let's keep going forward in this exhibit.
(Playing Exhibit 64.)
Q. (BY MS. PEREZ) What are you doing? You're looking around. You see the smoke, right?
A. Yes.
Q. You're looking around, right?
A. Yes.
Q. Looking at the ground, right?
A. Yes.
Q. You're looking for something to pick up, right?
A. No.
Q. You are prepared with those thick gloves to be a part of what people around you are doing, right?
A. No.
(Playing Exhibit 64.)
Q. (BY MS. PEREZ) Okay. Have you been sprayed with OC spray,

like pepper spray?
A. The officer was aiming at somebody else, but yes, some of it got on me.
Q. Okay. And that doesn't deter you much, does it?
A. No, it does not.
Q. Okay. Your response to getting at least peripherally sprayed with pepper spray was a middle finger at the officers, right?
A. Yes. It upset me.
Q. It upset you that someone else was sprayed?
A. It upset me that I got sprayed.
Q. Okay. And so rather than move further back, you move closer to officers, right?
A. I did not move closer to the officers.
Q. And rather than move back, you tell them, with the middle finger up, "Come on, fucking do it." Right?
A. Yes. There was an officer that had less-lethal munitions pointed at me.
Q. Okay. And so now you are being presented with the thing that you were previously concerned about?
A. Yes.
Q. And your response is "Come on, fucking do it"?
A. Yes.
Q. Let's keep watching. I'm going to back up just a few seconds, and then I'm going to move forward again.

(Playing Exhibit 64.)

Q. (BY MS. PEREZ) Did you hear yourself there? That's what you said, right?

A. Yes.

Q. And not only are you saying that, you're kind of holding your arms out. Aggressive posture, right?

A. I'm yelling and gesticulating, yes.

Q. Gesticulating with your arms out in an aggressive posture, right?

A. I was upset.

Q. This is an aggressive posture, right?

A. I would characterize it as angry.

Q. This is angry. Okay. But you can go home and be angry, right?

A. Yes.

Q. Okay. But you wanted to be right there, moving toward officers with your arms out saying, middle finger, "Come on, fucking do it," right?

A. I was backing away from the officers.

Q. You were backing away from the officers because your partner was pulling you, right?

A. No, she was not.

(Playing Exhibit 64.)

Q. (BY MS. PEREZ) Okay. You are backing away as slowly pretty much as you can, right?

A. I was backing away from the officers, yes.
Q. As slowly as the circumstances would permit, right?
A. I was backing away at the same rate that they were advancing.
Q. Okay. Exactly. Much of the crowd ran away, right?
A. Yes.
Q. And you are moving back.
A. Yes.
Q. Toward the -- you are as close to the officers as you can be, right?
A. No.
Q. You're at the front of this line from the crowd, right?
A. I'm at the front of part of it.
Q. Yeah. At the front of what we see here, right?
A. There are other people closer to the officers in this video right now.
Q. Okay. I'm going to go to Exhibit 65. And I'll fast-forward just a little bit, so somewhat of a different perspective.
(Playing Exhibit 65.)
Q. (BY MS. PEREZ) So you really aggressed toward officers there, right?
A. I shouted at them and took a step forward, yes.
Q. You shouted at them, took a step forward. But it wasn't just, hey, officers, step forward, right? Of course not. This

was an aggressive step forward, right?
A. You could characterize it that way.
Q. And your arms are kind of coming up and you're slamming them down a little bit, right? You're kind of motioning in that way, right?
A. Yes.
Q. And this is as you're yelling, as you've been saying "Come on, fucking do it," right?
A. Yes.
Q. Okay.
(Playing Exhibit 65.)
Q. (BY MS. PEREZ) And then you spit toward them too, right?
A. Yes. I had pepper spray in my mouth.
(Playing Exhibit 65.)
Q. (BY MS. PEREZ) And then you spin across the crowd, right?
A. Yes.
Q. Twirling with your arms out, the closest person to the officers in the street, right?
A. There are other people closer to the officers in this video right now.
Q. There are very few, right?
A. Yes.
Q. Okay. So you're just about the closest to the officers, right?
A. I'm one of the closest people, yes.

