# Exhibit K.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:25-cr-00113-RLP |
| | ) | |
| Plaintiff, | ) | May 26, 2026 |
| | ) | Spokane, Washington |
| vs. | ) | |
| | ) | Excerpt of Jury Trial - Day 6 |
| JUSTICE FORRAL (2), | ) | **Testimony of Jac Dalitso** |
| BAJUN MAVALWALLA (8), | ) | **Archer** |
| and JAC ARCHER (9), | ) | |
| | ) | Pages 1 - 90 |
| Defendants. | ) | |

BEFORE THE HONORABLE REBECCA PENNELL
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | LISA C. CARTIER-GIROUX<br>REBECCA R. PEREZ<br>U.S. Attorney's Office<br>920 W. Riverside Avenue<br>Suite 340<br>P.O. Box 1494<br>Spokane, WA 99201 |
| For Defendant Forral: | ANDREA K. GEORGE<br>AMY H. RUBIN<br>Federal Defenders of Eastern Washington & Idaho<br>601 W. Riverside Avenue<br>Suite 900<br>Spokane, WA 99201 |
| For Defendant Mavalwalla: | AINUDDIN AHMED<br>Ahmed Law Firm<br>550 Congressional Boulevard<br>Suite 350<br>Carmel, IN 46032 |
| | MATTHEW F. DUGGAN<br>Duggan Law Offices PLLC<br>23505 East Appleway Avenue<br>Suite 200-175<br>Greenacres, WA 99019 |

For Defendant Archer: CARL JOSEPH ORESKOVICH
ANDREW M. WAGLEY
Etter McMahon Lamberson Van Wert & Oreskovich PC
618 West Riverside Avenue
Suite 210
Spokane, WA 99201

Official Court Reporter: Crystal L. Gonzalez, CRR, RPR
United States District Courthouse
P.O. Box 700
Spokane, Washington 99210
(509) 458-3434

Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.

(Whereupon, previous proceedings were held which were not ordered and transcribed.)

(JAC DALITSO ARCHER, called as a witness by Defendant Archer, having first been duly sworn, testified under oath as follows:)

THE COURT: Please be seated.

DIRECT EXAMINATION

BY MR. ORESKOVICH:

Q. Please state your full name and spell your last name, please.

A. My name is Jac Dalitso Archer, and my last name is spelled A-R-C-H-E-R.

Q. How old are you, Jac?

A. 34.

Q. And I want to talk to you a bit about your background. Where were you born and raised?

A. I was born in -- it doesn't exist anymore, but in the Walla Walla General Hospital in Walla Walla, Washington, about three hours south of here.

Q. Did you go to high school in Walla Walla?

A. Yeah. Well, there's a couple schools. I went to Walla Walla Valley Academy. It's a Christian private school.

Q. All right. And then following graduation from high school, did you go to college?

A. Yes.

Q. Where did you go to college?
A. First I went to the Walla Walla University there in Walla Walla, but then I later transferred to Eastern Washington University, and that's where I earned my degree.
Q. When did you graduate from Eastern Washington?
A. Complicated. I completed my coursework in 2017. They didn't award me my diploma until 2023.
Q. Following graduation from Eastern Washington, did you have any further education?
A. Yes.
Q. What was that, please?
A. I just completed my law degree at Gonzaga University School of Law about two weeks ago.
Q. I want to talk to you a bit about your work experience. You have been involved with various community organizations; is that true?
A. It is.
Q. And can you tell us -- just summarize, if you would, slowly and speak into the microphone so we can hear, what that experience has been.
A. Let's see. So this isn't a complete history, but off the top of my head, I spent some time as an intern with Washington Community Action Network or WashingtonCAN. I have been a long-time volunteer for PJALS, that is the Peace and Justice Action League of Spokane, and was on their steering committee

for a minute before joining staff. I eventually left that job to do law school.

And then I -- what -- my sort of home work wise has been Spokane Community Against Racism. I was recruited to be on that steering committee and then eventually joined staff.

Q. And have you held a position, an employment position, with Spokane Community Against Racism?

A. Yes.

Q. What -- at the time of this particular incident on June 11, 2025, was your position?

A. At that time, I held the title co-executive director.

Q. And briefly just summarize what your duties were in that regard.

A. The easiest way to describe it is I focused on the policy advocacy of things. I focused on making sure that the vision of what SCAR is about was being fulfilled through our day-to-day work, our advocacy, our grassroots lobbying, and sometimes protest actions supporting other members in the community and all things that help combat racism.

Q. Have you had some training in participating in protests?

A. Quite a bit.

Q. Can you just summarize what that training has been, please?

A. I went through YALP, Young Activist Leadership Program, through PJALS. I've gone through some training with -- I guess most recently to -- let me see. Things before last summer.

Besides YALP, I got some training being involved with WashingtonCAN. I got some training through my involvement doing grassroots lobbying work, meaning, you know, ordinary people reaching out to government. And honestly, a lot of my training has come through a lot of firsthand experience and mentorship with people in this town and also who I respect.

Q. All right. And in addition to employment or volunteering in these various organizations, have you sat on any committees as a commissioner or a committee member?

A. Oh, yeah. Let's see. I was on the Spokane -- the City of Spokane Human Rights Commission. I did a term or two on that. I don't remember how many. I was on the City of --

Q. Let me stop you for a minute. What does the Human Rights Commission do, please?

A. Oh, it's a city commission that is intended to promote human rights here in Spokane.

Q. All right. Any other committees, then?

A. Yes. Let's see. I was on the Spokane 21st Century Workforce Task Force for a while. It's about essentially modernizing how the city handles a diverse workforce and making it a better -- an employee of choice for people of all identities.

I've been politically involved before. I have been on -- oh, Spectrum Center Spokane. I've served on that board for quite some time. It's an LGBT center, family and youth space

that provides services and community.

I was -- briefly had a committee position with the NAACP here in Spokane, but I don't remember the details of it now. It's been a while.

Q. On June 11th of 2025, were you working in the SCAR office?

A. Yes.

Q. Did you learn about, at some point, that there was the potential for some type of a protest activity at the ICE building on I think it's 411 Cataldo in Spokane?

A. Yeah. I --

Q. Let me ask you the question, please.

How was it that you learned?

A. I saw a screenshot of Ben Stuckart's post who -- it was posted in a group chat and I looked at it.

MR. ORESKOVICH: Could you pull up Exhibit 78, please? And could you just keep going through the pages until I tell you to stop?

Stop, please.

Q. (BY MR. ORESKOVICH) You had mentioned that you had seen a post. Is this --

MR. ORESKOVICH: Sorry. Does everyone have the ability to see this? Are we on screen? Thank you.

Q. (BY MR. ORESKOVICH) Is the post shown on the right-hand side of the screen?

A. Correct.

Q. And what was it that you understood that Mr. Stuckart was asking people to do?
A. Looking at it at face value, it sounded as though he was asking people to come to the ICE building in support of him protesting the detention and moving of Cesar -- I know it's his name now -- who he was the guardian of at the time, the asylee. And he said he'd sit in front of the bus and invited others to sit in front of the bus with him.
Q. And what did you understand that to be? Particularly the sitting in the front of the bus. What did you believe or understand that Mr. Stuckart was asking you and/or others to do?
A. I believed he was asking people to sit in front of the bus, the bus that would be taking the person in his care away. He was going to be in front of it and wasn't going to make it, I guess, easy. I don't know.
Q. Did you understand there was a purpose in that? Was that to prevent the bus from leaving?
A. I understood it as taking a stand.
Q. As doing what, sir? I didn't hear.
A. Taking a stand.
Q. All right. Did you repost this or ask permission to repost this as part of your job at SCAR?
A. I did.
Q. All right. And why was it that you did that?
A. I think there's a -- the time stamp says it was about 1:18.

I asked this -- well, I asked, "I want to repost on our page. Any objections?" to the group chat.

Q. Okay. Were you seeking permission to repost?

A. Yes. So this is the SCAR staff and steering committee group chat, and we make a lot of -- do a lot of consensus-based decision-making. So even though I was a co-executive director, I didn't feel comfortable just doing something on my own without consulting with the group. But we also have a lot of trust.

So I asked and I got one affirmative reply or someone saying they had no objections. And after not seeing any replies for quite some time, went ahead from there.

MR. ORESKOVICH: Can we look at the next page, please, of Exhibit 78?

Q. (BY MR. ORESKOVICH) Did you make various posts to various different groups?

A. Yes.

Q. All right. I don't want to spend a lot of detail on this. I just want you to explain to the ladies and gentlemen of the jury what these various groups are that you posted to and whether or not that was part of the routine of working at SCAR. So what is the comm and rumor control?

A. So communications and rumor control, that's what it stands for. It -- pretty much everyone in this group is some kind of social justice organizer movement worker of some kind. And this group is created essentially to help share primary sources of

information when big things are happening, avoid rumors spreading and make sure that we have direct references. So a lot of screenshots go in this group.

And I saw a post from a highly influential person that I thought was going to be a big deal, so the first thing I wanted to do was inform these people, these community leaders.

MR. ORESKOVICH: All right. Can we go to the next page, please?

Q. (BY MR. ORESKOVICH) Same group, is it not?

A. Yep. It is the same group.

Q. One more, please.

A. This is the Spokane Police Accountability Group. This was a working group, cross-organizational working group, that came together a few years ago to work on police accountability issues. And the group kept living after the initial wave of work I guess subsided, but anything having to do with law enforcement information of that variety almost always went into this group as well.

MR. ORESKOVICH: Next page, please.

THE WITNESS: BIPOC Advocate Support Group. So BIPOC stands for black indigenous people of color. So there are a lot of movement workers who, like myself, are black or indigenous or otherwise a person of color. And we wanted to have space where we could talk with each other about what we're experiencing, the work that we're doing, and frankly to be able to support each

other because this is very difficult work.

MR. ORESKOVICH: And next page, please. Let's go one more. One more, please. And again.

Q. (BY MR. ORESKOVICH) Without looking to this page -- I might have gotten the wrong one. At some point in time, when you were posting these various -- the Stuckart post to these various organizations, did you have some communication with your parents?

A. Yes.

Q. And was it as part of one of these posts?

A. I believe it's somewhere in there, yeah.

Q. All right. What was the purpose of having a communication with your parents?

A. I was responding to a message and was responding to a -- or I planned to respond to a call for potentially civil disobedience and wanted to keep my parents informed, because if they saw something on the news or I got arrested, I didn't want them to be worried about me.

Q. Okay. And Mr. Stuckart's post had said that he was going to sit in front of the bus and welcomed people to come join him. You referenced civil disobedience. Is that what you were referring to?

