# Exhibit L.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. JUSTICE FORRAL (2), BAJUN MAVALWALLA (8), and JAC ARCHER (9), Defendants. | Case No. 2:25-cr-00113-RLP<br>May 20, 2026<br>Spokane, Washington<br>Excerpt of Jury Trial - Day 3<br>**Testimony of Jason McIntosh**<br>Pages 1 - 51 |

BEFORE THE HONORABLE REBECCA PENNELL
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | LISA C. CARTIER-GIROUX<br>REBECCA R. PEREZ<br>U.S. Attorney's Office<br>920 W. Riverside Avenue<br>Suite 340<br>P.O. Box 1494<br>Spokane, WA 99201 |
| For Defendant Forral: | ANDREA K. GEORGE<br>AMY H. RUBIN<br>Federal Defenders of Eastern Washington & Idaho<br>601 W. Riverside Avenue<br>Suite 900<br>Spokane, WA 99201 |
| For Defendant Mavalwalla: | AINUDDIN AHMED<br>Ahmed Law Firm<br>550 Congressional Boulevard<br>Suite 350<br>Carmel, IN 46032 |
| | MATTHEW F. DUGGAN<br>Duggan Law Offices PLLC<br>23505 East Appleway Avenue<br>Suite 200-175<br>Greenacres, WA 99019 |

For Defendant Archer: CARL JOSEPH ORESKOVICH
ANDREW M. WAGLEY
Etter McMahon Lamberson Van Wert & Oreskovich PC
618 West Riverside Avenue
Suite 210
Spokane, WA 99201

Official Court Reporter: Crystal L. Gonzalez, CRR, RPR
United States District Courthouse
P.O. Box 700
Spokane, Washington 99210
(509) 458-3434

Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.

(WHEREUPON, previous proceedings were held which were not ordered and transcribed.)

(JASON MCINTOSH, called as a witness by the Plaintiff, having first been duly sworn, testified under oath as follows:)

THE COURT: Please be seated.

DIRECT EXAMINATION

BY MS. PEREZ:

Q. Would you please state your full name spell your last name?

A. Jason McIntosh. M-C-I-N-T-O-S-H.

Q. How are you employed?

A. I'm sorry?

Q. How are you employed?

A. Full time with Immigration Customs Enforcement.

Q. What is your -- what do you do with Immigration and Customs Enforcement?

A. I'm a deportation officer, but my field is the nondetained unit. Kind of like a probation officer, I guess.

Q. How long have you been with ICE?

A. 18-plus years.

Q. And have you always worked here in Spokane with ICE?

A. No, ma'am. I started in Portland, and I worked there until 2019. Then I moved here.

Q. Okay. Back on June 11, 2025 -- so you had the same job with ICE at that point; is that right?

A. Yes.
Q. Where is your physical work location?
A. 411 West Cataldo Avenue.
Q. We've had some testimony about what occurred at that building that day, so I'm just going to ask you a few specific questions about what you did.
At some point that day, did you have contact with an individual named Ben Stuckart?
A. Yes.
Q. Describe that contact with me briefly.
A. He came into the office. I believe it was his wife, or I thought at the time it was his wife, another lady, and two males.
Q. Okay. Were those two males detained?
A. They were taken into custody, yes.
Q. Okay. Based on an immigration hold; is that right?
A. Correct.
Q. And after that occurred, how did Mr. Stuckart react?
A. He was upset obviously. I mean, I could tell he was upset. And I was doing my best to try to deflate his being upset, let him know, you know, this is not the end, this is just a change of custody. And so I tried to assure him this doesn't mean they're being removed. It's just -- it's a change of custody, and that's all it is.
Q. Did you let him know what would occur with those two

individuals that were detained?
A. I told them they would get a chance to call them when they got to Tacoma and let him know what was going on.
Q. What happens in Tacoma?
A. That's where the detention center is at, so they're held there to await court, generally via video. But when they get there, they're given a packet and told everything that's going to happen to them, and then they get the chance to make phone calls to people.
Q. And then they appear for the court hearing and go from there; is that right?
A. Correct.
Q. After these two individuals were detained, what did you do?
A. I continued working for the day.
Q. Okay. And so just kind of generally what are you doing during the day?
A. So for these individuals, I go back there. I talk to them, you know, kind of let them know what's going on at that moment, see if they have any concerns about anything, try to do an interview with them so I got all of the correct information. Maybe there's something there I missed. And then I process them. I get them ready for the proceedings in Tacoma.
But there was many people that we had that day, so I did my best to get them, you know, going, get them started, and then moving on to the next person, the same type of thing.

Q. Okay. So that's a general process that occurs with everyone that comes in the facility; is that right?
A. Yes.
Q. Do you speak Spanish?
A. I speak pretty good Spanish, yes.
Q. At some point, did you become aware of something going on outside?
A. I did become aware of it. I wasn't totally aware of what was going on because I was back there working, and back there you don't -- I can't tell what's going on out front. So just, you know, people walking by, hey, there's protesters out front, there's starting to be people milling around a bit, which was a little unusual. But I thought okay, you know. And by a little bit of people, I just thought maybe there was a couple of people out there.
Q. Yeah. And initially, was that concerning to you?
A. Not initially, no.
Q. At some point, did it become concerning to you?
A. Yes.
Q. When?
A. It started becoming more and more people out there, and so then I was worried about the safety of how are we going to move people from one area, our custody, to the bus safely if there's people out there. And we don't have enough officers that we can be in front of every single person. So I started to become a

little worried at that point because I was, like, I want to make sure these people are safe. I can't -- I can't be everywhere at the same time.

Q. Why would having people, just the public, in front of the bus, why would that make you concerned for your safety?

A. At that point, I wasn't concerned about my safety so much as I was worried about the safety of the people that were in our custody, because, again, there's a limited number of me versus a big number of people out there. When they're sitting in front of the bus, okay, maybe they're trying to make a statement at that point, but they'll let us through. But then it got to the point where I knew that we are not going to be able to get them through safely.

