Todd Blanche
Attorney General of the United States
Lisa Cartier-Giroux
Rebecca R. Perez
Assistant United States Attorneys
Eastern District of Washington
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JUSTICE FORRAL,<br><br>Defendant. | Case No.: 2:25-CR-113-RLP-2<br><br>United States' Response to Defendant Forral's Amended Motion for Judgment of Acquittal under Fed.R.Crim.P. 29 or Motion for New Trial under Fed.R.Crim.P. 33 (ECF No. 433) |

Plaintiff United States of America, by and through Lisa Cartier-Giroux and Rebecca Perez, Assistant United States Attorneys for the Eastern District of Washington, submits the following Response to Defendant Justice Forral's Amended Motion for Judgment of Acquittal under Rule 29 or Motion for New Trial under Rule 33 (ECF No. 433).

## FACTS PRESENTED AT TRIAL

Summary of United States Trial Evidence

On June 11, 2025 at approximately 12:52 pm, charged and pled co-conspirator Benjamin Stuckart, posted on social media a call for others to come and join him as he blocked a white transport bus designated to transport federal

detainees from a temporary holding facility at 411 West Cataldo Avenue in Spokane, Washington to a detention facility to Tacoma, Washington for their immigration hearings. Trial Exhibit 76. Prior to this call to action, Stuckart accompanied two males to the Cataldo office, where the two males were arrested on an administrative warrant. ECF No. 433-12 at 9-10. Stuckart and the males had been apprised that the males would be seeing a judge in Tacoma and that their current detention was not a determination that they were being removed from the United States. *Id.* at 5-6.

The facility on Cataldo is an "under-12-hour detention space" with limited bathroom facilities, limited food and water, and no medical staff. ECF No. 433-2, at 6[1]. That day, twelve adult detainees were scheduled to be transported to Tacoma, including a female who had to be kept separate[2]. *Id.* at 8, 12. Six federal officers were present who could aid in the transport. ECF No. 433-1 at 14. Two civilian staff were inside the building. ECF No. 433-2 at 7.

Special Agent Laforte testified that there were a total of 3 doors leading to the HSI facility plus the sally port door, and two additional doors to the Cataldo building that were for retail establishments in the building that did not have access to the HSI portion of the building. ECF No. 433-5 at 98-99.

Federal officers testified they could not release detainees unless HSI headquarters made that determination or they were ordered to do so by a judge. ECF No. 433-2 at 8-9. They believed their duty was to assist in the transportation of persons in custody to the federal facility in Tacoma where they would have their immigration hearing(s). *Id.* at 7. A GEO white transport bus was the means by

[1] This is a summary of the testimony. Officer Burlingame's testimony was not stricken from the record. Officers Wilks and McIntosh, and Agents Tomaso, Wilks, McSullivan, and McIntyre offered consistent and corroborative testimony of what is cited here.

[2] No children were held at the facility, and all the detainees were 21 years of age or older. *Id.* at 8.

which the officers were to transport the detainees to Tacoma, and in order to get them onto the white bus, federal officers had to move the 12 detainees from the temporary holding cells in the facility out the sally port door to the public sidewalk and escort them onto the bus parked in front of the building on the street. ECF No. 433-12 at 7-8; *see also* ECF No. 433-1 at 8. A GEO employee, a contractor, would drive the detainees to the federal facility in Tacoma where federal officers would then take the detainees off the bus and into the facility. *Id.*

After the two males accompanied by Stuckart were taken into custody, Stuckart posted the following on his public Facebook page:




Trial Exhibit 76.

Persons, including charged and uncharged co-conspirators, arrived in response to Stuckart's post. Approximately nineteen minutes after Stuckart's post, Defendant Archer reposted Stuckart's post to several of their Signal groups, several of which included Archer's employee, Defendant Forral. ECF No. 433-4 at 13. In their post, Archer encouraged others to respond to Stuckart's call. Trial Exhibit 78 at slides 5-7. Archer arrived at the white bus a little after 2:00 p.m.. ECF No. 433-4 at 15. Forral appeared soon thereafter driving a red car which they parked in a manner, according to multiple witnesses, that pinned in the bus at the front. Trial Exhibits 422. A second car soon arrived soon after and similarly parked behind the bus preventing its movement. *See* Trial Exhibit 420.

Charged co-conspirators including, Archer, Stuckart, Lang, and Hatfield, as well as others, sat in the path of the walkway from the sally port to the bus door, blocking officers from accessing the bus. Trial Exhibit 414. HSI Officer Burlingame, and subsequently HSI Special Agent Laforte and ATF SA Tomaso, attempted to dialogue with the individuals blocking the path. ECF No. 433-5 at 7-8; ECF No. 433-2 at 12-14. They identified themselves as officers and/or wore clothing indicative of their status and advised the persons blocking the path and door to the bus that they were obstructing, ordered them to move, and indicated that they could be subject to arrest. *Id.* Many, including Archer, Stuckart, and Hatfield declined to move or otherwise comply with orders. *Id.* Federal officers observed individuals crawling under the cab of the bus where break and fluid lines are housed, as well as in the tire wells, and became concerned with whether the bus was being tampered with or could be operated safely. ECF No. 433-5 at 12-13. At some point, an individual had driven by and sprayed white paint on the bus' windshield. *Id.* However, agents believed it could have been scraped off. *Id.* But the persons crawling under the bus and the fact that the bus was pinned by Forral's red vehicle at the front and another vehicle at the rear made officers believe that the white bus not a viable safe option for transport. *Id.* Further, the number of persons in the crowd and the vocally expressed anger had increased significantly, and with the federal officers being quickly outnumbered, SA Laforte did not believe it was a safe egress. *Id.*

During this time, Archer was observed with a notepad and clipboard, conversing with persons at the bus. Trial Exhibit 10 and 10a. Archer was collecting information to include names, emergency contacts, and phone numbers of persons who indicated they were willing to be arrested. Trial Exhibit 78 at slides 9-12. Archer also instructed persons willing to be arrested to shut off the biometrics on their cell phones. *Id.* FBI SA Burns testified that based on his

training and experience, biometrics are required to open the phone and without having those, it is much more difficult for investigators to gain access to a phone's content, even with a search warrant. ECF No. 433-4 at 28-29. At 1:47 p.m., Archer reached out to their parents and family indicating that their coming to the call out by Stuckart "carries the risk of arrest" and the acts they took in preparation even before coming to the Cataldo address in response to Stuckart's post. *Id.* at slide 14. At the white bus, Archer further engaged with several others giving instructions both using a bullhorn and in small groups. Trial Exhibits 413, 414 and 7.

Calls were made no later than 2:00 p.m. to the Spokane Police Department (SPD) requesting a response by officers due to the escalating situation. ECF No. 433-5 at 63-64. Contact was also made with SPD Chief Hall requesting police response to the Cataldo facility.

At approximately 2:00 p.m., SPD Officer Gonzalves was parked in an unmarked patrol vehicle just to the northeast of the Cataldo building after being asked by his lieutenant to assess the situation. ECF No. 433-7 at 10. Officer Gonsalves used binoculars and saw the white bus pinned in front and in back with vehicles, which he recognized as a technique commonly used to prevent vehicles from leaving, the windshield of the white van covered with white paint, and a large group of protestors on the sidewalk between the north door and the white bus. *Id.* at 11. He testified that after observing the bus and the protestors, he would not feel free to leave that building if he were in the federal officer's situation, and he reported the same to his lieutenant. *Id.* at 12. He further testified that as he was monitoring the situation in his unmarked vehicle, a group of 8-10 or 12 individuals dressed in black approached his vehicle and encircled it and began filming him, preventing him from leaving. *Id.* at 13. He activated his lights and sirens in an attempt to leave the area; however, the individuals would not move. *Id.* It was only after using his air horn that he could safely leave. *Id.* Officer Gonsalves stated that

he was concerned that the individuals believed he was a federal officer. *Id.* at 15. Officer Gonsalves returned to SPD TAC headquarters. He testified that a plan was not put into place until 6:00 pm to respond to the building because he believed there was insufficient manpower. *Id.* at 16.

After the white bus was determined to be unsafe, agents planned to use a red Border Patrol van to transport the detainees from a different exit located near the east gate of the secure parking lot at the south side of the Cataldo building. ECF No. 415 at 188. Border Patrol Agent Sullivan arrived in the red van at the south side of the building and parked in the unsecured parking lot next to the east gate secured lot at approximately 3:00 p.m., understanding that the detainees would be brought out the rear exit of the building. *Id.* at 190-192. However, individuals at that location immediately alerted others of his presence, to include use of a bullhorn. People began blocking and surrounding the red van causing BPA Sullivan concern that he would not be able to drive away. *Id.* The crowd was not receptive to instructions to move. *Id.* The plan was aborted, and BPA Sullivan was ultimately able to drive off. *Id.*

At approximately 3:14 p.m., Archer posted on Facebook requesting others to come to the Cataldo building to "risk arrest to block the exits". Trial Exhibit 77. In the post, Archer comments that they are "about 100 strong in total" at that time. Archer then edited the post indicating a belief that there was a chance the detainees would be freed if they had "more bodies":




Trial Exhibit 77.

Stuckart's Verizon cell phone records show that from 2:48 p.m. – 4:30 p.m., several phone contacts were made between Stuckart and a phone number associated with Spokane Mayor Lisa Brown[3]. Trial Exhibit 75. SPD Chief Hall reports to Mayor Brown. ECF No. 433-4 at 71. At 4:34 p.m. after Stuckart's contacts with Mayor Brown, a number associated with Washington State Attorney General Nicholas Brown called Stuckart for a phone call lasting approximately 7 minutes. Trial Exhibit 75.

At approximately 4:30 p.m., BPA Sullivan and another agent were parked in an unmarked vehicle in a handicap space in the north parking lot in front of the Cataldo building next to the Podium facility. ECF No. 415 at 193-194. Within 10

[3] Not presented to the jury but in support of good faith in questions posited at trial by the prosecution was that Stuckart, former city council president, told reporters later that he had contacted Mayor Brown and asked her not to send the police.

minutes, Forral and an unidentified male approached the vehicle and began looking into the windows, shouting at them, and placed their cellular phone onto the glass to better film the occupants of the vehicle. *Id.* Concerned for his safety, BPA Sullivan and the other agent left the area in their vehicle. *Id.*

At approximately 5:11 p.m., Archer created a voice memo indicating that the white bus cannot move because there was one car parked in front and one behind. Trial Exhibit 78 at slide 15. Archer stated they were aware of two other exits on the other side of the building that "we are coordinating eyes on". *Id.* Archer further stated that there was a 90-minute period where "we did not have eyes on all of the exits" but believed the detainees were still in the building based on collective observations. *Id.* Archer then created a second voice memo describing the "strange feeling" they are having "hoping to get arrested" and laughs. *Id.* at 16.