Q. And so you've taken that aggressive step toward them, you've motioned in the way we've described. Now you're kind of slowly walking across, spinning. That was intended to be intimidating to the officers, right? Right?
A. No.
Q. How could that be anything but?
A. Flying like an airplane?
Q. Yeah. Yeah.
A. I'm not sure how that can be construed as intimidating.
Q. So, Mavalwalla, let's break it down a little further. Officers had just, after multiple hours of trying to get you to leave, deployed smoke, right?
A. And chemical munitions, yes.
Q. And OC spray, right?
A. And PepperBalls.
Q. And PepperBall, sure. They've done all of these steps, right?
A. Yes.
Q. And you are taking an aggressive step forward, slamming your hands, saying, "Come on, fucking do it," and then twirling across the screen, right?
A. Yes.
Q. How could that be anything but intimidating, Mavalwalla?
A. Because I'm not wearing any body armor, I'm not carrying any weapons, I'm not advancing towards the officers.

Q. Well, you are advancing toward them.
A. I took one step.
MR. AHMED: Objection.
Q. (BY MS. PEREZ) You took one step toward them, and you've got hundreds of people behind you backing you up, right?
A. They were not backing me up.
Q. They were there for the same purpose you were, right?
A. There were lots of people there that had the same general purpose, yes.
Q. Yeah. Exactly. You are hundreds strong in this video, right?
A. There looks to be several hundred people, yes.
Q. And you're in front twirling like an airplane in front of the officers who have been forced to use nonlethal munitions on you, right?
A. Yes.
Q. Exhibit 66. I'm going turn the sound off on this. Just play from the beginning.
(Playing Exhibit 66.)
Q. (BY MS. PEREZ) I'm going to actually fast-forward to about 1:13 or so in this exhibit.
See yourself walking slowly across the screen?
A. Yes.
Q. Followed by your partner, right?
A. Yes.

Q. And here, you truly are the closest to the officers, right?
A. It's hard to tell. There were a lot of people that were on the sidewalk and in the grass.
Q. Okay. So within the street, so where the officers are, you're the closest to the officers, right?
A. At this point in time, yes.
Q. Yes.
(Playing Exhibit 66.)
Q. (BY MS. PEREZ) What are you doing? You raise your hand to the crowd, the people behind you, right?
A. I'm facing them, but yes.
Q. Sure. Okay, yeah. So you turn and face the crowd and raise your arms, right?
A. Yes.
(Playing Exhibit 66.)
Q. (BY MS. PEREZ) And you slowly spin, turn toward officers, and then turn back, right?
A. Yes, to indicate we're still here.
Q. To indicate -- to intimidate, right?
A. No. To indicate to the officers that we are still here.
Q. We are still here and we're not moving.
A. We will be heard.
Q. Well, you've been heard, but this is to indicate we're not moving, right?
MS. GEORGE: Objection. Asked and answered.

MR. ORESKOVICH: Join.

THE COURT: You can ask him if his intent was to express we're not moving.

Q. (BY MS. PEREZ) Wasn't your intent to express we're not moving?

A. Yes.

Q. There was another point at which you had that umbrella, and you're kind of like fencing with officers, right?

A. Briefly, yes.

Q. Yeah. So a little silly, sure. Right?

A. Yes.

Q. But, again, in the context meant to express we're not moving, right?

A. Yes.

Q. And so this is -- as we've talked about, this is about 8:11 p.m. or so. The first smoke deployment, right? And many members of the crowd leave after that, right, or back up?

A. Yes.

Q. You don't.

A. Correct.

Q. You are one of those who is not leaving, right?

A. Yes.

Q. And you're showing up there to prove it, that you are not going to move, right?

A. Yes.

Q. I'm going to show you Exhibit 73A.

Okay. And we've watched this already. It's just a few seconds long. And so you're there in the crowd again, right, with your umbrella, right?

A. Yes.

Q. And when those smoke canisters are being thrown toward you guys, the crowd, you back up a little but not really very much, right?

A. Yes.

(Playing Exhibit 73A.)