A. Yeah. Sitting in front of a bus under those circumstances could be arrestable, could be an act of civil disobedience and thus -- yeah, thus lead to arrest.

Q. All right. Ultimately, did you make some decision to go and attend this event that was occurring at Cataldo on this day?
A. I did.
Q. And what is it that you did, if anything, in preparation for your arrival?
A. So as an organizer and as an experienced -- I say relatively experienced protester --
Q. Can I ask you to do one thing, please?
A. Sorry.
Q. I would like you to speak into the microphone so we all can hear, and I want you to talk slow. All right?
A. Yes. As an organizer and a relatively experienced protester, I have certain protocols that I do anytime I think things have the potential to be intense, really, in any way, and civil disobedience qualifies in that regard.
So I went through my backpack. I brought my backpack to work that day. I took all of my electronics out of it, like my laptop, et cetera. I removed anything that I didn't want to be broken or damaged or confiscated potentially. I removed anything that could be construed as a weapon. I don't really carry weapons, but even anything that looks like a stick or that looks like a knife could be mistaken for one. And so I took anything like that out of my backpack.
It was a summer day, so I added a couple of water bottles. And I borrowed the office's battery pack because I anticipated

potentially doing a lot of filming, taking pictures on my phone, and so I wanted to make sure I had a battery pack so it didn't die on me.

Q. What time did you arrive at the Cataldo location?

A. I want to say right before 2:00, like 1:58 or 59.

Q. Describe for us what you did when you got there, please.

A. I parked across Washington, so I ran across the street. And I saw some people waving signs on the corner. And I kind of was just like, hey, guys, like what's going on? Like, what's the deal? And there was not a very clear idea of what was supposed to be happening. It didn't seem as though there was any plan. There hadn't been any of the like -- like the traditional sort of messaging or safety measures or anything put in place that I would be used to finding.

So they kind of directed me to go up the hill, up the steps to where the white bus was. That's where I saw Ben Stuckart and some other people. And to start with, I just began observing the situation.

Q. At that point in time, can you describe the tenor of what was occurring at the white bus area?

A. It was very casual. People were sitting in the grass in the shade. People were milling about on the sidewalk, talking. Fair amount of networking going on because, you know, the sort of people who showed up were all movement-involved, you know, just involved in advocacy in some way or form.

Q. You had mentioned the fact that when you got there, it didn't seem like there was a continuity purpose. That's my word, and maybe I'm mischaracterizing. What was -- was there anything of concern to you when you got there? Did it seem like it was an organized event?

A. No. No. It did not seem -- it was very clearly a rapid response. It was very clearly people showing up much the way I had, and which was concerning to me because of the implicit call for civil disobedience that I read in Ben's -- or, sorry, Mr. Stuckart's post. So immediately I'm thinking, okay, we have an influential individual who is calling on his community to show up in a way suggesting an act of civil disobedience, but there is no jail support coordinated. There's no -- there are no information trustees or personal trustees around taking -- like taking care of people's things. There's no obvious safety plan. It's a hot day, and I don't -- at this point, no one had brought -- I don't think anyone had brought any cases of water yet. There just wasn't planning that I -- I could see, at least in that moment when I first arrived.

Q. What, if anything, did you do in that regard in terms of assisting or help organizing the protest?

A. Well, like I said, the first thing I did was survey who was about. And I determined relatively quickly that I was one of the more experienced organizers or protesters in that space, so I kind of figured if no one else is doing it, then I will. I'll

see how I can get things a bit more organized and safe.

And one of my first concerns was that if anyone was going to be involved in civil disobedience, we needed to have jail support on lock.

Q. Did you have any concern about organizing or getting people on the same page to be nonviolent?

A. Oh, absolutely.

Q. Tell us about that.

A. So, again, large impromptu gathering, large crowd. And everyone I assume is coming based on either hearing about it or seeing something on social media, but that means there's no common message. There's no common policy or agreement of how things will go. There's no common set of standards for behavior or anything.

So pretty early on, I thought Mr. Stuckart did a very good job of standing up and saying that he wanted things to be nonviolent and peaceful, and then I tried to build on that by sort of talking to people about, you know, like what are your rights? Where can you stand and not stand? When are you on public property versus when are you not? And then eventually talked about different strategies for maintaining nonviolent demeanor and nonviolent behavior, especially in the case where there hasn't been extensive training.

And if I may add, one of the things -- it's one thing to have a planned protest. Civil disobedience is a completely

different animal. And, you know, if you go back -- like looking historically, you know, lunch counter sit-ins in the '60s and whatnot, they prepared way in advance to take -- to do those kinds of things. And we were potentially doing civil disobedience more or less on the fly.

Q. You had been trained in protests, and you have attended some protests?

A. (Moves head up and down.)

Q. Is there any concern about protests getting out of hand?

A. Always. It's -- a really well-planned protest will go off, you know, calmly and without a hitch with the goals -- the agreed-upon and understood goals of the attendees being accomplished or moved toward and everyone getting home safely. That's what you want. That's the goal.

An unplanned protest, how it goes depends a lot on just who is there, how -- who sort of helps set the tone. And if people aren't in a mindset mentally prepared to behave calmly, to be nonviolent, to stay focused on a specific goal, then they might choose their own adventure, and that might be some misadventure.

Q. Okay. So if things aren't planned, is there a danger that there can be -- it can have an adverse effect on safety of participants?

A. Absolutely. Actually, as a personal rule, I'm very selective about attending any kind of rapid response or unplanned protest for that reason.

Q. All right. In that regard, I'm going ask you to --

MR. ORESKOVICH: If we could -- if we could look at Exhibit 77, page -- or Exhibit 77, please. Are we all up on the screen?

Q. (BY MR. ORESKOVICH) What is this, sir? What is Exhibit 77?

A. Sorry. Ask that again.

THE COURT: Can you repeat the question a little bit closer with the microphone.

Q. (BY MR. ORESKOVICH) What is Exhibit 77?

A. Oh. It is a screenshot of a repost I made of Ben Stuckart's initial action alert. At first, I reposted it with the text that you see below the row of Xs. That's the first thing -- part of the repost. I read it a few minutes later, didn't -- wanted to put more oomph behind it and so edited it. But to avoid having the post change, like without acknowledgment of the edit as like a sort of not strictly necessary but online etiquette thing, I put "edit" at the top and put the most recent message. And that's what you see at the top.

Q. Part of it is Exhibit 77 says, "We are still here. Some contingents are choosing to risk arrest to block the exits to ICE. We're about a hundred strong in total. I hope to see you there."

Explain to us your comment about some contingents are choosing to risk arrest?

A. It meant that some people were choosing to take actions of civil disobedience. So it's worth noting that all protests carry a risk of arrest. That's just a fact of protest, and it's one of the things I'm trained to always think about.

But certainly, civil disobedience can lead to arrest, and people were at this point, I think, sitting in front of the doors to the white bus, and there were people discussing sitting on the sidewalk and such. And those were behaviors that, as had been mentioned previously, an ICE officer who came out and talked to us said we're arrestable if we were there when they came out.

Q. Can you tell us, when you would use this language that some contingents are choosing to risk arrest, whether you intended acts that were going to be violent or forceful?

A. Absolutely not.

Q. Were you intending, with this language, that people were going to be threatening or intimidating?

A. Absolutely not.

MR. ORESKOVICH: If we can go back to Exhibit 78, please. Let's go four pages in to the Signal chat group -- this is it. Can you blow up the top quarter of the screen square?

Q. (BY MR. ORESKOVICH) Did you also make posts on your Signal platform?

What is the Signal platform, so we know what that means?

A. It's just an encrypted chat, like Facebook Messenger,

something similar.

Q. Is that what you used as part of the SCAR communication program?

A. Yeah. Our staff and steering committee chats are both on Signal. So I use it for work, and most of the people I know in similar work use Signal.

Q. Okay. And, sir, is this a message that you sent out to these various persons that are listed on the phone numbers there?

A. It is.

Q. Okay. And can you read it for us so we understand what you were conveying?

A. "There are multiple exits that about 90 to 100 people are struggling to cover. Can use more folks willing to thoughtfully risk arrest."

MR. ORESKOVICH: And if we could go down at the bottom, just so we can find about what time this was sent out. Blow up the lower right-hand corner, please.

Q. (BY MR. ORESKOVICH) And can you look at that and tell us, Mx. Archer, as to what time this post was sent?

A. According to this, 3:09 p.m.

Q. All right. Does this come from when you were at the ICE facility?

A. Yes.

Q. All right. I'm interested in your choice of words at the

top. "We could use more folks who would thoughtfully risk arrest." What did you mean in that regard?

A. Getting arrested isn't something people should do -- getting intentionally arrested or risking that on purpose, that's not something you should do lightly. You need to think about it. You need to prepare, make sure that, first, you know what that means, how you're going to behave. This kind of choice to willingly risk arrest also assumes that you're going to accept arrest, so you're not fighting with folks or anything if you are successfully arrested. That's the deal.

And in order to prepare for that, you want to inform, you know, any partners you may have. You want to make sure that any kids you have are going to be picked up from school. You want to make sure that there's somebody to move your car so it doesn't get impounded. You want to make sure that, if you're looking in on your parents or you've got pets to feed, that those responsibilities are covered.

So you just want to be logistically prepared. You want to think through what arrest will mean for you in your life. It's not a risk just anyone should take. Like, if someone is on parole or something like that, or if they're in the middle of a different legal proceeding, it's a bad idea potentially.

Q. Did the thoughtfully risk arrest in any way apply to the nature of the conduct, nonviolent versus violent conduct?

A. Absolutely. It is -- it is an -- it is an -- inherently a

call to engage in nonviolent but arrestable activity, like civil disobedience.

Q. All right. You had mentioned that part of your practice is at SCAR is to be involved in protests, correct, sir? Correct?

A. Correct.

Q. Sorry. And as part of that, you have also testified about various steps that are taken to form emergency contacts.

A. Yes.

Q. Jail support?

A. Yes.

Q. Tell us what that's about, if you would, please.

A. Yeah. So this is something that I actually first saw in action at a different protest I went to protesting an oil pipeline. Before people could go, they had to go to the legal tent that was staged ahead of where the protest was, and you had to fill out like a form that included your emergency contacts, you know, what medications do you have, what are your -- just a lot of that logistical information we discussed before. And most importantly, you had your full name, your government name and your full date of birth because that's what's needed in order to get bailed out. You can't just walk up to the jail facility and say, you know, my friend Johnny is in there and I've got money. Can you let them out? They have to identify you by full name and birth date.