Q. What brought it to that point that you knew you couldn't get through safely?

A. When our doors were completely covered by people, the doors of the bus were covered by people, people in front of the bus. And at that point, it was a very large crowd of people.

Q. When you say doors covered, what doors are you talking about?

A. The door from our building to the bus. So the door from our building there and the door to the bus, both of those were kind of to the point where, like, we can't -- we can't take people out there safely.

Q. And so door to the building. Are you talking the lobby

entrance or is there a different door that you're talking about?
A. There's a different door, a sally port door where the cells are at and the processing area is at.
Q. Okay.
A. That was a lot of people around that area.
Q. Why is that the door that you use?
A. Because that's where the cells are at. That's where the processing center is at.
Q. Do you take detainees out the lobby entrance?
A. Not detainees, no.
Q. Why?
A. We try to have a dedicated area for that. We've still got people coming in, so I need to worry about both people coming in, people going out. I don't want to scare people, you know, with -- the people that are coming in voluntarily to talk with me, I don't want them getting all scared because, okay, now we're taking people out. And again, it's just -- it's not safe.
Q. Okay. So we talked about you determined not safe with that white bus. What happened next?
A. After I determined it was not safe?
Q. Let me ask a better question. So you just a second ago indicated we determined we couldn't use the white bus; is that right?
A. Yeah.
Q. And so then what did you and, I mean, kind of people in the

building do next? What was the next step in that?
A. We just continued working. I continued working.
THE COURT: Just a minute. There's an objection.
MS. GEORGE: Objection, cumulative.
THE COURT: Some of this has probably been covered, so if you can get through things that have not been covered already.
Q. (BY MS. PEREZ) Agent McIntosh -- Officer McIntosh, rather, based on your inability to use the white bus, did you participate in another plan to exit this building?
A. Yes. There was a plan for three of us to go down to the secured parking area and leave there to go rendezvous somewhere else to have a plan to come in and get them.
Q. Describe to me your role in that plan. What did you do?
A. So I put my body gear, body armor on.
Q. So let me just so stop you there and we'll continue. Why did you put your body armor on?
A. Policy.
Q. It's policy; is that what you said?
A. Mm-hmm.
Q. Okay.
A. So I put the body armor on. I went down to our secure parking. We talked about it. We were going to have our lights on. We're going to go out this door. We're going to meet at a different place. And I think we were going to meet somebody

there. I wasn't sure who, but I was told the three of us are going to go do this. So that's when we went out to our vehicles and were trying to leave.

Q. As you walked to your vehicles, describe to me what you were seeing and hearing outside.

MS. GEORGE: Objection, cumulative.

THE COURT: Overruled.

You can answer.

THE WITNESS: I saw a lot of people outside. And I saw somebody at the corner of the building, and I heard them yell, "Hey, they're coming out here. They're coming out here." And then it was like a wave of people coming towards me or towards the parking area.

Q. Coming from where?

A. They were coming from the front of the building or the side of the building down to the parking area where we were trying to exit.

Q. Could you hear anything else from the people outside?

A. I heard a lot of stuff, yes.

Q. What stands out?

THE COURT: You can -- you can relay what you heard. It's not offered for the truth. And I understand if it's vulgarities, you can repeat it. We won't hold that against you.

THE WITNESS: I can repeat it? "Fuck ICE. Get the fuck out of our town. Die, ICE. Your parents must be proud.

Your kids don't like you." A lot of "Fuck ICE."
Q. (BY MS. CARTIER-GIROUX) As you walked out, you talked about you had body armor on. Were you wearing a mask?
A. Yes.
Q. Why do you do that?
A. At that time, I worried about my family. I worried about my safety, my family's safety, safety of those I work with.
Q. What did a mask have to do with that? How would that protect the safety of you or your family?
A. I knew these people weren't trying to be my friend. You could tell there was hostility just from the anger you could hear in their voices and what they were trying to do. So to me, I don't want my children to be subjected to somebody's anger at me, or my wife, anything taken out on them because of what I do. So I didn't want that to get out just because I don't want them going after my family.
Q. So as you walked out, you've described what you heard and saw. And so the vehicles were driving toward the south gate; is that right?
A. Yes.
Q. Do you remember what vehicle number you were in?
A. I believe I was in number 2, vehicle number 2.
Q. And so what happened? What did you see as you were driving out?
MS. GEORGE: Objection, cumulative.

THE COURT: Overruled.

You can answer.

THE WITNESS: So we backed our vehicles out, got in a line, and we had our lights on and started to pull out, and then the door -- the gate opened. And then it was just a wall of people. I mean, just a wall of people. And I thought right then, we're not going anywhere. We can't get through these people. We can't hit anybody, you know, with the vehicles. There's not a safe path out. And it was so compacted there that I thought we're not going to get it out.

Q. (BY MS. PEREZ) So what did you do?

A. Well, when I saw the gate open, I sat there for a second to try to assess the situation. Are they coming in? Are they doing this? What do I do now? And then I saw officers out in the crowd at that point, and I thought I can't sit here. I gotta go assist of what's going to happen. So I exited my vehicle and went to the front where the gate was at and assessed the situation at that point.

Q. As you were assessing the situation, tell me what happened. What were you seeing and hearing?

A. I was hearing a lot of, you know, "Fuck you, ICE. Fuck off. You should die." You know, a lot of that. But you kind of -- at that point, I kind of stopped hearing individuals, and you're trying to -- you're trying to remain safe. You're trying to keep your partners safe. You're trying -- you want everybody

to be safe is the whole goal.

So you kind of -- it was like there was nothing discernible to me. I could hear noise, but I was trying to focus. Like, is everything safe here? And so you're -- you've got a limited field of vision, but you're trying to take everything in that's going on around you at that point.

Q. Did you -- did you see pushing?

A. Yeah.

Q. Pushing by who?

A. I saw --

MS. GEORGE: Objection, cumulative. We've all seen the video.

THE COURT: Overruled. When we're on a break, I'll explain my cumulative thoughts. Go ahead. Overruled.