Between approximately 2 p.m. and 6:00 p.m., SPD did not respond to any federal officers' requests for police response and assistance, and federal officers did not believe local police would respond. ECF No. 433-1 at 23. Federal officers knew they could not stay at the facility indefinitely as they did not have resources for anything other than temporary detention and/or no medical resources or medication for anyone who may be in need of it. *Id.* at 24. At approximately 5:00 p.m., federal officers made another plan; they would attempt to get three of the federal vehicles out of the secured lot in the south parking lot and meet up with the red border patrol van. They would attempt to stage at the back of the Cataldo building and bring the detainees out to the red Border Patrol van and safely on their way to their immigration hearing as most of the protestors were still on the north side of the building. ECF No. 433-5 at 14-15.

Federal officers Burlingame, Wilks, and McIntosh exited the Cataldo building wearing equipment that clearly identified them as law enforcement and turned on the red and blue lights on their vehicles to further indicate this fact. ECF

No 433-2 at 24-25. However, as soon as they exited the building, person(s) who appeared to be "spotters" notified others that they were coming out and people, including those on the northside of the building, came running. ECF No. 433-5 at 15. Officers heard yelling, "Stop them block the exits, we're going to fuck you up. Get those Nazis." ECF No 433-2 at 24. "Don't let them leave." ECF No. 433-1 at 27. Defendant Mavalwalla, who was at that time in the unsecured parking lot on the south side of the building, saw the officers going into the man gate (pedestrian gate) entrance to the secure parking lot and walk to their vehicles. Mavalwalla ran ahead of the crowd, running and turning over his left shoulder to look behind him in the direction of the following crowd. Trial Exhibit 22A. He ran out into the street in front of an oncoming vehicle to get to the south gate before the federal officers' vehicles could exit the gate. Trial Exhibit 22A. Once Mavalwalla arrived, he stood in the middle of the now open gate. *Id.* The federal vehicles stopped at the gate line as they could not pass without hitting Mavalwalla or the others that followed Mavalwalla to block the gate. ECF No. 433-12 at 13.

Upon arrival, Mavalwalla was heard telling the officers who had exited their vehicles as their path was now blocked, "the cops can't help you it's against state law … nobody is going to move us". Trial Exhibit 23. Chants of "Let them go!" followed. *Id.* Mavalwalla followed up by giving the order, "Make sure people stay at the front! Make sure people block every exit!" *Id.* Another person repeated Mavalwalla's words, "Every exit!" Mavalwalla then ordered, "Keep the bus blocked!" *Id; see also* Trial Exhibit 88 at sec 22 (Mavalwalla's arm seen moving in sync with the words and his mouth's movement). The numbers increased at the gate as people arrived met up with Mavawalla and the others at the gate. Trial Exhibit 26. Archer arrived and immediately headed to the front of the group assembled at the gate, stating, "the people risking arrest are here, here we go … if you are risking arrest, this is what we talked about … we are linking arms". Trial

Exhibit 23. It was only then that people linked arms. Charged and pled co-conspirator Hatfield was facing the inside of the secure lot with their arms linked with Liz Moore, who linked arms with Archer, who linked arms with Mavalwalla. Hatfield faced forward towards the vehicles and Moore, Archer, and Mavalwalla placed their backs to the vehicles. *Id.*; Jury Trial Exhibit 88.

SA Jared Tomaso, who was watching from a window facing the south secured lot as the three federal officers exited the building, heard people yelling outside something to the effect of, “They’re trying to leave, get them”. ECF No. 433-1 at 25. His attention was drawn to the size of the crowd running towards the 3 federal officers attempting to leave. *Id.* Concerned for officer safety and believing it was their only remaining opportunity to get the detainees safely out of the building to effectuate the transport with vehicles capable of handling the number of detainees, SA Tomaso, HSI SA McSullivan, and SA Laforte ran out the door to go aid the federal officers. *Id.* SA Tomaso and SA McSullivan wore tactical body armor indicating they were law enforcement. ECF No. 433-1 at 28-29; ECF No. 433-8 at 22. SA Laforte, who was being transferred to another assignment, had already turned in his equipment and was not wearing a tactical vest but was wearing a lanyard that identified him. ECF No. 433-1 at 29. As Tomaso, McSullivan, and Laforte exited the building, they were met with yelling and profanity. *Id.* at 30. McSullivan, described the crowd as “incensed”. *Id.* at 17.

Upon arrival at the gate, Tomaso, McSullivan, and Laforte saw the group forming a kind of human chain blocking the open gate and a crowd behind them with the vehicles lined up waiting to exit. *Id.* at 31. They noted that the persons forming the chain were past the gate line. *Id.*at 41-42; *also see* Trial Exhibit 86 at 12 sec. The agents gave loud commands to “get out of the way” and “move” and advised that they were impeding a lawful process. *Id.* at 41. They noted they were significantly outnumbered by the persons at the gate and also had in mind

LaForte's lack of protective equipment. *Id.* at 36; 43. The agents took an aggressive approach as a counter tactic to being outnumbered and immediately coordinated to form their own line to counter the human chain blocking the gate. They were initially able to move people back away from the gate by pushing and created a momentary gap. ECF No. 433-1 at 36-37; 42-43; ECF No. 433-8 at 24. However, the agents could feel as they were pushing that the line of individuals blocking the gate were pushing back into them. *Id.* As the agents pushed, individuals in the crowd with linked arms pushed against one another and used their combined force to prevent the agents from making any progress in moving the line and allowing the vehicles to exit. Trial Exhibit 86; ECF No. 433-1 at 42-45; ECF No. 433-8 at 27-28. SA McSullivan described the tactic as akin to a rugby scrum, where a team binds together and interlocks to use their body mass to push back together. ECF No. 433-8 at 13-14. When agents had any success in moving those linked together, they would reposition themselves back and relink arms and repeat the tactic. *Id.* at 25.

At the south gate, SA McSullivan was pushed from behind by charged and pled co-conspirator Bobbi Silva. Trial Exhibit 86. Mavalwalla elbowed Officer Burlingame. *Id.* Officers and agents noted Mavalwalla and Hatfield bladed their bodies and balled their fists, which officers recognized as pre-assault indicators. *Id.* at 46; ECF No. 433-12, 15-16 (Hatfield); ECF No. 433-12 at 17, ECF No. 433-2 at 30-31 and Trial Exhibit 87 (Mavalwalla). Officers and agents testified that people at the gate were screaming in their faces at very close proximity. ECF 433-12 at 16; *also see* Trial Exhibit 24. SA Laforte testified he felt threatened while he was in the crowd. ECF No. 433-5 at 35. Charged and pled co-conspirator Muncey and Defendant Forral also appeared at the gate. Trial Exhibit 24. Forral ordered the officers to "Back up!", and yelled expletives at the officers. *Id.* Officer McIntosh also testified that when he saw Forral, he heard Forral yelling "Fuck ICE" and

Forral called Officer Wilks, who is Native American, a "fucking race traitor". ECF No. 433-12 at 20.

The federal agents determined they would not be able to exit through the south gate as planned as it would be tactically unsound to escalate and attempt to force their way out. ECF No. 433-8 at 35-36; *see* Trial Exhibit 26. When they were able to get the south gate closed, they heard cheering, followed by continued verbal berating of shouts of "Nazi", and words to the effect of "I hope your kids hate you". ECF No. 433-1 at 69-70. Once inside the closed gated lot, SA Tomaso checked his cell phone and heard words to the effect of, "You can't leave, can you? Are you scared?" *Id.* "Are you looking at your phone? How much battery do you have?" *Id.* SA Laforte also heard yelling to the effect, "The police aren't coming. Are you scared?" ECF No. 433-5 at 37. The repeated chanting of "Let them go!" and what they had experienced throughout the day caused officers to believe that the only way the were going to be able to get out of the situation was if they released the detainees. ECF No. 433-1 at 68. SA Laforte testified that he felt the building was "under siege". ECF No. 433-5 at 40.

Based on what they had just experienced, the officers were also concerned for their safety in returning to the building. ECF 433-1 at 72. The officers did ultimately return into the building by going through the man gate (pedestrian gate) from the secured parking lot that led to the walkway back to the south door of the building. ECF No. 433-8 at 37. As they exited, an individual standing outside the man gate attempted to hit Officer Wilks in the face. *Id.* at 38. On the walk out, SA Laforte finger flipped an individual's hat off by its brim who was yelling something to the effect of "Fuck ICE". ECF No. 433-5 at 40.

Immediately after they were forced to abandon the exit plan and close the south gate but were still in the secured lot, co-conspirators began to barricade the exits to the parking lot and the entrance to the man gate (pedestrian gate). Trial

Exhibit 30. Muncey, Hatfield, Forral, and others gathered benches, lime scooters, sandbags, trash cans, and other items in front of the south gate, the east gate, and the man gate (pedestrian gate). *Id.* Drone footage showed all three, along with others, working together to stack the items to barricade and block all of the gates to the lot where the federal vehicles were parked. Trial Exhibits *Id.*, 438, 439, and 440. In drone video, Defendant Archer was observed appearing to give instructions to others within feet of Forral, Muncey, and the others as they stacked up the objects both at the south gate and the east gate and was also seen communicating with Muncey appearing to give Muncey directions towards the east gate where he is seen stacking items with Forral. Trial exhibits 30, 34, 440, 441, and 442.

At approximately 5:45 p.m., Forral, Mavawalla, and charged and pled co-conspirator Lang (red bike helmet) were captured on drone video back on Cataldo at the white bus. Trial Exhibit 14; 421. The video showed Forral and Lang speaking as Forral let air out of the front driver's side tire and Lang appeared to look at the tire that Forral was working on. Trial Exhibit 13. An unidentified male was present and communicated with Forral. *Id.* Lang then walked over to the rear driver's side tire and began letting out the air. *Id.* The male then walked over to Lang and watched Lang release the air as Forral continued to work on the front driver's side tire. *Id.*; Trial Exhibit 419. Forral then got up and looked over towards Lang. Trial Exhibit 14. Lang got up and Lang and the male walked over towards Forral as Forral spoke to individual(s) on the sidewalk area near the door of the white bus which was still being blocked. *Id.* Forral then walked over to Lang and they spoke. *Id.* Forral walked towards the rear of the bus past the tire that Lang deflated, and Lang, the male, and others followed Forral. *Id.* Forral walked to the lobby door area of the building where they directed some individuals in that area. Forral then turned and walked back and Forral and Lang returned to the tires and continued to release the air out of the tires. *Id.* Forral and Lang appeared to speak

to one another while they let out the air on their respective tires. *Id.* Forral appeared to say something to Lang and then Lang banged her hand on the wall of the tire. *Id.*

At approximately 6:00 p.m., SPD advised willingness to participate in a plan to do a caravan-type escort of the red Border Patrol van driven by two federal agents with police vehicles in front and back, to the east side of the Cataldo building on Washington St., and form two skirmish lines from the van to the Cataldo building door to create a safe corridor so federal officers, civilian workers, and detainees could exit the building. ECF No. 433-7 at 16-17. It was decided that a dialogue officer would not be sent in. ECF No. *Id.* at 17. SPD Officer Gonsalves testified that he did not recommend a dialogue officer based on his experience working hundreds of peaceful protests; seeing the kind of escalation he had observed at the white bus and seeing how the crowd was "amped up", he did not feel comfortable recommending sending an officer into that situation. *Id.* at 18.