Q. (BY MS. PEREZ) And you kick the smoke canister, right?

A. Yes, with my left foot.

Q. Mm-hmm. Kicked it with your left foot back toward officers, right?

A. Away from myself and other protesters.

Q. Okay. Well, most of the protesters are gone or moved away, right?

A. Protesters are moving away, yes.

Q. Yeah. But not you, right?

A. No.

Q. So if you didn't want that smoke canister near you, you just had to kind of follow the crowd, right?

A. There were also smoke canisters behind me.

Q. Not -- not really very many. They're mostly in front of you, right?

A. I believe other people had returned the munitions as well.
Q. Okay. Yeah, so people are either leaving or returning munitions is basically what's happening here, right?
A. There are lots of people that didn't leave.
Q. And by leaving, I meant just moving further south. Just kind of getting out of the way, right?
A. Yes.
Q. So that's what's going on. They're either getting out of the way or returning munitions, right?
A. If you want to simplify it to that, yes.
Q. That's what's happening, right?
A. There were also people standing on that street corner who did not move away.
Q. Okay. Yes. There were people standing like outside of the street, right?
A. Yes.
Q. Yeah. Lots of people over on the sides and the peripherals. And they're out of the way, right?
A. Out of the way from what?
Q. From traffic, from the police, everything, right?
A. I still see lots of people in the street right now.
Q. Okay. So you testified on direct -- well, you were kicking that back toward officers so that their situational awareness is impeded, right?
A. No.

Q. That -- you're aware that the smoke makes it so people can't see, right?

A. Yes.

Q. And so you're getting that back toward them to impede what they're doing, right?

A. No. I was moving it away from myself and other protesters.

Q. So didn't you -- and you talked about this a little bit with Mr. Ahmed. So you had some Reddit posts following this day, right?

A. Yes.

Q. And didn't you tell someone on Reddit, with respect to moving munitions, that you were returning that smoking, burning garbage that the police were throwing at us?

A. I did not say that.

Q. You didn't say that?

A. I did not say that I returned burning, smoking munitions.

Q. You typed -- and this is your quote -- in response to talking about smoke canisters being thrown and calling those smoke canisters fireworks, you said, quote: "No. Returning the smoking, burning garbage that the police were throwing at us."

A. I can't see the quote.

Q. Did you say that?

A. I can't see the quote.

Q. But did you say that?

A. I don't recall specifically. If you'd like to put the

quote up, then I can testify easier.
Q. Do you recall saying something like that?
A. Something to the effect that the crowd had returned munitions, yes.
Q. And so you brought up again situational awareness. That was your phrase. Sending smoke back toward officers impedes their ability do their job, right?
MS. GEORGE: Objection.
THE COURT: Overruled.
THE WITNESS: Yes, it could.
Q. (BY MS. PEREZ) And despite that, you did it, right?
A. I moved smoking, burning items away from myself and other protesters, yes.
Q. Well, also, Mavalwalla, to be clear, you specifically referenced these people on the side, right?
A. Yes.
Q. And that's kind of where this canister was kicked like that, right?
A. I kicked it with my off foot.
Q. Sure. It wasn't -- it wasn't accurate. It was an oblong object being kicked with your off foot. I get that. But really, there's protesters all around here, right?
A. Yes. I can see people all around.
Q. Okay. So is what I've drawn in the street, kind of that U that goes, I mean, to the crowd, then to the east and to the

west; is that right?
A. Yes.
Q. Okay. And so when you kicked that canister -- back up. Really the only place that people aren't is like right here in the middle where you are, right?
A. Right where munitions were deployed, yes.
Q. Right, exactly. Except you chose to stay there.
A. Yes.
Q. So if you wanted to avoid that smoke coming at you, you could have just moved to anywhere else on this screen, right?
A. Yes.
Q. Now, you indicated that you -- hang on just one second.
And at some point you were -- you were actually shot with a less lethal something, right?
A. Yes.
Q. And that was kind of around this time that we just watched in that drone -- around second -- second deployment of smoke, right?
A. Yes.
Q. And so very end of the day, right?
A. No, not the end of the day.
Q. Very end of your time at this event, right?
A. Relatively close to it, yes.
Q. Yeah, relatively close to it. Okay. And wasn't that what you meant when you said, "Come on, fucking do it" to officers?