So that was -- one of the first things I did was chat with

someone, an attorney who was there, and actually got to borrow her notebook and start collecting some of that basic information. Obviously, we didn't have jail support forms on hand because this was rapid response. But the two things I collected from folks and was circulated the notebook was the name and phone number of their emergency contact as well as hopefully their relation to them just for context, and then their full government name and birth date.

MR. ORESKOVICH: If we could look at Exhibit 78 and go to the page that has the two notebook pages on it. Stop. I'd like to, if we could, blow up the notebook page that's circled in -- or that's framed in red, please.

Q. (BY MR. ORESKOVICH) Are you familiar with what's shown on Exhibit 78, this document that is framed in the red square?

A. Yes.

Q. Can you explain to us what that is, please?

A. It's an emergency contact sheet. People wrote down their emergency contact's name or relation, like I put down my husband's name, and then their phone number so that, in the event something happened to me, I was injured or taken to hospital, he would be contacted.

Q. Okay. You've heard some testimony and saw some video of you holding tablets earlier in this trial. Do you recall that?

A. Yes.

Q. Is this the tablet that you were involved with?

A. Yes.
Q. All right. And so that we know, is this tablet in Exhibit 78 framed in red, is that all your handwriting?
A. Oh, no. The only handwriting that's mine is the handwriting containing my name and that row.
Q. All right.
A. I might -- actually, it's also my handwriting that wrote "emergency contacts" at the top.
MR. ORESKOVICH: All right. And then also if we could then blow up the sheet below that's framed in yellow, please.
Q. (BY MR. ORESKOVICH) What is this document?
A. Yeah. So this is a jail support list. It contains full names and birth dates for people who have expressed at least the potential that they may engage in some kind of civil disobedience so that in the event they are arrested, they can be bailed out as soon as possible.
Q. We had talked previously that in planned protests, this is one of the steps, one of kind of the normal steps in terms of working up the plan of the protest. Is that fair?
A. Yes.
Q. Was this a planned protest?
A. No.
Q. And why, again, were you trying to get this information, if you could, please?
A. Because being in jail is traumatic, and we want people to

spend as little time in there as possible. And precisely because this wasn't planned, I -- I had reason to believe no one else was prepping this kind of information or collecting it, or really even briefing folks on what it meant to potentially sit in front of a bus. So I wanted to keep people safe.

Q. Okay. Earlier in your direct testimony, I had asked you questions about you notifying your parents of the activity that you were going to be involved in. The emergency contacts list, does that function in a similar manner?

A. Yes.

Q. And what is the purpose of it?

A. Again, if someone gets arrested, or even if they don't get arrested, maybe they get, you know, injured by, you know, some less lethal munitions or something, and they have to go to the hospital, people's families get scared when they don't know where their loved one is. And I didn't want to put my parents through the anxiety of hearing about some big protest in Spokane and not knowing what had gone on with me, especially since they're very aware of my job and what I do. And I know most people feel the same way about, you know, whoever their partner or emergency contact is also if something really bad happened and there needed to be someone to make, say, decisions on someone's behalf for some reason, medical treatment. It was a way to make sure there was someone to call quickly.

Q. Now, does this all occur in the time period that you are in

the area of the white bus?
A. With this notebook, yes.
Q. All right. When you were in the area of the white bus, I think we saw you on a bullhorn at one time. Did you have conversations with people -- apart from being in the bullhorn -- on the bullhorn, did you have conversations with people at the protest as to how the protests would go, whether this would be violent or not violent?
A. Yeah. Once I personally decided to sit in front of the bus, again, I looked at the group, realized I was probably the most experienced person in that space, and we sat down and talked about how we were going to effect nonviolence.
Q. Okay. You talked about sitting in front of the bus. Did you have any conversation about linking arms?
A. Yes, we did. So this kind of links back to what I said earlier about how civil disobedience is something that you train for. We were here on the spur of the moment without any training, and yet we were going to take on this challenge of being -- of engaging in civil disobedience. My thinking around it, and we made all the decisions by consensus -- my personal thinking was the hardest thing to do when you're confronted with aggression is to not fight back, is to hold your peace, and avoid fighting, essentially.
    And without any training on regulating ourselves emotionally, I was thinking about how can we get people's hands

out of the equation, essentially? How can we keep our hands occupied? So linking arms was something that we ended up in this group, this small group, agreeing to do because when your arms are linked, you know, like this, you can't -- you can't hit anyone. And not only are you holding someone, but they're holding you, and so it helps add an extra barrier to the knee-jerk reaction of fighting.

It also was a great symbol of solidarity. I think we felt that, visually and symbolically, it was a great symbol of solidarity to stand with our arms linked or to sit with our arms linked together.

Q. Did you also have conversations with people as to whether or not they were capable of being involved in a -- perhaps an aggressive situation and not using force?

A. Yes. I -- multiple times. And I said this at the bus, and I said this every time I saw someone new later at the gate: If you can't take a punch without throwing one, don't join the line. I did not want to be involved in something with people who couldn't hold their peace.

Q. All right.

THE COURT: Mr. Oreskovich, we are at --

MR. ORESKOVICH: Could I just finish, Judge? Just finish this one geographical location at the bus and then be good?

THE COURT: Okay.

Q. (BY MR. ORESKOVICH) While you were at the bus, did you observe any of the protesters paint the windshield?

A. I observed someone paint the windshield.

Q. Say again?

A. I observed someone paint the windshield. I don't think it was one of the protesters.

Q. What did you see?

A. So at this point, I was standing back looking at the group. This is how I remember it, at least. So my back is to the building and facing the crowd, and we're discussing protest and nonviolence. And some guy in like a black mask and a hoodie rides up on his bicycle, leans over with what turned out to be a can of white spray paint, obscures the driver's side, rides away.

MR. ORESKOVICH: Now would be a good time, your Honor.

THE COURT: Okay. We will take a 15-minute recess. Members of the jury, we might go to 5:30 today. It sort of depends. Does that work a hardship on anybody if we go to 5:30? You can let me know if it does.

I'm getting no answers.

Okay. Could be. We'll just see where we're at naturally. I won't keep you past 5:30, though.

Okay. Don't discuss the case. Don't do any research on the case. But enjoy your break.

All rise for the jury.

(Jury exits the courtroom.)

THE COURT: I will try to remember to say this when the jury comes back. I want to make sure that the same message is given to Archer and the other witnesses. Don't talk to your attorneys or anyone else during the break so we are as fresh as if it was ongoing. Hopefully, I'll remember to say that when the jury comes back in. I think it's important for them to know that, that you haven't had conversations with your attorney during the break.

THE WITNESS: Thank you, your Honor.

THE COURT: All right. All rise.

(Court recessed from 3:18 p.m. to 3:32 p.m.)

THE COURT: Are we ready to get started?

MR. ORESKOVICH: Yes, your Honor.

THE COURT: Okay. Bring the jury back in.

(Jury enters the courtroom.)

THE COURT: Members of the jury, I wanted to make sure you are aware that, as with all witnesses, I advised our juror [sic] not to discuss this testimony with anyone during our break so that their testimony is just as if we hadn't taken a break.

Go ahead.

MR. ORESKOVICH: Thank you, your Honor.

Q. (BY MR. ORESKOVICH) Mx. Archer, before I go to the south gate, I'm going to ask you a few questions I forgot.

We saw some video of you making an announcement about

having -- while at the south gate, having a huddle with people who were willing to risk arrest.
A. Yes.
Q. Did that happen?
A. Yes.
Q. And with whom, if you recall, did that discussion take place?
A. Only those who had sat in front of the doors of the white bus and then anyone else who came over in response to me saying, hey, if you think you might risk arrest, it's a handful of people on top of that, so a relatively small group of people.
Q. Can you name any of the people? Do you recall any of the people who were in the huddle?
A. Honestly, I can't. I met most of these people for the first time that day and on -- with a year's distance from it, nobody I knew very well.
Q. Okay. You had mentioned to us about comments that you made about people if they couldn't --
A. If you can't take a punch without throwing one.
Q. All right. Did you have any conversation with the folks in the huddle about any items that could appear to be weapons?
A. Oh, yeah. So there was kind of a spiel that this huddle turned into, like we basically covered just a handful of things. It was nonviolence, don't be here if you can't take a punch without throwing one, make sure you're signed up for jail

support, make sure you put down your emergency contacts, remove any hanging jewelry or piercings, and remove anything from your person that is a weapon or could be construed as a weapon, so pocket knives, nail clippers, whatever. Just get it all off your person, entrust it to someone else who will not be in that same position who is going to be keeping their distance.

Q. Slow down.

A. Pardon.

Q. Thank you.

A. And the last thing was remove any valuables or sentimental items that you do not wish to be broken or confiscated.

Q. Okay. And in that huddle, was the notion of locking arms also discussed?

A. Yes.

Q. All right. So I want to then talk about what happens at the south gate. What drew your attention, if anything, to go into the south gate?

A. Yelling. Someone said, "They're over here" or "They're taking them out here" or -- I honestly couldn't tell you precisely, but some kind of yelling.

Q. What then happened with respect to the protesters who were on the north side near the white bus, including yourself, at that point?

A. I rushed down. I immediately ran around the corner and to what I later learned was the south gate.

Q. All right. When you arrived at the south gate, were there other persons, other protesters there at that point?
A. Yes.
Q. All right. We have seen a video and heard a video. I can show it to you if you need to refer to it, but let's try it without. There is a video that you are heard saying something to the effect, for those risking arrest, this is what we talked about, link arms.
A. Yes.
Q. Do you recall that video?
A. Yes.
Q. Describe for us, please, what you were referring to at that point.
A. So I was referring to the huddle that we had up at the white bus. Those things that I mentioned about removing any weapons and signing up for jail support, et cetera, and about being nonviolent and linking arms, that had been discussed, not just in terms of the bus, but like what do we do? You know? Because I think the thought at this point was that the bus had been spray-painted, so whatever we went with was going to be used wherever it needed to be used.
Q. Was there agreement then with the people that you huddled with to people to link arms to block the gate?
A. Yes.
Q. All right. And did that happen?