Q. (BY MS. PEREZ) Go ahead. What did you see as far as pushing?

A. So I saw Officers Tomaso and McSullivan trying to get people back so that we could exit. I knew that wasn't gonna happen. So as I'm standing the line, I see somebody I thought hit Jeremy, Officer Burlingame. And so I went over to him because I thought, okay, this is where it starts. Nothing else seemed to continue on from there. But it was just I saw them lock arms and like nothing's -- you know, nothing's getting past that.

Q. Were there individuals that you were seeing that kind of

stood out to you?
A. Yes.
Q. Okay. So I'm going to play you Exhibit 24 -- actually, sorry. I'm going to play you Exhibit 25.
Hang on. I'm sorry. It is 24. Okay.
Officer McIntosh, I'm not going to play this whole thing. I'm going to start at the beginning, and I'll pause it a few seconds in.
A. Okay.
(Playing Exhibit.)
Q. (BY MS. PEREZ) Okay. Officer McIntosh, let me back up a tiny bit. Are you in this scene?
A. Yes. I'm the officer on the right.
Q. Which one are you? Can you circle on your screen which one you are?
A. (Witness complies.)
Q. Now, I asked you if there were people within the crowd that stood out to you that you noticed. Do you see any of those people here in this screen?
A. The gentleman that's kind of got his fists together, black and white and gray shirt.
Q. Where's that person? Circle the person you're talking about.
A. (Witness complies.)
Q. Okay. Why was that person notable?

A. Because he was screaming right in my face.
Q. What was he screaming? Do you know?
A. "Shame, shame. Get out, ICE. Get out, ICE." Something along those lines.
Q. Anyone else in this particular screen that was notable to you?
A. This lady right here.
Q. Why?
A. She had a look in her eyes that I've never seen before, I guess, but it -- to me it was a look of -- of hate --
MR. ORESKOVICH: Objection.
THE WITNESS: -- to a point.
MR. ORESKOVICH: Just a moment, your Honor. I object to the characterization of reading someone's eyes and determining what's in her mind.
THE COURT: Try to use -- when you're explaining what you see, rather than trying to guess what that person might be feeling, just explain what you see. Okay?
THE WITNESS: Okay.
Q. (BY MS. PEREZ) What were you seeing in that person?
A. This person was staring off like there was nothing, nothing else there. And it's a look that I'll never forget.
Q. Okay. Sorry. Go ahead.
A. I was just going to show you the next person that I...
Q. Okay. If you see someone else in the screen, go ahead.

A. It's hard to tell from this angle, but I think I recognize that person. I think that was the one that was near Jeremy. And at some point, I know he bladed off on me, and so it was someone that I told myself, you know, pay attention, keep an eye on that.
Q. He bladed off on you. What do you mean by "bladed off"?
A. Screaming in my face, putting your hands together tightened up, you know, trying to get a good angle at me of -- if you're going to fight someone, that's -- you would blade off on them, angle off to where --
Q. Okay.
A. Just from training, that's stuff that we learn. You know, if someone starts to do that to you, those are indicators that something could go down.
Q. And I think you say -- I may have missed it -- what that person, the last person you circled in the upper right-hand corner, what did you see with him in respect to Jeremy Burlingame?
A. I assumed that it was a -- that they had pushed him or punched him or something because I know he went back when I thought --
Q. When you say "he" -- use names just to be clear?
A. I don't know this individual's name.
Q. Okay. Sorry. So --
THE COURT: And, Ms. Perez, I just want to be careful.

He can only testify as to what he saw, not what he assumed happened.

MS. PEREZ: Absolutely.

THE COURT: So be careful about that.

THE WITNESS: All right.

Q. (BY MS. PEREZ) Officer McIntosh, tell me what you saw with respect to that person and Officer Burlingame.

A. I saw them in proximity -- close proximity to each other. I saw Jeremy go back. That was not a natural movement. So I thought there's an issue going to happen here, this is where it's going to start. So I tried to maneuver closer to that to help Jeremy if need be, but nothing amounted to it from what I saw.

Q. When you say you saw Jeremy, Officer Burlingame, move back, what do you mean by that?

A. Stumble erratically, move kind of like you were pushed.

Q. Okay. I'm going to move forward just a bit. And I'll clear this first.

(Playing Exhibit.)

Q. (BY MS. PEREZ) Actually, I want to -- let me go back just a second here.

This person in the middle with the white kind of flowered, maybe, shirt, do you recognize that person?

A. I saw that person around, but I had no idea who that was.

Q. Okay.

A. I know that person was milling around there, but didn't stick out to me.
Q. Did you see that person in any other context aside from here at the south gate?
A. Not that I recall.
Q. Okay. Did you push anyone in this crowd?
A. I didn't push anybody. I tried to pull apart hands when they were locked because I saw John LaForte out there, and not knowing where John had come from, I thought he was being pulled out there. And so I saw him and I tried to break apart their interlinking of arms because I was, like, you gotta let him in, you gotta let him in, you gotta let him in. And I was worried that he was being pulled out there. And so that's why I tried to break the embrace or the locking of the arms at that point.
Q. Was that -- was that easy to do? Difficult to do?
A. No, not at all.
Q. So describe that. How did that feel as you were trying to pull locked arms apart?
A. Like I was trying to pull a chain apart. It was totally there, and people are moving, and I just -- I didn't think it was going to happen. It was very difficult.
Q. Did anyone push you independently of this -- aside from this linking arms that you've just described, did someone push you?
A. I don't recall if anybody pushed me or not. No one pushed