At approximately 6:00 p.m., BPA Sullivan and BPA Wilson met with their SPD escort vehicles at North Central High School. ECF No. 415 at 196. The BPA agents drove the red Border Patrol van with several SPD vehicles with their lights and sirens on in front of the BPA vehicle and one behind. *Id.* at 197. Behind the trailing SPD vehicle were several Border Patrol agents in unmarked Border Patrol vehicles. *Id.*; Trial Exhibit 40. SPD Officer Heiman drove the vehicle in front of the red van. ECF 433-6 at 6-7. As he drove south on Washington, he passed Cataldo and saw that the tires were deflated on the white bus. *Id.* at 7-8. As soon as the red Border Patrol van arrived, protestors started coming from the north side of the building and the van was quickly surrounded and blocked. ECF No. 415 at 199-200; Trial Exhibit 41, 42. The BPA agents inside the van could hear constant shouting to the effect of "Block the door, block the van". ECF No. 415 at 199. Stuckart, Silva, Hatfield, and Lang could be seen in drone video surrounding the

red van. Trial Exhibit 42; 444. According to BPA Sullivan, the van was completely blocked, and he was unable to exit and could not move the van without injuring someone. ECF No. 415 at 200; ECF No. 433-7 at 19. Spokane County Sheriff's Office Deputies arrived soon thereafter to aid SPD with the skirmish lines. ECF No. 415 at 201. Verbal warnings were given by local police to move back; and while some individuals further away from the red van appeared to comply, those closest to the red van ignored the warnings. ECF No. 433-7 at 22. According to officers, the crowd was highly agitated upon arrival of the red van. *Id.* at 23.

Forral was captured on drone video at the time the Border Patrol red van arrived and parked on Washington. Trial Exhibit 41; *also see* ECF No. 433-6 at 11-12. In the drone video, the driver's side door to Forral's red car opened and shut and Forral then walked from the area of the white bus to the red van holding a stick like object consistent with a steering wheel lock club, and a dog leash in their hands. *Id.* Forral walked to the red van. *Id*. Forral was seen by Officer Gonsalves with the steering wheel lock club in his hands on the north side of the skirmish line. ECF No. 433-7 at 27. Forral was also seen by Officer Heiman near the red van at approximately 6:30 p.m. with the steering wheel lock club and the pink dog leash around their neck, which was captured by Officer Heiman's body camera. Trial Exhibit 48; ECF No. 433-6 at 12-13. Officer Heiman described Forral as extremely angry, escalated, and screaming. *Id.* at 14. The encounter was captured on Officer Heiman's body camera. Trial Exhibit 48. Forral is seen banging the steering wheel lock club on a metal bollard yelling Officer Heiman's name repeatedly. *Id.* Officer Heiman tried to calm Forral down. *Id.* An unidentified protestor observing Forral's actions approached Forral and can be heard telling Forral, "Keep it peaceful". *Id.* Forral responded, "I'll keep it peaceful until it's not". *Id.* Forral is also captured on drone video near the passenger door of the red

van screaming and acting aggressively, and striking Officer Morgan in the head and knocking off his hat. Trial Exhibit 43, minute 2:16.

Forral was also observed in drone video interacting with others near the red van during which Forral appeared to be directing them, including Stuckart, Hatfield, and Silva. Trial Exhibit 46. Forral then walked over to the driver's side of the red van where Stuckart and Hatfield were standing, and appeared to tell them where to go and they and others complied. *Id.* Forral then walked to the front of the red van and gave further directions to include those sitting at the front of the bus. *Id.* Forral standing alongside Silva, called for people to "Block the doors" at the red van. Trial Exhibit 49. Forral was also captured screaming and directing people to block a door that they believed the detainees might exit from. Trial Exhibit 49A; ECF No. 433-6 at 19.

Soon after the arrival of the red van, Mavalwalla walked to the area of the red van from the south gate carrying a backpack. Trial Exhibit 43. As Mavalwalla walked from the south gate to the red van, he passed Archer and they acknowledged each other. *Id.* Mavawalla was then seen standing with a person in a red shirt near the red van with linked arms. Trial Exhibits 56 and 466. Officer Gonsalves testified that he observed a tactic being used by some individuals to create resistance to being moved by officers. ECF No. 433-7 at 24-25. The individual with arms linked to another would turn their backs to officers, and then others linked behind them would push against them, creating resistance against officers and pushing back. *Id.* This meant that as an officer would push on the individual closest to him to move the person back, the person behind that individual would try to countervail the force with their weight pushing back. *Id.* Officer Gonsalves reviewed Trial Exhibit 53 which showed Mavalwalla and the individual in the red shirt later identified by Mavalwalla to be Caleb Hutchins (during cross examination). ECF No. 433-7 at 24-26. Officer Gonsalves explained

that the officer captured in the video was trying to move the person in the red shirt (Hutchins) by pushing him forward. ECF No. 433-7 at 24-26; Trial Exhibit 53. Mavalwalla had linked arms with Hutchins, and Hutchins turned his back towards the officers rather than comply and move back as ordered. *Id.* The officers then attempted to move Hutchins back by pushing him. *Id.* Mavalwalla, along with people on the other side of Hutchins then created pressure by pushing forward against Hutchins, pushing back against officers and preventing officers from gaining any ground. *Id.*

At the same time of the events at the red van, Defendant Archer remained on the south gate, posted directly in front of the vehicle exit. Trial Exhibit 90; Trial Exhibit 78, slide 17. Objects which had been placed in front of the south gate to prevent the federal vehicles from leaving by Forral and others were moved aside and repurposed to the area surrounding the red van. *Id.* Trial Exhibits 91 and 92. Drone video captured Forral, Muncey, and others repurposing the items from the south gate to block the red van and the law enforcement vehicles on Washington. Trial Exhibits 91 and 92. They were seen bringing benches and lime scooters in the direction of the red van. *Id.* Forral still had the pink dog leash in their hand in the video. Trial Exhibit 92. Officer Gonsalves testified he observed physical objects placed, including park benches and lime scooters, to impede the red van and the police vehicles from leaving or moving. ECF No 433-7 at 23. Officer Heiman also testified he had to remove objects wedged under law enforcement vehicles and had to move park benches placed to obstruct the vehicles. ECF No. 433-6 at 18. He further testified that he removed a lime bike that was tied up with a pink leash and that it was consistent with the leash he had observed around Forral's neck earlier. *Id.* BPA Sullivan testified that he observed individuals with lime scooters that were placed under the SPD vehicle parked in front of the red van and under the red van as well. ECF No. 415 at 204.

Officer Gonsalves testified that the officers were outnumbered with an estimated 20-30 officers to a crowd that was growing from 50 to within a few hundred. *Id.* at 27-28. During the time he was near the red van, he observed arrestable offenses, but they did not have the resources to safely make arrests. *Id.* at 28. Around 7p.m., local law enforcement began making dispersal orders over a loudspeaker. ECF No. 433-7 at 37. At this time, the crowd had grown to several hundred and was blocking the entirety of Washington St., a main north-south arterial from downtown Spokane. Shortly after the dispersal order was given, two tires on the red van were slashed by charged and pled co-conspirator Thalia Ramirez. ECF No. 417 at 134. An unlawful assembly order was issued by Mayor Lisa Brown and munitions were deployed a little after 8p.m. in an effort to push the crowd back. ECF No. 433-7 at 37.

Multiple officers testified that there was no point in time between the time of the arrival of the red van and the unlawful assembly order that it would have been safe to bring the detainees out of the building. ECF No 433-7 at 36; ECF No 433-6 at 24.

Officers also testified that they observed individuals “gearing up” when it became apparent that munitions were going to be deployed to disperse the crowds, to include putting on welding gloves to pick up hot cannisters of smoke, OC, or chemical agents, obtaining umbrellas to mitigate pepper ball or blunt impact munitions, and gas masks to protect from the smoke or chemical agents. ECF No 433-7 at 30-31. Mavalwalla was at the red van passing out face masks. Trial Exhibit 460. Mavalwalla was also captured on body camera video putting on gloves and a long sleeve hoodie from his backpack, as well as holding an umbrella. Trial Exhibit 57. He also pulled a respirator out of his backpack and handed it to a female next to him. *Id.* The weather was hot and gloves and long sleeve jackets were not consistent with the temperature. ECF No 433-7 at 30. Deputy Wolf with

SCSO viewed Trial Exhibit 65 which captured Mavalwalla during the first deployment of smoke. Officer Wolf described Mavalwalla's stance being a bladed stance with his fists at his side as he yelled at officers, as if preparing to fight. ECF No. 417 at 112-113; Trial Exhibit 65. Officer Riggles testified that after the first deployment of canisters, some were either kicked or thrown back towards officers. ECF No. 417 at 176. BPA Sullivan testified that while sitting in the red van during the deployment of munitions, he saw cannisters being thrown or kicked back towards himself and the officer, and that one landed at the driver side rear tire of the red van. ECF No. 415 at 207. Officer Riggles further testified that throwing or kicking the canisters back created a danger of injury to officers as it affected their vision and the canisters were being returned in a dangerous manner. ECF No. 417 at 176. He stated that he had to deploy his less lethal 40 mm multilauncher at individuals who attempted to cover the smoke cannisters or pick them up or kick them at officers. *Id.* at 177-178. Officer Riggles was shown his body camera video which captured his deployment of his less lethal after the second smoke deployment in the direction of Mavalwalla. Trial Exhibit 74. Officer Riggles testified that he saw an individual with an open umbrella that looked like he was getting ready to try to kick or do something with one of the smoke cannisters. ECF No. 417 at 184-187. Drone video showed Mavalwalla kicking the canister in a northwest direction, toward officers. Exhibit 723 and 73A. Officer Riggles deployed his less lethal at the individual because he believed that he was close enough that he could send the cannister towards the officers. ECF No. 417 at 187.