A. No.
Q. You weren't encouraging them to shoot you?
A. I mean, no, nobody wants to get shot.
Q. Absolutely not. Right? That had to hurt, right?
A. Yes, it did.
Q. Yet despite that, despite you being aware of what was going on, of what officers had in their hands, you stayed there and engaged in this conduct that we've just watched, right?
A. Yes.
Q. You talked about Keep Washington Working. Right?
A. Yes.
Q. That particular law. And you said your impression of it, which is that -- I guess your impression, the idea is that local law enforcement cannot assist with deportation or immigration offenses, right?
A. Correct.
Q. So to be clear, that's not why local law enforcement showed up that day, right?
A. I don't know why law enforcement showed up.
Q. They showed up to deal --
MS. GEORGE: Objection.
THE COURT: Ask your question. I'm concerned that this might call for him speculating about why other people did things.
Q. (BY MS. PEREZ) Didn't they show up to deal with you,

Mavalwalla?
A. I have no idea why the officers showed up.
Q. You have no idea why the officers showed up that day?
MS. GEORGE: Objection as to the attitude and argument.
MS. PEREZ: Your Honor --
THE COURT: I'm not going to sustain an objection based on attitude. I think he's answered the question. If you want to ask it more precisely, but I think he -- you're also asking him to speculate as to why other people did certain things, and so I generally don't allow those questions.
Q. (BY MS. PEREZ) Mavalwalla, based on what was going on that day, so based on the time that you had been there, based on the blocking of the gates, based on the refusal to comply with commands, based on what you were seeing and hearing and doing, aren't you aware that local law enforcement showed up to deal with you and the crowd?
A. I believe that law enforcement showed up to break up the protest.
Q. Exactly. Exactly. They showed up to deal with you and the crowd, right?
A. The crowd. Not me specifically.
Q. What you were doing in concert with the crowd, right?
A. The crowd in general.
MS. PEREZ: No further questions.

MR. AHMED: Judge, can we have a sidebar real quick?

THE COURT: Okay.

(The following proceedings were had at the bench by Court and counsel, out of the hearing of the jury:)

THE COURT: Speak into the microphone and quietly. That's your microphone.

MR. AHMED: Judge, before I start my redirect, counsel asked a question about returning munitions in terms of texts or posts that he had. I've gone through all of his texts and posts, and I don't see anything like that.

THE COURT: Can you share what you were relying on, Ms. Perez? Were you relying on an exhibit?

MS. PEREZ: No. Special Agent Burns' report.

MR. AHMED: This is a problem, Judge. Has to have a good-faith belief that he sent a text like that. I've gone through all his texts, and I don't see it, or for a post like that.

THE COURT: I want you to review whether any statement has been shared to the Defendant of the defendant's statement. Was this a report that was shared?

MS. PEREZ: And it was in his phone.

MR. AHMED: It's not in his phone. I've gone through his phone.

THE COURT: I will deal with that with a special instruction to the jury. I don't think you need to ask him

about it. He's answered that. If there was something that was not disclosed, I can also instruct the jury that this is not in evidence.

MR. AHMED: I want to go through all his texts, Judge.

THE COURT: We're not going to do that now. If you need to recall him, you can recall it. But he's testified as to his memory. Sounds to me like you're talking about a discovery violation or misrepresentation about something. And I can deal with that with an instruction to the jury if that's what happened.

MR. AHMED: Judge, he has a Cellebrite report that he's looked at already. It's very short. I can display it on the computer just to him so he only sees it on the screen and don't go into what the exhibit -- like what it contains, but do you see anything in your texts with Mr. Hutchins which says throwing back munitions because --

MS. PEREZ: It was Reddit posts.

MR. AHMED: Okay. We have his Reddit posts too.

THE COURT: I recall saying something to that effect. So let's deal with this not now. We can deal with this after we have a chance to look at it further. But if they represent something and it's not in evidence, I don't see how that hurts.

MS. PEREZ: I don't intend putting it into --

THE COURT: I'm not making that finding. I'm not -- assuming right now that you're not making that accusation.