A. Yes.
Q. All right. We've seen the video, and I don't think we need to see it again. How long did the whole interaction with the ICE agents where you were linking arms, people were getting pushed, falling down, et cetera? How long did that last?
A. From beginning to end, no more than three minutes. As far as the actually shoving and pushing goes, maybe 30 seconds.
Q. All right. At some point in time after the 30 seconds happened with the linked arms and the shoving and pushing, do the agents from ICE go back with -- inside of the gate?
A. Mm-hmm.
Q. And prior to that -- let me rephrase that question.
When they went inside the gate, was it a period of time before the gate actually closed?
A. Yeah. It took a minute. There was a moment when we were just standing there with linked arms, and they were standing there inside the gate and -- I've seen now on video at the time it didn't grok what the holdup exactly was, but it took time for them to back up and let -- so the door would close.
Q. Okay. During that time when they were on one side of the entrance and your group was on the other side of the entrance and the gate had not closed, did your group of folks advance on them in any way?
A. No.
Q. Was the only physical interaction that your group had with

the ICE agents the 30 or so seconds that we've seen video of the south gate?
A. Correct.
Q. At some point in time, the agents went back into the building, correct?
A. Mm-hmm.
Q. Yes?
A. Correct.
Q. What did you do at that point?
A. Well, immediately after, I kind of just stood there and debriefed with the people I'd been with. I've never been in a physical altercation prior to this, so I think I took a moment to get my bearings and then talked to the people around, get a sense of who was going to stay in that area. I got -- I decided for myself to stay at the south gate. And, you know, there were other intermittent events, but ultimately I just sat down in front of the gate with the group of people who agreed to stay there.
Q. And at some point in time, did you see items being placed against the gate? I think there was a reference to perhaps a Lime scooter or a park bench or other items.
A. Yes.
Q. All right. And did you participate in putting those items there?
A. No.

Q. All right. At some point in time, was there any effort by your group or any discussion amongst your group about removing those items that had been stacked against the gate?

A. Yes.

Q. When did that happen? How long after the items being placed there do you think there was a conversation?

A. I want to say it was in -- it was within five to seven minutes, something like -- less than 10 minutes. Certainly not much more than five.

Q. And as a result of the conversation, was there a consensus from your group to move the items?

A. Those of us who decided to stay there decided to move everything and just sit down directly in front of the area where those things had been. We put everything off to the right against the wall, against the brick of the gate, and left it there.

Q. All right. At some point in time we saw some video. Let me back up.

Other than -- I'll try one more time.

What did you do for the remainder of the night? Did you stay at the south gate?

A. Yes.

Q. Were there ever any times that you left the south gate?

A. Yes.

Q. Tell us what for, please.

A. Let's see. I went to the bathroom a couple of times. I used the public restrooms in the park. I went --
Q. Let me stop you for a moment. And if we're facing the south gate, when you're at the entrance of the park, is that to the west?
A. Yes.
Q. Okay. Go ahead.
A. I went to what I referred to as the east parking lot. I saw one time on camera and -- well, actually, I saw both of them. But what I remember specifically was talking to an attorney who was also present about jail support.
Q. All right. Did you ever go to the area of the red van? Did you participate in any protests in the area of the red van?
A. No.
Q. Did you even know if there was a red van there during that time period?
A. I might have found out late in the game, but honestly, I don't remember being cognizant of it most of that day.
Q. All right. And you also heard testimony about a skirmish line that existed on Washington Street?
A. Mm-hmm.
Q. Do you recall that testimony?
A. Yes.
Q. In any way did you participate in that skirmish line?
A. No.

Q. When you were at the south gate with your group of people for the remainder of the night, were you able to observe all the things that were happening to the east on Washington Street?
A. Oh, no. We were essentially around a corner. So it was all noise and smoke, but I couldn't see anything.
Q. How long did you stay? What time did you leave the event?
A. I want to say I finally left at about 12:30 a.m.
Q. Did you know or were you able to observe all the things that were happening with the skirmish line and the police and the various videos that we watched here in court?
A. No. It's all new info for me.
Q. When you got home, did you notify anybody that you were home safely?
A. Yeah. I texted I think my parents and possibly my family chat.
Q. When you were at the south gate and when you had the huddle, did you have any intent to engage in any vandalism?
A. No.
Q. Did you have any agreement to engage in any vandalism?
A. No.
Q. We've heard some testimony here about a -- I'm going to call it a post, but I don't think it's a post. Something that you dictated into your phone, was it, the next day?
A. Yeah. My voice memo.
Q. A voice memo? All right. What were you doing? I mean

what were you attempting to do?
A. In the voice memo?
Q. Yeah.
A. Capture my feelings. I use voice memos often like diary entries, and I also sometimes use them to capture my thoughts and feelings around something that's been intense because I am a writer, and so sometimes I'll write about things later. But really first and foremost, just unburdening myself.
Q. Part of that voice memo included some comments to the effect that you were proud of Spokane?
A. Mm-hmm. Yes.
Q. Answer "yes"?
A. Yes.
Q. Explain to us what you were referring to, please.
A. It was just inspiring that -- because one person said, hey, someone I know and care about is, you know, being harmed or in danger, this member of our community, this immigrant in our community, so many people from Spokane showed up to -- in response to that, demonstrating care. You know, there was so much care for Cesar and Joswar.
And also throughout the day, especially at the white bus, people who couldn't stay and protest brought, like, cases of water, and someone ordered pizza, and people circulated sunscreen. People were looking out for each other. It was -- it was a real community. And so I was -- I was impressed on two

fronts: To see how much Spokane cared for Joswar and Cesar and to see how we chose to care for each other.

MR. ORESKOVICH: That's all the questions I have. Thank you.

THE COURT: Okay. Cross-examination.

CROSS-EXAMINATION

BY MS. CARTIER-GIROUX:

Q. Good afternoon.

A. Good afternoon.

Q. Congratulations on graduating from law school.

A. Thank you.

Q. I have a couple of questions to ask you about -- a little bit about before you got to the Cataldo building. Okay?

So, I mean, you describe that you prepared to go to potentially get arrested, right?

A. Yes.

Q. Part of what you did in preparation was so that you believed that you could get arrested, right?

A. I was considering it.

Q. Because you were at least -- at least according to the post were being invited to sit in front of a bus, correct?

A. Yes.

Q. And if you sat in front of a bus and blocked it, that is a crime, correct?

A. Potentially.

Q. Potentially?
A. Well, I honestly don't know all the ins and outs of when it becomes considered criminal.
Q. Okay. So blocking a sidewalk, that's possibly a crime, right?
A. I thought it was a civil infraction.
Q. Well, blocking a sidewalk to prevent someone from utilizing or doing their job, like loading up potentially people into a bus, that could be a crime, right?
A. It could.
Q. And regardless of whether you think it's a crime or what specifically is a crime or what's not a crime, you went there with the possibility that you would get arrested.
A. Yes.
Q. You prepared for that.
A. Yes.
Q. You took immense care to make sure you emptied your backpack, right?
A. (Moves head up and down.)
Q. Contacted your family.
A. (Moves head up and down.)
Q. You designated someone on scene to take your personal effects, right? Your phone?
A. Yeah. Well, yes.
Q. And we'll get to that because you actually talk about that

right when you're at the south gate, that you were supposed to give somebody your phone, right, before the south gate incident?
A. Yes.
Q. Okay. So when you went there, your mindset was: I could get arrested here.
A. Yes.
Q. Okay. And at the time when you first got there, it was to block a bus?
A. To sit in front of the bus.
Q. Sit in front of a bus. Well, to sit in front of a bus so it couldn't move, right?
A. Ostensibly.
Q. Well, the post was to sit in front of the bus to prevent them from being transported to Tacoma; wasn't that the post?
A. That was the post.
Q. So you're sitting in front of the bus so the bus can't go. Fair?
A. Fair.
Q. So when you first get there, you -- what you notice immediately is that there's a leadership vacuum, right?
A. Sure.
Q. I mean, you got there and you're used to rapid -- you call it rapid responses?
A. Mm-hmm.
Q. And, you know, you testified that it's super important to

have organization in place, right?
A. Yes.
Q. So when people, as you intended, get arrested, there would be potentially someone who has their property, correct?
A. I'm not sure what you mean by "as you intended."
Q. Well, you just testified that when you went there, you intended to get arrested.
A. Not really. I knew it was possible I could get arrested. I didn't actually make the decision to engage in civil disobedience until I'd been there for I want to say a couple of hours.
Q. Okay. Okay. But you just went there -- so you prepared.
A. Yes.
Q. So for people who are preparing for the possibility of arrest, there usually should be an organizational structure for them.
A. Ideally.
Q. And that would mean some of the things that you did while you were there, which is collecting their information.
A. Mm-hmm.
Q. Contact information, family information.
A. Mm-hmm. Yes.
Q. Names and dates of birth, right?
A. Yes.
Q. Making sure that there's potentially a bail fund available

for them, right?
A. Yes.
Q. And you were communicating with someone not at the location to provide that other person with that information?
A. Yes.
Q. And that person was advising you to remind these people to shut off the biometrics on their phone, for example.
A. Yes.
Q. So that if their phones were seized, it's harder for law enforcement to access the content, correct?
A. To maintain their privacy in the event that they lost their phone at all.
Q. Right. So that law enforcement has difficulty accessing the content if they seek to access it with a warrant?
A. I -- truthfully, I'm not sure that turning off biometrics has any impact when you're dealing with a warrant situation.
Q. Well, getting a warrant is separate from accessing a phone, correct? A warrant --
A. Sure.
Q. -- is simply permission to access a phone.
A. Mm-hmm.
Q. When you're changing or shutting off biometrics, that affects the access to the phone?
A. It does.
Q. Not the legal permission to search it?

A. Yes. What I'm getting at is my understanding is that when the government has a warrant, they also have access to tools that are more robust than what, say, an average person or even an average police department might have passive access to when they get a phone. I -- so I can't say I really thought I was thinking in terms of avoiding access in terms of warrants, but I didn't -- I wanted people to have their information secure and so that no one could just passively access their phone, for the same reason you always have a phone lock.

Q. Okay. That's fair. So when you were on-site, you began to talk to people, right? You differentiated between those who were willing to risk arrest and those who were not?

A. I hesitate to say I differentiated, but, yeah, I encouraged people to figure out for themselves what they were comfortable with doing, what they wanted to do so that I could make sure I provided the right information to folks.

Q. Right. And when you created the list of people that wrote their names and their date of birth, those were people who were risking arrest. Let's put it that way.

A. Not necessarily. I actually -- again, because of how spur of the moment this was and because people's emotions can run on high, I said at different times like, hey, if you think there's even like a 30 percent chance that you might be moved to be involved in civil disobedience, then put your name down and make sure, blah-blah, or 51 percent chance. I think it varied.

Q. But you were giving special instruction to the group that indicated that even at a 30 percent or a 20 percent or 10 percent willingness, they were being given different information than the people that were not.

A. No. Everyone was given the same information. Everyone was informed that depending -- if they thought they might engage in civil disobedience, they should make sure that they had provided jail support information and emergency contact information, and then people acted accordingly.

Q. So when you say on the recording that those of us who are risking arrest need to have a huddle --

A. Mm-hmm.

Q. -- you were going to talk directly to those people risking arrest, correct?

A. Sure. Insofar as --

Q. So thee were separating them from those who were not risking arrest?

A. I'm sorry. Ask that one more time.

Q. Okay. The purpose of asking people who are risking arrest to do a huddle was to provide them with information different from those who were not risking arrest.