me to the point of where I felt I needed to retaliate or protect myself.
Q. We'll move forward in this Exhibit 24.
(Playing Exhibit.)
THE COURT: Will you clear the screen when you get a chance?
MS. PEREZ: Yes. Sorry.
Q. (BY MS. PEREZ) Did you see anyone move into screen that you recognized?
A. Yes.
Q. Who?
A. Mr. Forral.
Q. Okay. Where is that person in this -- okay. And why did you recognize that person?
A. He seemed to be the loudest one yelling stuff, and it was one of the only times that I guess I really -- I -- it was one of the things I heard that I remember. I know he was yelling at us "Fuck ICE. Fuck ICE," and then he called Kevin "Fucking race traitor."
MS. GEORGE: It's Forral, please, not he.
THE WITNESS: Okay. Mr. Forral.
Q. (BY MS. PEREZ) Sorry, Officer McIntosh. We aren't going to use "Mr.," so just Forral.
A. All right. Forral was yelling very loud and was telling -- directed towards Kevin, "Fucking race traitor. Fucking race

traitor. Fucking race traitor."
Q. When you say "Kevin," who are you talking about?
A. Officer Wilks, Kevin Wilks.
Q. Where was Kevin or Officer Wilks standing in relation to you?
A. He was to my right at that point, I believe.
Q. "Race traitor," are you familiar with that phrase?
A. Somewhat.
Q. Tell me what it means.
A. I mean, I don't know the Webster's definition of it, but to me it's someone who's betraying their race for something. And I remember thinking that is the weirdest thing to say because Kevin is Native. And so I was, like, you don't know him, why are you talking to him like that?
Q. So Forral that you circled there, did you see them, that person, later or at any other time during that day, June 11th?
A. Yes.
Q. When?
A. Once we ended up back inside, he seemed to be the loudest one and the most active person. So I was telling -- I was watching -- I picked him out of the crowd because of his shirt to begin with, but I was watching him, and it looked like he had something in his hands.
MS. GEORGE: Objection.
THE COURT: Why don't we take a short recess. Let's

take an afternoon recess. Ladies and gentlemen of the jury, we'll take a short recess.

All rise.

This one will be a short one, so be prepared in the next five minutes or so, but gives you a little bit of an opportunity to stretch.

(Jury exits the courtroom.)

THE COURT: Officer McIntosh, I've instructed the Government's counsel to inform their witnesses -- I don't know if you weren't instructed -- on the proper use of pronouns in my courtroom. Pronouns in my courtroom are according to how people prefer to be addressed. And defendants in this matter prefer to be addressed by they/them pronouns and by last name only. So I understand that sometimes people want to use Mr. or Ms. I often use Mr. or Ms., but in this case, please use just the last name. And if you need to use a pronoun, it is they/them or you can use the name if you're wanting to be more specific than that.

So while we're on break, is there anything further that counsel wants to make a record of?

MS. PEREZ: Your Honor, and I apologize. That was not intentional by any means. Officer McIntosh has been consistently very respectful. I think it's just the nerves of testifying. There's no disrespect meant here at all. We apologize.

THE COURT: Okay. I want you to please make sure your

witnesses know so that it's not an issue and it does not make anybody feel either uncomfortable or disrespected.

Anything from the defense counsel?

MR. ORESKOVICH: No, your Honor.

THE COURT: So I wanted to explain my thoughts on cumulative testimony.

I don't think it matters that you're here for that.

I've indicated that I will take cumulative objections. In my opinion, something's not cumulative if it's a witness expressing what they saw from their unique perspective, particularly if it's a contested issue. If it's not a contested issue, such as the layout of the building or things like that, then I think we don't need to go over it again. But if it's things as -- such as pushing or what happened, that's, I think, a contested issue in this case. So I will not consider that type of testimony cumulative.

If all we're doing is watching the same video that we've already watched, I would consider that cumulative unless we narrow in to a specific portion where a person is explaining what they specifically saw, recognizing, of course, that the defense can cross-examine with videos. I'm not going to stop the defense from cross-examining with videos just because a video has been played, but of course, it should be tailored in the interests of everyone making sure that we can get through this case on time.

So we just have a couple minutes of break if people want to stretch. We'll bring the jury back in.

MR. ORESKOVICH: Your Honor?

MS. PEREZ: Your Honor, to clarify, we are going until 5:30 today; is that correct? Is that the plan?

MS. GEORGE: We can't. We can't.

THE COURT: Ms. George is saying she can't. My thoughts was -- Ms. George, do you have a conflict or are you just...

MS. GEORGE: I was at the office at 3:00 a.m., and I can't go until 5:30.

THE COURT: Okay. Well, let's see how far we can go.

MS. GEORGE: We've been moving fast.

THE COURT: Okay. Hopefully, we've been moving faster. We may need to start with testimony at 8:30 tomorrow morning. I'm not sure if there's anything else to address.

MS. GEORGE: We could start testimony at 6:00 a.m. I could do that.

THE COURT: That interferes with, you know, my morning.

MS. RUBIN: Can we run to the restroom?

THE COURT: Yes. Run to the restroom, but be back here promptly.

(Court recessed from 3:58 p.m. to 4:02 p.m.)

THE COURT: Are we ready for the jury? No. We don't

have Ms. Cartier-Giroux.

THE LAW CLERK: I'll get them lined up at least.

THE COURT: Okay. Ms. Perez.

Q. (BY MS. PEREZ) Officer McIntosh, you had just circled Forral, and I asked had you seen them in a different context that day, June 11th. What's your answer?

A. It was yes, I saw them outside the windows. Once we were back inside in the processing area, looking down from the second floor --

Q. Okay.

A. I was able to pick Forral out of the crowd.

Q. I'll come back to that in a second. Did you see Forral earlier in the day?

A. I believe I did.

MS. RUBIN: Your Honor, may I just ask the witness to speak up a little bit?

THE COURT: Do you want to pull the microphone a little bit closer?

THE WITNESS: I believe I did. I believe I was shown a photo of him next to the bus.

MS. GEORGE: Excuse me.

THE COURT: The prior admonishment.

THE WITNESS: I'm sorry?

THE COURT: The prior admonishment.

THE WITNESS: Okay.

Q. (BY MS. PEREZ) So you saw them?
A. Them.
Q. When in the day?
A. By the bus, the white bus near the tires, bent down by the tires.
Q. Can you describe to me, where were you when you saw that?
A. I was in the processing area. I was -- it was a photo --
Q. Okay.
A. -- that was given or shown.
Q. Okay. So going back, then -- so that was earlier in the day. And then you stated there was some point -- I'll come back to that in a second.