Archer remained at the south gate during the deployment of the munitions. According to a voice memo in their phone, Archer discussed being part of a group whose job was to "link arms and man that gate and keep anything from going in or out … they were not going to kidnap anybody by getting them out through that gate and they tried". Exhibit 78, slide 17. Archer further stated, "we held the gate

from about 4 pm … until everyone had a safe way home until about midnight”. *Id.* In the voice memo, Archer stated they did not find out until later that the federal officers were able to get the detainees out of the facility. *Id.* Archer stated, “we did our jobs … we planned we communicated … it wasn’t perfect because it was rapid response”. *Id.* Archer stated, “Ultimately all the plan … not all but a lot of the plan that had been put together had to be put into place … essentially we forced ICE to use a different entrance and execute a different plan … because they tried to get out that gate and it didn’t work … collectively as a community we were on all of the exits and we collectively made it so that they had to essentially deploy violence in order to kidnap these boys … they had to show us who they are”. Muncey was seen alongside Archer and others, and when the munitions begin, they got into order and lined up in front of the gate, sitting facing the gate to prevent anyone from leaving, not the direction of the munitions or the individuals running from the munitions. Trial Exhibit 63.

After deployment of munitions, federal agents, civilian employees, and the detainees were able to leave the facility at approximately 9 p.m. with the assistance of the Spokane Police Department S.W.A.T. team via an armored vehicle. ECF 433-1 at 81-82.

Federal civilian employee, Arianna Sanchez, testified about her experience at the facility from the time she arrived at 8:00 a.m. until she left on the armored vehicle. ECF No. 413. While she did not see all the events that transpired, she did see events occurring at the red van when it was parked on Washington. *Id.* at 226. She testified that she was afraid to exit the facility based on what she saw happening to the officers outside, “getting pushed … knowing they were officers, I didn’t think it would go well for me trying to step outside. I didn’t have protective gear. I didn’t have anything on me … I just didn’t feel safe.” *Id.* at 228. Sanchez also expressed concern that although she wasn’t dressed as any of the [federal]

officers, she was worried that because she was working in the building, she "didn't know how that would be perceived if [she] tried to walk outside". *Id.* at 224-225.

Summary of Defendants' Witnesses: Facts In Support of the Jury's Verdict

Defendant Mavalwalla chose to testify. On cross-examination, he stated that he arrived at the Cataldo building at approximately 5 p.m. and went to the area of the white bus. ECF No. 433-10 at 19. He indicated he was aware that people wanted to block the white bus but claimed he did not share that intent. *Id.* at 23. While "orienting himself" around the building, he was at the south side when he saw three officers leave the building. *Id.* at 25. He affirmed that he knew they were federal agents. *Id.* He admitted that he ran "the fastest" to block the gate. *Id.* at 26. When asked if he was yelling for people to follow him, he admitted that while running, he was "repeating some of the things he had heard". *Id.* at 26-27. He admitted that he was looking over his left shoulder as he ran to see if the crowd was following him. *Id.* at 29-30. He did not deny that he might have been yelling at that time but claimed he couldn't recall. *Id.* at 32. After being shown video of himself, he ultimately admitted that he did yell "to make sure other people knew what was going on". *Id.* at 33-34. He further admitted that he yelled something to the effect of "come help, they're getting out this way, come here, block the gate". *Id.* at 34. He admitted that he could not block the exit alone. *Id.* He admitted he made the statements captured in the video: "The cops won't help you. It's against state law. Nobody is going to move us." *Id.* at 35. When confronted with the video capturing him saying, "Block all the exits …. Keep the bus blocked", Mavawalla stated he didn't specifically remember what he said. *Id.* at 41-42. He did admit that he was punctuating the syllables with his arm as he spoke "to ensure effective communication". *Id.* at 42. He did admit that he "communicated that people should stay in the front as well" to block the exits. *Id.* at 43. He further stated he believed

the officers were trying to sneak out and "I wanted to make sure that they didn't try to go out another direction as well" and that he needed to have people working together to accomplish that. *Id.* at 44.

Mavalwalla further testified it was only when Archer arrived that he linked arms. *Id.* at 48-49. He admitted he linked arms to combine strength. *Id.* at 51. He stated his intent was that "I was not letting those vehicles leave". *Id.* at 55; 61. Between 5:30 p.m. and 6:30 p.m., Mavalwalla went to his truck to get his backpack which contained the items to defy the munitions. *Id.* at 64. He stated he did return to the white bus area. *Id.* at 62. Mavalwalla further admitted that during the encounter near the red bus as depicted in Trial Exhibit 53, Mavalwalla did in fact link arms with the person in the red shirt (Hutchins) and his partner, and then pushed Hutchins, to use their combined weights to push back against the officers, confirming the tactic Officer Gonsalves had described in his testimony. ECF No. 433-10 at 73-75. He further admitted the purpose of the umbrella was as a shield and that the gloves could be used to pick something up. *Id.* at 77-78. He further admitted that in Trial Exhibit 64 he was telling the officer, "Come on fucking do it" with respect to being sprayed with OC and that he did not back up. *Id.* at 80-81. He admitted when being shown Trial Exhibit 65 that he aggressed towards the officers. *Id.* at 83-84. He admitted to fencing with his umbrella at the officers. *Id.* at 88. He claimed that his purpose was to communicate that he was not going to move. *Id.* Mavalwalla admitted that he kicked the cannister as captured in Trial Exhibit 73A at a time when most of the protestors were behind him except for those returning munitions. *Id.* at 90.

Contrary to fact and Archer's own testimony, Archer's witness Liz Moore claimed that they learned that the detainees were removed from the building at 6:00 p.m. ECF No. 385 at 32. She further stated that they stayed to guard the south gate thereafter to "show their commitment". *Id.* at 32-33. She admitted that

peaceful ideals or principles of PJALS were not followed. *Id.* at 35. Moore claimed that the purpose of linking arms at the south gate was not stop the vehicles from leaving, but to “convey our commitment to each other and to our shared cause”. *Id.* at 43. When asked why she didn’t link arms in an area to the side and not blocking the gate, she replied, “I did not experience them [the officers] as being blocked”. *Id.* at 44. When then asked whether she was not clear as to what the officers were doing at the south gate, specifically that they were trying to move her, she answered, “I don’t remember what I thought at the moment”. *Id.* at 46-47. Moore did admit that she ran to the south gate because she learned that some vehicles were getting ready to leave. *Id.* at 50.

Defendant Archer also called Laura Tewel. Tewel testified that she came to the Cataldo building after reading Stuckart’s Facebook post. ECF No. 386 at 5. Although she had indicated on direct that she had read Stuckart’s Facebook post, on cross examination, she claimed that she didn’t know the white bus was being blocked because “I am around a lot of teachers … [w]hen people are sitting, they tend to sit in front of buses”. *Id.* at 16. She further denied understanding that the south gate was a gated entrance, but upon arrival believed it was “just an opening”. *Id.* at 18. She further claimed that she believed the federal officer’s vehicles were “parked” at the opening. *Id.* She did admit that she nonetheless went and stood in front of the opening and in front of the vehicles and linked arms but wasn’t cognizant of what was happening behind her. *Id.* at 19. She claimed she didn’t know the reason why the federal officer’s vehicles were stopped. *Id.* at 21. Even after the physical interaction between officers and the protestors, Tewel claimed that “the officers never said they were trying to get through the gate” and claimed that she had no idea that was their purpose. *Id.* at 30.

Defendant Archer testified on their own behalf. Archer testified that soon after arrival in the white bus area on the north side of the facility, Archer

determined that they were one of the more experienced protestors and took on a leadership or organizer role. ECF No. 433-11 at 15. Archer testified that they engaged in "a huddle" with people who were willing to "risk arrest" while at the white bus to instruct and organize them. *Id.* at 30. Archer stated that they met some of the people in the huddle for the first time. *Id.* Archer admitted that Forral was their employee at the time but denied a level of authority over Forral that other organizations may give an employer. *Id.* at 47-48. Archer agreed that before they arrived, they prepared for the possibility of being arrested. Archer denied the white bus was pinned by Forral's car at the front. *Id.* at 48. Archer claimed that when Archer responded to Stuckart's Facebook post it was not their intent to block the bus. *Id.* at 51.

Archer claimed that with 50-100 people, there were not enough bodies available to "watch" the doors of the possible 6 doors to the facility, and the purpose was not to block the exits. *Id.* at 54. Archer further testified that it was not Archer's intent to block the exits when they posted their Facebook call to action for more bodies to block the exits and potentially release the detainees. *Id.* at 54-57. Archer admitted that by 5 p.m. Archer was intending to block the exits, and their purpose was to put pressure on the officers inside. *Id.* at 57-59. Archer agreed that their purpose was not to prevent federal officers from walking outside. *Id.* at 60-61. Archer admitted that what their intent was to cause the detainees to be released as Archer had seen done in other places. *Id.* at 61-62. Although Archer posted the words "block the exits" in their Facebook post call to action, Archer would not agree that the pressure was to block them from leaving with the detainees. Instead, Archer preferred to use the words, "We were in their way." *Id.* at 62. Archer did admit their statement: "we collectively made it so that federal officers had to essentially deploy violence in order to leave with the detainees". *Id.* at 65-66. Archer admitted they believed it was possible that the officers at the

south gate were transporting the detainees and responded to the south gate to prevent the officers from transporting the detainees. *Id.* at 68-69. Archer agreed that they were a part of a group whose job it was "to man the gate and keep anything from going in or out". *Id.* at 76. Archer's offered reason why the gates were barricaded was to prevent the officers from possibly "running them over". *Id.* at 78. They claimed that they did not see the barricading done by Forral and Hatfield at the south gate or Forral and Muncey (orange shirt) barricading the east gate despite being present during the barricading at both locations in the drone video. *Id.* at 47; 79-80. Archer would only admit that they saw Forral "carrying some things". *Id.* at 80. Archer admitted they did not express disagreement with the barricading. *Id.* Archer admitted that when the munitions went off, their immediate reaction was to get up to block the gate to not let anyone in or out of there because they "were not going to be complicit in the kidnapping". *Id.* at 84.

**VERDICT AFTER TRIAL**

The jury found all Defendants guilty. With respect to Defendant Forral, the jury found unanimously and beyond a reasonable doubt that Defendant conspired to: prevent by force, intimidation, or threat, any officer of the United States from discharging any of their official duties (Question 1); to injure the property of any officer of the United States on account of their lawful discharge of their official duties or while they were engaged in the lawful discharge of their official duties (Question 3); and to injure the property of any officer of the United States so as to molest, interrupt, hinder, or impede them in the discharge of their official duties (Question 4). The jury further found unanimously and beyond a reasonable doubt that Defendant aided and abetted another to conspire to impede or injure any officer of the United States in the discharge of their official duties (Question 5).