Sounds to me like it was in a report, and that's what you're dealing with. If there's a need for me to take an instruction later on, I will do that. I do not take lightly an insinuation of misconduct. I don't think there was misconduct based on anything I heard. If there was something that's something legally to address with me, then we'll address it at a break. Why don't -- your client has answered the question. Okay.

MR. AHMED: Okay.

(The following proceeded back in front of the jury:)

THE COURT: Okay. Redirect examination, Mr. Ahmed.

MR. AHMED: Thank you, Judge.

REDIRECT EXAMINATION

BY MR. AHMED:

Q. Mr. Mavalwalla, I have just a few questions for you.

MR. AHMED: Can we please see Exhibit 19, please? Government's Exhibit 19. Go ahead and play it.

(Playing Exhibit 19.)

MR. AHMED: If you could stop it right there.

Q. (BY MR. AHMED) Mr. Mavalwalla -- Mavalwalla, excuse me. Do you see a gentleman in that with a bullhorn?

A. I do.

MR. AHMED: Okay. Please play.

(Playing Exhibit 19.)

MR. AHMED: Can you stop there? Go back three, four seconds.

Q. (BY MR. AHMED) I want to call your attention to another gentleman approaching the gate. Do you see that?

MR. AHMED: If you can go back another couple seconds and we're looking right there. If you can play that.

Q. (BY MR. AHMED) Do you see someone approaching the fence area with a blue shirt on?

A. I'm not sure.

THE COURT: Mr. Ahmed, are you referring to the person in the hat?

MR. AHMED: No. If I could circle it. Hold on a second. I'm looking in this area here. Okay? Now if we could go back, you'll see somebody come towards that area. Go back about five, ten seconds.

Q. (BY MR. AHMED) Do you see a gentleman right there?

A. I do, yes.

Q. Okay. All right.

MR. AHMED: If you could keep playing it.

(Playing Exhibit 19.)

Q. (BY MR. AHMED) Do you see several people approaching the fence area at this point?

A. Yes.

Q. And none of those people are you, correct?

A. Correct.

Q. And we see you --

MR. AHMED: Stop right there. Stop. Okay.

Q. (BY MR. AHMED) We see you running, correct?
A. Yes.
Q. To the left of you, are there several other individuals running with you?
A. Yes.
Q. Have you turned around and barked any orders at this point or anything like that?
A. No.
Q. Okay.
MR. AHMED: Keep playing it. It's Exhibit 19.
(Playing Exhibit 19.)
Q. (BY MR. AHMED) And in terms of your intent to run to the south gate, you testified on cross that you were trying to prevent them from leaving with the detainees; is that correct?
A. The vehicles from leaving. I didn't know if there were detainees or not.
Q. Okay. Do you see several people running at this point?
A. I see upwards of a dozen people running, yes.
Q. Okay.
MR. AHMED: If we could shift to Exhibit 22. Government's Exhibit 22.
(Playing Exhibit 22.)
Q. (BY MR. AHMED) Do you see yourself in that black shirt right there, blue jeans?
A. Yes.

(Playing Exhibit 22.)

Q. (BY MR. AHMED) Do you see several people at this point going towards the gate?

A. Yes.

(Playing Exhibit 22.)

MR. AHMED: Okay. Stop right there.

Q. (BY MR. AHMED) Do you see several people running towards the south gate?

A. Yes, I do.

Q. And at this point -- I mean at any point, did you turn around and bark orders to anybody?

A. No.

Q. Okay.

MR. AHMED: Keep going, please.

(Playing Exhibit 22.)

Q. (BY MR. AHMED) And we see you standing in front of the south gate, correct?

A. Correct.

Q. Okay.

MR. AHMED: And if you could stop it there.