A. Not primarily. By and large, actually wanted to share information as broadly as possible. It was more to make sure that we were all on the same page about -- well, especially about nonviolence and especially about, you know, what -- how

are we going to behave if confronted in some way by, you know, aggressive behavior. It wasn't something that I was really conveying. It was a conversation.

And again, you know, like I said, my workplace is very consensus-based, and I brought that same mindset into this space. I wanted to make sure everybody -- I wanted to make sure there was consensus on nonviolent behavior, what that meant, how we would react.

Q. So when you're saying at the white bus "For those of us risking arrest" and when you're saying at the south gate "For those of us risking arrest," you're talking about everybody?

A. I'm talking about everyone who knows that that applies to them. I don't personally know --

Q. Okay.

A. -- who all is going to make that decision for themselves. All I can say is, you know, if this applies to you, listen up.

Q. Okay. Okay. Do you know a person named Mikki Hatfield?

A. Know is a stretch, but I can now recognize that person.

Q. Okay. I'm going to pull up Exhibit 414.

Do you recognize this person right here?

A. I believe that's Mikki Hatfield.

Q. And was Mikki Hatfield part of some of these conversations that you're telling us you were having about risking arrest and the things that they can and cannot or should and should not do aspirationally?

A. Based on this photo, I would say yes.
Q. Okay. Do you remember him?
A. Not --
Q. Or them. Sorry. I apologize.
A. I think I remember seeing them that day, but where and when is not solid in my mind.
Q. Okay. So you don't remember them at the south gate?
A. No, not explicitly.
Q. And you don't remember them at the south gate when they were carrying benches and helping Forral blockade or barricade the south gate?
A. I wasn't watching the situation that was happening at the south gate that you described. I believe that was during a time when I was engaged in conversation with other folks, so I wasn't really focused on who was engaged in that.
Q. Okay. Forral. Forral was your employee at that time, correct?
A. More or less.
Q. What do you mean more or less?
A. I say more or less because I -- when you say they were my employee, it sounds like I had a lot of authority over them, like a lot of direct, you know, day-to-day this is what you do, this is what you don't do. But again, the relatively sort of flat structure of the organization was such that, while I did have some authority, it wasn't like typical the way you might

think of.
Q. Okay. Well, you had concerns about Forral because Forral was your employee, right?
A. I'm not sure what you mean by "concerns."
Q. Well, you were -- you wanted to make sure that Forral was okay at the protest, right? Forral's safety.
A. I cared about everyone's safety at the protest.
Q. Okay. That's fine. So you don't have a particular close relationship with Forral that you would have any particular --
A. I mean --
Q. -- concerns about a person as a good friend?
A. I did work with Forral, and they were a friend, and, yeah, they matter. I don't remember singling them out in my head, though, as somebody to focus on.
Q. Okay. But you did see Forral throughout the -- at least the -- from -- at the white bus, correct?
A. Possibly.
Q. Possibly? You don't recall Forral parking their red car and pinning in the white bus?
A. What do I remember? I do remember their car. As I recall, though, they parked in front of the bus. There was nothing behind the bus, so it wasn't really pinned in.
Q. So the -- so parking that close to the bus was just the manner of parking? Is that what your testimony is?
A. My testimony is that the bus had the capability of

reversing.
Q. At the time it initially was parked?
A. At -- yes.
Q. Do you remember in one of your voicemails at 5:00, you indicated in the voicemail that the bus, the white bus, was pinned in?
A. Yes. At the time I left the voicemail, there were -- there was a second car that had come by and parked behind it. But I think that might have been -- I don't know. It was sometime later.
Q. Okay. So when you -- did you see Forral's car parked next to the bus, in front of the bus?
A. You mean -- if you're talking about the screen, there's nothing on my screen. But I --
Q. No, I'm asking you --
A. Oh.
Q. -- when you were at the white bus --
A. Yes, I did. I did see it.
Q. -- did you see the red car parked in front of the white bus?
A. Yes, I did.
Q. And it was really close, wasn't it?
A. Yes, it was.
Q. Like really close?
A. Sure.

Q. Unless you wanted your car damaged, you wouldn't park that close to a white -- to that bus, would you?
A. That's for the parker to decide.
Q. Okay. But you noticed that it was very close, didn't you?
A. I saw the car parked in front of the bus.
Q. Okay. You are at the white bus, and it's around 2:00. At that time, it was still -- the plan still was sit in front of the bus, correct?
MS. GEORGE: What time are we at?
MS. CARTIER-GIROUX: 2:00.
THE WITNESS: I wouldn't say there was any plan, really, at 2:00. I would say that Ben Stuckart had posted that his plan was to sit in front of the bus. At that point that early, I don't know if I actually saw anyone else sitting at or near the bus at that point. I'd just arrived, though, so I was still getting my bearings.
Q. (BY MS. CARTIER-GIROUX) Well, you were there when the agents came outside and spoke to the people blocking the doorway, correct?
A. The people sitting in front of the doorway, yeah. That was sometime after I arrived. I would say at least -- well, let me not speculate, but it was sometime after.
Q. And when the agent went out and spoke to that person and told them to move, they didn't move, right?
A. To be honest, I don't actually recall that specific

encounter. I wasn't in front of the bus at that point in time myself.
Q. You were standing there.
A. Sure, I was standing nearby, but I do not remember that specific encounter.
Q. You don't remember standing in the grassy area right by there while they came out?
A. I remember standing in the grassy area while they were -- ICE agents, when they came out. I don't remember any interactions they had with other people.
Q. You don't recall seeing after the agent spoke to the person that everybody went and sat or most of the people went and sat with that person in front of the door? You don't remember that happening?
A. At some point, I saw four or five people join Ben in front of the doors to the bus. I did see that happen.
Q. Okay. So -- but you weren't part of that?
A. No, I wasn't.
Q. So it wasn't your intent when you got there to block the bus?
A. Not at that point, no.
Q. Okay. So you only had an intent when you sent that voicemail at 3:00 where you indicated that you needed -- you had about 50 to 100 people, and you needed more people to block the exits.

A. I didn't say I needed more people to block the exits. I said we needed more people to cover the exits. We wanted to have eyes on every exit to the building because, frankly, we didn't want them to just sneak out Joswar and Cesar without us knowing. I can't say for certain at that point whether or not I had made the decision to sit down in front of the doors. It might have been before. It might have been after. I don't know.

Q. Can you pull up --

I'm going to go to slide 5. And it says at 3:09 p.m. that you sent out a text or a message stating: "There are multiple exits that about 90 to 100 people are struggling to cover. Can use more folks willing to thoughtfully risk arrest."

So it's your testimony at this time that you weren't sure whether you were going to block the exits?

A. Yes.

Q. So you were sending out a text asking for more people to come to risk arrest for something that you weren't going to be involved in?

A. So there are two separate thoughts. There's about 90 to a hundred people needed to keep eyes on all the exits. I think I said that in my voice memo. There was a period of time when nobody was watching the doors. We didn't know what was going on. So it was a struggle to just kind of keep track of this building we weren't particularly familiar with and make sure

there were eyes on all of it.

The second thought is can use more folks willing to thoughtfully risk arrest. That is a reference to civil disobedience. But the vast majority of the people at the protest at this time weren't engaged in any civil disobedience or even, I think, planning on engaging in civil disobedience. People took on different roles that they felt good about, whether it was sign-waving on the corner, leading chants.

Q. That's not what I'm asking you about. I'm asking you about this text message and your intent.

A. Yes.

Q. And you are telling this jury that those are two separate ideas, that you are not asking for more people to show up to cover the exits to thoughtfully risk arrest. You're saying that that's not what you're saying in this text message?

A. I'm saying this text message says I want more people, and I want more people to thoughtfully risk arrest.

Q. And the purpose of covering the exits is to make sure that the detainees are not brought out of the building without your knowledge; is that correct?

A. Yes.

Q. And it's not enough for 90 to a hundred people to stop that?

A. We didn't really know the building very well. It's got -- there's all this stuff with the man door and the enclosed

parking lot and the old Bark doors and whatnot. So I think at one point, we were probably watching several doors that weren't relevant.

Q. Well, to be clear -- wait. There's about six doors to that building, correct? Right?

A. If you say so.

Q. Well, even if you had, you know, 90 people there, like the low end of your average, and all you're doing is watching the door and not blocking it, you'd have more than 10 people per door.

A. Except that people were doing other things, too. Again, this wasn't like an organized protest. People were taking on different roles that felt right to them. So in total, there were about 90 to 100 people there, but lots of people were on the corner waving signs, getting cars to beep if you love immigrants, that kind of thing.

Q. But those people weren't watching the exits, were they?

A. No. Exactly. So --

Q. They weren't covering the exits. They're not the 90 to a hundred people struggling to cover.

A. 90 to 100 people is the total of people who are -- at least that I was aware of that were present around 3:00 p.m.

Q. That's not what this text message says.

MR. ORESKOVICH: Judge --

Q. (BY MS. CARTIER-GIROUX) Is that what this text message

says? Is this text message --

MR. ORESKOVICH: Objection.

THE COURT: The text message is in evidence so the jury can read the text message. You can ask questions about the intent of the text message.

MR. ORESKOVICH: And, Judge, my objection --

Q. (BY MS. CARTIER-GIROUX) Just to be clear, so that I'm not wrong --

THE COURT: Mr. Oreskovich has another objection.

Mr. Oreskovich.

MR. ORESKOVICH: I do indeed, Judge. Counsel cuts the witness off before the witness is done and cuts them off with another question, and I'm just objecting to that procedure.

THE COURT: Okay. So if you have a question regarding the witness's intent, ask the question and let the witness answer.

Q. (BY MS. CARTIER-GIROUX) So is it your testimony that this message is to convey that there were only 90 to a hundred people present at the protest?

A. Oh. Yeah.

Q. That's what you're saying this means?

A. Well, there were only 90 to a hundred people at the protest. I may have written the text clumsily, but that's just what it was.