Now, with respect to this individual, Mavalwalla, you previously talked about at least one comment you heard from him. Did you hear Mavalwalla say anything else?
A. I'm sure I heard him say something else, but nothing made sense at that point.
Q. Okay. Did you hear anyone make a comment as far as --

MR. AHMED: Objection. Leading.

THE COURT: Overruled. Let her finish her question.

Q. (BY MS. PEREZ) Did you hear anyone make a comment as far as whether or not someone would come and help you?
A. From the crowd?
Q. Yes.
A. I don't recall that, no.

Q. Okay. Now, eventually, were you able to get back inside the gate?
A. Yes.
Q. And so -- well, as you were standing kind of next to the crowd in this state, did you have concerns for your safety?
A. Yes. We were severely outnumbered. You don't know what's going to happen. I worried about the safety of me and my fellow officers, yes.
Q. Why?
A. You could tell that this was not a crowd that was -- they seemed very agitated, and you just -- you want to always be ready for something if you -- if you see that. You never know what's going to happen.
Q. What did you see that made you say "agitated"?
A. They were yelling at us. The individual in the front yelling at the top of his lungs, not listening to requests from police officers to move, for one, knew they weren't going to move, and just some of the language that was being used.
Q. Why do you say they weren't going to move?
A. They had locked arms and, you know, they were shouting, and we were outnumbered again. There's no way we're going to move these people.
Q. Okay. So going forward, you say you got back into the gate, gated area. And I'm going to go to Exhibit 27.
Okay. Do you recognize this?

A. Yes.
Q. Is this where you walked out of the gated area?
A. Yes.
Q. I'm going to play this for a second.
(Playing Exhibit.)
Q. (BY MS. PEREZ) Which one are you? Do you see you in this screen?
A. Yes.
Q. Okay.
MR. ORESKOVICH: What exhibit number, please?
MS. PEREZ: 27.
MR. ORESKOVICH: Thank you.
Q. (BY MS. PEREZ) At some point, does someone here in this screen do something with respect to you, touch you in any way?
A. No.
Q. Okay. Is that Officer Wilks?
A. Yes.
Q. Okay. So he was behind you; is that right?
A. Yes, ma'am.
Q. Okay. As you were walking there, that path that we just saw, what were you hearing?
A. "Go home, ICE. Fuck ICE. Go home, ICE."
THE LAW CLERK: The screen is broken. A screen is not working.
THE COURT: Okay. We're going to hold off on your

testimony. We'll see if we can get the screen to work.
Q. (BY MS. PEREZ) Once you were back in the building, Officer McIntosh, what were you doing?
A. Waiting.
Q. Okay. For how long?
A. Seemed like a couple of hours. We were -- at that point, there was nothing we could do. So it was just wait until there was a decision made of what next.
Q. Okay. Where were you within the building?
A. I was in the processing center or processing area, second floor.
Q. Were you able to see outside?
A. Yes.
Q. And what were you seeing?
A. I was just seeing what appeared to be a mob of people everywhere. And at some point, I know the police came. So I was hoping, you know, at that point, okay, we're going to get out of here. But then I saw them lining up in a place where we couldn't even access, so I know there was nothing going there. So I guess just waiting, waiting for something to happen, trying to keep the people that we had in custody good, trying to assure them, you know, everything was fine, trying to make sure that, you know, everyone had water like they needed. Basically just waiting.
Q. Give them food and bathroom, that sort of thing?

A. Yeah. It was getting really hot back there, and so we were very limited on water that we had there since we're not an overnight facility. So I just wanted to make sure everyone had water in -- and it was getting hot in the cells. So I just wanted to make sure everyone was hydrated, that, you know, no one was going to have a problem.

Q. You indicated previously that you had seen Forral later on in the day. Describe to me what you saw Forral later in the day.

A. So I was looking down, and like I said, I could pick Forral out mostly for what he -- they were wearing. And I noticed something that appeared to be in their hand. So I just -- I notified, hey, just be careful if you go out there, there might be something there, there might be a weapon in his -- in their hand.

Q. What did it look like in their hand?

A. Like a club, like a stick, something like that.

Q. I'm going to show you Exhibit 452. Do you recognize that?

A. Yes.

Q. And what do you see in the hand? Is that consistent with what you were describing?

A. Yes.

BY MS. PEREZ: No further questions.

THE COURT: Okay. Cross-examination.

CROSS-EXAMINATION

BY MR. AHMED:

Q. Good afternoon. Is it McIntosh?

A. Yes, sir. Or yes.

Q. And it's agent, correct, or officer?

A. Officer.

Q. Officer McIntosh, I've just got a very -- I've got few questions for you.

You and other people we've heard from in the last day or two mentioned the term "blading," correct? Do you remember mentioning that on direct examination?

A. Yes.

Q. And just so the jury understands -- and you correct me if I'm wrong, okay? Blading is basically taking a fighting stance, correct? Right? Is that what your term "blading" means?

A. Blading to me is turning like you did.

Q. Right.

A. Doesn't necessarily have to have the hands up, but that's the beginning of it, yes.

Q. At least taking an aggressive stance against somebody, correct?

A. Right.

Q. You would agree that if you're blading, your feet have to be pointed towards the person that you're being aggressive with, correct?

A. I don't -- I don't know about that, no.
Q. Well, let's say you were describing me blading. If I was turned this way, I wouldn't be blading, correct? Correct?
A. Correct.
Q. All right. That wouldn't be taking an aggressive stance, correct?
A. I wouldn't take it as aggressive, no.
Q. Okay. If somebody was pulling me back this way, that wouldn't be blading either, correct? If somebody had me by the arm, my left arm, and was pulling me, that would not be considered blading, correct?
A. Correct.
THE COURT: I'm just going to note for the record that you've got your back more or less towards the witness, so that it's clear for the record.
MR. AHMED: Thank you, Judge. I appreciate that.
Q. (BY MR. AHMED) Okay. And so I want to show you something. And this has already been admitted, so let's start here. This is Exhibit 703. It's been admitted. I would like the jury to see it.
You also talked about -- I mean, there's 15, 20 people at this gate, right?
A. (Moves head up and down.)
Q. And what, four or five of you, right? Correct?
A. Correct.