## ARGUMENT

### 1. Rule 29 Motion for Judgment of Acquittal

Under Federal Rule of Criminal Procedure 29, a court may enter a judgment of acquittal when "evidence if insufficient to sustain a conviction." Courts have consistently held that "evidence supports a conviction if, in viewed in the light most favorable to the government, it would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *See eg United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010); *see also United States v. Johnson*, 297 F.3d 845, 868 (9th Cir. 2002) (a Rule 29 motion will be granted "only if viewing the evidence in the light most favorable to the government, and granting to the government all reasonable inferences that may be drawn from the evidence, no rational trier of fact could find beyond a reasonable doubt that the defendant committed the crime"); *United States v. Disla*, 805 F.2d 1340, 1348 (9th Cir. 1986) ("A conviction is supported by the evidence if, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences, there was relevant evidence from which the jury could reasonably have found the defendant guilty beyond a reasonable doubt."); *United States v. Hazeem*, 679 F.2d 770, 772 (9th Cir. 1982) (in deciding a Rule 29 motion, the "trial court must determine whether, viewing the evidence in the light most favorable to the government, the jury could reasonably find the defendant guilty beyond a reasonable doubt"). Such motions may be made before submission of the case to the jury, or after the jury verdict. Fed. Crim R. 29(a), (c).

A "rational juror" may make reasonable inferences from both direct and circumstantial evidence, and circumstantial evidence alone may be sufficient to form a basis for conviction. *United States v. Yoshida*, 303 F.3d 1145, 1151 (9th Cir. 2002); *United States v. Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992). And importantly, juries are not required to believe any particular witness—jurors

are the finders of fact, who weigh and determine the credibility (or not) of any particular witness. *United States v. Scheffer*, 523 U.S. 303, 313 (1998). A jury is also free to disbelieve a defendant's testimony and infer the opposite of the testimony to support its verdict. *United States v. Cordova Barajas*, 360 F.3d 1037, 1041 (9th Cir. 2004). As the Ninth Circuit has stated, in considering a Rule 29 motion, a court "must bear in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts". *United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977). And importantly, "any conflicts in the evidence are to be resolved in favor of the jury's verdict." *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1201-02 (9th Cir. 2000).

In their motion, Defendant complains not simply that there was insufficient evidence to convict them, but that the prosecutor made constitutionally improper argument: (i) to base a conviction on protected speech; and (ii) mislead the jury on the elements of the offense. ECF No. 433 at 11-12. Further, despite not asking for a different special verdict form and having not objected to the verdict form prior to submission to the jury, now claims the special verdict form was defective and there is a "significant risk that the jury was not unanimous in convicting [Forral]". *Id.* at 12.

a. <u>Any rational trier of fact could have found the essential elements of the crime of 18 U.S.C. § 372 *Conspiracy to Impede or Injure Officers* beyond a reasonable doubt</u>

In this filing the United States has provided the Court with a comprehensive summary of the facts, supported by the trial transcript, that it will not repeat again in full detail here. Defendant disputes their guilt. However, a jury considering the law as given to them in the jury instructions by the Court and the totality of the

evidence, including defendants' evidence, found Defendant guilty of the charged offense.

i. <u>Evidence of Agreement</u>

In order to convict the defendant of conspiracy, the United States needed to prove two things: (1) an agreement to commit the specified crime; and (2) the defendant's knowledge of the conspiracy's objectives and intent to help further them. *United States v. Gil*, 58 F.3d 1414, 1423 (9th Cir. 1995). *See United States v. Shabani*, 513 U.S. 10 (1994). A person does not become a conspirator by simply associating with conspirators or knowing that a conspiracy exists but rather must agree to participate in the conspiracy. *See United States v. Estrada–Macias*, 218 F.3d 1064, 1066 (9th Cir. 2000). Once the United States proved that a conspiracy existed, "evidence of only a slight connection is necessary to support a conviction of knowing participation in that conspiracy." *United States v. Sanchez-Mata*, 925 F.2d 1166, 1167 (9th Cir. 1991); *see United States v. Restrepo*, 930 F.2d 705, 709 (9th Cir. 1991). This connection can inferred from circumstantial evidence. *United States v. Mares*, 940 F.2d 455, 458 (9th Cir. 1991). A co-conspirator is liable for reasonably foreseeable acts committed by a co-conspirator within the scope of the unlawful project and in furtherance of the conspiracy even if the co-conspirator did not directly participate in those acts or was aware of them. *United States v. Fonseca–Caro*, 114 F.3d 906, 907 (9th Cir. 1997).

This incident was not a preplanned event, but it did have an organizational structure that Archer and their employee, Defendant, and others rapidly put into place upon arrival. The drone video captures, with regard to Defendant, consistent and clear activities that show an agreement to commit the charged offense. Defendant is seen directing and leading others to commit acts to prevent the federal officers from leaving the building with the detainees to transport them, the plan clearly articulated by Archer during their testimony and understood by the federal

officers during the events on that day. Evidence of the agreement included but are not limited to: parking their vehicle to pin in the white bus; barricading with other co-conspirators all of the gates to the secure parking lot where the federal agents' vehicles were parked; Defendant returning to the white bus after the south gate event to let the air out of the tires along with another co-conspirator; working with other co-conspirators to repurpose the items barricading the south gate entrance that Archer was guarding with other co-conspirators (and leaving the other gates barricaded which were not guarded), by placing them in front of and underneath law enforcement vehicles, including the red Border Patrol van, to block them and cause them damage if they tried to drive away; Defendant's activities around the red Border Patrol van, directing and appearing to tell co-conspirators where to stand; Defendant yelling for people to come and respond to stop the federal officers from leaving, "Block the doors! This is the Exit!" and "Over here! Over here! They are coming out over here!"

Defendant also commits acts themself, and also acts combined with words, that demonstrate that they have the specific intent to use force, intimidation, or threat against the federal officers from discharging their official duties, or to injure the property of the federal officers on account of the discharge of their duties or while they were engaged in the discharge of their duties, or to injure the property of the officers so as to molest, interrupt, hinder, or impede them in the discharge of their duties. Importantly, Defendant or their co-conspirators do not actually have used force, intimidation, or threat against the federal officers, or injured their property—they simply must have agreed to do so. However, with the inclusion of the requirement in the Court's instruction that the United States had to prove beyond a reasonable doubt that an overt act was performed for the purpose of carrying out the conspiracy, the jurors had to find that there was not simply an agreement but something was done for the purpose of carrying out a conspiracy

articulated in A, C, and D of the jury instruction No. 15 in order to have found Defendant guilty. *See* ECF No. 15 at 19. The United States believes they did meet the elements, including the overt act as required, and that a rational juror could find specific intent by Defendant based on the totality of the evidence to do A, C, and D. While Defendant takes an exorbitant amount of time in their motion claiming the jury convicted Defendant on speech alone, that is simply not the case when the overt political rhetoric is set aside and the actual admitted evidence is considered.

From the time Defendant arrived on scene until Defendant was arrested, Defendant and co-conspirators were engaged in actions coupled with words (and sometimes actions without any words) that a rational juror could find a specific intent to do A, C, and D. The purpose of the agreement to do A, C, and D was to prevent the federal officers from leaving safely with the detainees. As Archer admitted on cross, they were going to put as much pressure on the federal officers as possible to release the detainees as they had seen done in other places. And they did so by agreeing to doing A, C, and D. The evidence showed that the co-conspirators worked together to ensure that no one was leaving out the south gate or any of the gates where there were vehicles to transport, any vehicle suspected of transport would be taken out of commission, and the exits to the building where the officers could possibly "sneak out" with the detainees would be covered with enough bodies willing to physically engage and prevent them from leaving until those detainees were released. It was a "siege" as SA Laforte described it. It was not simply resisting or protesting. A rational jury could find based on the totality of the evidence that there was an agreement to do A, C, and D.

ii. <u>Intent to Commit A</u>

Defendant was seen in the video evidence and described through the testimonial evidence as working with co-conspirators in all the aforementioned actions to prevent federal officers from discharging their duties. The evidence

showed Defendant did so by force, intimidation, or threat. Defendant's response to the peaceful protestor who came over to Defendant and admonished Defendant when Defendant purposely retrieved and brought a weapon (the steering lock club) to the area of the red van and showed it to officers by banging it repeatedly on the bollard is telling of Defendant's intent to use force, intimidation, or threat that day. When the peaceful protestor rebuked Defendant, "This is supposed to be peaceful", Defendant's response captured on video while they are brandishing a weapon is, "I'll keep it peaceful until it's not."[4] As stated in Instruction No. 16 an act involves "force" if it threatens or results in violence or if it threatens or results in harming or destroying property or harming or killing people. ECF No. 361 at 21. At the south gate, a tactic was used by those linking arms to use their combined body mass and to move behind others in the chain to force back the officers. Clearly the linking of arms alone is not enough[5]. However, the evidence showed that they were not simply linking arms and tensing up or resisting. It was a tactic testified to by the officers at the south gate and the officers at the red van that is visible in the video from the south gate. It is also a tactic that Mavalwalla is seen doing with Hutchins

---

[4] The building at Cataldo has windows on every side and the federal officers inside testified that they were watching at the windows and on surveillance cameras. It is very evident by the video evidence that the activity by the red van was not simply to communicate to local law enforcement that it would be dangerous for federal officers to attempt to bring the detainees outside.

[5] Defendant claims that the "prosecutor told the jury that the protestors' linking of arms was evidence of an agreement to use force". ECF No 433 at 22 n.10. That is an inaccurate summary of the argument. The trial transcript speaks for itself. Further, Defendant argues that the conduct by the defendant in *Zorn v. Linton*, 146 S. Ct. 926 (2026) is consistent with the conduct of the co-conspirators at the south gate. In *Zorn*, Linton refused to get up as ordered initially linking arms with another protestor. The officer (Zorn) took her arm and put it behind her back using pain compliance. The officer then lifted her up by her underarm and she jerked her arms and fell on the floor. She wouldn't get up off the floor, and the officers had to pick her up and carry her out. That conduct is not similar to what occurred at the south gate.

at the red van (and admitted) was used to push back the officers. The federal officers at the south gate testified they were being pushed and shoved, and that those linked up were using this tactic. There was no escalation into actual violence because the officers retreated and gave the co-conspirators their victory at the south gate, but the intent as testified to by both Mavalwalla and Archer was that they were there to make sure that nobody was getting out that gate. To claim that it was only their intent to simply link arms does not bear out to be true when considering the video evidence combined with the intent of the co-conspirators to pressure the officers, trap them inside, and make them use violence against them if they tried to leave. The officers testified that after the south gate they were fearful of escalating the situation by engaging again. A rational juror could find that the conspiracy involved an agreement to prevent a federal officer by force from discharging their duty.

iii. Intimidation or threat

Intimidation or threat require a subjective intent. The speaker or actor must intend to for their words or conduct to intimidate or convey a threat, and those words or conduct must be such that a reasonable person would find to be a serious expression of intent to harm or assault. Those instructions were properly given to the jury at Instruction 16. Furthermore, the Ninth Circuit has analyzed threats and intimidation, ultimately finding that for any alleged threats or intimidation to pass First Amendment scrutiny, the speaker/actor's state of mind must be proven: "speech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as threat". *United States v. Cassel*, 408 F.3d 622, 634 (9th Cir. 2005). Thus, the Ninth Circuit requirements as to what would constitute intimidation without First Amendment protection is exactly what the jury instruction stated and is what the jury found.