Q. (BY MR. AHMED) Are you barking any orders to anybody to come follow you?

A. No, but I do believe that I had said something to the effect of back gate.

Q. Okay. And you also said that something to the effect of

"This is Washington, cops aren't going to help you" at this point, correct?
A. Something to that effect, yes.
Q. Counsel asked you a number of questions about whether officers were intimidated, correct?
A. Yes.
Q. Okay. And we've seen video -- and if I could transfer just a moment. I'm going to show you --
MR. AHMED: Just give me a second before you put it on.
I'm going to show you Exhibit 703, Defense Exhibit 703, which has been admitted. And if we could put that on for the jury.
(Playing Exhibit 793.)
Q. (BY MR. AHMED) I'm just going to stop there for a second. Does this occur after you made that statement?
A. Yes.
Q. Does it appear to you that the agents are intimidated?
MS. PEREZ: Objection. Leading, your Honor, and also speculation.
MR. AHMED: I'm asking for his opinion.
THE COURT: Well, again, he can talk about his intent, and he can talk about the way the officers acted, but he will need to describe with nonconclusory words and through nonleading questions.

MR. AHMED: Okay. Thank you, Judge.
Q. (BY MR. AHMED) Let me ask you, Mr. Mavalwalla: How are the agents acting right now?
A. Very aggressive.
Q. I'm going ask you about that back strike.
(Playing Exhibit 703.)
Q. (BY MR. AHMED) Do you get pushed at this point?
A. Yes.
(Playing Exhibit 703.)
Q. (BY MR. AHMED) I'll go back just a little bit.
(Playing Exhibit 703.)
Q. (BY MR. AHMED) Okay. Did you see that right there?
A. Yes.
Q. Did you attempt to do an elbow strike at that point?
A. No.
Q. Do you know how to do an elbow strike?
A. Yes.
MR. AHMED: If we could shift back to that computer, and if we could see Exhibit 64, please.
(Playing Exhibit 64.)
MR. AHMED: Just another 30 seconds. That would be great. Okay. Oh. Go back. I'm sorry. Go to 20 seconds. I apologize. Okay.
(Playing Exhibit 64.)
Q. (BY MR. AHMED) Are you advancing at officers?

A. No. I'm walking backwards.

MR. AHMED: If we could see -- is this 64 right here? Okay. Keep playing it, please?

(Playing Exhibit 64.)

Q. (BY MR. AHMED) Okay. And is the whole crowd moving backwards?

A. Some faster than others, yes.

Q. Okay. You were also asked about joining arms at the south gate. Do you recall that?

A. Yes.

Q. Okay. Did the -- when you joined arms, did you ever advance to the gate?

A. No.

Q. You were also asked about force, okay, in terms of -- I think it was in terms of Mr. Hutchins. When you were standing there with Mr. Hutchins, explain to the jury what you mean by force in terms of force being exerted on you and you maintaining your ground.

A. So to maintain your ground, you can plant your feet and use the ground as leverage to prevent yourself from being moved or at least to make it more difficult. And the more people that are together, the stronger you are.

Q. Okay. Did you ever use force to advance against the police?

A. No.

Q. Were you arrested that night?
A. No.
Q. To your knowledge, were many people arrested that night?
A. Yes.
Q. More than 30?
A. Yes.

MR. AHMED: Can I have a minute, Judge?

THE COURT: You may.

MR. AHMED: Thank you. No further questions.

THE COURT: Okay. Any recross?

MS. PEREZ: No, your Honor. Thank you.

THE COURT: Okay. You can step down, Mr. Mavalwalla.

THE WITNESS: Thank you, your Honor.

(End of excerpt.)

* * * * *

WITNESS INDEX


| For the Defense | Page |
|---|---|
| BAJUN MAVALWALLA II | |
| DIRECT EXAMINATION BY MR. AHMED | 3 |
| CROSS-EXAMINATION BY MS. PEREZ | 19 |
| REDIRECT EXAMINATION BY MR. AHMED | 97 |


* * * * *

EXHIBIT INDEX


| No. | Description | Page |
|---|---|---|
| None | | |

C E R T I F I C A T E

I, CRYSTAL L. GONZALEZ, do hereby certify:

That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Spokane, Washington;

That the foregoing proceedings were taken on the date and place as shown on the first page hereto; and

That the foregoing proceedings are a full, true, and accurate transcription of the requested proceedings, duly transcribed by me or under my direction.

I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings;

DATED this 22nd day of July, 2026.

CRYSTAL L. GONZALEZ, CRR, RPR
Washington CCR No. 2955
Official Court Reporter
Spokane, Washington