Q. Let's just take a look -- I'm going have to switch out of

this.
A. At least that I could see.
Q. I want to go back to your Facebook post, then. So let's take a look at your Facebook post, which is a little bit after 3:00. Okay. 77.
This is Exhibit 77. And this is posted at 3:14 p.m. So a little bit after that text message you sent out.
A. Mm-hmm.
Q. And now we have "Come down now. We need more bodies. There is a non-zero chance we can wait out ICE, and they may free this man."
So let me -- non-zero means that an event is possible, because anything other than a zero percent chance means there's a possibility.
A. Yes.
Q. If we read this text, "Come down now. We need more bodies. There is a chance we can wait out ICE and they may free this man. Come down now."
A. Yes.
Q. And then your earlier text which you had -- sorry -- earlier post which you had supplemented this with had said, "We are still here. Some contingents are choosing to risk arrest to block the exits to ICE."
A. Yes.
Q. "We're about a hundred strong in total. Hope to see you

here."
A. Yeah. Like I said, about a hundred people total around 3:00 p.m.
Q. To block the exits to ICE?
A. Yes.
Q. So that's your intent at 3:00 p.m.?
A. That is what some contingents were choosing to do at that point in time.
Q. So it's your testimony that you were not concerned at all that these individuals could be snuck out of the building without you being able to know?
A. I was absolutely concerned that we might not know that they would leave.
Q. But you're saying that you weren't part of the effort to block exits?
A. You can watch an exit without sitting in it. And at this point, I'm not -- yeah. As I look back on this, I hadn't decided whether or not I was going to participate in civil disobedience, but I was informing the people who could see my post online that some contingents were.
Q. Okay. So by 5:00 you were, though, right?
A. Yeah.
Q. By 5:00 you were willing to risk arrest. You were going to block the exits, and you were manning the exits and being part of that. Correct?

A. Correct.

Q. And that's why, at 5:00, you were concerned about people, meaning the agents, being able to get out?

A. No. I was concerned about the detainees being transported. Whether agents could get in and out wasn't really the point.

Q. True. That is a true statement. I agree with that. Because what you're trying to do -- isn't it fair to say that you are trying to prevent them from bringing the detainees out, to force them to free them?

A. What I'm trying to do is make it, yeah, annoying for them to transport these men. I had read a -- earlier that month, I'd seen something about a protest in, like, California or something where essentially the protest had gotten so big and constant that the ICE office decided, you know what, the juice isn't worth the squeeze. The individual that they detained was, like, sent home on their own recognizance and given, like, 48 more hours to come back and check in. And that bought them time to meet with their legal counsel. And I don't know what happened to them after that, but it bought them time. And I was hoping we could buy them time.

Q. Well, you were hoping that they would release them.

A. Yes.

Q. You were hoping that you could put pressure on them by not allowing them to transport the detainees so that they would release them.

A. I was hoping to put pressure on them, absolutely.
Q. And you were putting pressure on them by blocking exits.
A. By sitting in that exit, yes, I was.
Q. And you were actually excited about the possibility of getting arrested for this.
A. "Excited" isn't quite the right word.
Q. Well, you laughed in your voice memo at 5:00 when you talked about getting arrested.
A. Yeah. I was pretty nervous at the prospect.
Q. That was a nervous laugh?
A. Yes.
Q. Okay. So the bodies at the exit, the purpose of bringing more bodies to cause them to free the people, the detainees, instead of transporting them, you needed more bodies because you needed to show more strength, right?
A. Sure.
Q. It's a form of telling them if you come out here, you're going to meet us out here.
A. That's not really the message. It wasn't about -- that sounds like we're spoiling for some kind of fight, and it's -- frankly, no, that's not how I roll, and that's not what I was up for. But for the same reason community pressure works in any other situation, wanted to bring it to bear here.
Q. So we're not talking about community pressure. We're talking about trapping people inside of a building.

A. No one was trapped in a building.

Q. They couldn't bring the detainees out.

A. Yeah, but they weren't -- they couldn't execute their original plan, but, I mean, ICE officers came at us from two directions. We've got tape of them going in and out of the building, the man gate, the gate, coming, pushing us around from one side and the other. They -- the front door was completely open for like six hours. They could come and go as they wanted to. No one was trapped.

Q. So you were saying that they could have gone out with the detainees at the front door? Is that what you're saying?

A. I'm --

Q. Withdrawn.

I'm not disagreeing with you that an ICE officer could walk outside. That's not what the purpose was.

MR. ORESKOVICH: Judge, I'm going to object to the notion of counsel's comments "I'm not disagreeing." It's not a question.

THE COURT: Form your questions as questions, Ms. Cartier-Giroux.

Q. (BY MS. CARTIER-GIROUX) Can we agree that your purpose wasn't to prevent an ICE officer walking outside? Can we agree on that?

A. Yeah.

Q. Your purpose was to not allow them to bring the detainees

out of that building.
A. My hope was to --
Q. It's a yes, no.
A. I can't give you a yes or no.
Q. Okay. Well, then why don't we use something that you say in your voice memo.
You were not going to let them kidnap the detainees.
A. Yes.
Q. Right? You weren't going to let them bring them out.
A. I --
Q. Unless they were going to turn them over to you.
A. Oh, no. I don't -- I don't think any of us were prepared to take custody of anyone.
Q. Well, where were they going to go if they were -- if -- you wanted them to be released.
A. Well, Cesar --
Q. That would mean they'd walk outside, right?
A. I think they had homes and places they were staying.
Q. Oh, I'm sorry. I'm not saying you personally would take them into your home. I'm saying the options the ICE officers had were either stay trapped in the building with the detainees or hand them over.
A. No one was trapped.
Q. The detainees couldn't be brought out. They can't abandon their duty, can they?

A. It's a question for them. All I know is that I'd seen that in other places, people had been released for 48 hours or something like that to be able to seek their legal counsel and make sure their case was taken care of. And I was hoping, yes, for a similar outcome here.
Q. If you put enough pressure on them.
A. Sure.
Q. And the pressure was by blocking them from coming outside with the detainees.
A. The pressure was our physical presence surrounding the building, yeah.
Q. To block them from leaving with the detainees.
A. We were in their way.
Q. Excuse me?
A. We were in their way. We did get in their way. I did get in their way.
Q. So at 5:00, you were still at the white bus when this plan occurred to block the exits, correct?
A. Again, I -- I think saying that there was a set plan is generous and -- but was I at the white bus at 5:00? Based on the timeline that I've seen, that sounds correct.
Q. Let's play -- because we're having some disagreement about your mind frame -- frame of mind. Let's play 15 from Exhibit 78. There's no sound.
(Playing Exhibit.)

BY MS. CARTIER-GIROUX: That was the wrong one. It's slide 15. It's what I said, but I played the wrong one.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) So when this message is made at 5:00, you've decided that if they're going to try to use the bus, that you're going to link arms around it, correct?

A. Yes.

Q. You're going to block it.

And you have eyes on these exits, and you're concerned about them leaving?

A. Without us knowing, yes.

Q. Okay. So at this point in time at 5:00, you're in. You're in on this plan with the others who are helping you.

A. At 5:00, I decided to participate in civil disobedience with other people.

Q. Well, you've decided to commit criminal acts, correct?

A. I decided --

Q. And get arrested.

A. I decided to participate in civil disobedience.

Q. Okay. So let's talk about what those acts are, then. You can call it what you want to call it. I want to talk about specifically what you were agreeing to do at this point in time.

A. Okay.

Q. You were agreeing to block the bus.

A. I was agreeing to sit in front of the bus and link arms.

Q. Okay. You were agreeing to block exits.
A. I was agreeing to sit in front of exits and lock arms.
Q. Okay. And then there came a point in time where you were given information that the officers were leaving the building from the south gate.
A. Oh. I don't know precisely what I heard, but yeah, I heard some shout that the gate was opening and there was cars or something and -- so, yeah.
Q. Well, you had people at each exit, correct?
A. I didn't have people, but yeah, there were people around the building watching what was going on.
Q. People in your group that were in this plan to block the exits were informing each other if someone exited from a particular exit.
A. No.
Q. So there was no plan to shout out if someone was trying to come out, they're coming from here?
A. There were people who watched various exits and volunteered to keep an eye out and keep people informed in the crowd, but there wasn't like a discrete group and a plan with, like, runners or whatever. It wasn't that coordinated. It was just people around the building, protesting around the building and sharing information.
Q. Understood. Because this wasn't a preplanned decision, right? This was made on the spot. You all decided then and

there that you were going to block the exits and not let them out.

A. We decided in that moment that we were going to link arms at the south gate.

Q. No. I'm talking about the exit still, before you even heard them coming out.

A. Yeah. It just doesn't -- that just feels way too specific. It wasn't really a set plan to sit and create like a whole blockade. Really where it came from was originally we just had eyes on the bus, and it was just sitting in front of the bus itself. We weren't actually concerned with the building at all for the most part.

And then it occurred to us later, especially after spray paint guy, oh, they probably aren't going to use this vehicle anymore, so we should be aware of what else they might do. And that's when we spread out around the building and kept each other informed.

So that first notion of linking arms in front of the bus doors kind of just ended up translating into like the default civil disobedience that we were going to do.

Q. So you had collectively made a plan -- use your words -- so that the federal officers had to essentially deploy violence in order to leave the detainees -- leave with the detainees, as your words were kidnap these boys. You stated "We collectively made it so that they" -- the federal officers -- "had to

essentially deploy violence in order to leave with the detainees."

A. I did write that.

Q. Okay. And that was a plan that you had in place with others. "We."

A. Yeah. I mean, yeah. That was what the people who were going to do CD agreed to.

Q. And that was a plan that you had at the white bus even before you went to the south gate.

A. Not really. I don't think we anticipated when we were at the white bus just how hot things would get at the south gate. We expected to be arrested. Right? The guy came out of the building, he said if you're sitting here you're going to be arrested. So we linked arms and we expected that they would then do their best to arrest us. We'd agreed that we weren't going to fight or seek de-arrest but that we would try to stay linked as long as we could, and after that, that was going to be what that was going to be.

Q. So in your voice memo on June 12th, the day after this, is your testimony that you did not describe that it was a collective decision that you would cause the federal officers to essentially deploy violence in order to leave with the detainees?

A. Oh, I'm not saying I didn't say that. I was saying that that wasn't -- that there wasn't a set gelled plan before we

went to the south gate up at the white bus. That wasn't really in place. That's what I understood the question to be. I'm sorry.

Q. So when you say "We collectively made it so that they had to essentially deploy violence in order to leave with the detainees," you're saying that that wasn't any part of a plan?

A. I was only saying that that wasn't a plan created up at the white bus. The -- I'm trying to figure out if I understand what you're asking.

Q. I'm asking you at what point in time did you collectively agree that the officers would have to essentially deploy violence in order to leave the facility with the detainees?

A. Oh. I mean, I guess the moment civil disobedience was decided upon, that's the nature of civil disobedience is you are nonviolent and defensive, and you let the people who are pushing the unjust behavior show the world who they are.

Q. Let's talk about what happened at the south gate. So you and others, when you heard that they may be leaving from the south gate, rushed over to the south gate.