Q. And you talked about -- you really -- you were concerned about your safety, correct?
A. Mine and the fellow officers and everybody, for that matter, yes.
Q. Okay. Now, the guy -- and I'm just going to describe him as a shorter guy with no vest on. That's LaForte, correct?
A. Yes.
Q. Okay. And LaForte is the boss of ICE, correct?
A. He's an HSI SAC, I believe. He's not over me.
Q. He doesn't seem to be too concerned about his safety going in the middle of this crowd, right? You'd agree with that, correct?
A. I would agree.
Q. All right. Now you're going to see in a minute LaForte --
MS. GEORGE: It's not showing on here.
MR. AHMED: Is it not showing again?
THE COURT: Are you plugged in?
MR. AHMED: Am I not -- putting on a show and nobody's seeing it. That would be better if I do that. We're gonna start again a little bit. All right?
THE WITNESS: All right.
MR. AHMED: Okay. Can the jury see that now?
(Playing Exhibit.)
Q. (BY MR. AHMED) Now, at this point, LaForte and the ICE agents with him don't seem to be too afraid of the crowd,

correct?

MS. PEREZ: Objection, speculation.

Q. (BY MR. AHMED) You're standing there observing it.

THE COURT: There's an objection pending. Just as is the case on direct, the witness needs to describe what they saw and not describe what they think other witnesses might have been feeling.

MR. AHMED: Okay.

Q. (BY MR. AHMED) But does it appear to you that anybody is afraid at this point?

MS. PEREZ: Objection. That is the same question.

THE COURT: Okay. Please, Mr. Ahmed, ask the witness what -- more specifically about what he saw, not about other people's impressions.

Q. (BY MR. AHMED) Officer McIntosh, you're to the right of this screen, correct?

A. Yes.

Q. And based on your observations, did you see agents pushing the crowd?

A. I did.

Q. Okay.

(Playing Exhibit.)

Q. (BY MR. AHMED) Okay. I want to stop right there, and I want to go back a little bit because it concerns my client, and that's what I want to focus on.

When you say "blading," is that what you're referring to right there?
A. I don't see anybody blading right there, no.
Q. I'm going to go back just a little bit just for my client because that's what I want to concentrate on. Okay?
(Playing Exhibit.)
Q. (BY MR. AHMED) Okay. Did you see him get pushed right there?
A. I did.
Q. Okay. I'm going to go back.
Do you see his left arm being grabbed?
(Playing Exhibit.)
Q. (BY MR. AHMED) At this point, have you seen him blading?
A. I don't know that at this point I have, but I believe it's the very next couple seconds.
(Playing Exhibit.)
Q. (BY MR. AHMED) Is it at this point he's blading?
A. No. It was right after -- right after when you had paused it before.
Q. Uh-huh.
A. Maybe a second after.
Q. Was it not on the screen?
(Playing Exhibit.)
A. It was before that part.
Q. (BY MR. AHMED) So it was before this you saw him blading?

A. To me, I took it as a blade, yes.
Q. Okay. Have you seen that on any video, him blading?
A. This video.
Q. You saw him blading on this video?
A. Mm-hmm.
Q. Well, I'll go back. Let's -- if -- you tell me when to stop when he's blading. Okay?
A. Okay.
(Playing Exhibit.)
A. Right there.
Q. (BY MR. AHMED) Right there?
A. Yep.
Q. That's blading to you?
A. That is blading to me. Yes, sir.
(Playing Exhibit.)
A. He didn't have the fists. He --
THE COURT: Wait. Make sure you only talk after the video is playing so we can hear you.
Q. (BY MR. AHMED) I'm sorry. You said something about the fists?
A. Yeah. He didn't have the fists clenched that I remember, but I know he was yelling in my face. He had turned, you know, like you would if you were going to throw a punch.
Q. Let me ask you this: Wasn't he holding a poster at this time? Did you see him leaning down, grabbing a poster off the

ground and getting back up?
A. I wasn't focused on him, no.
Q. Okay. But certainly, if he was holding a poster at that time, he couldn't throw a punch, right, unless he dropped the poster and threw a punch?
A. He could hold it with one hand and throw a punch.
Q. Okay. Did you see him do that?
A. Like I said, I didn't focus on him. I was trying to be aware of my surroundings, all of my surroundings, not just one individual.
Q. Did you see any individual throw a punch?
A. I didn't see any punches thrown, no.
Q. You'd agree -- there's 15, 20 people. If they wanted right into that parking lot, they could have, right?
A. Absolutely.
Q. They could have overpowered you guys.
A. Mm-hmm.
Q. Unless you used firearms, right?
A. Correct.
Q. But that didn't happen either, right? Right?
A. Correct.
MR. AHMED: Okay. All right. That's all I have. Thank you, sir.
THE WITNESS: Yes.
THE COURT: Okay. Further cross-examination?

Ms. George.

MS. GEORGE: Yes.

CROSS-EXAMINATION

BY MS. GEORGE:

Q. You are a deportation officer, right?

A. Yes.

Q. And that means you enforce immigration laws?

A. Yes.

Q. And part of that is to deal with people who have been, say, paroled into the country?

A. Yes.

Q. All right. And that is when someone presents them or comes into the country, they don't have papers, but they present themselves to a U.S. Customs and Border Patrol Officer.

A. (Moves head up and down.)

Q. Right?

A. I'm not sure what your question was.

Q. Well, when someone is paroled into the country, it generally is that they come across the border, yes?

A. Yes.

Q. Don't have papers.

MS. PEREZ: Objection to policy on parolees, policy questions.

THE COURT: You need to get to the relevance of this --

MS. GEORGE: I will.

THE COURT: -- Ms. George, as well as legal issues. It doesn't seem -- well, anyway, get to the relevance.