Importantly, in consideration of threats and intimidation: an analysis of words and conduct within a context is important. In interpreting a person's intent in the First Amendment context, Courts consistently look at both. *See United States v. Osinger*, 753 F.3d 939 (9th Cir. 2014) (examining a defendant's harassing online posts as well as his surrounding conduct); *Virginia v. Black*, 538 U.S. 343 (2003) (allowing a statute to ban cross burnings with the intent to intimidate); *United States v. Jubert*, 139 F.4th 484, 494-95 (5th Cir. 2025) (stating "context matters" when considering potential protected speech).

A rational juror could find that the totality of the evidence shows an agreement to prevent federal officers by intimidation or threat from discharging their official duties. The term "intimidation" or "threat" in 18 U.S.C. § 372 is narrowly construed by courts to be limited to "true threats." *See, e.g., United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007). Intimidation or threat was properly defined by Instruction No. 16 as a "true threat": (1) the speaker or actor must intend their words or conduct to intimidate or to be a threat, and (2) those words or conduct must also be such that a reasonable person hearing or observing them would foresee that they would be interpreted as a serious expression of intent to harm or assault. In being defined in that manner, a jury could not apply it to legitimate threats to take lawful action. *See United States v. Fulbright*, 105 F.3d 443, 452 (9th Cir. 1995).

Although threat statutes such as 18 U.S.C. § 372 are interpreted in light of the First Amendment, the Supreme Court has "left no doubt that true threats [can] be criminalized because they are not protected speech." *United States v. Hanna*, 293 F.3d 1080, 1084 (9th Cir. 2002) (*citing Watts v. United States*, 394 U.S. 705, 707, 89 S. Ct. 1399, 22 L.Ed.2d 664 (1969)). "A statement is a 'true threat' if a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to

harm or assault." *United States v. Stewart*, 420 F.3d 1007, 1016–17 (9th Cir. 2005) (internal citation omitted). A statement is a "true threat" and subject to criminal liability only when the speaker subjectively intends the speech as a threat or intimidation. *Elonis v. United States*, 575 U.S. 723, 740 (2015) (the United States must prove that a defendant made a communication for the subjective purpose of issuing a threat). A defendant may not be convicted simply because a federal officer subjectively felt threatened or intimidated. *United States v. Johal*, 428 F.3d 823, 827 (9th Cir. 2005) (mens rea "limits the likelihood that a defendant will be prosecuted for mere inadvertent conduct").

Consider, for example, someone stands in front of the police precinct and says "fuck you" to a police officer who exits. Those words, taken alone, would certainly be protected speech. A First Amendment analysis of those words alone would have one result – the speech is protected. But in an alternate scenario where the speaker rear-ends a police car, gets out of his car goes over to the officer who tries to open the door to his police car, and the speaker pushes the police car door so the officer cannot get out, and says, "Fuck you". Those words would inform that it was possibly not an accidental collision and the speaker's actions intend something more. This is why the Supreme Court held in *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) that the First Amendment allows speech to be used to prove motive, intent, and the elements of a crime.

Defendant's conduct, in conjunction with others, showed an intent to intimidate federal officers. Any one action, taken in isolation may not quite reach the burden of showing intent. But when taken as a whole, Defendant's intent is clear. The evidence showed that Defendant and their co-conspirators intended their words or conduct to threaten or intimidate the officers such that a reasonable person hearing the words and observing the conduct would interpret it as a serious expression of intent to harm or assault. Defendant and co-conspirators through

their words combined with their actions intended to threaten or intimidate the federal officers so that they would feel that they would be harmed or assaulted if they tried to transport the detainees. Clearly, it is not sufficient evidence that an officer was heckled, berated, or repeatedly called names. However, when actions are accompanied by words, as when for example, Defendant at the south gate visually angry and very close, yells at the federal officers, “Back up!” and then when they pull back in, Defendant and co-conspirators (while the cars are still at the gate line) starts barricading them inside the gates so they cannot leave out through that exit, or if they tried to, they would have to go remove those items with that crowd present to stop them, a rational jury could find an intent to threaten or intimidate the officers and make them feel if they tried to leave they would be subject to harm or assault. SA Jared Tomaso testified that after they pulled back into the south gate and he was checking his phone, he heard someone telling him, “You can’t leave, can you? Are you scared? Are you looking at your phone? How much battery do you have?” SA Laforte also heard yelling others yelling to the same effect, “The police aren’t coming. Are you scared? Are you afraid?” Alone those words would be insufficient, but coupled with the intent and actions of the co-conspirators to isolate and trap the federal officers inside and not let them leave for fear of their safety and the safety of the detainees, and the actions they took to communicate that by barricading them, physically pushing them back when they tried to move the crowd to leave, covering every exit with multiple bodies, tampering and damaging their transport vehicles, and walking about with a potential weapon in your hands, a steering wheel lock club that has no purpose outside your car, and banging it loudly on a metal pole to draw attention to you and it, the totality of the actions and communications over that nine hour span of time was expressly intended to be and would cause a reasonable person to see it as a

serious expression of intent or threat to harm or assault if they tried to come outside with the detainees.

The second element, as listed in the instructions and required by law, was also met. The federal agents who were present that day repeatedly expressed their fear and concern for their safety, and their actions demonstrated that fear: they retreated inside the building and did not reattempt to exit until late into the evening when SWAT took them out in an armored vehicle. A reasonable person who heard and saw Defendant and the co-conspirators conduct throughout the day would have felt the same. A rational jury could find an agreement to prevent by intimidation or threat.

iv. Intent to Commit C and D

The evidence presented supports the jury finding that the co-conspirators agreed to injure property for the purposes set forth in C and D. Defendant barricaded the gates of the south secured lot with objects which could cause a rational trier of fact that those items could cause damage to either the gates or the vehicles if they tried to exit, or it was Defendant and co-conspirators' intent to do so. Defendant and co-conspirator Lang deflated the tires to the white transport bus to be certain that it would be out of service in the event that the federal officers attempted to utilize it. And Defendant and co-conspirators placed objects in front of and under law enforcement vehicles, including the red Border Patrol van so that the transport vehicles would be blocked or damaged if they were moved. These activities show a clear intent to injure property the federal officers were using to transport even if their actions ultimately did not result in injury.

Defendant claims there was no evidence of any agreement to deflate the tires of the white transport bus. While the United States was unable to use the admissions made by Lang when she pled guilty to the charge, the video evidence admitted at trial showed that interactions between Defendant, Lang, and the

unidentified male at the white transport bus. *See* Trial Exhibits 13, 14, and 421. At approximately 5:45 p.m., after the interaction at the south gate during which Mavawalla yelled for co-conspirators to keep the white bus blocked[6] and after the exit gates were blocked with objects by Forral and co-conspirators, Mavalwalla, Defendant, and charged and pled co-conspirator Lang were captured on drone video back on Cataldo at the white bus. As indicated in the factual section, the video shows Forral and Lang speaking as Forral let air out of the front driver's side tire and Lang appeared to look at the tire that Forral was working on. An unidentified male was present and communicated with Forral. Lang then walked over to the rear driver's side tire and began letting out the air. The male then walked over to Lang and watched Lang release the air as Forral continued to work on the front driver's side tire. Forral then got up and looked over towards Lang. Lang got up and Lang and the male walked over towards Forral as Forral spoke to individual(s) on the sidewalk area near the door of the white bus which was still being blocked. Forral then walked over to Lang and they spoke. Forral walked towards the rear of the bus past the tire that Lang deflated, and Lang, the male, and others followed Forral. Forral walked to the lobby door area of the building where they directed some individuals in that area. Forral then turned and walked back and Forral and Lang returned to the tires and continued to release the air out of the

[6] Defendant asserts that the fact that the officers believed the bus was unsafe, has some weight in determining whether Defendant and the co-conspirators committed acts to injure property to prevent the officers from transporting the detainees. ECF No. 78 at 36. There was no testimony that the bus was inoperable, just that the officers at that time did not believe that was a viable option and looked for a safer one in planning the south gate exit. Clearly Mavawalla, Forral, and Lang still believed it was a possible means by which the officers could attempt to transport the detainees or they would not have expressed the need to keep the bus blocked or deflated the tires. What matters is the intent of the co-conspirators in taking the steps that they took, not whether or not the officers tried to use a safer means than take a chance on having to scrape the paint off the windshield and driving a bus they believed may have had the brakes tampered with.

tires. Forral and Lang appeared to speak to one another while they let out the air on their respective tires. Forral appeared to say something to Lang and then Lang banged her hand on the wall of the tire. When the red van was being escorted to Washington at a little after 6 p.m., SPD Officer Heiman drove the vehicle in front of the red van, and as he drove south on Washington, he passed Cataldo and saw that the tires were deflated on the white bus. ECF 433-6 at 6-8. Based on the video evidence and the totality of the evidence showing Defendant as well as Lang, a rational jury could find there was an agreement to injure the property of the officer under C and D. In its verdict, the jury did not find that they were "a handful of isolated unplanned acts of vandalism" committed randomly by individuals as argued by Defendant at trial and their motion. ECF No. 433 at 31.

Defendant argues that the white bus was not government property and therefore the object of the conspiracy to injure the "property of the officer" is not met. Prior to trial, Defendant filed a motion to strike in which Defendant chose not to have the Court rule on this issue, but rather simply argued that the property had to be the personal property of the officer to qualify. *See* ECF No. 245. Despite citing case law in the prior motion that supported that the property simply had to be in the custody and control of the officer -- that it could be the officer's personal property, Defendant now reverses tactics and argues that the property must be government property. ECF No. 433 at 38. In their pretrial motion, Defendant cited an unpublished out-of-Circuit case, *United States v. Hopper*, 436 Fed. Appx. 414 (6th Cir. 2011) in support of the assertion that "property" under clauses [(3)] and [(4)] of 18 U.S.C § 372 must be the officer's personal property. On appeal to the Sixth Circuit, the defendant in Hopper, who had taken the officer's personal property, asserted that the prosecution was required to prove the property was property of the United States government. *Hopper*, 436 Fed. Appx. at 425. The Sixth Circuit rejected the defendant's argument to narrowly define "officer's

property", citing that the clause of § 372 for which the defendant was convicted "simply requires an intent to injure an individual in his person or property, that the individual is an officer of the United States, and that the injury is planned to occur while the individual is engaged in the lawful discharge of his duties … [and] the statute also says 'his person or property,' not government property such as the mail." *Id. citing* § 372.