A. Yes.

Q. And the purpose of going to the south gate was to stop them from leaving.

A. It was to be in the way, yes.

Q. And it wasn't just the detainees. They didn't have any detainees with them. Did you know that?

A. No, I didn't.

Q. So you believed that they might be transporting the detainees?

A. I thought it was possible.

Q. And that's why you wanted to block them.

A. That's why I wanted to stand in the gate, yes.

Q. And when you got to the gate, there -- many people were already there.

A. Yes.

Q. And when you got there, you took charge of that gate?

A. In a way.

Q. Well, you went to the front line, right?

A. Yes.

Q. You instructed those -- well, you instructed out loud, "Those of us willing to face arrest, this is what we talked about; it's time to link arms."

A. I mean, I wouldn't call that an instruction, but I did say that, yes.

Q. Well, and they linked arms with you.

A. With each other, yeah.

Q. With each other. People who you knew.

A. Some.

Q. People who you didn't know.

A. Some.

Q. All together linking arms to block the gate.

A. Yes.

Q. To prevent the officers from transporting what you believed to be the detainees.

A. Yes.

Q. The other officers arrived. Those three other officers, Tomaso, McSullivan, and LaForte. They arrived from the side, right? And they tried to move you?

A. Sure.

Q. Well, they created a line and pushed. We saw the video.

A. Yeah. We did see that.

Q. And they told you to move.

A. Yeah. They did.

Q. And they were wearing police markings.

A. They were. I'll throw out there that, like, the police marking is like a -- it's like a two-by-one-inch thing. It wasn't very obvious, honestly, who they were.

Q. You knew they were at least associated with ICE.

A. I suspected.

Q. Right. And the vehicles had red and blue lights on.

A. I've seen that in the video. I don't know if I -- if I clocked that at the time, but yes, they did.

Q. Because you would have stopped them even if they didn't have the lights on, right?

A. I would have been at the gate for the purpose that I came to the building for.

Q. Let's be clear. You just testified that you thought they were transporting the detainees.
A. I thought that was possible, yes.
Q. So you believed that they were federal officers or agents that were transporting them.
A. I thought that was possible, yes.
Q. And that's why you were blocking them.
A. That's why I went where I went, yeah.
Q. And at the gate, when they pushed to move you out of the way after ordering you to move, you didn't obey their order, right?
A. There wasn't really an opportunity.
Q. Were you going to?
A. No.
Q. Okay. Thank you.
You were going to stay there no matter what.
A. I was going to stay there till I got arrested.
Q. Okay. And that's what you thought would happen is you would get arrested?
A. Yeah.
Q. So are you telling this jury if they said, "All of you are under arrest," you would haven't blocked the gate anymore?
A. I mean, if I had understood myself to be under arrest, I would have complied with that arrest.
Q. Meaning if you were cuffed?

A. Yes.

Q. So if you're not cuffed, and they just say you're under arrest, you still would have done what you did.

A. Stood where I was standing, yeah. I probably would have stood where I was standing until given further instruction.

Q. Blocked the gate.

A. Yes, I would have stood in the gate until given further instruction.

Q. Okay. And so when they pushed you -- when they pushed you, you weren't going to let them move you. They were giving you instructions. Did you just think that the only way -- only instruction you had to obey was you're under arrest? Is that your testimony?

A. My testimony is that ICE agents came and started yelling and immediately began pushing us around, that --

Q. But you were blocking them.

MR. ORESKOVICH: Just a moment. Judge?

THE COURT: Okay. Let the witness answer the question and then --

MS. CARTIER-GIROUX: I'm sorry.

THE COURT: I think it's just slowing down. Probably just slowing down helps.

MS. CARTIER-GIROUX: Okay. I'll withdraw the question. We'll restart.

Q. (BY MS. CARTIER-GIROUX) They were pushing you.

A. Yes.
Q. Correct?
A. Correct.
Q. They were pushing you because you were blocking them and not listening to them.
A. That goes to their intent. That's not something I can speak on.
Q. Okay. You weren't listening to them.
A. Honestly, I didn't have the opportunity.
Q. Well, when they pushed you and told you to move, you went right back to where you were.
A. When they -- eventually, yeah, I did do that.
Q. So you weren't listening to them.
A. Ultimately, no.
Q. And when they were pushing you, you linked arms with other people.
A. I was already linked when they started pushing.
Q. But when your arms became unlinked, you went back and relinked arms.
A. Yes, I did.
Q. To create a larger mass of people.
A. To conform with the previously agreed-upon plan, conversation.
Q. Which was to link arms.
A. Yes.

Q. Which was to force them to use violence.
A. Which was to prevent us from becoming violent in response to their aggression because we hadn't had the weeks of civil disobedience training to, like, keep our tempers in check and that kind of thing. So it took our hands out of the equation.
Q. So you're saying that you were linking arms not to push back?
A. I don't know how I would push someone without the use of my hands. I'm being sincere. I genuinely don't know how.
Q. When we see in the video -- well, we can pull it up -- with you and Officer Tomaso, he's trying to push you. And the whole group of you together, you're able to stay up against him.
A. The --
Q. Now, if it was just -- do you remember that?
A. I remember the video you're referring to. I would probably characterize it differently.
Q. Okay. Let's play it. Let's play 86.
A. I just see Signal.
MS. CARTIER-GIROUX: Do you still have Signal?
MS. GEORGE: Yeah.
MS. CARTIER-GIROUX: Try now.
MS. GEORGE: Black.
THE COURT: Black with a green dot.
MS. CARTIER-GIROUX: I don't know why it did this all of a sudden. Hold up. Let's play 86.

(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) I'll slow down a little bit.
(Playing Exhibit.)
Q. (BY MS. CARTIER-GIROUX) So as we're seeing the linked arms, is it your testimony that the individuals are not linking arms to keep together in one mass?
A. We are trying to stay together.
Q. And the purpose -- one of the purposes -- I understand one of the purposes might not be so that you might not throw a punch, but one of the purposes is to use the mass of all of you together.
A. No.
Q. It's not?
A. No. That wasn't discussed.
Q. Okay. But that's what they're doing whether or not it's been discussed; is that not right?
A. What do you mean "doing"?
Q. Aren't they using each other's body weights to push back against the officers?
A. No. We're mostly just trying to stay on our feet. We don't have much coordination. We're all uneven. We're being pushed and pulled from different angles. And because we're connected, one person gets pulled, it affects the whole line. There's not a whole lot of coordination there at all.
Q. So you're saying in this video that you are not using the

others to stay up when he's -- when Tomaso is pushing you, you're not using these other people that just came right across here to push back against Tomaso.

MR. ORESKOVICH: Objection.

THE WITNESS: Only --

MR. ORESKOVICH: One at a time, please. Asked and answered, repetitive.

THE COURT: Why don't --

MS. CARTIER-GIROUX: These people.

THE COURT: Why don't you just show the video and then ask the question and then just -- it could get argumentative after that.

MS. CARTIER-GIROUX: Okay.

Q. (BY MS. CARTIER-GIROUX) Is it your testimony when Tomaso was just pushing you forward in this video, that these individuals did not come forward to push you back by -- push you back?

A. I -- I don't know what those individuals are doing in that video. My testimony is that my only intent in that entire scene is just to keep from eating pavement. I eventually do, but I'm really just trying to stay upright and -- yeah.

Q. Here we go. This is what I was talking about.

(Playing Exhibit.)

Q. (BY MS. CARTIER-GIROUX) So Tomaso is trying to push you, right?

A. Looks like it, yes.
Q. But you're not falling down.
A. No.
Q. He's a lot bigger than you are.
A. He is.
Q. And the reason why you're not falling down is because you're linked with those people behind you.
A. Likely.
(Playing Exhibit.)
A. And I do eventually fall down.
Q. (BY MS. CARTIER-GIROUX) You were part of a group whose job was to link arms and man that gate and keep anything from going in or out. Your words. Right?
A. Yes.
Q. They were not going to kidnap anyone by getting them out through that gate. Your words.
A. Yes.
Q. And, in fact, when this whole melee was going on, you had a friend there, right? Erin Sellers?
A. Erin Sellers was there.
Q. Do you recall Exhibit 23? Do you remember hearing someone yell "Fight, Jac, fight"?
A. No, I don't.
Q. You were making it so that they, the officers, would have to use violence against you in order to move you out.

MR. ORESKOVICH: Objection, repetitive and argumentative.

THE COURT: Overruled.

You can answer the question.

THE WITNESS: I was staying in my spot and letting them show the community who they were.

Q. (BY MS. CARTIER-GIROUX) They had to show us who they are.
A. Yes.
Q. You were going to make them use violence to show you who they were.
A. They chose to use violence on people who didn't aggress against them.
Q. People who were blocking and trapping them in a building?
A. They weren't trapped in a building.
Q. Do you agree that they have a duty to these detainees?
A. Short answer, no, but that gets political.
Q. Okay. Well, you had food brought to you, right?
A. Yeah.
Q. You had water brought to you?
A. They had indoor plumbing.
Q. You had pizza brought to you?
A. At 12:30, yes.
Q. Did you have any concern about whether or not they had food in that building?
A. No, because if they wanted food, they could get food.

Q. If they wanted food, they could let them go.
A. If they wanted food, they could get food.
Q. Eventually, the officers gave up, right? They closed the gate and left?
A. Yes.
Q. And then you all barricaded the south gate?
A. Some people chose to put objects in front of the gate. What I recall from that was there was conversation of, you know, next time they might just run us over. And so they --
Q. Wait, wait. That they were going to run you over?
A. There were people who were concerned about what would happen the next time the gate opened. And so I remember hearing that sort of chatter. And some people did put objects in front of the gate, yes.
Q. And you were asked on direct examination that -- about whether you all followed them into the -- when the gate was open whether you followed them inside the secured lot.
A. Yes.
Q. By following them inside the secured lot, you couldn't get access to the building, could you?
A. I don't actually know. I don't know the layout of the building.
Q. You were actually present the entire time that Forral and Hatfield and Muncey -- do you remember Muncey, the guy with the orange shirt?

A. I saw him.
Q. Well, you actually had conversations with him.
A. I think -- yeah, there's a video of us talking, yeah.
Q. You were talking to him?
A. Apparently.
Q. Well, around the time of the barricading?
A. I am unsure of the timing.
Q. Let's look at 442.
It's you, right?
A. Yes.
Q. And it's all barricaded behind you.
A. Yes.
Q. And according to your witness that came in here and testified, the only reason why you took it down is because you all were afraid it would fall on you.
A. That was one of the reasons that was raised. We -- there was a lot of conversation. We also -- I know personally, I preferred to just maintain kind of where we started before. I was willing to put myself on the line, so I was going to put myself on the line, just pure and simple.
Q. So your coworker, your friend Forral, is barricading this gate, right?
A. I see a barricade in front of the gate. I think --
Q. Well, you saw them barricading it, didn't you?
A. Maybe. I think so.