MS. GEORGE: All right.

Q. (BY MS. GEORGE) You testified that you took the two men that Ben Stuckart brought to the HSI facility, that you took them into custody based on an immigration hold.

A. Not on an immigration hold, no.

Q. Okay. So you took them into custody because there was a warrant for them, right?

A. I took them into custody because my supervisor told me to.

Q. Okay. And you had access to their files.

MS. PEREZ: Objection, relevance.

THE COURT: Are you going to get to it being relevant? Ms. George, this case is not about those two individuals.

MS. GEORGE: But it is about what happened to them initially, and the jury should know.

MS. PEREZ: Your Honor, it is not. We have established what occurred. We are going into not relevant material.

MS. GEORGE: It will be very quick.

THE COURT: Very quick, Ms. George.

MS. GEORGE: All right.

Q. (BY MS. GEORGE) These two men had been paroled into the United States.

MS. PEREZ: Objection, relevance.

THE COURT: I think we've established that they've been paroled into the United States, but you can ask that. But, again, Ms. George, tie it up.

MS. GEORGE: I will.

Q. (BY MS. GEORGE) And they had work cards.

MS. PEREZ: Objection, your Honor. Ms. George is ignoring this Court.

THE COURT: Okay. Let's have a brief --

MS. GEORGE: I have one more question after that on this topic.

MS. PEREZ: Your Honor, I will likely object to relevance again.

THE COURT: Okay. Let's have a brief sidebar, which is...

(THE FOLLOWING proceedings were had at the bench by Court and counsel, out of the hearing of the jury:)

THE COURT: Ms. George, where are you going with this line of questioning?

MS. GEORGE: All I'm going to do is that they were lawfully -- they were paroled here.

MS. PEREZ: Can you be quiet?

MS. GEORGE: They were paroled here and had work cards. They came because the parole program was terminated, not because they did something bad. That's it.

MS. PEREZ: That is not relevant.

MS. GEORGE: It is.

MS. PEREZ: It's not true. You need to be quiet. The jury is listening.

MS. GEORGE: You brought up that he testified --

MS. PEREZ: He was taken into custody on an immigration warrant or hold.

MS. GEORGE: Yes. And so I want --

MS. PEREZ: But the --

MS. GEORGE: No. I want the jury to know that it wasn't because they did something unlawful.

MS. PEREZ: It's irrelevant.

THE COURT: Why don't you just say they were only taken in on not a new crime. They were only taken in on an immigration warrant, which --

MS. GEORGE: Because they were here illegally? That's what they think.

THE COURT: It was testified about asylum. It gets a little bit far afield.

MS. GEORGE: It's going to be very, very quick.

MS. PEREZ: Your Honor -- what's your question, Andrea? You can say they did not have a new crime.

MS. GEORGE: It's more than that. They didn't have a new crime, and the program changed and so they were --

THE COURT: We're not going to go into the program

change. I think that there is testimony about asylum, you know, that people were checking in. So you can -- I think we've gone into it. You can say that they were here for a check-in, and there was not a new crime and --

MS. GEORGE: And they --

(Simultaneous speaking.)

MS. PEREZ: No. Andrea, that is getting into exactly what we are not -- those two individuals are not on trial. This Court has ruled that we are not dealing with them in this trial.

MS. GEORGE: They were taken into custody because the program changed, not because they did --

THE COURT: Why is it -- you need to explain the relevance. And I will say we're finishing with this witness today, so if we have to go until 7:00, we'll stay until 7:00 on this witness.

MS. GEORGE: Fine. Let's stay till 10:00.

THE COURT: What's the relevance to the elements in this case?

MS. GEORGE: It is relevant because it explains why these people were so upset. And he kept saying these people were so upset like nothing I've seen before. I looked her in the eyes, and it's nothing I've seen before.

MS. PEREZ: That has nothing to do with their --

MS. GEORGE: You brought it up. You opened the door.

MS. PEREZ: Andrea --

THE COURT: Okay. You can ask if they were checking in for asylum, but they were arrested, apparently not even on a warrant, just because a boss told them to arrest them, and, you know, that --

MS. GEORGE: And they didn't --

THE COURT: -- and the only basis was that the boss told them to.

MS. GEORGE: Okay.

THE COURT: Okay.

MS. PEREZ: Your Honor, that's not true.

THE COURT: Well, I'm just going by what his testimony was. That's what he said.

MS. PEREZ: I think we need to move on from this. We've got to be very careful. He is trying to not talk about the underlying policy of everything going on, per this Court's ruling. We are and we are sticking to the elements of this offense. And so the fact that at the south gate someone looked at him in a certain way has nothing to do with why those two individuals were detained.

THE COURT: Here's where I think it has a degree of relevance is just in explaining why people were there that day, and the defendants, of why they came there that day with whatever sort of impression. So the fact that maybe they were here for asylum, that they were arrested on administrative, they were not arrested on a new crime. Is that sufficient?

MS. PEREZ: An administrative hold. That's what this is.

MS. GEORGE: Well, then I'm going to explain the administrative hold.

MS. PEREZ: No.

THE COURT: Just say not a new crime.

MS. GEORGE: That doesn't fulfill it.

MS. PEREZ: They were arrested on an administrative hold.

MS. GEORGE: The program was terminated. Why is that so bad to say?

THE COURT: I don't know what program it is. We're going to get into a whole thing about a program.

MS. GEORGE: I can show it to you. It's in --

THE COURT: Okay. Well, not today. I guess if we need to recall somebody, we'll recall it. It's not today. You can ask him about arrested on an administrative hold, that there was -- that they had been here on asylum and that there was not a new -- that was not criminal activity.

MS. GEORGE: No crime.

THE COURT: What did I just say?

MS. RUBIN: You keep saying "new crime," but there's no crime.

THE COURT: New crime. It was not arrested because of any crime. Okay. Those three questions.

MS. GEORGE: Give me those three questions again.

THE COURT: They were here on asylum. They were arrested because of an administrative hold. And they were not arrested because of a crime. Okay. That's it. Okay?