The word "ownership" rightfully does not appear in the statute, and the legal definition of possession is also not ownership. *See United States v. Sellers*, 670 F.2d 853 (9th Cir. 1982) ("Under the common law, the person last in actual possession of property retains constructive possession until he abandons it, gives it to another person, or until another person otherwise acquires actual possession. 3 Wharton's Criminal Law, Larceny s 369 (1980); 50 Am.Jur.2d, Larceny s 22 (1970); 52A C.J.S. Larceny s 17 (1968)"). The settled principle of statutory construction is that absent contrary indications, Congress intends to adopt the common law definition of statutory terms. *See Shabani*, 513 U.S. at 14. Had Congress wanted to limit "the officer's property" to government property it would have defined property as such as it does in other statutes. See 18 U.S.C. § 136. Interpreting § 372 otherwise circumvents the purpose of the statute, which is to criminalize actions that interfere with official duties of federal officers by injuring property in their possession or custody and control – whether it is the officer's personally-purchased property, property contracted by the United States, or it belongs to the United States and is in the possession or custody and control of the officer to aid him in the discharge of his official duties. What matters here is that it was property being used by federal officers for the express purpose of fulfilling their duties and that is exactly what Defendant believed and why they did what they did to disable the white bus. It is the same reason why Defendant and their co-conspirators put objects in front of and under the red Border Patrol van. Where the

property is being used by the officers to fulfill their duties, and Defendant and co-conspirators intentionally act to injure the property to disable it so they cannot do their duties, whether the white bus belongs to the United States, Geo, or the officer, C and D are met. So restricting the definition as Defendant urges the Court would create absurd and inconsistent results where defendants held the same beliefs, same purpose, and did the same acts but for who held the title to the vehicle. Furthermore, Defendant did make this same argument at trial, and a rational jury could have agreed with Defendant and nonetheless found that the red van as well as the conduct at the gates to the secure lot committed by Defendant and co-conspirators met C and D[7].

Defendant argues that the act of letting air out of the tire does not constitute "injury" as required in elements C and D, or the intent to injure. ECF No. 433 at 43-45. Defendant argues that in order to prove the Conspiracy using C or D, the United States would have to show that actual damage occurred to the vehicle because Defendant and co-conspirators deflated them. Anyone with a driver's license[8] and/or basic common sense knows that it is dangerous to drive a vehicle with flat tires at any distance. First, steering will pull harder to the side with the flat tire, breaking distances change, and there is instability in turning. Without air pressure, the heavy weight of the vehicle can force the rim onto the pavement, bending, denting, or cracking the rims. Continuous friction with the flattened rubber and the road can shred the tire and even ignite a tire fire (hence the smell of burning rubber everyone has smelled after passing by as a passenger or driver, or themselves experiencing a blowout). A rational jury could find that is "injury" to

---

[7] Defendant further argues that the Court should reverse its pretrial ruling on who qualifies as an officer of the United States. ECF No. 433 at 38-43. The United States reasserts the arguments made in its response to the motions made by defense and asks that the Court maintain its prior ruling.

[8] Defendant has a driver's license or knows how to drive if unlicensed since they drove the car to the location and pinned in the white bus with their car.

the bus. Furthermore, Defendant and co-conspirators committed the act to disable it. A rational jury could find that meets the intent to injure property under C and D[9].

v. Aiding and Abetting

"[T]o prove liability as an aider and abettor the government must establish beyond a reasonable doubt that the accused had the specific intent to facilitate the commission of a crime by someone else—and this is an 'element' that need not be established for conviction on the underlying offense." *United States v. Garcia*, 400 F.3d 816, 819 (9th Cir. 2005). Jurors are not required to agree unanimously on alternative means of committing a crime. *Id. citing Schad v. Arizona*, 501 U.S. 624 (1991). Defendant alleges that because the United States did not prove a conspiracy existed, Defendant could not be convicted under an aiding and abetting theory of liability. The evidence at trial supports that a rational jury could find the conspiracy charged was committed and that Defendant was guilty under an aiding and abetting theory[10].

b. Defendant's Conduct Is Not Protected by the First Amendment

Defendant's choice to spend hours on June 11th coordinating and participating in an agreement to commit A, C, and D is not protected speech or a protected right to assemble to protest.

---

[9] Following Defendant's logic, if the Border Patrol agent did not drive the Border Patrol red van over the scooters that Defendant and co-conspirators shoved underneath it to damage it when it moved because he saw it happen, because the act of shoving the items under the van would not cause damage until the red van pulled out, and were removed without damaging it, the act of shoving the scooters under the van would not meet the statute.

[10] Defendant argues in a footnote that a person can only aid and abet a general conspiracy statute such as 18 U.S.C. § 371 or one that requires proof of an overt act. The Court should reject the assertion as there is a plethora of cases in this Circuit where defendants are convicted of 21 U.S.C. § 846 under an aiding and abetting theory of liability. ECF No. 433 at n. 12.

i. Standard of Review

In a Rule 29 motion, the standard remains: the jury is the trier of fact, and every reasonable inference should be taken in favor of the jury's determination of the verdict. In *Hanna,* the Ninth Circuit considered a defendant's claim that insufficient evidence supported the jury. *Hanna*, 293 F.3d at 1087. The Court noted that the case had been properly submitted to the jury—based on the material facts in dispute, the jury needed to act as a fact-finder regarding the circumstances of the threats in question. *Id.*at 1087. And following that jury verdict, "the appellate court defers to the jury's findings on all but the constitutional facts" which are facts which "determine the core issue of whether the challenged speech is protected by the First Amendment." *Id.* A reviewing court must defer to the jury's findings on other facts and credibility and then determine "whether the facts as found by the jury establish the core constitutional fact." *Id.* This includes deference to findings of credibility made by the jury. *Eastwood v. National Enquirer, Inc.,* 123 F.3d 1249, 1252 (9th Cir. 1997). In other words, the reviewing court makes a determination of "whether the believed conduct" constitutes a First Amendment violation. *Hanna,* 293 F.3d at 1088.

Similarly, in another Ninth Circuit case, the Court stated they would "consider the undisputed facts as true, and construe the history facts, the findings on the statutory elements, and all credibility determinations in favor of the prevailing party. In this way, we give appropriate deference to the trier of fact…yet assure that evidence of the core constitutional fact…falls within the unprotected category." *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1070 (9th Cir. 2002). Furthermore, the Ninth Circuit has implied that if the constitutional facts are subsumed within the elements, then the reviewing court will defer to the factfinder. *United States v. Keyser,* 704 F.3d 631, 639 (9th Cir. 2012).

Constitutional facts are the core aspect of the facts which removes the behavior from constitutionally protected behavior to criminal behavior. *Hanna,* 293 F.3d at 1088. For example, "actual malice" is required to prove defamation—otherwise, the statements may be mean or false, but will still be protected by the First Amendment. *Eg New York Times Co. v. Sullivan,* 376 U.S. 254 (1964). Similarly, a statement made against the President must be considered a "true threat"; something lesser or which does not constitute a "true threat" will be protected by the First Amendment. Here, the constitutional facts are the elements of the offense which push the conduct outside of First Amendment protection—the use of force, intimidation, or threats; and damage to property.

For example, one district court considered a Rule 29 motion similar to the one made here, wherein defendants argued that their various online posts were protected by the First Amendment. *United States v. Lacey,* No. CR1800422001PHXDJH, 2024 WL 1765673, at *14-15 (D. Ariz. Apr. 23, 2024). During pretrial motions, as here, the district court denied a motion to dismiss based on the First Amendment, noting that if the particular online post constituted an offer to engage in an illegal transaction, then it was not protected by the First Amendment. *Id.* at 15. The court also noted, however, that the United States would need to prove as much at trial. *Id.* Following trial, in consideration of the Rule 29 requirements, the district court again denied defendants motion, noting that "given the jury's verdict as to [defendant], they apparently found that the ads were in fact for prostitution and not for some other purpose such as a lawful escort ad. Thus, in applying the instruction [given to the jury], they necessarily found that the ads…were unprotected speech." Ultimately, the district court stated "there is sufficient evidence for a reasonable juror to find that each [posted ad] was illegal and therefore not protected by the First Amendment." *Id. See also United States v. Harkonen,* No. C 08-00164 MHP, 2010 WL 2985257, at *15 (N.D. Cal. July 27,

2010) (stating that the jury concluded the defendant was guilty of wire fraud, and "as a result, the First Amendment provides the defendant with no defense from his conviction as it is well settled that the First Amendment does not protect fraud."); *but see United States v. Hayner*, 371 F. Supp. 3d 700, 706 (N.D. Cal. 2018) (giving no deference to a factfinder's assessment of the evidence in evaluating a defendant's speech).

This Court heard pretrial motions regarding the First Amendment claims of Defendant, and at that time properly denied those motions, noting that the United States at trial would need to prove all of the elements of §372 including more than "mere presence, attendance, or abstract agreement. Section 372 requires both an agreement to engage in unlawful conduct and the requisite culpable objective and subjective intent." ECF 276. Essentially, this Court stated that the core constitutional facts would need to be proven. The jury was instructed consistent with that ruling regarding the elements of the offense, as well as how the jury should consider First Amendment implications. ECF 361. The jury also received instructions regarding definitions of force, threats, and intimidation. *Id.* Following those instructions, the jury convicted.

a. <u>The Use of Force, Threats, and Intimidation are Not Protected</u>

The question for this Court is whether the believed facts constitute a First Amendment violation or violation of Defendant's right to assembly. With the jury's decision regarding the core constitutional facts (the use of force, intimidation, or threat; or the injuring of property), is Defendant's conduct protected by the First Amendment and/or their right to Assembly? Is a defendant permitted to conspire to use force, intimidation or threats against officers who are engaging in their duties, or work with others with the intention of damaging property? The answer is no—even if the defendants feel very strongly about their actions, or claim they are peaceful, or have many community supporters. Courts

have consistently found criminal behavior such as this not protected; in fact, far less-egregious behavior is regularly found to be properly proscribed in law, which was extensively discussed in pretrial briefing and is hereby incorporated by reference. ECF 247; see also *Osinger,* 753 F.3d at 946 (speech integral to criminal conduct is unprotected speech).