Q. Okay.
A. I wasn't watching things happening. I was -- you can see I'm facing the group of people in that huddle. We're having a conversation about what had just happened and where we're at.
Q. It took a while to put up all those benches, didn't it?
A. I don't know how long it took.
Q. Well, there came a point in time where you saw people barricading.
A. I -- yeah.
Q. And you saw Forral barricading.
A. I saw Forral carrying some things, yes.
Q. You saw Forral barricading the gate, putting it up against the gate.
A. Not like single-handedly.
Q. No. With others helping.
A. I saw Forral carry things to the gate, yeah.
Q. And at no point in time did you say "Don't do that."
A. No, I didn't.
Q. No point in time did you say "We don't want to put this here because if they come out, it will cause property damage."
A. No. I just waited until it was done and then worked with everyone else to remove it.
Q. After you all were concerned that it could harm you.
A. That was one reason listed.
Q. Well, according to Tewel, that was the only reason that was

listed.

MS. GEORGE: Objection.

MR. ORESKOVICH: Judge, objection to the --

THE WITNESS: That's --

MR. ORESKOVICH: Hang on, please.

THE COURT: Mr. Oreskovich, you have an objection?

MR. ORESKOVICH: I'm objecting to the mischaracterization of the Tewel testimony and the repetitive and argumentative nature of these questions.

THE COURT: Okay. What I will sustain is asking to pass on the testimony of another witness. And please ensure that the questioning is not argumentative.

MS. CARTIER-GIROUX: Okay.

Q. (BY MS. CARTIER-GIROUX) Well, then let's talk about the east side, the other area that was barricaded. Do you recall that being barricaded?

A. I've seen the photos, yes.

Q. You were there, weren't you?

A. I don't actually recall being present for when that took place.

Q. That also took a while, didn't it?

A. I don't know how long it took.

Q. Well, isn't this you right here?

A. Yes. And as you can see, I'm not actually facing that gate. I'm again engaged in conversation with a gaggle of

people.

Q. To be clear, the plan to block the exits is still ongoing.

A. Again, there isn't really so much a plan to block the exits in, like, this coordinated sense, but I had certainly agreed with the people who I stayed with at the south gate to maintain that position.

Q. So is it your testimony that what we see here is not coordinated? Is that your testimony?

MS. GEORGE: Objection. Already stated had no part of that.

THE WITNESS: Yes.

THE COURT: I don't understand the objection.

MR. ORESKOVICH: And I join.

MS. GEORGE: Speculative.

THE COURT: The witness has answered.

THE WITNESS: It is my testimony that if there was coordination related to that, I certainly had no part in it.

Q. (BY MS. CARTIER-GIROUX) Okay. So is it your testimony that, after you all blocked the south gate, that the plan to block the exits and prevent the agents from transporting the detainees was over?

A. It is my testimony that after what happened at the south gate, I stayed at the south gate to keep an eye on the south gate. And I knew there were many protesters around the building watching and demonstrating around other parts of the building.

Q. Maybe you didn't understand my question.
A. Maybe.
Q. The question was: Was the plan -- okay.
Was the decision at some point to have people at all the exits that you talked about that was at 5:00 at a minimum that you were in, was that abandoned after the south gate?
A. To abandon a plan, you have to have a cohesive plan.
Q. You thought it was your responsibility to man the south gate, correct?
A. I made it my responsibility to stay at that gate, yes.
Q. You held the gate -- sorry. "We held the gate and we held it from about 4:00 p.m. to midnight." Those are your words, right?
A. Yes.
Q. "We did our jobs."
A. Yes.
Q. So it was you and the others that were at that gate whose job it was to man that exit?
A. Yes, insofar as we assigned that to ourselves, yeah.
Q. Well, it was part of the overarching plan, loose as it may have been, to make sure that the detainees were not brought out of any exit.
A. To make sure specifically that they weren't transported to Tacoma. Being brought out of the building at any point wasn't really the point. It was about them being transported to a

detention facility under a situation that we understood not to be particularly lawful.
Q. It was about your desire to make the determination of whether or not they should be released or whether or not they should remain and be transported to Tacoma to see the judge. You took it on as your decision. Am I not correct?
A. I didn't have that power.
Q. Well, you tried to force them to be released.
A. I protested.
Q. You tried -- you made actions -- you committed acts to try to force them to release them.
MR. ORESKOVICH: Objection, argumentative and repetitive.
THE COURT: I think this is getting repetitive.
MS. CARTIER-GIROUX: I'll move on. That's fine.
Q. (BY MS. CARTIER-GIROUX) When the munitions went off, they were deployed, your immediate reaction was to get up and stand in front of that gate.
A. Yes.
Q. Because you were still in on blocking that gate when the munitions were deployed.
A. That was the commitment I had made, yes, standing there.
Q. You and your group were not going to let anyone out of there.
A. I wrote that because I wasn't going to be complicit in the

kidnapping by doing nothing, but I was under no illusions that people with body armor and all these other tools and whatnot were actually at our mercy.

Q. You mean the people that retreated inside the building? Is that who you're referring to?

A. The people who walked back in the building and walked out again and then walked in again, yes. Those people. I -- they were very intimidating. I did not think that they were in any way at the mercy of really anyone they didn't want to be under specific circumstances. They had the tools, the OC, the batons, the guns, the body armor. And we were just going to sit there and refuse to be complicit in what we understood and what I still understand to be essentially the kidnapping of someone seeking asylum.

Q. Okay. So they could leave, but they couldn't get out unless they used violence against you.

MS. GEORGE: Asked and answered.

THE WITNESS: They chose to use violence.

Q. (BY MS. CARTIER-GIROUX) When they pushed you when you didn't listen to their commands?

A. When they shoved me to the ground, when they shoved other people to the ground, yeah. I would call that violence.

Q. Well, let's talk about that. PJALS. We heard a lot about PJALS today. What's a peacekeeper?

A. A peacekeeper is a trained protester who, while not

neutral, is not in -- has a different role in the protest to essentially help de-escalate things and to help people exercise their First Amendment rights safely and help achieve the goals of the protest.
Q. And peacekeepers, they're not supposed to become physical, correct?
A. Correct.
Q. And do you remember Joseph Stussi? I think I'm saying his name right. Stussi? Stossy (phonetic)? Do you know him?
A. I know him. I'm not solid on the pronunciation of his last name. I do know him.
Q. He was backpack guy that Deputy Morgan was talking about, right?
A. Yes.
Q. And he hit Deputy Morgan in the chest.
A. I don't know that I saw that.
Q. Okay. And you know that Justice Forral brought a steering wheel lock immediately upon the arrival of the red van?
A. I saw a video with them holding a steering wheel lock.
Q. You saw them banging it?
MS. GEORGE: Objection. This is based on a video.
THE COURT: That's true, Ms. Cartier-Giroux. I think we need to focus on --
Q. (BY MS. CARTIER-GIROUX) Would it be fair to say that, while the PJALS rules were rules that you wanted to follow, that

they were, in fact, aspirational as opposed to actual?

A. They aren't rules. They're guidelines and community agreements that apply at PJALS events. This wasn't that, and there were no peacekeepers here. Nobody in the peacekeeper vests. It was just an event and came spontaneously. I hold those values dear. Everyone else came to the protest with their own values.

Q. Right. Understood. But you didn't check people's values when you worked with them.

A. Oh, I did. I told them that if they couldn't take a punch without throwing one, they should not join the line.

Q. That's -- that was what you told them, right?

A. Mm-hmm. And I asked people to consider, you know, for themselves, do you really feel like you can handle a situation where things might get rough? Is your fight response really strong? Or are you going to be able to hold back, stay calm, keep your hands to yourself, even if you're being shoved around or pepper-sprayed or whatever? I would ask people to consider these things for themselves because I can't tell anyone what to do, but people know their own temperament and what they're capable of under difficult circumstances.

Q. Other than that, telling them what you just said about the punch, throw a punch, not throw a punch, there wasn't any other type of communication about rules.

A. About -- well, again, the way that I organize it, it's not

rules-based. It's about consensus and consent and people making their own decisions. So there are other things we talked about. I gave advice, like take your -- well, first, I told people to take their keys out of their pockets because they're sharp, and falling on them sucks. And remove anything from your person that's a weapon or could be construed as a weapon, even if it's just your little pocket mace or pocket knife or whatever. I advised people to remove piercings because those can cause injury in a crowd situation if there's like a scuffle or something like that. I checked in with folks about what protest experience they'd had personally, just to get a vibe of the group. Some people I know showed up that day, it was their first protest; other people, it was old hat.

We discussed the intent of nonviolence. You know, we're not here to be aggressors. We're not here to hurt anyone. We are only here to protect our fellow community members, and we're not going to lay our hands on anyone even, if they make contact with us. So that was kind of the conversation that we had.

Q. Correct. Fair to say you didn't throw any punches, right?

A. Correct.

Q. You didn't need to throw any punches to put the pressure you needed to get them to release.

A. Sure.

Q. You didn't need to, right?

A. No. I did not see it as a necessity.

Q. It was your numbers. It was your tactics. It was your blocking. Didn't need to punch anybody.
A. No, I did not need to punch anyone.

MS. CARTIER-GIROUX: I don't have anything else. I pass the witness.

THE COURT: Okay. Redirect examination, Mr. Oreskovich?

MR. ORESKOVICH: No, your Honor.

THE COURT: Okay. You may step down.

THE WITNESS: Thank you, your Honor.

(WHEREUPON, further proceedings were held which were not ordered and transcribed.)

* * * * *

## WITNESS INDEX


| For Defendant Archer | Page |
|---|---|
| **JAC DALITSO ARCHER** | |
| DIRECT EXAMINATION BY MR. ORESKOVICH | 3 |
| CROSS-EXAMINATION BY MS. CARTIER-GIROUX | 38 |


* * * * *

## EXHIBIT INDEX


| No. | Description | Page |
|---|---|---|
| None | | |

C E R T I F I C A T E

I, CRYSTAL L. GONZALEZ, do hereby certify:

That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Spokane, Washington;

That the foregoing proceedings were taken on the date and place as shown on the first page hereto; and

That the foregoing proceedings are a full, true, and accurate transcription of the requested proceedings, duly transcribed by me or under my direction.

I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings;

DATED this 28th day of June, 2026.

CRYSTAL L. GONZALEZ, CRR, RPR
Washington CCR No. 2955
Official Court Reporter
Spokane, Washington