(The following proceeded back in front of the jury:)

Q. (BY MS. GEORGE) These two individuals --

MS. PEREZ: Wait until we get back to our seats, please.

MS. GEORGE: Sorry.

Q. (BY MS. GEORGE) These two individuals were on asylum, yes?

A. I'm sorry. I didn't hear.

Q. These two individuals were on asylum?

A. Asylum?

Q. Yes.

A. They may have been applying for asylum, yes.

Q. And they had been paroled into the United States.

A. Okay.

Q. Yes?

A. If you say so.

MS. PEREZ: That was not the question this Court authorized.

THE COURT: Okay. You don't know. Is that the -- your answer?

THE WITNESS: Yes.

Q. (BY MS. GEORGE) You had their files.

MS. PEREZ: Your Honor --

THE COURT: Ms. George, he doesn't know.

MS. GEORGE: He does know.

MS. PEREZ: Your Honor, Ms. George is consistently ignoring the rulings for the benefit of the press behind us.

THE COURT: We will move on, and I will address this when we conclude for the day.

MS. GEORGE: I'll ask the next two questions.

Q. (BY MS. GEORGE) They were detained on an administrative hold.

A. Yes.

Q. And not based on any crime.

A. I don't know why they were being detained. I was given instructions to do that, and that's what I did.

Q. All right. So let's talk about at the back gate. You were not physically assaulted.

A. I wouldn't consider myself assaulted, no.

Q. The detainees were in good spirits.

A. They weren't fighting us. I don't think they were happy to be there. They were worried about what was going on outside.

Q. You were interviewed by FBI Agent DeBartolo?

A. Okay.

Q. Fair enough?

A. Sure.

Q. And you were asked about what happened that day. And when

you answered DeBartolo's questions, you were trying to be as truthful as possible?
A. Yes.
Q. You were trying to give as much detail as possible?
A. Yes.
Q. And you were trying to, you know, really answer his questions.
A. Yes.
MS. PEREZ: Objection, asked and answered.
Q. (BY MS. GEORGE) Yes, you were trying to answer his questions?
A. Yes.
Q. And what you said to Agent DeBartolo is --
MS. PEREZ: Objection. This is improper impeachment. She can ask --
MS. GEORGE: It's correct impeachment.
Q. (BY MS. GEORGE) McIntosh noted --
THE COURT: Wait a second. I've got an objection in front of me. Are you impeaching with a prior inconsistent statement or omission?
MS. GEORGE: Yes, I am.
THE COURT: Why don't you go through the textbook of going through what the statement is now and then what was said?
MS. GEORGE: All right.
Q. (BY MS. GEORGE) Now I don't even know -- remember what you

testified to just now. I asked you: "McIntosh noted the detainees were in good spirits." You noted that the detainees were in good spirits. Fair enough?
A. Yes.
Q. Okay. And you were not aware of any injuries to anyone?
A. No. Not that I can recall anyway.
Q. Well, you were also asked about that from Agent DeBartolo.
A. Okay.
Q. Right?
A. I don't remember the interview or the questioning.
Q. Would you refute if Agent DeBartolo wrote in his report you were not aware of any injuries to anyone? Would that refresh your recollection?
A. That's what I said. I don't recall any injuries.
Q. Oh, you don't recall any injuries. Oh, I misunderstood you. I'm sorry. Okay.
Now, you said the lady at the south gate had a look in her eyes --
A. Yeah.
Q. -- like you'd never seen before. Like a look of great sadness, where this country has gone?
MS. PEREZ: Objection, your Honor. Ms. George is consistently putting on a show --
THE COURT: Okay.
MS. PEREZ: -- for the people behind us.

THE COURT: No speaking objections.

MS. PEREZ: It's ridiculous.

THE COURT: No speaking objections.

Ms. George, that's an improper question. Please move on.

Q. (BY MS. GEORGE) A look in her eye --

MS. PEREZ: I move to strike that question.

THE COURT: Question is stricken. There is no answer.

MS. GEORGE: The Government brought it up. A look in --

MS. PEREZ: Your Honor --

THE COURT: Okay.

MS. PEREZ: This is getting out of hand.

THE COURT: Okay. Please, Ms. George, abide by the prior rulings, and stick to the facts of this case and not larger issues. Please, Ms. George, just ask the questions.

MS. GEORGE: I'm just trying to find out what he perceived the look in her eyes were, and I was just giving options.

THE COURT: Okay. Well, as I indicated before, he's only permitted to describe what he saw and not try to guess as to what a person might have been thinking.

MS. GEORGE: I have no further questions.

THE COURT: Okay. Any further cross-examination?

MR. ORESKOVICH: No, your Honor.

THE COURT: Okay. Any redirect?

MS. PEREZ: No. Thank you, Officer Wilks [sic].

THE COURT: May this witness be excused?

MS. PEREZ: Yes.

THE COURT: You are excused from further testimony. Thank you.

Okay. We're at 4:37. Does the Government have time to start another witness?

(WHEREUPON, further proceedings were held which were not ordered and transcribed.)

* * * * *

WITNESS INDEX


| For the Plaintiff | Page |
|---|---|
| **JASON MCINTOSH** | |
| DIRECT EXAMINATION BY MS. PEREZ | 3 |
| CROSS-EXAMINATION BY MR. AHMED | 30 |
| CROSS-EXAMINATION BY MS. GEORGE | 37 |


* * * * *

EXHIBIT INDEX


| No. | Description | Page |
|---|---|---|
| None | | |

C E R T I F I C A T E

I, CRYSTAL L. GONZALEZ, do hereby certify:

That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Spokane, Washington;

That the foregoing proceedings were taken on the date and place as shown on the first page hereto; and

That the foregoing proceedings are a full, true, and accurate transcription of the requested proceedings, duly transcribed by me or under my direction.

I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings;

DATED this 29th day of June, 2026.

CRYSTAL L. GONZALEZ, CRR, RPR
Washington CCR No. 2955
Official Court Reporter
Spokane, Washington