Furthermore, the jury also specifically found that Defendant aided and abetted in a conspiracy to impede or injury any officer of the United States in the discharge of their duties. And while Defendant cites *Claiborne Hardware* in support of the idea that the conduct of the crowd cannot be imputed to Defendant, that reliance is misplaced. The facts of that case involved a civil suit by several businesses against the NAACP and other organizations who had organized a years-long boycott of those businesses. *NAACP v. Claiborne Hardware Co.* 458 U.S. 886, 890-91 (1982). The suit also named multiple individuals who had participated in the boycotts. *Id.* Over the course of time, the boycotts involved some violent behavior, and also many individuals who were unequivocally non-violent—simply standing to the side or holding signs in front of businesses. *Id.* The Court considered the various roles and ultimately held that "civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence. For liability to be imposed by reason of association alone, it is necessary that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Id.* at 920. Further, "the government has the burden of establishing a knowing affiliation with an organization possessing unlawful aims and goals, and a specific intent to further those illegal aims." *Id.* Thus, the "store-watchers" who stood in front of the businesses, or those who organized the boycott of the businesses, could not be held liable for the violent activities during the years of the alleged boycott. *Id.*

Those facts do not align with what occurred here. True, if Defendant the day before had urged people on to go protest and nothing more, they might be akin to the organizer of the boycott in *Claiborne Hardware*. Or if they had stood across the street, like hundreds of others, and watched what occurred, perhaps even recording on their phone, they might be akin to the "store-watchers" who could not be accountable for violent acts. But that is not what was presented, and not what the jury found. Of the hundreds of individuals present outside the HSI facility on June 11th, the grand jury indicted 9 individuals. Six of them pled guilty, admitting that there was indeed a conspiracy. This is not a prosecution of the "entire collective effort…rather than holding specific individuals liable" that Defendant contends. ECF 429. Rather, this was an isolated prosecution of a very small number of individuals who engaged in specific acts in furtherance of the obstruction of officers. And unlike *Claiborne Hardware,* with the lawful goal of a boycott of business, here the goal of the conspiracy was not lawful—the goal was to impede officers as stated in the indictment. And critically, Defendant *was* knowingly engaged in the threatening, intimidating, and forceful acts, as outlined above and in the listed exhibits. They were not a passive or outside observer who was simply scooped up in the criminal conduct of others. They organized and directed the criminal conduct and participated in it. They, as *Claiborne Hardware* requires, were part of an organization with unlawful aims, and had the specific intent to further those aims.

**2. Rule 33 Standard**

Under Federal Criminal Rule 33, "a court may vacate any judgment and grant a new trial if the interest of justice so requires." This decision is within the "discretion of the district judge" and "should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981). In reviewing the trial evidence, "the

district court need not view the evidence in the light most favorable to the verdict; it may weight the evidence and in so doing evaluate for itself the credibility of the witnesses." *United States v. A. Lanoy Alston*, D.M.D., P.C., 974 F.2d 1206, 1213 (9th Cir. 1992); *United States v. Chang*, No. 16-CR-00047-EJD-1, 2020 WL 5702131, at *9 (N.D. Cal. Sept. 24, 2020) (*quoting United States v. Endicott*, 869 F.2d 452, 454 (9th Cir. 1989). In reviewing the trial evidence, "the district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." Alston, 974 F.2d at 1213. Newly discovered evidence may be a valid basis for granting a new trial, if the evidence is material and was diligently sought prior to trial, and would probably lead to a defendant's acquittal. *United States v. Hinkson*, 585 F.3d 1247, 1264 (9th Cir. 2009). Jury instructions "contradicted existing Ninth Circuit law at the time they were issued" may also be a valid basis for a new trial, although such errors may still be harmless and the "burden on the defendant is heavy" to show such an error. *United States v. Kramer*, No. 16-CR-00322-EJD-1, 2020 WL 5408165, at *5 (N.D. Cal. Sept. 9, 2020) (*quoting United States v. Thongsy*, 577, F.3d 1036, 10434 (9th Cir. 2009); *United States v. Espino*, 892 F.3d 1048, 1053 (9th Cir. 2018).

The United States refutes the claim that the weight of the evidence weighs heavily against the verdict and in support points to the trial record. The United States submits that the evidence supports the verdict. Further, the verdict does not rest on constitutionally impermissible grounds as the Court properly instructed the jury as to the law. The prosecutors did not make improper arguments, and much of Defendant's motion inaccurately summarizes what was said by prosecutors, takes quotes out of their context, and uses language to characterize the prosecution in a very negative light. The United States recognizes that Defendant is upset with the verdict of the jury. The United States does not address every allegation made in

Defendant's motion as the United States relies on this Court to make decisions based on the trial record and not on unsubstantiated accusations or the influence of inflammatory political rhetoric.

a. Allegations of Prosecutorial Misconduct Are Not Supported by the Record

Defendant now alleges that the prosecutor misstated the law and fact in its closing argument. Notably, like several of the issues that Defendant now raises, Defendant did not object to the prosecutor's arguments during or after closing.

The Supreme Court stated in *Boyde v. California*, 494 U.S. 370, 384 (1990):

> [A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence …, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law. Arguments of counsel which misstate the law are subject to objection and to correction by the court. E.g., *Greer v. Miller*, 483 U.S. 756, 765–766, and n. 8, 107 S. Ct. 3102, 3109, and n. 8, 97 L.Ed.2d 618 (1987). This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made. *Greer, supra*, at 766, 107 S. Ct., at 3109; *Darden v. Wainwright*, 477 U.S. 168, 179, 106 S. Ct. 2464, 2470, 91 L.Ed.2d 144 (1986); *United States v. Young*, 470 U.S. 1, 11–12, 105 S. Ct. 1038, 1044–1045, 84 L.Ed.2d 1 (1985); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S. Ct. 1868, 1873, 40 L.Ed.2d 431 (1974) ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations").

Defendant complains throughout their motion that the prosecutor misstated the law as to § 372 with regard to both force, threats, and intimidation[11]. The prosecutor, at least twice in her closing argument, directed the jury to follow the Court's instructions and apply the facts to the law given by the Court in the instructions. In one such example, the prosecutor stated to the jury:

> You are here to decide whether or not I have proven this case beyond a reasonable doubt, deciding each defendant individually. That is the purpose of the instructions. The purpose of the instructions is to guide you. It is to make sure your oath can be fulfilled. Because you are to use these instructions and apply the evidence that we've presented to you, by all of the parties, and make a determination of whether or not we've proven our case beyond a reasonable doubt.
> ECF No. 431-7 at 24.

Defendant fails to report that the United States told the jury very clearly during closing that "[a]ll of those acts show the purpose – and those statements show what the purpose was. It was to commit A, B, C, or D or the combination of them in order to prevent the detainees from being transported." ECF No. 431-7 at 51-52. The United States never told the jury that all they had to prove was that Defendant impeded. With regard to the prosecutor's statement regarding charged and pled co-conspirator Silva, it was in the context of an argument that if the jury believed, as the United States argued, that the co-conspirators had agreed to not let anyone leave the south gate, that it become physical at the south gate was reasonably foreseeable. That is not improper argument. ECF No. 433 at 62. Because of the limited time allowed, the prosecutor summarized the evidence but repeatedly urged

---

[11] Much is made of the prosecutors calling the charge "*Conspiracy to Impede*", claiming that translates into the prosecutor directing the jury to not follow the Court's instructions as to the elements. This would be similar, for example, a prosecutor referring to a violation of 18 USC § 1591 as human trafficking, without reference to the required use or force, fraud, or coercion. A mention of the name of the charge does not require a repeated reiteration of every element of the offense. Based on the totality of the record, this allegation is not substantiated.

the jury to look at the exhibits themselves, even telling them at the end of her argument to "… review the evidence, … look at it carefully, … hold me to my burden." ECF No. 431-7 at 54.

Defendant reasserts that the prosecutor erred by "mischaracterize[ing] the meaning of property of the officer". ECF No. 433 at 64. As addressed already in this response, the United States disagrees with the narrow definition of "property of the officer" to be "property of the federal government".

b. The Jury Verdict Form Correctly Distinguished Elements of the Offense Versus Means of Committing the Offense

Although Defendant did not request it prior to submission to the jury, Defendant now claims that a special verdict form should have been given as to the means "force, intimidation, or threat". ECF No. 65-67. Defendant confuses elements of the offense versus means of committing the offense. The Supreme Court has said that jurors do not have to be unanimous on the means by which a crime is committed. *Schad,* 501 U.S. at 631-32. Jurors further need not required to decide unanimously "which of several possible means the defendant used to commit an element of the crime". *Richardson v. United States*, 526 U.S. 813, 817 (1999). The special verdict form given by the Court to the jury properly separated the elements of the offense to ensure jury unanimity.

c. Selective Prosecution Allegation Is False and Unsubstantiated and Fails to Meet the Requirements Under *United States v. Armstrong*

Defendant now claims that a newspaper interview given by a former Acting United States Attorney[12] Barker after the verdict is "new information" that would

[12] Barker is incorrectly identified as the United States Attorney in Defendant's motion. While upon information and belief, Barker sought to be appointed as the United States Attorney and applied to be appointed by the Trump administration, he was not chosen. The undersigned has advised the parties that the undersigned, who was the prosecutor assigned this case from inception, had several conversations with Barker during which Barker never indicated anything but

require the Court to reconsider Defendant's prior pre-trial motion for dismissal on a claim of selective prosecution. The United States asserts that this "new information" is not reliable or even probative of any fact in issue. There are other former employees of DOJ, with equal access to the information in this case, who have expressed support for this case, albeit without contacting the media. Their statements are irrelevant to this motion, as are those of Mr. Barker. In the event the Court wishes to consider this claim, the United States would request the ability to brief the issue further. However, the United States would assert that the newspaper article does not entitle Defendant to hearing on a selective prosecution claim considering *United States v. Armstrong*, 517 U.S. 456 (1996). Defendant's claims are solely based on the comments of a former DOJ employee to a newspaper journalist post-verdict who was not involved in the investigation, the grand jury proceedings, or the trial.

**CONCLUSION**

For all the foregoing reasons, the United States respectfully submits that Defendant's motion should be denied in its entirety.

Dated: October 26, 2026

*s/ Lisa C. Cartier Giroux*
Lisa C. Cartier Giroux
Assistant United States Attorney

---

support for the undersigned and expressed no concerns regarding the charging of the conspiracy of the charged individuals.

**CERTIFICATE OF SERVICE**

I hereby certify that on October 26, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system.

*s/ Lisa C. Cartier Giroux*
Lisa C. Cartier Giroux
Assistant United States Attorney